# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

---

TREJOS HERMANOS SUCESORES S.A.,

        Plaintiff,

    v.

VERIZON COMMUNICATIONS, INC.,

        Defendant.

---

Index No. _____

Filed:  October 26, 2021

**SUMMONS**

TO THE DEFENDANT:

      YOU ARE HEREBY SUMMONED and required to serve your answering papers on Plaintiff's counsel within the time period specified in the attached notice.  If you fail to submit answering papers, summary judgment may be entered against you by default for the relief demanded in the notice of motion.  The action will be heard in the Supreme Court of the State of New York in and for the County of New York.  This action is brought in the County of New York pursuant to CPLR § 503(a) because Defendant is resident in the County of New York.  Plaintiff designates the County of New York as the place of trial.

Dated:  October 26, 2021

WILLIAMS & CONNOLLY LLP

By: _____

Ana C. Reyes
Benjamin W. Graham
650 Fifth Avenue, Suite 1500
New York, NY  10019
Tel.:  (202) 434-5000
Fax:  (202) 434-5029
Email: areyes@wc.com

*Counsel for Plaintiff*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 3 of 490     RECEIVED NYSCEF: 10/26/2021

TO:

Verizon Communications Inc.
1095 Avenue of the Americas
New York, NY 10036

C/O:

CT Corporation System
28 Liberty Street
New York, NY 10005

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

---

TREJOS HERMANOS SUCESORES S.A.,

               Plaintiff,

      v.

VERIZON COMMUNICATIONS, INC.,

               Defendant.

---

Index No. _____

Filed:  October 26, 2021

**NOTICE OF MOTION FOR**
**SUMMARY JUDGMENT**
**IN LIEU OF COMPLAINT**

---

PLEASE TAKE NOTICE that, upon the Summons; the Affidavit of Rolando Laclé Zúñiga dated October 26, 2021 and the exhibits thereto; the Report of Grant Thornton Int'l Ltd. dated October 26, 2021; and the accompanying Memorandum of Law in Support of the Motion for Summary Judgment in Lieu of Complaint dated October 26, 2021, Plaintiff will move this Court in the Motion Support Courtroom – Submissions Part, Room 130, at the New York County Courthouse, 60 Centre Street, New York, New York 10007, on December 6, 2021, at 9:30 a.m., or as soon thereafter as counsel may be heard, for an Order:

      (a)      granting Plaintiff summary judgment against Defendant, pursuant to New York Civil Practice Law and Rules ("CPLR") §§ 3213 and 5303, in recognition of the final and conclusive foreign country judgment rendered by the Tribunal Contencioso Administrativo y Civil de Hacienda in Costa Rica on July 19, 2017, including plus post-judgment interest from the date of this Court's judgment until the date of payment at the rate allowed by law; and

      (b)      granting such other and further relief this Court deems just and proper.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR §§ 2214(b) and 3213, answering papers, if any, must be served upon the undersigned counsel at least seven days before the return date of this motion.

Dated:  October 26, 2021

WILLIAMS & CONNOLLY LLP

By: _____

Ana C. Reyes
Benjamin W. Graham
650 Fifth Avenue, Suite 1500
New York, NY  10019
Tel.:    (202) 434-5000
Fax:    (202) 434-5029
Email:  areyes@wc.com

*Counsel for Plaintiff*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

TREJOS HERMANOS SUCESORES S.A.,

               Plaintiff,

     v.

VERIZON COMMUNICATIONS, INC.,

               Defendant.

Index No. _____

Filed: October, 22 2021

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTFF'S**
**MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT**

WILLIAMS & CONNOLLY LLP

Ana C. Reyes
Benjamin W. Graham
650 Fifth Avenue, Suite 1500
New York, NY 10019
Tel.: (202) 434-5000
Fax: (202) 434-5029

*Counsel for Plaintiff*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    A.    The Parties. ....................................................................................................... 2

    B.    Relationship Between the Parties........................................................................ 3

    C.    Verizon LLC Breaches Its Contract with the Institute........................................ 4

    D.    Verizon LLC Wrongfully Terminates the Contract with Trejos Hermanos. .......... 5

    E.    The Tribunal Contencioso Holds Verizon Inc. Jointly and Severally Liable. ........ 6

    F.    The Tribunal Contencioso Awards Damages to Trejos Hermanos. ...................... 6

    G.    Verizon Inc. Appeals the Judgment to the Supreme Court of Justice. .................. 9

LEGAL STANDARD........................................................................................................ 11

ARGUMENT ................................................................................................................... 11

I.    TREJOS HERMANOS IS ENTITLED TO SUMMARY JUDGMENT. ............................ 11

    A.    The Judgement Is Final and Conclusive. ............................................................ 12

    B.    No Grounds for Non-Recognition Exist. ............................................................. 14

    C.    None of the Discretionary Grounds for Non-Enforcement Applies. .................... 17

CONCLUSION................................................................................................................. 19

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# TABLE OF AUTHORITIES

*Abu Dhabi Commercial Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*,
    986 N.Y.S.2d 454 (1st Dep't 2014) ................................................................11, 12

*Atl. Ship Supply, Inc. v. M/V Lucy*,
    392 F. Supp. 179 (M.D. Fla. 1975) ..............................................................15

*Borja v. Dole Food Co., Inc.*,
    2002 WL 31757780 (N.D. Tex. Nov. 29, 2002) ....................................15

*Bridgeway Corp. v. Citibank*,
    45 F. Supp. 2d 276 (S.D.N.Y. 1999) ..........................................................15

*Canales Martinez v. Dow Chem. Co.*,
    219 F. Supp. 2d 719 (E.D. La. 2002) ........................................................15

*CDR Creances, S.A.S. v. Cohen*,
    23 Misc. 3d 1102(A) (N.Y. Sup. Ct. 2009) .............................................14

*CIBC Mellon Tr. Co. v. Mora Hotel Corp. NV*,
    100 N.Y.2d 215 (2003) ................................................................................12, 14

*Dunster Properties Ltd. v. Roc Apparel Group LLC*,
    No. 0600895/2007, 2007 WL 4476792 (N.Y. Sup. Ct. Dec. 17, 2007) ............13, 14

*Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*,
    470 F. Supp. 610 (S.D.N.Y. 1979) ............................................................16

*Griffith v. Gonzales-Alpizar*,
    421 P.3d 282 (Nev. 2018) ............................................................................15

*ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN*,
    206 F. App'x 68 (2d Cir. 2006) ....................................................16, 17, 18, 19

*In re B-E Holdings, Inc.*,
    228 B.R. 414 (E.D. Wis. Bankr. 1999) ....................................................14

*Interman Indus. Prods., Ltd. v. R.S.M Electron Power, Inc.*,
    37 N.Y.2d 151 (1975) ..................................................................................11

*John Galliano, SA. v. Stallion, Inc.*,
    15 N.Y.3d 75 (2010) ....................................................................................12

*Laminoirs-Trefileries-Cableries de Lens, S. A. v. Southwire Co.*,
    484 F. Supp. 1063 (N.D. Ga. 1980) ..........................................................14

*Mailänder Druckmaschinenfabrik GmbH & Co. K. G. v. Isenschmid Corp.*,
    88 A.D.2d 654 (2nd Dep't 1982) ................................................................11

ii

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

*McLane v. Marriott Inter., Inc.,*
    960 F. Supp. 2d 1351 (S.D. Fla. 2013) ...................................................................15

*Pariente v. Scott Meredith Literary Agency, Inc.,*
    771 F. Supp. 609 (S.D.N.Y. 1991) ........................................................................14

*Priscilla v. EFT Holdings, Inc.,*
    No. 653049/2016, 2016 WL 6026766 (Sup. Ct. N.Y. Cty. Oct. 5, 2016) ...............12

*Proyectos Orchimex de Costa Rica, S.A. v. E.I. du Pont de Nemours & Co.,*
    895 F. Supp. 1197 (M.D. Fla. 1995) ...................................................................15

*Really Useful Grp. v. Option Clause Entm't LLC,*
    No. 650843/2016, 2016 WL 3485381 (Sup. Ct. N.Y. Cty. June 23, 2016)..............12

*S.B. v. W.A.*, 38 Misc.3d 780,
    959 N.Y.S.2d 802 (Sup. Ct. 2012) ........................................................................18

*Sarl Louis Feraud Int'l v. Viewfinder Inc.,*
    406 F. Supp. 2d 274 (S.D.N.Y. 2005) .....................................................................18

*SC. Chimexim SA. v. Velco Enters. Ltd,*
    36 F. Supp. 2d 206 (S.D.N.Y. 1999) ...............................................................12, 17

*Sea Trade Maritime Corp. v. Stylianos Coutsodontis,*
    No. 653407/2011, 2014 WL 4787290 ...................................................................12

*Servipronto De El Salvador, S.A. v. McDonald's Corp.,*
    837 F. App'x 817 (2d Cir. 2020) .........................................................................13

*Shipcraft v. Arms Corp. of the Philippines, Inc.,*
    No. 150651/2012, 2013 WL 649415 (N.Y. Sup. Ct. Feb. 19, 2013)......................13

*Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.,*
    957 N.Y.S.2d 602 (Sup. Ct. N.Y. Cty. 2012), .........................................................12

*Sung Hwan Co., v. Rite Aid Corp.,*
    No. 112444/01, 2007 WL 1815995 (Sup. Ct. N.Y. Cty. May 1, 2007)....................12

*United States v. Ruiz,*
    536 U.S. 622 (2002)..............................................................................................17

**Statutes and Rules**

CPLR § 451 ....................................................................................................................13

CPLR § 3213 .........................................................................................................11, 13

iii

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CPLR § 5302 .................................................................................................... 1, 11, 12

CPLR § 5303 ........................................................................................................ 1, 12

CPLR § 5303 ............................................................................................................ 12

CPLR § 5304 .................................................................................... 1, 14, 16, 17, 18

iv

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# INTRODUCTION

Plaintiff Trejos Hermanos Sucesores S.A. ("Trejos Hermanos") seeks the domestication and enforcement of a foreign country money judgment (the "Judgment") entered against Verizon Communications, Inc. ("Verizon Inc.") in Costa Rica by the Tribunal Contencioso Administrativo y Civil de Hacienda (the "Tribunal Contencioso"). The Judgment awarded damages in the principal amount USD 51,355,812, along with certain statutory adjustments. The Judgment was entered after trial by the Tribunal Contencioso and upheld on appeal by the First Chamber of the Supreme Court of Justice, the highest appellate court in Costa Rica. The Judgment satisfies the requirements of CPLR §§ 5302 and 5303 because it grants the "recovery of a sum of money" and is "final, conclusive and enforceable" in Costa Rica.

None of the grounds for non-recognition under CPLR § 5304(a) apply. *First*, Costa Rica's judicial system provides for the impartial administration of justice and comports with notions of due process. *See* CPLR § 5304(a)(1). *Second*, the Tribunal Contencioso had "personal jurisdiction over the defendant," which voluntarily appeared in Costa Rica and litigated the claims through trial and appeal. CPLR § 5304(a)(2). *Third*, the Tribunal Contencioso had jurisdiction over the subject matter. *See* CPLR § 5304(a)(3). Verizon Inc. challenged subject-matter jurisdiction before both the trial court and the appellate court, losing in both forums. That issue is settled, and Verizon Inc. is collaterally estopped from challenging the Court's subject-matter jurisdiction here. Nor could Verizon Inc. plausibly establish any discretionary basis on which the Court could refuse recognition. *See* CPLR § 5304(b).

Plaintiff is thus entitled to judgment as a matter of law and respectfully requests that the Court grant summary judgment in its favor.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## STATEMENT OF FACTS

As described below, this case involves a public printing contract in Costa Rica. In 2000, a subsidiary of Verizon Inc. contracted with the Costa Rican Institute of Electricity (the "Institute") for the printing and distribution of telephone directories across the country. To perform that contract, Verizon Inc.'s subsidiary subcontracted its printing obligations to Trejos Hermanos. But in 2004, Verizon Inc.'s subsidiary breached its contract with the Institute and attempted unilaterally to change the format and content of the directories for the following year. When the subsidiary refused to remedy its breach, the Institute terminated the contract for cause. Verizon Inc.'s subsidiary then defaulted on its obligations to Trejos Hermanos and terminated the subcontract. Trejos Hermanos filed suit against the Institute, Verizon Inc., and its subsidiary before the Tribunal Contencioso. Verizon Inc. appeared and defended the suit. Following trial, the Tribunal Contencioso entered judgment in favor of Trejos Hermanos in the amount of USD 51,355,812, along with certain statutory adjustments (for indexation, interest, and legal fees and costs). Verizon Inc. appealed the judgment, but the Supreme Court of Justice rejected its arguments (and its motion for reconsideration) and upheld the Judgment.

### A.     The Parties.

This matter involves a century-old, family-run business, Trejos Hermanos. Founded in 1912 by four brothers, the company grew from a small printing press to a large printing house that distributed materials throughout the Caribbean and parts of Miami. *See* Laclé Aff. ¶ 2; Ex. A, Complaint at 6. Trejos Hermanos was continuously owned and run by the Trejos family, most recently by Alvaro Trejos Fonseca, the great grandson of an original founder. The family business ended with him. The termination of the contract central to the Costa Rican dispute made Trejos Hermanos insolvent.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Verizon Inc. is a company incorporated in the State of Delaware and headquartered in New York City.

### B.     Relationship Between the Parties

On February 28, 2002, Trejos Hermanos entered into a "Master Purchase Agreement" with an entity named General Telephone Directory Company C por A.  Ex. B, Judgment at 3. On May 16, 2002, Trejos Hermanos's counterparty gave notice that it had changed its name to Verizon Information Service Costa Rica LLC ("Verizon LLC").  *Id.* at 20.  That name change was the result of an upstream corporate restructuring.  On June 30, 2000, Bell Atlantic Corp. merged with GTE Corp., and the resulting company became Verizon Communications Inc. (the defendant in the present suit).  *See* Ex. F, SEC Filing; Ex. G, Verizon Website; Ex. B, Judgment at 20.  At the time of the events underlying this lawsuit, Verizon Inc. was the parent of Trejos Hermanos's contractual counterparty, Verizon LLC.

The Master Purchase Agreement between Trejos Hermanos and Verizon LLC related to another contract with the Institute.  *See* Ex. B, Judgment at 37 (describing the subcontracting relationship between Trejos Hermanos and Verizon LLC, on the one hand, and the Verizon Group and the Institute, on the other).  In 1999, the Institute issued a public tender for the provision of telephone directories in Costa Rica.  Ex. B, Judgment at 16.  The bidding terms provided that if a bidder is part of a larger business group or structured beneath a holding company, it must submit financial statements, "in which case the business group would be jointly and severally liable with the bidder for all contractual obligations."  *Id.*

On August 10, 1999, a group of companies that referred to itself as the GTE Consortium submitted a bid to participate in the public tender.  *Id.*  The GTE Consortium was composed of three entities:  GTE Information Services Incorporated, GTE Directories Corporation, and General Telephone Directory Company C por A.  *Id.* at 59.  As the bidding terms required, the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

GTE entities submitted their financial statements together and accepted joint and several liability for all contractual obligations. *Id.* at 16. The ultimate parent company, GTE Corp., also executed a separate guaranty of the GTE Consortium's obligations, pursuant to which it agreed to be jointly liable for the obligations of the bidding entities. *See* Ex. E, GTE Guaranty. The GTE Consortium won the tender and, on March 10, 2000, executed a contract with the Institute, which was styled as a "Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between [the Institute] and GTE" (the "Public Contract"). Ex. B, Judgment at 17.

As discussed, the GTE Consortium was part of a merger and corporate restructuring in June 2000. GTE Corp., the parent that had guaranteed the GTE Consortium's performance, merged with Bell Atlantic Corp. and became Verizon Inc. Thereafter, the subsidiaries that had contracted with the Institute changed their names: GTE Information Services, Inc. became Verizon Information Services, Inc., and General Telephone Directory Company C por A became Verizon Information Service Costa Rica, LLC. *Id.* at 18. After the corporate restructuring, the Verizon entities "issued Statements of Continued Commitment" to the Institute "with respect to the rights and obligations set forth in the consortium agreement of August 9, 1999; in the bid submitted to [the Institute] by GTE Consortium on August 26, 1999; and in the contract executed by and between ICE and GTE Consortium on March 10, 2000." *Id.*

### C.    Verizon LLC Breaches Its Contract with the Institute.

In 2004, Verizon LLC sought unilaterally to change the format and content of the telephone directories it had contracted to deliver in Costa Rica. *See* Ex. B, Judgment at 19–21 (noting that Verizon LLC wanted to exclude certain provinces and cities from its listings). The Institute objected to Verizon LLC's attempt "to unilaterally amend the contractual conditions agreed upon[.]" *Id.* at 20. When Verizon LLC declined to remedy its breach, the Institute

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

initiated a formal procedure for termination of the contract on December 14, 2004. *Id.* at 21.

The procedure concluded on June 1, 2005 with the termination of the Public Contract between

Verizon LLC and the Institute. *Id.*

    **D.    Verizon LLC Wrongfully Terminates the Contract with Trejos Hermanos.**

    On September 2, 2005, Verizon LLC informed Trejos Hermanos that it was terminating

the Master Purchase Agreement. Ex. B, Judgment at 23. The Tribunal Contencioso determined

that "when terminating its contractual relationship with the plaintiff company, [Verizon LLC]

falsely indicated to it that the party responsible for the contractual breach was [the Institute]" and

that Verizon LLC thereby "committed a willful breach" of the Master Purchase Agreement. *Id.*

at 43. After reviewing the evidence presented at trial, the Tribunal Contencioso concluded "from

the proven facts," that Verizon LLC acted with an "awareness and willingness . . . to breach the

contractual relationship with [the Institute] . . . , know[ing] that such breach of contract would

openly affect its relationship with the plaintiff." *Id.* at 47.

    Under Costa Rican law, Verizon LLC's willful misconduct rendered "ineffective[] any

agreed exemption or limitation of liability" in the contract and resulted in Verizon LLC's

liability for consequential damages. *Id.* at 47, 49 (citing Article 701 of the Costa Rican Civil

Code). Having found that Verizon LLC committed a willful breach, the Tribunal Contencioso

held it liable for Trejos Hermanos's damages. Verizon LLC's "malicious breach" worked "to

the detriment of the plaintiff company" Trejos Hermanos and "therefore generates contractual

liability" for any consequential damages. *Id.* at 54–55. Ultimately, the Tribunal Contencioso

found it probable that Trejos Hermanos would have remained in business but for the unlawful

termination. *Id.* at 69.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### E.     The Tribunal Contencioso Holds Verizon Inc. Jointly and Severally Liable.

Under Costa Rican law, liability adopts a practical rather than a formalistic approach. Liability is not limited by corporate formalities but rather encompasses any "economic interest group" that exists when "a group of individuals or legal entities maintain common links and interests and coordinate their activities to achieve a certain common objective" such that "there is control, autonomy and unity of behavior in the market." Ex. B, Judgment at 62.  Noting the initial bid on behalf of the "GTE Consortium," the Tribunal Contencioso concluded that Verizon Inc., as the corporate successor to GTE Corp., was part of the same economic group as the three subsidiaries that had contracted with the Institute.  *Id.* at 56.  The Tribunal Contencioso concluded under Costa Rican law that "the existence of the economic interest group binds [Verizon Inc.] in matters of liability." *Id.* at 58.  The Judgment therefore holds Verizon Inc. jointly and severally liable with Verizon LLC.  *Id.*

### F.     The Tribunal Contencioso Awards Damages to Trejos Hermanos.

Verizon LLC's wrongful termination of the contract forced Trejos Hermanos to shutter operations.  Trejos Hermanos took out substantial loans to lease new warehouses and purchase new equipment that could accommodate Verizon LLC's specific printing specifications.  Ex. B, Judgment at 63–68.  It also made extensive investments in working capital to obtain the necessary manpower and inventory to handle the expected business.  After termination, Trejos Hermanos was left with machinery and inventory that it could not use.  Mr. Trejos Fonseca attempted to save the family business.  But he could not.  The loans taken out in reliance on the contract and the loss of expected operational cash ultimately made Trejos Hermanos insolvent.

Trejos Hermanos claimed several categories of damages in its complaint before the Tribunal Contencioso.  *See id.* at 70–71.  Those claims generally included the sunk costs that Trejos Hermanos spent in reliance on the contract, the lost profits that it expected under the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 3    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 17 of 490    RECEIVED NYSCEF: 10/26/2021

contract, and lost opportunity costs due to the interruption of its operations. *Id.* The Tribunal Contencioso considered each claim of damages in detail, based on the expert testimony prepared by a licensed "Professional in Economic Sciences" and submitted by Trejos Hermanos for examination by Verizon Inc. *Id.* at 71. The Tribunal Contencioso ultimately accepted and entered judgment on damages in the principal amount of USD 51,355,812, along with statutory adjustments for indexation, interest, and legal fees.

The Tribunal Contencioso appointed an independent "judicial expert Ramón Humberto Romero Rodríguez, Certified Public Accountant and Expert Actuary," to test and verify the evidence submitted by Trejos Hermanos. *Id.* at 84. Mr. Rodríguez's figures agreed with those of Trejos Hermanos's expert, and Verizon Inc. "did not object to or provide evidence that disproved the methodology or the estimated dates for future value of the losses incurred, the interest rates applied, projections, calculations, methodologies or conclusions obtained." *Id.* at 76. As a result, the Tribunal Contencioso found no basis in the evidence to challenge the damages figures above. *Id.*[1]

The principal figure of damages includes six categories, which Trejos Hermanos pleaded and established at trial:

    a.      USD 2,582,156 for the costs of investment in machinery, *id.* at 72;

    b.      USD 2,860,696 for the costs of increased inventories, *id.* at 72;

    c.      USD 983,825 for interest paid on financing the investment and inventory, *id.* at 74;

    d.      USD 8,806,872 for lost operating cash flows under the Master Purchase Agreement between 2004 and 2013, *id.* at 73;

---

[1] Verizon Inc. had the opportunity to retain its own expert and present evidence to contest Trejos Hermanos' damages figures, but declined to do so.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

e.  USD 7,237,068 for certain losses between 2004 and 2007, *id.* at 73; and

f.  USD 28,885,195 for interruption of operations, i.e., the future amounts on a discount-cash-flow basis that Trejos Hermanos failed to earn when its main client, Verizon LLC, breached its agreement and caused the termination of Trejos Hermanos's operations, *id.* at 74–75.

The Tribunal Contencioso did not award Trejos Hermanos every category of damage it sought. To the contrary, the Tribunal Contencioso denied Trejos Hermanos its claims for (i) USD 7,912,999 corresponding to lost cash flows for the printing of directories in the Dominican Republic between 2004 and 2013, *see id.* at 5, 76; and (ii) moral damages in the amount of USD 5,000,000, *id.* at 5, 77–89.

Finally, the Tribunal Contencioso applied statutory adjustments to account for indexation, interest, and legal costs. The adjustments include three components. *First*, the Tribunal Contencioso ordered that "[t]he amounts subject to the judgment are indexed in order to update the purchasing power of the amounts indicated[.]" *Id.* at 90. In Costa Rican practice, damages calculations are submitted with the filing of the complaint. Laclé Aff. ¶ 4. In this case, that meant Trejos Hermanos submitted its expert analysis in 2008, using a cut-off date of August 31, 2008. *Id.*; *see also* Ex. A, Complaint at 52; Ex. B, Judgment at 72–75. The indexing adjustment accounts for inflation and adjusts the figures to present-day dollar figures. Laclé Aff. ¶ 5. *Second*, the Tribunal Contencioso ordered that "the legal interest established in Article 1163 of the Civil Code must be applied to . . . the net profit component" of the award from the date of their calculation on August 30, 2008 "until they are fully paid." Ex. B, Judgment at 90. In American practice, this is akin to routine pre-judgment interest. *Third*, Verizon Inc. was ordered

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

to pay Trejos Hermanos's legal costs, as provided by Article 193 of the Code of Contentious Administrative Procedure. *Id.* at 91.

These amounts are readily calculable. For example, using a calculation date of October 15, 2021, indexing brings Trejos Hermanos's damages figure to USD 76,432,427; pre-judgment interest on net profits increases that figure by USD 7,089,284; and statutory legal fees and costs amount to USD 10,449,155. *See* Grant Thornton Report at 1. Thus, the final figure of damages owed to Trejos Hermanos as of October 15, 2021 is USD 93,970,866. *Id.* Under the Judgment, the indexation and pre-judgment interest will continue to increase until the date on which the Court domesticates the judgment (at which point New York post-judgment interest will apply).

### G.    Verizon Inc. Appeals the Judgment to the Supreme Court of Justice.

The Tribunal Contencioso entered judgment on July 19, 2017. Verizon Inc. timely filed an appeal to the Supreme Court of Justice on September 4, 2017, arguing several grounds of error.[2] The Supreme Court of Justice heard argument on the appeal and rendered its decision on June 25, 2020. *See* Ex. C, Appellate Decision. Two of Verizon Inc.'s grounds are potentially relevant to this enforcement action under CPLR Article 53:

*First*, Verizon Inc. argued that the Master Purchase Agreement between Verizon LLC and Trejos Hermanos contained an arbitration clause that divested the Tribunal Contencioso of subject-matter jurisdiction. *See* Ex. C, Appellate Decision at 3. The Supreme Court of Justice rejected this argument, relying on a settled line of precedent and holding that the Tribunal Contencioso had subject-matter jurisdiction over these claims due to their relationship to the Institute, a public entity. *Id.* In terms of U.S. jurisprudence, the Tribunal Contencioso had non-

---

[2] In Costa Rican practice, this is called a *casacion*, a procedure that addresses legal issues but does not reconsider factual findings. For ease of reference and comparison to U.S. procedure, we refer to it as an "appeal."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

delegable jurisdiction over administrative contracts involving public entities (e.g., the Institute) and related claims.

*Second*, Verizon Inc. argued that the Tribunal Contencioso also lacked subject-matter jurisdiction because the issues decided were matters of private law, not public law. *Id.* at 3–4. The Supreme Court of Justice also rejected this argument, holding that the Tribunal Contencioso's ruling turned on "the termination of the administrative contract" with the Institute and that the Master Purchase Agreement between Verizon LLC and Trejos Hermanos was a "subcontract[] for the execution of the contract" with the Institute. *Id.* at 3. Thus, the Tribunal Contencioso acted within its competence.

Verizon Inc. also raised several other grounds for appeal, covering the interpretation of applicable law, the temporal scope of the damages calculation, the effect of contractual liability exclusions, the nature of subcontracting under Costa Rican law, the admissibility of certain expert testimony, the application of a statute of limitations, and a general objection to the trial court's assessment of the evidence. *See generally* Ex. C, Appellate Decision at 4–6. The Supreme Court of Justice considered and rejected each ground on appeal.

Following the Supreme Court of Justice's decision, Verizon Inc. filed a motion for clarification, which sought to reargue or urge reconsideration of the decision. Verizon Inc. criticized the Supreme Court of Justice's analysis as "cursory," impoverished, "weak," and "legally invalid." Ex. D, 2d Appellate Decision at 2. The Supreme Court of Justice questioned Verizon Inc.'s conduct. The rules of civil procedure did not permit Verizon Inc. a second appeal on the matter, and the court's determinations following an adversary proceeding "produces *res judicata* material." *Id.* at 9. Looking past the procedural violations of Verizon Inc.'s second appeal, the Supreme Court of Justice found that the merits were equally lacking: Verizon Inc. did not allege any substantive error of law in the Supreme Court's initial opinion.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## LEGAL STANDARD

A plaintiff may move for summary judgment in lieu of complaint when "an action is based . . . upon [a] judgment." CPLR § 3213. The purpose of CPLR § 3213 is to provide a speedy and efficient procedure of securing judgment on adjudicated claims for the payment of money, which are presumptively meritorious and for which "a formal complaint is superfluous, and even the delay incident upon waiting for an answer and then moving for summary judgment is needless." *Interman Indus. Prods., Ltd. v. R.S.M Electron Power, Inc.*, 37 N.Y.2d 151, 154 (1975). Foreign country judgments are enforceable by motion under CPLR § 3213 when they are "final, conclusive, and enforceable" in their issuing jurisdiction. CPLR § 5302; *see also, e.g.*, *Mailänder Druckmaschinenfabrik GmbH & Co. K. G. v. Isenschmid Corp.*, 88 A.D.2d 654, 654 (2nd Dep't 1982).

## ARGUMENT

The Judgment entered by the Tribunal Contencioso is final, conclusive, and enforceable. Trejos Hermanos is therefore entitled to summary judgment.

## I.    TREJOS HERMANOS IS ENTITLED TO SUMMARY JUDGMENT.

"New York has traditionally been a generous forum in which to enforce judgments for money damages rendered by foreign courts." *Abu Dhabi Commercial Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*, 986 N.Y.S.2d 454, 457 (1st Dep't 2014) (citing *CIBC Mellon Tr. Co. v. Mora Hotel Corp. NV*, 100 N.Y.2d 215, 221 (2003)). New York law proceeds from the premise that judgments rendered by foreign courts are entitled to enforcement "'under the doctrine of comity . . . [a]bsent some showing of fraud in the procurement of the foreign country judgment or that recognition of the judgment would do violence to some strong public policy of this State.'" *Id.* (quoting *Sung Hwan Co. v. Rite Aid Corp.*, 7 N.Y.3d 78, 82 (2006)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Article 53 of the CPLR codifies the longstanding case law enforcing money judgments on principles of comity. *Id.*

A judgment creditor "'does not seek any new relief against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the foreign country money judgment and converting it into a New York judgment.'" *CIBC Mellon*, 100 N.Y.2d at 222 (quoting *Lenchyshyn v Pelko Elec.*, 281 A.D.2d 42, 49 (4th Dep't 2001)). Accordingly, New York courts routinely grant recognition to foreign money judgments on motions for summary judgment. *See, e.g.*, *John Galliano, SA. v. Stallion, Inc.*, 15 N.Y.3d 75, 82 (2010) (enforcing French judgment); *Priscilla v. EFT Holdings, Inc.*, No. 653049/2016, 2016 WL 6026766 (Sup. Ct. N.Y. Cty. Oct. 5, 2016) (enforcing Singaporean judgments); *Really Useful Grp. v. Option Clause Entm't LLC*, No. 650843/2016, 2016 WL 3485381, at *3 (Sup. Ct. N.Y. Cty. June 23, 2016) (enforcing English judgment); *Sea Trade Maritime Corp. v. Stylianos Coutsodontis*, No. 653407/2011, 2014 WL 4787290, at *5 (enforcing Spanish judgment); *Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.*, 957 N.Y.S.2d 602, 608 (Sup. Ct. N.Y. Cty. 2012), *aff'd*, 973 N.Y.S.2d 197 (1st Dep't 2013) (enforcing Bahraini judgment); *Sung Hwan Co., v. Rite Aid Corp.*, No. 112444/01, 2007 WL 1815995, at *3 (Sup. Ct. N.Y. Cty. May 1, 2007) (enforcing Korean judgment); *SC. Chimexim SA. v. Velco Enters. Ltd*, 36 F. Supp. 2d 206, 216 (S.D.N.Y. 1999) (enforcing Romanian judgment).

### A.    The Judgment Is Final and Conclusive.

New York law provides that a foreign country judgment is enforceable if it is "final, conclusive and enforceable" "under the law of the foreign country where rendered[.]" CPLR § 5302. A foreign country judgment is "conclusive" where "it grants or denies recovery of a sum of money." CPLR § 5303. In considering whether a foreign judgment meets this standard in the

12

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

17 of 24

jurisdiction where it was rendered, courts may take judicial notice of foreign law.  CPLR § 451

l(b) ("Every court may take judicial notice without request of . . . the laws of foreign countries.").

The Judgment entered by the Tribunal Contencioso is "final, conclusive and enforceable"

under Costa Rican law.  The Tribunal Contencioso entered the Judgment following a trial on the

merits, and Verizon Inc. has exhausted its avenues of appeal.  *See* Laclé Aff. ¶ 8.

The Judgment is also a money judgment, awarding USD 51,355,812 with interest and

legal costs.  It does not order specific performance, assign any rights or title, or prescribe other

relief.  The Judgment can be satisfied by money alone.  The total amount that Verizon Inc. owes

is readily calculable.  Assuming a payment date of October 15, 2021, the amount reached

USD 93,970,866.  Straightforward arithmetic can update that figure for any future payment date.

The calculation of interest and legal costs is no barrier to enforcement.  "[A] party

seeking to domesticate an unsatisfied foreign judgment under Article 53 may be entitled to an

award of interest payment by New York court" where the foreign judgment so instructs.

*Servipronto De El Salvador, S.A. v. McDonald's Corp.*, 837 F. App'x 817, 819 (2d Cir. 2020).

Courts enforce judgments awarding interest at a specified rate and time period without

specifying what that recovered sum would be.  For example, in *Shipcraft v. Arms Corp. of the

Philippines, Inc.*, No. 150651/2012, 2013 WL 649415, at *9 (N.Y. Sup. Ct. Feb. 19, 2013), the

court granted plaintiff's motion pursuant to CPLR § 3213 for summary judgment in lieu of

complaint recognizing and enforcing a Danish judgment.  The New York Supreme Court

rendered a judgment for the amount of the foreign country judgment, or DKK 240,829.00, plus

interest at a rate of 9% from May 25, 2011 (the date of the Danish judgment) to February 19,

2013 (the date of enforcement of the Danish judgment).  The court instructed that the final

amount was to be calculated by the Clerk.  *Id.*  In *Dunster Properties Ltd. v. Roc Apparel Group*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

*LLC*, No. 0600895/2007, 2007 WL 4476792 (N.Y. Sup. Ct. Dec. 17, 2007), the court awarded judgment for the U.S. dollar equivalent of 102,520 British pounds plus 8% interest through the entry of judgment.

Nor is the need to reference interest rates and statutory formulas a barrier to enforcement. Courts often consult outside sources in calculating damages. For example, in *CDR Creances, S.A.S. v. Cohen*, 23 Misc. 3d 1102(A) (N.Y. Sup. Ct. 2009), the plaintiff sought to enforce a French judgment for €1.89 million, and the court entered judgment in favor of plaintiff for $2.21 million. *Id.* at *1. The court calculated the amount of damages in dollars "by applying the conversation rate of 1.17135 dollars to the euro that was in effect on May 20, 2003, and applying the interest rate of 7.11% which was employed by the French court." *Id.*; *see also In re B-E Holdings, Inc.*, 228 B.R. 414, 420, n.12 (E.D. Wis. Bankr. 1999) (calculating damages awarded in a Peruvian judgment using tables completed by an expert appointed by the Peruvian Court); *Laminoirs-Trefileries-Cableries de Lens, S. A. v. Southwire Co.*, 484 F. Supp. 1063, 1071 (N.D. Ga. 1980) (consulting the Wall Street Journal to determine the exchange rate from francs to dollars).

### B.     No Grounds for Non-Recognition Exist.

None of the three grounds for mandatory non-recognition apply here. *First*, Costa Rica's judicial system provides for the impartial administration of justice and comports with notions of due process. *See* CPLR § 5304(a)(1). New York law "does not demand that the foreign tribunal's procedures exactly match those of New York"; it is "satisfied if the foreign court's procedures are compatible with the requirements of due process of law." *CIBC Mellon*, 100 N.Y.2d at 222; *see also Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F. Supp. 609, 616 (S.D.N.Y. 1991) ("it is well established that mere divergence from American procedure does not render a foreign judgment unenforceable").

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

14

Costa Rican courts easily clear that threshold. In considering whether Costa Rica provided a "legal system that would treat litigants fairly," the Eastern District of Louisiana concluded:

> "The Constitution and law [of Costa Rica] provide for an independent judiciary, and the Government generally respects this provision in practice. The Constitution provides for the right to a fair trial, and an independent judiciary vigorously enforces this right." U.S. Dept. of State, Country Report on Human Rights Practices, Costa Rica, 2001 (released Mar. 4, 2002). Further, . . . Costa Rica has one of the more independent, advanced judicial systems in Latin America.

*Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 734–35 (E.D. La. 2002).[3] Other courts routinely find that Costa Rica is an adequate forum providing for due process and fair proceedings. *See, e.g.*, *Griffith v. Gonzales-Alpizar*, 421 P.3d 282 (Nev. 2018) (affirming enforcement of Costa Rican judgment); *McLane v. Marriott Inter., Inc.*, 960 F. Supp. 2d 1351 (S.D. Fla. 2013) (finding that Costa Rican courts provided an adequate alternative forum and dismissing on grounds of *forum non conveniens*); *Borja v. Dole Food Co., Inc.*, 2002 WL 31757780, at *4 (N.D. Tex. Nov. 29, 2002) ("Costa Rica provides an adequate forum"); *Proyectos Orchimex de Costa Rica, S.A. v. E.I. du Pont de Nemours & Co.*, 895 F. Supp. 1197 (M.D. Fla. 1995) (accepting evidence that "Costa Rica is a civil law jurisdiction with a reliable and impartial court system"); *Atl. Ship Supply, Inc. v. M/V Lucy*, 392 F. Supp. 179, 183 (M.D. Fla. 1975) (granting "full faith and credit" to the "judgment and decree of the Court of Costa Rica").[4]

---

[3] The current version of the State Department report provides the same. *See* U.S. Dept. of State, Country Report on Human Rights Practices, Costa Rica, 2020 (released Mar. 30, 2021), *available at* https://www.state.gov/reports /2020-country-reports-on-human-rights-practices/costa-rica/

[4] By contrast, courts concluded that a foreign judicial system is not fair and impartial and did not comport with the requirements of due process, where the country was "embroiled in a civil war" and in a "state of chaos," where the "Constitution was ignored," "justices and judges served at the will of the leaders of the warring factions," and "due process rights of litigants were often ignored." *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*Second*, the Tribunal Contencioso had personal jurisdiction over Verizon Inc., which voluntarily appeared in Costa Rica and litigated the claims through trial and appeal. *See* CPLR § 5304(a)(2). Verizon Inc.'s participation precludes it from raising any defense on grounds of personal jurisdiction.

*Third*, the Tribunal Contencioso had jurisdiction over the subject matter of the dispute. *See* CPLR § 5304(a)(3). Verizon Inc. challenged subject-matter jurisdiction before both the trial court and the appellate court, losing in both forums. That issue is settled, and Verizon Inc. is collaterally estopped from challenging the Court's subject-matter jurisdiction here. When considering enforcement of foreign judgments, courts "grant preclusive effect to the [foreign court's] finding" where the defendant "had the opportunity to fully and fairly litigate the [] issue" in that forum. *ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN*, 206 F. App'x 68, 70 (2d Cir. 2006). In so doing, courts apply the well-worn rules of collateral estoppel. *See Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F. Supp. 610, 616 (S.D.N.Y. 1979) ("[W]hen an issue that has necessarily been decided in the prior action is decisive of the subsequent action and the party seeking to avoid the estoppel had a full and fair opportunity to litigate the issue in the prior action, that party is bound by the prior decision."). The Supreme Court of Justice addressed and decided Verizon Inc.'s challenges to the Tribunal Contencioso's jurisdiction; that determination was necessary to its decision.

Collateral estoppel requires that the first court had subject-matter jurisdiction. Verizon Inc. might (mistakenly) argue that the Tribunal Contencioso's decision concerning its own subject-matter jurisdiction cannot be the basis for collateral estoppel on that issue. But that argument would miss the mark: Verizon Inc. litigated the question of the Tribunal Contencioso's subject-matter jurisdiction on appeal before the Supreme Court of Justice. There

16

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

can be no question that the Supreme Court of Justice had subject-matter jurisdiction to decide matters of Costa Rican law, including the scope of the Tribunal Contencioso's authority. *See, e.g.*, *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (a court "always has jurisdiction to determine its own jurisdiction"); *ICC Chem. Corp.*, 206 F App'x at 70 (noting that the "Singapore Court plainly had subject matter jurisdiction to decide whether the parties agreed to arbitrate in New York, and the Singapore Court's finding on that issue, which is entitled to comity, answers ICC's attack on its jurisdiction over the merits of TCL's suit").

### C.   None of the Discretionary Grounds for Non-Enforcement Applies.

Verizon Inc. has "the burden of proving that a discretionary basis for non-recognition pursuant to CPLR § 5304(b) applies." *S. C. Chimexim*, 36 F. Supp. 2d at 212. As the record in this case indicates, Verizon Inc. could not hope to meet that burden. CPLR § 5304(b) sets forth nine grounds on which the Court may, in its discretion, decline to recognize and enforce a foreign judgment:

1. the defendant in the proceeding in the foreign court did not receive notice of the proceeding in sufficient time to enable the defendant to defend;

2. the judgment was obtained by fraud that deprived the losing party of an adequate opportunity to present its case;

3. the judgment or the cause of action on which the judgment is based is repugnant to the public policy of this state or of the United States;

4. the judgment conflicts with another final and conclusive judgment;

5. the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court;

6. in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action;

7. the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

8.       the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law; or

9.       the cause of action resulted in a defamation judgment obtained in a jurisdiction outside the United States . . . .

CPLR § 5304(b)(1)-(9). None of these grounds applies.

Verizon Inc. received notice of the proceedings and actively participated in them for twelve years through an evidentiary trial and multiple appeals. *See* CPLR § 5304(b)(1), (6), (8). There is no suggestion that the judgment is "repugnant to the public policy of this state" or "conflicts with another final and conclusive judgment." CPLR § 5304(b) (3), (4); *see Sarl Louis Feraud Int'l v. Viewfinder Inc.*, 406 F. Supp. 2d 274, 280 (S.D.N.Y. 2005) (the test "is not whether the foreign law on which the judgment depends is perfectly congruent with domestic law on the same subject, or whether the identical judgment could have been obtained in New York on the same facts"), *rev'd on other grounds*, 489 F.3d 474 (2d Cir. 2007); *S.B. v. W.A.*, 38 Misc. 3d 780, 959 N.Y.S.2d 802, 821 (Sup. Ct. 2012), *aff'd*, 135 A.D.3d 792 (2016) (judgment enforceable even where foreign law "may be more expansive than the laws of New York"). Nor is there any indication of doubt about the integrity of the court or that the specific proceeding lacked due process. CPLR § 5304(b)(7), (8).

As with its objection to subject-matter, Verizon Inc. has raised before the specter of an arbitration agreement. *See* Ex. C, Appellate Decision at 2, 3. And as before, that issue has already been decided, and Verizon Inc. is precluded from raising it again here. As the Second Circuit held in *ICC Chem. Corp.*, the "[Costa Rican] Court plainly had subject matter jurisdiction to decide whether the parties agreed to arbitrate . . . , and the [Costa Rican] Court's finding on that issue, which is entitled to comity, answers [Verizon Inc.'s] attack on its jurisdiction over the merits of [Trejos Hermanos's] suit." 206 F App'x at 70.

In short, none of the grounds for non-recognition applies.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## CONCLUSION

For these reasons, Trejos Hermanos respectfully requests that the Court enter an order (i) granting summary judgment; (ii) setting a date for final calculation of the statutory adjustments owed under the Judgment; (iii) setting a date by which Plaintiff should submit the updated calculation to the Court; (iv) directing the Clerk of the Court to enter judgment in favor of Trejos Hermanos against Verizon Inc. in the final amount so calculated; and (v) imposing post-judgment interest from the date of entry until payment.

Dated:  October 26, 2021

WILLIAMS & CONNOLLY LLP

By: _____

Ana C. Reyes
Benjamin W. Graham
650 Fifth Avenue
New York, NY  10019
Tel.:    (202) 434-5000
Fax:    (202) 434-5029
Email:  areyes@wc.com

*Counsel for Plaintiff*

19

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

---

TREJOS HERMANOS SUCESORES S.A.,

Plaintiff,

v.

VERIZON COMMUNICATIONS, INC.,

Defendant.

Index No. _____

Filed: October 26, 2021

**AFFIDAVIT OF ROLANDO**
**LACLÉ ZÚÑIGA**

---

**Rolando Laclé Zúñiga**, an attorney duly admitted to practice law, hereby affirms the

truth of the following under penalty of perjury

1. I am an attorney licensed to practice law in Costa Rica. I have been admitted to

the bar for more than thirty years. I have prepared this affidavit in English. I am familiar with

the facts herein and base this affidavit upon my knowledge and understanding of the legal system

in Costa Rica and the records of the proceedings brought by Trejos Hermanos Sucesores S.A.

("Trejos Hermanos") against Verizon Communications, Inc. ("Verizon Inc.") before the Tribunal

Contencioso Administrativo y Civil de Hacienda in Costa Rica (the "Tribunal Contencioso").

2. Trejos Hermanos Sucesores S.A. is a Costa Rican company founded in 1912 by

the four Trejos brothers. It operated in the printing business and, more specifically, in the

printing of telephone directories throughout the Caribbean. On 15 December 2008, it filed suit

against Verizon Inc. before the Tribunal Contencioso. A true and correct copy of the Complaint

is attached as **Exhibit A**.

3. The Tribunal Contencioso conducted a trial of Trejos Hermanos's claims on 28

and 29 June 2017. It rendered its decision on 19 July 2017. A true and correct copy of the

foreign judgment entered by the Tribunal Contencioso in favor of Trejos Hermanos against

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Verizon Inc. is attached as **Exhibit B**.  The Judgment is "final, conclusive and enforceable" under Costa Rican law.

4.       In Costa Rican litigation, damages calculations are typically submitted with the filing of the complaint.  Trejos Hermanos submitted expert testimony with its Complaint, which calculated its damages with a cut-off date of 31 August 2008.

5.       In its judgment, the Tribunal Contencioso awarded principal damages, along with indexing, interest, and legal costs.  Each of those components is readily calculable based on statutory rates.  For indexing, courts use the prime rate of first-rate international banks to bring the value of the submitted damages figures up to the present-day value on the date of the judgment.  For net interest, courts base the rates set in Article 1163 of the Civil Code—i.e., the six-month bank-deposit rate in US dollar.  For legal costs, fees are established pursuant to Executive Decree No. 32493-J of 9 March 2005.  The Decree calculates fees for trial proceedings by percentage of the damages awarded:

    a.  Twenty percent for damages up to 15 million Colones

    b.  Fifteen percent for damages between 15 million and 75 million Colones.

    c.  Ten percent for damages above 75 million Colones.

Additionally, when a case proceeds to the Supreme Court of Justice, the fees are increased by twenty-five percent.

6.       The Tribunal Contencioso did not calculate the indexing, interest, and legal costs.  That is normal practice.  If Trejos Hermanos presented the Judgment for enforcement in Costa Rica, those amounts would be calculated as a routine matter according to statutory rates.

7.       Following the trial and entry of judgment, Verizon Inc. filed a *casacion* on the decision of the Tribunal Contencioso to the Supreme Court of Justice on 4 September 2017.  In

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 4    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 32 of 490    RECEIVED NYSCEF: 10/26/2021

Costa Rican practice, a *casacion* is a form of appeal that addresses legal issues and does not reconsider the factual findings of the first-instance court. The Supreme Court of Justice is the highest and final court of appeal in Costa Rica. The First Chamber of the Supreme Court of Justice rendered its decision on 25 June 2020. A true and correct copy of that decision is attached as **Exhibit C**.

8.    On 17 and 20 July 2020, Verizon Inc. filed a request for clarification with the Supreme Court, effectively seeking to reargue or urge reconsideration of the Court's prior decision. The Supreme Court of Justice rendered its decision on this second appeal on 9 March 2021. A true and correct copy of that decision is attached as **Exhibit D**. Verizon Inc. has exhausted its avenues of appeal in Costa Rica.

9.    Finally, **Exhibit E** is a true and correct copy of the guaranty executed by GTE Corp., by which it accepted joint liability for the obligations of the GTE Consortium in connection with their bid to the Costa Rican Institute of Electricity.

Dated:  San Jose, Costa Rica
         26 October 2021

                                                    _____
                                                    Rolando Laclé Zúñiga

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 33 of 490     RECEIVED NYSCEF: 10/26/2021

# Exhibit A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

[handwritten text]:

[line 1] 91 original folios / 3 sets of copies

[line 2] 3 bundles of evidence that

[line 3] include 77 documents of evidence.

[line 4] fully reviewed [line 5] All are attached.

## ORDINARY CIVIL TAX ACTION

**Plaintiff:** "Trejos Hermanos Sucesores, Sociedad Anónima"

**Defendants:**      Instituto Costarricense de Electricidad [Costa Rican Institute of Electricity]

Verizon Communications Incorporated

Verizon Information Services -Costa Rica- LLC

**TAX COURT OF ADMINISTRATIVE LITIGATION AND CIVIL PROCEDURE.**
**Second Judicial Circuit. Goicoechea, Building Annex A.-**



The undersigned, **ALVARO TREJOS FONSECA,** of legal age, married in second marriage, Master of Science, resident of San José, identity card number 1-0390-0895, acting in my capacity as President and broadly empowered attorney-in-fact without limit of amount, of the company of this domicile **"TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA"**, legal person identification card number 3-101-000940, with the attached certification, document marked as **No. 1**, hereby file an Ordinary Civil Tax Action against the **"INSTITUTO COSTARRICENSE DE ELECTRICIDAD"** [Costa Rican Institute of Electricity], represented by its Executive President Pedro Pablo Quirós Cortés, of legal age, married, resident of Ciudadela Calderón Muñoz, Electrical Engineer, identity card number 2-195-129; and against the commercial firms **"VERIZON COMMUNICATIONS INCORPORATED"**, a company registered in the State of

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 35 of 490

Delaware of the United States of America, but with offices at 140 West St., 29th floor, New York, NY 10007, telephone (212) 395-1000, registered with the **SEC** (U.S. Securities and Exchange Commission of the United States Government), with registration number 0000732712, represented by Ivan G. Seidenberg, Chairman and Chief Executive Officer, and alternatively by William P. Barr, Executive Vice President and General Counsel, both U.S. citizens, both with the same last name due to their nationalities and other unknown qualities, which we have verified by reproducing the web pages on the internet; and **"VERIZON INFORMATION SERVICES -COSTA RICA- LLC"** limited liability company, branch in Costa Rica registered in the Registry of Legal Entities of the National Registry of Costa Rica, with the legal identification number 3-012-026573, of the company of the same name incorporated and organized under the laws of the State of Delaware, United States of America, as recorded in volumes 147, 672 and 1517; folios 27, 65 and 214; entries 35, 76 and 220, respectively, represented by its Resident Agent in accordance with the provisions of Article 232 of the Code of Commerce, Mr. HERNÁN PACHECO ORFILA, attorney at law, resident of San José, with office open at the Pacheco Coto Law Firm at 11th Avenue, 5th and 7th Streets, identification card 1-585-980, as evidenced by the attached certification, documentary evidence marked as No. 2.-

[handwritten] *AEJ* →

The complaint is filed to declare that the actions and resolutions of the defendants, to terminate and leave without legal effects the administrative contract that had been formalized between them, for the "Publication of the Telephone Directory and Development and Implementation of Information Services", signed on March 10, 2000, have caused the plaintiff serious damages and losses that, as such, constitute a matter of financial liability.

**Initial Clarification:**

Solely for the purposes of the statement of the facts of the claim, we clarify that in this document we will use, conventionally and for procedural economy, the following abbreviations:

**THS** means the Costa Rican firm plaintiff in the proceedings Trejos Hermanos Sucesores, Sociedad Anónima.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

**ICE** means the Instituto Costarricense de Electricidad [Costa Rican Institute of Electricity], an autonomous institution of Costa Rica, responsible for the administration, among others, of the country's telephone services.

**CGR** means the Office of the Comptroller General of the Republic, an auxiliary entity of the Legislative Assembly, in charge of auditing and controlling the Public Treasury.

**GTE** means the U.S. company GTE Corporation and indistinctly all its subsidiaries, the U.S. companies linked to the contracts entered into with ICE since 1975, such as GTE Information Services Incorporated (GTE-IS), GTE Directories Corporation (GTE-DC), General Telephone Directory Company C por A (GTDC) and the branch of the latter, of the same name, registered in the Mercantile Registry of Costa Rica in Volume 147, folio 27, entry 35.

**GTE GROUP** means the consortium comprising GTE Corporation, the Group Holding Company and all subsidiaries.

**VERIZON** means the U.S. company resulting from the merger between the American company Bell Atlantic and GTE and indistinctly all its subsidiaries, such as, for example, the U.S. companies linked to the contracts entered into with ICE, such as Verizon Information Services Inc., Verizon Directories Corp. and Verizon Information Services - Costa Rica, LLC.

**VERIZON GROUP** means the consortium comprising Verizon Communications Inc, the Holding Company and all subsidiaries.

**SEC** means the U.S. government office called the "U.S. Securities and Exchange Commission" of the United States Government, which oversees publicly listed companies in the United States.

**RACSA** means the public company Radiográfica Costarricense, Sociedad Anónima, which belongs to the **ICE** group.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)  INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 37 of 490   RECEIVED NYSCEF: 10/26/2021

TRANSLATION

**File or Administrative File** means the administrative file in ICE's files, to which we will refer, so as to identify the folios containing the proof of documents that we offer to prove the facts of the claim, duly certified by ICE's Procurement Department.


**Corporate background.-**


In this explanation, which is inserted to serve as an exordium of the claim, we indicate, in summary, the corporate background of the U.S. companies that participated in the contract entered into with **ICE,** which is the conventional link from which the consequences and other facts on which this claim is based are derived.


As will be demonstrated later with the support of the pertinent evidence, three companies belonging to the holding company of the United States of America, called **GTE CORPORATION,** of which details will be given later, formed a consortium or association of companies to participate in a public bidding promoted by **ICE,** a group of companies that was awarded the contract. A fourth company joined the same group to unify the execution of the administrative contract, for which a branch of the same company was registered in Costa Rica.


Clause No. 25 of the contract signed and countersigned between **GTE** and **ICE** stipulates that the contract would remain unchanged and in force between the parties with the new legal names, in the event that the original firms or the holding company changed their names or merged into a different company, which actually ended up happening, since the **GTE** group subsequently merged with the U.S. firm Bell Atlantic and formed the **VERIZON** group, which expressly assumed all obligations and liabilities to **ICE** arising from the contract. For this reason and depending on the dates in which they occur, the corporate name **GTE** is substituted in the Facts of the Complaint by the new corporate name that we identify as **VERIZON,** without there being any solution of continuity in such events, with respect to the existence of the contract, as will be demonstrated later.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 10/26/2021

TRANSLATION

# A.- FACTS OF THE COMPLAINT.

**1).-** **THS** is a Costa Rican industrial company that, since 1912, has focused its commercial activities on text printing, and specifically on the publication and printing of telephone directories, also known commercially and in popular slang as phone books (Document No. 3).

**2).-** The experience of **THS** in the publication and printing of telephone directories began in Costa Rica and was extended, over time, to other countries in Central America and the Caribbean, which we demonstrate with photocopies of telephone directory covers produced by the company for the Dominican Republic, Jamaica, Honduras, Virgin Islands, Antigua and Barbados, Dominica, Turks and Caicos, Aruba, Montserrat, Grenada, Cayman Islands, the Caribbean and South Florida, St. Lucia, Louisiana, Belize, Puerto Rico, Jacksonville and Costa Rica (Document No. 4).

**3).-** The GTE Group, through its company **General Telephone Directory Company,** became interested in the publication of telephone directories in Costa Rica and began its activities in this country in 1974, participating in a bidding process promoted by **ICE** for such a purpose, which was awarded on a final basis and the respective administrative contract was formalized, as evidenced by the certificate issued by the General Manager of GTE Costa Rica on January 26, 1999 (Document Nos. 5 and 7).

**4).-** It has always been a contractual requirement imposed by **ICE,** included as an invariable condition in its public bidding documents, that the publication and printing of telephone directories had to be done in Costa Rican territory, a provision of the bidding document that is explained only by the following text, which is transcribed verbatim: ***"... thereby contributing to the growth of well-paid employment, vocational training, technology transfer for the benefit of Costa Rican citizens and the country's economic***

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 39 of 490

RECEIVED NYSCEF: 10/26/2021

TRANSLATION

*general, which ICE considers to be in the general interest..."* (see Clause 27 of the ICE-GTE Consortium Contract signed on March 10, 2000, in Folio No. 2767 of the File, which is included in Document No. 6 and Document No. 24).

5).-       Among other obligations and rights, in order to comply with the requirement of the previous fact and once it had acquired its condition as **ICE**'s awardee and consequently being its co-contractor, **GTE** entered into printing contracts with **THS** so that the latter would be in charge of updating the telephone subscriber database, printing and binding phone books as of 1975 and for thirty more years that the commercial relationship lasted (see copy of deeds 35-11, 36-11 and 45-15 executed before Notary Edgar Chamberlain); furthermore, through deed 53-15 executed before the same notary office, GTE contracted with THS the printing of the phone books of Panama for the year 1982 (Document No. 7).

6).-        **THS**'s business relationship with **GTE** intensified over time, due to the excellence of its services, which contributed to **GTE** being awarded other tenders promoted by **ICE**, always in the same commercial activity, i.e., for the publication and printing of telephone directories. As a result of **GTE**'s sustained interest in **THS** as the printer of the telephone directories, new publishing and printing contracts were later formalized - in principle, one for each awarded bid -, the contents of which were negotiated between the two companies, based on the award of each administrative contract between **GTE** and **ICE**. In general terms, **THS** prepared the phone books for the **GTE Group** as long as the latter was awarded the contract and contractor of **ICE**, as mentioned above (Document Nos. 4, 5 and 8).

7).-       **THS**'s relationship with **GTE** was not limited to the latter's subsidiaries in Costa Rica and Panama, but was extended, first, starting in 1988 and for twenty more years, to the printing and publishing of phone books in the Dominican Republic, initially through Compañía Dominicana de Teléfonos (CODETEL), a company equivalent in functions and competencies to **ICE** in Costa Rica and which was a subsidiary of the **GTE** group and then with GTE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Directories Corporation, another subsidiary of the **GTE** group (Document Nos. 8 and 9).-

**8).-**         Within the framework of this business relationship, **GTE** entered into an "agency and mutual cooperation" agreement with **THS** on May 8, 1997. Within the clauses of this Agreement, in Annex B Point 5 it was established that GTE Information Services granted **THS** the status of ***"preferred vendor"*** or preferred supplier for Central America including Panama and the Caribbean, defined in Annex 2 as a series of thirty-two (32) countries including the Dominican Republic and Puerto Rico. While this status was in force and with the contracts of Costa Rica and the Dominican Republic also in force, by express and contractual decision of GTE of March 15, 1999, the plaintiff company received the requirements of GTE to acquire and implement its industrial process, a new plant and new equipment, which would eventually lead to the closing of operations, since it could not sustain it without the respective contracts signed with GTE, as demonstrated. At the same time, **THS** was asked on March 15, 1999, to [sic] (see the contract in Document No. 10 and the report of expert Bruce Wataru, as well as the requirements for handling the purchase of paper and quoting the directories for Puerto Rico for 2001).

**9).-**         Subsequently, in 2000, **GTE** commissioned **THS** to print and publish telephone directories, including those of Costa Rica and Belize, and on January 21, a new contract was signed regarding the business relationship between the two companies. In the months leading up to this contract, various forms of association between **GTE** and **THS** were discussed, including the formalization of a joint venture between the two companies (see the contract in Documents Nos. 11 and 23).

**10).-**         Regarding the relationship with **ICE,** this Costa Rican public institution issued Public Bidding No. 6378-T in 1999 and 2000, promoted for the "Development and Implementation of Information Services", in which Grupo GTE participated (Document No. 12).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5

Case 1:21-cv-08928  Document 1-1  Filed 11/01/21  Page 41 of 490

RECEIVED NYSCEF: 10/26/2021

TRANSLATION

**11).-** The commercial firms **"GTE Information Services Incorporated", "GTE Directories Corporation" and "General Telephone Directory Company C por A",** companies of the United States of America, domiciled in the State of Delaware and with main offices in the City of Dallas, State of Texas, submitted a joint bid, under the form of a consortium or association of companies, in Public Bidding No. 6378-T promoted by **ICE** and for all purposes related to this public bidding, identified themselves as the **GTE Consortium** (see folios 1 to 10 of the bid submitted by the Consortium in ICE's possession, copies of which are attached duly certified in Document No. 13).

**12).-** The offer of the GTE Consortium was signed by Terrence Mitchell Leve, acting as special attorney-in-fact of the consortium, as stated in the incorporation agreement of that legal entity (same evidence above and copy of the agreement in certified file folios 298 and 360 to 367 in Document No. 14).

**13).-** In the letter of presentation for the bid, in Point No. 10, the GTE Consortium stated the following:

"10. We give a brief explanation of the companies mentioned in the offer, including those that make up the GTE Consortium and the relationship between them, as follows:

- A) **GTE Corporation** is a corporation established in New York, United States of America, whose shares are listed and traded on the New York Stock Exchange.

- B) **GTE Information Services Incorporated** (GTE-IS) is a corporation established in the State of Delaware, United States of America, with its main offices in Dallas, Texas. All of its shares are owned by GTE Corporation.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

- C) **GTE Directories Corporation** (GTE-DC) is a Delaware corporation headquartered in Dallas, Texas. It is wholly owned by GTE Information Services Incorporated.

- D) **General Telephone Directory Company C por A** (GTDC) is also a Delaware corporation, headquartered in Dallas, Texas. It is wholly owned by GTE Information Services Incorporated.

- E) **General Telephone Directory Company C por A** (GTDC) established in Costa Rica, in 1975, a branch with the same name, which is registered in the Mercantile Registry of Costa Rica in Volume 147, folio 27, entry 35.

- F) **GTE Information Services Incorporated, GTE Directories Corporation and General Telephone Directory C por A** have formed the **GTE Consortium** to complement their experience and background in order to bid in this bid. The GTE consortium shall be considered the principal bidder for all legal purposes" (see folios 4 and 5 of the file certified in Document No. 13)

14).-    On page 8 of its offer to **ICE,** the GTE Consortium wrote:

"**NAME AND MAILING ADDRESS**

The main domicile of the **GTE CONSORTIUM** is as follows:

GTE Place - West Airfield Drive DFW Airport, TX 7576-9810

United States of America

P.O. Box: P.O. BOX 619810

Telephone: 001-9724537589

Fax:       001-9724537655"

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(Same evidence Document No. 13).

**15).-**        In folio 9 of its bid, the GTE Consortium stated textually:

"1.3.1.3 The GTE Consortium by the fact of submitting its bid declares that it knows, accepts and submits to ICE's procedures for the processing of bids, to everything stipulated in the documents of this bid and to the courts and laws of Costa Rica, as stated in the attached Consortium Agreement (Document III-I)" (same Exhibit Document No. 13).

**16).-**        The administrative contract was awarded to the GTE Consortium by the Board of Directors of **ICE,** in the ordinary session number five thousand one hundred fifty-two, held on February 1, 2000, an agreement published in Scope No. 10 of La Gaceta [National Gazette] No. 28 of February 9, 2000 (see folio 2779 of the file in ICE's possession, which is page one of the contract signed between ICE and the GTE Consortium "recital" letter "a" in the contract in Document No. 6).

**17).-**        The contract was countersigned by the **CGR** on December 13, 2000, as evidenced based on the approval visible on folio 2766 of the administrative file for the Tender in the possession of **ICE.** Attached, as documentary evidence, are pages 2751 to 2781 of the administrative file, which is a copy of the contract, duly certified by ICE's Procurement Department (see the contract in Document No. 6).

**18).-**        In Clause 25 of the contract, **ICE** and the GTE Consortium stipulated the following:

"In the event that due to a modification in the ICE law this entity changes its name or that, for its part, GTE changes its name as a result of a merger or association with another company, in both cases this agreement shall remain unchanged and in force between the parties under the new legal names that replace the names of the legal

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

entities represented herein" (same evidence, folio 2768, Document No. 6).

**19).-**          The firm VERIZON Information Services - Costa Rica, LLC, sent a note dated May 16, 2002, to the **ICE** Procurement Department, in which it states, among other things, that "General Telephone Directory Company C por A" changed its name to Verizon Information Services Costa Rica, LLC and requests that the change of the corporate name of the companies that make up the GTE Consortium be considered officially communicated, citing as a basis Clause 25 of the contract (see certified copy of official letter S I.-0247-05-02 that the Head of the Information Services Area sent to the Telecommunications Legal Department, visible on folio 3045 of the file). That is to say, in accordance with the legislation of its country, **GTE** merged with the American firm Bell Atlantic and as a result of the merger the **VERIZON GROUP** was created, so that in all ongoing contracts of **GTE** with **ICE** and **THS** the corporate name of the American contracting company **GTE** was replaced by companies of the **VERIZON GROUP** and all this means that the commercial relationship of **THS** to publish and print telephone directories, from that moment on, continued in execution with the firms of this group, so that the commercial relationship between **THS** and the **GTE and VERIZON Groups** lasted approximately thirty years, when adding the time of duration with **GTE** and **Verizon** without interruption (see documents of change of name of GTE to Verizon in folios 2956 to 3045 of the file in Document No. 15).-

**20).-**          On June 8, 2002, by means of official letter DCA 966, the Administrative Contracting Division of **ICE**'s Institutional Legal Department advised the Information Services Area that the documentation received only evidenced the change of name of two of the companies of the consortium, "GTE Information Services Incorporated", which changed to "Verizon Information Services Inc." and "General Telephone Directory Company C por A", which changed to "Verizon Information Services - Costa Rica, LLC", and therefore the name of the Consortium could not be considered officially changed. This decision was communicated to Verizon Information Services by means of official letter S.I.-0284-06-02 dated June 18, 2002 (see folios 3043 and 3044 of the attached administrative file certified in Document No. 15).-

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

**21).-** Michael Q. Neal, acting in his capacity as General Manager of "Verizon Information Services - Costa Rica, LLC", by means of a note dated August 28, 2002, clarified to the Information Services Area of **ICE** what happened with the name changes and attached the necessary documentation to prove the facts and stated literally:

"a) On August 5, 1999, the document creating the GTE Consortium was signed, which was formed by the companies GTE Directories Corp, GTE Information Services, Inc. and General Telephone Directory Company C por A., which was the awardee of public bidding 6378-T.

b) These 3 companies changed their names as a result of the merger between Bell Atlantic and GTE, which created VERIZON, to be called Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services-Costa Rica, LLC".

c) In the case of Verizon Directories Corporation on January 31, 2002, 2 things happened:

1) Verizon Directories Corp. **merged** with Verizon New Media Services Inc. and, legally, Verizon New Media Services, Inc. became the **surviving company** of the merger.

2) The second issue that happened that same day is that Verizon New Media Services Inc, the surviving company of the merger, decided to **CHANGE its name** from Verizon New Media Services, Inc (which had already absorbed Verizon Directories Corp), to VERIZON DIRECTORIES CORP.

As can be seen from the attached certification, at **11:30 a.m.** on January 31, 2002, the first change was filed and only 5 minutes later, at **11:35 a.m.**, the second change was filed, with the certificate of consolidation to **change the name.**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

d)     The above sequence explains why, both in the certification that we have already attached together with the note of May 16, 2002, and in the certification that we now attach, it appears that the former name of Verizon Directories Corp. was Verizon New Media Services, Inc. and not Verizon Directories Corp., as occurred with the other two companies (see certified folios 3040, 3041 and 3042 of the administrative file attached in Document No. 15).

**22).-**     In the same note of August 28, 2002, to which the previous point refers, Verizon Information Services Costa Rica, LLC, expressed the following:

**"II.- MAINTENANCE OF ALL OBLIGATIONS AND RIGHTS.**

As required in the note of June 18, 2002, I also attach herewith a SWORN DECLARATION on the **Maintenance of Obligations and Rights,** signed by the legal representatives of Verizon Information Services, Inc, Verizon Directories Corp. and Verizon Information Services-Costa Rica, LLC, in which they accept the rights and obligations derived from the Bidding 6378-T and the contract derived therefrom" (folios 3035, 3036 and 3037 of the administrative file attached certified in Document No. 15).

**23).-**     The documents referred to by Verizon Information Services Costa Rica, LLC in the immediately preceding Fact, all of them authenticated and certified by the consulate, are found in folios 3019 to 3039 of the administrative file, which are summarized in the official translations of folios 3019 to 3027. Essentially, these documents are the statements of Maintenance of Undertakings made by the companies VERIZON Information Services, Inc. and VERIZON Directories Corp., these two companies represented by William G. Mundy, Vice President of each of them, with sufficient power and legal representation to commit the two principal companies and VERIZON Information Services - Costa Rica, LLC, represented by W. Scott Hanle, in his capacity as Vice President of the company, with sufficient power to bind the firm. The statement is made as follows:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

"1.-    That our principals VERIZON Information Services Inc. formerly known as GTE Information Services, Incorporated, VERIZON Directories Corp. formerly known as GTE Directories Corporation and VERIZON Information Services-Costa Rica, LLC formerly known as General Telephone Directory Company C por A., signed a **"Consortium Agreement"** on August 5, 1999, to submit a bid to the COSTA RICAN INSTITUTE OF ELECTRICITY in Public Bidding 6378-T.

2.-    We declare that our principals, now under the new names indicated, fully and absolutely maintain the rights and obligations established in the consortium agreement of August 9, 1999; in the offer presented to ICE by GTE Consortium on August 26, 1999, and in the contract signed between ICE and GTE Consortium on March 10, 2000, which was authenticated (sic) by the Office of the Comptroller General of the Republic on December 13, 2000.

3.-    As stated in Clause "seven" of the Consortium Agreement, we repeat that for all obligations arising from Public Bidding 6378-T, "the company directly responsible, on behalf of the Consortium, before the COSTA RICAN INSTITUTE OF ELECTRICITY, is VERIZON Information Services-Costa Rica, LLC (formerly known as General Telephone Directory Company C por A).

4.-    That the compensation for the services required from each different company of the Consortium to comply with all the bidding conditions before the COSTA RICAN INSTITUTE OF ELECTRICITY will be affected in accordance with an internal agreement between the parties of the Consortium." *(evidently, this is a material error in the translation: what the statement says is "That the compensation for the services required by the different companies of the Consortium to fulfill, etc.")*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5.-      The present statement was made at the request of ICE (Note dated June 18, 2002, S.I. 0284-06-02) to officially register the change of names of our principals in the contract signed between ICE and GTE Consortium (now VERIZON)..." (see folios 3019 to 3045 certified in Document No. 15-A).

24).-      The Consortium Agreement signed on August 5, 1999, by GTE Information Services Inc., GTE Directories Corp. and General Telephone Directory Company C por A., consists of ten clauses and was signed by representatives with sufficient powers to do so, as evidenced by the documentation mentioned. In summary, the agreement states in its clauses:

**First:** that GTE Information Services Incorporated is a wholly owned subsidiary of GTE Directories Corporation and General Telephone Directory Company C por A.

**Second:** that the purpose - essential aim - of the consortium is to complete the background and experience of the three signatory companies in order to participate in the bidding process.

**Third:** ICE's bidding document requires the bidder to demonstrate experience in publishing telephone directories for administrations with at least 2 million telephone lines in total, experience in customer and quality orientation programs, experience in developing complementary services to the telephone directory, experience in developing substitute products to the telephone directory, experience in developing different technological platforms for information services; it requires certifying the budget allocated to research and development, indicating audio-text facilities and their operating mechanisms, granting an unconditional commitment to provide ICE with advice and access to technological development in information services for the Information Service [directory assistance] 113, by means of a letter of commitment, among other obligations.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

**Fourth:** that the bidding companies are presented as a consortium so that the background and experience of each one of them may be jointly evaluated in the bidding process.

**Fifth:** They agree that the sole representative before ICE will be General Telephone Directory Company C por A., which will be the awardee and will be responsible for coordinating, with the other companies of the Consortium, the provision of all services and supplies. The parties to the Consortium shall be jointly and severally liable to ICE for all obligations arising from the bid, participation in the Consortium in the contracting procedures, the eventual award and its execution.

**Sixth:** appoint Bill J. Brewer and Terrence Mitchel Leve, U.S. citizens, and José María Quirós Alfaro, Costa Rican, as special attorneys-in-fact for the Consortium, so that they may sign and present the Consortium's bid; sign and present to ICE clarifications of the bid; extend the validity of the bid and of the participation guarantee; defend the award if it is favorable to the Consortium or appeal the award if it is not favorable to the Consortium; substitute the power of attorney in whole or in part, reserving for themselves at all times the power of attorney; sign the respective contract. The attorneys-in-fact may act jointly or separately and declare that the principal companies and the attorneys-in-fact submit to the laws and courts of Costa Rica for all effects and contracts entered into and to be executed in Costa Rica by reason of the aforementioned bidding.

**Seventh:** that the directly responsible party, on behalf of the consortium, before ICE for all obligations arising from the bidding, is General Telephone Directory Company C por A., without prejudice to the joint and several liability of the other members of the Consortium.

**Eighth:** That the responsibility of GTE Information Services Incorporated and GTE Directories Corporation shall consist of providing General Telephone Directory Company C por A with all types of technical and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

financial support to enable it to comply with all obligations, such as providing ICE with advice and access to technological development in information systems for the Information Service 113 and any other type of financial or technological support required by the bidding document. This is without prejudice to the **joint and several liability of all the companies of the Consortium in the event of non-compliance by any of them**.

**Ninth:** that by virtue of the provisions of Clause 1, the compensation of the services required from the different companies of the consortium, in order to comply with all the obligations of the bidding document, shall be made by means of an internal agreement between the parties.

**Tenth:** The legal address of the Consortium is fixed in Costa Rica.

The three companies attach to the Consortium Agreement the certificates of incorporation issued by the Office of the Secretary of State of Delaware, together with their official translations, which show the legal existence of the companies and of the officers signing on their behalf (see folios 298 and 360 to 394 corresponding to the bid submitted by the Consortium to ICE, certified copies of which are attached in Document No. 14).

**25).-** Copies, with their official translations, of the contract signed by General Telephone Directory Company C por A with the firm Belize Telecommunications Limited, on February 10, 1994, can be found on folios 395 to 426 of the Consortium's bid (see those folios of the file certified in Document No. 16).

**26).-** Clause 2.4.1.B of ICE's Bidding Document 6378-T regulated the bid evaluation criteria under three headings: 40% for Experience; 30% for Financial Capacity and 30% for Quality of number 113 and in Point B of the clause, where the following was expressly stated:

"The bidding company must submit with its bid the audited financial statements in Spanish for the last 3 years containing at least the

This is a copy of a pleading filed electronically pursuant to New York State court rule (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Balance Sheet, Income Statement and Retained Earnings or Accumulated Deficit (according to the rules and regulations of its country of origin), which will allow ICE to verify its financial capacity. **In the event that the bidder is part of another company or group of companies (Holding Company), the presentation of the financial statements of the latter shall be allowed under the terms established herein, in which case the corporate group shall be jointly and severally liable with the bidder for all the obligations that the latter will acquire as awardee; this joint and several liability must be demonstrated by the bidder through an express and written statement of the representative of those companies."** (Document No. 17)

27).-		On folios 427 to 432 of the Consortium's bid, there is a document in which, in order to comply with Clause 2.4.1.B, paragraph I, the company GTE CORPORATION HEREBY CERTIFIES:

"I.-		This Corporation is aware that the Consortium formed by GTE Information Services Incorporated, GTE Directories Corporation and General Telephone Directory Company C por A, will participate in Public Bidding No. 6378-T, promoted by the COSTA RICAN INSTITUTE OF ELECTRICITY for "The Contracting of Services for eight years and the Development and Implementation of Information Services".

II.-		That in accordance with the provisions of Clause 2.4.1-B (Financial Capacity of the Company) included in the Public Bidding Document No. 6378-T, mentioned above, the aforementioned Consortium will present the Financial Statements of GTE Corporation, which is the group's holding company.

III.-		That in accordance with the requirements of the aforementioned Clause 2.4.1-B, GTE Corporation declares that it will be jointly responsible with the companies of the aforementioned Consortium for all the obligations that this Consortium acquires as bidder and awardee of the aforementioned Public Bidding No. 6378-T before the COSTA RICAN INSTITUTE OF ELECTRICITY

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

IV-    This corporation issues this certification to be submitted to the Costa Rican Institute of Electricity in the aforementioned Public Bidding 6378-T.

Done in the city of Irving, State of Texas, United States of America, on June 22, 1999."

The document was signed by Daniel P. O'Brien in his capacity as EVP, Chief Financial Officer and is accompanied by a notarial footnote from Notary Public Cynthia Owens of Tarrant County, State of Texas, which is then certified by the consulate and notarized in accordance with the Law (see certified copies of the file in Document No. 18).

**28).-**    By virtue of all that has been proven with Facts 12, 13, 14, 15, 19, 20, 21, 22, 23, 24, 26 and 27 of this Complaint, the winning consortium of ICE's Public Bidding No. 6378 - T, was made up of the American companies GTE Directories Corp., GTE Information Services Inc. and General Telephone Directory Company, C. por A., all three belonging to the Group led by the Holding Company (of the Group) GTE Corporation, who freely granted its joint (and several) liability to the consortium companies for all obligations acquired by such consortium as bidder and awardees of the aforementioned Bidding. By changing the corporate name of the companies, both the Holding Company and the members of the Consortium continued to be jointly and severally liable, only now under the new corporate names. In this way, the companies of the consortium called "Verizon Information Services -Costa Rica, LLC", "Verizon Information Services Inc." and "Verizon Directories Corp.", as the awardees of the Bid and subsidiaries of Verizon Communications Incorporated, Holding Company of the Group, into which GTE Corporation was converted, retained their joint and several liability in relation to the contract derived from the aforementioned Public Bidding. All these entities integrate a single consortium, whose main entity is "Verizon Communications Incorporated" (same proof of all the Facts referred to at the beginning of this document).

**29).-**    The contract between **ICE** and the **GTE Consortium** was executed in accordance with the rules of the bidding document in Clauses

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Three and Twenty-Seven of the contract, it was stipulated that the total production of the guide should be carried out in Costa Rica "thereby contributing to the growth of well-paid employment, professional training, technology transfer for the benefit of Costa Rican citizens and the country's economy in general, which ICE considers to be in the general interest" (see copy of the contract in folios 2751 to 2785 of the administrative file in Document No. 6).

**30).-**     In compliance with the above and considering that the Costa Rican company **THS**, as already demonstrated in Facts 1 to 9 of this Complaint, had the best experience in the type of contract to be executed, VERIZON INFORMATION SERVICES - COSTA RICA, LLC, acting with respect to its obligations to **ICE** on behalf of the GTE Consortium awarded the Bid and VERIZON INFORMATION SERVICES - BELIZE, LLC (formerly General Telephone Directory Company, C por A) by virtue of the change of corporate name, all companies of the State of Delaware, United States of America, on February 28, 2002, signed with **THS** a Master Purchase Agreement for a maximum term of 168 months (Clause 2.b of the agreement), to produce, package and distribute the phone books, in accordance with the agreement signed between the GTE Consortium and ICE (see copy of the agreement attached in Document No. 19).

**31).-**     Concomitant with the preparation of the participation of the **GTE Consortium** in bidding **6378-T**, a series of negotiations took place between **GTE** and **THS** to meet the new definitions of the publishing and printing needs imposed by **GTE**, and it was established, as a result, that the industrial plant (equipment and space) of **THS** should be expanded and renovated in order to be able to subscribe and meet the contract to be agreed upon in relation to this bid, based on the recommendations of the technicians sent by GTE to evaluate the machinery and facilities (see Fact 8 and Document No. 10).

**32).-**     It was based on this extensive and profound relationship between them and due to the contractual and commercial requirements imposed by **GTE,** as a result of the contract originally signed in 2000 with **ICE**, that **THS**, in order to comply with the agreed obligations, decided to take on debt and carry out the

This is a copy of a document filed electronically pursuant to Uniform Rule 202.5-b(d)(3)(i) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

major industrial transformations in plant and equipment, as well as make the enormous investments that such a decision required. This investment (indebtedness) imposed as a contractual condition, meant another scale of industrial plant, such that it could only be sustained with the volume of work represented by the publications and printings of the Costa Rican phone books, as well as those of other countries that, like the Dominican Republic, were operations of the **GTE** entity (Document No. 20, which is the Investment Plan for the purchase of the Heidelberg rotary press and Document No. 27 that shows the annual negotiations of THS with the Transamerica Bank and Trust Co.).

**33).-** As a direct consequence of the Master Purchase Agreement signed by **THS** with **GTE** (later **Verizon**) and the recommendations of **GTE**'s technicians, it became necessary for my client to move all its industrial facilities, which for decades had been located in Curridabat, to the Canton of Cartago, occupying larger industrial buildings, where it could install not only its own equipment, offices and machines but also the new Heidelberg Mercury 24D rotary offset press and all its accessories, which according to said agreement, was indispensable in order to comply with the volume of work that **GTE** (later **Verizon**) had committed to purchase from **THS** (see agreement in Document No. 19 and Document No. 10).

**34).-** For this purpose, two industrial buildings were located and rented in the Zeta Free Zone, in Guadalupe de Cartago, property of INMOBILIARIA ZOROASTER S.A., legal identification number 3-101-326.723, where **THS** was established with all its equipment, offices and warehouse, according to the contract signed with the owner on July 1, two thousand four (Document No. 21).

**35).-** As indicated in the previous Fact and because for the same purposes, **THS** acquired a modern Heidelberg rotary press, a binding line and pre-press equipment called CTP or Direct to Plate, together with all the electrical and mechanical installations of the new plant, **THS** needed [to assume] a significant indebtedness with financial entities and was justified by the forecasts of industrial expansion that the company had due to its business relationship with **GTE**, and in fact the investment in the new plant was made as a result of a

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 55 of 490

TRANSLATION

RECEIVED NYSCEF: 10/26/2021

contractual and commercial requirement (Document No. 19, master purchase agreement Clause 15 letter "j" and Document No. 20).

36).-      These investments were made by the plaintiff company, heavily in debt, because the contract signed with **GTE** had a horizon of 168 months, which allowed it to recover the investment, especially with the promise and understanding that it would be granted the publication and printing of other directories in the region. Apart from the long horizon of the new contract, the twenty-five years of continuity and deepening of the business relationship were the basis for accepting the requirement to make major investments and, to this end, to borrow to the limit of the company's capacity. The project and **GTE**'s commitment were so viable that financial institutions did not hesitate to grant loans for the expansion, given the supposed seriousness of the **GTE** consortium (Document No. 20-A).

37).-      It should be noted that two years and four months prior to the signing of the **Master Purchase Agreement** indicated in Fact 8 of this Complaint, that is, on October 15, 1999, Douglas C. LaVelle, then President of GTE Directories International (which was the parent company in phone books of GTE and as stated in the logo of the same note "A part of GTE Corporation"), sent an attached letter to **THS**, on behalf of its subsidiaries in Costa Rica and Dominican Republic, whose explicit intention is to define the terms and matters under which the printing and manufacturing services of the phone books would be provided by the GTE Group to such companies and defined in a subsequent contract. It was clear and established in Point 1 of the aforementioned note that if the terms of the letter were not accepted within seven days, the negotiations would be terminated, and this was made known by the local and regional executives of **GTE,** José María Quirós and David Andrade (Document No. 22).

38).-      In Point e) of the same note, it is established that if **GTE** provides **THS** with the opportunity to print additional directories to those of Costa Rica and the Dominican Republic, **THS** was obligated to give additional price discounts to **GTE.** This condition clearly indicates **GTE**'s intention to grant an additional

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

volume of work from other countries to support the decision on the investment in plant and equipment to be made (Document No. 22).

**39).-**    Point g) of that note is absolutely clear in that **THS** was to comply with each and every technical requirement demanded by **GTE** including, but not limited to, the so-called "white knock out" process and four colors in that process, which in effect implied the purchase of a new press according to a final deadline as this point states: "... from the first directories to be printed under any agreement" (Document No. 22).

**40).-**    Point h) states that **THS** shall provide documentary evidence by November 15, 1999, i.e., 15 days after the date of this letter, that **THS** will procure, install and test equipment capable of printing white knock out and four colors in such process and that the quality of the tests will be acceptable at the sole discretion of **GTE** (Document No. 22).

**41).-**    Point I) is conclusive in that any failure by **THS** to comply with any of these essential points will result in the right of **GTE** to immediately terminate any agreement it has with **THS** without any liability to **GTE** (Document No. 22**)**.

**42).-**    In summary, this note, which is set forth in the Facts from No. 37 to the this document, replaces all previous conversations and offers the printing of the phone books of Costa Rica and the Dominican Republic, and eventually other directories, if the demands for equipment established therein are met, according to a final deadline and without the right to subsequent negotiation, so that the plaintiff company had to immediately start preparing the plan and documentation for the purchase of the equipment and the expansion of the plant necessary to make the directories in the established manner. In the strict legal sense, **GTE** and then **VERIZON** imposed on **THS** a true contract of adhesion, which it had to accept as presented by the other party (Document Nos. 22 and 23).

**43).-**    In the note dated August 20, 1999, signed by Terence Mitchell Leve, Senior Attorney, who appears in **GTE**'s bidding documents before **ICE**,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5     Case 1:21-cv-08928  Document 1-1  Filed 11/01/21  Page 57 of 490     RECEIVED NYSCEF: 10/26/2021

TRANSLATION

addressed to Mr. Mario Quintana (deceased), who was attorney for the plaintiff at that time, in the second, fourth and ninth paragraphs, the possibility of setting up a joint venture between **GTE** and **THS** is discussed; the idea is not dismissed but it is considered that it would be very time-consuming and therefore the initial emphasis is for a printing contract. But these statements reflect a clear desire to move toward a joint venture (Document No. 23).

**44).-**       In the fourth paragraph of that note referred to in the previous Fact, it is clearly expressed that **GTE** recognizes that a greater volume of printing would greatly contribute to correcting some of the inefficiencies of **THS** existing at that time and also recognizes that the printing of the directories of the Dominican Republic could be beneficial to solve the problem (same Exhibit Document No. 23).

**45).-**       On November 15, 1999, a meeting was held between Mr. Alvaro and Mr. Alonso Trejos Fonseca and Mr. Guillermo Navarro, then President, Vice President and Production Manager of **THS,** respectively, with the Director of Printing of GTE Directories International for the purpose of: 1) evaluating the progress made on the plant improvement project; 2) assisting in developing a formal project to closely monitor the new plant project; 3) agreeing on a contingency plan in case **THS** did not meet the installation dates of the new equipment and plant, which consisted of contracting another plant in the United States, especially in case the equipment was not acquired on time; 4) evaluating the potential purchase of the equipment, with the specific assistance of **GTE**'s recommended consultant, Mr. Bill Snell (Document No. 24).

**46).-**       This means that **GTE** had a contingency plan to take - move - the printing of the phone books to the United States or any other country abroad, if the planned and required investments were not carried out by **THS. GTE** followed the project closely and continuously and assigned one of its consultants to recommend to **THS** the type of equipment to be purchased, which was recorded in detail in the final printing contract (Document No. 19).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5
Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 58 of 490
RECEIVED NYSCEF: 10/26/2021
TRANSLATION

**47).-** On August 31, 2000, José María Quirós, General Manager of **GTE** in Costa Rica, submitted to **ICE** (folio 3631 of the file) the subcontract for printing the telephone directories for its approval, indicating that **THS** is a commercial firm with recognized experience at the national and international level and that it has been in charge of printing **ICE**'s telephone directories for the last twenty-five years. This contract, which later became the basis for subsequent contracts with **Verizon**, was signed for a term of one hundred sixty-eight months (Document No. 25).

**48).-** Two e-mails highlight the material nature of the business relationship between **THS** and **GTE:** one is from February 2001 in which **GTE** requests a quote for Puerto Rico directories, which demonstrates the breadth of the relationship; the other, from September 2001, states that as preferred printer for Costa Rica and the Dominican Republic, **THS** is expected to seek quotes from paper suppliers, etc. This reaffirms the status of preferred printer even in 2001 (Document No. 26).

**49).-** **THS**, as is evidenced in this Complaint, complied with all the duties and obligations imposed, first by the GTE Group and then by the Verizon Group, at the cost of heavy indebtedness that was supported, in order to justify the company's ability to pay, by the income from its commercial activity and that generated by the contract for the publication, printing, binding and delivery of the telephone directories, which was valid for 168 months. That is to say, with respect to the financial institutions (banks, finance companies and suppliers), the projected income, mainly in accordance with the current contract, was sufficient guarantee to meet the obligations assumed with the indebtedness, as well as sufficient to produce the profits projected with this business (Document No. 27).

**50).-** On October 14, 2004, and in accordance with the terms of the contract between **THS** and **GTE,** already at that date the **Verizon** Group, the parties involved entered into the **"Production Schedule, 2005 Provincial Guide"**, which establishes the conditions for the preparation of the books corresponding to that particular guide. This schedule sets December 15, 2004,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

as the deadline for modifying the number of pages and the number of books (Document No. 28).

**51).-**      In accordance with what is stated in the previous Facts, on July 15, 2004, the Consortium contractor of the Verizon Group processed, on the stationery of Compañía General de Directorios C. por A., with offices in San José, Costa Rica, subsidiary of GTE Corporation as stated in the same document, purchase order 4568 for the printing of the Telephone Directories for Metro (Acronyms for Metropolitan Area), for the total amount of $3,033,625.60 and on August 20, 2004, purchase order 4582, for the amount of $2,134,503 for the Provincial Telephone Directories, for a total of $5,168,128.00 for the Directories corresponding to the year 2005 (Document No. 29).

**52).-**      The purchase orders indicated in the previous Fact were substituted by **Verizon** by number 4612 dated November 3, 2004, for the Metropolitan Area Guides in the amount of $2,120,828 and by number 4644 dated December 17, 2004, for the Provincial Guides, in the amount of $1,254,023, for a total of $3,374,851, that is, with a unilateral and also untimely decrease of $1,793,277 (Document No. 30).

**53).-**      In accordance with the above and with the terms of the contract between the parties, any modification in relation to these two aspects must be communicated at least seven days in advance. Notwithstanding the foregoing, it is on December 20, 2004, when **THS** receives "Purchase Order" number 0004644, dated December 17, 2004, and signed by the General Manager of **Verizon**, Melvin Andujar Queipo, that is, five days after the deadline (see Master Agreement, Clause 11 b in Document No. 19), in which they not only drastically reduce the number of pages of the telephone directories and the number of books, but also unilaterally establish a different conformation and composition of the directories than the one that **GTE** had agreed to in its contract with **ICE** (same Document No. 30).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

**54).-** Based on what is stated above, the following essential aspects are analyzed in the previous Facts of the Complaint: a) the commercial background of **THS** and its links with **GTE** first and then with **Verizon** in the publication, printing, binding and distribution of the telephone directories in Costa Rica; b) the promotion of Public Bidding No. 6378-T by **ICE**, in which, participating and becoming the awardee was the **GTE Consortium,** which later changed its name to **Verizon**; c) the commercial obligations imposed by **GTE (Verizon)** on **THS**, to increase in equipment and facilities, based on the economy of scale entailed by the editing, printing and publication of telephone directories for a term of ONE HUNDRED SIXTY EIGHT (168) months, which led the Costa Rican company to incur heavy indebtedness to acquire modern equipment and rent larger facilities; d) the cessation of payments (income) that occurred against **THS**, which meant that the company lacked sufficient resources to meet the payment of its obligations incurred due to the imposition of **GTE,** so that all accumulated debts became due and were judicially executed, leading the company to totally cease operations and to exit the commercial line of business that it had exercised for almost one hundred years. From now on, in the following Facts, we point out what happened with the contract formalized between **ICE and the GTE Consortium** (later **Verizon)**, as a consequence of the awarding of **ICE**'s Public Bidding No. 6378-T (see all evidence from Fact 1 to 54).

**55).-** According to Clause Two of the **ICE - GTE (later Verizon)** contract, each year **ICE** and **GTE** were to review the structure of the Telephone Directories according to market needs. In application of this provision, on May 13, 2004, **Verizon** submitted to **ICE** a proposal to restructure the Telephone Directories for the 2005 edition, in order to eliminate the entries of Metropolitan Area customers in the Provincial Telephone Directories and vice versa (Document No. 31).

**56).-** In official letter 6000-29898-2004 dated May 25, 2004, the Telecommunications Deputy Manager's Office replied and informed **Verizon** that the request would not be attended to until it complied with the contractual terms regarding the amount and term of the Performance Bond, as stipulated in Clause 2.3.1 of the Bidding Document and Clause 29 of the contract (Document No. 32).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

**57).-** On July 15, 2004, ICE's Telecommunications Department, through official letter 6000-41046-2004, informed **Verizon** that the 2005 edition of the Telephone Directories, since there was no agreement between the parties on a possible restructuring, would be published in the same manner as in 2004 (Document No. 33).

**58).-** On September 8, 2004, **Verizon** informed the Deputy Manager of Telecommunications that on May 13 of that same year, it had made several requests to review the structure of the telephone directories and that since more than thirty days had elapsed as established in Article 16 of the Administrative Contracting Law without obtaining a response, it asserted its right to positive silence and declared that the points referring to the structure of the Directory and Contents; the publication and distribution of the Directory; and the so-called processes and responsibilities had been accepted (Document No. 34).

**59).-** On September 14, 2004, by note 6000-52278-2004, the Telecommunications Department responded to Verizon that its claim to assert positive silence was clearly inadmissible and was therefore expressly rejected (Document No. 35).

**60).-** On November 8, 2004, **Verizon** indicated to the Deputy Manager of Telecommunications that it reiterated its position on the positive silence in relation to the note of May 13, 2004 (Document No. 36).

**61).-** On November 12, 2004, **ICE** ordered the Notaries Public Ms. Patricia Hernández Salazar and Ms. Ligia Picado Arguedas, to draw up notarial records of the results of the visits made to **THS**'s industrial premises, certifying that the telephone directories being prepared did not include the records of customers in the provinces and verifying that **Verizon** ordered **THS** to print the residential white pages of the Metropolitan Area Telephone Directory with the records only of San José, excluding the subscribers of the Los Santos area and the Provinces (Document No. 37).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

**62).-**        On November 15, 2004, with note S.I.-0726-11-04, **ICE** informed **Verizon** that the telephone directories of the Metropolitan Area did not comply with the contractual terms, which contravenes notes 6000-41046-2004 and 6000-52278-2004 of July 15 and September 14, both of 2004, issued by the Telecommunications Department of that institution (Document No. 38).

**63).-**        ICE ordered the Notary Mr. Francisco Solis to prepare a notarial act to certify that **Verizon** was printing the Telephone Directories according to the proposal presented thereby, according to the note of May 13, 2004, and not as indicated by ICE, in accordance with the terms of the contract and on November 17, 2004, a meeting was held between ICE and Verizon and through official communication S.I.0730-11-04 the minutes of the meeting were communicated, with ICE indicating that Verizon did not comply with Clauses 3.1 and 3.4.1.3 of the Bidding Document and Clause 2 of the contract (Document No. 39).

**64).-**        On November 18, 2004, with note 6000-64540-2004, the Telecommunications Department responded to **Verizon**'s note of November 8, 2004, again stating that it should maintain the format of the 2004 telephone directories (Document No. 40).

**65).-**        On November 23, 2004, in its Session 5649, **ICE**'s Board of Directors firmly agreed to "instruct the Deputy Manager of Telecommunications to notify Verizon Information Services, contractor of Public Bidding 6378-T, processed for the development, marketing, production, distribution and implementation of the Telephone Directories, as well as complementary and substitute products and services for the period 2001-2008, that this Board of Directors rejected any intention to unilaterally vary the contractual conditions agreed upon, and urges it to comply in all aspects of the current contract. Final agreement" (Document No. 41).

**66).-**        On November 29, 2004, with note 6000-66202-2004, SGT-2625-2004, the Deputy Manager of Telecommunications notified **Verizon** of

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

agreement 10 of the Minutes of the 5649 meeting of the Board of Directors of November 23, 2004, which rejected any intention to unilaterally vary the agreed contractual conditions and urged Verizon to comply with the current contract in all its aspects (Document No. 42).

67).-        On November 30, 2004, by note 9100-UENSC/888, **ICE**'s Information Processes Unit of the Customer Service Strategic Business Unit (UEN) ratified the Board of Directors' agreement for **Verizon**; it also indicated that **ICE** would not allow or authorize the distribution of telephone directories printed in violation of the contract and that if this stance continued, **ICE** could opt to execute the performance bond and initiate the contract termination process (Document No. 43).

68).-        On December 2, 2004, during a visit to **THS**'s facilities, the Notary Public Ms. Yaila Paola Sanchez notarized a document certifying that 103,000 copies of the residential white pages of the Metropolitan Area were printed and that the printing company **(THS)** had not received any type of order to modify the printing and binding process; that the printing company works with the purchase orders delivered by **Verizon** (Document No. 44).

69).-        On December 13, 2004, Agnes Paniagua Cubero, Head of **ICE**'s Information Services Process, requested the Administrative Department of Procurement to open the corresponding procedure for the termination of the contract and execution of the performance bond against **Verizon** (Document No. 45).

70).-        On December 14, 2004, **ICE** issued the opening the administrative procedure for the termination of the contract and the execution of the performance bond against **Verizon**, according to official letter 5225-69163-2004, AEG-0572-2004 of December 14, 2004 (Document No. 46).

71).-        On December 17, 2004, Mr. MELVIN A. ANDUJAR QUEIPO, in his capacity as General Manager of **Verizon**, filed a written objection to the prior

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928  Document 1-1  Filed 11/01/21  Page 64 of 490

TRANSLATION

note AEG-0003-2005 to ICE's Institutional Legal Department, in order to obtain a legal pronouncement on the matter. The Office of Procurement, Warranties, Records and Sanctions Area, through Official Letter 5225-2022-2005, AEG-0037-2005 dated January 13, 2005, examined the matter and found that Verizon's opposition was inadmissible (Document No. 47).

**72).-** On January 7, 2005, **ICE**'s Information Processes unit of the Customer Service Strategic Business Unit (UEN) requested the Procurement Department to implement some precautionary measures within the administrative procedure, among others, not to execute the contractual services due to **Verizon**'s non-compliance; that **ICE** continue with the billing procedure of the advertisers of the 2004 and 2005 Telephone Directory, as well as the inclusion of the necessary information for billing; that **Verizon** refrain from using the **ICE** brand logo in possible telephone directories, complementary products and in any other media or activity not authorized by **ICE.** All this in internal note S.I. 0013-01-05 of January 7, 2005 (Document No. 48).

**73).-** On January 7, 2005, by resolution No. 5225-00939-2005 AEG-0020.2005, **ICE**'s Procurement Department notified **Verizon** of the precautionary measures (Document No. 49).

**74).-** On January 10, 2005, **Verizon** filed a motion for revocation with appeal and concomitant nullity against the resolution ordering the precautionary measures, arguing that they seriously violate its subjective rights. Furthermore, that the administrative act that was born to legal life is a tacit act of approval of its request, with all the characteristics and guarantees that the legal system grants to this kind of acts, in light of the doctrine of numeral 16 of the Administrative Contracting Law (Document No. 50).

**75).-** On January 12, 2005, **ICE**'s Institutional Legal Department received a legal opinion signed by Patricia Hernández Salazar, Francisco Rojas Giralt, and Hissell Mayorga Quirós, indicating and recommending that the appeal for revocation with appeal in subsidy and concomitant nullity filed against the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

precautionary measures be declared inadmissible, according to note 0092.01644.2005 DCA-020-05 of January 12, 2004 (Document No. 51).

**76).-**    On January 12, 2005, Ms. Agnes Paniagua of the Information Services Process of the Costa Rican Institute of Electricity, requests that the Motion for Revocation with Supplementary Appeal and Accompanying Nullity, be declared inadmissible, according to note S.I.-0025-01-2004 of January 12, 2004 (Document No. 52).

**77).-**    On January 12, 2005, **Verizon** filed, within the term granted in resolution 5225-69163-2004 (AEG - 0572-2004) dated December 14, 2004, its pleadings with respect to the opening of the Proceeding to declare the Contractual Termination (Document No. 53).

**78).-**    On January 21, 2005, **ICE** notified **Verizon** of resolution 5225-03122-2005 of January 21, 2005, rejecting the appeal for revocation against the application of the precautionary measures and filed an appeal with concomitant nullity against the application of the precautionary measures issued in official letter 5225-00939-2005 AEG-0020.2005 of January 7, 2005 before the Deputy Manager of Telecommunications (Document No. 54).

**79).-**    Received on January 31 but dated January 25, 2005, **Verizon** filed within the term granted in resolution 5225-03122-2005, (AEG - 0060-2005) dated January 21, 2005, an extension of the pleadings of the appeal against the precautionary measures, before the Hierarchical Superior [court] (Document No. 55).

**80).-**    On January 13, 2005, **ICE** notified **Verizon** of the writ of transfer of the request for a "prior exception to arbitration agreement" to the Telecommunications Department, so that the latter, in turn, could submit it to the Board of Directors for its knowledge and resolution (Document No. 56).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

**81).-** On February 2, 2005, by means of note number 0012-5372-2005 CD-070-2005 sent to the Deputy Manager of Telecommunications, the Board of Directors communicated that in article 12 of the minutes of Session 5657, held on February 1, 2005, it agreed to reject in its entirety the request to resort to arbitration proceedings as contained in the prior exception to the arbitration agreement filed by **Verizon** (Document No. 56).

**82).-** On February 7, 2005, the Deputy Manager of Telecommunications rejected the appeal and concomitant nullity appeal filed, according to official letter number 6000-06301-2005 SGT-510-2005 (Document No. 57).

**83).-** The Deputy Manager of Telecommunications, Claudio Bermúdez Aquart, MBA, issued the final act of the procedure, based on the recommendation of the final act that was sent to him by the Board of Directors in Official Letter AEG-0128-2005 of February 11, 2005, indicating textually the following:

> "This Deputy Manager's Office, based on the legal citations, applicable jurisprudence and documentary evidence contained in the administrative file, agrees to accept the recommendation of the Institutional Legal Department, of the Technical Unit Information Services Process and of the Procurement Department in its note AEG -0128-2005, therefore, in accordance with articles 10, 11, 13, 14, 20, 21 and 34 of the Administrative Contracting Law, articles 12.1, 13.2, 15.1, 15.2, 15.3, 15.4, 16.2, 22.1, 23.1, 35.1, 35.1 [sic], 49.2 of the General Regulations for Administrative Contracting, article 3, 75, 76, 77, 78, 79 of the Internal Regulations for Administrative Contracting, orders:
>
> **I)** The termination of the contract and execution of the performance bond, given the non-compliance of the contractor VERIZON INFORMATION SERVICE (Costa Rica) LLC.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

*II) Proceed to collect the damages caused, all in accordance with Clause 3.10.3 which textually states: If the quality of the materials used in a particular edition and the preparation of the telephone directories delivered does not guarantee ICE's compliance with the contract and the specifications in this bidding document, and if the amount fixed as a guarantee is not sufficient or is exhausted, ICE may take legal action against the contractor for the collection of damages....*

*III) VERIZON INFORMATION SERVICES (Costa Rica) LLC is hereby notified that this resolution may be appealed within three working days following its notification, in accordance with articles 342 and 346 of the General Law of Public Administration.*

*IV)* **This resolution shall be notified to the legal domicile of Verizon Information Services (Costa Rica) LLC"** (Document No. 58).

**84).-** **Verizon**'s representative filed the appeals mentioned in the previous resolution. On July 8, 2005, by means of Official Letter 0150-36359-2005-GG-680-2005, Engineer Carlos Obregón Quesada rejected the appeal with concomitant nullity (folios 4593 to 4617 of the administrative file) and considered the administrative process exhausted, thus confirming the administrative act of contract termination, contained in note 6000-27733 of June 1, 2005, and ordered the lifting of the precautionary measures issued to that effect. By virtue of this resolution, the contract between **ICE** and **Verizon Group**, which provided the legal basis for the contract between **THS** and **Verizon**, was terminated (Document No. 59).

**85).-** The administrative act that declared the termination of the contract became final on July 20, 2005, date on which the company was notified of the rejection of the appeal filed (Document No. 59).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 68 of 490    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

**86).-**      On February 15, 2005 **THS** sent a note to Mr. Pablo Cob, then Executive President of **ICE**, indicating that **THS** had been acting as the main subcontractor with **ICE**'s approval in all the contracts for publishing and printing the phone books and that for reasons beyond its control, the main contract was being questioned by the parties **(ICE - Verizon)** without **THS** knowing the reasons because it was not involved in the discussion between the parties. It was pointed out that according to Clause Three of the **GTE (later Verizon) - ICE** contract, the former was obliged to carry out the entire process for printing Telephone Directories in Costa Rica. According to Clause 2.13.1 idem, subcontracts had to have prior written approval from **ICE.** In this note, a direct **ICE - THS** contract was proposed in the event that the contract between **ICE** and **Verizon** was definitively terminated. All this, because the information contained in the telephone directories is a public service and is based on what is expressly stated in Article 79 paragraph 1) in relation to paragraph 6) of the Administrative Contracting Regulations. Among the considerations were the unique experience in Costa Rica, the capacity and the fact that the work and experience of **THS** as a company had guaranteed the continuity and regularity of the public service (Document No. 60)

**87).-**      On July 1, 2005, **THS** sent a note to **ICE** requesting reconsideration of the agreements that, among other things, released ICE from charging for the information service of number 113, instead of contracting directly all the stages of the publication, marketing and printing of the guides and reiterated the request for **ICE** to contract these processes directly with **THS** (Document No. 61).

**88).-**      On July 11, 2005, the Secretary of the Board of Directors of **ICE,** Mr. José Abraham Madrigal informs that in session 5679 it was agreed to transfer the letter referred to in the previous Fact to the Telecommunications Sub-Management and Legal Department (Document No. 62).

**89).-**      On August 4, 2005, the Deputy Manager of Telecommunications sent note SGT-3228-2005 in which he informed that at the 5679 meeting of **ICE**'s Board of Directors held on July 5 of that year, it was agreed that **ICE** would enter

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

into an agreement with **RACSA** so that this public company of ICE Group would prepare the 2006 guides (Document No. 63).

**90).-** On that same date, August 4, 2005, **ICE**'s Legal Director, Mr. Geovanni Bonilla, by means of note 0090.38888.2005, informed **THS** of article 01 of the 5680 session of July 12, 2005, of the Board of Directors, in which the interim General Manager was instructed to coordinate what was necessary to do with **RACSA**, so that the 2006 Telephone Directory could be prepared through **RACSA** and thus "decided how to proceed in relation to the telephone directory" (Document No. 64).

**91).-** **ICE,** with this act, failed to comply with its duty to guarantee the principles of regularity and continuity of the public service, which was imposed by the contract originally formalized with the **GTE Group,** now **Verizon Group**, and in which **THS** was in charge of supplying it to users through the publication and printing of telephone directories (same Document No. 64).

**92).-** Pronouncement No. C-152-2000 of the Office of the Attorney General of the Republic, binding for the entire Public Administration, states that the provision of telephone directories by ICE to be supplied to all users is an unavoidable obligation, because it is a public service (Document No. 65).

**93).-** In the session held on August 30, 2005, the Board of Directors of **ICE** agreed:

"To authorize ICE's General Management to evaluate, within a period of thirty working days, the technical, legal, financial, and marketing feasibility of executing the following tasks, starting in 2007 through the execution of a specific agreement with RACSA:

(...)

e) The development, marketing, production and distribution of the Telephone Directories, starting in 2007.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

To repeal resolutions of sessions 5679 of July 5, 2005, and 5680 of July 12, 2005" (Document No. 66).

**94).-** Given the events described in Fact 49 of this Complaint and in order to avoid litigation with **Verizon, THS** filed with the Conciliation and Arbitration Center of the Costa Rican Chamber of Commerce, a request for Conciliation in file CCA28-C011-09-05. The conciliation hearing was held at 10:00 a.m. on October 18, 2005, but the representative of **Verizon**, Mr. Melvin Andujar Queipo, indicated that by instructions of the parent company, he was unable to make any type of proposal or reach any conciliation (Document No. 67).

**95).-** On **September 2, 2005,** the General Manager of **Verizon** in Costa Rica, by means of an Official Letter, a copy of which is attached, informed **THS**, among other things, that "... **ICE** disrespected the contractual rights and those established by law of my client and proceeded to initiate an administrative procedure for the termination of the contract, using public means to distort the reality of the facts", and that as expressly authorized by Clause 28 paragraph b) of the Master Purchase Agreement, **Verizon** terminates this contract due to the termination of the existing contract between **Verizon** and **ICE** for any reason. Thus, **Verizon** unilaterally terminated the Master Purchase Agreement, without assuming and acknowledging its responsibilities to **THS** (Document No. 68).

**96).-** The contract with **ICE** was seriously altered and ceased to produce income, which is why **THS** is in arrears in the payments of its pledge obligation contracted with HEIDELBERG PRINT FINANCE AMERICAS INC. for the acquisition of the Heidelberg Mercury 24D Offset press and all its accessories. On October 19, 2006, the creditor initiated an executive foreclosure proceeding which, under file number 06-001956-0640-CI, was filed in the Civil Court of Cartago, ordering a preventive seizure of up to US $2,831,409.07, which was executed on November 29, 2006 (Document No. 69).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**97).-** In spite of various delaying actions of **THS** in the exercise of its right of defense in the judicial process, at 1:30 p.m. on June 6, 2007, the pledged equipment was auctioned and by order of 9:23 a.m. on August 19, 2007, HEIDELBERG PRINT FINANCE AMERICAS INC. was ordered to take possession of it, which was executed at 2:00 p.m. on October 31, 2007 (Document No. 69).

**98).-** As a result of the actions of the defendants, as indicated and proven in the preceding Facts, **THS** is forced to be in arrears with the rental payments for the industrial buildings of Inmobiliaria Zoroaster S.A., accumulating several monthly payments, so as a delaying measure, while a hope remains of a satisfactory solution between **Verizon** and **ICE, THS** agrees with the said lessor, the company "Inmobiliaria Zoroaster, S.A.", to execute a public deed, corresponding to number 144, beginning on page 133 reverse of the first volume of the Protocol of the Notary Public LAURA MÓNICA ZAMORA ULLOA, at twelve o'clock on March 23, 2006, whereby **THS** commits up to the sum of TWO HUNDRED THOUSAND TWO HUNDRED TWENTY-THREE DOLLARS AND SEVENTY-FIVE CENTS (US $200,223.75), Clause 2 of said document indicating the following: "...SECOND. Debt substitution. This constitution of debt substitutes the monthly rent arrears owed by the Debtor - (TREJOS HERMANOS SUCESORES) - corresponding to the months of July two thousand five up to and including March two thousand six, at the rate of nine months of monthly payments, according to the lease contract signed between Creditor and Debtor, dated July first, two thousand four, lease that is executed on the property of the Creditor, property registered in Property Identification ("Folios Reales") three-one nine zero eight seven three- zero zero zero and three- one nine five eight nine eight- zero zero zero, which is expressly accepted by the Creditor..." (Document No. 70).

**99).-** In said public deed, which in accordance with the provisions of the Code of Commerce is enforceable, interest and form of payment are established by means of monthly installments of twenty-two thousand two hundred forty-seven dollars and eighty-three cents until the obligation is paid in full (same Document No. 70).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 72 of 490

INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5                                                    RECEIVED NYSCEF: 10/26/2021
TRANSLATION

**100).-** **THS** made some payments to its obligations, but due to **Verizon**'s actions and the cessation of contractual payments ordered by **ICE**, it was unable to comply with the form of payment agreed with Inmobiliaria Zoroaster S.A., for which reason the latter filed before the Civil Court of Cartago, a simple enforcement proceeding under file number 06-001846-0640-CI, which culminated with a judgment, accepting the exception of partial payment and ordering **THS** to pay the sum of one hundred fifty-six thousand one hundred eight dollars and ten cents (US $156,108.10) (see Document No. 71).

**101).-** By separate Eviction process filed by INMOBILIARIA ZOROASTER S.A. against **THS**, by resolution of the Small Claims Civil Court of Cartago, issued at 11:35 a.m. on November 8, 2006, within the file number 06-002424-0346-CI, the same is considered established and the eviction is foreseen in the following fifteen days. In said proceedings, several incidents and dilatory actions were filed to extend the term until the judgment of Second Instance issued at 7:40 a.m. on October 4, 2007, but by that time, a settlement had already been reached with the Lessor, which is discussed below (see Document No. 72).

**102).-** In view of the imminent eviction by Inmobiliaria Zoroaster S.A., the auction of the entire press printing equipment by HEIDELBERG PRINT FINANCE AMERICAS INC, **THS** is forced to make a sale under very unfavorable conditions, of practically all its assets in equipment and improvements in the real estate of the Lessor, to the Colombian company CONDOR EDITORES DE COSTA RICA, S.A., legal identification number three- one hundred one- three hundred ninety-five thousand five hundred six, who agree with Inmobiliaria Zoroaster S.A., in the lease of the industrial buildings of the Zeta Free Zone in Cartago, to acquire the equipment auctioned by HEIDELBERG PRINT FINANCE AMERICAS INC. under favorable conditions and already installed in those industrial buildings, as well as the rest of the **THS** equipment pledged to the Banco Nacional de Costa Rica and Banco Interfin (Document No. 73).

**103).-** In order to deliver the industrial buildings so that the Lessor could agree on the new contract with CONDOR EDITORES, as mentioned above, **THS** reached an agreement with Inmobiliaria Zoroaster S.A. which is specified in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5
Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 73 of 490
TRANSLATION
RECEIVED NYSCEF: 10/26/2021

document dated March 28, 2007, entitled *"Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda" [Lease Settlement and Debt Acknowledgment Agreement]*. In this contract, **THS** basically delivers the industrial building where the rotary press and the remaining printing equipment are located, since previously the other building where the offices and warehouse were located had already been delivered, and both parties grant the settlement in that sense, but at the same time it is stated that "...Inmobiliaria Zoroaster S.A. acknowledges having received to date two payments - (which in the eviction process had not been accredited) - for a total amount of fifty five thousand US dollars, as well as having to its credit a security deposit for the amount of thirty-nine thousand dollars, all of which **THS** expressly authorizes Inmobiliaria Zoroaster S.A. to apply toward the total amount owed. Regardless of the fact that the aforementioned legal proceedings may continue, **THS** undertakes to pay the total amount owed as determined in due course, once such deductions are made, together with the agreed interest and costs, until its effective payment, by a final deadline, both parties recognizing that there is an express instruction in the "Trejos Hermanos Trust - Fiduciary Castro Garnier", by which the amount owed to Inmobiliaria Zoroaster S.A. must be paid, as soon as **THS** receives payment of the amounts owed for different transactions pending cancellation, such as for example, an outstanding debt from Radiográfica Costarricense, S.A. (Document No. 74).

**104).-**    Together with the auction of the HEIDELBERG rotary printing equipment, the delivery of the industrial buildings, with all the necessary and specific facilities and infrastructure for such equipment, on that same date, March 28, 2007, **THS** is forced to lease with an option to purchase to DACONDOR D.C.R. SOCIEDAD ANONIMA, which then, on May 29, 2007, assigns its rights to the same company CONDOR EDITORES DE COSTA RICA, S.A. over the remaining industrial assets of the company, for a fraction of the liabilities, both in Transamérica Bank & Trust Co. Ltd. (a subsidiary of Banco Interfin), Banco Nacional de Costa Rica and Banco Improsa S.A. In the specific case of Transamérica Bank & Trust Co. Ltd., these liabilities correspond to a line of credit that was granted to **THS**, based on the magnificent prospects that it had and after the banking studies where the contracts entered into with Verizon for the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

preparation of the phone books of the Dominican Republic and Costa Rica were analyzed (Document No. 75).

**105).-** As can be seen in the attached evidence, the loss of the contract and its immediate consequence of the loss of the income associated with it, implied that the plaintiff company became delinquent with a series of Financial Institutions, accumulating arrears of hundreds of days with several of them and placing some operations in judicial collection. The Company also accumulated significant arrears in its commitments with the Costa Rican Social Security Fund and other public institutions. All of this led the company and its partners that financially guaranteed it to cease to be creditworthy, since with the accumulated levels of delinquency and according to SUGEF regulations, no institution could grant credit to debtors with this type of score, due to the reserves that the financial institution would be obliged to make. By not being able to obtain credit and remaining in a default position in the National Financial System and among the Public Institutions, moral damage of incalculable proportions and impossible to repair has been caused, since not only were the claimed sums not received, but it was also impossible to conduct new business (Document No. 76).

**106).-** In the MASTER PURCHASE AGREEMENT entered into between the **Verizon Group and THS** on February 28, 2002, and March 1, 2002, clauses exempting contractual civil liability and limiting contractual civil liability were inserted, such as those numbered 24 and 28. Specifically, Clause 28 (b) states that the master agreement terminates if the contract with **ICE** terminates for "any reason", and Clause 28 (e) states that "the buyer", i.e. **VERIZON,** is not obligated to compensate TREJOS HERMANOS SUCESORES for damages for non-performance of the contract (Document No. 19, which is a copy of the Master Purchase Agreement).

**107).-** The disclaimers referred to in Fact **105**, above, were imposed by **VERIZON** on **THS**, as well as the other contractual contents, in such a way that **THS** could not modify in any way the contractual content pre-established by **VERIZON** (this Fact is proven by **VERIZON**'s statement, which is requested in the evidence).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## B) .- PURPOSE OF THE TRIAL.-

The purpose of the complaint filed by **THS** is for the judgment to state, as will be specified in the petitioning part of this Complaint, that the actions and decisions of the defendants to set aside the administrative contract between the **ICE** and the **GTE Group,** subsequently called the **Verizon Group,** for the "Edition of the Telephone Guide and Development and Implementation of Information Services" signed in San José on March 10, 2000 have caused the plaintiff serious damages and losses that, as such, constitute a matter of pecuniary liability.

In order to arrive at a better understanding of the object of the trial, we outline the main lines and points of interest of the complaint, providing a rational and comprehensive summary of the interests of the plaintiff.

    a).-   **THS** is a commercial company that specializes in the edition, printing, binding and distribution of telephone directories or phone books. It has worked in this line of business for nearly 90 years.

    b).-   The **GTE Group** entered the national market in 1974 after being awarded a tender issued by the **ICE** to edit and print telephone directories and to sell advertising and feature space in those telephone directories. As part of the set specifications of the call for bids, the ICE required that the part of the contract related to the edition, printing, binding and distribution of the directories be performed in Costa Rica in order to take advantage of the nation's economy and technology.

    c).-   After exploring the Costa Rican market, the **GTE Group** hired **THS** for this purpose based on its history and business reports. The **GTE Group** gradually expanded the coverage of the edition and printing of telephone directories to the Central American and Caribbean market (32 countries). It engaged in negotiations with **THS,** which became its regional partner specializing in such tasks, and was granted the status of "preferred vendor" by the **GTE Group.**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

d).-    In 1999 and 2000, the **ICE** published Public Tender Number 6378 - T, and the **GTE Group** participated in that process and was awarded the administrative contract through a consortium comprised of three of its companies, which participated with the unconditional and full support of the Group's holding company, GTE CORPORATION.

e).-    Alongside the bidding process, the **GTE Group** negotiated the future conditions for regulating and incorporating technological advances that would improve the quality of the editing and printing processes with **THS**. **THS** was required to acquire the most modern equipment and to expand its physical plant so that it could install the necessary equipment.

f).-    Once the main contract was signed by the **ICE** and the **GTE Group,** it was endorsed by the Comptroller General of the Republic. The **GTE Group** hired **THS** for a period of one hundred sixty-eight (168) months to edit and print telephone directories for Costa Rica, Belize and the Dominican Republic.

g).-    Based on the security that such a contract represents, **THS** went into serious debt to be able to acquire the new equipment and expand its industrial plant. **THS** was able to finance the bank and commercial credits that it engaged with the sole purpose of making its production sustainable. If the contract signed by GTE with the **ICE** were added, it would allow **THS** to produce enough income to meet all of its obligations and secure a reasonable and decent profit.

h).-    The contract between **GTE** and the **ICE** entered into force as scheduled. The **GTE Group** merged with the firm Atlantic Bell and formed the **VERIZON Group,** issuing a written statement to the **ICE** indicating that it would maintain all of the rights, duties, obligations and guarantees originally granted by the **GTE Group.** This was confirmation of the fact that, based on the duties set out the contract with the **ICE,** absolutely

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

nothing was to change when the company's name changed as stipulated in Clause Twenty-Five of the contract.

i).-    The contract remained in place under normal conditions for about four years. In 2004, when production of the 2005 telephone directories began, the contract execution policies issued by **Verizon** came into conflict with the bidding and contractual provisions set by the **ICE.** As such, the contract was suspended by both parties, at which point the **ICE** called the performance bonds, declared default and terminated the contract, ordering its management to demand that **Verizon** pay compensation for damages and losses.

j).-    **Verizon** unilaterally terminated its valid and current contracts with **THS** and abandoned all of its commercial activities in the country;

k).-    **THS** is unaware of the legal implications of what occurred between the **ICE and Verizon,** but **THS** was unable to pay off its bank and commercial loans due to the actions of these two parties. It also stopped making payments to raw materials suppliers and on its leases, stopped paying wages and benefits to its employees and was forced to suspend its activities and permanently close its business. In a technical sense, **THS** was placed in a situation that is equivalent to commercial bankruptcy.

l).-    Given that the commercial misfortune of **THS** stems from the breach of the contract signed with the **GTE Group,** subsequently named **VERIZON Group,** and based on the fact that the nexus is the tender and the contract signed between **THS and VERIZON Group** as a subcontract and, therefore, an accessory to it, it is legally essential that it sue both parties so that **THS** can be compensated for the damages and losses caused by each of them proportionally.

In short, the purpose of the trial is to demand that the defendants pay for the damages and losses caused to **THS** as a result of the conflict that both parties -

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)         INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5                                                        RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 78 of 490

TRANSLATION

the **ICE and the GTE Group** (later **VERIZON Group)-** created between them, with the terrible effects of the suspension of all of the industrial activity of **THS** and its permanent exit from the business line that it had exercised for more than 90 years.

## C).- MAIN CONTRACT, ITS NATURE AND LEGAL FRAMEWORK.-

The contract that the GTE Consortium initially signed with the ICE was based on the administrative hiring procedures (public tender) that the Costa Rican Electricity Institute established in the performance of its duties. These strictly follow the provisions of Article 182 of the Constitution. The GTE Consortium was awarded the tender through this process as outlined in the Facts of this complaint.

National doctrine, case law established by the constitutional and contentious-administrative courts, and the case law of the Office of the Comptroller General of the Republic unanimously hold that an administrative contract is much more that the "document contract" signed by the parties when the awarding act is final.

In our system, the administrative contract includes the bid specifications (tender); the awarded offer with its annexes and clarifications; the technical, financial and legal studies that serve as the basis for awarding the tender; the awarding document itself; and the document that is signed, which is endorsed by the Comptroller General of the Republic.

This was expressly recognized by the **GTE Consortium** and the **ICE** when they signed the First Clause of their contract, which was endorsed by the **CGR** on December 13, 2000.

These principles and regulations played an important role in the contract between the GTE Consortium and the ICE, which we summarize as follows:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

1).-     In Fact 15) of the complaint, we show that on page 9 of its bid, the GTE Consortium stated, unconditionally accepting Clause 1.3.1.3 of the tender, that it is aware of, accepts and submits to ICE procedures for bidding, to everything stipulated in the documents of this tender, and to the courts and laws of Costa Rica, as stated in the Consortium Agreement, in which the companies that formed it literally expressed: *"... In addition, in compliance with the provisions of articles two hundred twenty-six and two hundred thirty-two of the Commercial Code of the Republic of Costa Rica, we hereby declare, for the purposes of this document and the Consortium Agreement in general, that both the three companies that comprise this Consortium and the legal representatives named herein submit to the Laws and Courts of Costa Rica for all purposes and contracts that are signed or are to be executed in Costa Rica as part of the aforementioned tender..."*. (Document No. 13 and Clause Six of the consortium agreement in Fact 24 of this Complaint).

2).-     In Fact 18) of the Complaint, we show that in Clause 25 of the document, the two parties involved with the contract, the **ICE** and **GTE Consortium,** stipulated that, *"In the event that this entity changes its name due to a change in the law or GTE changes its name as a result of merging or partnering with another company, this contract will remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented herein"* (Document No. 6).

3).-     In Fact 21 of the Complaint, we also demonstrate that in a note dated August 28, 2002, the General Manager of Verizon Information Services - Costa Rica, LLC explained the changes to the names of the three companies that signed the Consortium agreement to the **ICE** Information Services Area and attached the necessary documentation to prove those facts. This was done in order to indicate that the companies GTE Directories Corp, GTE Information Services, Inc and General Telephone Directory Company C por A. changed their names as a result of the merger between Bell Atlantic and GTE, which created VERIZON. They came to be called Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services- Costa Rica, LLC. All

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

this is demonstrated in folios numbers 3040, 3041 and 3042 of the administrative file attached in Document No. 15, which were certified by the ICE.

4).-        Fact 22 of the Complaint shows that in the August 28, 2002 note referenced in the immediately preceding point, the following is stated: *"II.- MAINTENANCE OF ALL OBLIGATIONS AND RIGHTS. In accordance with the requirements set out in the note dated June 18, 2002, I attach to this document an AFFIDAVIT on the **Maintenance of Obligations and Rights** signed by the legal representatives of Verizon Information Services, Inc, Verizon Directories Corp and Verizon Information Services-Costa Rica, LLC in which they accept the rights and obligations derived from Tender 6378-T and the contract derived from the same"* (folios 3035, 3036 and 3037 of the administrative file attached and certified in Document No.15).

5).-        Fact 27 of the Complaint shows that pages 427 to 432 of the administrative file contain the Consortium's offer. In compliance with Clause 2.4.1.B, paragraph I of the tender, the American firm **GTE CORPORATION** CERTIFIES:

> *"I.- That this Corporation is aware that the Consortium constituted by GTE Information Services Incorporated, GTE Directories Corporation and General Telephone Directory Company C por A will participate in Public Tender No. 6378-T, promoted by COSTA RICAN ELECTRICITY INSTITUTE for "The Contracting of Services for eight years and the Development and Implementation of Information Services."*

> *II.- That in accordance with the provisions of Clause 2.4.1- B (The Financial Capacity of the Company) included in Public Tender No. 6378-T, the aforementioned Consortium will submit the Financial Statements of GTE Corporation, the group's holding company.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*III. - That according to the requirements of the same Clause 2.4.1- B mentioned above, **GTE Corporation** declares that it will be jointly responsible with the companies of the aforementioned Consortium for all of the obligations that this Consortium acquires as a bidder and as the winner of the aforementioned Public Tender No. 6378-T before the COSTA RICAN ELECTRICITY INSTITUTE.*

*IV. - This corporation issues this certification to be presented to the Costa Rican Electricity Institute in Public Tender 6378-T mentioned above.*

*Issued in the city of Irving, State of Texas, United States of America, on June 22, 1999."*

The document was signed by Daniel P. O'Brien in his capacity as EVP, Chief Financial Officer, and is accompanied by a notarized footnote from Notary Public Cynthia Owens of Tarrant County, State of Texas, which is then certified by the Consulate and certified in accordance with the Law (see certified copies of the file in Document No. 18).

6).-        The firm **GTE CORPORATION,** Holding company of the GTE Group, by stating that it granted its full guarantee backed by its financial statements, which could be used in the ICE's Public Tender 6378-T to prove the financial capacity of the Consortium, which was then acting as bidder, and also granting its guarantee to be jointly responsible with the companies of the Consortium for all of the obligations that it undertook as a bidder and as a successful bidder, acquired, irremediably, the condition of joint and several responsible party for both the Consortium and for the full execution of the contract and therefore also the condition of a party that is jointly responsible with the ICE for the results of the negotiation.

Note that according to the text of Clause 2.4.1.B of ICE Tender 6378 T, this was not a mandatory provision, but was available to all potential bidders, who could

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

decide to use or not use this resource when formulating the proposal that they submitted to the administration.

In other words, in cases in which the participants (bidders) in the bidding process needed or wanted to strengthen their financial endorsements, relevant experience, and knowledge of the technological development of information systems such as is required by the ICE, they could accompany the audited financial statements of the Holding to which they belonged in order to earn the full score for the elements considered in the evaluation of the offers.

But in this case, the Holding Company (**GTE Corporation**) assumed joint and several liability together with the bidder or bidders for all of the obligations arising from the contract to be awarded. As such, they had to prove indubitably and manifestly in the proposal their will freely expressed in that sense. In other words, in this specific case, solidarity was not a condition imposed by the ICE, but an obligation freely assumed and undertaken by the Holding Company **GTE CORPORATION,** which expressed in writing, in certified documents, its intention to act in that manner at the time.

Through a merger of companies in the United States of America, **GTE Corporation** became **VERIZON COMMUNICATIONS INC.,** the Holding Company of the VERIZON Group. It is therefore clear that the relationships derived from the Administrative Contract of International Public Tender 6378-T and its legal effects for the fulfillment of its duties and obligations did not undergo any changes, remaining unaltered, final and in force because the entity liable to the ICE is the same company (the winning Consortium) with a different name or company name.

7).- That said, it is more than evident that the defendant companies Verizon Communications Inc. and Verizon Information Services - Costa Rica-LLC are part of an economic interest group, which we conventionally call the VERIZON GROUP, which is the same economic interest group as the entity that

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

was called GRUPO GTE, comprised of the GTE Consortium and GTE CORPORATION. This entity was awarded Public Tender No. 6378-T promoted by the ICE, entering into an administrative contract that was executed through this economic interest group through the "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

8).-       When it addressed the specifications set out in the terms of Public Tender 6378-T, the GTE Consortium indicated in its response to Clause 1.1 regarding the purpose of the contract that it is to Develop and Implement Information Services, which includes the development, marketing, production and distribution of telephone directories and complementary and substitute products and services.

Based on the criteria of the Office of the Attorney General of the Republic set out in pronouncement No. C-152-2000, which is binding for the entire Public Administration, in which it declared that the provision of telephone directories by the ICE to all of its users is an unavoidable obligation because it is **a public service,** it is clear that in the administrative contract awarded in Public Tender 6378-T has a main objective and secondary objectives.

The main objective of the administrative contract from the perspective of this area of public service is the duty to edit, publish and distribute telephone directories to all telephone service users, and everything else is accessory and dispensable. If one analyzes the terms, it is clear that it is possible to publish the telephone directories without advertisements, and that it is not possible to publish a commercial advertising book without including the names and telephone numbers of all telephone service users.

This was recognized by the parties - GTE Consortium and the ICE - when describing the work covered by the contract in the Second Clause "Description of the Work": the Phone Book is the main element, and the rest is secondary.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

As such, by dissolving the contract between the GTE Consortium and the ICE, this Public Institution should have taken the precautionary measures necessary to ensure that the public service of providing information through Phone Books was not seriously affected and that classic principles such as equality, continuity and adaptation were not violated.

Although the administrative contract was signed between the GTE Consortium and the ICE, as shown in Facts that 4) through 9) and 29) of this Complaint, the terms required that the main part of the contract be formalized with a company based in Costa Rica, which was historically done with **THS.** That contract had to be reported to and approved by the **ICE** in advance in order to be valid.

As such, the Contract that THS signed with the GTE Group (later the VERIZON Group) and that the ICE approved and authorized, is by its very nature a contract governed by the principles of public service and is regulated by its principles, standards and values.

## D) .- DAMAGES AND LOSSES CLAIMED.-

As demonstrated by the list of Facts set forth in this Complaint, which are proven by the evidence that supports them, the plaintiff company demands that the defendants compensate it by paying for the damages and losses incurred as a result of their actions, which led the two parties - the **ICE** and **Verizon Group-** to terminate the administrative contract signed by the two as part of International Public Tender No. 6378-T held by the **ICE.**

This administrative contract provided legal and commercial support to the negotiation that was held and the contract between the plaintiff and the **GTE Group**, which would later change its name to **Verizon Group.**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

The seriousness of the actions and omissions of the defendants and the effects of their conduct forced **THS** to irrevocably cease all commercial activity; to be absolutely unable to pay the obligations that it had undertaken with financial and commercial institutions in order to comply with the obligations imposed by its contract with **Verizon Group**, which the **ICE** approved; and to liquidate all of the business activities that it had conducted for nearly one hundred years.

The attached economic-financial report prepared by renowned expert Tomás Evans Salazar, Bachelor of Business Administration, attests to the consequences of the contractual breaches of the **Verizon** Group in Costa Rica, Belize and the Dominican Republic.

This study supports the estimate of damages and losses caused by the irregular execution of contracts after 2000 which forced **THS** to make special investments in order to increase its capacity (in physical plant, machinery and equipment) and increase the production of telephone directories to reasonable levels based on the production volumes required by the defendants.

As such, and in accordance with the attached financial analyses, the plaintiffs demand compensation for the following from the defendants, all of them settled as of August 31, 2008:

Based on the study prepared by Mr. Tomás Evans Salazar, member of the College of Professionals in Economic Sciences, card 11968 and which is attached as expert evidence that must be ratified by the experts to be appointed by the Court, this claim identifies as the elements that comprise the damages and losses incurred by the defendants against the plaintiff to be the amount that should have been reserved for investment in machinery, the increase in average inventories that should have been maintained from the years 2000 to 2004, the expected and unrealized flows from the period 2004 to 2007, the interest paid inherent to the operations subscribed for the purchase of machinery and infrastructure financing, the interruption of operations, the related pain and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

suffering, the interest that these elements produce until the full payment of the amounts established in the judgment and, finally, the costs of these proceedings.

The estimates made are based on the accounting information for the periods from December 31, 1990 to March 31, 2004, which is duly recorded in the company's accounting records. In addition, for the financial statements for 2000 to 2004, the necessary adjustments were incorporated into the calculations aside from the exceptions filed by the auditors in each of these periods relative to the development of new projects.

The rates applicable to the calculations correspond to average rates calculated based on Central Bank of Costa Rica publications.

The tools that are normally used for prospective and retrospective information have been used conservatively, which involves the use of formulas to determine averages, future values, current values, estimates based on regressions, and others.

The periods 2003 and 2004 are presented together given that there was a change during the 2003 accounting period in accordance with the provisions of paragraph 2 of Article 4 of the Income Tax Law, which meant that the financial information audited would last from October 1, 2003 to March 31, 2004.

## BASES FOR THE ESTIMATION OF DAMAGES AND LOSSES

| Basis for Compensation | Assumptions |
|---|---|
| **For Investment in Machinery** | • Calculation of the future value of investments recorded in accounting minus the sale price of the rotating machine and its accessories. <br> • Cut-off date August 31, 2008. <br> • Average annual rate of 16.94% applied. |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 87 of 490

RECEIVED NYSCEF: 10/26/2021

TRANSLATION

| | |
|---|---|
| **For Increased Inventory** | • The future value of the increase in the investment made in inventories was calculated by comparing the average for the periods 1997 to 1999 with the inventory levels for 2000 to 2004.<br>• Cut-off date August 31, 2008.<br>• Average basic passive annual rate applicable to the corresponding period. |
| **For Unrealized Profits**<br>**P 2004-2013**<br>　　**Costa Rica and Dominican Republic** | • We proceeded to calculate the future and present values of the cash flows that the company would have generated in accordance with the terms of the contract and according to the estimated income based on the thousands of pages provided.<br>• Cut-off date August 31, 2008.<br>• Average annual rate of 2.79% applied.<br>• Average US inflation rate 3.54% per year. |
| **For Losses 2004-2007** | • The resulting losses for the period between 2004 and December 31, 2007 were carried to future value.<br>• Cut-off date August 31, 2008.<br>• Average annual rate of 2.79% applied. |

| **Basis for Compensation** | **Assumptions** |
|---|---|
| **Interest** | • All of the interest paid to Banco Cuscatlán and Heidelberg's supplier company was considered based on the accounting record dates, and their amounts were carried to future value.<br>• Cut-off date August 31, 2008.<br>• Average annual rate of 2.79% applied. |
| **Due to interruption of operations** | • Based on the information contained in the audited financial statements for 1991 to 1999, the cash flows that the company would have generated without the impact of the Verizon contract on its operations were projected. |

## Calculation Detail

**1).- Investment in Machinery**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5     Case 1:21-cv-08928  Document 1-1  Filed 11/01/21  Page 88 of 490  RECEIVED NYSCEF: 55/26/2021

TRANSLATION

In order to comply with the terms of the contracts signed with Verizon Information Services - Costa Rica, LLC, Verizon Information Services - Belize, LLC, and GTE Directorios República Dominicana, C por A., the company had to purchase a Rotating Machine and all of the related Heidelberg brand equipment with an acquisition cost of ₡ 955,116,741.00 including the capital expenditures necessary to make it operational.

The rotating machine stopped operating because the original terms of the contract were not met. This specialized equipment was eventually sold by the seller company in June 2007. The following procedure was followed to ascertain the loss caused by the judicial sale of the machine:

The original cost of the equipment and the rotary machine was updated to express it in *colones* for June 2007, the month the judicial auction was finalized. The same procedure was applied with the amount of the revaluation carried out in December 2004. Monetary adjustment factors calculated based on the Consumer Price Index published by the Central Bank of Costa Rica were used.

The accumulated depreciation amounts of the historical cost of the equipment and the rotating machine and of the revaluation that was carried out on it were indexed in order to re-express the amounts in *colones* for June 2007. Next, the loss was determined as the difference between the net value of the machinery as of June 30, 2007 and its sale price on the same date.

The resulting amount was restated in *colones* for August 2008 using the aforementioned consumer price index. This figure was converted to its equivalent in US dollars by dividing it by the exchange rate for August 31, 2008 published by the Central Bank of Costa Rica.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5          Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 89 of 490    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

Given that the aforementioned investment in machinery would not have been necessary for the company had it not signed the contracts in question (to meet the technical, volume and quality requirements provided for therein), compensation for that investment and capitalizable expenses incurred inherent to it must be provided.

**Amount to be compensated for this item**      **$ 2,582,156.00**

### 2).-    Increase in Inventory

There were significant differences in the investment in inventory between 1997 and 1999 and between 2000 and 2004. These variations were the result of the investment in working capital necessary to comply with the contracting requirements.

Therefore, to calculate the damage, the variations in inventory expressed in US dollars for 2000 to 2004 were taken to future value using the cut-off date of August 31, 2008. The average net passive interest rate of the Financial System for deposits in US dollars for the pertinent periods was used.

**Amount to be compensated for this item**      **$2,860,696.00**

### 3).-    Projected and unrealized flows for 2004-2013

To calculate the damage and loss derived from this situation due to contracting in Costa Rica, the consumption of thousands of pages between 2000 and 2003 was used. The information was projected from 2004 to 2013. The contractual rate of $1.20 per thousand was applied for 2004 through 2005 and that of $1.15 was used for 2006 to 2013 to establish the amount of projected income. The percentage of the historical average of the cost of sales for 2000 to 2004 was

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

determined. The projected cost of sales was estimated based on that percentage. The edition and administration expenses corresponding to the 2004 period were determined. The percentage that the thousands of pages produced represent of the total income for this item was calculated. Based on said distribution percentage, the portion of administrative and publishing expenses inherent to the Costa Rican directories was estimated. Average US inflation was determined for 2004 to June 2008. This inflation was applied to the administrative and publishing costs (in US$) through 2013. The elapsed and remaining days were calculated between December 31, 2004 and 2013 compared to August 31, 2008. Future and current values were calculated as of August 31, 2008. The total amount of the quantified damages is $8,806,872.00.

We used the same calculation to ascertain the damage and loss generated in the Dominican Republic as a result of the same premature termination of the contract and its partial execution under parameters other than those agreed to. The total amount of the quantified damages is $7,912,999.00.

<u>**Amount to be compensated for this item**</u>

| | |
|---|---|
| **Costa Rica** | **$ 8,806.872.00** |
| **Dominican Republic** | **$ 7,912.999.00** |

### 4).-    Losses incurred between 2004 and 2007

The resulting losses for 2004 through 2007 were carried to future value on the cut-off date of August 31, 2008 using the average net borrowing rate of the financial system for deposits in US$ according to information from the Central Bank of Costa Rica.

<u>**Amount to be compensated for this item**</u>                **$ 7,237,068.00**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### 5).-    Interest

To calculate the damage and loss derived from the interest incurred, each of the interest charges paid to Banco Cuscatlán and to the Heidelberg equipment supplier company were considered based on their accounting record date. The amounts were taken to future value, with August 31, 2008 established as the cut-off date. To calculate the future value of each of these disbursements, the average net Passive Interest Rate of the Financial System for deposits in US$ was used based on information from the Central Bank of Costa Rica.

### Amount to be compensated for this item          $ 983,825.00

### 6).-    Interruption of operations

The company Trejos Hermanos Sucesores, S.A. (THS) has maintained continuous operations in the printing industry for decades, specifically since 1912. This speaks to the historical consolidation of a business with normal operations. The economic performance of the firm during the period 1991-1999 has been evaluated on this basis, and an external audit opinion has been provided for those financial statements. The firm's representatives believe that, as of the year 2000, the effects of the contractual relationship with its counterpart considerably and cumulatively damaged the firm's management to the point of preventing it from maintaining its normal operation and, finally, causing it to be impossible for it to continue. Given this background, a technical procedure was carried out to estimate lost profits in US$. This procedure includes the following points:

1.    Analysis of the real economic trajectory of the firm (audited figures) during the period 1991-1999.

2.    Forecast of the results of economic income for the period 2000-2014 based on the trends for the period 1991-1999.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

3.    Estimate of sales costs and operating expenses for the period 2000-2014 in accordance with the real proportion that these items represented in the economic structure of the firm during the period 1991-1999.

4.    Depreciation is added to operating profit as it constitutes a non-effective expense, thus determining Earnings before Interest, Taxes, Depreciation and Amortization (EBITDA).

5.    The reinvestment rate in fixed assets that would have been reasonably necessary to maintain future operational continuity is subtracted from the EBITDA. The annual cash flows for the period 2000-2013 are estimated based on this.

6.    The net cash flow is completed by calculating the present value of the perpetuity of the business assuming, given its previous history, the operational continuity of an indefinite term. A perpetuity is a financial technical procedure that allows one to express the value of the future flows of a business beyond the horizon or basic planning term. The cash flow corresponding to the last projected year is divided by the rate of return of the business (discount rate).

7.    Perpetuity includes a real growth rate of 3.28%, which conservatively corresponds to two-thirds of the Gross Domestic Product for the period corresponding to the years 2000 to 2007. Perpetuity is based on the technical financial principle that states that permanently generating a cash flow is equivalent to having its present value (in this case, the value as of 2007).

8.    The discount rate of the flows (update rate) was determined considering the Average Deposit Rate for 2002 to 2008 in US$ from the State Bank in Costa Rica, the average US inflation for 2002-2006, the business risk and return represented by its historical percentage EBITDA.

9.    The net cash flows were discounted in order to establish the present value of normal operations projected for the 2007 and subsequent periods and the values corresponding to the flows for the 2000-2006 period were updated, all in order to express the flows in *colones* of December 2007.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Amount to be compensated for this item**          $28,885,195.00

## Summary of Claimed Items

TREJOS BROTHERS SUCCESSORS SOCIEDAD ANONIMA
SUMMARY OF ESTIMATE OF INDEMNIFIABLE AMOUNTS
In US$

| | |
|---|---|
| Cut-off date | 31 Aug 08 |
| Average Basic Passive Rate 2000 - 2008 | 16.94% |
| Average interest rate on deposits of the Financial System for deposits in the US - 2000-2008 | 2.79% |
| Estimated exchange rate as of August 31, 2008 | 547.93 |

| Element | Concept | Amount in USD As of 06/30/200? |
|---|---|---|
| 1 | Investment in Machinery | 2,582,156 |
| 2 | Increase in Inventories | 2,860,696 |
| 3A | Operating Cash Flows not received P 2004-2013 Directories Costa Rica | 8,806,872 |
| 3B | Operating Cash Flows not received P 2004-2013 Dominican Republic | 7,912,999 |
| 4 | Losses (2004 to 2007) | 7,237,068 |
| 5 | Interest | 983,825 |
| 6 | Interruption of operations | 28,885,195 |
| | **TOTAL COMPENSATION SOUGHT** | **59,268,811** |

## 7).-      Pain and Suffering Caused.-

In addition to the items listed above, **THS** has suffered severe pain and suffering as a direct result of the conflict created by the defendants through the termination of the contract signed on February 28, 2002.

The lack of production volume necessary to produce the income required to cover fixed costs caused the company to stop making payments and lose other customers, among other negative effects.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

The company and the partners that endorsed it fell into the ignominious category of being classified as unfit for credit, mainly due to delays in meeting financial obligations and, later, due to the real impossibility of being able to meet those obligations.

The company saw its machinery and equipment seized, was evicted from industrial facilities, had bank loans closed and was unable to compensate its staff. All of this together prevented the company and its partners from seeking out other business opportunities and affected partners' other companies, which had no connection to **THS.**

See the certified documentation submitted by Caribbean Publishing Co., its notes, its emails about the board from the Republic of Honduras and the credit history issued by the General Superintendency of Financial Entities (SUGEF) and credit protectors, which comprise Document No. 72 and form part of the documentary evidence.

<u>**Amount to be compensated for this item**</u>          **$ 5,000,000.00**

<u>**8).-    Interest.-**</u>

Finally, the plaintiffs demand that the defendants pay interest on these sums that accrued between the cut-off date for the calculation, August 30, 2008, and the effective payment of their obligations. This interest will be calculated in accordance with Article 1163 of the Civil Code, that is, at the rate paid by the National Bank of Costa Rica for six-month certificates of deposit for the currency in question.

<u>**E).- LAW.**</u>

The legal situation set out in the complaint speaks to the presence of a complex contractual relationship.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

It is based on a contract between GTE (now VERIZON) and the ICE for the production of telephone directories that they entered into in 2000. This contract required that the printing of the telephone directories be carried out entirely in Costa Rica. To that end, GTE (now VERIZON) agreed to a "Master Purchase Agreement" in February 2002 under which TREJOS HERMANOS SUCESORES, S.A. would produce, pack and distribute telephone directories.

When it signed the Master Purchase Agreement, GTE (now VERIZON) considered the highly positive information provided regarding THS's efficiency in its continued business relationship as well as the material preparation that GTE (now VERIZON) required from THS, such as the transformation and expansion of its industrial plant.

The GTE - THS Master Purchase Agreement was the tool that GTE used to meet its obligations to the ICE under the 2000 contract. The existence of the Master Purchase Agreement cannot be understood without its foundation, the ICE - GTE contract. Even said Master Contract had to be approved by the ICE.

Once the ICE administratively ordered the termination of the 2000 contract with GTE (now VERIZON) attributing to it a serious breach, the GTE - THS Master Purchase Agreement was left without the foundation necessary for its execution.

As such, the legal relationships cited are ICE - GTE (VERIZON) - THS, constituting a complex contractual network in which the end parties (ICE and THS) are not completely separate. Although they are not direct contractors, both had mutual knowledge of each other's participation in the contracted material activity (the production of telephone directories), and the ICE oversaw and conducted periodic visits to the THS plant to supervise the correct printing of the telephone directories. It is important to highlight the approval of the Master

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Printing Agreement by the ICE, which necessarily involved it in the legal relationship that is the basis of this litigation.

The termination of the ICE - GTE (VERIZON) contract had the immediate effect of making the execution of the GTE (VERIZON) - THS contract impossible. Thus, all of the resulting negative consequences (damages and losses caused to THS) rest on the termination of the ICE - GTE (VERIZON) contract.

There are two contractual relationships: ICE - GTE (VERIZON) and GTE (VERIZON) - THS. There is also an extra-contractual relationship: ICE - THS.

The termination of the ICE - GTE (VERIZON) contract constitutes an **objective breach** of the GTE (VERIZON) - THS contract. This objective breach is attributable to GTE (VERIZON). As such, this entity must be liable for the damages and losses caused under the general principle of contractual liability established in Article 702 of the Civil Code.

And the losses and damages suffered by THS, due to the objective breach of its contract with GTE (VERIZON) were generated by the ICE, which terminated its contract with GTE (VERIZON) without considering the legitimate interests that THS had in that agreement, thereby violating the *Neminem laedere* principle of not harming others. The ICE incurred civil liability in accordance with the application of the principles of the General Law of Public Administration (Articles 190 and following), whether its action is considered lawful (Articles 194 and 195) or illegal (Articles 191 and 192). Article 1045 of the Civil Code also establishes such responsibility.

The damages and losses for which compensation is sought from the defendants by THS are an immediate and direct consequence of the unlawful actions attributed to the defendants. The provisions of Article 704 of the Civil Code are thus met, as the charges made against the defendants are the sole cause of such damages. The damages and losses claimed are foreseeable in nature because

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the defendants could rationally anticipate that they would be caused to THS by the alleged actions.

The direct damages or capital decrease itself consists of the assets and rights that THS lost as a result of the termination of the complex contractual relationship referred to in this complaint.

Damages for loss of profits refer to the assets and rights that were to be received by THS (as is a clear case of anticipated and foreseeable profits) and the fact that the entity could not receive them due to the termination of the aforementioned complex contractual relationship.

This termination of the contractual relationship caused pain and suffering to THS because the defendants' actions robbed it of the prestige developed since its founding in 1912. Compensation for this must be provided under Article 59 of the Civil Code, which establishes the general principle of the right of compensation for damage to the right of publicity.

This complaint presents facts that speak to the existence of an *economic interest group* comprised of the companies of the VERIZON GROUP. It notes that the civil liability claimed in the complaint covers the *higher-ranking entity* VERIZON COMMUNICATIONS INCORPORATED.

It should be noted that the First Chamber of the Supreme Court has used the concept of economic interest group to assign civil liability for the actions of the entities that comprise it. Supreme Court judgment number 000973-F-2005 issued at 4:00 p.m. on December 15, 2005 (declaring a cassation appeal inadmissible) supports the criterion of the Second Civil Court of San José regarding the responsibility of the ***"highest ranking entity"*** within the group.

Economic interest groups have also been called "economically efficient contractual networks." This term reflects a move to put into play the principle of contractual relativity, in the sense that only those who appear formally as parties

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

to the contract can be subject to the rights and obligations derived from it. But if the "economically efficient contractual network" or the "economic interest group" are found to be tools for abusing legal status, it should be understood that such abuse of rights is expressly condemned by Article 22 of the Civil Code. Article 432 of the Commercial Code (cited in another judgment regarding economic interest groups) states that the obligation of co-debtors is joint and several. It is that solidarity between co-debtors that is claimed in this process.

The civil liability disclaimers included in the master purchase agreement at VERIZON's insistence are necessarily ineffective due to imperative principles of Public Law. It should be noted that although the Verizon - THS contract was signed in the form of a commercial agreement, it is administrative in nature due to its purpose and effects. The Office of the Attorney General of the Republic has expressed, in a binding opinion and as stated in this complaint, that the edition, printing and distribution of telephone directories constitutes a public service. As such, it adds, the agreements that have as their object the editing, printing and distribution of telephone directories are also administrative in nature. Based on this legal situation, the anticipated exemption of responsibility by the Administration through the agreement is inadmissible. The same is true for the renunciation of the Administration's privileges given that the Public Treasury manages such matters, which are protected by principles of constitutional rank. Under the administrative principle, these privileges cover both the contract that "appears" as the main one and the subcontracts established to comply with all the expected effects of the public service.

On the other hand, from a Private Law perspective, note that the disclaimers of contractual civil liability contained in the MASTER PURCHASE AGREEMENT entered into by VERIZON and TREJOS HERMANOS SUCESORES are also null and void.

These clauses are integrated into an **adhesion contract** because the content of that agreement only allowed TREJOS HERMANOS to accept or reject it and the **abusive** nature of the clauses results in their nullity. This nullity is recognized in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

January 19, 1995 (Law for the Promotion of Competition and Effective Defense of the Consumer).

In the end, these civil liability disclaimers are ineffective in the case of an intentional breach in accordance with Article 701 of the Civil Code. Verizon's breach of the MASTER PURCHASE AGREEMENT is intention: this company did not meet its obligations even though it had no material obstacles to doing so. This is clear based on the fact that VERIZON unilaterally tried to modify its contract with the ICE so that it would not have to comply with its original obligations, which was attributed to VERIZON's compliance with the Master Purchase Agreement with the plaintiff. This is intent in the execution of a contract in accordance with the doctrine of the First Chamber of the Supreme Court of Justice, established in Judgment Number 320, which was issued at 2:20 p.m. on November 9, 1990. As a result of this willful breach, all of the contractual clauses that were intended to exonerate VERIZON from civil liability are rendered ineffective.

## F).- CLAIM.

Based on what was explained in Chapter D) above on the Damages claimed, in accordance with the Facts of the Complaint, the evidence provided and the economic studies that are attached, we are filing suit against the **Costa Rican Electricity Institute** and companies **Verizon Communications Incorporated** and **Verizon Information Services - Costa Rica- LLC,** so that the judgment finds in favor of the plaintiff on all counts and said parties are ordered to pay for the damages and losses claimed jointly and severally.

We thus ask that the sentence state:

**1).-** That the "Master Purchase Agreement" signed on February 28, 2002 by plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES - COSTA RICA, LLC) constituted a **means of execution** of the contract between the commercial firms "GTE Information

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A", companies of the United States of America domiciled in the State of Delaware with their main offices in the City of Dallas, State of Texas, who identified themselves as the <u>GTE Consortium</u>" and the COSTA RICAN ELECTRICITY INSTITUTE, for the award to said Consortium of Public Tender No. 6378-T promoted by the ICE according to the agreement of the ICE Board of Directors reached during ordinary session number five thousand one hundred fifty-two held on February 1, 2000 and endorsed by the Office of the Comptroller General of the Republic on December 13, 2000.

**2).-** That the aforementioned "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A, was known to the COSTA RICAN ELECTRICITY INSTITUTE, **which approved the intervention of TREJOS HERMANOS SUCESORES S.A. in the execution of the administrative contract awarded to the GTE Consortium** resulting from Public Tender No. 6378-T promoted by the ICE.

**3).-** That the termination of the administrative contract entered into by the COSTA RICAN ELECTRICITY INSTITUTE and the GTE CONSORTIUM (whose name changed to the VERIZON CONSORTIUM) led to the termination of the "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

**4).-** That TREJOS HERMANOS SUCESORES S.A. was not responsible for the events that led to the termination of the administrative contract entered into between the COSTA RICAN ELECTRICITY INSTITUTE and the GTE CONSORTIUM.

**5).-** That TREJOS HERMANOS SUCESORES S.A. had no responsibility whatsoever for the events that led to the termination of the "Master

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Purchase Agreement" signed on February 28, 2002 by plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

**6) .-**        That the termination of the "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. caused immediate and direct damages and losses to TREJOS HERMANOS SUCESORES S.A.

**7.-**        That the defendant companies Verizon Communications Inc. and Verizon Information Services –Costa Rica- LLC are part of an economic interest group that is in turn a successor to the economic interest group called the GTE Consortium, which was awarded Public Tender No. 6378-T, promoted by the ICE, and executed through the "Master Purchase Agreement" signed on February 28, 2002 by plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

**8) .-**        That **"VERIZON COMMUNICATIONS INCORPORATED"** is the highest-ranking entity of an economic interest group which is part **"VERIZON INFORMATION SERVICES –COSTA RICA- LLC."** Therefore, the first of these companies is jointly and severally liable with the second for all the obligations contracted by **"VERIZON INFORMATION SERVICES - COSTA RICA- LLC"** with **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA.**

**9) .-**        That the defendant companies **Verizon Communications Inc. and Verizon Information Services –Costa Rica- LLC** are jointly and severally liable for the negative consequences suffered by the plaintiff company, which occurred due to the termination of the Master Purchase Agreement signed on February 28, 2002 with plaintiff Trejos Hermanos Sucesores S.A.

**10) .-**        That the **COSTA RICAN ELECTRICITY INSTITUTE** ignored the legitimate rights and interests of **TREJOS HERMANOS SUCESORES S.A.** derived from the execution of Public Tender No. 6378-T through the "Master Purchase Agreement" signed on February 28, 2002, for which it is jointly liable

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

with Verizon Communications Inc. and Verizon Information Services –Costa Rica- LLC for compensation for the damages suffered by the plaintiff due to the termination of the aforementioned Master Purchase Agreement signed on February 28, 2002.

**11).-** That the clauses of the MASTER PURCHASE CONTRACT entered into between VERIZON and TREJOS HERMANOS SUCESORES regarding the exemption of civil liability of VERIZON for breach of contract are null and void, including within this nullity, above all, Clauses 24 and 28 of that contract. This statement is not limited to them, since it includes all the civil liability exonerative clauses that favor VERIZON.

**12) .-** That the defendants the **COSTA RICAN ELECTRICITY INSTITUTE** and companies **Verizon Communications Inc.** and **Verizon Information Services –Costa Rica. LLC** must pay the plaintiff, jointly and severally, the damages and losses incurred, which we break down as follows:

| | |
|---|---|
| a) Investment in machinery | $ 2,582,156 |
| b) Increase in inventories | $ 2,860,696 |
| c) Operating cash flows not received 2004-2013 Costa Rica Directories | $ 8,806,872 |
| d) Operating Cash Flows not received 2004-2013 Dominican Republic Directories | $ 7,912,999 |
| e) Realized losses from 2004 to 2007 | $ 7,237,068 |
| f) Interest paid by THS | $ 983,825 |
| g) Interruption of operations | $28,885,195 |
| h) Pain and suffering | $ 5,000,000 |

i) In accordance with the provisions of Article 123 of the Contentious-Administrative Procedure Code, an update of the sums of the conviction will also be granted to compensate for the variation in purchasing power, and interest will be recognized from all the previous items that will be paid as of August 30, 2008 and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

until they are fully settled, which will be calculated in accordance with the provisions of Article 1163 of the Civil Procedure Code.

**13) .-**        The defendants must jointly pay the plaintiff the personal and procedural costs of this matter.

**Complaint Estimate:** We estimate the total amount of the claim to be US $64,268,811 (sixty-four million two hundred sixty-eight thousand eight hundred eleven United States dollars).

## G.- TEST.-

## I.- Documentation:

We attach the following documentary evidence, which refers to that elements necessary to verify the Facts of the Complaint.

**Document No. 1.-**        Notarial certification of the legal status of Mr. Alvaro Trejos Fonseca, President with unlimited powers of attorney of the plaintiff company.

**Document No. 2.-**        Notarial certification of the registration of the firm Verizon Information Services –Costa Rica- LLC, in which it is stated that its Resident Agent is Mr. Hernán Pacheco Orfila, attorney, resident of San José, with an office at Bufete Pacheco Coto, Avenida Once, Calles Cinco and Siete, identity card number 1-585-980. Additionally, the publication of the internet pages containing the bylaws, the certificate of incorporation, the list of directors and the corporate history of Verizon Communications Inc. is attached. These indicate that Ivan G. Seidenberg is the President of the Board of Directors, and that Chief Executive Officer and William P. Barr is Executive Vice President and General Counsel.        [handwritten:] *Yes*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

**Document No. 3.-**        Notarial certification in which the original registration of the Trejos Hermanos Collective Society, later Trejos Hermanos Sucesores, S.A., whose corporate term began on January 1, 1912 and expires on September 30, 2025. The same attached document includes a copy of the List of Subscribers (telephone directory) of Costa Rica from 1918, the first published in the country.

[handwritten:] *Yes    Yes*

**Document No. 4.-**        Photocopies of the covers of the Telephone Guides printed by THS for various Central American and Caribbean countries and cities in the United States.                [handwritten:] *No    irrelev.*

**Document No. 5.-**        Copy of the certificate issued by Mr. José María Quirós Alfaro, General Manager of GTE Costa Rica dated January 26, 1999.

[handwritten:] *irrelev.*

**Document No. 6.-**        Folios 12-87 of Volume II of the documentary evidence, which contains the initial contract signed by GTE and the ICE with its addenda and additional information. This evidence refers to the Complaint Facts 4, 16, 17, 18, 29 and 35.                [handwritten:] *It isn't here.*

**Document No. 7.-**        Copy of the public deeds certified by notary public in which contracts were formalized between GTE and THS to draft, assemble, print and bind the telephone directories in Costa Rica for contract years 1978 and 1981.                [handwritten:] *Yes*

**Document No. 8.-**        Copy of the letter sent by the Manager of GTE Costa Rica on December 18, 1995 to the Board of Directors of Antel in El Salvador, stating that GTE Directories gives THS its broadest possible support, which covers all the aspects necessary for the directory production to be a complete success. It also states that GTE will make available to THS all of the resources and technology necessary to meet and exceed the sales projections and other aspects contemplated in the tender.        [handwritten:] *Yes    irrelev.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5                                                                RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 105 of 490

TRANSLATION

**Document No. 9.-** Certified copies of purchase orders issued by Verizon Servicios de Información Dominicana S.A. in the Dominican Republic to THS so that it would edit and print directories for that country in 1995, 1997, 1999, 2000, 2001 and 2002. A copy of the Financial Statements of THS as of September 30, 1989, September 30, 1991 and 1992, and September 30, 1992 and 1993 are included. They reflect the commitments (current contracts) in place with the Dominican Republic, Costa Rica, Honduras and Jamaica.

[handwritten:] *Yes translation*

*Without translation  irrelev.*

**Document No. 10.-** Certified copy and official translation of the Agency and Cooperation contract between GTE and THS; translated and certified copy of the letter dated November 4, 1996 that GTE attorney Sandra Parker sent to executives Scout Hanle and Doug LaVelle; and a copy of the certificate issued by Notary Mario Quintana Musmanni regarding the execution of the contract. Document No. 10 also includes official translations of the evaluation conducted by GTE through its agent Bruce Wataru dated March 15, 1999, of the existing equipment in the THS facilities and of the recommendations for modernizing the printing plant and the details and translation of correspondence with Art Nixon regarding a request to provide paper and issue a quote for providing directories for Puerto Rico for 2001. [handwritten:] *Yes, irrelev.*

**Document No. 11.-** Copy of the contract signed by General Telephone Directory Company, C. por Ac and Trejos Hermanos Sucesores, S.A. on January 21, 2000 as shown in the Annex (Exhibit E), which would later be modified by the parties, together with the purchase orders to print the phone books for the year 2000. [handwritten:] *It is not translated.*

**Document No. 12.-** Pages 294 through 317 of Volume II of the documentary evidence, which contains the latest version of the contract signed by GTE and the ICE for Tender 6378-T. The background section includes information regarding this tender. [handwritten:] *Volume II*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 106 of 490    RECEIVED NYSCEF: 73/26/2021

TRANSLATION

**Document No. 13.-** Folios 1 through 11 of Volume II of the documentary evidence, which contains copies of part of the offer submitted by the GTE Consortium with the information listed in Fact 11 of the Complaint.

**Document No. 14.-** Folios 125 through 160 of Volume II of the documentary evidence, which contains documents related to and that prove Facts 12 and 24 of the Complaint.

**Document No. 15.-** Pages 88 through 124 of Volume II of the documentary evidence, which contains documents related to Facts 19, 20, 21, 22 and 23 of the Complaint.

**Document No. 15-A.-** Folios 199 through 293 of Volume II of the documentary evidence, which contains documents related to Fact 23 of the Complaint.

**Document No. 16.-** Pages 161 through 192 of Volume II of the documentary evidence, which contains documents related to Fact 25 of the Complaint.

**Document No. 17.-** A certified copy of Clause 2.4.1.B of ICE Public Tender 6378-T.

**Document No. 18.-** Folios 193 through 198 of Volume II of the documentary evidence, which contains documents related to Fact 27 of the Complaint.

**Document No. 19.-** Certified copy of the Master Purchase Agreement signed by Verizon and THS on February 28, 2002 with its Annexes, in the official translation version. The document proves Facts 30 and 33.

**Document No. 20.-** Copy of the Investment Plan presented by THS for the purchase of the Heidelberg Rotating Machine for the sum of CIF US $2,700,000.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Document No. 20-A.-**   Official Translation of the Heidelberg Rotary Machine purchase documents.

**Document No. 21.-**   Certified copy of the lease contract signed by THS with Inmobiliaria Zoroaster, S.A. for the rental of the physical plant in Cartago.

**Document No. 22.-**   Official translation and notarial certification of the Letter sent by Douglas C. LaVelle, President of GTE Directories International to THS on October 15, 1999 proposing the terms to be agreed upon regarding the telephone directories of the Dominican Republic and Costa Rica and the conditions imposed. The Document proves Facts 37 through 42 inclusive.

**Document No. 23.-**   Official translation of the messages sent by Terrence Mirtchell Leve, Senior Attorney at GTE, dated August 20, 1999, in which he proposes that the goal of the discussions is to obtain a long-term contract with THS and eventually to sign a joint venture; the need to increase the production of telephone directories in other countries such as the Dominican Republic in order to achieve prices that are adequate for GTE; the need for THS to change equipment so that it could be more cost efficient; and the possibility that GTE might provide technical services through experts that would visit THS plants. The documents prove Fact No. 43.

**Document No. 24.-**   Official translation of the document that Art Nixon sent on November 15, 1999 to prove the contents of Fact 45 of the Complaint.

**Document No. 25.-**   Certified copy of the note sent by José María Quirós, General Manager of GTE, to the ICE on August 31, 2000. He submitted the subcontract for printing the telephone directories from 2001 to 2008 for verification in accordance with Clauses 2.13.1 and 3.13.5 signed by GTE with THS. In the note, the GTE Manager says that the chosen company is THS, which has recognized national and international experience and handled the printing the telephone directories that the ICE entrusted to GTE for 25 years. The document proves Fact 47.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Document No. 26.-** Official translation of the two messages sent by Art Nixon of Verizon on February 1 and September 16, 2001, which prove Fact 48 of the Complaint.-

**Document No. 27.-** Certified copies of the documents of part of the financing assumed by THS with Banco Interfin S.A. and the credit line with Transamérica Bank and Trust.

**Document No. 28.-** Certified copies of the 2005 Telephone Directory Production Schedule and evidence in Fact No. 50 of the Complaint.

**Document No. 29.-** Certified copies of the purchase orders issued by Verizon for the production of the telephone directories for the year 2005 indicated in Fact No. 51 of the Complaint.

**Document No. 30.-** Certified copies of the substitute purchase orders for the 2005 guides issued by Verizon, which are discussed in Facts 52, 53 and 54 of the Complaint.

**Document No. 31.-** Certified copy of the document that Verizon presented to the ICE Telecommunications Department on May 13, 2004, proposing changes to the telephone directory publication system for 2005 in accordance with the terms of the contract. This refers to Fact 55 the Complaint.

**Document No. 32.-** Certified copy of the acknowledgment of receipt of the note dated May 13, 2004 sent by the Assistant Manager of Telecommunications demanding that the terms of the compliance guarantee be adjusted in advance. The note refers to Fact 56 of the Complaint.

**Document No. 33.-** Certified copy of official letter 6000-41046-2004 dated July 15, 2004 sent by the Telecommunications Assistant Manager to Verizon stating that if there is no consensus between the parties, the 2005 phone book

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5                                                    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928  Document 1-1  Filed 11/01/21  Page 109 of 490

TRANSLATION

must be produced with the same structure and quantity as that of 2004. It refers to Fact 57 of the Complaint.

**Document No. 34.-** Certified copy of the note sent by Verizon on September 8, 2004 to the Telecommunications Department asserting positive silence due to a lack of response from the ICE. It refers to Fact 58 of the Complaint.

**Document No. 35.-** Certified copy of official letter 6000-52278-2004 dated September 14, 2004, which the ICE Telecommunications Department sent to Verizon, rejecting the claim of positive silence and maintaining the contractual conditions, which is analyzed in Fact 59 of the Complaint.

**Document No. 36.-** Certified copy of the note sent by Verizon to the ICE's Telecommunications Department on November 8, 2004 reiterating the claim for positive silence, which proves Fact 60 of the Complaint.

**Document No. 37.-** Certified copies of the public deeds signed by notaries on the telephone directory production process for 2005, which proves Facts 61 and 63 of the Complaint.

**Document No. 38.-** Certified copy of the official letter S.I.-0726-11-04 dated November 15, 2004 sent by Attorney Agnes Paniagua Cubero from the ICE to Verizon requesting information on the performance bond and the structure of the telephone directory for the Metropolitan Area, which proves Fact 62 of the Complaint.

**Document No. 39.-** Certified copy of the official letter S.I.-0730-11-04 of November 17, 2004, in which Attorney Agnes Paniagua informs the different ICE offices about the meeting with Verizon that same day. It is related to Fact 63 of the Complaint.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

**Document No. 40.-** Certified copies of official letter 6000-64540-2004 dated November 18, 2004 in which the ICE Telecommunications Department contacts the Verizon Information Services Vice President for Latin America and Asia regarding the decision to maintain the conditions originally agreed to in the contract for the production of telephone directories for the year 2005. The Document proves Fact 64 of the Complaint.

**Document No. 41.-** Certified copy of official letter 0012-65785-2004 dated November 25, 2004 with which the ICE notified Verizon of the agreement of the Board of Directors to reject any intention to unilaterally change the contractual conditions for the production of telephone directories and urged Verizon to comply with every aspect of the current contract. The Document proves Fact 65 of the Complaint.

**Document No. 42.-** Copy of official letter 6000-66202-2004 (SGT-2625-2004) dated November 29, 2004 that ICE's Telecommunications Department sent to Verizon notifying it of the agreement with Article 10 of the Minutes of session 5649 held November 23, 2004, which proves Fact 66 of the Complaint.

**Document No. 43.-** Copy of Official Letter 9100-UENSC-888 dated November 30, 2004 in which the ICE Customer Service UEN informs Verizon that in accordance with the decision of the Board of Directors, it will not allow the telephone directory printing process to fail to comply with the terms agreed in the current contract. The Document proves Fact 67 of the Complaint.

**Document No. 44.-** Certified copy of deed number 131 issued before Public Notary Yaila Paola Sánchez Canessa at eleven o'clock a.m. on December 2, 2004 on the process of printing the telephone directories for the year 2005. The Document proves Fact 68 of the Complaint.

**Document No. 45.-** Copies of Official Letter SI-0759-12-04 dated December 13, 2004 sent by the ICE Information Services Process to the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Procurement Office accusing Verizon of engaging in a contractual breach and asking it to initiate the process of termination of the contract and execution of the performance guarantee. The Document proves Fact 69 of the Complaint.

**Document No. 46.-**     Copies of Official Letter 5225-69163-2004 (AEG-0572-2004) sent by the ICE Procurement Office to Verizon notifying the company that the contract resolution procedure is being opened and granting it a hearing to present witnesses and evidence. The Document proves Fact 70 of the Complaint.

**Document No. 47.-**     Copies of the brief presented by Verizon on December 17, 2004 in response to the hearing granted and opposing the previous exception to the arbitration agreement. The Document proves Fact 71 of the Complaint.

**Document No. 48.-**     Copies of Official Letter SI-0013-01-05 that UENSC Information Services sent to Procurement on January 7, 2005 requesting that Verizon not be allowed to fulfill the benefits of the contract under its charge given the breach which it has incurred and asking that certain precautionary measures be issued to protect the public interests involved. The Document proves Fact 72 of the Complaint.

**Document No. 49.-**     Copies of Official Letter 5225-00939-2005 (AEG-0020-2005) dated January 7, 2005 in which the Procurement Office notifies Verizon of the precautionary measures issued. The Document proves Fact 73 of the Complaint.

**Document No. 50.-**     Copies of the brief presented by Verizon on January 10, 2005, challenging the precautionary measures. The Document proves Fact 74 of the Complaint.

**Document No. 51.-**     Copy of Official Letter 0092-01644-2005 (DCA-020-05) of January 12, 2005 by which the ICE Institutional Legal Directorate recommends

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

denying the appeals filed by Verizon against the precautionary measures issued. The Document proves Fact 75 of the Complaint.

**Document No. 52.-**     Copy of Official Letter SI-0025-01-2004 of January 12, 2005 of Attorney Agnes Paniagua also recommending that the administrative appeals against the precautionary measures be denied. The Document proves Fact 76 of the Complaint.

**Document No. 53.-**     Copy of the brief filed on January 12, 2005 by Verizon exercising its right of defense within the administrative procedure for terminating the contract and proving Fact 77 of the Claim.

**Document No. 54.-**     Copy of official letter 5225-03122-2005 (AEG-0060-2005) dated January 21, 2005, through which the revocation filed by Verizon against the decision set out in official letter 5225-00939-2005 AEG-0020-2005 is declared invalid and the appeal to the Telecommunications Department was admitted. The Document proves Fact 78 of the Complaint.

**Document No. 55.-**     Copy of the brief filed by Verizon on January 31, 2005 reiterating its arguments in support of the appeal. The Document proves Fact 79 of the Complaint.

**Document No. 56.-**     Certified copies of official letter 5225-01843-2005 (AEG-0033-2005) dated January 13, 2005 in which the ICE informs Verizon that the Board of Directors is reviewing its request to go to arbitration and a copy of the official letter 0012-5372-2005 (CD-070-2005) of February 2, 2005 in which the Telecommunications Department is notified of the agreement of the Board of Directors that rejects the request to go to arbitration. The Documents prove Facts 80 and 81 of the Complaint.

**Document No. 57.-**     Copy of official letter 6000-06301-2005 (SGT-510-2005) dated February 7, 2005 by means of which the ICE informs Verizon of its rejection of the appeal and the attendant nullity filed confirming note 5225-00939

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

-2005 and the execution of the precautionary measures. The Document proves Fact 82 of the Complaint.

**Document No. 58.-** Certified copies of the resolution contained in official letter 6000-27733-2005 (SGT-2326-2005) dated June 1, 2005 in which the Telecommunications Department declares the contract terminated and orders the company to proceed to collect the damages and losses incurred. Attached to the Document is the recommendation of the Governing Body of the Administrative Procedure on which it is based. The documents prove Fact 83 of the Complaint.

**Document No. 59.-** Certified copy of the brief presented by Verizon on June 7, 2005 filing the appeals for revocation with subsidiary appeal and attendant nullity against the termination of the contract, which was rejected by a resolution issued by the General Manager of ICE through official communication 0150-36359-2005 (GG-680-2005) dated July 8, 2005, the last act being final. The Document proves Facts 84 and 85 of the Complaint.

**Document No. 60.-** Certified copy of the note that THS sent to the Executive President of the ICE on February 15, 2005 stating that the provision of telephone directories to telephone service users is a public service and that THS, as a subcontractor of such service, could legally continue with that service. The Document proves Fact 86 of the Complaint.

**Document No. 61.-** Certified copy of the note sent by THS to the ICE Board of Directors proposing a direct contract to continue to produce the telephone directories. The Document proves Fact 87 of the Complaint.

**Document No. 62.-** Certified copy of official letter 0012-34690-2005 (CD-581-2005) that the Secretary of the ICE Council sent to THS indicating that its request had been sent to the Telecommunications Department. The Document proves Fact 88 of the Complaint.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Document No. 63.-**    Certified copy of official letter SGT-3228-2005 dated August 4, 2005 sent by the ICE Telecommunications Department to THS indicating that the Board of Directors decided to sign a contract with RACSA to prepare the telephone directories. The Document proves Fact 89 of the Complaint.

**Document No. 64.-**    Copy of official letter 0090-38888-2005 (DJI/220) dated August 4, 2005, in which the Institutional Legal Directorate of ICE informs THS that RACSA has been contracted to produce the telephone directories. The Document proves Facts 90 and 91 of the Complaint.

**Document No. 65.-**    Copy of Opinion number C-152-2000 of the Office of the Attorney General of the Republic dated July 7, 2000 addressed to the Commission to Promote Competition and binding for the Public Administration.

**Document No. 66.-**    Copy of the agreement of the ICE Board of Directors in which it is decided that RACSA will be in responsible for preparing the telephone directories. The Document proves Fact 93 of the Complaint.

**Document No. 67.-**    Certified copy of the note dated September 13, 2005, which THS sent to the Conciliation and Arbitration Center of the Costa Rican Chamber of Commerce requesting their intervention to discuss the conciliation of the conflict with the Verizon Group. The Document proves Fact 94 of the Complaint.

**Document No. 68.-**    Certified copy of the note that Verizon sent to THS on September 2, 2005, unilaterally terminating the current contract without Verizon's liability. The Document proves Fact 95 of the Complaint.

**Document No. 69.-**    Certified copies of the resolutions of the Civil Court of Cartago in the Pledge Executive Process of Heidelberg Print Finance Americas Inc. against Trejos Hermanos Sucesores, S.A., which was processed in file No. 06-001956-0640-CI, in which the assets acquired by THS were auctioned off by

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

order of the courts and pawned for up to US $2,831,409.07. The Documents prove Facts 96 and 97 of the Complaint.

**Document No. 70.-**        Certified copy of public deed No. 144 granted before the Notary Public Laura Mónica Zamora Ulloa in San José at 12:00 p.m. on March 23, 2006, in which the debt is established for the rental of the industrial buildings where THS was located in Cartago, for the sum of US $200,223.75 with annual interest of 9.5% and a variable rate based on the fluctuations in the current rate of Banco Interfin. The Document proves Facts 98 and 99 of the Complaint.

**Document No. 71.-**        Certified copies of the judgments issued by the Civil Large Claims Court of Cartago and the Civil and Labor Court of Cartago, in File 06-001846-0640-CI, in the Simple Executive process of Inmobiliaria Zoroaster, S.A. against Trejos Hermanos Sucesores, S.A. The Document proves Fact 100 of the Complaint.

**Document No. 72.-**        Certified copies of the Sentences of First and Second Instance issued by the Civil Court of Cartago in the Eviction Process in file No. 06-002404-346-CI of Inmobiliaria Zoroaster, S.A. against Trejos Hermanos Sucesores, S.A. This is the documentary evidence for Fact 101 of the Complaint.

**Document No. 73.-**        Certified copy of the sale contract formalized between THS and Condor Editores de Costa Rica, S.A. for the sale of THS industrial movable property, which proves Fact 102 of the Complaint.

**Document No. 74.-**        Certified copy of the lease settlement contract signed by THS with Inmobiliaria Zoroaster, S.A., which proves Fact 103 of the Complaint.

**Document No. 75.-**        Certified copy of the contract for the lease of movable property with purchase option, signed by THS and Dacondor DCR, S.A., which proves Fact 104 of the Complaint.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 116 of 490

TRANSLATION

**Document No. 76.-**       Notarial certification of the THS "Credit Report" issued by the Credit Information Center of the General Superintendency of Financial Entities (SUGEF), together with the Regulation for Debtor Qualification published in Official Gazette 238 on December 9, 2005.

**Document No. 77.-**       Financial report prepared in October 2008 by Mr. Tomás Evans Salazar, member No. 11968 of the Board of Professionals in Economic Sciences, which contains the calculations of the damages and losses incurred by the defendants to the plaintiff firm .

## II.- Party's Declaration.-

We offer as evidence the statement made by the representative of the defendant Verizon Information Services –Costa Rica- LLC regarding the Facts of the Complaint in general, and especially numbers 31, 32, 33, 34, 35, 37, 38, 39 and 42.

## III.- Expert Evidence.-

We request that the Court appoint an expert, who must be a certified public accountant or a firm of authorized public accountants, to study the analysis of Mr. Tomás Evans Salazar that accompanies the complaint. The expert must establish whether Mr. Evans' analysis is based on recognized accounting practices and if his results are true and correct. If discrepancies are found between the expert's conclusions and Mr. Evans' analysis, the expert will correct any aspects of the latter that they deem pertinent. The plaintiff shall make all its accounting records and files available to that expert, and the expert will outline the records and methods used in their report.

## IV.- Administrative File.-

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5          RECEIVED NYSCEF: 04/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 117 of 490

TRANSLATION

The Costa Rican Electricity Institute is ordered to submit a certified copy of the Administrative File corresponding to Public Tender No. 6378-T "Development and Implementation of Information Services," including the complete tender terms, the bid submitted by the GTE Consortium, and the contracts signed by the ICE and the GTE Consortium. It must include all of the procedures, actions and resolutions issued within the administrative contract execution process, including those that were processed before Courts of Justice or Arbitration, all of in accordance with the provisions of Article 51 of the Contentious-Administrative Procedure Code.

**Precautionary Measure:** In the ordinary proceedings against **VERIZON INFORMATION SERVICES - COSTA RICA, LLC** processed in the Contentious Administrative and Civil Court of Finance under the file 05-000881-0163-CA, the Costa Rican Electricity Institute secured a seizure of the assets of that defendant. As the assets seized there constitute an important basis for the plaintiff in these proceedings, TREJOS HERMANOS SUCESORES S.A., to be compensated for the damages and losses incurred by the ICE and by VERIZON, we request that, in accordance with Articles 19 and following of the Code Administrative Litigation; 241 and following of the Civil Procedure Code, and specifically 242 idem, that ICE be ordered not to dispose of the proceeds of this embargo until the claim derived in the process initiated with this brief is resolved.

**Notifications:**          The plaintiff states that notifications can be sent to the fax number 22 83 11 46. It is hereby ordered that notice be given to the Costa Rican Electricity Institute at its headquarters in Sabana Norte; to the defendant firm "VERIZON INFORMATION SERVICES –COSTA RICA- LLC" at the offices of its Licensed Resident Agent Hernán Pacheco Orfila, at the Pacheco Coto Law Firm located on the fourth floor of Building A of the FORUM 2 Executive Center in Santa Ana; and to the company "VERIZON COMMUNICATIONS INCORPORATED." It is further ordered that its President and Chief Executive Officer be notified at their offices on 140 West St. 29th Floor, New York, NY 10007 and at its registered address located at 1209 Orange Street in the City of Wilmington, New Castle County, in the State of Delaware. As these are

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

notifications issued abroad, the case will proceed in accordance with Article 180

of the Civil Procedure Code.


**Goicoechea, December 15, 2008.**


[signature]

**Alvaro Trejos Fonseca.**


[raised seal:]                          [12 stamps:]
EDUARDO SANCHO GONZALEZ                  250 COLONES
ATTORNEY AND NOTARY C 1147               STAMP
COSTA RICA                               BAR ASSOCIATION
        [signature]

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

[illegible]

[handwritten:] *Document #1 Notarized certification of legal status / Document 2 Notarized certification/ Document #3 Notarized certification original registration of the company / Internet page / Document #4 Copy of telephone directory entries*

RECEIVED BY: *Eduardo M.*

TIME: *10:36 a.m.*                                          *12/16/18*

| | |
|---|---|
| Document #5 | Copy of certification issued by José Maria Quirós |
| Document #7 | Copy of public deeds notarial certificate |
| Document #8 | Copy of letter sent by the manager of GTE |
| Document #9 | Certified copies of purchase order by Verizon Servicios de Información Dominicana S.A. |
| Document #10 | Certified copy and official translation of the agency and cooperation contract between GTE and THS. |
| Document #11 | Copy of the contract signed by General Telephone Directory company C. por AC and Trejos Hermanos Sucesores |
| Document #17 | Certified copy of Clause 2.4.1.B of Public Tender 6378-T of the ICE |
| Document #19 | Certified copy of the Master Purchase Agreement |
| Document #20 | Copy of investment plan by THS |
| Document 20-A | Official translation of the purchase documents |
| Document 21 | Certified copy of the lease contract |
| Document 22 | Official translation and notarial certification of the letter sent by Douglas C. LaValle |
| Document 23 | Official translation of the messages sent by Terrence Mirtchell Leve |
| Document 24 | Official translation of the document sent by Art Nixon on 11/15/99. |
| Document 25 | Certified copy |
| Document 26 | Official translation of messages sent by Art Nixon |
| Document 27 | Certified copies |

*The administrative file was provided, which includes 318 folios.*

| | |
|---|---|
| Document 28 | Certified copy of the production timetable of the telephone books 2005 and proof #50 |
| Document 29 | Certified copy of purchase orders |
| Document 30 | Copy of substitute purchase orders |
| Document 31 | Certified copy of the document presented by Verizon |
| Document 32 | Certified copy of the proof of receipt of the note of 5/13/04 |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*Document 33     Certified copy of official letter 6000-41046-2004*

*Document 34     Certified copy of the note sent by Verizon 9/8/04*

*Document 35     Certified copy of official letter 6000-52278-2004 9/14/04*

*Document 36     Certified copy*

*Document 37     Certified copy of the public deeds*

*Document 38     Certified copy of official letter SI-0726-11-04,15*

*Document 39     Certified copy of official letter SI-0730-11-04*

*Document 40     Certified copy of official letter 6000-64510-2004*

*Document 41     Certified copy of official letter 0012-65785-2004*

*Document 42     Copy of official letter 6000-66202-2004*

*Document 43     Copy of official letter 9100-UENSC-888*

*Document 44     Certified copy of Deed #131*

*Document 45     Copy of official letter SO-0759-12-04*

*Document 46     Copy of official letter 5225-69163-2004*

*Document 47     Copy of the document of 12/17/04*

*Document 48     Copy of official letter SI-0013-01-05*

*Document 49     Copy of official letter 5225-00939-2005*

*Document 50     Copy of the document of 01/10/05*

*Document 51     Copy of official letter 0092-01644-2005*

*Document 52     Copy of official letter SI-0025-01-2004*


*Document 53     Copy of document of January 12, 2005*

*Document 54     Copy of official letter 5225-03122-2005*

*Document 55     Copy of document 1/31/05*

*Document 56     Certified copy of     5225-01843-2005*
*                                       0012-5372-2005*

*Document 57     Copy of official letter 6000-06301-2005 / 5225-00939-2005*

*Document 58     Certified copy of the [illegible] official letter 6000-27733-2005*

*Document 59     Certified copy of document of June 7, 2005*

*Document 60     Certified copy of the note of 02/15/05*

*Document 61     Certified copy of the note from THS*

*Document 62     Certified copy of official letter 0012-34690-2005*

*Document 63     Certified copy of official letter 56T-3228-2005*

*Document 64     Copy of official letter 0090-38888-2005*

*Document 65     Report ISZ-2000*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

*Document 66    Copy of the agreement of the Board of Directors of the ICE*

*Document 67    Certified copy of the note of 09/13/05*

*Document 68    Certified copy of the note of 9/2/05*

*Document 69    Certified copy of the resolutions of the Civil Court of Cartago*

*Document 70    Certified copy of public deed*

*Document 71    Certified copy of sentences and the Civil Large Claims Court of Carthage*

*Document 72    Certified copy of 1st and 2nd instance sentences*

*Document 73    Certified copy of the purchase contract*

*Document 74    Certified copy of the lease settlement contract*

*Document 75    Certified copy of the lease contract of goods and furnishings*

*Document 76    Notarial certificate credit report*

*Document 77    Report financial [illegible]*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 122 of 490   RECEIVED NYSCEF: 10/26/2021

TRANSLATION

[handwritten:] *08-001505 – 1027-CA* [signature] *2-638-788*

**PLAINTIFF: TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA.**
**PROCEEDINGS: ORDINARY CIVIL TREASURY.**
**DEFENDANTS: COSTA RICAN ELECTRICITY INSTITUTE, VERIZON COMMUNICATIONS INCORPORATED, VERIZON INFORMATION SERVICES - COSTA RICA- LLC.**

*1 power*
*1 [ill.] of copy of the document of the Complaint 4 of the Exhibit Doc. (34 [ill.])*

[seal]
JUDICIAL AUTHORITY
N JUDICIAL CIRCUIT OF SAN JOSE
DEC. 18, 2008
14.50
Contentious Administrative Procedural Court
RECEIVED

**CIVIL AND CONTENTIOUS-ADMINISTRATIVE PROCEDURAL COURT OF THE TREASURY.**
**SECOND JUDICIAL CIRCUIT. GOICOECHEA, BUILDING ANNEX A.**

**The undersigned, ÁLVARO TREJOS FONSECA, an adult married for the second time, Master in Sciences, resident of San José, identity card number 1-0390-0895, acting in my capacity as President with unlimited powers of attorney, of the company domiciled at this address "TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA," legal entity identification number 3-101-000940, grants SPECIAL JUDICIAL POWER to Attorney EDUARDO SANCHO GONZÁLEZ, an adult married lawyer and resident of Montes de Oca, identity card number 1-380- 073, in accordance with the provisions of Articles 1256, 1289 and 1290 of the Civil Code, with all of the attributions indicated in those legal regulations understood to be expressly conferred. The representative signs this document to signal acceptance of the power of attorney.**

**San José, December 16, 2008.**

[signature]
**Álvaro Trejos Fonseca.**

*AUTHENTICATED BY*
*Jose Leonardo Céspedes R.*
*LAWYER AND NOTARY PUBLIC*
*C. 1582*

[stamp]
250 COLONES
STAMP
BAR ASSOCIATION

[stamp]
REPUBLIC OF COSTA RICA
STAMP
100 COLONES

[stamp]
REPUBLIC OF COSTA RICA
STAMP
50 COLONES

[raised seal:]
JOSE LEONARDO CESPEDES RUIZ
ATTORNEY AND NOTARY C 1182
COSTA RICA

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

[illegible]
1 power, 1 set of copies of the document of the complaint, 3 [ill.] of documentary proof
(3 ampos) only.
RECEIVED BY: [initials]
TIME: 10:00 a.m.                    12/19/08

[illegible]
Document added [ill.]     12/19/08
Added [ill.]              Maria Luisa
                         [initials]
                         [illegible]

[illegible]

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



# <u>Certificate of Accuracy</u>

Tuesday, 26 October 2021

To whom it may concern,

We Trustpoint.One, hereby certify to the best of our knowledge and belief that the foregoing document described as "The Ordinary Civil Tax Action filed by Trejos Hermanos Sucesores" is a true and accurate translation of the original.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

If there is any additional information we can provide you, please do not hesitate to contact us.

Yours sincerely,

*Elizabeth Wozniak*

Elizabeth Wozniak
Project Manager
Trustpoint.One

3200 Cobb Galleria Parkway
Suite 200                    Trustpoint.One/translate-one                    page 1 of 1
Atlanta, GA 30339            p. 412.261.1101
                             translate-one@trustpoint.one

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 125 of 490   RECEIVED NYSCEF: 10/26/2021

## PROCESO ORDINARIO CIVIL DE HACIENDA

**Actora:** "Trejos Hermanos Sucesores, Sociedad Anónima"

**Demandados:**      Instituto Costarricense de Electricidad

                    Verizon Communications Incorporated

                    Verizon Information Services –Costa Rica- LLC

**TRIBUNAL PROCESAL CONTENCIOSO ADMINISTRATIVO Y CIVIL DE HACIENDA.**
**Segundo Circuito Judicial. Goicoechea, Edificio Anexo A.-**

El suscrito, **ALVARO TREJOS FONSECA**, mayor, casado en segundas nupcias, Máster en Ciencias, vecino de San José, cédula de identidad número 1-0390-0895, actuando en mi condición de Presidente con facultades de apoderado generalísimo sin límite de suma, de la compañía de este domicilio **"TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA"**, cédula de persona jurídica número 3-101-000940, personería que compruebo con certificación adjunta, documento que marcamos con el N° 1, - interpongo Proceso Ordinario Civil de Hacienda contra el **"INSTITUTO COSTARRICENSE DE ELECTRICIDAD"**, representado por su Presidente Ejecutivo Pedro Pablo Quirós Cortés, mayor, casado, vecino de Ciudadela Calderón Muñoz, Ingeniero Eléctrico, cédula de identidad número 2-195-129; y contra las firmas comerciales **"VERIZON COMMUNICATIONS INCORPORATED"**, empresa inscrita en el Estado de Delaware de los Estados Unidos de América, pero con oficinas en la calle 140 Oeste, piso veintinueve (140 West St. 29th. Floor) de la Ciudad de New York, No. 10007, teléfono (212) 395-1000, registrada en la **SEC** (U.S. Securities and Exchange Commision del Gobierno de los Estados

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



Unidos), con el número de inscripción 0000732712, representada por Ivan G. Seidenberg, Presidente y Principal Oficial Ejecutivo (Chairman and Chief Executive Officer) y alternativamente por William P. Barr, Vicepresidente Ejecutivo y Abogado General (Executive Vice President and General Counsel), los dos ciudadanos estadounidenses, de único apellido por razón de sus nacionalidades y demás calidades ignoradas, lo que comprobamos con la reproducción de las páginas WEB de internet; y **"VERIZON INFORMATION SERVICES –COSTA RICA- LLC",** sociedad de responsabilidad limitada, sucursal en Costa Rica inscrita en el Registro de Personas Jurídicas del Registro Nacional de Costa Rica, con la cédula jurídica número 3-012-026573, de la empresa de igual nombre constituida y organizada conforme con las leyes del Estado de Delaware, Estados Unidos de América, según consta a los tomos 147, 672 y 1517; folios 27, 65 y 214; asientos 35, 76 y 220, respectivamente, representada por su Agente Residente de conformidad con lo que dispone el artículo 232 del Código de Comercio, Licenciado HERNÁN PACHECO ORFILA, abogado, vecino de San José, con oficina abierta en el Bufete Pacheco Coto en avenida 11, calles 5 y 7, cédula 1-585-980, como se comprueba con la certificación adjunta, prueba documental marcada con el No. 2.- A E J —>

La demanda se interpone para que se declare que en las actuaciones y resoluciones de las demandadas, para resolver y dejar sin efectos jurídicos el contrato administrativo que habían formalizado entre ellas, para la "Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información", firmado el día diez de marzo del año dos mil, le han producido a la actora graves daños y perjuicios que, como tales, conforman una cuestión de responsabilidad patrimonial.

### Aclaración Inicial:

Únicamente para los efectos de la exposición de los hechos de la demanda, aclaramos que en este documento usaremos, convencionalmente y por economía procesal, las siguientes abreviaturas:


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**THS** por la firma costarricense actora en el proceso Trejos Hermanos Sucesores, Sociedad Anónima.

**ICE** por el Instituto Costarricense de Electricidad, institución autónoma de Costa Rica, encargada de la administración, entre otros, de los servicios telefónicos del país.

**CGR** por la Contraloría General de la República, ente auxiliar de la Asamblea Legislativa, encargado de la fiscalización y el control de la Hacienda Pública.

**GTE** por la empresa estadounidense GTE Corporation e indistintamente todas sus subsidiarias, las empresas estadounidenses vinculadas con los contratos formalizados con el ICE desde 1975, como por ejemplo GTE Information Services Incorporated (GTE-IS), GTE Directories Corporation (GTE-DC), General Telephone Directory Company C por A (GTDC) y la sucursal de esta última, de igual nombre inscrita en el Registro Mercantil de Costa Rica al Tomo 147, folio 27, asiento 35.

**GRUPO GTE** por el grupo de interés económico integrado por GTE Corporation, el Holding del grupo y todas las empresas subsidiarias.

**VERIZON** por la empresa estadounidense resultante de la fusión entre la empresa americana Bell Atlantic y GTE e indistintamente todas sus subsidiarias, como por ejemplo, las empresas estadounidenses vinculadas con los contratos formalizados con el ICE, como Verizon Information Services Inc., Verizon Directories Corp., y Verizon Information Services – Costa Rica, LLC).

**GRUPO VERIZON** por el grupo de interés económico integrado por Verizon Communications Inc, el Holding y todas las empresas subsidiarias.

**SEC** por la oficina gubernamental denominada "U.S. Securities and Exchange Commision" del Gobierno de los Estados Unidos, que supervisa las empresas

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**RACSA** por la empresa pública Radiográfica Costarricense, Sociedad Anónima, que pertenece al grupo **ICE.**

**Expediente o Expediente Administrativo** por el expediente administrativo que consta en los archivos del ICE, al que haremos referencia para identificar los folios en los que se encuentra la prueba de documentos que ofrecemos para demostrar los hechos de la demanda, debidamente certificados por la Dirección de Proveeduría del ICE.

## Antecedentes corporativos.-

En esta explicación que se inserta para que sirva de exordio de la demanda, indicamos, en síntesis, cuáles son los antecedentes corporativos de las empresas estadounidenses que participaron en el contrato formalizado con el **ICE,** que es el nexo convencional del que se derivan las consecuencias y los demás hechos en los que se fundamenta esta demanda.

Como luego se demostrará con el respaldo de la prueba pertinente, tres empresas pertenecientes a la compañía "holding" de los Estados Unidos de América, denominada **GTE CORPORATION,** de las que luego se dará detalle, constituyeron un consorcio o asociación de empresas para participar en una licitación pública promovida por el **ICE,** grupo de empresas que resultó adjudicatario. En ese mismo grupo ingresó una cuarta empresa para unificar la ejecución del contrato administrativo, para lo cual se inscribió una sucursal de la misma en Costa Rica.

La cláusula No. 25 del contrato firmado y refrendado entre **GTE** y el **ICE,** estipula que el contrato permanecería invariable y vigente entre las partes con las nuevas denominaciones legales, en el caso que las firmas originales o el holding cambiaran de nombre o se fusionaran en una empresa distinta, lo que efectivamente llegó a suceder puesto que, posteriormente, el grupo **GTE** se

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

que expresamente, asumió frente al **ICE** todas las obligaciones y responsabilidades originadas en el contrato. Por este motivo y dependiendo de las fechas en que ocurren, la razón social **GTE** se sustituye en los Hechos de la Demanda por la nueva razón social que identificamos como **VERIZON**, sin que mediara en tales eventos solución de continuidad, en lo que se refiere a la existencia del contrato, como luego se demostrará.

## A.- HECHOS DE LA DEMANDA.

**1).-**     **THS** es una empresa industrial costarricense que desde el año 1912, ha orientado sus actividades comerciales a la impresión de textos, y especificamente a la edición e impresión de guías telefónicas llamadas también comercialmente y en el argot popular,   directorios telefónicos (Documento No. 3).

**2).-**     La experiencia de **THS** en la edición e impresión de guías telefónicas se inició en Costa Rica ampliándose, con el tiempo, a otros países de Centroamérica y del Caribe, lo que demostramos con fotocopias de portadas de guías telefónicas producidas por la empresa para República Dominicana, Jamaica, Honduras, Islas Vírgenes, Antigua y Barbados, Dominica, Islas Turku y Caicos, Araba, Montserrat, Grenada, Islas Cayman, el Caribe y el Sur de Florida, Santa Lucia, Estado de Louisiana, Belice, Puerto Rico, Jacksonville y Costa Rica (Documento No. 4).

**3).-**     El grupo GTE, por medio de su empresa **General Telephone Directory Company,** se interesó en la edición de guías telefónicas en Costa Rica e inició sus actividades en este país en el año 1974, participando en una licitación promovida por el **ICE** para tal propósito, concurso que se le adjudicó en firme formalizándose el respectivo contrato administrativo, lo que demostramos con la constancia expedida por el Gerente General de GTE Costa Rica el 26 de enero de 1999 (Documentos Nos. 5 y 7).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

**4).-** Desde siempre fue exigencia contractual impuesta por el **ICE,** incluida como una condición invariable de sus carteles de licitación pública, que la edición y la impresión de guías telefónicas tenía que hacerse obligatoriamente en territorio de Costa Rica, disposición del cartel que se explica sola con el siguiente texto que se transcribe literalmente : *"... contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia de tecnología en beneficio de los ciudadanos costarricenses y a la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general..."* (véase cláusula 27 del Contrato ICE-Consorcio GTE firmado el 10 de marzo del 2000 en el Folio No. 2767 del Expediente, que se encuentra incluido en el Documento No. 6 y Documento No. 24).

**5).-** Entre otras obligaciones y derechos, para cumplir con la exigencia del hecho anterior y una vez adquirida su condición de adjudicataria del **ICE** y en consecuencia siendo su co-contratante, **GTE** suscribió contratos de impresión con **THS**, para que ésta se encargara de la actualización de la base de datos de los abonados telefónicos, la impresión y encuadernación de directorios telefónicos a partir del año 1975 y por treinta años más que duró la relación comercial (ver copia de las escrituras 35-11, 36-11 y 45-15 otorgadas ante el Notario Licenciado Edgar Chamberlain); además, mediante escritura 53-15 otorgada en esa misma notaría, GTE contrató con THS la impresión de los directorios telefónicos de Panamá para el año de 1982 (Documento No. 7).

**6).-** La relación empresarial de **THS** con **GTE** se intensificó con el tiempo, por la excelencia de sus servicios que contribuyeron a que **GTE** fuera adjudicataria de otras licitaciones promovidas por el **ICE,** siempre en la misma actividad comercial, es decir, para la edición e impresión de guías telefónicas. De esta manera, el interés sostenido de **GTE** para que **THS** fuera el impresor de las guías telefónicas, tuvo como resultado que más adelante se formalizaran nuevos contratos de edición e impresión –en principio, uno para cada licitación adjudicada-, cuyos contenidos fueron negociados entre las dos empresas, teniendo como base de ellos la adjudicación de cada contrato

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

directorios telefónicos para el **Grupo GTE** mientras éste fuera adjudicatario y contratista del **ICE,** como ha quedado dicho (Documentos Nos. 4, 5 y 8).

**7).-**         La relación de **THS** con **GTE** no se limitó a las subsidiarias de ésta en Costa Rica y Panamá, sino que se amplió, primero, a partir de 1988 y por veinte años más, a la impresión y edición de los directorios telefónicos de República Dominicana, inicialmente a través de la Compañía Dominicana de Teléfonos (CODETEL), empresa equivalente en funciones y competencias al **ICE** de Costa Rica y que era subsidiaria del grupo **GTE** y luego con GTE Directories Corporation, otra subsidiaria del grupo **GTE** (Documentos Nos. 8 y 9).-

**8).-**         En el marco de esa relación empresarial, **GTE** suscribió con **THS** un contrato de "agencia y cooperación mutua" el 8 de mayo de 1997. Dentro de las cláusulas de este Convenio, en el Anexo B Punto 5 se estableció que GTE Information Services le otorgó a **THS** el estatus de ***"preferred vendor"*** o suplidor preferido para Centroamérica incluyendo Panamá y el Caribe, definido en el Anexo 2 como una serie de treinta y dos (32) países incluyendo República Dominicana y Puerto Rico. Estando vigente ese estatus y con los contratos de Costa Rica y República Dominicana también vigentes, por decisión expresa y contractual de GTE del 15 de marzo de 1999, la empresa actora recibe los requerimientos de GTE para adquirir y a poner en ejecución de su proceso industrial, una nueva planta y un nuevo equipo, que a la postre la llevará al cierre de operaciones, al no poder sostenerla sin los contratos respectivos firmados con GTE, como se demuestra. A la vez, se le solicitó a THS el 15 de marzo de 1999 que (ver el contrato en Documento No. 10 y el informe del experto Bruce Wataru, como también los requerimientos para manejar la compra de papel y cotizar los directorios para Puerto Rico para el 2001).

**9).-**         Posteriormente, en el año 2000, **GTE** encargó a **THS** la impresión y edición de guías telefónicas incluyendo las de Costa Rica y Belice, firmando el día 21 de enero, un nuevo contrato relativo a la relación

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

contrato, se discutieron varias formas de asociación entre **GTE** y **THS** y entre ellas, formalizar un joint venture ente ambas empresas (ver el contrato en Documentos Nos. 11 y 23).

**10).-** En lo que se refiere a la relación con el **ICE,** esta institución pública costarricense sacó a concurso la Licitación Pública No. 6378-T en los años 1999 y 2000, promovida para el "Desarrollo e Implementación de Servicios de Información", en la que participó el Grupo GTE (Documento No. 12).

**11).-** Las firmas comerciales **"GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephone Directory Company C por A",** empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, sometieron oferta conjunta, bajo la formalidad de consorcio o de asociación de empresas, en esa Licitación Pública No. 6378-T promovida por el **ICE** y para todos los efectos relacionados con ese concurso público, se identificaron como el **Consorcio GTE** (ver folios del 1 al 10 de la oferta presentada por el Consorcio en poder del ICE, cuyas copias se adjuntan debidamente certificadas en el Documento No. 13).

**12).-** La oferta del Consorcio GTE fue firmada por Terrence Mitchell Leve, actuando como apoderado especial del consorcio, como consta en el acuerdo de constitución de esa figura jurídica (misma prueba anterior y la copia del acuerdo en folios del expediente certificados 298 y del 360 al 367 en el Documento No. 14).

**13).-** En la carta de presentación de la oferta, en el punto No. 10, el Consorcio GTE expresó lo siguiente:

"10. Damos una breve explicación de las compañías que se mencionan en la oferta, incluyendo las que integran el Consorcio GTE y de la relación que existe entre ellas, de la siguiente manera:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 133 of 490

A) **GTE Corporation** es una corporación
establecida en Nueva York, Estados Unidos de América,
cuyas acciones figuran y son negociables en la Bolsa de
Valores de Nueva York (New York Stock Exchange).

B) **GTE Information Services Incorporated**
(GTE-IS) es una corporación establecida en el Estado de
Delaware, Estados Unidos de América, con sus oficinas
principales en Dallas, Texas. La totalidad de sus
acciones pertenecen a GTE Corporation.

C) **GTE Directories Corporation** (GTE-DC) es
una corporación establecida en Delaware, Estados
Unidos de América, con sus oficinas principales en
Dallas, Texas. La totalidad de sus acciones pertenecen a
la GTE Information Services Incorporated.

D) **General Telephone Directory Company C
por A** (GTDC) es también una compañía establecida en
Delaware, Estados Unidos de América, con sus oficinas
principales en Dallas, Texas. La totalidad de sus
acciones pertenecen a la GTE Information Services
Incorporated.

E) **General Telephone Directory Company C
por A** (GTDC) estableció en Costa Rica, en el año 1975,
una sucursal que lleva su mismo nombre, la cual se
encuentra inscrita en el Registro Mercantil de Costa Rica
al Tomo 147, folio 27, asiento 35.

F) **GTE Information Services Incorporated,
GTE Directories Corporation** y **General Telephone
Directory C por A** han constituido el **Consorcio GTE**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

el fin de ofertar en esta licitación. El consorcio GTE se tendrá como el oferente principal para todos los efectos legales" (ver folios 4 y 5 del expediente certificados en el Documento No. 13).-

14).-    Al folio 8 de su oferta al **ICE**, el Consorcio GTE escribió:

"**NOMBRE Y DIRECCION POSTAL**

El domicilio principal del **CONSORCIO GTE** es el siguiente:

GTE Place -- West Airfield Drive DFW Airport, TX 7576-9810

Estados Unidos de América

Apartado postal : P.O. BOX 619810

Teléfono: 001-9724537589

Fax:    001-9724537655"

(Misma prueba Documento No. 13).

15).-    En el folio 9 de su oferta el Consorcio GTE expresó textualmente:

"1.3.1.3 El Consorcio GTE por el hecho de presentar su oferta declara que conoce, que acepta y que se somete a los procedimientos del ICE para el trámite de licitaciones, a todo lo estipulado en los documentos de esta licitación y a los tribunales y leyes de Costa Rica, según consta en el Convenio de Consorcio que se adjunta (Documento III-I)" (misma prueba Documento No. 13).

16).-    El contrato administrativo fue adjudicado al Consorcio GTE por el Consejo Directivo del **ICE**, en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, acuerdo publicado en el Alcance No. 10 a La Gaceta No. 28 del 9 de febrero del 2000 (véase folio 2779 del expediente que obra en poder del ICE y que es página primera del contrato firmado entre el ICE y el Consorcio GTE "antecedente" letra "a" en el

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**17).-** El contrato fue refrendado por la **CGR** el 13 de diciembre del 2000, según consta en la razón de aprobación visible al folio 2766 del expediente administrativo de la Licitación en poder del **ICE**. Se adjuntan, como prueba documental, los folios del 2751 al 2781 del expediente administrativo, que es copia del contrato, debidamente certificados por la Proveeduría del ICE (ver el contrato en Documento No. 6).

**18).-** En la cláusula Vigésima Quinta del contrato, el **ICE** y el Consorcio GTE estipularon lo siguiente:

"En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas" (misma prueba, folio 2768, Documento No. 6).

**19).-** La firma VERIZON Information Services - Costa Rica, LLC, le envió a la Dirección de Proveeduría del **ICE** la nota de fecha 16 de mayo del 2002, en la que le manifiesta, entre otras cosas, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE y cita como fundamento la cláusula Vigésima Quinta del contrato (véase la copia certificada del oficio S.I.-0247-05-02 que la Jefe del Área de Servicios de Información le envió a la Asesoría Legal de Telecomunicaciones, visible al folio 3045 del expediente). Es decir, de conformidad con la legislación de su país, **GTE** se fusionó con la firma americana Bell Atlantic y como resultado de la fusión se creó el **GRUPO VERIZON**, de manera que en todos los contratos en curso de **GTE** con el **ICE** y con **THS** se sustituyó la razón social de la empresa contratante estadounidense **GTE** por empresas del **GRUPO VERIZON** y todo



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

telefónicas, a partir de ese momento siguiera en ejecución con las firmas de este grupo, de manera que la relación comercial entre **THS** y los **Grupos GTE y VERIZON** durara aproximadamente treinta años, al sumar los tiempo de duración con **GTE** y con **Verizon** sin solución de continuidad (ver documentos de cambio de razón social de GTE a Verizon en los folios del 2956 al 3045 del expediente en Documento No. 15).-

**20).-**    El 8 de junio del 2002, mediante oficio DCA 966, la División de Contratación Administrativa, de la Dirección Jurídica Institucional del **ICE**, advirtió al Área de Servicios de Información, que en la documentación recibida sólo se acreditó el cambio de nombre de dos de las empresas del consorcio "GTE Information Services Incorporated" que cambió a "Verizon Information Services Inc." y "General Telephone Directory Company C por A", que cambió a "Verizon Information Services – Costa Rica, LLC", por lo que no se podía tener por oficialmente cambiado el nombre del Consorcio. Tal decisión se comunicó a Verizon Information Services mediante oficio S.I.-0284-06-02 del 18 de junio del 2002 (véanse folios 3043 y 3044 del expediente administrativo que se adjuntan certificados en el Documento No. 15).

**21).-**    Michael Q. Neal, actuando en su condición de Gerente General de Verizon Information Services – Costa Rica, LLC", mediante nota del 28 de agosto del 2002, le aclara al Área de Servicios de Información del **ICE**, lo ocurrido con los cambios de nombres y adjunta la documentación necesaria para acreditar los hechos y manifestó literalmente:

"a)    El 5 de agosto de 1999 se firmó el documento de creación del Consorcio GTE, el cual estaba integrado por las empresas GTE Directories Corp, GTE Information Services, Inc y General Telephone Directory Company C por A., el cual resultó adjudicatario de la licitación pública 6378-T.

b)    Estas 3 empresas cambiaron sus nombres, como consecuencia de la fusión entre Bell Atlantic y GTE, que creó VERIZON, para

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 137 of 490

Directories Corporation y Verizon Information Services-Costa
Rica, LLC".

c)   En el caso de Verizon Directories Corporation el 31 de enero del
2002 sucedieron 2 cosas:

1)   Verizon Directories Corp. **se fusionó** con Verizon New Media
Services Inc. y, jurídicamente, Verizon New Media Services,
Inc, se convirtió en la **compañía sobreviviente** de la fusión.

2)   La segunda cuestión que sucedió ese misma día es que
Verizon New Media Services Inc, la compañía sobreviviente
de la fusión, decidió **CAMBIAR su nombre** de Verizon New
Media Services, Inc (Que ya había absorvido a Verizon
Directories   Corp),   para   denominarse   VERIZON
DIRECTORIES CORP.

Como se puede observar de la certificación adjunta, a las
**11:30 hrs** del 31 de enero del 2002 se presentó el primer
cambio y tan solo 5 minutos después, a las **11:35 hrs.,** se
presentó el segundo cambio, con el certificado de
consolidación para **cambiar el nombre.**

d)   La anterior secuencia explica por qué, tanto en la certificación que
ya adjuntamos junto con la nota del 16 de mayo del 2002, como
en la certificación que adjuntamos ahora, aparece que el nombre
anterior de Verizon Directories Corp. era Verizon New Media
Services, Inc y no Verizon Directories Corp, como ocurrió con las
otras dos empresas" (véanse folios certificados 3040, 3041 y 3042
del expediente administrativo que se adjuntan en el Documento
No. 15).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

14

22).-        En la misma nota del 28 de agosto del 2002, a que alude el punto inmediato anterior, Verizon Information Services Costa Rica, LLC, expresó lo siguiente:

"II.- MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS.

De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el **Mantenimiento de Obligaciones y Derechos,** firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directories Corp. y Verizon Information Services-Costa Rica, LLC, en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma" (folios 3035, 3036 y 3037 del expediente administrativo que se adjuntan certificados en el Documento No. 15).

23).-        En los folios del 3019 al 3039 del expediente administrativo, se encuentran los documentos a que se refiere Verizon Information Services Costa Rica, LLC en el Hecho inmediato anterior, todos ellos autenticados y consularizados, que se resumen en las traducciones oficiales de los folios del 3019 al 3027. En lo esencial, esos documentos son las declaraciones de Mantenimiento de Compromisos que hacen las compañías VERIZON Information Services, Inc. y  VERIZON Directories Corp., estas dos empresas representadas por William G. Mundy, Vicepresidente de cada una de ellas, con suficiente poder y representación legal para comprometer a las dos empresas comitentes y VERIZON  Information Services – Costa Rica, LLC., representada por W. Scott Hanle, en su condición de Vicepresidente de la empresa, con poder suficiente para comprometer a la firma. La declaración la hacen de la siguiente manera:

"1.-      Que nuestros comitentes VERIZON Information Services

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



Incorporated, VERIZON Directories Corp., anteriormente conocida como GTE Directories Corporation y VERIZON Information Services-Costa Rica, LLC, anteriormente conocida como General Telephone Directory Company C por A., firmaron un **"Acuerdo de Consorcio"** el día 5 de agosto de 1999, para presentar una oferta al INSTITUTO COSTARRICENSE DE ELECTRICIDAD en la Licitación Pública 6378-T.

2.-     Declaramos que nuestros comitentes, ahora bajo los nuevos nombres que se indican, mantienen de manera total y absoluta los derechos y obligaciones establecidos en el acuerdo de consorcio del 9 de agosto de 1999; en la oferta presentada al ICE por GTE Consortium el día 26 de agosto de 1999 y en el contrato firmado entre el ICE y GTE Consortium el día 10 de marzo de 2000, el cual fue autenticado (sic) por la Oficina del Contralor General de la República el día 13 de diciembre de 2000.

3.-     Según se establece en la cláusula "siete" del Acuerdo de Consorcio, repetimos que para todas las obligaciones que se originen en la licitación pública 6378-T, "la compañía directamente responsable, en nombre del Consorcio, ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, es VERIZON Information Services-Costa Rica, LLC (anteriormente conocida como General Telephone Directory Company C por A).

4.-     Que la compensación por los servicios requeridos de cada compañía diferente del Consorcio para cumplir con todas las condiciones de la licitación ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, se verán afectadas de conformidad con un acuerdo interno entre las partes del Consorcio." *(evidentemente, se trata de un error material en la traducción: lo que la declaración dice es "Que la compensación por los servicios requeridos por las diferentes compañías del Consorcio para cumplir, etc.")*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.


CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 140 of 490     RECEIVED NYSCEF: 10/26/2021

16

5.-      Se hizo la presente declaración a solicitud del ICE (Nota del 18 de junio de 2002, S.I. 0284-06-02) para registrar de manera oficial el cambio de nombres de nuestros comitentes en el contrato firmado entre el ICE y GTE Consortium (ahora VERIZON)..."(ver folios del expediente del 3019 al 3045 certificados en el Documento No. 15-A).

**24).-**      El acuerdo de Consorcio firmado el 5 de agosto de 1999 por las empresas GTE Information Services Inc., GTE Directories Corp. y General Telephone Directory Company C por A., consta de diez cláusulas y fue firmado por representantes con facultades suficientes para hacerlo, según consta en la documentación que se dirá. En síntesis, el convenio señala en sus cláusulas:

**Primera:** que GTE Information Services Incorporated es dueña en su totalidad de GTE Directories Corporation y de General Telephone Directory Company C por A.

**Segunda:** que el objeto –finalidad esencial- del consorcio es completar los antecedentes y la experiencia de las tres empresas firmantes para participar en el concurso.

**Tercera:** que el cartel de la licitación del ICE exige del oferente que demuestre experiencia en la edición de guías telefónicas para administraciones con al menos 2 millones de líneas telefónicas en total, experiencia en programas de orientación al cliente y a la calidad, experiencia en desarrollo de servicios complementarios a la guía telefónica, experiencia en desarrollo de productos sustitutos a la guía telefónica, experiencia en el desarrollo de diferentes plataformas tecnológicas para servicios de información; requiere certificar el presupuesto destinado a investigación y desarrollo, indicar facilidades de audiotexto y sus mecanismos de operación, otorgar un compromiso incondicional para brindar al ICE asesoría y acceso al desarrollo tecnológico en servicios de información para el Servicio de Información

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

**Cuarta:** que las empresas oferentes se presentan en consorcio con el fin de que los antecedentes y experiencia de cada una de ellas, sean evaluados conjuntamente en la licitación.

**Quinta:** convienen en que el único representante ante el ICE lo sea General Telephone Directory Company C por A., la que se tendrá como adjudicataria y que será la responsable de coordinar con las demás empresas del Consorcio, la prestación de todos los servicios y suministros. Las partes del Consorcio responderán, solidariamente, ante el ICE por todas las obligaciones derivadas de la oferta, de la participación en Consorcio en los procedimientos de contratación, de la eventual adjudicación y su ejecución.

**Sexta:** nombran como apoderados especiales del Consorcio a Bill J. Brewer y Terrence Mitchel Leve, ciudadanos estadounidenses y a José María Quirós Alfaro, costarricense, para que puedan firmar y presentar la oferta del Consorcio; firmar y presentar ante el ICE aclaraciones de la oferta; ampliar la validez de la oferta y de la garantía de participación; defender la adjudicación si es favorable al Consorcio o apelar la misma si no se favorece al Consorcio; sustituir el poder en todo o en parte, reservándose para sí en todo momento el poder de representación; firmar el contrato respectivo. Los mandatarios pueden actuar conjunta o separadamente y declaran que las empresas poderdantes y los mandatarios se someten a las leyes y tribunales de Costa Rica para todos los efectos y contratos que se celebren y deban ejecutarse en Costa Rica en razón de la licitación antes mencionada.

**Sétima:** que el responsable directo, a nombre del consorcio, ante el ICE para todas las obligaciones que deriven de la licitación es General Telephone Directory Company C por A., sin perjuicio de la responsabilidad solidaria de los demás integrantes del Consorcio.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

**Octava:** que la responsabilidad de GTE Information Services Incorporated y de GTE Directories Corporation, consistirá en brindar a General Telephone Directory Company C por A, todo tipo de apoyo técnico y financiero para que pueda cumplir todas las obligaciones, como brindar al ICE asesoría y acceso al desarrollo tecnológico en sistemas de información para el Servicio de Información 113 y cualquier otro tipo de apoyo financiero o tecnológico requerido por el cartel. Todo ello sin perjuicio de la **responsabilidad solidaria que cabe a todas las empresas del Consorcio, en caso de incumplimiento de alguna de ellas.**

**Novena:** que en virtud de lo establecido en la cláusula primera, la compensación de los servicios requeridos de las diferentes empresas del consorcio, para cumplir todas las obligaciones del cartel, se hará mediante un acuerdo interno entre las partes.

**Décima:** se fija la dirección legal del Consorcio en Costa Rica.

Al acuerdo de Consorcio, las tres empresas adjuntan los certificados de incorporación expedidas por la Oficina del Secretario del Estado de Delaware, junto con sus traducciones oficiales, en los que constan las existencias jurídicas de las empresas y de los dignatarios que firman a nombre de ellas (véanse folios 298 y del 360 al 394 que corresponde a la oferta presentada por el Consorcio ante el ICE, copias que se adjuntan certificadas en el Documento No. 14).

25).- En los folios del 395 al 426 de la oferta del Consorcio se encuentran unas copias, con sus traducciones oficiales, del contrato firmado por General Telephone Directory Company C por A con la firma Belize Telecommunications Limited, el 10 de febrero de 1994 (ver esos folios del expediente certificados en Documento No. 16).

26).- La cláusula 2.4.1.B del Cartel de la Licitación 6378-T del ICE,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Experiencia; 30 % por la Capacidad Financiera y 30 % por la Calidad del número 113 y en el punto B de la cláusula, se indicó expresamente:

"La empresa oferente deberá presentar con su oferta los estados financieros auditados en español de los últimos 3 años que contengan como mínimo el Balance General (Estado de Situación), Estado de Resultados y su Utilidad Retenida o Déficit Acumulado (de acuerdo a las reglas y normas de su país de origen), los que le permitan al ICE comprobar su capacidad financiera. **En caso de que la oferente sea parte de otra compañía o grupo de empresas (Holding), se permitirá la presentación de los estados financieros de éstas últimas en los términos aquí establecidos, en cuyo caso el grupo empresarial será solidariamente responsable con la oferente de la totalidad de las obligaciones que ésta última adquirirá como adjudicataria; esta solidaridad deberá ser demostrada por la oferente mediante manifestación expresa y por escrito del representante de aquellas empresas."** (Documento No. 17)

27).-     En los folios del 427 al 432 de la oferta del Consorcio, se encuentra un documento en el que, para cumplir con la cláusula 2.4.1.B, párrafo I, la empresa GTE CORPORATION CERTIFICA:

"I.-     Que esta Corporación tiene conocimiento de que el Consorcio constituido por GTE Information Services Incorporated, GTE Directories Corporation y General Telephone Directory Company C por A, van a participar en la Licitación Pública No. 6378-T, promovida por el INSTITUTO COSTARRICENSE DE ELECTRICIDAD para "La Contratación de Servicios por ocho años y el Desarrollo e Implementación de Servicios de Información".

II.-     Que de acuerdo con las disposiciones de la Cláusula 2.4.1-B (La Capacidad Financiera de la Compañía) incluida en el Cartel de la Licitación Pública No. 6378-T, antes mencionada, el Consorcio mencionado presentará los Estados Financieros de GTE Corporation, que es la compañía "holding" (tenedora) del grupo.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5(d)) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

III.- Que de acuerdo a los requisitos de la misma cláusula 2.4.1-B, antes mencionada, GTE Corporation declara que será conjuntamente responsable con las empresas del Consorcio mencionado por todas las obligaciones que este Consorcio adquiera como oferente y como adjudicatario de la mencionada Licitación Pública No. 6378-T ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD.

IV.- Esta corporación emite esta certificación para ser presentada al Instituto Costarricense de Electricidad en la Licitación Pública 6378-T, antes mencionada.

Dado en la ciudad de Irving, Estado de Texas, Estados Unidos de América, el 22 de junio de 1999."

El documento fue firmado por Daniel P. O'Brien en su condición de EVP, Chief Financial Officer y se acompaña una razón notarial de la Notario Público Cynthia Owens del Condado de Tarrant, Estado de Texas, que es luego consularizada y legitimada conforme con la Ley (ver copias certificadas del expediente en Documento No. 18).

28).- En virtud de todo lo que se ha probado con los hechos 12, 13, 14, 15, 19, 20, 21, 22, 23, 24, 26 y 27 de esta Demanda, el consorcio adjudicatario de la Licitación Pública No. 6378 – T del ICE, estaba integrado por las empresas americanas GTE Directories Corp., GTE Information Services Inc. y General Telephone Directory Company, C. por A., pertenecientes las tres al Grupo liderado por el Holding (empresa tenedora del Grupo) GTE Corporation, quien otorgó libremente su responsabilidad solidaria (conjunta) a las empresas del consorcio por todas las obligaciones que ese consorcio adquiriera como oferente y adjudicatarios de la mencionada Licitación. Por cambiar de razón social las empresas, tanto el Holding como las integrantes del Consorcio, continuaron siendo solidariamente responsables, solamente que ahora con las nuevas razones sociales. De esta forma, las empresas del consorcio

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Information Services Inc." y "Verizon Directories Corp.", por ser las adjudicatarias de la Licitación y subsidiarias de Verizon Communications Incorporated, Holding del Grupo, en que se convirtió la empresa GTE Corporation conservaron su responsabilidad solidaria con relación al contrato derivado de la Licitación Pública indicada. Todas esas entidades integran un único grupo de interés económico, cuya entidad principal es "Verizon Communications Incorporated" (misma prueba de todos los Hechos referidos en el inicio de éste).

29).-    El contrato entre el **ICE** y el **Consorcio GTE** fue puesto en ejecución: De conformidad con lo que establecen las normas del cartel de la licitación, en las Cláusulas Tercera y Vigésima Sétima del contrato, se estipuló que la producción total de la guía debía ser realizada en Costa Rica "contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia tecnológica en beneficio de los ciudadanos costarricenses y a la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general" (ver copia del contrato a los folios 2751 a 2785 del expediente administrativo en Documento No. 6).

30).-    En cumplimiento de lo señalado en el punto anterior y atendiendo a que la empresa costarricense **THS**, como ya se demostró en los Hechos del 1 al 9 de esta Demanda, tenía la mejor experiencia en el tipo de contrato que se debía ejecutar, VERIZON INFORMATION SERVICES – COSTA RICA, LLC, actuando con respecto a sus obligaciones para con el **ICE** en representación del Consorcio GTE adjudicatario de la Licitación y de VERIZON INFORMATION SERVICES – BELIZE, LLC (antes General Telephone Directory Company, C por A) en virtud del cambio de razón social, todas empresas del Estado de Delaware, Estados Unidos de América; firmaron el 28 de febrero del 2002 con **THS** un contrato Maestro de Compra por un plazo máximo de 168 meses (cláusula 2.b del contrato), para producir, empacar y distribuir los directorios telefónicos, de conformidad con el contrato firmado entre el Consorcio GTE y el ICE (ver copia del contrato que se adjunta en Documento No. 19).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**31).-**　　　Concomitantemente a la preparación de la participación del **Consorcio GTE** en la licitación 6378-T, se produjeron una serie de negociaciones entre **GTE** y **THS** para atender las nuevas definiciones de las necesidades de edición e impresión impuestas por **GTE**, y se estableció, como resultado, que debía ampliarse y renovarse la planta industrial (equipo y espacio) de **THS** para poder-suscribir y atender el contrato que se acordaría en relación con esa licitación, con base en las recomendaciones de los técnicos enviados por GTE a evaluar la maquinaria y las instalaciones (véase Hecho 8 y Documento No. 10).

**32).-**　　　Fue con base en esa extensa y profunda relación entre ellas y debido a las exigencias contractuales y comerciales impuestas por **GTE**, como derivación del contrato firmado originalmente en el año 2000 con el **ICE**, que **THS**, para cumplir con las obligaciones pactadas, toma la decisión de endeudarse y llevar a cabo las grandes transformaciones industriales en planta y equipo, así como realizar las enormes inversiones que tal decisión exigía. Esta inversión (endeudamiento) impuesta como condición contractual, significaba otra escala de planta industrial, tal que sólo podía sostenerse con el volumen de trabajo que representaban las ediciones e impresiones de los directorios telefónicos de Costa Rica, así como los de otros países que, como República Dominicana, eran operaciones de la entidad **GTE** (Documento No. 20, que es el Plan de Inversión para la compra de la máquina rotativa Heidelberg y Documento No. 27 que recoge las negociaciones anuales de THS con el Transamerica Bank and Trust Co.)

**33).-**　　　Como consecuencia directa del contrato Maestro (Master Purchase Agreement), suscrito por **THS** con **GTE** (luego **Verizon**) y de las recomendaciones de los técnicos de **GTE**, se hace necesario para mi representada trasladar todas sus instalaciones industriales, que por décadas habían estado ubicadas en Curridabat, al Cantón de Cartago, ocupando unas naves industriales más amplias, donde se pudieran instalar no sólo sus propios equipos, oficinas y máquinas sino también la nueva máquina rotativa tipo "Offset" marca Heidelberg, modelo Mercury 24D y todos sus accesorios, que

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

volumen de trabajo que **GTE** (luego **Verizon**) se había comprometido a comprarle a **THS** (ver contrato en el Documento No. 19 y Documento No. 10).

34).- Con ese objeto se localizan y alquilan dos naves industriales en la Zona Franca Zeta, en Guadalupe de Cartago, propiedad de INMOBILIARIA ZOROASTER S.A., cédula jurídica 3-101-326.723, donde se llega a instalar **THS** con todos sus equipos, oficinas y bodega, según contrato que se suscribe con la propietaria de fecha primero de julio de dos mil cuatro (Documento No. 21).

35).- Lo indicado en el Hecho anterior y en razón de que para los mismos propósitos, **THS** adquirió una moderna máquina rotativa Heidelberg, una línea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta, precisó de un importante endeudamiento por parte de **THS** con entidades financieras, y se justificó con las previsiones de expansión industrial que tenía la empresa por su relación empresarial con **GTE**. De hecho la inversión en la nueva planta se realizó por una exigencia tanto contractual como comercial (Documento No. 19, contrato maestro de compra cláusula 15 letra "j" y el Documento No. 20).

36).- Estas inversiones las realizó la empresa actora endeudándose fuertemente, porque el contrato suscrito con **GTE** tenía un horizonte de 168 meses, que la permitía recuperar la inversión, sobre todo con la promesa y el entendimiento que se le iban a otorgar la edición e impresión de otros directorios en la región. Aparte del largo horizonte del nuevo contrato, los veinticinco años de continuidad y profundización de la relación comercial, constituyeron la base para aceptar el requisito de realizar las grandes inversiones y para ello, endeudarse al límite de las capacidades de la empresa. Tan viable era el proyecto y el compromiso de **GTE**, que las instituciones financieras no dudaron en otorgar los créditos para esa expansión, dada la supuesta seriedad del consorcio **GTE** (Documento No. 20-A).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**37).-**       Debe advertirse que dos años y cuatro meses antes de la firma del **Contrato Maestro de Compra** que se indica en el Hecho 8 de esta Demanda, sea el día 15 de octubre de 1999, Douglas C. LaVelle Presidente entonces de GTE Directories Internationational (que era la casa matriz en directorios telefónicos de GTE y como consta en el logo de la misma nota "Una parte de GTE Corporation"), remite una carta adjunta a **THS,** en nombre de sus subsidiarias de Costa Rica y República Dominicana, cuya intención explícita es definir los términos y asuntos bajo los cuales los servicios de impresión y manufactura de los directorios telefónicos, serían provistos por el Grupo GTE a dichas empresas y definidos en un contrato subsecuente. Fue claro y se estableció en el punto uno de la nota referida, que si en siete días no se aceptaban los términos de dicha carta, las negociaciones se terminaban y así lo hicieron saber los ejecutivos locales y regionales de **GTE**, José María Quirós y David Andrade (Documento No. 22).

**38).-**       En el punto e) de esa misma nota, se establece que si **GTE** provee a **THS** la oportunidad de imprimir directorios adicionales a los de Costa Rica y República Dominicana, **THS** quedaba obligada a dar descuentos adicionales de precios a **GTE**. Tal condición indica, claramente, la intención de **GTE** de otorgar un volumen adicional de trabajo de otros países, para apoyar la decisión de la inversión en planta y equipo a realizar (Documento No. 22).

**39).-**       El punto g) de esa nota es totalmente claro en que **THS** debía cumplir todos y cada uno de los requerimientos técnicos exigidos por **GTE** incluyendo, pero no limitado a, el proceso denominado "white knock out" y cuatro colores en dicho proceso, lo que en efecto implicaba la compra de una nueva rotativa en un plazo perentorio ya que dice este punto: "...a partir de los primeros directorios que se imprimirán bajo cualquier acuerdo" (Documento No. 22).

**40).-**       El punto h) dice que **THS** deberá proveer evidencia documental el 15 de noviembre de 1999, o sea 15 días después de la fecha de esta carta, que **THS** procurará, instalará y probará equipo con capacidad para imprimir

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

pruebas será aceptable a criterio, exclusivamente, de **GTE** (Documento No. 22).

**41).-** El punto I) es terminante en el sentido de que cualquier falta de **THS** en el cumplimiento de cualquiera de estos puntos esenciales, dará como resultado el derecho de **GTE** de terminar inmediatamente cualquier acuerdo que tenga con **THS** sin ninguna responsabilidad para **GTE** (Documento No. 22).

**42).-** En resumen, esta nota que se expone en los Hechos del No. 37 al presente, sustituye todas las conversaciones anteriores y ofrece la impresión de los directorios telefónicos de Costa Rica y República Dominicana, y eventualmente otros directorios, si se cumplen las demandas de equipo ahí establecidas, en un plazo perentorio y sin derecho a negociación posterior, por lo que la empresa actora tuvo que avocarse, de inmediato, a la elaboración del plan y la documentación de compra del equipo y la ampliación de la planta necesaria para hacer los directorios en la forma establecida. En estricto sentido jurídico **GTE** y luego **VERIZON** imponían a **THS** un verdadero contrato de adhesión, que debía aceptar tal y como lo presentaba la contraparte (Documentos Nos. 22 y 23).

**43).-** En la nota de Agosto 20, 1999 suscrita por Terence Mitchell Leve, Senior Attorney, quien figura en los documentos de la licitación de **GTE** ante el **ICE**, dirigida al Lic Mario Quintana (q.d.D.g.), quien era abogado de la actora en esa época, en el segundo, cuarto y noveno párrafo se discute la posibilidad de integrar un "joint venture" entre **GTE** y **THS;** la idea no se desecha sino que se considera que consumiría mucho tiempo realizarla y que por lo tanto, el énfasis inicial es por un contrato de impresión. Pero estas afirmaciones reflejan el deseo manifiesto de ir hacia un "joint venture" (Documento No. 23).

**44).-** En el cuarto párrafo de esa nota referida en el Hecho anterior, se expresa claramente que **GTE** reconoce que un mayor volumen de impresión, sería un gran contribuyente para subsanar algunas de las ineficiencias de **THS**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 150 of 490   RECEIVED NYSCEF: 10/26/2021

26

directorios de República Dominicana podría ser beneficiosa para resolver el problema (misma prueba Documento No. 23).

**45).-**      El 15 de noviembre de 1999 se llevó a cabo una reunión de los señores Álvaro y Alonso Trejos Fonseca y don Guillermo Navarro, entonces Presidente, Vicepresidente y Gerente de Producción de **THS,** respectivamente, con el Director de "Printing" de GTE Directories International con el propósito de: 1) evaluar el progreso realizado en el proyecto de las mejoras en la planta; 2) asistir en desarrollar un proyecto formal para dar un seguimiento cercano al proyecto de la nueva planta; 3) acordar un plan de contingencia en caso que **THS** no cumpliera con las fechas de instalación de los nuevos equipos y planta, el cual consistía en contratar otra planta en Estados Unidos, sobre todo, en caso de que no se adquirieran los equipos a tiempo; 4) evaluación de la compra potencial del equipo, con la específica asistencia del consultor recomendado por **GTE**, señor Bill Snell (Documento No. 24).

**46).-**      Significa lo anterior que **GTE** tenía un plan de contingencia para llevarse -trasladar- la impresión de los directorios telefónicos a Estados Unidos o a cualquier otro país en el extranjero, si las inversiones programadas y exigidas no las llevaba a cabo **THS**. **GTE** le dio un seguimiento continuo y cercano al proyecto y asignó a uno de sus consultores para recomendarle a **THS** el tipo de equipo que se debía adquirir, lo que quedó consignado, con detalle, en el contrato de impresión definitivo (Documento No. 19).

**47).-**      El 31 de agosto del 2000 José María Quirós, Gerente General de **GTE** en Costa Rica, remite al **ICE** (folio 3631 del expediente) el subcontrato de impresión de las guías telefónicas para que fuera aprobado, indicando que la empresa **THS** es una firma comercial de reconocida experiencia a nivel nacional e internacional y que ha sido la encargada, durante los últimos veinticinco años, de llevar a cabo la impresión de las Guías Telefónicas del **ICE**. Este contrato, que luego dio base a los subsiguientes con **Verizon**, se firmó por un plazo de ciento sesenta y ocho meses (Documento No. 25).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**48).-**    En dos correos electrónicos se pone de manifiesto la naturaleza material de la relación empresarial entre **THS** y **GTE**: uno es de Febrero del 2001 en el que **GTE** solicita cotización para los directorios de Puerto Rico, que demuestra la amplitud de la relación; el otro, de Setiembre de 2001 donde se afirma que como impresor preferido para Costa Rica y República Dominicana, se espera que **THS** busque cotizaciones de suplidores de papel, etc.- En esa forma se reafirma el estatus de impresor preferido aún en el año 2001 (Documento No. 26).

**49).-**    **THS**, como queda acreditado en esta Demanda, cumplió con todos los deberes y obligaciones impuestas, primero por el Grupo GTE y luego por el Grupo Verizon, a costa de fuertes endeudamientos que quedaron respaldados, para justificar la capacidad de pago de la empresa, por los ingresos que provenían de su giro comercial y los que generaba el contrato para las ediciones, impresiones, encuadernación y entrega de las guías telefónicas, con una validez de 168 meses. Es decir, frente a los institutos financieros (bancos, financieras y proveedores), los ingresos proyectados principalmente de conformidad con el contrato vigente, eran garantía suficiente para enfrentar las obligaciones asumidas con los endeudamientos, como también eran suficientes para producir las ganancias que se proyectaron con este negocio (Documento No. 27)

**50).-**    El 14 de octubre de 2004 y de conformidad con los términos del contrato entre **THS** y **GTE**, ya a esa fecha el Grupo **Verizon**, las partes involucradas suscribieron el **"Cronograma de Producción, Guía Provincias 2005"**, donde se establecen las condiciones para la confección de los libros correspondientes a esa guía en particular. En dicho cronograma se señala como fecha límite, para modificar el número de páginas y la cantidad de libros, el día 15 de diciembre de 2004 (Documento No.28).

**51).-**    De conformidad con lo que viene dicho en los Hechos anteriores, el 15 de julio del 2004 el Consorcio contratista del Grupo Verizon tramitó, en papelería de la Compañía General de Directorios C.por.A, con oficinas en San

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

documento, la orden de compra 4568 para la impresión de las Guías Telefónicas para Metro (Siglas para Área Metropolitana), por la suma total de $ 3,033,625.60 y el día 20 de agosto del 2004, la orden de compra 4582, por la suma de $ 2,134,503 por las Guías Telefónicas de Provincias, para un total de $ 5,168,128.oo para las Guías correspondientes al año 2005 (Documento No. 29).

52).-     Las órdenes de compra indicadas en el Hecho anterior fueron sustituidas por **Verizon** por la número 4612 del 3 de noviembre del 2004 para las Guías del Área Metropolitana por la suma de $ 2,120,828 y por la número 4644 del 17 de diciembre del 2004 para las Guías de Provincias, por la suma de $ 1,254,023, para un total de $ 3,374,851, o sea, con una disminución unilateral y además, extemporánea, de $ 1,793.277 (Documento No. 30).

53).-     De acuerdo con lo anterior y a lo señalado en el Contrato entre las partes, cualquier modificación en relación a estos dos aspectos, debía comunicarse con una antelación de por lo menos siete días. No obstante lo anteriormente dicho, es el 20 de diciembre del 2004 la fecha en que **THS** recibe la "Orden de Compra" número 0004644, de fecha 17 de diciembre de 2004 y suscrita por el Gerente General de **Verizon**, Melvin Andujar Queipo, es decir, cinco días después de la fecha límite (ver Contrato Maestro, Cláusula 11 b en Documento No. 19), en la que no sólo reducen drásticamente el número de páginas de las guías telefónicas y el número de libros, sino que establecen en forma unilateral, una conformación y composición de las guías distinta a la que había convenido **GTE** en su contrato con el **ICE** (mismo Documento No.° 30).

54).-     En lo dicho hasta aquí, en los anteriores Hechos de la Demanda se analizan los siguientes aspectos esenciales: a) los antecedentes comerciales de **THS** y sus vínculos con **GTE** primero y luego con **Verizon** en la edición, impresión, encuadernación y distribución de las guías telefónicas en Costa Rica; b) la promoción de la Licitación Pública No. 6378-T por el **ICE**, en la que participó y resultó adjudicatario el **Consorcio GTE**, que luego cambia de

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

impuestas por **GTE (Verizon)** a **THS**, para crecer en equipo e instalaciones, con fundamento en la economía de escala que significaba la edición, impresión y publicación de las guías telefónicas por un término de CIENTO SESENTA Y OCHO (168) meses, lo que llevó a la empresa costarricense a contraer fuertes endeudamientos para adquirir modernos equipos y alquilar instalaciones más grandes; d) la cesación de pagos (ingresos) que se dio en contra de **THS**, lo que significó que la empresa careciera de recursos suficientes para hacer cumplido pago de sus obligaciones contraídas en razón de la imposición de **GTE**, de manera que todas las deudas acumuladas se vencieran y se ejecutaran judicialmente, llevando a la empresa al cese total de operaciones y a salir del giro comercial que había ejercido por casi cien años. A partir de ahora, en los siguientes Hechos, señalamos lo que sucedió con el contrato formalizado entre el **ICE y el Consorcio GTE** (luego **Verizon)**, como consecuencia de la adjudicación de la Licitación Pública No. 6378-T del **ICE** (véase toda la prueba del Hecho 1 al 54).

55).- Según la Cláusula Segunda del contrato **ICE – GTE (luego Verizon)** cada año el **ICE** y **GTE** debían revisar la estructura de las Guías Telefónicas atendiendo a las necesidades del mercado. En aplicación de tal disposición, el día 13 de mayo de 2004 **Verizon** presentó al **ICE** una propuesta de reestructuración de las Guías Telefónicas para la edición del 2005, para eliminar los registros de los clientes del Área Metropolitana en las Guías Telefónicas de Provincias y viceversa (Documento No 31).

56).- En oficio 6000-29898-2004 de fecha 25 de mayo 2004, la Subgerencia de Telecomunicaciones le contestó y comunicó a **Verizon** que la solicitud no se atendería hasta tanto no se pusiera a derecho en cuanto a los términos contractuales de monto y plazo de la Garantía de Cumplimiento, según lo estipulado en la Cláusula 2.3.1 del cartel de la Licitación y la cláusula 29 del contrato (Documento No. 32).

57).- El 15 de julio del 2004 la Subgerencia de Telecomunicaciones del ICE, mediante el oficio 6000-41046-2004, le comunicó a **Verizon** que para la

**This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.**

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 154 of 490    RECEIVED NYSCEF: 10/26/2021

entre las partes sobre una posible reestructuración, se editarían de la misma manera como se hizo para el año 2004 (Documento No. 33).

**58).-** El 8 de setiembre del 2004 **Verizon** le comunicó a la Subgerencia de Telecomunicaciones, que el 13 de mayo de ese mismo año, hizo varias solicitudes para revisar la estructura de las guías telefónicas y que como habían transcurrido más de los treinta días que establece el artículo 16 de la Ley de Contratación Administrativa sin obtener respuesta, hacía valer su derecho al silencio positivo y declara que han sido aceptados los puntos referidos a la estructura del Directorio y Contenido; a la publicación y distribución del Directorio; y, a los llamados procesos y responsabilidades (Documento No. 34).

**59).-** El 14 de septiembre 2004 con nota 6000-52278-2004, la Subgerencia de Telecomunicaciones respondió a Verizon que resultaba abiertamente improcedente su pretensión de hacer valer el silencio positivo, por lo que se la rechazaba expresamente (Documento No. 35).

**60).-** El 8 de noviembre del 2004 **Verizon** le indicó a la Subgerencia de Telecomunicaciones, que reiteraba su posición sobre el silencio positivo con relación a la nota del 13 de mayo del 2004 (Documento No. 36).

**61).-** El 12 de noviembre 2004 el **ICE** ordenó a las Notarias públicas Lcda. Patricia Hernández Salazar y Licda. Ligia Picado Arguedas, levantar actas notariales del resultado de las visitas que hacen en el local industrial de **THS,** certificando que en las guías telefónicas en elaboración, no se incluyeron los registros de los clientes de provincias y comprobando que **Verizon** ordenó a **THS** imprimir las páginas blancas residenciales de la Guía Telefónica del Área Metropolitana con los registros únicamente de San José, excluyendo los abonados de la zona de Los Santos y de las Provincias (Documento Nº 37).

**62).-** El 15 de noviembre 2004 con nota S.I.-0726-11-04, el **ICE** le comunicó a **Verizon** que las guías telefónicas del Área Metropolitana no

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

6000-41046-2004 y 6000-52278-2004 del 15 de julio y 14 de setiembre, ambas del 2004, emitidas por la Subgerencia de Telecomunicaciones de esa Institución (Documento No. 38).

63).-    El ICE ordenó al Notario Lic. Francisco Solís levantar una acta notarial para certificar que **Verizon,** estaba imprimiendo las Guías Telefónicas de acuerdo a la propuesta presentada por ella misma, según la nota del 13 de mayo del 2004 y no como se lo había indicado el ICE, de conformidad con los términos del contrato y el día 17 de noviembre del 2004 se celebró una reunión entre el ICE y Verizon y mediante oficio S.I.0730-11-04 se comunicó la minuta de la reunión señalando el ICE que Verizon incumplía las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación y segunda del contrato (Documento No. 39).

64).-    El 18 de noviembre 2004, con nota 6000-64540-2004, la Subgerencia de Telecomunicaciones responde la nota del 8 de ese mes de **Verizon,** manifestándole nuevamente que debía mantener el formato de las guías telefónicas del año 2004 (Documento No. 40).

65).-    El 23 de noviembre 2004, en su Sesión 5649 el Consejo Directivo del **ICE** acordó, en firme, "instruir a la Subgerencia de Telecomunicaciones para que notifique a la empresa Verizon Information Services contratista de la Licitación Pública 6378-T, tramitada para el desarrollo, mercadeo, producción, distribución e implementación de las Guías Telefónicas, así como los productos y servicios complementarios y sustitutos a las mismas, para el período 2001-2008, que este Consejo Directivo rechazó cualquier intención de variar unilateralmente las condiciones contractuales pactadas, y se le insta a cumplir en todos sus extremos el contrato vigente. Acuerdo firme" (Documento No. 41).

66).-    El 29 de noviembre 2004, con nota 6000-66202-2004, SGT-2625-2004, la Subgerencia de Telecomunicaciones le notificó a **Verizon** el acuerdo 10 del Acta de la sesión 5649 del 23 de noviembre de 2004 del Consejo Directivo que rechazó cualquier intención de variar unilateralmente las

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 156 of 490   RECEIVED NYSCEF: 10/26/2021

32

condiciones contractuales pactadas y le insta a cumplir en todos sus extremos el contrato vigente (Documento No. 42).

**67).-** El 30 de noviembre 2004 con nota 9100-UENSC/888, la dependencia del **ICE** denominada Procesos de Información de la UEN Servicio al Cliente, le ratifica a **Verizon** el acuerdo del Consejo Directivo; además, le indica que el **ICE** no permitirá ni autorizará la distribución de las guías telefónicas que se impriman contra lo dispuesto en el contrato y que de mantenerse esa actitud el **ICE** podría optar por ejecutar la garantía de cumplimiento e iniciar el proceso de resolución del contrato (Documento No. 43).

**68).-** El 2 de diciembre de 2004 en visita que se realizó en las instalaciones de **THS**, la Notaria pública Licda. Yaila Paola Sánchez, levantó una acta notarial en la que se certifica que estaban impresos 103.000 ejemplares de las páginas blancas residenciales del Área Metropolitana y que la imprenta **(THS)** no había recibido ningún tipo de orden para modificar el proceso de impresión y encuadernación; que la imprenta trabaja con las órdenes de compra entregadas por **Verizon** (Documento No. 44).

**69).-** El día 13 de diciembre del 2004 la Licenciada Agnes Paniagua Cubero, Jefe de Proceso Servicios de Información del **ICE,** solicitó a la Dirección Administrativa de Proveeduría, la apertura del procedimiento correspondiente de Resolución del contrato y ejecución de garantía de cumplimiento contra **Verizon** (Documento No. 45).

**70).-** El 14 de diciembre de 2004 el **ICE** dictó el acto de apertura del procedimiento administrativo para la resolución del contrato y la ejecución de la garantía de cumplimiento contra **Verizon**, según oficio 5225-69163-2004, AEG-0572-2004 de 14 de diciembre del 2004 (Documento No. 46).

**71).-** El 17 de diciembre del 2004, el señor MELVIN A. ANDUJAR QUEIPO, en su calidad de Gerente General de **Verizon**, presentó por escrito la excepción de previa pronunciamiento de cláusula arbitral que determina al

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 157 of 490     RECEIVED NYSCEF: 10/26/2021



día 3 de enero de 2005 mediante nota AEG-0003-2005 a la Dirección Jurídica Institucional del ICE, con el fin de obtener pronunciamiento jurídico al respecto. La Dirección de Proveeduría, Área Garantías, Registros y Sanciones, mediante Oficio 5225-2022-2005, AEG-0037-2005 del 13 de enero de 2005, examinó el asunto y opinó que la oposición de Verizon era improcedente (Documento No. 47).

**72).-** El 7 de enero de 2005 la dependencia del **ICE** denominada Procesos de Información de la UEN Servicio al Cliente, solicitó a la Dirección de Proveeduría la implementación de algunas medidas cautelares dentro del procedimiento administrativo entre otras, no ejecutar las prestaciones contractuales por incumplimiento de **Verizon;** que el **ICE** continuara con el procedimiento de facturación de los anunciantes de la Guía Telefónica 2004 y 2005, así como la inclusión de la información necesaria para la facturación; que **Verizon** se abstuviera de utilizar el logotipo de la marca **ICE** en posibles guías telefónicas, productos complementarios y en cualquier otro medio o actividad no autorizado por el **ICE.** Todo ello en nota interna S.I. 0013-01-05 del 7 de enero, 2005 (Documento No. 48).

**73).-** El 7 de enero de 2005, mediante resolución No. 5225-00939-2005 AEG-0020.2005, la Dirección de Proveeduría del **ICE** le notificó a **Verizon** las medidas cautelares dictadas (Documento No. 49).

**74).-** El 10 de enero de 2005 **Verizon** interpuso recurso de revocatoria con apelación en subsidio y nulidad concomitante contra la resolución que ordena las medidas cautelares, aduciendo que lesionan gravemente sus derechos subjetivos. Además, que el acto administrativo que nació a la vida jurídica es un acto tácito de aprobación de su solicitud, con todas las características y garantías que el ordenamiento jurídico le concede a esta clase de actos, a la luz de la doctrina del numeral 16 de la Ley de Contratación Administrativa (Documento No. 50).

**75).-** El 12 de enero de 2005 en la Dirección Jurídica Institucional del

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 158 of 490    RECEIVED NYSCEF: 10/26/2021

34

Salazar, Francisco Rojas Giralt, y Hissell Mayorga Quirós, indicando y recomendando que el recurso de revocatoria con apelación en subsidio y nulidad concomitante interpuesto contra las medidas cautelares sea declarado improcedente, según nota 0092.01644.2005 DCA-020-05 del 12 de enero del 2004 (Documento No. 51).

76).-    El 12 de enero del 2005 la Licda. Agnes Paniagua del Proceso Servicios de Información del Instituto Costarricense de Electricidad, solicita que el Recurso de Revocatoria con Apelación en Subsidio y Nulidad concomitante, sea declarado improcedente, según nota S.I.-0025-01-2004 del 12 de enero del 2004 (Documento No. 52).

77).-    El 12 de enero de 2005 **Verizon** presentó, dentro del plazo concedido en resolución 5225-69163-2004 (AEG – 0572-2004) de fecha 14 de diciembre de 2004, sus alegatos con respecto a la apertura del Procedimiento para declarar la Resolución Contractual (Documento No. 53).

78).-    El 21 de enero de 2005 el **ICE** le notificó a **Verizon** la resolución 5225-03122-2005 del 21 de enero del 2005, rechazando el recurso de revocatoria contra la aplicación de las medidas cautelares y elevó ante la Subgerencia de Telecomunicaciones el recurso de apelación con nulidad concomitante contra la aplicación de las medidas cautelares dictadas en el oficio 5225-00939-2005 AEG-0020.2005 del 7 de enero de 2005 (Documento No. 54).

79).-    Recibida el día 31 pero de fecha 25 de enero de 2005 **Verizon** presentó dentro del plazo concedido en resolución 5225-03122-2005, (AEG – 0060-2005) de fecha 21 de enero del 2005, ampliación de alegatos del recurso de apelación en contra de las medidas cautelares, ante el Superior Jerárquico (Documento No. 55).

80).-    El 13 de enero de 2005 el **ICE** le notificó a **Verizon** el auto de traslado de la solicitud "excepción previa de acuerdo arbitral", a la Subgerencia

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 159 of 490     RECEIVED NYSCEF: 10/26/2021

35

de Telecomunicaciones, para que ésta a su vez, la elevara a conocimiento y resolución del Consejo Directivo (Documento No. 56).

**81).-** El 2 de febrero de 2005 mediante nota número 0012-5372-2005 CD-070-2005 remitida a la Subgerencia de Telecomunicaciones, el Consejo Directivo comunica que en el artículo 12 del acta de la Sesión 5657, celebrada el primero de febrero de 2005, acordó rechazar en todos sus extremos la solicitud para acudir a procedimiento arbitral según lo contenido en la excepción previa de acuerdo arbitral presentada por la empresa **Verizon** (Documento No. 56).

**82).-** El 7 de febrero de 2005 la Subgerencia de Telecomunicaciones rechaza en todos sus extremos el recurso de apelación y nulidad concomitante interpuesto, según oficio número 6000-06301-2005 SGT-510-2005 (Documento No. 57).

**83).-** El Subgerente de Telecomunicaciones, MBA. Claudio Bermúdez Aquart, dictó el acto final del procedimiento, con fundamento en la recomendación de acto final que en Oficio AEG-0128-2005 del 11 de febrero del 2005, le remitió el Organo Director Administrativo, indicando textualmente lo siguiente:

> *"Esta Subgerencia con fundamento en las citas legales, jurisprudencia aplicable y prueba documental que consta en expediente administrativo, se acuerda acoger la recomendación de la Dirección Jurídica Institucional, de la Dependencia Técnica Proceso Servicios de Información y de la Dirección de Proveeduría en su nota AEG -0128-2005, por lo que al tenor de los artículos 10, 11, 13, 14, 20, 21,, 34, de la Ley de Contratación Administrativa, artículos 12.1, 13.2, 15.1, 15.2, 15.3, 15.4, 16.2, 22.1, 23.1, 35.1, 35.1, 49.2 del Reglamento General de Contratación Administrativa, artículo 3, 75, 76, 77, 78, 79 del Reglamento Interno de la Contratación Administrativa, acuerda :*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 160 of 490   RECEIVED NYSCEF: 10/26/2021

36

*I)* *La resolución del contrato y ejecución de la garantía de cumplimiento, dado el incumplimiento del contratista VERIZON INFORMATION SERVICE (Costa Rica) LLC.*

*II)* *Proceder al cobro de los daños y perjuicios ocasionados, todo de acuerdo a la cláusula 3.10.3 que textualmente dice: Si la calidad de los materiales empleados en una edición particular y la confección de las guías telefónicas entregadas, no garantiza al ICE el cumplimiento de lo ofrecido en el contrato y lo especificado en este cartel y si además el monto fijado como garantía no fuese suficiente o se encontrare agotado, el ICE podrá accionar judicialmente contra el contratista para el cobro de daños y perjuicios...*

*III)* *Se le Comunique a la empresa VERIZON INFORMATION SERVICES(Costa Rica) LLC que contra la presente resolución se pueden interponer los recursos de revocatoria y el de apelación, que han de plantearse, dentro de los tres días hábiles siguientes a su notificación, de conformidad con el artículo 342 y 346 de la Ley General de la Administración Pública.*

*IV)* **Se notifique la presente resolución en el domicilio legal de la empresa Verizon Information Services (Costa Rica) LLC"** (Documento No. 58).

**84).-**    El representante de **Verizon** interpuso los recursos mencionados en la resolución anterior. El 8 de julio de 2005, mediante Oficio 0150-36359-2005-GG-680-2005 el Ingeniero Carlos Obregón Quesada rechazó el recurso de apelación con nulidad concomitante (folios 4593 a 4617 del expediente administrativo) y dio por agotada la vía administrativa confirmando, de esta forma, el acto administrativo de resolución contractual, contenido en la nota 6000-27733 del 1 de junio del 2005 y ordenó levantar las medidas cautelares dictadas al efecto. Por virtud de esta resolución se dio por terminado el contrato

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 161 of 490    RECEIVED NYSCEF: 10/26/2021



entre el **ICE** y el **Grupo Verizon**, que daba el sustento jurídico al contrato formalizado por **THS** y **Verizon** (Documento No. 59).

**85).-**      El acto administrativo que declaró la resolución del contrato quedó firme el 20 de julio de 2005, fecha en la cual se le notificó a la empresa el rechazo del recurso de apelación interpuesto (Documento No. 59).

**86).-**      El día 15 de febrero de 2005 **THS** remitió una nota al Ing. Pablo Cob, entonces Presidente Ejecutivo del **ICE**, en la que se indicaba que **THS** se había venido desempeñando como subcontratista principal con la aprobación del **ICE**, en todos los contratos de edición e impresión de los directorios telefónicos y que por razones ajenas a su voluntad, el contrato principal estaba siendo cuestionado por las partes **(ICE – Verizon)** sin conocer **THS** las razones por haber sido ajena a la discusión entre las partes. Se le señaló que de acuerdo con la Cláusula Tercera del contrato **GTE (luego Verizon) - ICE**, la primera se obligaba a efectuar todo el proceso de impresión de las Guías Telefónicas en Costa Rica. De acuerdo con la cláusula 2.13.1 ídem, las subcontrataciones debían contar con la aprobación previa y escrita del **ICE**. En dicha nota se propuso una contratación directa **ICE – THS**, en el evento que el contrato entre el **ICE** y **Verizon** fuese resuelto en forma definitiva. Todo esto, por constituir la información contenida en las guías telefónicas un servicio público y con base en lo expresamente señalado en el artículo 79 inciso 1) en relación con el inciso 6) del Reglamento de Contratación Administrativa. Dentro de las consideraciones se estableció la experiencia única en Costa Rica, la capacidad y el hecho que la labor y experiencia de **THS** que era la empresa que había garantizado la continuidad y regularidad del servicio público (Documento No. 60).-

**87).-**      El día 1 de Julio de 2005 **THS** envía al **ICE** una nota en la que se solicita reconsiderar los acuerdos que, entre otras cosas, liberaba de cobro del servicio de información del número 113, en vez de contratar directamente todas las etapas de la edición, comercialización e impresión de las guías y se

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

reitera la solicitud para que el **ICE** contrate directamente esos procesos con **THS** (Documento No. 61).

**88).-**      El 11 de Julio de 2005 el Secretario del Consejo Directivo del **ICE**, Lic. José Abraham Madrigal informa que en la sesión 5679 acordó trasladarle la misiva a que se refiere el Hecho anterior a la Subgerencia de Telecomunicaciones y a la Dirección Jurídica (Documento No. 62).

**89).-**      El 4 de agosto de 2005, el Subgerente de Telecomunicaciones remite la nota SGT-3228-2005 en la que informa que en la sesión 5679 del Consejo Directivo del **ICE** del 5 de Julio de ese año, acordó que el **ICE** celebrara un convenio con **RACSA** a efecto de que esa empresa pública del Grupo ICE elabore las guías del año 2006 (Documento No. 63).

**90).-**      El mismo día 4 de agosto de 2005 el Director Jurídico del **ICE**, Licenciado Geovanni Bonilla, mediante nota 0090.38888.2005, le informa a **THS** del artículo 01 de la sesión 5680 del 12 de Julio del 2005 del Consejo Directivo, en el que se instruye al Gerente General a.i. para que coordine lo necesario con **RACSA,** para que se posibilite que la Guía Telefónica del año 2006 sea elaborada a través de **RACSA** y con eso "decidió como procederá con relación al tema de la guía telefónica" (Documento No. 64).

**91).-**      El **ICE** con ese acto, faltó al deber de tutela que debía garantizar los principios de regularidad y continuidad del servicio público, que le imponía el contrato formalizado originalmente con el **Grupo GTE,** ahora **Grupo Verizon,** y en el que **THS** era el encargado de suplirlo a los usuarios a través de la edición e impresión de las guías telefónicas (mismo Documento No. 64).

**92).-**      El pronunciamiento No. C-152-2000 de la Procuraduría General de la República, vinculante para toda la Administración Pública, declara que el suministro de las guías telefónicas por el ICE para ser suministradas a todos los usuarios, es una obligación ineludible, porque se trata de un servicio público (Documento Nº 65).

**93).-**      En la sesión del 30 de agosto del 2005 el Consejo Directivo del **ICE** acuerda:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 163 of 490

"Autorizar a la Gerencia General del ICE para que en conjunto con RACSA valore, en un plazo de treinta días hábiles, la viabilidad técnica, jurídica, financiera y de mercadeo, de ejecutar a través de la suscripción de un convenio específico, las siguientes labores a partir del 2007:

(...)

e)    El desarrollo, mercadeo, producción y distribución de las Guías Telefónicas a partir del año 2007.

Derogar los acuerdos de las sesiones 5679 del 5 de Julio del 2005 y 5680 del 12 de Julio del 2005" (Documento No. 66).

**94).-**    Dados los eventos señalados en el Hecho 49 de esta Demanda y con el propósito de evitar un litigio con **Verizon**, **THS** presenta ante el Centro de Conciliación y Arbitraje de la Cámara de Comercio de Costa Rica, una solicitud de Conciliación que ocupa el expediente CCA28-CO11-09-05. La audiencia de conciliación se realiza a las 10:00 horas del 18 de octubre de 2005, pero el representante de **Verizon**, señor Melvin Andujar Queipo señala que por instrucciones de la casa matriz, se inhibe de hacer cualquier tipo de propuesta o llegar a alguna conciliación (Documento No. 67).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**95).-** El **2 de setiembre del 2005** el Gerente General de **Verizon** en Costa Rica, mediante Oficio cuya copia se adjunta, le comunicó a **THS**, entre otras cosas, que "... el **ICE** irrespetó los derechos contractuales y aquellos establecidos por ley de mi representada y procedió a iniciar un procedimiento administrativo para la resolución del contrato, utilizando los medios públicos para distorsionar la realidad de los hechos", y que como la cláusula 28 inciso b) del "Master Purchase Agreement" la autoriza expresamente, **Verizon** da por terminado este contrato por haber terminado el existente entre **Verizon** y el **ICE** por cualquier causa. De esta manera, **Verizon** concluyó unilateralmente el Master Purchase Agreement, sin asumir y reconocer las responsabilidades que le correspondían para con **THS** (Documento No. 68).

**96).-** El contrato con el **ICE** se vio seriamente alterado y cesó de producir ingresos, razón por la que **THS** incurre en atrasos en los pagos de su obligación prendaria contraída con HEIDELBERG PRINT FINANCE AMERICAS INC., para la adquisición de la prensa rotativa tipo "Offset" marca Heidelberg, modelo Mercury 24D y todos sus accesorios. La acreedora inicia un proceso ejecutivo prendario que con el expediente número 06-001956-0640-CI, se presenta el 19 de octubre de 2006 en el Juzgado Civil de Mayor Cuantía de Cartago, ordenándose un embargo preventivo hasta por la suma de US$ 2,631.409,07, embargo que se practica el 29 de noviembre de 2006 (Documento No. 69).

**97).-** A pesar de distintas acciones dilatorias de **THS** en ejercicio de su derecho de defensa en la vía jurisdiccional, a las 13:30 horas del 6 de junio de 2007, se realiza el remate del equipo pignorado y por auto de 9:23 horas del 19 de agosto de 2007, se ordena la puesta en posesión del mismo a HEIDELBERG PRINT FINANCE AMERICAS INC., rematario, lo que se ejecuta a las 14:00 horas del 31 de octubre de 2007 (Documento No. 69).

**98).-** A raíz de las actuaciones de las demandadas, como se indica y se prueba en los Hechos anteriores, **THS** se ve obligada a incurrir en mora con los pagos de las rentas por el alquiler de las naves industriales de Inmobiliaria

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

medida dilatoria, mientras se mantiene la esperanza de una solución satisfactoria entre **Verizon** y el **ICE**, **THS** conviene con la arrendante dicha, la empresa "Inmobiliaria Zoroaster, S.A.", en suscribir una escritura pública, que corresponde a la número 144, que se inicia al folio 133 vuelto del tomo primero del Protocolo de la Notaria LAURA MÓNICA ZAMORA ULLOA, a las doce horas del 23 de marzo de 2006, mediante la cual **THS** se compromete hasta por la suma de DOSCIENTOS MIL DOSCIENTOS VEINTITRÉS DOLARES CON SETENTA Y CINCO CENTAVOS (US$ 200,223,75), indicándose en la cláusula segunda de dicho documento lo siguiente: "...SEGUNDA. Sustitución de deuda. Esta constitución de deuda, sustituye las mensualidades atrasadas por concepto de alquiler adeudados por El Deudor -(TREJOS HERMANOS SUCESORES)- correspondientes a los meses de julio de dos mil cinco hasta marzo de dos mil seis inclusive, a razón de nueve meses de mensualidad, según contrato de arrendamiento suscrito entre Acreedor y Deudor, de fecha primero de julio de dos mil cuatro, arrendamiento que se ejecuta en la propiedad del Acreedor, finca inscrita a Folios Reales tres- uno nueve cero ocho siete tres- cero cero cero y tres- uno nueve cinco ocho nueve ocho- cero cero cero, lo cual expresamente acepta El Acreedor..." (Documento No. 70).

99).-    En dicha escritura pública, que conforme a lo dispuesto en el Código de Comercio tiene carácter de título ejecutivo, se establecen intereses y forma de pago, mediante cuotas mensuales de veintidós mil doscientos cuarenta y siete dólares con ochenta y tres céntimos hasta cancelar la totalidad de la obligación (mismo Documento No. 70).

100).-    **THS** hizo algunos pagos a sus obligaciones, pero a causa de las actuaciones de **Verizon** y de la cesación de pagos contractuales ordenada por el **ICE**, se vio imposibilitada de cumplir con la forma de pago pactada con Inmobiliaria Zoroaster S.A., por lo que ésta presenta ante el Juzgado Civil de Mayor Cuantía de Cartago, proceso ejecutivo simple que ocupa el expediente número 06-001646-0640-CI, que culmina con sentencia, acogiendo la excepción de pago parcial y condenando a **THS** a pagar la suma de ciento cincuenta y seis mil ciento ocho dólares con diez céntimos de dólar (US$

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5   Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 166 of 490   RECEIVED NYSCEF: 10/26/2021

42

101).-    Por aparte y mediante proceso de Desahucio que presenta INMOBILIARIA ZOROASTER S.A. contra **THS,** por resolución del Juzgado Civil de Menor Cuantía de Cartago, dictada a las 11:35 hrs. del 8 de noviembre de 2006, dentro del expediente número 06-002424-0346-CI, se tiene por establecido el mismo y se previene el desalojo en los quince días siguientes. En dicho proceso se presentaron varias incidencias y acciones dilatorias, para extender ese plazo hasta la sentencia de Segunda Instancia que se dicta a las 7:40 horas del 4 de octubre de 2007, pero ya para entonces, se había llegado a un finiquito con la Arrendante, que se comenta seguidamente (ver Documento No. 72).

102).-    Ante la inminencia del desalojo por parte de Inmobiliaria Zoroaster S.A., el remate del equipo completo de impresión en rotativa por parte de HEIDELBERG PRINT FINANCE AMERICAS INC., **THS** se ve en la necesidad de concretar una venta en condiciones muy desfavorables, de prácticamente todos sus activos en equipos y mejoras en los inmuebles de la Arrendante, a la empresa de capital colombiano CONDOR EDITORES DE COSTA RICA, S.A., cédula jurídica tres- ciento uno- trescientos noventa y cinco mil quinientos seis, quienes convienen con Inmobiliaria Zoroaster S.A., en el arrendamiento de las naves industriales de la Zona Franca Zeta en Cartago, adquieren el equipo rematado por HEIDELBERG PRINT FINANCE AMERICAS INC., en condiciones favorables y ya instalado en esas naves industriales, al igual que el resto del equipo de **THS** pignorado al Banco Nacional de Costa Rica y al Banco Interfin (Documento No. 73).

103).-    A fin de entregar las naves industriales para que la Arrendante pudiera convenir en el nuevo contrato con CONDOR EDITORES, según se dijo, **THS** llega a un acuerdo con Inmobiliaria Zoroaster S.A., que se concreta en un documento de fecha 28 de marzo de 2007, titulado *"Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda"*. En ese contrato, básicamente **THS** entrega la nave industrial donde se encuentra la máquina rotativa y el restante equipo de impresión, puesto que con anterioridad ya se había

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 167 of 490    RECEIVED NYSCEF: 10/26/2021

43

ambas partes el finiquito en ese sentido, pero al mismo tiempo se señala que "...Inmobiliaria Zoroaster S.A. reconoce haber recibido a la fecha dos pagos - (que en el proceso de desahucio no se habían podido acreditar)-, por una suma total de cincuenta y cinco mil dólares estadounidenses, así como tener a su haber un depósito de garantía por la suma de treinta y nueve mil dólares, todo lo cual expresamente autoriza **THS** lo aplique Inmobiliaria Zoroaster S.A. al total adeudado. Independientemente de que los procesos judiciales dichos puedan continuar, **THS** se compromete a cancelar el total adeudado que oportunamente se determine, una vez hechas esas deducciones junto con los intereses pactados y costas, hasta su efectivo pago, en un plazo perentorio, reconociendo ambas partes que hay una instrucción expresa en el "Fideicomiso Trejos Hermanos – Fiduciaria Castro Garnier", por la cual se debe cancelar lo adeudado a Inmobiliaria Zoroaster S.A., en cuanto **THS**, reciba el pago de sumas que se le deben por diferentes negocios pendientes de cancelación, como por ejemplo, una deuda pendiente de Radiográfica Costarricense, S.A. (Documento No. 74).

**104).-**    Junto con el remate del equipo rotativo de impresión HEIDELBERG, la entrega de las naves industriales, con toda las instalaciones e infraestructura necesaria y específica para esos equipos, en esa misma fecha, 28 de marzo de 2007, **THS** se ve en la necesidad de arrendar con opción de compraventa a DACONDOR D.C.R. SOCIEDAD ANONIMA, que luego, con fecha 29 de mayo de 2007, cede sus derechos a la misma empresa dicha CONDOR EDITORES DE COSTA RICA, S.A. sobre los restantes activos industriales de la empresa, por una fracción de los pasivos, tanto en Transamérica Bank & Trust Co. Ltd., (subsidiaria de Banco Interfin), en el Banco Nacional de Costa Rica y con Banco Improsa S.A. En el caso concreto de Transamérica Bank & Trust Co. Ltd., esos pasivos corresponden a una línea de crédito que se le otorgó a **THS**, con base en las magníficas perspectivas que se tenían y luego de los estudios bancarios donde se analizaron los contratos celebrados con Verizon, para la confección de los directorios telefónicos de República Dominicana y de Costa Rica (Documento No. 75).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**105).-**    Como se puede observar en la prueba que se adjunta, la pérdida
del contrato y su consecuencia inmediata   de la pérdida de los ingresos
asociados al mismo, implicó que la empresa actora quedara morosa con una
serie de Instituciones Financieras, acumulando atrasos de cientos de días  con
varias de ellas y colocando algunas operaciones en cobro judicial.  De igual
manera se acumularon atrasos significativos en sus compromisos con la Caja
Costarricense de Seguro Social y otras Instituciones Públicas. Todo esto llevó
a la empresa y a sus socios que la avalaron financieramente  a dejar de ser
sujetos de crédito, puesto que con los niveles de morosidad acumulados y de
acuerdo a la normativa de la SUGEF   que se certifica,  ninguna institución
podría conceder crédito a deudores con este tipo de puntaje,  debido a las
reservas que estaría obligada esa institución financiera a realizar. Al no poder
obtener crédito y quedar en una posición  morosa en el Sistema Financiero
Nacional y entre las Instituciones Públicas,  se ha producido un daño moral de
incalculable proporciones y de imposible de reparación, ya que no solo se
dejaron de percibir las sumas reclamadas sino que imposibilitaron conducir
nuevos negocios (Documento No. 76).

**106).-**    En el CONTRATO MAESTRO DE COMPRA suscrito entre el
**Grupo Verizon y THS,** en fechas 28 de febrero de 2002 y 1 de marzo de
2002, se insertaron cláusulas de exoneración de responsabilidad civil
contractual y de limitación de responsabilidad civil contractual, como son las
que llevan los números 24 y 28. Específicamente, en el inciso b) de la cláusula
28 se indica que el contrato maestro termina si el contrato con el **ICE** concluye
por "cualquier razón", y en el inciso e) de esa cláusula se señala que "el
comprador", o sea **VERIZON,** no está obligado a indemnizar a TREJOS
HERMANOS SUCESORES los daños y perjuicios por inejecución  del contrato
(Documento No. 19 que es copia del Contrato Maestro de Compra).

**107).-**    Las cláusulas eximentes de responsabilidad civil referidas en el
Hecho 105 anterior, fueron impuestas por **VERIZON** a **THS,** así como los otros
contenidos contractuales, en forma tal que **THS** no podía modificar en nada el
contenido contractual preestablecido por **VERIZON** (este Hecho se prueba con

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



45

## B).- OBJETO DEL JUICIO.-

La demanda que interpone **THS** es para que en sentencia se declare, como se especificará en la parte petitoria de esta Demanda, que con las actuaciones y las resoluciones de las demandadas, acordadas por ellas para dejar sin efectos jurídicos el contrato administrativo que habían formalizado el **ICE** y el **Grupo GTE,** luego denominado como el **Grupo Verizon**, para la "Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información" y que fue firmado en San José el día 10 de marzo del año 2000, le han producido a la actora graves daños y perjuicios que, como tales, conforman una cuestión de responsabilidad patrimonial.

A los efectos de lograr una mejor comprensión del objeto del juicio presentamos, en forma esquemática, los grandes lineamientos y puntos de interés de la demanda, lo que hacemos a manera de una síntesis racional y comprensiva de los intereses de la parte actora.

a).- **THS,** como empresa mercantil especializada en la edición, impresión, encuadernación y distribución de guías telefónicas o directorios telefónicos, trabajó en este giro comercial desde hace cerca de noventa años;

b).- a partir del año 1974 se insertó en el mercado nacional el **Grupo GTE**, obteniendo la adjudicación de una licitación promovida por el **ICE**, para editar e imprimir los directorios telefónicos y comercializar la publicidad y los destacados de esas guías telefónicas. Dentro de las especificaciones invariables del cartel de la licitación, el ICE exigió que la parte específica del contrato, vinculada con la edición, impresión, encuadernación y distribución de los libros, debía realizarse en Costa Rica, para que aprovechara a la economía y a la tecnología nacional;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)                    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5   Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 170 of 490   RECEIVED NYSCEF: 10/26/2021

46

c).- examinado el mercado de oferta costarricense, el **Grupo GTE** contrató para tales fines a **THS,** justamente por sus antecedentes y atestados comerciales. Posterior y paulatinamente, el **Grupo GTE** fue ampliando la cobertura de la edición e impresión de guías telefónicas al mercado de Centroamérica y el Caribe (32 países), siempre negociando con **THS**, que se convirtió en su asociada regional especializada en tales labores, al recibir del **Grupo GTE** la calificación de "preferred vendor";

d).- en los años 1999 – 2000 el **ICE** publicó la Licitación Pública número 6378 – T y el **Grupo GTE** participó y resultó adjudicatario de ese contrato administrativo, lo que hizo por medio de un consorcio formado por tres de sus empresas, que participaron con la garantía incondicional y total de la empresa Holding del Grupo, la firma GTE CORPORATION;

e).- paralelamente a los trámites de la licitación, el **Grupo GTE** negociaba con **THS** las condiciones futuras para regular e incorporar en los trabajos de edición e impresión, los avances tecnológicos para mejorar la calidad de los trabajos. Se le impuso a **THS** de manera obligatoria, la adquisición de los equipos más modernos y la ampliación de la planta física para poder instalar esos equipos;

f).- firmado el contrato principal por el **ICE** y el **Grupo GTE,** el mismo fue refrendado por la Contraloría General de la República. El **Grupo GTE** contrató con **THS,** por un plazo de ciento sesenta y ocho (168) meses, la edición y la impresión de las guías telefónicas de Costa Rica, más los directorios telefónicos de Belice y de República Dominicana;

g).- con la garantía que significaba la ejecución de tal contrato, **THS** se endeudó seriamente para poder adquirir los nuevos equipos y ampliar su planta industrial. Los créditos bancarios y comerciales que formalizó eran financiables para la economía de **THS,** con sólo hacer

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

ejecución y si a ello se le agregaba, además, el contrato formalizado por GTE con el ICE, todo esto en su conjunto, le permitía a THS producir suficientes ingresos para el pago de todas sus obligaciones y obtener, adicionalmente, una utilidad razonable y decorosa;

h).- el contrato de GTE con el ICE entró en vigencia en su momento; el Grupo GTE se fusionó con la firma Atlantic Bell y se formó el Grupo VERIZON, que manifestó por escrito al ICE mantener todos los derechos, deberes, obligaciones y garantías originalmente otorgadas por el Grupo GTE. Fue este un acto de confirmación del hecho real que frente a los deberes del contrato formalizado con el ICE, no se alteraba absolutamente nada por virtud del cambio de la razón social, como lo estipula la Cláusula Vigésimo Quinta del contrato.

i).- el contrato se mantuvo en condiciones normales de ejecución por cerca de cuatro años y en el 2004, cuando se inició la producción de las guías telefónicas que correspondían para el año 2005, las políticas de ejecución del contrato por parte de Verizon entraron en conflicto con las disposiciones licitatorias y contractuales del ICE; el contrato lo paralizaron del todo ambas partes y luego el ICE ejecutó las garantías de cumplimiento, declaró el incumplimiento y resolvió el contrato, ordenándole a su administración exigirle a Verizon el resarcimiento de los daños y perjuicios causados;

j).- Verizon, unilateralmente, dejó sin efectos jurídicos los contratos que mantenía válidos y vigentes con THS y abandonó toda actividad comercial en el país;

k).- THS desconoce las implicaciones jurídicas de lo sucedido entre el ICE y Verizon, pero el resultado de lo que produjeron estas dos partes implicó que THS no pudiera cancelar los créditos bancarios y comerciales, cesara en los pagos con relación a los proveedores de materia prima y los alquileres, cesó en el pago de los salarios y

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, was not yet available for viewing and approved by the County Clerk. Because court rules (22 NYCRR §202.5(df) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



sus actividades y al paro permanente de su giro comercial. En sentido técnico, la situación en que se colocó a **THS** resultó equivalente a la de una quiebra comercial;

I).-    como el infortunio comercial de **THS** se origina en el incumplimiento del contrato formalizado con el **Grupo GTE**, luego denominado **Grupo VERIZON,** reconocido como el nexo derivado de la licitación y en el contrato firmado entre **THS y Grupo VERIZON**, como subcontrato y por tanto, accesorio de aquél, resulta jurídicamente imprescindible demandar a ambas partes, para que se le indemnice a **THS** de los daños y perjuicios irrogados por cada una de ellas, en la parte proporcional que corresponda.

En síntesis: el objeto del juicio es exigirle a las demandadas el pago de los daños y perjuicios irrogados a **THS,** con el conflicto que ambas partes - **ICE y Grupo GTE** (luego **Grupo VERIZON**) crearon entre ellas, con los efectos terribles de la paralización de toda actividad industrial de **THS** y de su salida definitiva del giro comercial que había ejercido por más de noventa años.

## C).- CONTRATO PRINCIPAL, SU NATURALEZA Y SU RÉGIMEN JURÍDICO.-

El contrato que inicialmente formalizó el Consorcio GTE con el ICE, se originó en los procedimientos de contratación administrativa (licitación pública) que impulsó en el ejercicio de su competencia, el Instituto Costarricense de Electricidad, sujetándose estrictamente a lo que dispone el artículo 182 de la Constitución Política, procedimiento en el que resultó adjudicatario el Consorcio GTE como ya se ha explicado en los Hechos de esta demanda.



De conformidad con la doctrina nacional, la jurisprudencia de los Tribunales de Justicia, tanto la constitucional como la contencioso administrativa y la que emana de la Contraloría General de la República, se manifiestan de forma

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

49

llamado "contrato documento" que es el que firman las partes, cuando el acto de adjudicación queda firme.

En nuestro sistema, forman parte del contrato administrativo el pliego de condiciones (cartel de la licitación), la oferta adjudicada con sus anexos y aclaraciones, los estudios técnicos, económicos y jurídicos que sirven de base para adjudicar la licitación, el acto mismo de adjudicación y el documento que se firma, en el que se obtiene el refrendo de la Contraloría General de la República.

Así lo reconocieron el **Consorcio GTE** y el **ICE** expresamente, al suscribir la Cláusula Primera de su contrato, que fue refrendado por la **CGR** el 13 de diciembre del 2000.

Estos principios y estas normas jugaron un papel importante en el contrato entre el Consorcio GTE y el ICE, que resumimos así:

1).-       En el Hecho 15) de la demanda, demostramos que en el folio 9 de su oferta el Consorcio GTE expresó, aceptando incondicionalmente la cláusula 1.3.1.3 del cartel, que conoce, acepta y se somete a los procedimientos del ICE para el trámite de licitaciones, a todo lo estipulado en los documentos de esta licitación y a los tribunales y leyes de Costa Rica, según consta en el Convenio de Consorcio, en el que expresaron literalmente las empresas que lo conformaron: *"...Además, en cumplimiento de lo estipulado en los artículos doscientos veintiséis y doscientos treinta y dos del Código de Comercio de la República de Costa Rica, por el presente declaramos, para efectos de este poder como para efectos del Acuerdo Consorcial en general, que tanto las tres empresas que forman este Consorcio como los apoderados aquí nombrados se someten a las Leyes y Tribunales de Costa Rica para todos los efectos y contratos que se celebren o que deban ejecutarse en Costa Rica en razón de  la licitación antes mencionada...".* (Documento N° 13 y cláusula sexta del acuerdo de consorcio en el Hecho 24 de esta Demanda).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5   Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 174 of 490   RECEIVED NYSCEF: 10/26/2021

50

2).- En el Hecho 18) de la Demanda demostramos que en la cláusula Vigésima Quinta del documento contrato las dos partes involucradas, **ICE** y **Consorcio GTE**, estipularon que *"En el caso de que por modificación en la ley del ICE, esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas"* (Documento Nº 6).

3).- En el Hecho 21 de la Demanda demostramos, también, que el Gerente General de Verizon Information Services – Costa Rica, LLC, mediante nota del 28 de agosto del 2002, dejó aclarado ante el Área de Servicios de Información del **ICE**, lo ocurrido con los cambios de nombres de las tres empresas que suscribieron el Consorcio y adjuntó la documentación necesaria para acreditar esos hechos, para señalar que las empresas GTE Directories Corp, GTE Information Services, Inc y General Telephone Directory Company C por A., cambiaron sus nombres, como consecuencia de la fusión entre Bell Atlantic y GTE, que creó VERIZON, para denominarse Verizon Information Services, Inc., Verizon Directories Corporation y Verizon Information Services-Costa Rica, LLC. Todo ello está demostrado con los folios certificados por el ICE números 3040, 3041 y 3042 del expediente administrativo que se adjuntan en el Documento Nº 15).

4).- En el Hecho 22 de la Demanda se demuestra que en la misma nota del 28 de agosto del 2002, a que alude el punto inmediato anterior, se expresó lo siguiente: *"II.- **MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS.** De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el **Mantenimiento de Obligaciones y Derechos,** firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directories Corp y Verizon Information Services-Costa Rica, LLC, en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma"* (folios 3035, 3036 y 3037 del expediente



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5).- En el Hecho 27 de la Demanda se demuestra que en los folios 427 al 432 del expediente administrativo, aparece la oferta del Consorcio y en ella se encuentra un documento en el que, para cumplir con la cláusula 2.4.1.B, párrafo I del cartel de la licitación, la firma estadounidense **GTE CORPORATION** CERTIFICA:

*"I.- Que esta Corporación tiene conocimiento de que el Consorcio constituido por GTE Information Services Incorporated, GTE Directories Corporation y General Telephone Directory Company C por A, van a participar en la Licitación Pública No. 6378-T, promovida por el INSTITUTO COSTARRICENSE DE ELECTRICIDAD para "La Contratación de Servicios por ocho años y el Desarrollo e Implementación de Servicios de Información".*

*II.- Que de acuerdo con las disposiciones de la Cláusula 2.4.1-B (La Capacidad Financiera de la Compañía) incluida en el Cartel de la Licitación Pública No. 6378-T, antes mencionada, el Consorcio mencionado presentará los Estados Financieros de GTE Corporation, que es la compañía "holding" (tenedora) del grupo.*

*III.- Que de acuerdo a los requisitos de la misma cláusula 2.4.1-B, antes mencionada, **GTE Corporation** declara que será conjuntamente responsable con las empresas del Consorcio mencionado por todas las obligaciones que este Consorcio adquiera como oferente y como adjudicatario de la mencionada Licitación Pública No. 6378-T ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD.*

*IV.- Esta corporación emite esta certificación para ser presentada al Instituto Costarricense de Electricidad en la Licitación Pública 6378-T, antes mencionada.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

52

*Dado en la ciudad de Irving, Estado de Texas, Estados Unidos de
América, el 22 de junio de 1999."*

El documento fue firmado por Daniel P. O´Brien en su condición de EVP, Chief
Financial Officer y se acompaña una razón notarial de la Notario Público
Cynthia Owens del Condado de Tarrant, Estado de Texas, que es luego
consularizada y legitimada conforme con la Ley (ver copias certificadas del
expediente en Documento Nº 18).

6).- La firma **GTE CORPORATION**, Holding del Grupo GTE, al
expresar que otorgó su garantía plena respaldada por sus estados financieros,
que podían usarse en la licitación pública 6378-T del ICE para acreditar la
capacidad financiera del Consorcio, que actuaba entonces como oferente y
que otorgaba, también, su garantía para ser conjuntamente responsable con
las empresas del Consorcio, por todas las obligaciones que éste adquiera
como oferente y como adjudicatario adquirió, irremediablemente, la condición
de responsable solidario no sólo del Consorcio, sino de la plena ejecución del
contrato y por ello, también responsable conjuntamente con el ICE de los
resultados de la negociación.

Adviértase que según el texto de la cláusula 2.4.1.B del Cartel de la Licitación
6378 T del ICE, era ésta una disposición no obligatoria pero que estaba
disponible para todos los potenciales oferentes, quienes podían o no usar ese
recurso al formular la propuesta que sometían a la administración.

Es decir, que en los casos en que los participantes (oferentes) en el proceso
de licitación, necesitaran o quisieran fortalecer sus respaldos financieros, la
experiencia en el giro comercial de la licitación y el conocimiento en el
desarrollo tecnológico de sistemas de información como los requeridos por el
ICE, podían acompañar los estados financieros auditados del Holding al que
pertenecían, para poder aspirar a obtener todo el puntaje de los extremos de
la evaluación de las ofertas.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 177 of 490     RECEIVED NYSCEF: 10/26/2021

53

Pero en este supuesto, el Holding (en el caso concreto **GTE Corporation**), asumía la responsabilidad solidaria junto con el oferente o los oferentes por todas las obligaciones derivadas del contrato que se adjudicara, motivo por el cual, debía acreditar en la propuesta, de manera indubitable y por manifestación expresa, su voluntad libremente expresada en ese sentido. Es decir, que en el caso concreto, la solidaridad no era una condición impuesta por el ICE, sino una obligación libremente asumida y adquirida por la empresa Holding **GTE CORPORATION,** que expresó en su momento por escrito en documentos legalizados, su propósito comercial de actuar de esa manera.

**GTE CORPORATION** por virtud de una fusión de empresas en los Estados Unidos de América, se transformó en **VERIZON COMMUNICATIONS INC.,** Holding del Grupo VERIZON, de manera que resulta evidente, que las relaciones derivadas del Contrato Administrativo de la Licitación Pública Internacional 6378-T y sus efectos jurídicos para el cumplimientos de sus deberes y obligaciones, no sufrieron alteración alguna, permaneciendo inalteradas, firmes y vigentes, puesto que la obligada frente al ICE es la misma empresa (el Consorcio adjudicatario) pero con distinto nombre o razón social,

7.-     Dicho lo anterior, resulta más que evidente que las empresas demandadas Verizon Communications Inc. y Verizon Information Services – Costa Rica- LLC     integran un grupo de interés económico, que convencionalmente podemos llamar GRUPO VERIZON, que es el mismo grupo de interés económico que en su momento se denominó GRUPO GTE, integrado por el Consorcio GTE y por GTE CORPORATION, a quien se adjudicó la Licitación Pública No. 6378-T promovida por el ICE conformando un contrato administrativo que por medio de este grupo de interés económico se ejecutó, a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

8).-     Al contestar las especificaciones invariables del cartel en la

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Cláusula 1.1 y refiriéndose al objeto del contrato, que es para el Desarrollo e Implementación de Servicios de Información, que incluye el desarrollo, mercadeo, producción y distribución de las Guías Telefónicas, así como productos y servicios complementarios y sustitutos de las Guías Telefónicas.

Si se toma en cuenta que de conformidad con el criterio de la Procuraduría General de la República, en su pronunciamiento No. C-152-2000, que es vinculante para toda la Administración Pública, en el que declaró que el suministro de las Guías Telefónicas por el ICE para todos sus usuarios es una obligación ineludible, porque se trata de **un servicio público**, es evidente que en el contrato administrativo adjudicado en la Licitación Pública 6378-T, hay un objetivo principal y otros que son secundarios.

Desde esta dimensión del servicio público, el objetivo principal del contrato administrativo es el deber de editar, publicar y distribuir las Guías Telefónicas a todos los usuarios del servicio telefónico, y todo lo demás, es accesorio y prescindible, lo que se entiende si se analiza que es posible publicar las Guías Telefónicas sin ninguna publicidad comercial en el directorio; pero en cambio, no es posible publicar un libro de publicidad comercial, pero sin incluir los nombres y los números telefónicos de todos los usuarios del servicio telefónico.

Así lo reconocieron las partes -- Consorcio GTE y el ICE- al describir los trabajos que corresponden al contrato en la Cláusula Segunda "Descripción del Trabajo": las Guías Telefónicas es lo principal y lo demás lo accesorio.

Consecuentemente, al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación.

Si bien el contrato administrativo se formalizó entre el Consorcio GTE y el ICE,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



van del 4) al 9) y el 29) de esta Demanda, que la parte principal del contrato se debía formalizar con una empresa radicada en Costa Rica, lo que se hizo históricamente con **THS**, contratación que debía ser conocida y aprobada previamente por el **ICE** para que fuera válida.

Consecuentemente, el Contrato que firmó THS con el Grupo GTE (luego Grupo VERIZON) y que aprobó y autorizó el ICE, es por su naturaleza un contrato que se rige por los principios del servicio público y queda regulado por sus principios, normas y valores.

## D).- DAÑOS Y PERJUICIOS RECLAMADOS.-



Como queda demostrado de la relación de Hechos expuesta en esta Demanda, comprobados con los elementos probatorios que la soportan, la empresa actora le exige a las demandadas indemnizarla con el pago de los daños y perjuicios irrogados con sus actuaciones, que condujeron a las dos partes - **ICE** y **Grupo Verizon**- a dar por terminado el contrato administrativo formalizado entre ambas en el trámite de la Licitación Pública Internacional No. 6378-T promovida por el **ICE.**

Ese contrato administrativo es el que le dio sustento jurídico y comercial a la negociación que se formalizó, a su vez, en un contrato entre la actora con el **Grupo GTE** que luego cambiaría su razón social por **Grupo Verizon.**

La gravedad de las actuaciones y omisiones de las demandadas y los efectos que sus conductas condujeron a **THS**, irremediablemente, a cesar en toda actividad comercial; a colocarse en estado de incapacidad absoluta de pago de las obligaciones contraídas con Instituciones financieras y comerciales, para poder cumplir con los deberes impuestos en la formalización del contrato con



**Grupo Verizon** que el **ICE** aprobó; y, por último, a la liquidación de toda sus

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



actividades empresariales que había venido ejerciendo por casi cien años consecutivos.

En el informe económico financiero que se adjunta, elaborado por el conocido experto Tomás Evans Salazar, Licenciado en Administración de Negocios, se le da sustento técnico a las consecuencias de los incumplimientos de los contratos por el Grupo **Verizon** en Costa Rica, Belice y República Dominicana.

En este estudio se sustenta la estimación de los daños y perjuicios originados en la irregular ejecución de los contratos formalizados a partir del año 2000, que impusieron a **THS** la obligación de hacer inversiones especiales para aumentar la capacidad de trabajo (en planta física, maquinaria y equipo), para elevar a niveles razonables la producción de guías telefónicas según los volúmenes de producción exigidos por las demandadas.

Por consiguiente, y de conformidad con esos estudios económicos adjuntos, en la demanda se reclama de las demandadas el resarcimiento de los siguientes extremos o partidas, todas ellas liquidadas al 31 de agosto del 2008:

Con fundamento en el estudio elaborado por el Licenciado Tomás Evans Salazar, miembro del Colegio de Profesionales en Ciencias Económicas, carné 11968 y que se adjunta como prueba pericial que deberá ser ratificada por los peritos que nombrará el Tribunal, esta demanda identifica como extremos que integran los daños y perjuicios irrogados por las demandadas contra la parte actora, el importe que debió inmovilizarse por inversión en maquinaria, el incremento en los inventarios promedio que debió mantener de los años 2000 al 2004, los flujos previstos y no realizados desde el período 2004 hasta el 2007, los intereses pagados inherentes a las operaciones suscritas por compra de maquinaria y financiamiento de infraestructura, la interrupción de operaciones, el daño moral asociado, los intereses que producen esos extremos hasta la total cancelación de los montos que se fijen en sentencia y



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Las estimaciones realizadas se fundamentan en la información contable de los períodos que van del 31 de diciembre de 1990 al 31 de marzo del 2004 y que se encuentra debidamente asentada en los libros contables de la empresa. Además para los estados financieros del 2000 al 2004, en los cálculos se incorporaron los ajustes necesarios para salvar las excepciones interpuestas por los auditores en cada uno de esos períodos, relativas al desarrollo de nuevos proyectos.

Las tasas aplicables a los cálculos corresponden a tasas promedio calculadas con base en publicaciones del Banco Central de Costa Rica.

Se han utilizado con criterio conservador las herramientas de aplicación normal en materia de información prospectiva y retrospectiva, que implican la utilización de fórmulas para determinar promedios, valores futuros, valores actuales, estimaciones basadas en regresiones y otros.

Los períodos 2003 y 2004 se presentan agrupados en atención a que se produjo un cambio en el período contable del año 2003, conforme a lo dispuesto en el párrafo segundo del artículo 4 de la Ley del Impuesto sobre la Renta, que implicó que la información financiera auditada abarcara del primero de octubre del 2003 al 31 de marzo del 2004.

## SUPUESTOS DE ESTIMACIÓN DE LOS DAÑOS Y PERJUICIOS



| Concepto a Indemnizar | Supuestos |
|---|---|
| Por Inversión en Maquinaria | • Cálculo de valor futuro de inversiones registradas contablemente menos el precio de venta de la maquinaria actualmente. |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 182 of 490    RECEIVED NYSCEF: 10/26/2021

58

| | |
|---|---|
| | • complementos. <br> • Fecha de corte 31 de agosto del 2008. <br> • Tasa aplicada 16.94% anual promedio. |
| **Por Incremento en Inventarios** | • Se calculó el valor futuro del incremento de la inversión realizada en inventarios comparando el promedio de los períodos 1997 al 1999 con los niveles de inventario del período 2000 al 2004. <br> • Fecha de corte 31 de agosto del 2008. <br> • Tasa básica anual promedio pasiva aplicable para el período correspondiente. |
| **Por Ganancias no realizadas P 2004-2013** <br><br> **Costa Rica y República Dominicana** | • Se procedió a calcular los valores futuros y presentes de los flujos de efectivo que la empresa hubiese generado con apego a los términos de la contratación y según la estimación de ingresos basada en los millares de páginas previstos. <br> • Fecha de corte 31 de agosto del 2008. <br> • Tasa aplicada 2.79% anual promedio. <br> • Tasa de inflación promedio U.S.A 3.54% anual. |
| **Por Pérdidas realizadas 2004 al 2007** | • Se llevaron a valor futuro las pérdidas resultantes para los períodos comprendidos entre el año 2004 y el 31 de diciembre del 2007. <br> • Fecha de corte 31 de agosto del 2008. <br> • Tasa aplicada 2.79% anual promedio. |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

| Concepto a Indemnizar | Supuestos |
|---|---|
| **Intereses** | • Fueron considerados cada uno de los intereses pagados a Banco Cuscatlán y a la empresa proveedora de Heidelberg según su fecha de registro contable, y sus importes fueron llevados al valor futuro.<br>• Fecha de corte 31 de agosto del 2008.<br>• Tasa aplicada 2.79% anual promedio. |
| **Por interrupción de operaciones** | • Con base en la información de los estados financieros auditados que abarcaron los años de 1991 a 1999, se proyectaron los flujos de efectivo que la empresa hubiese generado sin que mediara en sus operaciones la participación del contrato con Verizon. |

## Detalle de Cálculo

### 1).- Inversión en Maquinaria

Para el cumplimiento de los contratos suscritos con Verizon Information Services – Costa Rica, LLC, Verizon Information Services – Belice, LLC, y GTE Directorios República Dominicana, C por A., fue necesaria la compra de una Máquina Rotativa y todo el equipo accesorio marca Heidelberg con un costo de adquisición de ¢ 955.116.741,oo incluyendo las erogaciones capitalizables necesarias para su puesta en operación.

Debido a la no continuidad del contrato en los términos originalmente pactados, la máquina rotativa dejó de operar. Este equipo especializado fue finalmente rematado por la compañía vendedora en junio del 2007. El procedimiento para determinar la pérdida originada en la venta judicial de la máquina es el siguiente:



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Se procedió a actualizar el costo original del equipo y la máquina rotativa para expresarlo en colones de junio del 2007, mes en que quedó firme esa subasta judicial. Igual procedimiento se aplicó con el importe de la revaluación realizada en diciembre del 2004. Para tales efectos se utilizaron factores de ajuste monetario calculados con base en el Índice de Precios al Consumidor publicado por el Banco Central de Costa Rica.

Del mismo modo se indexaron los importes de depreciación acumulada del costo histórico del equipo y la máquina rotativa y de la revaluación que se practicó a la misma, a fin de reexpresarla en colones de junio del 2007. Seguidamente, se determinó la pérdida, producto de la diferencia entre el valor neto de la maquinaria al 30 de junio del 2007 y el precio de venta de la misma a esa fecha.

El importe resultante fue reexpresado en colones de agosto del 2008 utilizando el referido Índice de precios al consumidor. Esta cifra fue convertida a su equivalente en U. S. Dólares dividiéndola entre el tipo de cambio al 31 de agosto del 2008, publicado por el Banco Central de Costa Rica.

Dado que la referida inversión en maquinaria, no habría sido necesaria para la empresa de no haber suscrito los contratos de marras (para cubrir requerimientos técnicos, de volumen y calidad previstos en los mismos), se requiere la indemnización por esa inversión y los gastos capitalizables incurridos inherentes a ella.

**Monto a indemnizar por este concepto**          $ 2,582.156.oo

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



## 2).- Incremento en Inventarios.

Se produjeron diferencias significativas de la inversión en existencias, entre los períodos que van de 1997 a 1999 y entre el 2000 y el 2004. Estas variaciones fueron producto de la inversión necesaria en capital de trabajo para dar cumplimiento a los requerimientos de la contratación.

Por tanto, para calcular el perjuicio, se llevaron a valor futuro las variaciones en inventario expresadas en U. S. Dólares de los años 2000 al 2004, utilizando como fecha de corte el 31 de agosto del 2008. Para tales efectos se utilizó la tasa de interés pasiva neta promedio del Sistema Financiero para depósitos en dólares de los Estados Unidos de América para los períodos pertinentes.

**<u>Monto a indemnizar por este concepto</u>**          **$ 2,860.696.oo**

## 3).- Flujos previstos y no realizados desde el período 2004 al 2013

Para calcular el daño y perjuicio derivado de esta situación por la contratación en Costa Rica, se utilizó el consumo de millares de páginas entre los años 2000 y 2003. Se proyectó la información del 2004 al 2013. Se aplicó la tarifa contractual de $ 1.20 por millar para los períodos 2004 y 2005 y la de $ 1.15 del 2006 al 2013 para establecer la cuantía de los ingresos proyectados. Se determinó el porcentaje de costo de ventas promedio histórico de los años 2000 al 2004. Se estimó el costo de ventas proyectado con base en ese porcentaje. Se determinaron los gastos de edición y administración correspondientes al período 2004. Se calculó el porcentaje de contribución de los millares de páginas producidos al total de ingresos por ese concepto. Se estimó, con base en el porcentaje de distribución dicho, la porción de gastos administrativos y de edición inherentes a los directorios de Costa Rica. Se

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



2004 a junio del 2008. Se aplicó esa inflación a los costos (en US $) administrativos y de edición hasta el año 2013. Se calcularon los días transcurridos y por transcurrir entre el 31 de diciembre del 2004 y el 2013, respecto del 31 de agosto del 2008. Se calcularon valores futuros y valores actuales al 31 de agosto de 2008. El resultado del daño y perjuicio cuantificado asciende a la suma de $ 8,806.872.oo.

Con relación al daño y perjuicio generado en República Dominicana, producto de la misma resolución anticipada de contrato y de su ejecución parcial bajo parámetros distintos de los convenidos, se aplicó el mismo procedimiento de cálculo descrito en el párrafo anterior. El resultado del daño y perjuicio cuantificado asciende a la suma de $ 7,912.999.oo.

**Montos a indemnizar por estos conceptos**



| | |
|---|---|
| **Costa Rica** | **$ 8,806.872.oo** |
| **República Dominicana** | **$ 7,912.999.oo** |

**4).-   Pérdidas realizadas 2004 a 2007**

Considerando las pérdidas resultantes para los períodos comprendidos entre el año 2004 y el 2007, se llevaron a valor futuro con fecha de corte 31 de agosto del 2008, cada uno de los importes de las mismas, utilizando la Tasa de interés pasiva neta promedio del Sistema Financiero para depósitos en US $, según información del Banco Central de Costa Rica.

**Monto a indemnizar por este concepto**          **$ 7,237.068.oo**



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



## 5)-    Intereses

Para calcular el importe requerido por el daño y perjuicio derivado de los intereses incurridos, fueron considerados cada uno de los cargos por intereses pagados a Banco Cuscatlán y a la empresa proveedora del equipo Heildelberg, según su fecha de registro contable, y sus importes fueron llevados a valor futuro, estableciendo como fecha de corte el día 31 de agosto de 2008. Para calcular el valor futuro de cada uno de esos desembolsos, se utilizó la Tasa de Interés Pasiva neta promedio del Sistema Financiero para depósitos en US$ según información del Banco Central de Costa Rica.

**Monto a indemnizar por este concepto**        $   983.825.oo



## 6).-    Interrupción de operaciones

La compañía Trejos Hermanos Sucesores, S. A. (THS), ha mantenido operaciones en la industria de impresión durante décadas, para ser más preciso, desde 1912. Este antecedente supone la consolidación histórica de un negocio con operaciones normales. Sobre esta base se ha evaluado la trayectoria económica de la firma durante el período 1991-1999, cuyos estados financieros cuentan con dictamen de auditoría externa. Los personeros de la firma consideran que a partir del año 2000 las incidencias de la relación contractual con su contraparte, perjudican de manera considerable y acumulativa la gestión de la firma, hasta el punto de impedir su normal operación y, finalmente, hacer imposible la continuidad de la misma. Considerando este antecedente, se practicó un procedimiento técnico para la estimación del lucro cesante en US$. Este procedimiento incluye los siguientes puntos:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



1. Análisis de la trayectoria económica real de la firma (cifras auditadas) durante el período 1991-1999.

2. Pronóstico de los resultados de los ingresos económicos para el período 2000-2014, sobre la base de las tendencias del período 1991-1999.

3. Estimación de los costos de venta y gastos de operación para el período 2000-2014, de conformidad con la proporción real que representaron dichos rubros en la estructura económica de la firma durante el período 1991-1999.

4. A la utilidad operativa se le suma la depreciación por constituir un gasto no efectivo, determinando así la Utilidad antes de Intereses, Impuestos, Depreciación y Amortización (UAIIDA).

5. A la UAIIDA se le resta la tasa de reinversión en activos fijos que razonablemente hubiese sido necesaria para mantener la continuidad operativa futura, con lo cual se estiman los flujos de efectivo anuales del período 2000-2013.

6. Se completa el flujo neto de efectivo calculando el valor presente de la perpetuidad del negocio, asumiendo, dado su antecedente histórico, la continuidad operativa de plazo indefinido. Una perpetuidad es un procedimiento técnico financiero que permite expresar el valor de los flujos futuros de un negocio, más allá del horizonte o plazo básico de planeación. Se toma el flujo de efectivo correspondiente al último año proyectado y se divide entre la tasa de rendimiento del negocio (tasa de actualización).

7. La perpetuidad incluye una tasa de crecimiento real del 3,28%, que corresponde conservadoramente a dos tercios del Producto Interno Bruto del período correspondiente a los años 2000 a 2007. La perpetuidad se basa en el principio técnico financiero que señala que generar permanentemente un flujo de efectivo, equivale a contar con el valor presente del mismo (en este caso, el valor al año 2007).

8. Se determinó la tasa de descuento de los flujos (tasa de actualización) considerando la Tasa Pasiva Promedio del período 2002 a 2008 en USA $

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Unidos de América para el período 2002-2006, el riesgo del negocio y rendimiento que representa su UAIIDA histórica porcentual.

9. Se descontaron los flujos netos de efectivo a fin establecer el valor presente de las operaciones normales proyectadas para el período 2007 y siguientes y se actualizaron los valores correspondientes a los flujos del período 2000-2006, todo ello a fin de expresar los flujos en colones de diciembre del 2007.

**Monto a indemnizar por este concepto**          $ 28,885.195.oo

## Resumen de Partidas Reclamadas

TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA
RESUMEN DE ESTIMACION DE MONTOS INDEMNIZABLES
En USA $ Dólares

| | |
|---|---|
| Fecha de Corte | 31-ago-08 |
| Tasa Básica Pasiva Promedio 2000 - 2008 | 16.94% |
| Tasa de interés pasiva neta promedio del Sistema Financiero para depósitos en EUA$ - 2000-2008 | 2.79% |
| Tipo de cambio estimado al 31 de agosto 2008 | 547.03 |

| Elemento | Concepto | Monto en USA$ Al 30/06/2007 |
|---|---|---|
| 1 | Inversión en Maquinaria | 2,582,166 |
| 2 | Incremento en inventarios | 2,944,686 |
| 3 A | Flujos de Caja Operativos no tenidos P 2004-2013 Direcciones Costa Rica | 8,906,872 |
| 3 B | | |
| 4 | | |
| 5 | Intercord | 993,926 |
| 6 | Indemnización de operaciones | 28,885,195 |
| | **TOTAL RUBROS A INDEMNIZAR** | **59,268,611** |

**7).-   Daño Moral causado.-**


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 190 of 490     RECEIVED NYSCEF: 10/26/2021

Además de las partidas antes reclamadas, **THS** ha sufrido un severo daño moral, con las consecuencias directas del conflicto creado por las demandadas con la resolución del contrato suscrito el 28 de febrero del 2002.

La falta de volumen de producción necesario para producir los ingresos imprescindibles para poder cubrir los costos fijos, provocó, entre otros efectos negativos, que la empresa cesara en sus pagos y perdiera otros clientes.

La empresa y los socios que la avalaron, cayeron en la categoría ignominiosa de ser calificados como sujetos no aptos para el crédito, sobre todo, por causa de los atrasos en cumplir las obligaciones financieras y luego, por la imposibilidad real de poder enfrentar esas obligaciones.

Embargada la maquinaria y el equipo, ordenado el desalojo de las instalaciones industriales, cerrados los créditos bancarios y habiendo cesado en los pagos de los extremos laborales del personal de la empresa, todo ello en conjunto, impidió a la empresa y a sus socios buscar otras actividades productivas, a la vez que contagió, por ósmosis, las otras empresas de los socios que no tenían relación alguna con **THS.**

Véase la documentación legalizada de Caribbean Publishing Co., sus notas, sus correos sobre el directorio de la República de Honduras y el historial crediticio emitido por la Superintendencia General de Entidades Financieras (SUGEF) y de las protectoras de crédito, que integran todos el Documento N° 72 de la prueba documental.

**Monto a indemnizar por este concepto**          **$ 5,000.000.oo**

**8) Intereses.**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Por último, se reclama también el pago de los intereses sobre esas sumas a partir de la fecha de corte del cálculo, sea el 30 de agosto de 2008 y hasta la efectiva cancelación de las obligaciones, intereses que se calcularán de conformidad con lo que establece el artículo 1163 del Código Civil o sea, a la tasa que paga el Banco Nacional de Costa Rica por los certificados de depósito a seis meses plazo para la moneda de que se trate.

## E).- DERECHO.

La situación jurídica que se expone en la demanda revela la presencia de una relación contractual compleja.

La base de la cuestión es un contrato entre GTE (ahora VERIZON) y el ICE para la producción de directorios telefónicos celebrado en el año 2000. En ese contrato se exigía que la impresión de las guías telefónicas se realizara enteramente en Costa Rica, para lo cual GTE (ahora VERIZON) acordó en febrero de 2002 un "Contrato Maestro de Compra" con TREJOS HERMANOS SUCESORES, S.A. para producir, empacar y distribuir los directorios telefónicos.

Para la suscripción del Contrato Maestro de Compra GTE (ahora VERIZON), tomó en consideración los antecedentes altamente positivos de la eficiencia de THS en su continuada relación empresarial, así como la preparación material que GTE (ahora VERIZON) exigió a THS, como fue la transformación y ampliación de su planta industrial.

El Contrato Maestro de Compra GTE – THS constituyó la herramienta para que GTE cumpliera sus obligaciones con el ICE derivadas del contrato del año 2000. No puede comprenderse la existencia del Contrato Maestro de Compra

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

sin su soporte elemental que fue el contrato ICE – GTE. Incluso dicho Contrato Maestro, requirió ser aprobado por el ICE.

Como el ICE dispuso administrativamente la resolución del contrato con GTE (ahora VERIZON) del año 2000, por atribuirle a ésta un incumplimiento grave, el Contrato Maestro de Compra GTE – THS quedó sin el sustrato necesario para su ejecución.

Entonces las relaciones jurídicas citadas son ICE – GTE (VERIZON) – THS, constituyendo un complejo contractual en el cual las partes extremas (ICE y THS) no son totalmente extrañas, ya que aunque no son contratantes directos entre sí, ambos tenían conocimiento recíproco de su participación en la actividad material contratada (la producción de directorios telefónicos) e incluso el ICE mantenía un control y visitas periódicas a la planta de THS para supervisar la correcta impresión de los directorios telefónicos. Es de importancia destacar la aprobación del Contrato Maestro de Impresión por parte del ICE, lo que lo involucró necesariamente en la relación jurídica que es el fundamento de este litigio.

La extinción del contrato ICE – GTE (VERIZON) tuvo el efecto inmediato de hacer imposible la ejecución del contrato GTE (VERIZON) – THS. De manera que todas las consecuencias negativas de esa imposibilidad de ejecución (daños y perjuicios causados a THS) descansa en la extinción del contrato ICE – GTE (VERIZON).

Hay dos relaciones contractuales: ICE – GTE (VERIZON) y GTE (VERIZON) – THS. Y existe una relación extracontractual que es ICE – THS.

La extinción del contrato ICE – GTE (VERIZON) constituye un **incumplimiento objetivo** del contrato GTE (VERIZON) – THS. Ese incumplimiento objetivo es imputable a GTE (VERIZON), por lo que ésta entidad debe responder por los daños y perjuicios causados, según el principio general de la responsabilidad contractual establecido en el artículo 702 del Código Civil.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)  INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 193 of 490    RECEIVED NYSCEF: 10/26/2021

Y los daños y perjuicios sufridos por THS por el incumplimiento objetivo de su contrato con GTE (VERIZON) fueron generados por la actuación del ICE, que dio por resuelto su contrato con GTE (VERIZON), sin respetar los intereses legítimos que THS tenía en esa contratación, con lo que violentó el principio *Neminem laedere* –no dañar a otros-. El ICE incurrió en responsabilidad civil conforme la aplicación de los principios de la Ley General de la Administración Pública (artículos 190 y siguientes), ya sea que se considere su actuación lícita (artículos 194 y 195) o ilícita (artículos 191 y 192). El artículo 1045 del Código Civil también es fundamento de esa responsabilidad.

Los daños y perjuicios cuya indemnización se reclama por parte de THS a los demandados, son consecuencia inmediata y directa de las actuaciones antijurídicas que se imputan a los demandados. Se cumple así con lo previsto en el artículo 704 del Código Civil, al constatarse que lo imputado a los demandados, es la causa única de tales daños y perjuicios. Los daños y perjuicios reclamados son de naturaleza previsible, porque los demandados podían, racionalmente, estimar que se iban a causar a THS por las actuaciones alegadas.

El daño emergente o disminución patrimonial propiamente dicha, consiste en los bienes y derechos que THS vio desaparecer de su patrimonio, por la extinción de la relación contractual compleja referida en esta demanda.

Los perjuicios, lucro cesante, están representados por los bienes y derechos que necesariamente debían entrar al patrimonio de THS (como es el caso claro de las utilidades previstas y previsibles) y que no fue posible que se produjeran, por la extinción de la citada relación contractual compleja.

Esa extinción de la relación contractual causó daño moral a THS, al desaparecer por causa de las actuaciones de los demandados, el prestigio empresarial que se forjó desde la fundación de la empresa en el año 1912, lo que debe ser indemnizado según lo ordena el artículo 59 del Código Civil, que



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

fija el principio general de derecho de la indemnización por lesión a los derechos de la personalidad.

En esta demanda se presentan hechos que revelan la existencia de un *grupo de interés económico*, integrado por las empresas del GRUPO VERIZON, para destacar que la responsabilidad civil que se reclama en la pretensión abarca al *ente de mayor jerarquía* que es VERIZON COMMUNICATIONS INCORPORATED.

Debe subrayarse que la Sala Primera de la Corte Suprema de Justicia ha utilizado el concepto de *grupo de interés económico* para asignar responsabilidad civil por actuaciones de las entidades que lo integran. Es en la sentencia número 000973-F-2005 de las 16 horas del 15 de diciembre de 2005 que ese alto Tribunal (declarando sin lugar un recurso de casación) respalda el criterio del Tribunal Segundo Civil de San José relativa a la responsabilidad que compete al **"ente de mayor jerarquía"** dentro del grupo.

Los grupos de interés económico han sido también denominados "redes contractuales económicamente eficientes", con lo que se intenta poner en juego el principio de la relatividad contractual, en el sentido de que solamente quienes aparecen formalmente como partes en el contrato pueden ser sujetos de los derechos y las obligaciones que de él se derivan. Pero si se considera que la "red contractual económicamente eficiente" o el "grupo de interés económico" son instrumentos para abusar de la personalidad jurídica, debe entenderse que tal abuso de derecho está condenado expresamente por el artículo 22 del Código Civil. El artículo 432 del Código de Comercio (citado en otra sentencia referente a grupos de interés económico) dispone que entre codeudores la obligación es solidaria. Es esa solidaridad entre codeudores la que se reclama en este proceso.

Las cláusulas exonerativas de responsabilidad civil que por imposición de VERIZON se incluyeron en el contrato maestro de compra, necesariamente son ineficaces por principios imperativos de Derecho Público. Debe destacarse

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

acuerdo comercial, por su objeto y por sus efectos es de naturaleza administrativa. La Procuraduría General de la República ha expresado, en opinión vinculante y como queda dicho en esta demanda, que la edición, impresión y distribución de las guías telefónicas constituye un servicio público, por lo que, se añade, los convenios que tengan como objeto la edición, impresión y distribución de guías telefónicas también tienen naturaleza administrativa, y frente a esta realidad jurídica, no procede la exoneración anticipada de responsabilidad frente a la Administración por la vía del convenio, como no procede la renuncia a ninguno de los privilegios de la Administración, puesto que en el manejo de sus asuntos tienen que ver con la Hacienda Pública, protegidas por principios de rango constitucional. Tales privilegios, por principio administrativo cobijan, no sólo el contrato que "aparezca" como principal, sino que se comunica, también, a las subcontrataciones que se formalicen para hacer cumplir con todos los efectos que se esperan del servicio público.

Por otro lado, desde una perspectiva de Derecho Privado, nótese que las cláusulas exonerativas de responsabilidad civil contractual contenidas en el CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES también son nulas e ineficaces.

Esas cláusulas están integradas a un **contrato de adhesión**, ya que el contenido de ese acuerdo sólo permitía la aceptación o el rechazo por parte de TREJOS HERMANOS, y la nulidad de tales cláusulas resulta de su naturaleza **abusiva**. Esa nulidad está reconocida en el artículo 1023, inciso m), del Código Civil y en el artículo 42 de la Ley 7472 de 19 de enero de 1995 (Ley de Promoción de la Competencia y Defensa Efectiva del Consumidor).

En última hipótesis, esas cláusulas exonerativas de responsabilidad civil son ineficaces cuando están referidas a un incumplimiento doloso, de conformidad con lo dispuesto por el artículo 701 del Código Civil. Y el incumplimiento del CONTRATO MAESTRO DE COMPRA por parte de VERIZON es doloso: esta empresa pudo cumplir sin tener obstáculos materiales para ello, pero no ejecutó sus obligaciones. Tal circunstancia se revela en que VERIZON intentó

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

modificar unilateralmente su contrato con el ICE, para no cumplir sus obligaciones originales, lo que se comunicó al cumplimiento por parte de VERIZON del Contrato Maestro de Compra con la parte actora. Eso es dolo en la ejecución de un contrato, de acuerdo con la doctrina de la Sala Primera de la Corte Suprema de Justicia establecida en la sentencia número 320 de las 14.20 horas del 9 de noviembre de 1990. Como consecuencia de ese incumplimiento doloso, son ineficaces todas las cláusulas contractuales que pretendieran exonerar de responsabilidad civil a VERIZON.

## F).- PRETENSIÓN.

Con fundamento en lo explicado en el Capítulo D) anterior, sobre los Daños y Perjuicios reclamados, de conformidad con los Hechos de la Demanda, la prueba aportada y los estudios económicos que se adjuntan, demandamos en esta vía al **Instituto Costarricense de Electricidad** y a las empresas **Verizon Communications Incorporated** y **Verizon Information Services – Costa Rica- LLC,** para que en sentencia se declare con lugar la demanda en todos sus extremos y se las condene, solidariamente, al pago de los daños y perjuicios irrogados.

Consecuentemente, pedimos que en sentencia se declare:

**1).-** Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A (que cambió su razón social a VERIZON INFORMATION SERVICES – COSTA RICA, LLC) constituyó un **medio de ejecución** del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephone Directory Company C por A", empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000.

**2).-**     Que el citado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A, fue del conocimiento del INSTITUTO COSTARRICENSE DE ELECTRICIDAD, **que aprobó la intervención de TREJOS HERMANOS SUCESORES S.A. en la ejecución del contrato administrativo adjudicado al Consorcio GTE** resultante de la Licitación Pública No. 6378-T promovida por el ICE.

**3).-**     Que la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

**4).-**     Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE.

**5).-**     Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

**6.-**     Que la extinción del "Contrato Maestro de Compra" suscrito el 28

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A.

**7.-**    Que las empresas demandadas Verizon Communications Inc., Verizon Information Services --Costa Rica- LLC  integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

**8).-**    Que **"VERIZON COMMUNICATIONS INCORPORATED"** es <u>el ente de mayor jerarquía</u> de un grupo de interés económico del que forma parte **"VERIZON INFORMATION SERVICES –COSTA RICA- LLC"**, por lo que la primera de esas sociedades responde solidariamente con la segunda por todas las obligaciones contraídas por **"VERIZON INFORMATION SERVICES – COSTA RICA- LLC"**, con **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA.**

**9).-**    Que las empresas demandadas **Verizon Communications Inc. y Verizon Information Services –Costa Rica- LLC**  son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por  la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A.

**10).-**    Que el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** desconoció los derechos e intereses legítimos de **TREJOS HERMANOS SUCESORES S.A.** derivados de la ejecución de la Licitación Pública No. 6378-T a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002, por lo que es responsable solidario con Verizon Communications Inc., Verizon Information Services --Costa Rica- LLC de la indemnización de los daños y perjuicios sufridos por la actora por la extinción del citado Contrato Maestro de Compra suscrito el 28 de febrero del 2002.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**11).-** Que son nulas e ineficaces las cláusulas del **CONTRATO MAESTRO DE COMPRA** celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se límite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON.



**12).-** Que los demandados el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** y las empresas **Verizon Communications Inc.** y **Verizon Information Services –Costa Rica. LLC** deben pagarle a la parte actora, solidariamente, los daños y perjuicios irrogados, que liquidamos de la siguiente manera:

a) Inversión en maquinaria — $ 2.582.156

b) Incremento en inventarios — $ 2.860.696

c) Flujos de Caja Operativos no recibidos 2004-2013 Directorios Costa Rica — $ 8.806.872

d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana — $ 7.912.999

e) Pérdidas realizadas 2004 a 2007 — $ 7.237.068

f) Intereses pagados por THS — $   983.825

g) Interrupción de Operaciones — $28.885.195

h) Daño Moral — $ 5.000.000

i) De conformidad con lo que dispone el artículo 123 del Código Procesal Contencioso Administrativo se concederá, además,   la actualización de las sumas de la condenatoria para compensar la variación en el poder adquisitivo y se reconocerán Intereses de todas las partidas anteriores que se pagarán a partir del 30 de agosto del 2008 y hasta que se cancelen totalmente, que se calcularán de conformidad con lo que dispone el artículo 1163 del Código Procesal Civil.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**13).-**        Los demandados deberán pagar solidariamente a la parte actora las costas personales y procesales de este asunto.

**Estimación de la Demanda:**     La estimamos en la suma de los extremos reclamados US $ 64,268,811 (sesenta y cuatro millones doscientos sesenta y ocho mil ochocientos once dólares de los Estados Unidos de América).

## G.- PRUEBA.-

### I.-     Documental:

Acompañamos la siguiente prueba documental, que se refiere a la necesaria para comprobar los Hechos de la Demanda.

**Documento No. 1.-** Certificación notarial de la personería de don Alvaro Trejos Fonseca, Presidente con facultades de apoderado generalísimo sin límite de suma, de la empresa actora.

**Documento No. 2.-** Certificación notarial de la inscripción registral de la firma Verizon Information Services –Costa Rica- LLC, en la que consta que su Agente Residente es el Licenciado Hernán Pacheco Orfila, abogado, vecino de San José, con oficina en el Bufete Pacheco Coto, avenida once, calles cinco y siete, cédula de identidad 1-585-980. Adicionalmente,  se adjunta la publicación de las páginas de internet en las que constan los estatutos, el certificado de incorporación, la lista de directores y la historia corporativa de Verizon Communications Inc. Consta  en ellos, que Ivan G. Seidenberg es el Presidente de la Junta Directiva y Principal Oficial Ejecutivo y William P. Barr es el Vicepresidente Ejecutivo y Abogado General.

**Documento No. 3.-** Certificación notarial en la que consta la inscripción original de la Sociedad Colectiva Trejos Hermanos, luego transformada en Trejos Hermanos Sucesores, S.A., cuyo plazo social se inició el día primero de

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



enero de 1912 y vence el 30 de setiembre del año 2025. Se adjunta, también    *Sí*

con el mismo documento, un ejemplar de la Lista de Abonados (guía

telefónica) de Costa Rica de 1918, históricamente es la primera editada en el

país.

**Documento No. 4.-** Fotocopias de las portadas de las Guías Telefónicas    *NO*

impresas por THS para los diferentes países de Centro América, el Caribe y    *irrelev*

ciudades de Estados Unidos.

**Documento No. 5.-** Copia de la certificación expedida por don José María    *irrelev*

Quirós Alfaro, Gerente General de GTE Costa Rica de fecha 26 de enero de

1999.

**Documento No. 6.-** Folios del 12 al 87 del Tomo II de la prueba documental,    *no está*

en los que consta el contrato inicial firmado por GTE y el ICE, con sus

addendas e información adicional, prueba que se refiere a los Hechos de la

Demanda 4, 16, 17, 18, 29 y 35.

**Documento No. 7.-** Copia de las escrituras públicas certificadas    *Sí*

notarialmente, en la que se formalizaron contratos entre GTE y THS para

levantar, componer, imprimir y encuadernar las guías telefónicas en Costa Rica

para los contratos de los años 1978 y 1981.

**Documento No. 8.-** Copia de la carta enviada por el Gerente de GTE Costa    *Sí*

Rica el 18 de diciembre de 1995 a la Junta Directiva de Antel, en El Salvador,    *irrelev*

en la que hace consta que el respaldo de GTE Directories a THS es el más

amplio posible y abarca todos los aspectos necesarios para que la operación

de los directorios sea todo un éxito; GTE pondrá a disposición de THS todos

los recursos y la tecnología necesarios para cumplir y superar las proyecciones

de ventas y demás aspectos contemplados en la licitación.    *Sí TRADUC*

**Documento No. 9.-** Copias certificadas de órdenes de compra expedidas por    *SIN*

Verizon Servicios de Información Dominicana S.A. en República Dominicana, a    *TRADUC*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

corresponden a los años 1995, 1997, 1999, 2000, 2001 y 2002. Se incluye copia de los Estados Financieros de THS al 30 de setiembre de 1989, al 30 de setiembre de 1992 y 1991, al 30 de setiembre de 1993 y 1992 en donde constan los compromisos (contratos vigentes) con República Dominicana, Costa Rica, Honduras y Jamaica.

**Documento No. 10.-** Copia certificada y traducción oficial del contrato de Agencia y Cooperación entre GTE y THS; copia traducida y certificada de la carta del 4 de noviembre de 1996 que envió la abogada de GTE Sandra Parker a los ejecutivos Scout Hanle y Doug LaVelle y una copia de la certificación expedida por el Notario Mario Quintana Musmanni, sobre la ejecución del contrato. Integran también el Documento No. 10 traducciones oficiales de la evaluación que hizo GTE por medio de su agente Bruce Wataru del 15 de marzo de 1999, del equipo existente en las instalaciones de THS y de las recomendaciones para modernizar la planta de impresión y los detalles y también la traducción de la correspondencia con Art Nixon, para suministrar papel y para cotizar directorios para Puerto Rico para el 2001.

**Documento No. 11.-** Copia del contrato firmado por General Telephone Directory Company, C. por Ac y Trejos Hermanos Sucesores, S.A. el 21 de enero del 2000 como consta en el Anexo (Exhibit E) y que luego sería modificado por las partes, junto con las órdenes de compra para imprimir las guías telefónicas para el año 2000.

**Documento No. 12.-** Formado por los folios del 294 al 317 del Tomo II de la prueba documental, en los que consta la última versión del contrato firmado por GTE y el ICE para la Licitación 6378-T y en sus antecedentes se lee la información que concierne a esa licitación.

**Documento No. 13.-** Formado por los folios del 1 al 11 del Tomo II de la prueba documental y se integra con copias de parte de la oferta presentada por el Consorcio GTE con la información que se indica en el Hecho 11 de la Demanda.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Documento No. 14.-** Formado por los folios del 125 al 160 del Tomo II de la prueba documental y son documentos que tienen que ver y prueban los Hechos 12 y 24 de la Demanda.

**Documento No. 15.-** Formado por los folios del 88 al 124 del Tomo II de la prueba documental y son documentos que tienen que ver con los Hechos 19, 20, 21, 22 y 23 de la Demanda.

**Documento No. 15-A.-** Formado por los folios del 199 al 293 del Tomo II de la prueba documental y son documentos que tienen que ver con el Hecho 23 de la Demanda.

**Documento No. 16.-** Formado por los folios del 161 al 192 del Tomo II de la prueba documental y son documentos que tienen que ver con el Hecho 25 de la Demanda.

**Documento No. 17.-** Es copia certificada de la Cláusula 2.4.1.B del Cartel de la Licitación Pública 6378-T del ICE.

**Documento No. 18.-** Formado por los folios del 193 al 198 del Tomo II de la prueba documental y son documentos que tienen que ver con el Hecho 27 de la Demanda.

**Documento No. 19.-** Copia certificada del Contrato Maestro de Compra firmado por Verizon y THS el 28 de febrero del 2002 con sus Anexos, en versión de traducción oficial, documento que prueba en los Hechos 30 y 33.

**Documento No. 20.-** Copia del Plan de Inversión presentado por THS para la compra de la Máquina Rotativa Heidelberg por la suma de CIF US $ 2.700.000.

**Documento No. 20-A.-** Traducción Oficial de los documentos de compra de la Máquina Rotativa Heidelberg.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Documento No. 21.-** Copia certificada del contrato de arrendamiento firmado por THS con la firma Inmobiliaria Zoroaster, S.A., para el alquiler de la planta física en Cartago.

**Documento No. 22.-** Traducción Oficial y certificación notarial de la Carta enviada por Douglas C. LaVelle, Presidente de GTE Directories Internacional a THS el 15 de octubre de 1999, proponiendo los términos para convenir sobre los directorios telefónicos de República Dominicana y Costa Rica, con las condiciones impuestas. El Documento prueba en los Hechos del 37 al 42 inclusive.

**Documento No. 23.-** Traducción Oficial de los mensajes enviados por Terrence Mirtchell Leve, Sr. Abogado Superior de GTE, del 20 de agosto de 1999, en los que propone que es objeto de las conversaciones obtener un contrato de largo plazo con THS y eventualmente, suscribir un joint venture; la necesidad de aumentar la producción de directorios telefónicos en otros países, como República Dominicana, para lograr precios que sean adecuados para GTE; la necesidad de que THS cambie el equipo para ser más eficiente con el costo y la posibilidad que GTE suministre servicios técnicos por medio de expertos que visiten las plantas de THS. Los documentos prueban en el Hecho No. 43.

**Documento No. 24.-** Traducción Oficial del documento que envió el 15 de noviembre de 1999 Art Nixon, para probar el contenido del Hecho 45 de la Demanda.

**Documento No. 25.-** Copia certificada de la nota enviada por José María Quirós, Gerente General de GTE al ICE el 31 de agosto del 2000, remitiendo para homologación el subcontrato de impresión de las guías telefónicas del año 2001 al 2008, de conformidad con las cláusulas 2.13.1 y 3.13.5, suscrito por GTE con THS. En la nota el Gerente de GTE dice que la empresa escogida es THS de reconocida experiencia a nivel nacional e internacional, firma que ha sido la encargada, en los últimos 25 años, de la impresión de la guía

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

telefónica que el ICE le ha confiado a GTE. El Documento prueba en el Hecho 47.

**Documento No. 26.-**          Traducción Oficial de los dos mensajes enviados por Art Nixon de Verizon, los días 1 de febrero y 16 de setiembre del 2001, que hacen prueba en el Hecho 48 de la Demanda.-

**Documento No. 27.-**          Copias certificadas de los documentos de parte de los financiamientos asumidos por THS con el Banco Interfin S.A. y la línea de crédito con el Transamérica Bank and Trust.

**Documento No. 28.-**          Copias certificadas del Cronograma de Producción de las Guías Telefónicas del año 2005 y prueba en el Hecho No. 50 de la Demanda.

**Documento No. 29.-**          Copias certificadas de las órdenes de compra emitidas por Verizon para la producción de las guías telefónicas del año 2005 señaladas en el Hecho No. 51 de la Demanda.

**Documento No. 30.-**          Copias certificadas de las órdenes de compra sustitutas para las guías del año 2005 emitidas por Verizon, que se analizan en los Hechos 52, 53 y 54 de la Demanda.

**Documento No. 31.-**          Copia certificada del documento que presentó Verizon en la Subgerencia de Telecomunicaciones del ICE el 13 de mayo del 2004, proponiendo modificar el sistema de publicación de los directorios telefónicos para el año 2005, de conformidad con los términos del contrato y que se refiere al Hecho 55 de la Demanda.

**Documento No. 32.-**          Copia certificada del acuse de recibo de la nota del 13 de mayo del 2004, enviada por el Subgerente de Telecomunicaciones exigiendo, de previo, que se ajusten los términos de la garantía de cumplimiento. La nota hace al Hecho 56 de la Demanda.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 206 of 490   RECEIVED NYSCEF: 10/26/2021



**Documento No. 33.-**    Copia certificada del oficio 6000-41046-2004 del 15 de julio del 2004 enviada por el Subgerente de Telecomunicaciones a Verizon, señalando que si no hay consenso entre las partes, la guía del 2005 se debe producir en estructura y cantidad igual a la del 2004 y se refiere al Hecho 57 de la Demanda.

**Documento No. 34.-**    Copia certificada de la nota enviada por Verizon el 8 de setiembre del 2004 a la Subgerencia de Telecomunicaciones, haciendo valer el silencio positivo por falta de respuesta del ICE y que se refiere al Hecho 58 de la Demanda.

**Documento No. 35.-**    Copia certificada del oficio 6000-52278-2004 del 14 de setiembre del 2004, que la Subgerencia de Telecomunicaciones del ICE le envía a Verizon, rechazando el reclamo del silencio positivo y mantener las condiciones contractuales vigentes, que se analiza en el Hecho 59 de la Demanda.

**Documento No. 36.-**    Copia certificada de la nota enviada por Verizon a la Subgerencia de Telecomunicaciones del ICE el 8 de noviembre del 2004 reiterando el reclamo del silencio positivo y que prueba en el Hecho 60 de la Demanda.

**Documento No. 37.-**    Copias certificadas de las escrituras públicas levantadas por notarios, sobre el proceso de producción de los directorios telefónicos para el año 2005, que prueban en los Hechos 61 y 63 de la Demanda.

**Documento No. 38.-**    Copia certificada del oficio S.I.-0726-11-04 del 15 de noviembre del 2004, enviado por la Licda. Agnes Paniagua Cubero del ICE a Verizon, requiriendo información sobre la garantía de cumplimiento y sobre la estructura de la guía telefónica del Area Metropolitana, lo que prueba el Hecho 62 de la Demanda.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



**Documento No. 39.-** Copia certificada del oficio S.I.-0730-11-04 del 17 de noviembre del 2004, en el que la Licda. Agnes Paniagua informa a los diferentes despachos del ICE sobre la reunión con Verizon de ese mismo día. Atañe al Hecho 63 de la Demanda.

**Documento No. 40.-** Copias certificadas del oficio 6000-64540-2004 del 18 de noviembre del 2004, en el que la Subgerencia de Telecomunicaciones del ICE le señala al Vicepresidente para Latino América y Asia de Verizon Information Services, en el sentido de mantener las condiciones originalmente pactadas en el contrato para la producción de las guías telefónicas para el año 2005. El Documento prueba el contenido del Hecho 64 de la Demanda.

**Documento No. 41.-** Copia certificada del oficio 0012-65785-2004 del 25 de noviembre del 2004 con el cual el ICE notificó a Verizon del acuerdo del Consejo Directivo que rechazó cualquier intención de variar unilateralmente las condiciones contractuales para la producción de guías telefónicas e insta a Verizon a cumplir en todos sus extremos el contrato vigente. El Documento prueba el Hecho 65 de la Demanda.

**Documento No. 42.-** Copia del oficio 6000-66202-2004 (SGT-2625-2004) del 29 de noviembre del 2004 que la Subgerencia de Telecomunicaciones del ICE le envía a Verizon notificándole el acuerdo con el artículo 10 del Acta de la sesión 5649 del 23 de noviembre del 2004, que prueba el Hecho 66 de la Demanda.

**Documento No. 43.-** Copia del Oficio 9100-UENSC-888 del 30 de noviembre del 2004 mediante el cual el UEN Servicio al Cliente del ICE, le comunica a Verizon que de acuerdo con lo resuelto por el Consejo Directivo, no se admitirá que el proceso de impresión de las guías telefónicas incumpla los términos convenidos en el contrato vigente. El Documento prueba el Hecho 67 de la Demanda.



**Documento No. 44.-** Copia certificada de la escritura número 131

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)



horas del 2 de diciembre del 2004 sobre el proceso de impresión de las guías telefónicas del año 2005. El Documento prueba el Hecho 68 de la Demanda.

**Documento No. 45.-**      Copias del Oficio S.I.-0759-12-04 del 13 de diciembre del 2004 enviado por el Proceso Servicios de Información del ICE a la Dirección de Proveeduría, acusando el incumplimiento contractual de Verizon y pidiendo iniciar el proceso de resolución del contrato y de ejecución de la garantía de cumplimiento. El Documento prueba el Hecho 69 de la Demanda.

**Documento No. 46.-**      Copias del Oficio 5225-69163-2004 (AEG-0572-2004) enviado por la Dirección de Proveeduría del ICE a Verizon, notificando que se procede a la apertura del procedimiento de resolución del contrato y le concede audiencia para la presentación de los descargos y pruebas. El Documento prueba el Hecho 70 de la Demanda.

**Documento No. 47.-**      Copias del escrito presentado por Verizon el 17 de diciembre del 2004, respondiendo la audiencia conferida y oponiendo la excepción previa de acuerdo arbitral. El Documento prueba el Hecho 71 de la Demanda.

**Documento No. 48.-**      Copias del Oficio S.I.-0013-01-05 que Servicios de Información UENSC le envía el 7 de enero del 2005 a la Proveeduría solicitándole que no se le permita a Verizon cumplir las prestaciones del contrato a su cargo, dado el incumplimiento en que ha incurrido y que se dicten ciertas medidas cautelares para proteger los intereses públicos involucrados. El Documento prueba el Hecho 72 de la Demanda.

**Documento No. 49.-**      Copias del Oficio 5225-00939-2005 (AEG-0020-2005) del 7 de enero del 2005 en el que la Dirección de Proveeduría le notifica a Verizon de las medidas cautelares dictadas. El Documento prueba el Hecho 73 de la Demanda.




This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



**Documento No. 50.-** Copias del escrito presentado por Verizon el 10 de enero del 2005, impugnando las medidas cautelares. El Documento prueba el Hecho 74 de la Demanda.

**Documento No. 51.-** Copia del Oficio 0092-01644-2005 (DCA-020-05) del 12 de enero del 2005 mediante el cual la Dirección Jurídica Institucional del ICE recomienda denegar los recursos interpuestos por Verizon contra las medidas cautelares dictadas. El Documento prueba el Hecho 75 de la Demanda.

**Documento No. 52.-** Copia del Oficio S.I.-0025-01-2004 del 12 de enero del 2005 de la Licda. Agnes Paniagua recomendando, también, denegar los recursos administrativos contra las medidas cautelares. El Documento prueba el Hecho 76 de la Demanda.



**Documento No. 53.-** Copia del escrito presentado el 12 de enero del 2005 por Verizon ejerciendo su derecho de defensa dentro del procedimiento administrativo de resolución del contrato y que prueba el Hecho 77 de la Demanda.

**Documento No. 54.-** Copia del oficio 5225-03122-2005 (AEG-0060-2005) del 21 de enero del 2005mediante el cual se declara sin lugar la revocatoria interpuesta por Verizon contra lo resuelto en oficio 5225-00939-2005 AEG-0020-2005 y se admite la apelación para ante la Subgerencia de Telecomunicaciones. El Documento prueba el Hecho 78 de la Demanda.

**Documento No. 55.-** Copia del escrito presentado por Verizon el 31 de enero del 2005 reiterando sus argumentos para respaldar la apelación presentada. El Documento prueba el Hecho 79 de la Demanda.



**Documento No. 56.-** Copias certificadas del oficio 5225-01843-2005 (AEG-0033-2005) del 13 de enero del 2005 en el que el ICE le comunica a Verizon que el Consejo Directivo está conociendo su solicitud para ir a la vía

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



del 2005 en el que se le comunica a la Subgerencia de Telecomunicaciones el acuerdo del Consejo Directivo que rechaza la solicitud para ir a la vía arbitral. Los Documentos prueban los Hechos 80 y 81 de la Demanda.

**Documento No. 57.-**    Copia del oficio 6000-06301-2005 (SGT-510-2005) del 7 de febrero del 2005 por medio del cual el ICE le comunica a Verizon el rechazo de la apelación y la nulidad concomitante interpuestas confirmando el acto de la nota 5225-00939-2005 y se confirma la ejecución de las medidas cautelares. El Documento prueba el Hecho 82 de la Demanda.

**Documento No. 58.-**    Copias certificadas de la resolución contenida en el oficio 6000-27733-2005 (SGT-2326-2005) del 1 de junio del 2005 en el que la Subgerencia de Telecomunicaciones declara resuelto el contrato y ordena proceder al cobro de los daños y perjuicios causados. Se adjunta, al Documento, la recomendación del Organo Director del Procedimiento Administrativo en la que se fundamenta. Los documentos prueban el Hecho 83 de la Demanda.

**Documento No. 59.-**    Copia certificada del escrito presentado por Verizon el 7 de junio del 2005 interponiendo los recursos de revocatoria con apelación subsidiaria y nulidad concomitante contra el acto de resolución del contrato, que fue rechazado por resolución dictada por el Gerente General del ICE, mediante oficio 0150-36359-2005 (GG-680-2005 del 8 de julio del 2005, quedando firme el acto final. El Documento prueba los Hechos 84 y 85 de la Demanda.

**Documento No. 60.-**    Copia certificada de la nota que el 15 de febrero del 2005, THS le envió al Presidente Ejecutivo del ICE, señalando que el suministro de guías telefónicas a los usuarios de los servicios de telefonía es un servicio público y que THS, siendo subcontratante de tal servicio, jurídicamente podía continuar con ese servicio. El Documento prueba el Hecho 86 de la Demanda.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



**Documento No. 61.-**    Copia certificada de la nota que envió THS al Consejo Directivo del ICE, proponiendo celebrar una contratación directa para continuar produciendo las guías telefónicas. El Documento prueba el Hecho 87 de la Demanda.

**Documento No. 62.-**    Copia certificada del oficio 0012-34690-2005 (CD-581-2005) que el Secretario del Consejo del ICE le envía a THS, indicando que su solicitud ha sido enviada a la Subgerencia de Telecomunicaciones. El Documento prueba el Hecho 88 de la Demanda.

**Documento No. 63.-**    Copia certificada del oficio SGT-3228-2005 del 4 de agosto del 2005 que le envía la Subgerencia de Telecomunicaciones del ICE a THS, indicándole que el Consejo Directivo  decidió contratar con RACSA la elaboración de las guías telefónicas. El Documento prueba el Hecho 89 de la Demanda.



**Documento No. 64.-**    Copia  del oficio 0090-38888-2005 (DJI/220) del 4 de agosto del 2005, en el que la Dirección Jurídica Institucional del ICE  le comunica a THS, que se ha contratado con RACSA la producción de las guías telefónicas. El Documento prueba los Hechos 90 y 91 de la Demanda.

**Documento No. 65.-**    Copia  del Dictamen número C-152-2000 de la Procuraduría General de la República del 7 de julio del 2000, dirigido a la Comisión para Promover la Competencia, vinculante para la Administración Pública.

**Documento No. 66.-**    Copia del acuerdo del Consejo Directivo del ICE en que se decide que sea RACSA quien se encargue de la elaboración de las guías telefónicas. El Documento prueba el Hecho 93 de la Demanda.



**Documento No. 67.-**    Copia certificada de la nota de fecha 13 de setiembre del 2005, que THS envió al Centro de Conciliación y Arbitraje de la Cámara Costarricense de Comercio, pidiendo su intervención para discutir con

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



el Grupo Verizon la conciliación del conflicto creado. El Documento prueba el Hecho 94 de la Demanda.

**Documento No. 68.-**     Copia certificada de la nota que con fecha 2 de setiembre del 2005, envió Verizon a THS dando por terminado unilateralmente el contrato vigente sin responsabilidad de Verizon. El Documento prueba el Hecho 95 de la Demanda.

**Documento No. 69.-**     Copias certificadas de las resoluciones del Juzgado Civil de Cartago en el Proceso Ejecutivo Prendario de Heidelberg Print Finance Americas Inc. Contra Trejos Hermanos Sucesores, S.A., que se tramitó en el expediente No. 06-001956-0640-CI, en el que se remataron judicialmente los bienes adquiridos por THS y pignorados hasta por la suma de US $ 2.831.409,07. Los Documentos prueban los Hechos 96 y 97 de la Demanda.

**Documento No. 70.-**     Copia certificada de la escritura pública No. 144 otorgada ante la Notaria Laura Mónica Zamora Ulloa en San José a las 12:00 horas del 23 de marzo del 2006, en la que se constituyó la deuda por alquileres de las naves industriales en donde se ubicó THS en Cartago, por la suma de US $ 200.223,75, con intereses del 9.5 % anual, con tasa variable según las oscilaciones que sufra la tasa corriente del Banco Interfin. El Documento prueba los Hechos 98 y 99 de la Demanda.

**Documento No. 71.-**     Copias certificadas de las sentencias dictadas por el Juzgado Civil de Mayor Cuantía de Cartago y el Tribunal Civil y de Trabajo de Cartago, en el Expediente 06-001846-0640-CI, en el proceso Ejecutivo Simple de Inmobiliaria Zoroaster, S.A. contra Trejos Hermanos Sucesores, S.A.- El Documento prueba el Hecho 100 de la Demanda.

**Documento No. 72.-**     Copias certificadas de las Sentencias de Primera y Segunda Instancia dictadas por el Juzgado Civil de Cartago, en el Proceso de Desahucio en el expediente No. 06-002404-346-CI de Inmobiliaria Zoroaster, S.A. contra Trejos Hermanos Sucesores, S.A.- El Documento prueba el Hecho



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Documento No. 73.-** Copia certificada del contrato de compraventa formalizado entre THS y Condor Editores de Costa Rica, S.A. para la venta de bienes muebles industriales de THS, que prueba el Hecho 102 de la Demanda.

**Documento No. 74.-** Copia certificada del contrato de finiquito de arrendamiento suscrito por THS con Inmobiliaria Zoroaster, S.A., que prueba el Hecho 103 de la Demanda.

**Documento No. 75.-** Copia certificada del contrato de arrendamiento de bienes muebles con opción de compra, suscrito por THS y Dacondor D.C.R., S.A., que prueba el Hecho 104 de la Demanda.

**Documento No. 76.-** Certificación notarial del "Reporte Crediticio" de THS emitido por el Centro de Información Crediticia de la Superintendencia General de Entidades Financieras (SUGEF), junto con el Reglamento para la Calificación de Deudores publicado en La Gaceta 238 del 9 de diciembre del 2005.

**Documento No. 77.-** Informe económico financiero elaborado en el mes de octubre del 2008 por el Licenciado Tomás Evans Salazar, miembro del Colegio de Profesionales en Ciencias Económicas, con el carné número 11968, que contiene los cálculos de los daños y perjuicios irrogados por las demandadas a la firma actora.

## II.- Declaración de parte.-

Ofrecemos como prueba la declaración de parte del representante de la demandada Verizon Information Services –Costa Rica- LLC, para que se refiera a los Hechos de la Demanda en general, y en especial los números 31, 32, 33, 34, 35, 37, 38, 39 y 42.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 5    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 214 of 490    RECEIVED NYSCEF: 10/26/2021

90

### III.- Prueba Pericial.-

Solicitamos que el Despacho designe a un perito, que debe ser un contador público autorizado, o una firma de contadores públicos autorizados, para que estudie el análisis del Licenciado Tomás Evans Salazar que se acompaña a la demanda. El perito deberá establecer si el análisis del Licenciado Evans es correcto, si está fundamentado en bases reconocidas por la práctica contable y si sus resultados son ciertos y correctos. El perito, en caso de discrepancia con el análisis del Licenciado Evans, corregirá los aspectos de éste en lo que estime pertinente. La parte actora pondrá a disposición de ese perito todos sus registros contables y sus archivos, y el perito indicará en su informe cuáles de esos registro utilizó y cómo lo hizo.

### IV.- Expediente Administrativo.-

Ordénese al Instituto Costarricense de Electricidad la remisión de una copia certificada del Expediente Administrativo que corresponde al proceso de Licitación Pública No. 6378-T "Desarrollo e Implementación de Servicios de Información", incluyendo el cartel de la licitación completo, la oferta presentada por el Consorcio GTE, los contratos firmados por el ICE con el Consorcio GTE y deberá incluir todas las gestiones, actuaciones y resoluciones dictadas dentro del proceso de ejecución del contrato administrativo, incluyendo las que se hubieran tramitado ante tribunales de Justicia o de Arbitraje, todo ello de conformidad con lo que dispone el artículo 51 del Código Procesal Contencioso Administrativo.

**Medida Cautelar:** El Instituto Costarricense de Electricidad, en el proceso ordinario contra **VERIZON INFORMATION SERVICES - COSTA RICA, LLC**, tramitado en el Juzgado Contencioso Administrativo y Civil de Hacienda bajo el expediente 05-000881-0163-CA, obtuvo embargo en bienes de esa demandada. Como los bienes embargados allí constituyen una base

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



SUCESORES S.A., pueda resarcirse de los daños y perjuicios irrogados por el ICE y por VERIZON, solicitamos que, de conformidad con los artículos 19 y siguientes del Código Procesal Contencioso Administrativo; 241 y siguientes del Código Procesal Civil, y específicamente con el 242 idem, que se ordene al ICE que no disponga del producto de ese embargo hasta tanto no se resuelva en firme la pretensión deducida en el proceso que se inicia con este memorial.

**Notificaciones:** La parte actora señala para oir notificaciones el Número de Fax 22 83 11 46. Notifíquese al Instituto Costarricense de Electricidad en sus oficinas centrales en Sabana Norte; a la firma demandada "VERIZON INFORMATION SERVICES --COSTA RICA- LLC" en las oficinas de su Agente Residente Licenciado Hernán Pacheco Orfila, en el Bufete Pacheco Coto ubicado en el Cuarto Piso del Edificio A del Centro Ejecutivo FORUM 2 en Santa Ana; y a la empresa "VERIZON COMMUNICATIONS INCORPORATED", notifíquese en los Estados Unidos de América, en la persona de su Presidente y Principal Oficial Ejecutivo, en sus oficinas en la Calle 140 Oeste, piso 29 (140 West St. 29th Floor) en la Ciudad de New York, No. 10007 y, además, en su domicilio registral ubicado en el Número 1209 Orange Street, en la Ciudad de Wilmington, Condado de New Castle, en el Estado de Delaware. Por tratarse de notificaciones en el extranjero, se procederá de conformidad con lo que dispone el artículo 180 del Código Procesal Civil.

**Goicoechea, diciembre 15 del 2008.**

Alvaro Trejos Fonseca.

Autentica:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)), which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Tribunal Procesal Contencioso Administrativo
II Circuito Judicial de San José

JUNTO CON (19) FOLIO; (3) LETRAS

JUNTA Documento #1 Certificación notarial de personería / Documento 2
certificación notarial / Documento # 3 Certif. notarial inscripción original
de la sociedad / Pág de internet / Documento # 4 cop. portadas Guías telefónicas

RECIBIDO POR Eduardo M.        16/12/8

10:36 hrs

Documento #5  Cop. certificación expedida x don José María Quirós

Documento # 7  Cop. escrituras públicas certif. notarialmente

Documento #8  cop. carta enviada x el gerente de CTE

Documento #9 Cop. certificadas de órdenes de compra x verizon servicios
de información Dominicana S.A.

Documento #10  Cop. certificada y traducción oficial del contrato de
agencia y cooperación entre CTE y THS

Documento #11 Copia del contrato firmado x general telephone Directory company
C. por AC y tregos Hermanos sucesores

Documento #17 Cop. certificada de la cláusula 24.1.B del cartel de la
licitación Pública G378-T de ICE

Documento #19 Copia certificada del contrato Maestro de compra

Documento #20 Cop. plan de inversión x THS

Documento 20-A traducción oficial de los documentos de compra

Documento 21 cop. certificada del contrato de arrendamiento

Documento 22  traducción oficial y certificación notarial de la carta
enviada por douglasC. Lavalle

Documento 23  traducción oficial de los mensajes enviadas por terrence
Mitchell Leue

Documento 24  traducción oficial del documento que envió el 15/4/99
Art Nixon.

Documento 25  cop. certificada

Documento 26 traducción oficial de mensajes enviados x art Nixon

Documento 27  cop. certificadas

Se aporta exp. Administrativo el cual consta de

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

producir debis iguas telefonicas 2005   y prueba #50

Documento 29  Cop. certificada. de ordenes de compra

Documento 30  cop. de ordenes de compra sustitutas.

Documento 31  Cop. certificada del documento que presento verizon

Documento 32 Cop. certificada del arose de recibo de la nota del 8/5/4

Documento 33  cop. certificada del oficio 6000-41046-2004

Documento 34 Cop. certificada de la nota enviada x Verizon - 8/4/4

Documento 35  cop. certificada del ofic. 6000-57778-2004 14/9/4

Documento 36  Cop. certificada.

Documento 37  cop. certificada de las escrituras publicas

Documento 38  cop. certificada del ofic. S.I.-0726-11-04, 15

Documento 39  cop. certif. of. SI-0730-11-04

Documento. 40 Cop. centif. of. 6000-64510-2004

Documento 41. Cop. cotif. ofi. 0017-65785-2004

Documento. 42 cop. ofic. 6000-66269-2004

Documento 43 Cop. ofic. 9100-UENJC-888

Documenta 44  cop. certificada escritura # 131

Documento 45 Cop. oficio. S.L-0759-12-04

Docum. 46 cop. ofi. 5775-69163-2004

Docum. 47 cop. del escrito del 17/12/04

Docum. 48 cop. ofi. S.I.-0013-01-05

Docum. 49. Cop. ofi. 5225-00939-2005

Docum. 50. cop. del escrito del 10/1/5

Docum. 51 Cop. ofi. 0092-01644-2005

Docum. 52 cop. ofic. S.I.-2005-01-2004

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 218 of 490

NYSCEF DOC. NO. 5      RECEIVED NYSCEF: 10/26/2021

Docu. 53. ........ 5225-03172-2005

Docu. 54 Cop. ofic.

Docuto. 55 Cop. escrito 31/1/5

Doumto 56. Cop certificada. 5225-01843-2005
              0012-5372-2005

Doumto 57. Cop. ofic. 6000-06301-2005 / 5225-00939-2005

Doumto 58. Cop. certif. resolucion oficio 6000-27733-2005

Doumto 59. Cop. certif. de escrito del 7/junio 2005

Doumto 60. Cop. certif. de la nota del 15/2/05

Doc. 61 Cop. certif. nota de THS

Doc. 62 Cop. certif. ofici. 0012-34690-2005

Doc. 63. Cop. certif. ofr. 5GT-3776-2005

Doc. 64. Cop. ofic. 0090-38888-2005

Doc 65 Dictamen 152-2000

Doc. 66. Copia. de acuerdo del consejo directivo del ICE

Doc. 67 Cop. certificada de la nota del 13/9/5

Doc. 68 Cop. certif. nota del 2/9/5

Doc. 69 Cop. certif. de las resoluciones del Juzgado civil de cartago

Doc. 70 Cop. certif escritura publica

Doc. 71 cop. certif. sentencias del juzgado civil de mayor cuentia
de cartago.

Doc. 72 Cop. certif. sentencias de 1era y segunda instancia

Doc. 73. Cop. certif. del contrato de compraventa

Doc. 74. cop. certif. del contrato de finiquito de arrendamiento

Doc. 75. cop. certif. de contrato de arrendamiento de bienes y muebles

Doc. 76 certif. Notarial reporte crediticio

Doc. 77. Infame Escarauco Francroo.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 5    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 219 of 490    RECEIVED NYSCEF: 10/26/2021

Expediente: 08-001503 - 1027-CA

**ACTOR: TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA.**
**PROCESO: ORDINARIO CIVIL DE HACIENDA.**
**DEMANDADOS: INSTITUTO COSTARRICENSE DE ELECTRICIDAD,**
**VERIZON COMMUNICATIONS INCORPORATED, VERIZON**
**INFORMATIONS SERVICES – COSTA RICA- LLC.**

**TRIBUNAL PROCESAL CONTENCIOSO ADMINISTRATIVO Y CIVIL DE HACIENDA.**
**SEGUNDO CIRCUITO JUDICIAL. GOICOECHEA, EDIFICIO ANEXO A.**

El suscrito ÁLVARO TREJOS FONSECA, mayor casado en segundas nupcias, Máster en Ciencias, vecino de San José, cédula de identidad número 1-0390-0895, actuando en mi condición de Presidente con facultades de apoderado Generalísimo sin límite de suma, de la compañía de este domicilio "TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA", cédula de persona jurídica número 3-101-000940, otorgo PODER ESPECIAL JUDICIAL al Licenciado EDUARDO SANCHO GONZÁLEZ, mayor, casado, abogado, vecino de Montes de Oca, cédula 1-380-073, de conformidad con lo que disponen los artículos 1256, 1289 y 1290 del Código Civil, entendiéndose conferidas, expresamente, todas las atribuciones que se señalan en esas normas jurídicas. El apoderado firma este acto en señal de aceptación del poder.

San José, 16 de diciembre de 2008.

Álvaro Trejos Fonseca.

AUTENTICA
José Leonardo Céspedes R.
ABOGADO Y NOTARIO PÚBLICO
C. 1582

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Tribun...

ESC...
Ab... + poder, 1 juego de cop. del escrito
___ de la demanda, 3 campos. de prueba
___ documental (3 campos), únicamente.—

RECIB... UFG
HORA: 10:00          19/10/08



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 221 of 490

RECEIVED NYSCEF: 10/26/2021

# Exhibit B

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

CASE: 08-001505-1027 -CA
DECLARATORY PROCEEDINGS
PLAINTIFF:
TREJOS HERMANOS SUCESORES S.A.
DEFENDANTS:
INSTITUTO COSTARRICENSE DE ELECTRICIDAD VERIZON COMMUNICATIONS INCORPORATED
VERIZON INFORMATION SERVICES -COSTA RICA- LLC

66- 2017- V

**CONTENTIOUS-ADMINISTRATIVE AND CIVIL FINANCE COURT. FIFTH SECTION. SECOND JUDICIAL CIRCUIT OF SAN JOSÉ.** Goicoechea, Attached Building A, at 8:00 a.m. on the nineteenth day of July, two thousand and seventeen.

Declaratory proceedings initiated by **TREJOS HERMANOS SUCESORES S.A.,** represented by **ÁLVARO TREJOS FONSECA,** of legal age, married twice, holder of Master of Science degree, resident of San José, bearer of identity card number 1-0390-0895, acting in his capacity as President of the company with Full Power of Attorney and no restrictions as to the amounts involved; **EDUARDO SANCHO GONZÁLEZ,** of legal age, married, an attorney at law, resident of Montes de Oca, bearer of identity card number 1-380-073; **ANDRÉS MEZA VILLALOBOS,** of legal age, an attorney at law, married; **DIEGO BAUDRIT CARRILLO,** married, an attorney at law, resident of San José, bearer of identity card number 1 -323-212, Bar Association Card number 1155, **LUIS GERARDO VILLANUEVA MONGE,** of legal age, married once, an attorney at law, resident of Cartago, bearer of identity card number 3-221 -204, all in their capacity as Special Judicial Agents, against **INSTITUTO COSTARRICENSE DE ELECTRICIDAD,** represented at different procedural times by **ENRIQUE ROJAS FRANCO,** of legal age, married, Attorney at Law, resident of Santa Ana, bearer of identity card number one - three hundred and ninety - one thousand two hundred and fifty, Bar Association Card number 1184, **GERMAN CALDERÓN LOBO,** of legal age, married, an attorney at law, resident of Heredia, bearer of identity card number 4-149-125, Bar Association Card number 5995, **DANNY FABRICIO SABORÍO MUÑOZ,** of legal age, single, bearer of identify card number 1-903-770, Bar Association Card number 16289, **CARLOS CERDAS DELGADO,** of legal age, married, bearer of identity card number 1-896-201, Bar

Digital signature
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

Association Card number 15240, **ANA VICTORIA ZAPATA CALVO,** of legal age, divorced, an attorney at law, resident of Escazú, bearer of identity card number one - eight hundred and ninety-two - four hundred and ninety-one, **JUAN PABLO HERNÁNDEZ CORTES,** of legal age, an attorney at law, married, all in their capacity as Special Judicial Agents, **VERIZON COMMUNICATIONS INC.,** represented by **ANDREA HULBERT VOLIO,** of legal age, married, an attorney at law, resident of Santa Ana, bearer of identity card number 9-100-121, **ALEXANDER SALAZAR SOLORZANO,** of legal age, married, an attorney at law, bearer of identity card number one - eight hundred and thirty-five - three hundred and ninety-eight, resident of Guachipelin of Escazú, in his capacity as Special Judicial Agent (power of attorney, on page 1170); **JUAN CARLOS PIZARRO CORRALES,** of legal age, married, an attorney at law, resident of San José, bearer of identity card number one - eight hundred and twenty-five - three hundred and sixty-six, **RODRIGO ALBERTO PÉREZ GONZÁLEZ,** of legal age, an attorney at law, who appeared for the stage of conclusions of the hearing, and **MARVIN CÉSPEDES MÉNDEZ,** of legal age, married, an attorney at law, resident of San José, bearer of identity card number 1-531-965, who appeared on behalf of this company in the stage of arguments for indemnity, opening arguments and examination of witnesses at the hearing, in their capacity as Special Judicial Agents, and **VERIZON INFORMATION SERVICES COSTA RICA LLC,** represented by the latter and by **GINO CAPPELLA MOLINA,** of legal age, married, an attorney at law, resident of San José, bearer of identity card number one - five hundred and sixty-nine - two hundred and twenty-six, in their capacity as Special Judicial Agents,

## FINDINGS OF FACT

I.      **-** On the fifteenth day of December 2008, the plaintiff initiated declaratory proceedings before this Court, and requested the following:

" 1.- *That the so-named "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES COSTA RICA, LLC) was the means for implementation of an agreement executed by and among the business companies "GTE Information Services*

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6   RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 224 of 490

TRANSLATION

Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware and with their main offices in the City of Dallas, State of Texas, identified as the "GTE Consortium," and INSTITUTO COSTARRICENSE DE ELECTRICIDAD, for the awarding to said Consortium of a contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, according to resolution of the Board of Directors of ICE, adopted at ordinary meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, approved by the Office of the Comptroller General of the Republic on December 13, 2000.

2).- Said "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A, was known by INSTITUTO COSTARRICENSE DE ELECTRICIDAD, which approved the involvement of TREJOS HERMANOS SUCESORES S.A. in the performance of the administrative contract awarded to the GTE Consortium as a result of Public Bidding Proceedings No. 6378-T conducted by ICE.

3).- The termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and GTE CONSORTIUM (which changed its name to VERIZON CONSORTIUM) caused the termination of the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A.

4).- TREJOS HERMANOS SUCESORES S.A. had no liability whatsoever for the events that led to the termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and GTE CONSORTIUM.

5).- TREJOS HERMANOS SUCESORES S.A. had no liability whatsoever for the events that led to the termination of the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A.

6.- The termination of the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 225 of 490

RECEIVED NYSCEF: 10/26/2021

TRANSLATION

Directory Company, C por A. caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A.

**7.-** The defendant companies Verizon Communications Inc. and Verizon Information Services -Costa Rica- LLC compose an economic interest group, successor of the economic interest group named GTE Consortium, which was awarded a contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, performed through the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A.

8.- "**VERIZON COMMUNICATIONS INCORPORATED**" is the most senior entity of an economic interest group of which "VERIZON INFORMATION SERVICES -COSTA RICA- LLC" is a member. Therefore, the first of these companies is jointly and severally liable with the latter for all the obligations acquired by "**VERIZON INFORMATION SERVICES - COSTA RICA- LLC**" with **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA**.

**9).-** The defendant companies **Verizon Communications Inc.** and **Verizon Information Services -Costa Rica- LLC** are jointly and severally liable for the negative consequences suffered by the plaintiff company, which occurred due to the termination of the Master Purchase Agreement executed on February 28, 2002 with the plaintiff Trejos Hermanos Sucesores S.A.

**10).- INSTITUTO COSTARRICENSE DE ELECTRICIDAD** disregarded the lawful rights and interests of **TREJOS HERMANOS SUCESORES S.A.** that have arisen out of the implementation of said Public Bidding Proceedings No. 6378-T through the "Master Purchase Agreement" executed on February 28, 2002, reason for which it is jointly and severally liable with Verizon Communications Inc. and Verizon Information Services -Costa Rica- LLC for indemnification of the damages suffered by the plaintiff as a result of the termination of said Master Purchase Agreement executed on February 28, 2002.

11).- The clauses of the MASTER PURCHASE AGREEMENT executed by and between VERIZON and TREJOS HERMANOS SUCESORES regarding the release of VERIZON from civil liability for breach of contract are null and void, particularly Clauses 24 and 28 of that Agreement, although this statement is not limited to them, because it includes all clauses

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

releasing VERIZON from civil liability.

12).- The defendants, **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** and the companies **Verizon Communications Inc.** and **Verizon Information Services - Costa Rica. LLC** must pay the plaintiff, jointly and severally, the damages incurred, which we define as follows:

| | |
|---|---|
| a) Investment in machinery | $2,582,156 |
| b) Increase in inventories | $ 2,860,696 |
| c) Operating Cash Flows not received 2004-2013 Directories in Costa Rica | $ 8,806,872 |
| d) Operating Cash Flows not received 2004-2013 Directories in the Dominican Republic | $7,912,999 |
| e) Losses incurred from 2004 to 2007 | $ 7,237,068 |
| f) Interest paid by THS | $ 983,825 |
| g) Interruption of Operations | $28,885,195 |
| h) Non-economic Damages | $ 5,000,000 |

i) In accordance with the provisions of Article 123 of the Code of Contentious Administrative Procedure, the amounts of the judgment shall also be updated to compensate for the variation in purchasing power, and interest shall be recognized on all the above items, which shall be paid starting from August 30, 2008, until they are fully paid, and shall be calculated in accordance with the provisions of Article 1163 of the Code of Civil Procedure.

13).- The defendants shall jointly and severally pay to the plaintiff the personal and procedural costs of this case."

II. - The complaint was served on the co-defendants by a decision issued at 8:00 a.m. on the twelfth day of January, two thousand and nine.

III. - By means of an instrument filed on March 3, 2009, Instituto Costarricense de Electricidad answered the complaint and filed the defenses of lack of active and passive standing, lack of right and lack of jurisdiction.

IV. - By means of an instrument filed on May 6, 2009, VERIZON COMMUNICATIONS INC. answered the complaint and filed the defenses of lack of right, lack of active and passive ad causam and procesum standing.

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 227 of 490

TRANSLATION

**V. -** By means of an instrument filed on May 7, 2009, VERIZON INFORMATION SERVICES COSTA RICA LLC answered the complaint and filed the defenses of lack of right, lack of jurisdiction and undue joinder of the lawsuit.

**VI. -** The defense of lack of jurisdiction was rejected by means of decision 1078-2009 by the Processing Judge. Upon the filing of an appeal expressing disagreement, the decision was upheld by vote **000874-C-S1-2009** issued **at** 11:15 a.m. on the twenty-fifth day of August, two thousand and nine, by the First Chamber of the Supreme Court of Justice.

**VII. -** The defense of undue joinder was initially rejected by means of decision 1080-2009, although it was decided subsequently to admit it by means of decision 3607-2010. The latter was upheld by decision 634-2010 issued at 10:30 a.m. on the 29th day of November 2010 by the Appeals Court. In view of the above, Verizon Information Services-Belize joined the lawsuit.

**VIII. -** The first preliminary hearing in these proceedings was conducted at 9:18 a.m. on the ninth day of June, two thousand and nine.

**IX. -** A second preliminary hearing in these proceedings was conducted at 1:45 p.m. on the twenty-third day of September, two thousand and ten. The petitions of the party were heard there, and Verizon Information Services- Belize was added to the proceedings.

**X. -** A third preliminary hearing in these proceedings was conducted at 8:40 a.m. on the fourteenth day of August, two thousand and twelve. The defense of undue joinder of claims was rejected by means of decision number 1314-2012-T. The facts in controversy were also established.

**XI. -** The discovery phase took place at 8:42 a.m. on the seventh day of September, two thousand and twelve, and accordingly, documental, testimonial and expert evidence was admitted.

**XII. -** Following the expert's assessment, this case was sent to Section IV of this Court, by means of a decision issued at 10:06 a.m. on the nineteenth day of March, two thousand and fourteen.

**XIII. -** By means of a decision issued at 9:00 a.m. on the fifth day of May, two

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6                                                                      RECEIVED NYSEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 228 of 490

TRANSLATION

thousand and fourteen, Section IV of this Court returned the appropriate records to the Processing Judge.

XIV. - Verizon Information Services- Belize was excluded from the proceedings by means of a decision issued at 8:52 a.m. on the twenty-second day of April, two thousand and fifteen.

XV. - The Processing Judge ordered the case be sent to the trial stage by means of a decision issued at 2:37 p.m. on the fourth day of April, two thousand and sixteen.

XV (sic). - This Section of the Court scheduled an oral hearing in these proceedings, by means of a decision issued at 11:40 a.m. on the twenty-third day of June, two thousand and sixteen.

XVI. - An oral and public hearing in these proceedings was held on June 28 and 29 of this year. At the hearing, it was determined that Attorney Marvin Céspedes Méndez was the representative of both co-defendants, pursuant to the powers of attorney on record, the evidence offered by the plaintiff was admitted to ensure a better decision, opening arguments were heard, and the expert and testimonial evidence offered and produced was admitted. The deposition of a relevant party, Instituto Costarricense de Electricidad, was deemed to have been withdrawn by the co-defendants and was also declared inadmissible, given that at the time of the respective proceedings, their representative had not yet appeared at the hearing, and had arrived late. In the continuation of the hearing on June 29, Attorney Rodrigo Alberto Pérez González appeared on behalf of Verizon Communications Inc. Finally, the conclusions of the parties were heard.

XVII. - No nullities have been observed in the proceedings before this Court that need to be corrected and the judgment is issued within the term established for such purpose by paragraph 111.1 of the Code of Contentious Administrative Procedure, given that the 15-day term of that rule expires on July 20 of the current year. After deliberation and unanimously, the following decision was reached.

Written by Judge **Campos Hidalgo, with the affirmative vote of Judges Alvarez Molina and**

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

Mena Garcia,

## LEGAL CONSIDERATIONS

I.    - <u>On the theory of the plaintiff's case and its main arguments</u>: A review of the complaint and the respective arguments at the trial hearing indicates that the plaintiff based its claims on the following arguments:

**a) Arguments of a general nature:**

**1.** Whereas the printing of telephone directories is a public service, it was therefore the responsibility of ICE to ensure that it was properly provided (as *argued in the complaint and at the trial hearing by Attorney Sancho Gonzalez).*

**2.** The termination of the ICE - GTE (VERIZON) contract had the immediate effect of making the performance of the agreement between GTE (VERIZON) and the plaintiff impossible. Therefore, the negative consequences of this impossibility of performance (damages caused to the plaintiff company) rest on the termination of the former. *(arguments in the complaint).*

**3.** There are two contractual relationships: ICE - GTE (VERIZON) and GTE (VERIZON) - plaintiff, and there is also an extracontractual relationship, which is between ICE and the plaintiff *(arguments in the complaint).*

**b) Arguments related to Instituto Costarricense de Electricidad:**

**1.** There is a <u>complex contractual</u> relationship between and among, the codefendants and the plaintiff company in ICE, in which the different agreements are interconnected to achieve a financial result, and where the final outcome requires the participation of each party. Therefore, the actions of the contractual complex are oriented to the common business object, so that the party that does not participate in it must compensate for its illegal action or omission. The parties, although not directly contracting with each other, had mutual knowledge of their participation in the contracted material activity (the production of telephone directories) and ICE even maintained control and periodic visits to the plaintiff's plant to supervise the correct printing of the telephone directories. The approval of the Master Printing Agreement by ICE necessarily involved it in the legal

Digital signature of:
     RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

relationship that is the basis of this litigation *(argument expressed in the complaint and at the trial hearing by Attorney Baudrit Carrillo).*

**2.** The entity is being sued for developing bidding proceedings that required the contractor to print the guides elsewhere in the country. For this reason, the plaintiff company entered into an agreement with the co-defendants that was submitted to the knowledge of ICE, which had control over the subcontracted company. Upon the termination of its contract with the contractor, it was obliged to continue providing the respective public service and, despite knowing that there was a company that produced the telephone directories, it interacted only with the Verizon group, without involving the plaintiff company. In view of the foregoing, it considers that the <u>extra-contractual liability</u> of Article 190 of the General Law of Public Administration applies, because the plaintiff was not given the opportunity to exercise its rights before the aforementioned administrative decision. *(argument expressed in the complaint and at the trial hearing by Attorneys Villanueva Monge and Sancho González).*

**3.** The contractual mechanism used by ICE for the preparation and distribution of telephone directories was not the correct one, given that we are in the presence of a public service, according to the Attorney General's Office, *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**4.** Upon the termination of the contract between GTE Consortium and ICE, this Public Entity should have adopted the necessary preventive measures, in order that the public service of information to the public through Telephone Directories would not be seriously affected, nor would the classic principles of the concept be violated, such as equality, continuity and adaptability, be violated, *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**5.** The damages suffered by the plaintiff for the objective breach of its contract with GTE (VERIZON) were caused by the actions of ICE, which terminated its contract with GTE (VERIZON), without respecting the lawful interests that the plaintiff had in that contract, thus violating the principle of *Neminem iaedere* -not to harm others-. ICE incurred civil liability in accordance with the application of the principles of the General Law of Public

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Administration (Articles 190 et seq.), whether its actions are considered lawful (Articles 194 and 195) or unlawful (Articles 191 and 192). Article 1045 of the Civil Code is also the basis for such liability, *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**c)  Arguments related to the co-defendant companies:**

**1.** The GTE Group negotiated the future conditions for incorporating technological advances to improve the quality of work in editing and printing with the plaintiff. Consequently, it was also obliged to acquire the most modern equipment and the expansion of the physical plant. In accordance with the above, the plaintiff became seriously indebted to banks and commercial creditors in order to acquire the new equipment and expand its industrial plant *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**2.** The GTE Group merged with the firm Atlantic Bell and the VERIZON Group was formed, which maintained with ICE all the rights, duties, obligations and securities originally granted by the initial Group and jointly and severally guaranteed by the VERIZON companies *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**3.** Verizon Information Services - Costa Rica LLC breached its contract with ICE. However, when Verizon Information Services - Costa Rica LLC broke its contractual relationship with the plaintiff, it falsely indicated that the entity was responsible for the breach *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**4.** GTE CORPORATION, Holding of the GTE Group, by expressing that it provided its full guarantee backed by its financial statements, which could be used in the ICE Public Bidding Proceedings 6378-T to prove the financial capacity of the Consortium, which was then acting as the bidder and which also provided its guarantee, becoming jointly liable with the companies of the Consortium, for all the obligations that it acquires as a bidder and as the successful bidder, it irremediably acquired  the condition of being jointly and severally liable not only for the Consortium, but also for the full performance of the contract and, therefore, became also jointly liable with the ICE for the results of the negotiation.

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6                                           RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 232 of 490

TRANSLATION

5.  Verizon Information Services- Costa Rica- LLC went into malicious default, as it wanted to leave its business in the country. Consequently, the civil liability exemption clauses of the respective contract are ineffective when they refer to a willful breach, in accordance with the provisions of Article 701 of the Civil Code. And the breach is intentional, since the co-defendants could have complied without facing any material obstacles to do so, but failed to fulfill their obligations *(argument expressed in the complaint and at the trial hearing by Attorneys Baudrit Carrillo and Sancho González).*

6.  The breach by Verizon is clearly demonstrated in the Court records. Because of it, the plaintiff could not pay the bank and commercial loans acquired, stopped paying its raw material suppliers and rents, stopped paying the salaries and labor rights of its employees and was forced to end its activities and permanently suspend its commercial operations *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

7.  The Agreement executed by the plaintiff with the GTE Group (later VERIZON Group), which was approved and authorized by ICE, is by its nature a contract governed by the principles of public service and is regulated by its principles, rules and values *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

8.  The commercial misfortune of the plaintiff has its origin in the breach of the contract executed with the GTE Group, recognized as the link derived from the bidding proceedings, and in the contract executed with the VERIZON Group, as a subcontract *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

9.  GTE CORPORATION, by virtue of a merger of companies in the United States of America, was transformed into VERIZON COMMUNICATIONS INC., Holding of the VERIZON Group; as a result, the relationships derived from the Administrative Contract of the International Public Bidding Proceedings 6378-T and its legal effects for the fulfillment of its duties and obligations, did not suffer any alteration. Consequently, the defendant companies Verizon Communications Inc: and Verizon Information Services - Costa Rica- LLC integrate an economic interest group, which we can conventionally call VERIZON GROUP *(argument*

Digital signature of:

        RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**10.** The termination of the ICE-GTE (VERIZON) contract constitutes an objective breach of the GTE (VERIZON) - plaintiff contract, which is attributable to GTE (VERIZON), therefore, the latter entity must respond for the damages caused, according to the general principle of contractual liability established in Article 702 of the Civil Code *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**11.** The civil liability exonerating clauses that were included in the master purchase agreement by imposition of VERIZON are necessarily rendered ineffective under imperative principles of Public Law, since although the Verizon - THS contract was executed as a commercial agreement, by its object and effects it is administrative in nature, because it concerns the provision of a public service *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**12.** The exonerating clauses are integrated to an adhesion contract, since the content of that agreement only allows acceptance or rejection by the plaintiff company, and the nullity of such clauses is a result of their abusive nature, in accordance with Article 1023, subsection m) of the Civil Code and Article 42 of Law 7,472 of January 19, 1995 (Law for the Promotion of Competition and Effective Defense of the Consumer).

**II.     - On the theory of the case of INSTITUTO COSTARRICENSE DE ELECTRICIDAD and its main arguments:** A review of the complaint and the respective reasoning at the trial hearing indicates that the ICE representatives base their claims on the following arguments:

**1.** The preparation of telephone directories is not a public service, and in any case when the events occurred, ICE opted not to charge for calls to 113 and also entered into an administrative contract with RACSA for their preparation. As a result, telecommunications was a public service at the beginning and now it is a service available to the public, but telephone directories are not understood to be within this concept.

**2.** The agreement between the plaintiff and the co-defendants is a private contract that is not governed by public service principles.

**3.** The were plaintiff should not be consulted about the termination of the contract

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

between ICE and the co-defendants.

4. The contractual relationship of the plaintiff company was with the codefendants, who opted to subcontract it, in accordance with the powers allowed by the Administrative Contracting Law. In this sense, the investments made by the plaintiff company were not only to satisfy the needs of ICE but also to provide services in other parts of the region. It indicates that the bidding terms required printing the guides in Costa Rica, but not at the plaintiff's facilities.

5. The contract with the co-defendant companies was terminated for reasons of public interest, since they unilaterally decided to restructure the 2005 guide, thus breaching the clauses of the contract.

6. The relationship between Verizon and the plaintiff company predates the public bidding proceedings 6378-T, so it was not ICE's place to endorse that private contract.

7. ICE's knowledge of the relationship between the co-defendants and the plaintiff was based on the fact that the latter was a simple subcontractor of the former.

8. In the case in question, we are not dealing with a complex contractual relationship, since we have an administrative contract, characterized by the existence of exorbitant clauses.

9. ICE was under no obligation to give any notice to the plaintiff since the plaintiff was not its provider.

10. ICE is not responsible for machinery acquired by the plaintiff to produce the telephone directories of the Dominican Republic.

III. - **On the theory of the case of VERIZON COMMUNICATIONS INCORPORATED and VERIZON INFORMATION SERVICES -COSTA RICA- LLC and its main arguments**: A review of the answer to the complaint and the respective arguments at the trial hearing indicates that the representatives of the codefendant companies base their claims on the following reasons:

1. If the plaintiff company made the decision to get into debt, it was due to its own business decision.

2. The plaintiff sold the acquired machinery, which it did not consider when claiming

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

losses.

3. The objected clause bases its logic on the fact that Verizon only has one business in Costa Rica and it was illogical for it to continue if ICE terminated its telephone directory contract.

4. The clause challenged by the plaintiff was negotiated with it and is not null and void under the provisions of Article 1023 of the Civil Code.

5. The relationship between Verizon and the plaintiff is exclusively private.

6. The damages are accessory to the issue of contractual nullity, since the parties did not know how to exercise the annulment claims, since they first had to request contractual termination and then payment of damages. Therefore, the Court faces a material impossibility to award damages, because contractual termination was not previously requested.

7. In the case under study, Article 701 of the Civil Code must be applied, which indicates that fraud is not presumed, and therefore must be proven, since a mere failure to comply does not per se mean fraudulent conduct.

8. It is not true that they formed an economic interest group, nor have they been part of any contractual relationship with the ICE or the plaintiff.

9. It is not true that Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. and Verizon Directories Corp are subsidiaries of Verizon Communications Incorporated and that the latter constitutes the holding company of the group.

10. With respect to the term of the contract, Clause 2 (b) of the agreement established a range between 48 months and 168 months, with the term of the agreement being conditional on the term of the agreement with ICE, given the nature of the agreement and the fact that Verizon had no other business in Costa Rica.

11. The problem that the plaintiff had with its plant and equipment was that they were obsolete and the production costs with those equipment units were higher; productivity was also lower during the printing time.

12. The claim made by the representative of the plaintiff that the contract with GTE was executed for a term of 168 months is false, because Clause 28 (b) established that the term

Digital signature of:
        RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6                                                                      RECEIVED NYSCEF: 10/26/2021

TRANSLATION

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 236 of 490

of Verizon's agreement with the plaintiff was subordinated to and dependent on the term of the agreement between Verizon and ICE, which was foreseeable and negotiated by the parties from the first contract executed by the plaintiff. Consequently, the termination of the agreement with the plaintiff was foreseen as valid grounds and agreed in advance by both parties in subsection (b) of Clause 28 of the Purchase Agreement.

13.   In any event, termination did not imply any liability for any of the parties, since the early termination of the agreement arose as a direct consequence of the deed or action of a third party, which in this particular case was ICE.

14.   It was assumed that the plaintiff did not depend on the existence of a single contract and that a company with the experience and national and international history of almost one hundred years maintained a variety of clients that guaranteed its solvency and the adequate management of finances and cash flows, to face its credit obligations in the face of any contingency.

15.   Clauses 24 and 28, which establish exemptions from civil contractual liability and limitation of civil contractual liability, specifically subsections b) and e) of Clause 28, were negotiated and accepted by the representative of the plaintiff company as a logical and reasonable matter for both parties, because the effectiveness of the agreement with the plaintiff depended on the effectiveness of the agreement with ICE and it was known by the plaintiff that Verizon had no other business in Costa Rica.

16.   The plaintiff did not in any way indicate that GTE Corporation had become Verizon Communications Inc.

17.   The plaintiff acknowledges that the execution of the agreement was maintained under normal conditions for nearly four years, which tells us that the agreement was executed within the range of 48 months established in section b) of Clause 2 - The Term.

18.   The plaintiff is seeking to mislead by stating that the agreement executed with Verizon is a subcontract of the contract executed between ICE and Verizon. This is not true and constitutes a legal aberration.

19.   The problem of the closing of operations of the plaintiff company was the immediate consequence of the poor management of the business.

Digital signature of:
    RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6

RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 237 of 490

**20.** GTE Corporation's joint guarantee to ICE cannot be presumed nor can it be assumed to be transferred for the benefit of third parties.

**IV.- Purpose of the proceedings:** Based on the statements made by the parties, both in their claims and in their arguments, the purpose of these proceedings is to determine the liability of the co-defendants, based on the facts established in the complaint, as well as the existence of the alleged damage.

*V.- Rationale of the Court.*

**V.I.- In particular regarding proven facts:** Therefore, and relevant to the resolution of the case, the following facts have been proven to this Court during the proceedings:

**a) Proven facts regarding the legal relationships between ICE and the codefendant companies:**

1. The plaintiff is a company with extensive experience in the production of telephone directories *(exhibits 1-4 of the plaintiff's evidence file).*

2. GTE (General Telephone Directory Company) has entered into agreements with Instituto Costarricense de Electricidad since 1975 for preparation of telephone directories in Costa Rica *(exhibit number 5 produced by the plaintiff, deposition of José Maria Quiros Alfaro).*

3. During this period, GTE engaged the plaintiff company as a subcontractor to print the telephone directories *(exhibit number 5 produced by the plaintiff).*

4. Instituto Costarricense de Electricidad conducted Public Bidding Proceedings 6378-T for *"Publishing of the Telephone Guide and Development and Implementation of Information Services" (exhibit 17 of the plaintiff's evidence file).*

5. These bidding terms provided that if a bidder was part of a business group or holding company, it must submit their financial statements, in which case the business group would be jointly and severally liable with the bidder for all contractual obligations *(exhibit 17 of the plaintiff's evidence file).*

6. On August 10, 1999, the GTE Consortium submitted a bid to participate in the Public Bidding Proceedings 6378-T *(exhibit 13 of the plaintiff's evidence file).*

7. On the tenth day of March 2000, Instituto Costarricense de Electricidad and the GTE

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 238 of 490

TRANSLATION

Consortium executed the *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* (exhibit 6 of the plaintiff's evidence file).

8. The *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* provided the following with regard to the possibility of subcontracting by the contractor: *"In accordance with Clause 2.13.1. of the bidding terms, GTE accepts that it may subcontract with the prior written approval of ICE up to 50% of the development, production, and distribution of the Telephone Directories, without this approval obliging ICE to be jointly and severally liable in the event of default by the subcontractor. Subcontracting shall not release GTE from its responsibility for the full performance of the contract"* (exhibit 6 of the plaintiff's evidence file).

9. The *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* provided the following with regard to the production of the telephone directories: *"In accordance with the experience of recent years, GTE has produced the all of the telephone directories for the Costa Rican territory, thus contributing to the growth of well-paid employment, professional training, and technology transfer for the benefit of Costa Rican citizens and the country's economy in general, which ICE considers to be in the general interest. Consequently, ICE requests and GTE accepts that during the performance of this contract, all stages and processes of production of the ICE Telephone Directory will be carried out by GTE in Costa Rica"* (exhibit 6 of the plaintiff's evidence file).

10. The *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* provided the following with regard to the contractor's name change: *"In the event that, due to a change in the law governing ICE, this entity were to change its name or GTE were to change its name as a result of a merger or partnership with another company, in both cases this contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented here"* (exhibit 6 of the plaintiff's

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6     RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 239 of 490

TRANSLATION

*evidence file).*

11.  GTE Information Service changed its name to Verizon Information Services Inc, GTE Directories Corporation changed its name to Verizon Directories Corp and General Telephone Directory Company C por A changed its name to Verizon Information Service Costa Rica, LLC *(exhibit 6, corresponding to numbered pages from page 3045 to 3022 of the plaintiff's evidence file's evidence file).*

12.  The legal representatives of Verizon Information Services, Inc., Verizon Directories Corp, and Verizon Information Services-Costa Rica, LLC accepted the rights and obligations under Bidding Proceedings No. 6378-T and the contract derived therefrom (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

13.  VERIZON Information Services - Costa Rica, LLC sent a note dated May 16, 2002, to the ICE Procurement Directorate, stating that "General Telephone Directory Company C por A'' had changed its name to Verizon Information Services Costa Rica, LLC, and requesting that the change in the name of the companies that made up the GTE Consortium be considered officially communicated (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

14.  GTE merged with the American firm Bell Atlantic and as a result of the merger, VERIZON GROUP was created, replacing GTE's corporate name with VERIZON GROUP (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

15.  VERIZON Information Services, Inc. and VERIZON Directories Corp, issued Statements of Continued Commitment to ICE, with respect to the rights and obligations set forth in the consortium agreement of August 9, 1999; in the bid submitted to ICE by GTE Consortium on August 26, 1999 and in the contract executed by and between ICE and GTE Consortium on March 10, 2000, obliging the two principal companies and VERIZON Information Services- Costa Rica, LLC (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

16. By means of official note DI-AA-875 dated December 13, 2000, the Unit of Authorizations and Approvals of the Division of Institutional Development of the Office of the Comptroller General of the Republic approved the *"Contract for Publishing of the*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*Telephone Guide and Development and Implementation of Information Services between ICE and GTE" (exhibit 6 of the plaintiff's evidence file).*

17.   In 2004, Verizon Information Services CR. proposed several adjustments to the contract executed for the publishing of telephone directories to ICE. In addition, on May 13 of that year, it proposed a review of their preparation. As a result, the Assistant Manager of Telecommunications of the entity, by means of official note 6000-41046-2004 of July 15, 2004, indicated that the 2005 guides should have the same structure and number of copies as the 2004 edition (exhibits 32, 33 and 34 of the plaintiff's evidence file).

18.   Through a note dated September 8, 2004, received at the Procurement Department on December 16 of that year, the Vice President of Verizon Information Services CR told the Assistant Manager of Communications of ICE that since no response was obtained to the note dated May 13 of the current year, the concept of tacit consent would be considered applied to the request (exhibits 32, 33 and 34 of the plaintiff's evidence file).

19.   By means of official note 6000-52278-2004 dated September 14, 2004, the Assistant Manager of Communications of ICE rejected the application of tacit consent, taking into account that by means of official note 6000-41046-2004 dated July 15, 2004, it was stated that the publishing of the 2005 guides had to be done using the same structure and number of copies as 2004, in answer to the proposal of May 13 of that year to review their preparation. In his answer, by means of note dated November 8, 2004, the Vice President of Verizon said that Assistant Manager that tacit consent operated *ipso iure* because there had been no answer within 30 business days. By means of official note 600-64540-2004 of November 18, 2004, he received an answer stating that the application of tacit consent was not admissible in that case as it was interpreted by the contractor (exhibits 35, 36 and 40 of the plaintiff's evidence file).

20.  Through official note SI-0726-11-04 dated November 15, 2004, the Head of the Information Services Process of ICE indicated to the General Manager of Verizon that it had not extended the validity of the performance bond requested since June 30, 2004, according to official note 6000-35344-2004, and that the structure of the Telephone Directory of the Metropolitan Area showed examples of non- compliance in disregard of

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                                                      RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 241 of 490

TRANSLATION

the indications in notes 6000-41046-2004 and 6000- 522678-2004 (exhibit 38 of the plaintiff's evidence file).

21.   On November 12, 2004, ICE ordered Notaries Public Leda Patricia Hernández Salazar and Attorney Ligia Picado Arguedas to draw up notarial records of the results of the visits they made to THS's industrial facilities, where it was noted that the telephone directories being prepared did not include the records of subscribers from the provinces and it was also noted that when printing the white residential pages of the Metropolitan Area Telephone Guide, only the San José records were used, excluding the subscribers from the Los Santos area and the provinces (exhibit 37 of the plaintiff's evidence file).

22.   By means of official note S.1.0730-11-04, Verizon was provided with the minutes of a meeting held with its officials, in which it was told that it was failing to comply with Clauses 3.1 and 3.4.1.3 of the Bidding Terms and Clause Two of the Contract (exhibit 39 of the plaintiff's evidence file).

23.   On November 18, 2004, by means of note 6000-64540-2004, the Assistant Manager of Telecommunications answered Verizon's note of the 8th of that month, stating again that it should maintain the format of the 2004 telephone directories (exhibit 40 of the plaintiff's evidence file).

24.   By means of a resolution adopted as set forth as Article 10 of the minutes of meeting 5649 held on November 23, 2004 of the Board of Directors of ICE, it was decided to tell the contractor that any intention to unilaterally amend the contractual conditions agreed upon was rejected (exhibits 41 and 42 of the plaintiff's evidence file).

25.   On December 2, 2004, during a visit made to the plaintiff's facilities, Notary Public Yaila Paola Sanchez drafted a notarial certificate stating that 103,000 copies of the residential white pages of the Metropolitan Area were printed and that the printing company had not received any type of order to modify the printing and binding process; rather, it was working with the purchase orders delivered by Verizon, which had not been modified by it (exhibit 44 of the plaintiff's evidence file).

26.   By means of official note SI-759-12-04 dated December 13, 2004, the company Verizon Information Services CR was asked to initiate a procedure for termination of the contract

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6      RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 242 of 490

TRANSLATION

because the company did not comply with the contract signed and the requirements of the entity (exhibit 45 of the plaintiff's evidence file).

27.  By means of official note 5225-69163-2004 of AEG-0572-2004 dated December 14, 2004, the procedure for termination of the contract was initiated (exhibit 46 of the plaintiff's evidence file).

28.  By means of official note 6000-27733-2005 of SGT-2326-2005 dated June 1,2005, the contract by and between ICE and Verizon Information Services Costa Rica LLC was terminated due to breach of contract by the latter. The above was confirmed by means of official note 0150-36359-2005 of GG-680-2005 dated July 8, 2005 of the General Management of the entity (exhibits 58 and 59 of the plaintiff's evidence file, testimony of José María Quirás Alfaro).

29.  By means of an arbitral award issued at 3 p.m. on December 4, 2015 in an arbitration proceeding initiated by ICE against Verizon Information Services Costa Rica LLC, the latter was ordered to pay different amounts because it had been demonstrated that there had been breach of contract by it (evidence for a better resolution produced by the plaintiff at the trial hearing, testimony of José María Quirós Alfaro).

30.  At all times, the contractual relationship and coordination for its implementation, as well as the respective payments, were made between ICE and Verizon Information Services Costa Rica LLC, exclusively (testimony of José María Quirós Alfaro).

31.  It was Verizon's choice not to continue negotiating for the development of telephone directories in the country *(deposition of José Maria Quirós Alfaro, former Manager of said company).*

**b)  Proven facts of relevance for the resolution of this case related to the relationship between the co-defendant companies and the plaintiff:**

1.  GTE entered into an "agency and mutual cooperation'' agreement with the plaintiff on May 8, 1997. Among the clauses of this Agreement, in Annex B, Section 5, it was established that GTE Information Services granted the plaintiff the status of "preferred vendor'' for Central America, including Panama and the Caribbean, defined in Annex 2 as a series of thirty-two (32) countries, including the Dominican Republic and Puerto Rico

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

(exhibit number 10 of the plaintiff's evidence file).

2. On January 21, 2000, GTE executed a new contract with the plaintiff company and also commissioned the latter to print and edit telephone directories, including those for Costa Rica and Belize (exhibit 11 of the plaintiff's evidence file).

3. The plaintiff and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC executed a contract, number VIS-2001-21-IP, entitled Master Purchase Agreement, which provided the following in Clause 2.b with regard to the term: *"This Agreement shall become effective only when the following two requirements have been met: (i) execution of this Agreement by the parties; (ii) execution of a contract by and between instituto Costarricense de Electricid ad (ICE) and the Purchaser, entered info as a result of a Purchaser's bid in public bidding proceedings 6378-T. At the time the foregoing requirements have been met, the effective date (the "Effective Date") of this Agreement shall be from the time of execution of the agreement identified in subsection (ii) of this Section 2 (a)..."* (exhibit 19 of the plaintiff's evidence file).

4. This agreement, number VIS-2001-21-IP, entitled Master Purchase Agreement, executed by and between Instituto Costarricense de Electricidad and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC, provided the following with regard to its termination: *"28. TERMINATION, (a) The Purchaser may terminate this Agreement by giving the Seller at least (90) days written notice of such termination if the parties cannot agree on any price revisions under this Agreement, any amendments to this Agreement pursuant to Section 28 (c) above, or the price for new options or specifications that the Purchaser may require, regardless of whether such new options or specifications are within the current capacity of the Seller. (b) The Purchaser may terminate this Agreement immediately at any time if during the Term of the Agreement, the Agreement between the Purchaser and ICE described in Section 2, Term is terminated for any reason..."* (exhibit 19 of the plaintiff's evidence file).

5. This agreement, number VIS-2001-21-IP, entitled Master Purchase Agreement, executed by and between Instituto Costarricense de Electricidad and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC,

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 244 of 490

RECEIVED NYSCEF: 10/26/2021

TRANSLATION

was governed by the Civil Code and by the Commercial Code of Costa Rica *(Clause 35, exhibit 19 of the plaintiff's evidence file).*

6. This agreement, number VIS-2001-21-IP, entitled Master Purchase Agreement, executed by and between Instituto Costarricense de Electricidad and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC, involved the preparation of telephone directories in Costa Rica and Belize *(Annex A, exhibit 19 of the plaintiff's evidence file).*

7. This Master Agreement was executed for a maximum term of 168 months (Clause 2.b of the Agreement), to produce, package and distribute the telephone directories, in accordance with the contract executed between the GTE Consortium and ICE *(exhibit 19 of the plaintiff's evidence file).*

8. On October 15, 1999, the President of GTE Directories International proposed terms to be agreed upon for the preparation of telephone directories for the Dominican Republic *(exhibit 22 of the plaintiff's evidence file).*

9. On October 14, 2004, the plaintiff and Verizon Information Services - Costa Rica- LLC signed the "Production Schedule, 2005 Provinces Guide," which establishes the conditions for the preparation of the books corresponding to that particular guide. This schedule establishes December 15, 2004 as the deadline for modifying the number of pages and the number of books (exhibit number 28 of the plaintiff's evidence file).

10. That by means of a note dated September 2, 2005, the General Manager of Verizon Information Services-Costa Rica LLC informed the plaintiff that it is terminating the contractual relationship originated in the respective Master Agreement (exhibit number 68 of the plaintiff's evidence file).

11. That in the aforementioned note, the General Manager of Verizon in Costa Rica told the plaintiff company that. *". iCE disrespected the contractual and legally established rights of my company and proceeded to initiate administrative proceedings for the termination of the contract, using public means to distort the reality of the facts"* (exhibit number 68 of the plaintiff's evidence file).

12. The company Verizon Information Services- Costa Rica LLC asked the plaintiff

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 245 of 490

TRANSLATION

company to modernize its equipment to deal with technological changes and contractors' requirements (testimonies of José María Quirós Alfaro and Guillermo Navarro Céspedes, exhibits 10 and 24 of the plaintiff's evidence file)

13. Ms. MARIANNE DROST, a U.S. citizen, granted powers of attorney and acted in her capacity as Corporate Secretary of the companies VERIZON COMMUNICATIONS INC. and VERIZON INFORMATION SERVICES-COSTA RICA, LLC (pages 1183 to 1188 of the Court records).

### c) Proven facts in connection with the existence of the damages claimed:

1. On February 25 and 26, 1999, Mr. Bruce Wataru visited the facilities of the plaintiff and made a series of observations regarding the company's facilities and equipment (exhibit 10 of the plaintiff's evidence file)

2. On November 15, 1999, a meeting was held between Mr. Alvaro and Alonso Trejos Fonseca and Mr. Guillermo Navarro, then President, Vice President and Production Manager of **THS,** respectively, with the Printing Director of GTE Directories International for the purpose of 1) evaluating the progress made on the plant improvement project; 2) assisting in developing a formal project to closely monitor the new plant project; 3) agreeing on a contingency plan in the event that THS does not comply with the installation dates of the new equipment and plant, which consisted of engaging another plant in the United States, in particular, if the equipment was not acquired on time; 4) evaluation of the potential purchase of the equipment, with the specific assistance of the consultant recommended by GTE, Mr. Bill Snell (exhibit 24 of the evidence of the plaintiff).

3. That in February 2000, the company acquired a modern Heidelberg rotary machine, a binding line and a pre-press equipment called CTP or Direct to Plate together with all the electrical and mechanical installations of the new plant. This was done to meet the requirements of Mr. Wataru and the provision (j) of Clause 16 of the Master Purchase Agreement. The purchase of the Rotary Machine and all the accessory equipment of the Heidelberg brand were at a cost of C.955,116,741.00 (exhibits 10, 19 and 20 of the plaintiff's evidence file).

4. In response to the requirements of Mr. Wataru, the plaintiff rented two industrial

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

warehouses in the Zeta Free Zone, in Guadalupe de Cartago, owned by INMOBILIARIA ZOROASTER S.A., with all its equipment, offices and warehouse, according to the contract executed with the owner on the first of July, two thousand and four (testimony of Guillermo Navarro Céspedes, exhibit 21, plaintiff's evidence file).

5. On July 15, 2004, using stationery of Compañia General de Directorios C. por. A, with offices in San José, Costa Rica, a subsidiary of GTE Corporation, as stated in the same document, the contractor consortium of the Verizon Group processed purchase order 4568 for the printing of the Telephone Directories for the Metropolitan Area for a total amount of $3,033,625.60, and on August 20, 2004, purchase order 4582 was issued for the amount of $2,134,503 for the printing of Telephone Directories for the Provinces, for a total amount of $5,168,128.00 for the 2005 Directories. The purchase orders indicated in the previous Fact were replaced by Verizon by order number 4612 of November 3, 2004, regarding the Telephone Directories for the Metropolitan Area for a total amount of $ 2,120,828 and by order number 4644 of December 17, 2004 for the Provincial Guides, in the amount of $ 1,254,023, for a total sum of $ 3,374,851; that is, an extemporaneous decrease of $ 1,793,277 (exhibit 30 of the plaintiff's evidence file).

6. The last purchase orders meant a reduction in the number of pages of the telephone directories and the number of books, as well as a different conformation and composition of the directories than had been agreed upon by GTE in its contract with ICE (exhibit 30 of the plaintiff's evidence file)

7. Due to the lack of payment of the obligations acquired for the machinery, the creditor-initiated pledge enforcement proceedings as case number 06-001956- 0640-CI, in the Civil Court of Major Pleas of Cartago. At 12:30 a.m. on June 6, 2007, the auction of the pledged equipment was carried out; and by resolution issued at 9:23 a.m. on August 19, 2007, the order was given to place HEIDELBERG PRINT FINANCE AMERICAS INC., the auctioneer, in possession of the equipment, which was executed at 24:00 p.m. on October 31, 2007 (exhibit 69 of the plaintiff's evidence file).

8. The plaintiff was forced to incur in arrears with the payments of the rents for the lease of the industrial warehouses of Inmobiliaria Zoroaster S.A.; for this reason, a public

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 247 of 490

TRANSLATION

document was executed. It was number 144, starting on page 133 reverse of volume one of the Protocol of Notary LAURA MONICA ZAMORA ULLOA, issued at 12:00 noon of March 23, 2006, according to which the plaintiff undertook to pay up to the sum of TWO HUNDRED THOUSAND TWO HUNDRED AND TWENTY-THREE DOLLARS AND SEVENTY-FIVE CENTS (US$ 200,223.75), providing the following in Clause Two of said document: ."... *TWO. Debt Substitution. This debt replaces the overdue monthly payments of rent owed by the Debtor - (TREJOS HERMANOS SUCESORES)- covering the months from July, two thousand and five, to and including March, two thousand and six, at a rate of nine months of monthly payments of rent, under the lease executed by and between Creditor and Debtor, dated the first day of July, two thousand and four. Such lease was for the property of the Creditor, with real estate registration number three - one nine zero eight seven three - zero zero zero and number three - one nine five eight nine eight - zero zero zero, which is expressly accepted by the Creditor.*" ...Likewise, interest was established, to be paid in monthly installments of twenty-two thousand two hundred and forty-seven dollars and eighty-three cents until the obligation is paid in full (exhibit 70 of the plaintiff's evidence file).

9.   In view of the failure to comply with the agreement, Inmobiliaria Zoroaster S.A. initiated simple proceedings for collection before the Civil Court of Major Pleas of Cartago, as execution proceeding case number 06-001846-0640-CI. Such proceedings ended with a judgment that admitted the defense of partial payment and ordered the plaintiff to pay fifty-six thousand one hundred and eight dollars and ten cents (US$156,108.10) [Note of Translator: different amount in letters and numbers in the original document] (exhibit 71 of the evidence).

10. The plaintiff sold, under very unfavorable conditions, virtually all of its assets in equipment and improvements in the Lessor's buildings to the Colombian capital company CONDOR EDITORES DE COSTA RICA, S.A., which agreed with Inmobiliaria Zoroaster S.A. to lease the industrial facilities in the Zeta Free Zone of Cartago, and acquired the equipment auctioned by HEIDELBERG PRINT FINANCE AMERICAS INC., under favorable conditions and already installed in said industrial facilities, as well as the rest of the THS equipment pledged to Banco Nacional de Costa Rica and Banco Interfin (exhibit 73 of the plaintiff's evidence

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

file).

11.  The plaintiff reached an agreement with Inmobiliaria Zoroaster S.A., dated March 28, 2007, entitled "Lease Termination and Debt Recognition Agreement," according to which it delivered the industrial building where the rotary machine and the remaining printing equipment were located, since the other building where the offices and warehouse were located had already been handed over. Both parties released each other from liability, but also stated that Inmobiliaria Zoroaster S.A. acknowledged receipt of two payments up to that date (which had not been possible to demonstrate in the eviction proceedings), for a total amount of fifty-five thousand U.S. dollars, and also that it had the security deposit for an amount of thirty-nine thousand dollars, all of which was expressly authorized by the plaintiff to be applied by Inmobiliaria Zoroaster S.A. to the total debt. Independently of the fact that said Court proceedings could continue, the plaintiff undertook to pay the total due, to be determined in a timely manner, once these deductions have been made, together with the agreed interest and costs, until they are effectively paid, within a peremptory term. Both parties acknowledged that there is an express instruction in the "Trejos Hermanos-Fiduciaria Castro Garnier Trust," whereby what is due to Inmobiliaria Zoroaster S.A. must be paid, as soon as the plaintiff receives the payment of amounts owed to it for different pending business, such as, an outstanding debt of Radiográfica Costarricense, S.A. (exhibit 74 of the plaintiff's evidence file).

12. The plaintiff leased with a purchase option to DACONDOR Q.C.R. SOCIEDAD ANÓNIMA, which then, on May 29, 2007, assigned its rights to the aforesaid CONDOR EDITORES DE COSTA RICA, S.A. over the remaining industrial assets of the company, for a fraction of the liabilities, both with Transamerica Bank & Trust Co. (a subsidiary of Banco Interfin), with Banco Nacional de Costa Rica and with Banco Improsa S.A. In the specific case of Transamerica Bank & Trust Co. Ud., those liabilities correspond to a line of credit that was granted to it, based on the excellent perspectives that it had, and after conducting bank studies which analyzed the contracts signed with Verizon, for the preparation of the telephone directories of the Dominican Republic and Costa Rica (exhibit 75 of the plaintiff's evidence file).

Digital signature of:
    RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6     RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 249 of 490

TRANSLATION

13. That following termination of the Master Agreement with the co-defendants, the plaintiff enforced an agreement with RACSA (deposition of Guillermo Navarro Céspedes and exhibit 74 of the plaintiff's evidence file, mentioning an outstanding debt of RACSA)

14. The estimated damages to the plaintiff as the result of the malicious breach of the Master Agreement are as follows:

| | |
|---|---|
| a) Investment in machinery | $2,582,156 |
| b) Increase in inventories | $ 2,860,696 |
| c) Operating Cash Flows not received 2004-20 J 3 Directories in Costa Rica | $ 8,806,872 |
| d) Operating Cash Flows not received 2004-20 i 3 Directories in the Dominican Republic | $7,912,999 |
| e) Losses incurred from 2004 to 2007 | $ 7,237,068, less the contract with RACSA, S.A., which would have been performed during that period |
| f) Interest paid by THS | $ 983,825 |
| g) Interruption of Operations | $28,885,195 |

(Exhibit 77 of the plaintiff's evidence file, an economic and financial report prepared by Mr. Tomás Evans Salazar and an expert report by Ramón Humberto Romero Rodríguez, Certified Public Accountant and Mathematical Actuary Expert, visible on pages 947 to 957 of the Court records).

**d)  Other proven facts of relevance to this case:**

1. That the Board of Directors of ICE arranged for the preparation of telephone directories for 2006 with RACSA (exhibits 63, 65 and 66 of the plaintiff's evidence file).

2. That as a preventive measure in light of Verizon's failure to comply, ICE resolved to waive the 113-information service fee (exhibit 61 of the plaintiff's evidence file).

**V.II- Specifically in regard to non-proven facts:** Of this nature, and of importance for the resolution of the case, the following facts have not been demonstrated to this Court during the proceedings:

a) That ICE has participated at some point in the process of approving the plaintiff's contracting, carried out by the co-defendant companies (no evidence on record and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                                                    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 250 of 490

TRANSLATION

the deposition of witness Roger Echeverría Coto was limited to a generic statement that ICE approved subcontracting, but not stating specifically that the agreement by and between Trejos Hermanos Sucesores and the co-defendants) had been approved.

b)  That the clauses exempting from civil liability contained in the master agreement executed by the plaintiff and other contractual contents have been imposed by the latter in an adhesion agreement and that the plaintiff was not in a position to modify in any way the contractual contents pre-established by Verizon Information Services - Costa Rica- LLC (no evidence of this was provided for the record).

c)  That there have been significant arrears in the plaintiff's obligations towards the Costa Rican Social Security Fund and other public entities (no evidence of this was provided for the record).

d)  That the plaintiff has conducted other business with the machinery and facilities acquired and leased for the production of telephone directories (no evidence of this was provided for the record).

e)  That the damages claimed are attributable to the plaintiff, to the defendant entity (no evidence).

f)  That the plaintiff has made investment errors due to poor business management (no evidence).

g)  That the master agreement executed has contemplated the preparation of telephone directories in the Dominican Republic (no evidence).

h)  That the plaintiff has suffered non-economic damages (no evidence).

**V.III. - On the lack of jurisdiction reiterated at the trial hearing:** As a significant part of its arguments, the representative of Verizon Information Services Costa Rica LLC reiterated allegations that in this case, the Trial Court is prevented from deciding on the merits given the lack of jurisdiction on its part. In this order of ideas, it claims the existence of errors and omissions on the part of the First Chamber of the Supreme Court of Justice at the time of defining jurisdiction and indicates that it limited itself to determining the existence of a public entity in the proceedings, without evaluating the substantive claims. In this regard, in an oral hearing the attorney was expressly told that the jurisdiction of this Court was

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

defined by vote 000874-C-S1-2009 issued at 11:15 a.m. on the twenty-fifth day of August, two thousand nine, by the First Chamber of the Supreme Court of Justice, and therefore any discussion on this matter is duly precluded. Given the above, it pointless and unnecessary to elaborate on this argument of the defendants' defense.

**V.IV.- Regarding the motion filed to dismiss based on the statute of limitations: a)** In its closing arguments, the representative of co-defendant Verizon Communications Inc. invoked the application of Article 984 of the Commercial Code, which provides: *"ARTICLE 984.- Except as expressly provided for in other chapters of this Code, all rights and their respective actions shall expire in four years, with the following exceptions, which shall expire in one year: a) The actions of nullity of the resolutions adopted by shareholders' meetings or boards of directors of business companies; those of claims for defects of things sold under a warranty of good operation; and those of responsibility of administrators, managers, directors and other members of the management of companies; b) Actions to collect interest, rent or leases; c) The actions of entrepreneurs to collect the value of the works they performed on a piecework basis; d) Actions to collect the use of any other rights in personal property; and e) Actions derived from wholesale and retail sales to other merchants or to the consumer directly,"* **b)** The representatives of the plaintiff made two arguments against this defense, as follows: 1. The possibility of raising this defense has expired. 2. We are not dealing with the requirements of Article 984 of the Commercial Code for one year, but for 4 years for the filing of the complaint, **c)** Court's criterion: According to a reading of the claims, it is noted that the plaintiff requests payment of the damages caused by the breach of contract by the co-defendant companies and entity, which it considered to be malicious. In view of the above, this Court considers that in this case, the statute of limitations is 4 years. Therefore, the Court affirms that by means of note dated September 2, 2005, the General Manager of Verizon Information Services- Costa Rica LLC informed the plaintiff that it was terminating the contractual relationship originated from the respective master agreement, and the complaint was filed on December 15, 2008. The complaint was served on the representative of Verizon Information Services Costa Rica LLC on January 28, 2009, and on March 18, 2009 on the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6     Case 1:21-cv-08928     Document 1-1     Filed 11/01/21     Page 252 of 490     RECEIVED NYSCEF: 10/26/2021

TRANSLATION

representative of Verizon Communications Inc. Consequently, this Court considers that it is appropriate to reject the defense submitted, given that the complaint was served within the four-year term established in the statute of limitations. Additionally, the plaintiff is advised that in accordance with Article 67.1 of the Code of Contentious Administrative Procedure, the possibility of presenting this defense had not expired, given that the co-defendant filed it before the end of the trial hearing.

**V.V.-Determination of the existence of liability of Instituto Costarricense de Electricidad: a)** The representatives of the plaintiff base their arguments regarding ICE's liability on the following basic claims: **1)** A complex contractual relationship exists between and among ICE, the co-defendants, and the plaintiff company, in which the different agreements are interconnected to achieve a financial result, and where the final result requires the involvement of each party. **2)** ICE's approval of the Master Printing Agreement involved it with the parties to the agreement. **3)** When this entity terminated its contract with the contractor, it was still required to provide the respective public service, and even though it knew that there was a company that produced the telephone directories, it interacted only with the Verizon group, not involving the plaintiff. **4)** The contractual mechanism used by ICE for the preparation and distribution of telephone directories was not the correct one, given that we are in the presence of a public service. **5)** Upon the termination of the contract between the GTE Consortium and ICE, this Public Entity should have adopted the necessary preventive measures, in order that the public service of information to the public through Telephone Directories would not be seriously affected, nor would the classic principles of the concept, such as equality, continuity and adaptability, be violated. **6)** The damages suffered by the plaintiff for the objective breach of its contract with GTE (VERIZON) were caused by the actions of ICE, which terminated its contract with GTE (VERIZON), without respecting the lawful interests that THS had in that contract, thus violating the principle of *Neminem iaedere* - not to harm others-, **b.** The representatives of the defendant entity base their arguments supporting their answer to the plaintiff on the following basic claims: **1.** The preparation of telephone directories is not a public service. **2.** The agreement between the plaintiff and the co-defendants is a private contract that

Digital signature of:
       RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 253 of 490    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

is not governed by public service principles. Consequently, the plaintiff should not be consulted about termination of the contract between ICE and the co-defendants. **3.** The contractual relationship of the plaintiff company was with the co-defendants, who opted to subcontract with it, in accordance with the powers allowed by the Administrative Contracting Law. **4.** The investments made by the plaintiff company were not only to satisfy the needs of ICE but also to provide services in other parts of the region. **5.** The bidding terms required printing the guides in Costa Rica, but not at the plaintiff's facilities. **6.** The contract with the codefendant companies was terminated for reasons of public interest, since they unilaterally decided to restructure the 2005 guide, thus breaching the clauses of the contract. **7.** ICE's knowledge of the relationship between the co-defendants and the plaintiff was based on the fact that the latter was a simple subcontractor of the former. **8.** In the case under study we are not in the presence of a complex contractual relationship, since we have an administrative contract, characterized by the existence of exorbitant clauses. **9.** ICE is not responsible for machinery acquired by the plaintiff to produce the telephone directories of the Dominican Republic, **c) This Court will now proceed to the detailed analysis of each argument**: 1.- Regarding the first core argument expressed by the plaintiff: After analyzing the arguments made by the parties and the evidence collected in the proceedings, this Court considers that the plaintiff is not correct in alleging the existence of a complex contractual relationship between the plaintiff and Instituto Costarricense de Electricidad. This is because in the case under examination we are dealing with two different and defined legal relationships; the <u>first</u> one is characteristic of public law, namely, the link between the entity and Verizon Information Services Costa Rica LLC, and the <u>second is</u> a relationship characteristic of private law, between the latter company and Trejos Hermanos Sucesores S.A. As a result, this Court considers that the analysis to be carried out must be made in a differentiated manner, taking into account the nature of both legal relationships. The plaintiff is a company subcontracted by Verizon Information Services Costa Rica LLC. This does not result in any contractual obligation of ICE towards Trejos Hermanos Sucesores S.A. In the record, it has been demonstrated that Instituto Costarricense de Electricidad conducted Public Bidding Proceedings 6378-T for

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

*"Publishing of the Telephone Guide and Development and Implementation of Information Services,"* and on August 10, 1999, the GTE Consortium submitted a bid to participate in said Public Bidding Proceedings 6378-T. Since it became the successful bidder, on the tenth day of March, 2000, Instituto Costarricense de Electricidad and GTE Consortium executed the *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE."* This agreement provided the following regarding the possibility of subcontracting by the contractor company: *"In accordance with Clause 2.13.1. of the bidding terms, GTE accepts that it may subcontract with the prior written approval of ICE for up to 50% of the development, production, and distribution of the Telephone Directories, without this approval obliging ICE to be jointly and severally liable in the event of default by the subcontractor. Subcontracting shall not release GTE from its responsibility for the full performance of the contract."* This provision has to be analyzed in accordance with the provisions of another clause of the contract, which established the following: *"In accordance with the experience of recent years, GTE has produced the entire telephone directory for the Costa Rican territory, thus contributing to the growth of well-paid employment, professional training, and technology transfer for the benefit of Costa Rican citizens and the country's economy in general, which ICE considers to be in the general interest. Consequently, ICE requests and GTE accepts that during the performance of this contract, all stages and processes of production of the ICE Telephone Directory will be carried out by GTE in Costa Rica."* As noted on record, and given the existence of a long-term relationship, the plaintiff and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC executed an agreement, number VIS-2001-21-IP, called Master Purchase Agreement, which provided the following with regard to its term: *"This Agreement shall become effective only when the following two requirements have been met: (i) execution of this Agreement by the parties; (ii) execution of a contract by and between instituto Costarricense de Electricidal (ICE) and the Purchaser, entered into as a result of a Purchaser's bid in public bidding proceedings 6378-T. At the time the foregoing requirements have been met, the effective date (the "Effective Date") of this Agreement*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

shall be from the time of execution of the agreement identified in subsection (ii) of this Section 2 (a)..." On the other hand, this private agreement was governed by the Civil Code and the Commercial Code of Costa Rica (see Clause 35, exhibit 19 of the plaintiff's evidence file) and was executed, in principle, for the preparation of telephone directories in Costa Rica and Belize. Consequently, we are in the presence of a subcontracting carried out by these companies with the plaintiff, in order that they could fully perform the contract arising from said public bidding proceedings 6378-T. The fact remains that although the original contractual relationship of ICE was with GTE, it was subsequently modified, so that the role of contractor was occupied at the time of the events that are the subject matter of these proceedings by the economic interest group Verizon, as will be explained later. In accordance with the above, it should be noted that there is no direct link between ICE and the plaintiff, nor is it feasible to assume the existence of a complex contractual relationship, typical of private law. For such purposes, this Court must distinguish between the latter modality and subcontracting in administrative law. In the case of the so-called **complex legal relationship**, this Court considers that we are in the presence of different parties that concur to the fulfillment of a common business object, so that all the actions carried out by the contractual complex must be oriented to that end. As a result, even though the parties are not necessarily direct contracting parties, all directly linked to each other, they do have reciprocal knowledge of their participation in the contracted material activity, which is necessary within the complex relationship developed, and if one of them does not fulfill its obligations to the others, it is required to compensate, to indemnify, for the unlawful damages caused by its breach. There is then full awareness of the contractual link between one and the other and of the consequences of the participation and of the failure to comply with the obligations directed to this common purpose. As we can see, in these cases, the starting point is a first-degree relationship between the participants, where the contributions may be different and have a greater impact on the business object, but always maintaining a complementarity between and among them. In the case of this first assumption, characteristics such as: a) The union on a factual level of different contracts according to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the will of the interested parties and the unity of the end pursued; b) The existence of a social economic function and specific purposes that the different parties in the relationship seek to achieve; c) The existence of a social control by one or more parties is noted; d) The whole is considered as a legally organic unit and, therefore, interrelated, so it must start from the essential content of the contractual framework, at the time of the analysis of any eventuality that it faces. As we can see, we are in the presence of a contractual framework, in which contracts can have their own cause, but respond to a common purpose and there is a balance of benefits among them, which cannot be unreasonably broken by one of the parties without the duty to indemnify. This is because a systemic social relationship emerges between the parties from which reciprocal duties arise aimed at protecting the sphere of shared interests. From this relationship resulting duties arise of diligence, good faith, loyalty, compliance with main and accessory obligations, among others, and the framework of the will of the parties is oriented towards them, with full awareness of the functioning of the network and its operation. We are therefore in the presence of non-linear relationships, in the sense that this does not translate into a mere duty to provide services in exchange for the existence of a consideration, but rather to a relationship of a global nature that may include various legal ties and situations oriented towards the same business purpose. In the case under analysis, we note how the judgment of reproach made by the plaintiff is aimed at presuming the breach of an obligation derived from its theory regarding the existence of a contractual relationship, which is the duty to preserve the integrity and assets of the parties (interest of protection) and which translates into an obligation of warning and one of conservation. However, the situation of **subcontracting** is different, as it arises when one of the parties in a basically binary contractual relationship turns to third parties to obtain goods or services that are necessary to fulfill the primary contractual obligations. In this situation, there is a first level relationship in the initial contract, in which one of the parties, at its own risk and in an exclusive way according to its will, goes on to establish one or several second level contractual relationships with subcontractors, which have the means for the contractor to fulfill its obligation. Consequently, we are in the presence of a main contract and a secondary

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 257 of 490

TRANSLATION

contract signed by one of the parties, for the performance of some of the services that are, in turn, the object of the main contract or that contribute at least to its fulfillment. It is clear then that subcontracting arises because of the specialization of business organizations and the material impossibility for a contractor to have at its disposal all the goods and services necessary for the fulfillment of the main obligation. Therefore, subcontracting operates at different levels and while it is true that the proper performance of the main contract depends on the good operation of the subcontracting, it cannot be seen as a framework, given the *instrumental* nature of the latter for the contract executed by the contractor. Thus, the destination of the secondary contract or the one originated with the subcontracting must not have a direct legal or factual consequence in the performance of the main contract; that is, the breach of the subcontractor does not release the contractor from complying in time and form with the terms and conditions of the main contract. Conversely, the contractor's failure to comply does not obligate or bind its subcontractors, so the contractor, or in this case the Administration, may hold liable only the principal, given that this is the contractual relationship it acquired; the above is in accordance with the provisions of the *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE,"* which provided the following concerning the possibility of a contractor to subcontract: *"in accordance with Clause 2.13.1. of the bidding terms, GTE accepts that it may subcontract with the prior written approval of ICE up to 50% of the development, production, and distribution of the Telephone Directories, without this approval obliging ICE to be jointly and severally liable in the event of default by the subcontractor. Subcontracting shall not release GTE from its responsibility for the full performance of the contract."* From the foregoing, it is evident that a contract arising from a subcontract or secondary contract is derived from or dependent on a previous primary contract, which is not exhausted by the former and exceeds the scope of the secondary contract, since it is a differentiated and distinguishable contractual relationship. Consequently, it is not possible to presume joint and several liability of the Administration as a contractor towards the subcontractor in events of default of the contractor, much less a legal relationship that is even more

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 258 of 490

TRANSLATION

complex beyond this second level linkage, where between the contracting party and the subcontractor, there is no direct linkage, but the contractor will always be involved, as responsible for the fulfillment of the contractual object. However, since in the contracting party and contractor relationship, the Administration may impose certain obligations on the latter referring to the public interest or to compliance with the law. This is because both applicable public order regulations and by the very existence of the exorbitant clauses and the very nature of the contractual object must be considered. In the case in question, Verizon Information Services Costa Rica LLC subcontracted with the plaintiff company. In addition to the fact that the guides had to be prepared in the national territory, it demonstrated a high degree of expertise in the subject, a long contractual relationship prior to the contract subject matter of this resolution, and the existence of a contractual recognition of the possibility that the contracting company could resort to this modality in order to comply with its contractual obligations. Consequently, the plaintiff is not correct in indicating a legal relationship other than subcontracting, nor has it demonstrated that in the case under analysis there was a relationship different from that established in the bidding terms, or that Trejos Hermanos Sucesores did not have a second-tier relationship, or that it was part of a contractual arrangement that allowed the presumption of the existence of a complex contractual relationship. On the contrary, the evidence provided by the plaintiff itself shows that its relationship is secondary to ICE and that there was full knowledge of such relationship. Even the testimonies of the witnesses Quirós Alfaro and Navarro Céspedes offered by the plaintiff confirm that there was no direct relationship between the entity and the plaintiff, so, it is not possible to assume a relationship beyond the one that has been demonstrated; that is, the one that the entity had with the Verizon Group. Additionally, we must not forget that we are in the presence of an administrative contracting of a public entity - state-owned company, so we consider it incorrect to allow a private law concept to prevail over a mechanism established to achieve public purposes, such as subcontracting. Although we are aware that the Administrative Contracting Law of that time established the subcontracting of contracts for the performance or construction of public works, the truth is that the possibility of using such

Digital signature of:
    RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
    MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 259 of 490

TRANSLATION

mechanism in other contractual modalities was opened up through administrative and jurisdictional jurisprudence, until we obtained the current wording of the regulations that expressly allows this mechanism for other types of administrative contracts. **Conclusion:** In accordance with the foregoing reasoning foregoing reasoning, it is appropriate to reject this first argument of the plaintiff. **2.-** The plaintiff claims that ICE's approval of the Master Printing Agreement involved it with the parties to the agreement. In this respect, this Court considers that first, there is no evidence that the entity has participated in the prior or post approval of such contract, given that the witness offered for such purpose said that he did not remember having issued any approval of the contract, nor is such a manifestation of will show by the agreement signed by the plaintiff. On the other hand, stating that the contract was approved is not the same thing as stating that the subcontractor modality was approved. This is because in accordance with the contractual text, ICE approved the possibility of subcontracting and the subcontractor in particular, but not the specific agreements of the contractor with the subcontractor. In this sense, we must not forget that we have a contract with a public company, a state entity, in which the obligation is permeated by the legal system itself and the public interest. Therefore, the imposition of the prior approval of the subcontractor mechanism is reasonable as indicated, since the Administration uses this mechanism to prevent the subcontractor from being subject to prohibitions or disqualified, among other aspects. Therefore, it is logical, as has been stated, that the activity of subcontracting is regulated by rules of a public nature that limit some aspects of the autonomy of the will of the parties, but this does not in any way imply that the legal nature of the relationship is blurred beyond its scope to the detriment of the contracting party and the public interest. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **3.-** In addition, the plaintiff indicates that this is a public service, so any contract executed in this area is covered by that legal nature. It invokes the application of a criterion of the Attorney General's Office. Therefore, this indicates that upon termination by the entity of its contract with the contractor, it was required to continue providing the respective public service. Even though it knew there was a company that prepared the telephone directories, it only

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

interacted with the Verizon group, without involving the plaintiff. In this regard, this Court considers that the plaintiff's arguments are not correct. In the first place, this Court considers that in the case under analysis, we are not dealing with a public service. In this regard, Article 3 of Law No. 7593 of August 9, 1996, defines public service as follows: "*a) Public Service: a service which, due to its importance for the sustainable development of the country, is defined as such by the Legislative Assembly, in order to subject it to the provisions of this law.*" In this regard, we note that the rule leaves it up to the lawmaker to classify an economic activity in a given historical moment as a public service. This declaration or "*publicatio*" has been recognized by the Constitutional Court Division in the following manner: "*For example, Article 3 of the Public Services Regulatory Authority Law contains several definitions, including the definition of public service as every activity which, due to its importance for the sustainable development of the country, is defined as such by the Legislative Assembly, in order to subject if to the provisions of this law. As can be seen, the determination of whether a need is in the public interest is not a legal question, but one of fact and circumstance, which requires - as already stated - a judgment of opportunity and convenience. There are no activities that by their 'nature' or imperatives of Constitutional Law are typical of public service: instead, that will depend on each company, its needs and the environment - private or public - in which these needs are best met*" (Vote No. 517-98 issued at 2:32 p.m. on August 26, 1998). Emphasis added. In this vein, this Court notes that Article 2 of Decree Law 449 of April 8, 1949 did not determine that telephone directories could be considered a public service, and in this regard, it ruled "*Article 2 - The aims of this Institute, towards which all its efforts and work programs are directed, shall be as follows: ..h) To seek the establishment, improvement, extension and operation of telephone, telegraphic, radiotelegraphic and radiotelephonic communication services, for which it shall have the appropriate concession for an indefinite period.*" Neither is it noted that the Public Services Regulatory Authority Law, Law No. 7593, of August 9, 1996, has considered the preparation of the guides as such, so any extensive interpretation is inappropriate if the will of the lawmaker is not expressly noted in this regard. In any case, based on the allegations of the plaintiff, this does not mean that

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

any subcontractors of a contractor company should be considered as being governed by an extensive public law relationship between the entity and them, given that their contractual relationship is not with the former, but with the company that would be the provider and that engages them. On the other hand, it should be noted, as additional reasoning that leads to the rejection of this argument, that the preparation per se of telephone directories does not meet the conditions to be considered a public service. In this sense, a public service is one that has certain characteristics, such as: a) it is an essential activity of general interest, b) the demand for it is captive and therefore implies profit, c) there is the "*publicatio*" by the lawmaker, d) a third party could not pretend to exploit the service without an enabling act of the Administration, taking into account that the Administration is the owner of the service, e) the concessionaire does not exercise fundamental powers, f) the Administration maintains control and accountability over the service. With regard to the above, Article 4 of the General Law of Public Administration applies, as follows: "*The activity of public entities must be subject, as a whole, to the fundamental principles of public service, in order to ensure its continuity, efficiency, adaptability to any change in the legal system or in the social need they satisfy, and equality in the treatment of recipients or beneficiaries.*" In the case in question, this Court considers that the preparation of telephone directories is one more means for the fulfillment of public service; it is an instrument, but not this latter concept itself. Consequently, in no way can making the guides be considered a public service and any extensive interpretation intended to give it such a character is erroneous and contrary to law. **Conclusion**: In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **4)** The plaintiff claims that the contractual mechanism used by ICE for the preparation and distribution of telephone directories was not the correct one, given that we are in the presence of a public service. In this respect, the considerations made above should be applied, since in the opinion of this Court, in the case of the contractual object, we are not in the presence of a public service as such, and in any case, if there had been an erroneous administrative contracting procedure, what was appropriate was to apply the figure of irregular contracting - which, as has been

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

said, is not the situation under analysis - but without this implying any contractual or even noncontractual obligation, with the subcontractor. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **5)** The plaintiff also claims that when the contract between the GTE Consortium and ICE was terminated, this Public Entity should have adopted the necessary preventive measures so that the public service of information to the public by means of telephone directories was not seriously affected, and to ensure that the classic principles of the figure, such as equality, continuity, and adaptability, were not violated. In this regard, we see in the case record that the entity adopted measures against the breach of contract with Verizon Information Services Costa Rica LLC, although in any case, there was no contractual link or rule that forced the entity to engage the plaintiff in a contingent manner. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **6.** This Court considers that we are also not in the presence of extra contractual civil liability, insofar as there is no rule that has imposed on the entity the obligation to inform the subcontractors of the pathological situation reached in a contractual relationship with one of the successful bidders and contractors of public bidding proceedings. As indicated, we are in the presence of a single contractual relationship between ICE and Verizon Information Services Costa Rica LLC, so the obligations of the entity are limited to those established in it. Any legal relationship that Verizon Information Services Costa Rica LLC has entered into with third parties does not obligate or bind the entity in terms of contractual or extra- contractual obligations that have not been agreed upon. To admit the contrary would mean to accept the absurd position that the entity is required to notify all subcontractors, suppliers and employees of a contractor when the contractual relationship has been broken, which is obviously disproportionate, unfounded and would imply a burden on the entity that transcends the regulations and the respective contractual relationship. Nor has it been demonstrated that ICE has caused damage that is directly linked to its conduct and omissions. To the contrary, based on the arguments and evidence gathered in the case, it is clear that any harm would be caused by the act of a third party, but not the public entity itself. In the case of the defendant entity, in

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

TRANSLATION

principle, its obligations are limited to its relationship with the contracting company and it is this company that is responsible for responding to its subcontractors, as well as the latter responding to the company that contracted them. Far from administrative contracting being an obligatory relationship of a triangular nature, we are in a synallagmatic obligation, where the demonstrated breach of the contractor before ICE, should not serve as a justification to allege extra-contractual damages without a causal link to said entity. Consequently, the plaintiff has not demonstrated the requirements of Article 190 et seq. of the LGAP to trigger the extra-contractual liability of the Public Administration. Furthermore, it is evident that Article 1045 of the Civil Code, applicable to the relationship between subjects of private law, does not apply here. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **Final Reasoning:** This does not mean that it is not appropriate to claim the existence of an alleged joint and several liability of the entity with the co-defendant companies against the plaintiff, when, as in this case, a <u>direct</u> legal relationship between ICE and Trejos Hermanos Sucesores S.A. capable of generating legal effects has not been demonstrated and there is no rule that provides for such an assumption.

**V.VI. -** In accordance with the above considerations, the complaint should be rejected with respect to Instituto Costarricense de Electricidad, since the plaintiff is not correct in any of the arguments invoked, and since the existence of some type of contractual relationship between the plaintiff and the company that has generated a contractual or non-contractual damage linked to a causal link with any of its conducts or omissions has not been determined.

**V.VII.- Determination of the existence of liability of the co-defendant Verizon Information Services - Costa Rica- LLC: a)** The representatives of the plaintiff base their arguments regarding the liability of Verizon Information Services - Costa Rica - LLC on the following basic affirmations: **1)** The Agreement executed by the plaintiff with GTE Group (later VERIZON Group), which was approved and authorized by ICE, is by its nature a contract governed by the principles of public service and is regulated by its principles, norms and values. Consequently, the exonerating clauses of civil liability that by imposition of VERIZON

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

were included in the master purchase agreement, are necessarily ineffective based on the imperative principles of Public Law, since although the Verizon - THS agreement was executed with the formalities of a commercial agreement, by its object and by its effects, it has an administrative nature, since it is for the benefit of a public service. **2)** Verizon Information Services - Costa Rica LLC breached its contract with ICE. However, when terminating its contractual relationship with the plaintiff company, it falsely indicated to it that the party responsible for the contractual breach was said entity, and it committed a willful breach, since it wanted to leave its business in the country. Consequently, it considers that the clauses exonerating from civil liability in the respective contract are ineffective when they refer to a willful breach, in accordance with the provisions of Article 701 of the Civil Code. **3)** The termination of the ICE - GTE (VERIZON) contract constitutes an objective breach of the GTE (VERIZON) - plaintiff contract, which is attributable to GTE (VERIZON); therefore, the latter must respond for the damages caused, according to the general principle of contractual liability established in Article 702 of the Civil Code. **4)** The exonerating clauses are part of an adhesion contract, since the content of that agreement only allowed the plaintiff company to accept or reject it. The nullity of such clauses results from their abusive nature, in accordance with Article 1023, subsection m), of the Civil Code and Article 42 of Law 7472 of January 19, 1995 (Law for the Promotion of Competition and Effective Defense of the Consumer), **b) The representatives of Verizon Information Services - Costa Rica- LLC claims in its defense that: 1.** The disputed clause is logical in the sense that Verizon only has one business in Costa Rica and it would be illogical for it to remain if ICE terminated its telephone directory contract, since it was negotiated with the plaintiff and is not null and void under the provisions of Article 1023 of the Civil Code. With respect to the term of the agreement, clause 2(b) of the agreement established a range between 48 months and 168 months, with the term of the agreement being in any event subject to the term of the agreement with ICE, given the nature of the agreement and the fact that Verizon had no other business in Costa Rica. **2.** The relationship between Verizon and the plaintiff is exclusively private. The plaintiff intends to deceive the court by affirming that the agreement signed with Verizon is a subcontract of

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the contract executed by and between ICE and Verizon, which is not true and constitutes a legal aberration. **3.** Article 701 of the Civil Code must be applied. It indicates that willful misconduct is not presumed, but must instead be demonstrated; therefore, mere breach does not constitute willful misconduct. **4.** The termination of the agreement did not imply any liability for any of the parties, since the early termination of the agreement arises as a direct consequence of the fact or action of a third party, which in this particular case was ICE. **5.** Clauses 24 and 28, which establish an exemption from contractual civil liability and limitation of contractual civil liability, specifically subsections b) and e) of Clause 28, were negotiated and accepted by the representative of the plaintiff. **5. (sic)** The plaintiff acknowledges that the performance of the agreement was maintained under normal conditions for nearly four years, which tells us that the agreement was executed in the range of 48 months established in point b) of Clause 2 - Term, **c) <u>This Court will now proceed to the detailed analysis of each argument</u>: 1.** Based on the reasoning indicated in the previous recital, it is clear to this Court that the relationship between the plaintiff company and Verizon Information Services - Costa Rica- LLC is not a matter of public law, nor does it imply the provision of a public service. As extensively indicated above, in this case there is a private law relationship, where Trejos Hermanos Sucesores is a subcontractor of Verizon Information Services - Costa Rica- LLC, the latter being the only one that executed a contract governed by public law regulations with ICE. Consequently, it is not true that the specific regulations by means of which the transfer of a public service is given are applicable to this contractual relationship. **<u>Conclusion</u>:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **2.** On the other hand, the plaintiff has not demonstrated the existence of an adhesion agreement in the agreement it executed with Verizon Information Services - Costa Rica- LLC; to the contrary, it was based on free will at the time of the execution of the contract, according to the agreements adopted by the parties. In addition, the pre-existing relationship between the plaintiff and GTE rules out any possibility of impossibility of reviewing the agreed terms and conditions, or of a mere adhesion relationship. The plaintiff must remember that unlike contractual relationships based on negotiation, in an adhesion contract, one party drafts

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

the content exclusively, without letting the other party intervene, and the latter merely adheres to the formulation drafted by the professional. Consequently, it cannot be presumed that a contractual relationship is of such a nature if it does not have a massive nature, has a tendency towards generality, and there are no preliminary negotiations to the execution of the contract that demonstrate the formation of the will. The previous requirements made by GTE and later Verizon regarding the machinery used and the quality of the product cannot be considered the unilateral possibility to which the plaintiff had to adhere; instead, they were the necessary conditions to maintain and continue a contractual relationship, within a business framework and a market society in which the free forces of supply and demand operate and in which economic agents can require from their contractors the quality requirements they deem appropriate to obtain a final product in accordance with their commercial interests. It is not even possible to speak of a consumer relationship or of a demonstration of an obligatory contractual imbalance that could lead to the presumption of such an argument.

**Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **3.** The plaintiff alleges breach of contract by the co-defendant Verizon Information Services - Costa Rica- LLC in its relationship with ICE. In this regard, this Court considers this fact to be proven, since through official note 6000-27733-2005 of SGT-2326-2005 of June 1, 2005, the contract between ICE and Verizon Information Services Costa Rica LLC was terminated due to breach of contract by the latter. The above was confirmed by means of official note 0150-36359-2005 of GG-680-2005 dated July 8, 2005, from the General Management of the entity. This was confirmed by an arbitral award issued at 3:00 p.m. on the fourth day of December, 2015, issued in arbitration proceedings initiated by ICE against Verizon Information Services Costa Rica LLC, in which the latter was ordered to pay different amounts because breach of contract by it was shown (evidence for a better resolution produced by the plaintiff at the hearing). Thus, there is a final administrative act and an arbitral award that proves the breach alleged. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to admit this argument of the plaintiff. **3.** The plaintiff claims a malicious breach of contract attributable to Verizon

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

4

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6     RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 267 of 490

TRANSLATION

Information Services - Costa Rica- LLC, in its relationship with Trejos Hermanos Sucesores S.A. In this regard, this Court considers this fact to be proven, since the indicated co-defendant deliberately caused the termination of its contractual relationship with Instituto Costarricense de Electricidad, as will be analyzed below. It has been demonstrated in the record that in 2004, Verizon Information Services CR proposed to ICE several adjustments to the contract signed for the publishing of telephone directories. Furthermore, on May 13 of that year it proposed a review of their preparation. In official note 6000-41046-2004 dated July 15, 2004, the Assistant Manager of Telecommunications of the entity indicated that the 2005 edition of the guides should have the same structure and number of copies as the 2004 edition. Subsequently, by means of a note dated September 8, 2004, received at the Procurement Department on December 16 of that year, the Vice President of Verizon Information Services CR told the Assistant Manager of Communications of ICE that since no response was obtained to the note dated May 13 of the current year, tacit consent would be considered applied to the request. By means of official note 6000-52278-2004 dated September 14, 2004, the ICE Assistant Manager of Communications rejected the application of tacit consent, considering that official note 6000-41046-2004 dated July 15, 2004 stated that the edition of the 2005 guides had to be done using the same structure and number of copies of 2004, in response to the proposal of May 13 of that year to review their preparation. Subsequently, by means of note dated November 8, 2004, the Vice President of Verizon told said Assistant Manager that tacit consent operated *ipso iure* because there had been no answer within 30 business days. By means of official note 600-64540-2004 of November 18, 2004, he received an answer stating that the application of tacit consent was not admissible in this case, interpreted by the contractor. Moreover, by means of official note SI-0726-11-04 dated November 15, 2004, the Head of the Information Services Process of ICE indicated to the General Manager of Verizon that it had not extended the validity of the performance bond requested since June 30, 2004, according to official note 6000-35344-2004, and that the structure of the Telephone Directory of the Metropolitan Area showed non-complying items in disregard of the indications in notes 6000-41046-2004 and 6000-522678-2004. Furthermore, by means of resolution adopted as

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 268 of 490

TRANSLATION

set forth as Article 10 of the minutes of meeting 5649 held on November 23, 2004, of the Board of Directors of ICE, a decision was made to tell the contractor that any intention to unilaterally amend the contractual conditions agreed upon was rejected. In view of its failure to meet such requirement, by means of official note SI-759-12-04 dated December 13, 2004, a request was made to initiate proceedings for contractual termination against the company Verizon Information Services CR for not complying with the signed contract and the requirements of the entity. Consequently, by means of official note 5225-69163-2004 of AEG-0572-2004 dated December 14, 2004, the procedure for termination of the contract was initiated, and by means of official note 6000-27733-2005 of SGT-2326-2005 dated June 1, 2005, the contract by and between ICE and Verizon Information Services Costa Rica LLC was terminated due to breach of contract by the latter. This was confirmed by means of official note 0150-36359-2005 of GG-680-2005 dated July 8, 2005, issued by the General Management of the entity. This Court notes that in no way could the defendant have claimed the existence of tacit consent, for the following reasons: a) Prior to claiming it, ICE had already made an express negative statement, so any subsequent actions to the contrary invoking an alleged act are improper and irrelevant, b) The petition did not fall within the scope of Article 16 of the Administrative Contracting Law, since it was not a request to perform the contractual object, but rather to modify it to the detriment of what had been agreed, c) Tacit consent does not operate *ipso iure*, but must be complemented by the provisions of Article 7 of the Law for the Protection of Citizens from Excessive Requirements and Administrative Procedures, which was not done. Consequently, from the proven facts, the existence of awareness and willingness of Verizon Information Services Costa Rica LLC to breach the contractual relationship with ICE is noted, and it is known that such breach of contract would openly affect its relationship with the plaintiff. Therefore, it must be remembered that fraudulent breach of contract is configured when it is conscious and voluntary, without necessarily implying an intention to cause damage. This breach will result in the ineffectiveness of any agreed exemption or limitation of liability clauses. In this sense, to speak of willful misconduct in the obligations, not *dolo in contrahendo* (which is a defect of the will), the breach must meet

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                                              RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 269 of 490

TRANSLATION

two requirements for it to be malicious: a) the subject's intent to not comply (negative element) and b) the specific possibility of the subject to comply (positive element). In other words, the contractor decides not to comply, even though it is in a position to do so. However, it chooses not to perform the service. Awareness of the unlawfulness and compliance with the elements indicated above occurred in this case, since it is evident from the evidence that the co-defendant was aware of the contrary nature of its behavior with respect to the law; despite this, it failed to comply. Consequently, the inexcusability of compliance determines the concurrence of willful misconduct, and the intentionality of not complying, since the co-defendant company never demonstrated an objectively relevant fact that justified its breach in either the administrative proceedings or in the arbitration. To the contrary, there is evidence of the foreseeability of non-compliance and its consequences. In support of this, the following communications from ICE on this subject are evidence in the record: a) By means of official note 6000- 41046-2004 of July 15, 2004, Verizon was told that the edition of the 2005 guides should have the same structure and number of copies as 2004. b) By means of official note 6000-52278-2004 dated September 14, 2004, the Assistant Manager of Communications of ICE rejected the application of tacit consent, taking into account that by means of official note 6000-41046-2004 dated July 15, 2004... (sic) c) By means of official note 600-64540-2004 of November 18, 2004, Verizon was told in the answer that the application of tacit consent was not admissible in this case, as had been interpreted by the contractor, d) By means of official note SI- 0726-11-04 dated November 15, 2004, the Head of the Information Services Process of ICE indicated to the General Manager of Verizon that it had not extended the validity of the performance bond requested since June 30, 2004, according to official note 6000-35344-2004, and that the structure of the Telephone Directory of the Metropolitan Area showed non-complying items in disregard of the indications in notes 6000-41046-2004 and 6000-522678-2004. e) On November 12, 2004, ICE ordered Notaries Public Leda Patricia Hernandez Salazar and Attorney Ligia Picado Arguedas to draw up notarial records of the results of the visits they made to THS's industrial facilities, where it was noted that the telephone directories being prepared did not include the records of subscribers from the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

provinces and it was also noted that when printing the white residential pages of the Metropolitan Area Telephone Guide, only the San José records were used, excluding the subscribers from the Los Santos area and the provinces, f) By means of official note S.1.0730-11-04, Verizon was provided with the minutes of a meeting held with its officials, in which it was told that it was failing to comply with Clauses 3.1 and 3.4.1.3 of the Bidding Terms and Clause Two of the Contract, g) On November 18, 2004, by means of note 6000-64540-2004, the Assistant Manager of Telecommunications answered Verizon's note of the 8th of that month, stating again that it should maintain the format of the 2004 telephone directories, h) By means of resolution adopted as set forth as Article 10 of the minute of meeting 5649 held on November 23, 2004 of the Board of Directors of ICE, it was decided to tell the contractor that any intention to unilaterally amend the contractual conditions agreed upon was rejected, i) On December 2, 2004, during a visit made to the facilities of the plaintiff, the Notary Public Yaila Paola Sanchez drafted a notarial certificate stating that 103,000 copies of the residential white pages of the Metropolitan Area were printed and that the printing company had not received any type of order to modify the printing and binding process; rather, it was working with the purchase orders delivered by Verizon, which were not modified by it. Therefore, the necessary requirements to determine the malicious breach of the co-defendant have been met, which means that despite the provisions of Clause 28 of the Master Agreement, it is liable for the damages caused to the plaintiff due to its breach in application of Articles 701 and 702 of the Civil Code. This is because its demonstrated breach with ICE also implies a lack of voluntary and therefore malicious compliance with the contractual relationship with the plaintiff. This can be seen through the proven fact that by means of a note dated September 2, 2005, the General Manager of Verizon Information Services-Costa Rica LLC informed the plaintiff that it was terminating the contractual relationship originated in the respective Master Agreement. It should be noted that the criterion for subjective attribution of willful misconduct implies the existence of a non-performing spirit, of the foreseeability rather than unlawful intention, of causing damage to the other contracting party, or of a behavior of a party that has no intention of honoring its contractual commitments. In this case, the above is demonstrated

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                     RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 271 of 490

TRANSLATION

based on the following considerations, duly demonstrated in the record: a) The fact that the rupture of the contractual relationship between the co-defendant and ICE was not due to rescission (either for reasons of public interest or agreement between the parties), but rather to contractual termination; that is, due to a deliberate breach of contract by the contractor, b) The evidence demonstrates the awareness and knowledge of the breach and its consequences. In each administrative act, it was warned in due time not to modify the telephone directories and in spite of this, the co-defendant continued with its non-compliant actions, c) There was a chance for the contractor to correct its behavior. The warnings about not modifying the guidelines were extended for several months and the co-defendant company could have corrected its behavior in a timely manner, but it failed to do so. d) The changes in the contractual object were unilateral, deliberate and without any evidence of the need for their implementation, e) The contractor could not claim to be unaware of the manner in which the entity operated or of the applicable legal system, given that its contractual relationship with ICE dated back several years, f) There is a final award that expressly recognizes the breach attributable to the contractor, g) Despite the fact that the Master Agreement also provided for the preparation of telephone directories for the Dominican Republic, it was decided to terminate the contractual relationship in its entirety, h) Sound judgment indicates that there was a possibility that the co-defendant company would have foreseen that its breach would generate bifrontal damage; that is, damage not only for its immediate party (that is, ICE and the public interest) but also for the contract that arose from the unfulfilled relationship; that is, with the plaintiff, i) There was no alternative for the contracting entity and the plaintiff company at the time the default was finalized. In its answer, the defendant invokes the existence of the provisions of Article 701 of the Civil Code, which states: *"ARTICLE 701.- Willful misconduct is not presumed, and whoever commits it is always obliged to compensate for the damages caused by it even if the opposite has been agreed."* With regard to Article 701 of the Civil Code, the vote 359-2014 issued at 11:30 a.m. on the thirty-first day of October, two thousand and fourteen, of the Second Section of the Second Civil Court, provided as follows: 'This *article determines the nullity of the clauses limiting liability*

Digital signature of:
       RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 272 of 490

TRANSLATION

derived from willful misconduct. This provision refers to the fact that if there is a **MALICIOUS BREACH OF CONTRACT** and a clause limiting liability has been agreed upon, such clause is null and void. By analogical interpretation, the doctrine teaches that the same thing happens in cases of *culpable breach of contract; if there is a liability limitation agreement, the consequence is the same; in other words, such an agreement is null and void, since the debtor could, at his discretion, comply or not comply and be exempted from the compensatory liability arising from any breach, which would allow him to bind himself under a purely optional condition, which is tantamount to the fact that he can bind himself to nothing, and this is inadmissible; but furthermore, this is so because contractual liability can only be displaced by the creditor's act, an event of* force majeure, *or act of God, according to Article 702, never by agreement...*" The plaintiff affirms that Clause 28 of the Master Agreement relieves it of responsibility in that the agreement could be terminated, as indicated therein. It provided: "28. *TERMINATION, (a) The Purchaser may terminate this Agreement by giving the Seller at least (90) days written notice of such termination if the parties cannot agree to any price revisions under this Agreement, any amendments to this Agreement pursuant to Section 28 (c) above or the price for new options or specifications that the Purchaser may require, regardless of whether such new options or specifications are within the current capacity of the Seller. (b) The Purchaser may terminate this Agreement immediately at any time if during the Term of the Agreement, the Agreement between the Purchaser and ICE described in Section 2, Term, is terminated for any reason... e. Upon termination of this Agreement, the Purchaser shall not be liable to the Seller for compensation for damages of any kind or nature whatsoever, whether for loss by the Seller of present or future profits, expenses, investments or commitments made in connection with this Agreement, or in connection with the establishment, development or maintenance of the Seller's business or for any other cause or thing, provided that the termination shall not impair or affect the rights or responsibilities of either the Seller or the Purchaser with respect to the directories previously produced under this Agreement, or any indebtedness of either party to the other...*" In this regard, and in accordance with the above, and since the willful misconduct of Verizon Information Services Costa Rica LLC has

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)       INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                                                 RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 273 of 490

TRANSLATION

been duly proven, it is the opinion of this Court that the clause invoked by the latter does not justify the willful misconduct carried out and translated into the unilateral breach of the Master Agreement, given that it was based on other different assumptions, in which this contractor would not have been the one that caused the breach of contract with ICE. For this Court, it has been demonstrated that the conduct of Verizon Information Services Costa Rica LLC is clearly unlawful and has a double legal effect, one immediate and the other mediate. This occurred because the voluntary and conscious breach by the aforementioned company of the contract arising from the Bidding Proceedings 6378-T, translated into legal effects for ICE, but also for the plaintiff, while the same provisions of the contractual validity of the Master Agreement executed with Trejos Hermanos Sucesores S.A. depended on the existing relationship with the entity. This is seen from Clause 2.b invoked by the defendant, which provides: *"This Agreement shall become effective only when the following two requirements have been: (i) execution of this Agreement by the parties; (ii) execution of a contract by and between Instituto Costarricense de Electricidad (ICE) and the Purchaser, entered into as a result of a Purchaser's bid in public bidding proceedings 6378-T. At the time the foregoing requirements have been the effective date (the "Effective Date") of this Agreement shall be from the time of execution of the agreement identified in subsection (ii) of this Section 2 (a)..."* In accordance with the foregoing, this Court believes that we are dealing with a specific case in which the provisions of Clause 28 of the above-mentioned Master Agreement, as well as any other clause that is deemed lawful for a breach of contract that has been brought without liability for the co-defendant company, become ineffective in view of the malicious breach incurred. Therefore, it must be understood that the willful misconduct that has been proven extends from the lack of compliance with ICE with respect to the contract that arose from Bidding Proceedings 6378-T towards the Master Agreement executed between the plaintiff and Verizon Information Service-Costa Rica LLC, given that, as has been demonstrated, the latter depended on the existence and validity of the former. As a result, logic indicates that a malicious breach of the contractual relationship with the entity would necessarily lead to a malicious breach

Digital signature of:
      RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

towards Trejos Hermanos Sucesores, as has been demonstrated to have occurred. Consequently, it is appropriate to apply the Civil Code, insofar as it provides the following in its Article 22: ."..Any *act or omission in a contract, which by the intention of its author, by its object or by the circumstances in which it is performed, manifestly exceeds the normal limits of the exercise of a right, with damage to a third party or to the other party, shall give rise to the appropriate compensation and to the adoption of the judicial or administrative measures that prevent the persistence of the abuse.*" For this Court it is clear that if a creditor alleges willful misconduct, it is not enough to prove default; instead, willful misconduct must be proven in order to produce the appropriate legal consequences (Articles 701 and 705 of the Civil Code). (Judgments of the First Chamber of the Supreme Court of Justice, number 320 issued at 2:20 p.m. on November 9, 1990. In the same sense, we note, among others, judgments 354 issued at 10:00 a.m. on December 14, 1990, 103 issued at 2:50 p.m. on June 28, 1991, 17 issued at 3:00 p.m. on January 27, 20 issued at 2:45 p.m. on January 31, both of 1992, 45 issued at 2:15 p.m. on June 11, 1997, 53 issued at 3:10 p.m. on May 27, 1998, 589 issued at 2:20 p.m. on October 1, 1999, 36 issued at 3:40 p.m. on January 10, and 509 issued at 2:25 p.m. on July 11, both of 2001). However, in the case under study, this Court considers that the intention to fail to comply with the contractual obligations on the part of the co-defendant company has been demonstrated, and that in order to be exempted from liability, the company must then demonstrate that the cause of the breach has been the creditor's act, an event of *force majeure* or act of God (Article 702 of said Code); however, in the case under analysis, this was not what occurred. It cannot be indicated that the damage was caused by the act of a third party, that is, Instituto Costarricense de Electricidad, given that the breakage did not occur by its unilateral decision as such; instead, that the cause of the entity's decision was the proven and malicious breach of contract by Verizon Information Services Costa Rica LLC. In response to this breach, the entity had to proceed to terminate its contractual relationship. If Verizon Information Services Costa Rica LLC had not breached its contract with ICE, the contractual relationship with the plaintiff company would have been normal, proof of the connection between the two and of the existence of willful misconduct in public

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 275 of 490
TRANSLATION

contracting that impacted private contracting. Note how the justification given by the co-defendant is precisely the contractual breach that it itself unilaterally and maliciously caused. This can be seen in the text of the respective letter: *"Given the situation described above, we call your attention to Clause 28, subsection b) of the agreement executed between VISCR and Trejos Hermanos Sucesores S.A. entitled "Master Purchase Agreement," which clearly states that VISCR may terminate the referred agreement immediately when the agreement between VISCR and ICE is terminated for any reason..."* It is clear to this Court from this quotation that the plaintiff caused a double breach of contract, one immediately and the other mediately, with full intention in both of them of not complying and with the possibility of compliance not being carried out, according to the objective facts that have been considered proven. Although the plaintiff negotiated and accepted the exemption from liability clauses, the truth is that they become ineffective in the event of a malicious breach of contract. 4. As an additional consideration, it should be noted that although the defendant company claims that the plaintiff recognizes that the contract was performed normally for nearly four years, which tells us that the contract was executed in the range of 48 months established in point b) of Clause 2 - Term, the truth is that the claim for the termination of the contractual relationship, as demonstrated, is the breach of contract with ICE and no other reason. Therefore, the true, real, effective and necessary cause for the breach of contract with Trejos Hermanos Sucesores is the deliberate and malicious breach and consequent contractual termination of Verizon Information Services Costa Rica LLC with ICE and no other reason, which reaffirms the preceding analysis. Proof of the existing willful misconduct with respect to the plaintiff company is the fact that in the note where the contractual relationship with it is terminated, the General Manager of Verizon in Costa Rica indicates that: ."*.. ICE disrespected the contractual rights of my principal and those established by law and proceeded to initiate administrative proceedings for the termination of the contract using public means to distort the reality of the facts." As* it has been determined, this statement is not correct and is therefore deliberately misleading, since it accuses the entity of being responsible for the breach of contract, when it has been duly demonstrated

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 276 of 490

TRANSLATION

that the break with ICE was due to the contractor's failure to comply with its contractual obligations. Furthermore, the former manager of Verizon in the country stated that it was Verizon's wish not to continue negotiating in the country for the production of telephone directories *(see deposition of José Maria Quiros Alfaro)*. Consequently, this Court considers that we are in the presence of a malicious breach to the detriment of the plaintiff company, which thus generates contractual liability and consequently any damage derived from it is indemnifiable. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to accept this argument of the plaintiff.

**V.VIII.- Argument related to the lack of joint and several liability of the co-defendant company with GTE Corporation's surety:** The defendant claims that the joint and several guarantees of GTE Corporation granted to ICE cannot be presumed, much less believed to be transferred for the benefit of third parties. In this regard, it is established in the record that in a letter dated August 28, 2002, Verizon Information Services Costa Rica, LLC expressed the following to ICE: *"11.- MAINTENANCE OF ALL OBLIGATIONS AND RIGHTS. As required in note dated June 18, 2002, I am enclosing hereto an AFFIDAVIT regarding the Maintenance of Obligations and Rights, signed by the legal representatives of Verizon Information Services, Inc., Verizon Directories Corp, and Verizon Information Services-Costa Rica, LLC, in which they accept the rights and obligations derived from Bidding Proceedings 6378-T and the agreement arising out of it."* In addition, Clause Twenty-Five of the contract between **ICE** and the GTE Consortium provided the following: *"In the event that, due to a change in the law governing ICE, this entity was to change its name, or that GTE were to change its name as a result of a merger or partnership with another company, in both cases this contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented here."* In accordance with the foregoing, in addition to the express provisions, there was an express statement by the co-defendant as to the maintenance of the obligations originally assumed by the GTE Group. Consequently, this argument must also be rejected.

**V.IX- Analysis of complementary argument:** As an additional argument, the codefendant argued at the trial hearing that the damages are accessory to the issue of contractual

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE
This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6     RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 277 of 490

TRANSLATION

nullity, therefore, the parties did not know how to exercise the annulment claims, since termination of the contract must first be requested and then the payment of damages. Therefore, it is materially impossible for the Court to award damages, because contractual termination was not requested before. In this respect, the defendant's attorney must consider that in a note dated September 2, 2005, the General Manager of Verizon Information Services-Costa Rica LLC informed the plaintiff that it was terminating the contractual relationship originated in the respective Master Agreement. Therefore, it was its own representative who unilaterally terminated the respective contractual relationship and therefore opened the possibility for the plaintiff to exercise its claims for compensation, based precisely on the breach of the contract executed between it and Verizon Information Services-Costa Rica LLC. Consequently, it is also appropriate to reject this argument.

**V.X.-** In accordance with the preceding reasoning, this Court considers that a malicious breach by the co-defendant Verizon Information Services-Costa Rica LLC can be determined, to the detriment of the plaintiff, and therefore it is appropriate to determine its duty to indemnify the damages caused by such breach.

**V.XI.- Arguments of the plaintiff with regard to the company Verizon Communications Inc.:**

**a)** The plaintiff's representatives base their reasoning regarding Verizon Communications Inc. on the following basic arguments: **1)** The GTE Group merged with the firm Atlantic Bell and the VERIZON Group was formed, which maintained with ICE all the rights, duties, obligations and securities originally granted by the initial Group and jointly guaranteed by the VERIZON companies, since GTE CORPORATION by virtue of a merger of companies in the United States of America, was transformed into VERIZON COMMUNICATIONS INC., Holding of the VERIZON Group. For this reason, the relationships derived from the Administrative Contract awarded in International Public Bidding Proceedings 6378-T and its legal effects for compliance with its rights and obligations did not suffer any alteration. Consequently, the defendants Verizon Communications Inc. and Verizon Information Services - Costa Rica- LLC compose an economic interest group which we may conventionally name the VERIZON GROUP, **b)** The co-defendant has answered using the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 278 of 490

TRANSLATION

following arguments: 1) The plaintiff did not in any way prove that GTE Corporation became Verizon Communications Inc., 2) It is not true that they formed an economic interest group nor have they been part of any contractual relationship with ICE or the plaintiff. 3) It is not true that Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. and Verizon Directories Corp, are subsidiaries of Verizon Communications Incorporated, **c) Criterion of the Court:** It has been demonstrated on record that the companies "GTE Information Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware with head offices in the city of Dallas, State of Texas, submitted a joint bid, as a consortium, in Public Bidding Proceedings No. 6378-T conducted by ICE, and for all purposes related to said public bidding proceedings, they identified themselves as the GTE Consortium. It is proven on record that the contract was awarded to said Consortium by the Board of Directors of ICE, at regular meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, and this resolution was published in Addendum No. 10 to the Official Journal "La Gaceta" No. 28 of February 9, 2000. In this order of ideas, Clause Twenty-Five of the contract between ICE and the Consortium provided the following: *"In the event that, due to a change in the law governing ICE, this entity should be to its name, or that GTE were to change its name as a result of a merger or partnership with another company, in both cases this contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented here."* Subsequently, on May 16, 2002, VERIZON Information Services - Costa Rica, LLC sent a note dated May 16, 2002, to the ICE Procurement Directorate, stating that "General Telephone Directory Company C por A" had changed its name to Verizon Information Services Costa Rica, LLC, and requesting that the change in the name of the companies that made up the GTE Consortium be considered officially communicated. Consequently, upon the merger of GTE with Bell Atlantic, it formed the so-called Verizon Group, composed of Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services-Costa Rica, LLC. An economic interest group is

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

considered to exist when a group of individuals or legal entities maintain common links and interests and coordinate their activities to achieve a certain common objective. In addition to the above, there is control, autonomy, and unity of behavior in the market. Therefore, a holding company make actually control others, or this control can be potential, when the possibility of carrying out the indicated control operates even if a centralized and hierarchical legal bond does not exist. Consequently, formal corporate autonomy transcends the interests of the group or economic entity. Therefore, although each subject of the group maintains a formal legal personality, in practice, transcending the forms, the factors of production of each one of them will be oriented to a determined common economic end and their wills are subordinated to that of the be leading or parent figure in some cases or to the integrated decision; but not specific to each individual company. This is how each member of the group comes to act in such a way that the whole behaves functionally as a single entity in the market, with a dominant subject and one or more secondary subjects. In the case under analysis, the legal representatives of the co-defendant companies are the same, in addition to the obvious similarity of their corporate names; this is because it has been proven in the record that MARIANNE DROST, a U.S. citizen, acted in her capacity as Corporate Secretary of the firm VERIZON COMMUNICATIONS INC. and VERIZON INFORMATION SERVICES-COSTA RICA, LLC., thereby, their common control and relationship is evident, in addition to the considerations made above regarding the origin of the Verizon Group, to the extent that its various companies were organized together (Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services-Costa Rica, LLC.), and maintain links since their founding (see note of Michael Quinn Neal, on pages 2964 and 2965 of the administrative records of ICE). Verizon Communications Inc. is no stranger to this economic group, for this reason, particularly considering that because of the phonetic similarity it would not be possible for a company not linked to the group to use the name "Verizon." This is why Article 1025 of the Civil Code should be understood as not being applicable to the case, given that the existence of the economic interest group binds the co-defendant in matters of liability. Consequently, Verizon Communications Inc. is jointly and severally

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

liable as a member of the economic interest group called "Verizon."

**Conclusion:** The argument of co-defendant Verizon Communications Inc. is rejected.

**V.XII.-** In accordance with the foregoing reasoning, this Court considers that the existence of an economic interest group among the companies of the Verizon group can be determined and that, consequently, Verizon Communications Inc. must be held jointly and severally liable for the malicious breach of the codefendant Verizon Information Services-Costa Rica LLC, to the detriment of the plaintiff and, consequently, it is necessary to determine its duty to compensate the damages caused by such breach.

**V.XIIII. - Regarding the declarative claims set forth in the complaint:** Based on the substantive arguments made in the preceding paragraphs, it is appropriate to resolve the declaratory claims filed, as follows: **Claim number 1**: This claim states: " *1.* The "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES COSTA RICA, LLC) *became a means for the performance of the contract executed by the business companies "GTE Information Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware with head offices in the city of Dallas, State of Texas, which identified themselves as the "GTE Consortium," and INSTITUTO COSTARRICENSE DE ELECTRICIDAD, as a result of the award to such Consortium of the contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, in accordance with* a resolution of the Board of Directors of ICE, adopted at regular meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, and approved by the Office of the Comptroller General of the Republic on December 13, 2000. In accordance with the analysis carried out and the evidence gathered, this Court considers that this claim should be accepted, in the understanding that said Master Agreement corresponds to a subcontract carried out by the subcontractor with the plaintiff company, as a contractually recognized means to achieve compliance with the respective contractual object.

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6                                                                RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 281 of 490

TRANSLATION

**Claim 2:** This claim states the following: *"2).- That said "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A, was known by INSTITUTO COSTARRICENSE DE ELECTRICIDAD, which approved the involvement of TREJOS HERMANOS SUCESORES S.A. in the performance of the administrative contract awarded to the GTE Consortium as a result of Public Bidding Proceedings No. 6378-T conducted by ICE."* As indicated above, it was not demonstrated on the record that the Master Purchase Agreement was known to any ICE official, and therefore this claim should be rejected.

**Claim 3:** This claim states: *"3).- That the termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM (which changed its name to the VERIZON CONSORTIUM) caused the termination of the "Master Purchase Agreement" executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A."* As proven on record, the representative of Verizon claimed the termination of the contract executed by it with ICE as the reason to terminate the Master Purchase Agreement, executed by it with the plaintiff. Consequently, this claim should be accepted.

**Claim 4:** The plaintiff asks the Court to declare: *"4).- That TREJOS HERMANOS SUCESORES S.A. did not have any liability whatsoever for the events that caused the termination of the administrative contract entered into between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM."* In this regard, there is no evidence of any action or omission of the plaintiff that caused or contributed to the breach of contract between ICE and Verizon Information Services Costa Rica LLC, and on the contrary, a willful breach of such contractual relationship by the latter is determined. Therefore, this claim should be granted.

**Claim 5:** The plaintiff asks the Court to rule: *"5.- That TREJOS HERMANOS SUCESORES S.A. did not have any responsibility for the events that caused the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A."* In this regard, there is no evidence of any action or omission of the plaintiff that caused or contributed to the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

breach of contract between the plaintiff (sic) ICE and Verizon Information Services Costa Rica LLC; to the contrary, a willful breach of such contractual relationship by the latter has been determined. Therefore, this claim should be accepted.

**Claim 6:** The plaintiff asks the Court to rule: "**6.-** *That the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por* A. *caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A.*" This claim shall be determined in the next consideration, upon analysis of the evidence of the damages claimed.

**Claim 7:** The plaintiff asks the Court to declare: "**7.-** *That the defendant companies Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC are part of an economic interest group, successor of the economic interest group called GTE Consortium, which was awarded the contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, which was implemented through the Master Purchase Agreement executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.*" In accordance with the analysis carried out above, this Court has been able to determine the existence of an economic interest group to which the aforementioned companies belong. Consequently, the claim should be accepted.

**Claim 8:** The plaintiff asks the Court to declare: .- *That "**VERIZON COMMUNICATIONS INCORPORATED**" is the most senior entity of an economic interest group of which "**VERIZON INFORMATION SERVICES -COSTA RICA- LLC**" is a member. Therefore, the first of these companies is jointly liable with the latter for all the obligations acquired by "**VERIZON INFORMATION SERVICES -COSTA RICA- LLC**" with TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA.*" In this respect, the plaintiff did not demonstrate the hierarchical condition invoked for Verizon Communications Inc., so it is appropriate to reject this aspect of the claim, but on the understanding that it accepts the aspect of the claim referring to its joint and several liability, as it is part of said economic interest group.

**Claim 9:** The plaintiff asks the Court to rule: "**9).-** *That the defendant companies Verizon Communications Inc. and Verizon Information Services - Costa Rica- LLC are jointly and*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 283 of 490

TRANSLATION

severally liable for the negative consequences suffered by the plaintiff company, which resulted from the termination of the Master Purchase Agreement executed on February 28, 2002 with the plaintiff Trejos Hermanos Sucesores S.A." In accordance with the considerations made above with respect to the participation of Verizon Information Services - Costa Rica - LLC in the facts that have been deemed proven and the existence of an economic interest group to which Verizon Communications Inc. belongs, this claim should be accepted.

**Claim 10:** The plaintiff asks the Court to declare: *"10).- That **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** disregarded the lawful rights and interests of **TREJOS HERMANOS SUCESORES S.A.** that have arisen out of the implementation of said Public Bidding Proceedings No. 6378-T through the "Master Purchase Agreement" executed on February 28,2002. For this reason, it is jointly and severally liable with Verizon Communications inc. and Verizon Information Services -Costa Rica- LLC for the indemnity of the damages suffered by the plaintiff as a result of the termination of said Master Purchase Agreement executed on February 28, 2002."* Since it has been determined that the plaintiff has no direct legal relationship with ICE, nor has the existence been demonstrated of any specific right or lawful interest derived from the implementation of public bidding proceedings 6378- T that has been harmed by reason of the conduct or omission of the entity, this claim should be rejected, according to the analysis made in previous recitals.

**Claim 11:** The plaintiff asks the Court to declare: *"11) That the clauses of the MASTER PURCHASE AGREEMENT executed by and between VERIZON and TREJOS HERMANOS SUCESORES regarding the release of VERIZON from civil liability for breach of contract are null and void. This nullity especially includes Clauses 24 and 28 of that Agreement, although this statement is not limited to them, because it includes all clauses releasing VERIZON from civil liability."* In accordance with the analysis made in this resolution and the evidence produced in the proceedings, it is deemed appropriate to rule that the aforementioned clauses are not in effect, in light of the willful breach demonstrated by the codefendant companies. The plaintiff did not demonstrate that the above- mentioned clauses were part of a contract of adhesion or that they met the conditions for their annulment, so in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

this respect, the claim is rejected.

**Claims 12 and 13:** These are purely compensatory claims that will be analyzed in the following recital.

**V.XIV.- Regarding the material damages claimed: a)** In order to justify the alleged damages, the plaintiff claims the following: **1)** Due to the breach, the plaintiff could not pay the bank and commercial loans acquired, stopped paying its raw material suppliers and the rents, stopped paying the salaries and labor rights of its employees and was forced to end its activities and permanently suspend its commercial operations. 2) The GTE Group negotiated with the plaintiff for the future conditions to incorporate technological advances to improve the quality of the work in the editing and printing jobs. Consequently, it was also obliged to acquire the most modern equipment and to expand the physical plant. In accordance with the above, the plaintiff indicates, it borrowed heavily from banks and took out commercial loans in order to acquire the new equipment and expand its industrial plant, **b)** In their answer to the complaint, the plaintiffs (sic) argued that: **1)** If the plaintiff company made the decision to get into debt, it was due to a business decision of its own. **2)** The plaintiff sold the acquired machinery, which it did not consider when claiming losses. **3)** The problem that the plaintiff had with its plant and equipment was that they were obsolete and the production costs with those equipment units were higher; productivity was also lower during the printing time. **4)** It was assumed that the plaintiff did not depend on the existence of a single contract and that a company with the experience and national and international history of almost one hundred years maintained a variety of clients that guaranteed its solvency and the adequate management of finances and cash flows, to face its credit obligations in the face of any contingency. **5)** The problem of the closing of operations of the plaintiff company was the immediate consequence of the poor management of the business, **c) Criterion of the Court with respect to the items charged for material damage:** It has been proven on record that on February 25 and 26, 1999, Mr. Bruce Wataru visited the facilities of the plaintiff and made a series of observations regarding the facilities and equipment of the company. Subsequently, on November 15, 1999, a meeting was held between Mr. Alvaro and Alonso

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

Trejos Fonseca and Mr. Guillermo Navarro, then President, Vice President and Production Manager of **THS,** respectively, with the Printing Director of GTE Directories International for the purpose of: 1) evaluating the progress made on the plant improvement project; 2) assisting in developing a formal project to closely monitor the new plant project; 3) agreeing on a contingency plan in the event that THS does not comply with the installation dates of the new equipment and plant, which consisted of engaging another plant in the United States, in particular, if the equipment was not acquired on time; 4) evaluation of the potential purchase of the equipment, with the specific assistance of the consultant recommended by **GTE,** Mr. Bill Snell. As a consequence of the above, in February 2000, the company acquired a modern Heidelberg rotary machine, a binding line and a pre-press equipment called CTP or Direct to Plate together with all the electrical and mechanical installations of the new plant. This was done to meet the requirements of Mr. Wataru and the provision (j) of Clause 16 of the Master Purchase Agreement. The purchase of the Rotary Machine and all the accessory equipment of the Heidelberg brand were at a cost of C.955,116,741.00. Furthermore, in response to the requirements of Mr. Wataru, the plaintiff rented two industrial warehouses in the Zeta Free Zone, in Guadalupe de Cartago, owned by INMOBILIARIA ZOROASTER S.A., with all its equipment, offices and warehouse, according to the contract executed with the owner on the first of July, two thousand and four. On July 15, 2004, using stationery of Compañía General de Directorios C. por. A, with offices in San José, Costa Rica, a subsidiary of GTE Corporation, as stated in the same document, the contractor consortium of the Verizon Group processed the contractor consortium of the Verizon Group processed purchase order 4568 for the printing of the Telephone Directories for the Metropolitan Area for a total amount of $3,033,625.60 and on August 20, 2004, purchase order 4582 was issued for the amount of $2,134,503 for the printing of Telephone Directories for the Provinces, for a total amount of $5,168,128.00 for the 2005 Directories. The purchase orders indicated in the previous Fact were replaced by **Verizon** by order number 4612 of November 3, 2004, regarding the Telephone Directories for the Metropolitan Area for a total amount of $ 2,120,828 and by order number 4644 of December 17, 2004 for the Guides of Provinces, in the amount of $ 1,254,023, for a total

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 286 of 490

RECEIVED NYSCEF: 10/26/2021

TRANSLATION

sum of $ 3,374,851, that is, an extemporaneous decrease of $ 1,793,277 (exhibit 30 of the plaintiff's evidence file). It has been demonstrated that the last purchase orders meant a reduction in the number of pages of the telephone directories and the number of books, as well as a different conformation and composition of the directories than had been agreed upon by **GTE** in its contract with **ICE**. Afterwards, the agreement between the plaintiff and the Verizon Group was terminated due to the willful breach by the latter, as has been demonstrated in the proceedings; in virtue of the this, the plaintiff ceased to honor its obligations with the seller of the machinery, and the creditor initiated pledge enforcement proceedings as case number 06-001956- 0640-CI, in the Civil Court of Major Pleas of Cartago, and at 12:30 a.m.s on June 6, 2007, the auction of the pledged equipment was carried out. Then, by order issued at 9:23 a.m. on August 19, 2007, the order was given to HEIDELBERG PRINT FINANCE AMERICAS INC., the auctioneer, to take possession of the equipment, which was executed at 2:00 p.m. on October 31, 2007. Furthermore, it has been demonstrated that the plaintiff was forced to incur in arrears with the payments of the rents for the lease of the industrial warehouses of Inmobiliaria Zoroaster S.A., for this reason, a public document was executed. It was number 144, starting on page 133 reverse of volume one of the Protocol of Notary LAURA MONICA ZAMORA ULLOA, issued at twelve noon on plaintiff undertook to pay up to the sum of TWO HUNDRED THOUSAND TWO HUNDRED AND TWENTY-THREE DOLLARS AND SEVENTY-FIVE CENTS (US$200,223.75), providing the following in Clause Two of said document: ."… TWO. *Debt Substitution. This debt replaces the overdue monthly payments of rent owed by the Debtor- (TREJOS HERMANOS SUCESORES)- covering the months from July, two thousand and five, to and including March, two thousand and six, at a rate of nine months of monthly payments of rent, under the lease executed by and between Creditor and Debtor, dated the first day of July, two thousand and four. Such lease was for the property of the Creditor, with real estate registration number three - one nine zero eight seven three - zero zero zero and number three - one nine five eight nine eight - zero zero zero, which is expressly accepted by the Creditor"* … Likewise, interest was established to be paid in monthly installments of twenty-two thousand two hundred and forty-seven dollars and eighty-three

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 287 of 490

TRANSLATION

cents until the obligation is paid in full (exhibit 70 of the plaintiff's evidence file). 9. In view of a failure to comply with the agreement, Inmobiliaria Zoroaster S.A. initiated simple execution proceeding for collection before the Civil Court of Major Pleas of Cartago, as case number 06-001846-0640-CI. Such proceedings ended with a judgment that admitted the defense of partial payment and ordered the plaintiff to pay fifty-six thousand one hundred and eight dollars and ten cents (US$ 156,108.10) [Note of Translator: different amount in letters and numbers in the original document]. In view of the above, the plaintiff sold, under very unfavorable conditions, virtually all of its assets in equipment and improvements in the Lessor's buildings to the Colombian capital company CONDOR EDITORES DE COSTA RICA, S.A., which agreed with Inmobiliaria Zoroaster S.A. to lease the industrial facilities in the Zeta Free Zone of Cartago, and acquired the equipment auctioned by HEIDELBERG PRINT FINANCE AMERICAS INC., under favorable conditions and already installed in said industrial facilities, as well as the rest of the THS equipment pledged to Banco Nacional de Costa Rica and Banco Interfin (exhibit 73 of the plaintiff's evidence file). Finally, the plaintiff reached an agreement with Inmobiliaria Zoroaster S.A., dated March 28, 2007, entitled *"Lease Termination and Debt Recognition Agreement,"* according to which it delivered the industrial building where the rotary machine and the remaining printing equipment were located, since the other building where the offices and warehouse were located had already been handed over. Both parties released each other from liability, but also stated that Inmobiliaria Zoroaster S.A. acknowledged receipt of two payments up to that date (which had not been possible to demonstrate in the eviction proceedings), for a total amount of fifty- five thousand U.S. dollars, and also that it had the security deposit for an amount of thirty-nine thousand dollars, all of which as expressly authorized by the plaintiff to be applied by Inmobiliaria Zoroaster S.A. to the total debt. Independently of the fact that said Court proceedings could continue, the plaintiff undertook to pay the total due, to be determined in a timely manner, once these deductions have been made, together with the agreed interest and costs, until they are effectively paid, within a peremptory term. Both parties acknowledged that there is an express instruction in the "Trejos Hermanos-Fiduciaria Castro Garnier Trust," whereby what

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 288 of 490

TRANSLATION

is due to Inmobiliaria Zoroaster S.A. must be paid, as soon as the plaintiff receives the payment of amounts owed to it for different pending business, such as, fan outstanding debt of Radiográfica Costarricense, S.A. On May 29, 2007, the plaintiff leased with a purchase option to DACONDOR Q.C.R. SOCIEDAD ANÓNIMA, which then assigned its rights to the aforesaid CONDOR EDITORES DE COSTA RICA, S.A. over the remaining industrial assets of the company, for a fraction of the liabilities, both with Transamerica Bank & Trust Co. Ud. (a subsidiary of Banco Interfin), with Banco Nacional de Costa Rica and with Banco Improsa S.A. In accordance with the foregoing, this Court considers that there is a causal link between the acquisition of the machinery and the lease of facilities with the contractual relationship entered into with GTE and subsequently with the Verizon Group, and it was the malicious breach by Verizon Information Services Costa Rica LLC that caused both the lack of payment of the equipment and leases and the remaining economic effects that have been proven and derived from them. For this Court it is clear that Bruce Wataru's initial indications must be complemented in its analysis with Clause 16 (j) of the Master Agreement which provided the following: *"Seller shall, beginning with the first Directories produced under this Agreement, comply with all technical requirements for printing and manufacturing the Directories for which Purchased (sic) has placed Orders, including, but not limited to; the technical ability to supply white trim and "four- color process" as those terms are understood in the printing industry."* As it can be seen, the contractual relationship of the plaintiff company with Verizon Information Services Costa Rica LLC, had as a background the need to change the work equipment of Trejos Hermanos Sucesores, since that this company had to assume obligations in order to meet the requirements of the contracting party. It is not true that the decision to modify the equipment or the location of facilities is due to a bad business decision, but rather it was a response to the evident need to maintain the contractual relationship between both parties. Therefore, the initial damage is composed of the value of the machinery acquired with the understanding that the cost of its sale must be deducted, as indicated below. In addition to the aforementioned damage, the plaintiff considers the following to also be damage: a) the differences in inventories between the periods from 1997 to 1999

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    TRANSLATION      RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 289 of 490

and between 2000 and 2004, as a result of the necessary investment in working capital to meet the requirements of the agreement, b) the expected and unrealized flows from 2004 to 2013. c) the resulting losses for the periods from 2004 to 2007. d) interest paid to Banco Cuscatlán and the Heidelberg equipment supplier, according to their accounting record date, for which the amounts were carried at future value, e) lost profits on the occasion of the closing of operations. All of these items are recognized insofar as the closing of operations of the plaintiff company and the evidence of the sale of its machinery and assets, implied that the consequences of the breach had an ongoing impact over time, since it prevented the maintenance and even expansion of the business. Additionally, the defendants have not demonstrated the impropriety or unfounded nature of what was requested and therefore the application of Article 317 of the Code of Civil Procedure is appropriate, inasmuch as it was up to them to prove that the damages claimed did not exist or were not causally linked to their intentional breach of contract, which they did not do. This Court considers that the items indicated are justified for the following reasons: a) It is demonstrated that the plaintiff acquired a modern Heidelberg rotary machine, a binding line and a prepress equipment called CTP or Computer to Plate together with all the electrical and mechanical installations of the new plant. These investments were based on the expectation that their contractual relationship with GTE and then Verizon was decades old and that the Master Agreement had a 168-month horizon, which allowed them to recover their investment. This led to the recognition of the value of the machinery and the interest paid on it. b) The previous long-standing relationship and the proven fact that on October 14, 2004, in accordance with the terms of the agreement by and between THS and GTE, the parties involved signed the "Production Schedule, 2005 Provinces Guide, justify the differences in stock, the projected flows and the losses for which compensation is sought in the complaint, c) The reasonable expectation generated by the previous relationship, the planned contract and the compliance with the requirements of the contracting party justify the loss of profit, given that we are in the presence of a proven financial or other impairment that was not perceived, which was reasonable, and to be expected if the unlawful breach had not occurred. This impact

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                             RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 290 of 490

TRANSLATION

goes beyond the agreement and its term, given that the consequences of its breach were so serious that they led to the extinction of the plaintiff in the exercise of its economic activities by being forced to sell machinery and assets and pay the debts generated by the agreement signed with Verizon Information Services Costa Rica LLC. In this sense, the interruption of operations translates into damage or loss of profit, not only because the plaintiff was prevented from obtaining a profit from the contractual performance of the Master Agreement, but also from the profits that could have been obtained in the future if it had remained in operation. In this regard, we believe that the willful breach by Verizon Information Services Costa Rica LLC was a determining factor in the fact that the plaintiff could no longer operate and was affected in a definitive manner. Therefore, we consider that the abrupt termination of the primary contractual relationship of the company (as stated by the court expert) affected the impossibility of future operations. The situation would have been different if the breach had been attributable to the plaintiff company or if the agreement had normally expired, given that the consequences of not continuing the agreement would have had to be assumed by Trejos Hermanos Sucesores as part of the business risk of depending on a commercial relationship. For this Court, based on a comprehensive assessment of the evidence, it is evident that there is a _probability_ that if the contractual relationship had not been abruptly, without cause, and intentionally broken by Verizon Information Services Costa Rica LLC, the plaintiff would have remained in business. The situation of the plaintiff goes beyond mere possibility, insofar as during the exercise of a normal performance of the agreement, there could have been the probability of recovering investments, paying debts, and having the opportunity to explore business alternatives. As evidenced on record, this was not possible, since the early termination caused by the co-defendant affected the economic projections of the plaintiff and the security provided by the signed agreement. Consequently, it was proven that an event occurred, with all its consequences expected according to the ordinary course of events, which, we repeat, would not have occurred if the contract had not been breached by the co-defendant. Therefore, it is indemnifiable, given the certainty that the company would have continued operating if the contractual object had been duly

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 291 of 490

TRANSLATION

performed by the contracting company. If, as has been demonstrated, Verizon Information Services Costa Rica LLC led the plaintiff to make substantial investments, and if it is evident from the contractual relationship and the type of activity that there was a marked dependence of the financial solvency of Trejos Hermanos Sucesores on its involvement with the contracts for the production of telephone directories, then it is logical to assume, in accordance with sound rational criticism, that the plaintiff was fully aware that its breach of contract would impact the very life of its contractor and its business operation. Thus, the so-called damages due to "interruption of operations" was not merely incidental but likely to occur and, as such, must be included among the damages to be compensated. Therefore, the existence of a willful default is determinant in considering that knowledge-avoidance position of Verizon Information Services Costa Rica LLC affects the determination of its contractual liability, not only for the damages and impairments suffered during the contractual period, but in any subsequent period, directly related from the causal point of view with the consequences of the unlawful act demonstrated to the contracting party. Consequently, claim 6 of the complaint should be accepted, which states: "**6.-** *That the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A.*" In accordance with the above, the co-defendant companies are ordered to pay the items indicated, jointly and severally.

**V.XV.- On the liquidated amounts:** a) In its complaint, the plaintiff files a claim for judgment as follows: "*12). - That the defendants* **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** *and the companies* **Verizon Communications Inc.** *and* **Verizon Information Services -Costa Rica. LLC** *must pay the plaintiff, jointly and severally, the damages caused, which are calculated as follows:*

| | |
|---|---|
| a) Investment in machinery | $2.582.156 |
| b) Increase in inventories | $2.860.696 |

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

| c) Operating Cash Flows not received 2004-2013 Directories in Costa Rica | $ 8,806,872 |
|---|---|
| d) Operating Cash Flows not received 2004-2013 Directories in the Dominican Republic | $ 7,912,999 |
| e) Losses incurred from 2004 to 2007 | $ 7,237,068 |
| f) Interest paid by THS | $ 983,825 |
| g) Interruption of Operations | $28,885,195 |

b) The objection of the defendants regarding these items is related to the causality of the alleged damages (since they allege poor business management and business decisions), the fact that in their opinion the subsequent sale of the machinery and the existence of a subsequent contract with Radiográfica Costarricense S.A. were not taken into account in the calculations, c) In this regard, this Court considers it appropriate to accept the amounts of the items listed, with the details that will be indicated for the following reasons: 1. Said calculations are based on the technical study prepared by Mr. Tomás Evans Salazar, provided as evidence by the plaintiff and ratified by the judicial expert Ramón Humberto Romero Rodríguez, Certified Public Accountant and Expert Actuary, who indicated the following in his expert opinion: *"ON THE STUDY PREPARED BY MR. TOMÁS EVANS SALAZAR. This professional conducted an exhaustive analysis entitled: "study prepared by Mr. Tomás Evans Salazar, member of the Association of Professionals in Economic Sciences," ID card 11968, which was attached as expert evidence. From his analysis, it was possible to conclude: I. The accounting information (accounting records and audited financial statements) on which the estimates for the periods from December 31, 1990 to March 31, 2004 were based was confirmed. 2. it was corroborated that the rates applicable to the calculations made correspond to calculated average rates, the source of which was the Central Bank of Costa Rica. 3. it was also determined that the focus of this study was conducted with a conservative criterion, using the tools of normal application in matters of prospective and retrospective information, using the necessary formulas to determine: - averages, - future values, - current values, - estimates based on*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

regressions and others. IV.- IN REGARD TO THE INVESTMENT IN MACHINERY. The formula for calculating the future value of the investments recorded for accounting purposes minus the sales price of the rotary machine and its accessories is the right formula. This was done with a cut-off date of August 31, 2008. The applied rate of 16.94% per year on average, seems to me to be reasonable. Amount of this item: US$ 2,582,156.00. It was therefore proven that the calculation of the amount claimed for investment in machinery of $2,582,156 is correct and based on an update to August 2008 of its acquisition cost, less the value at which it was auctioned. It was also concluded that said investment was made to meet the technical requirements of the ICE-GTE Consortium (later Verizon) contract and the agreement of these companies with the plaintiff. Therefore, its loss is a proven damage to the plaintiff's equity originated in the facts of this complaint. V.- REGARDING THE INCREASES IN INVENTORIES. The future value of the increase in the investment in inventories was calculated by comparing the average of the periods 1997 to 1999 with the inventory levels of the period from 2000 to 2004. This calculation is considered reasonable. The cut-off date considered was August 31, 2008. Likewise, the applicable average passive annual rate was considered reasonable. Amount of this item: US$2,860,696.00. The calculations for the amount claimed for the increase in inventories of $2,860,696.00 were verified as correct and adjusted to the technique. I agree with Mr. Evans that these variations were the result of the necessary investment in working capital to comply with the requirements of the agreement and, therefore, its loss is a proven damage to the equity of the plaintiff originated in the facts of the complaint, which is the subject matter of these proceedings. VI.- REGARDING THE PROFITS NOT EARNED FROM 2004 TO 2013, FOR COSTA RICA AND THE DOMINICAN REPUBLIC. The calculation of the future and present values of the cash flows that the company would have generated was reviewed in accordance with the terms of the agreement and according to the estimate of income based on the thousands of pages expected. This calculation was found to be correct. The cut-off date was August 31, 2008. An average rate of 2.79% per year was used and an average US inflation rate of 3.54% per year was employed. The company THS, as I was able to confirm based on the financial statements and the productive reality and full compliance of the contracts,

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

expected a stable environment that was protected by the contractual practice, to continue for the term of 2004 to 2013 without any difficulty and in a normal way as had been happening in the last 25 years. Amount of this item: US$16,719,871.00. The calculations and determination of the expected and unrealized flows from the telephone directories of Costa Rica from 2004 to 2013 for a net amount of $8,806,872.00 until August 31, 2008 (date of the study) were verified as correct and adjusted to generally accepted accounting and financial principles. The contractual prices and terms and the spreadsheets for income and cost projections and the result of the quantified damage were verified as correct. It was found that conservatively, the plaintiff company could have counted on those net cash flows if the events that led to the termination of the agreement to produce the Costa Rican telephone directories had not occurred through no fault of its own. VII.- LIKEWISE, THE PREDICTED BUT NOT RECEIVED FLOWS FROM THE DOMINICAN REPUBLIC DIRECTORIES WERE CALCULATED AT AN AMOUNT OF US $7,912,999.00, UNTIL AUGUST 31, 2008. They were considered correct and adjusted to the technique. It should be noted that although the plaintiff company did not have an agreement for the entire calculated period, it was possible to verify based on the audited reports and purchase orders of different years that the company had been preparing such directories for more than twenty years and the Costa Rican agreement with the GTE group (later Verizon) provided for the contracting of such directories as preferred supplier and the facts of these proceedings coincided with the sale of the operations of the Verizon Corporation in the Dominican Republic, described above, to prevent the company from having those net flows, which under normal circumstances it could have received. Therefore, it is considered reasonable that such amounts constitute damages to the equity of the plaintiff. VIII.- REGARDING THE LOSSES INCURRED FROM 2004 TO 2007. The calculation by which the resulting losses were carried forward for the periods from 2004 to December 31, 2007 was reviewed and found to be correct. The cut-off date was August 31, 2008. The rate applied was also 2.79% per year on average. Amount of this item: US$7,237,068.00. The calculation of losses incurred from 2004 to 2007 with an updated value as of August 31, 2008 of $7,237,068 was verified as correct and adjusted to the technique. Based on the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*accounting data, it was possible to verify that during 2004 and 2005 there was a reduction in income as a result of the above, with the loss of confidence of other clients and the company's fixed cost structure leading to losses. All this makes it possible to establish that the losses of the plaintiff company derive from the facts of the complaint that is the subject matter of these proceedings. IX.- REGARDING THE INTEREST PAID BY THE PLAINTIFF. The calculation of the interest paid to Banco Cuscatlán and the Heidelberg supplier was reviewed according to their accounting record date, and their amounts were taken to the future value, considering this calculation to be correct. The cutoff date used was August 31, 2008 and an average annual rate of 2.79% was used. Amount of this item: US$983,825.00. The calculation of the interest paid to the company that financed the rotary machinery Heidelberg Finance Corp, and to Banco Cuscatian which financed the purchase of other machinery and the updating of its value as of August 31, 2008 for a value of $983,825.00, was verified as correct. It was considered that such payments also originated from the technical requirements of contracts terminated for reasons beyond the control and responsibility of the plaintiff. X.- REGARDING THE INTERRUPTION OF OPERATIONS. The information from the audited financial statements for the years 1991 to 1999 was used to project the cash flows that the company would have generated without the participation of the agreement with Verizon in its operations. This calculation was considered reasonably correct. Here it is important to emphasize that since Verizon was the main client of THS, and the agreement of 168 months was the basis of the business, in its absence, the company did not have any possibility of continuing operations; for this reason, the use of the perpetuity formula is considered suitable, and that the loss of the agreement did not occur by deficiencies, and was not attributable to the plaintiff. Amount of this Item: US$28,885,195.00. In other words, the calculation of the amount claimed for interruption of operations for a value as of August 31,2008 of US $28,885,195.00 was proven to be correct, adjusted to the technique and the accounting and financial practices. In fact, the company was almost one hundred years old when, due to events beyond its control, it lost the contract for the preparation of Costa Rican telephone directories, which it had signed for a period of 168 months (14 years). It had been preparing these directories*

Digital signature of:
      RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE
This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     RECEIVED NYSCEF: 10/26/2021

TRANSLATION

*for almost one hundred years. It was possible to verify, based on the accounting records and audited reports, that because of the weight of this business in its operations and its cash flow, the company could not continue to operate without it. Likewise, and by virtue of the stability of the results of its operations, measured by both gross profit and earnings before interest, taxes, depreciation and amortization (EBITDA) for the fifteen years prior to the events, it is correct to calculate a perpetuity of the cash flows from the operations of the plaintiff company, as Mr. Evans did, and to consider the interruption of its centennial operations as a damage to the plaintiff. XI.- SUMMARY. The calculation of damages for breach of contract with Verizon Information Services Costa Rica, LLC, Verizon Information Services-Belize, LLC and GTE Directorios República Dominicana, C por A. prepared by Mr. Tomás Evans Salazar in the amount of $59,268,811.00 calculated as of August 31, 2008, is correct and accurate and was prepared in accordance with generally accepted accounting and financial principles and applying the correct techniques."* 2. The defendants have not demonstrated the opposite and therefore the application of Article 317 of the Code of Civil Procedure is appropriate, insofar as it was up their responsibility disprove, through technical evidence, that the amounts set and the concepts established did not conform to the truth or follow applicable techniques. 3. The calculations of indemnity for machinery investment made by Mr. Tomás Evans Salazar in a study provided as evidence by the plaintiff and ratified by the court expert Ramón Humberto Romero Rodríguez, Certified Public Accountant and Expert Actuary, do include the sale of the machinery. This is expressly indicated by pointing out that in this case the "Calculation of future value of investments recorded for accounting purposes minus the selling price of the rotary machine and its accessories" was considered. 4. The amounts determined in the documents mentioned, both by Evans Salazar and Romero Rodríguez, are based on the applicable techniques, are coincidental and include the items of machinery, increase in inventories, operating cash flows according to the agreement, losses incurred, interest paid and impairment due to interruption of operations. In this sense, this Court notes that in said documents with respect to the machinery, the cost of the equipment and machinery on the date on which the court auction became final, as well as the amounts

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

for depreciation thereof, were updated, and the loss was determined as the difference between the net value of the machinery as of June 30, 2007 (date of the auction) and the selling price thereof. Additionally, the variations in inventory were taken to future value, the projected but not actually realized flows were determined, projecting the consumption of thousands of pages obtained between the year 2000 and 2003, along with other calculation variables, in order to determine how the non-continuation of the contract affected this concept. On the other hand, the resulting losses for the periods between 2004 and 2007, the interest charges paid to Banco Cuscatlán and the Heidelberg company were taken to future value. Finally, the interruption of operations was calculated, using mathematical forecasts of economic income results for the period 2000-2014 based on the trends of the period from 1991 to 1999. The defendant did not object to or provide evidence that disproved the methodology or the estimated dates for future value of the losses incurred, the interest rates applied, projections, calculations, methodologies or conclusions obtained. Therefore, this Court does not have elements of conviction that allow it to question the scope of the documents under analysis. Consequently, it is appropriate to recognize the amounts indicated by the plaintiff and on the understanding that the additional amounts contemplated in the expert opinion of CPA Romero Rodríguez do not fall within the scope of the expert opinion requested and the claims put forward in the complaint, for which reason they should not be recognized. The amount indicated must be reduced by the amounts paid to the plaintiff by Radiográfica Costarricense S.A., for any contract of telephone directory preparation made after the breach of contract by Verizon information Services Costa Rica LLC. Likewise, this Court considers it appropriate to deduct the amounts corresponding to the following:

| | |
|---|---|
| d) *Operating Cash Flows not received 2004-2013 Directories in the Dominican Republic* | $ 7,912,999 |

This is because although the Master Agreement did not contemplate directories for that country, as can be seen from the text of the agreement, and the fact that the plaintiff's allegations are exclusively directed at the breach of said contractual object, there is no

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

proof of another duly signed contract that has been breached for the same *causa petendi* of these proceedings. Therefore, Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are jointly and severally ordered to pay the amounts specified.

**V.XI.- Regarding the noneconomic damages claimed:** As part of the damages awarded, the plaintiff claims the existence of a noneconomic damages as the result of the facts on which the complaint is based. With respect to the noneconomic damages, we note the following clarifications. The recognition of the responsibility of the State for purely noneconomic damages is implicit in the complementary reading of Articles 9 and 41 of the Political Constitution, given that in the former no distinction is made with respect to the responsibility of the State, and in the latter, there is an express reference to the possibility of protecting "noneconomic" interests, among which is the possibility of compensating for both subjective and objective noneconomic damages. The American Convention on Human Rights, on the other hand, affirmed in this regard: *"Article 11: 1. Everyone has the right to have his honor respected and his dignity recognized. 2. No one may be the object of arbitrary or abusive interference with his private life, his family, his home, or his correspondence, or of unlawful attacks on his honor or reputation. 3. Everyone has the right to the protection of the law against such interference or attacks."* Article 24: All persons are equal before the law. Consequently, they are entitled, without discrimination, to equal protection of the law."

*"Article 5.1:* Every person has the right to have his physical, mental, and moral integrity respected." Even before the 1949 Political Constitution came into force or the Convention was approved at the end of the 1960s, since the 19th century, Article 59 of the Civil Code provides: "The right to obtain compensation for noneconomic damages is established, in cases of injury to the rights of the personality." In matters of national administrative law itself, Article 197 of the General Law of Public Administration provides: *"There shall be liability for damage to purely noneconomic assets, as well as for noneconomic suffering and physical pain caused by death or injury, respectively."* Notwithstanding the foregoing, it is appropriate to make some clarifications on the matter, based on the doctrine and the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                                    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 299 of 490

TRANSLATION

judicial decisions issued on the subject matter, given the existing particularities with respect to this type of damage, taking into account that in the case of subjective noneconomic damage, since the most intimate sphere of the individual is affected, the common rules with respect to the proof of damage cannot be applied, when the damage is caused to the subject's assets. In this sense, it has been said: *"In order to prove the noneconomic damage in its existence and entity, it is not necessary to provide direct evidence, but the judge must* assess *the circumstances of the act and the qualities of the victim in order to objectively and presumptively establish the noneconomic damage in the reserved sphere of the victim's privacy. We do not believe that noneconomic offense should be subject to direct proof, since this is absolutely impossible due to the nature of the offense, which resides in the most intimate part of the personality, although it is sometimes manifested by external signs that may not be an authentic expression ... no one can probe the spirit of another so deeply as to be able to affirm with certainty the existence and intensity of pain, the truth of a suffering, the reality of anguish or disappointment"* (Bustamante Alsina, "*Equitativa valuación del daño no mensurable*" ("Equitable assessment of non-measurable damage"), 1990. pages 655 and 656). The foregoing considerations have as their foundation the assessment that noneconomic damage must be seen as in *re ipsa or in itself*, given that in order to have spiritual damage configured, it is not necessary to prove, in a direct way, the suffering or depression externalized towards third parties, given that it implies rather the alteration of the existential balance of the persons, within their most intimate scope, and not necessarily made known or externalized in all its dimension towards third parties, while the latter is a function of the personality of each injured individual and based on the fact that the reactions of the human being have diverse forms and opportunities of manifestation. Therefore, in the event that the existence of a conduct is proven (death of a loved one, loss or damage to a noneconomic or material asset, impairment of fundamental rights, etc.) that could affect the person's privacy by causing pain, anguish, suffering, etc., it is interpreted that there could necessarily be noneconomic damages, and

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 300 of 490

TRANSLATION

therefore the intensity of such damages and the means for their compensation will be determined in accordance with the criteria that we will analyze in this same section. It is then, in function of the undermined subjective rights, that we can speak of the existence of a noneconomic damage, given that this will occur in the face of the violation of some of the inherent rights of the personality and that therefore they are considered nonmonetary. For this reason, it is said that noneconomic damages arise from the mere occurrence of formal or material actions by the Administration or from the omission of actions that violate such rights, but the particular circumstances of the case must be taken into consideration, as well as the existence of evidence that proves its compliance in a particular case.

In this regard, reference should be made to the following: *"Since noneconomic offenses are necessary and unavoidable consequence of the violation of some of the rights of the personality of a subject, the demonstration of the existence of such transgression will require, at the same time, proof of the existence of the damage. The determination of the existence of noneconomic damage can be made in a way as objective as the verification of pecuniary damage. To this end, it is necessary only to compare a fact with the legal rule that grants a subject a right inherent to personality, to verify whether or not the former constitutes a violation of the provisions of the latter."* *Brebbia Roberto*. El Daño Moral *(Noneconomic Damage). Editorial Orbir.* In this regard, this Court considers that it is appropriate to make some clarifications regarding the noneconomic damages that will be fully applicable to the resolution of the performance submitted to its knowledge: In the first place, it should be noted that in matters of noneconomic damages we speak of a **compensatory role** and not of the equivalence sought in the case of material damages. In addition, it should not be forgotten that noneconomic damages are not exempt from the **certainty** required, which means that they must be the consequence of the action or omission of the Administration, and that the interest of the person who claims them

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6                                                           RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 301 of 490

TRANSLATION

must be certain. In this regard, the following has been indicated: *"Noneconomic damage is not pain, sorrow, anguish, but the spiritual undermining derived from the injury to a non-pecuniary interest. Such detriment exists even when the victim does not understand the damage suffered; in the absence of tears; even when the victim is not in physical or "psychological" condition to "feel" grief, pain, or anguish (e.g., a braindead person). Subjective disvalue exists when the victim has "matured" such pain and, perhaps, stopped "feeling" it. Therefore, it is immediately apparent that noneconomic damage can wreak its effects into the future, with a sufficient degree of certainty..."* (Daniel Pizarro Ramón. Daño Moral (Noneconomic Damage). Ed. Hammurabi. Page 105). This certainty implies, then, that even though the noneconomic damage is of an *in re ipsa* (by itself) nature and there are injuries which, by their very nature, become such a damage, as has been indicated, in certain circumstances in which the claim is generic or has been delimited in a certain sense when it is specified in the complaint, it does not imply such an automaticity that it relieves the party that claims to be affected of its duty to provide evidence to help the judge verify its scope in the particular case. With respect to the need for indirect evidence in the determination of noneconomic damages, the following has been indicated: *."..*

*This Chamber endorses the existence of noneconomic damages but reiterates that they correspond to an impairment of the non-monetary sphere. In this case, the damages awarded were of a subjective nature, i.e., pure or affective, which translates into an impairment of the individual's state of mind. Although it does not require direct proof, it does require at least indirect proof that would allow the judge to assess the damage..."*

**(Vote No. 000290-FS1-2014 issued at 10:05 a.m., on the sixth day of March, two thousand and fourteen, by the First Chamber of the Supreme Court of Justice).** On the other hand, the noneconomic damage is of a **personal nature,** depending on the impact on the legitimate interest of the affected person. With regard to the scope of noneconomic damage in our country, the First Chamber, in its vote No. 112 issued at 2:15 p.m. on July 15, 1992, repeatedly quoted and applied by different jurisdictional bodies, stated: *" IV.-*

Digital signature of:

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6 RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 302 of 490

TRANSLATION

*Damage constitutes one of the assumptions of civil liability in tort, since the duty to compensate is only configured if there has been a harmful illegal act that injures a legally relevant interest, susceptible to be protected by the legal system. Damage, in the legal sense, constitutes any impairment, loss or detriment to the legal pecuniary or non-pecuniary sphere of the person (injured party], which causes the deprivation of a legal asset, with respect to which it was objectively expected that it would be preserved if the harmful event had not occurred. Under this premise, there is no civil liability if no damage is caused, just as there is no damage if there is no victim. On the other hand, it is only the damage that can be proven (reality or existence) that is indemnifiable, this being a matter of fact reserved for the prudent discretion of the judge. In summary, damage constitutes the detrimental gap for the victim resulting from the confrontation between the situation prior to the wrongful act and the situation subsequent to it. V.- On many occasions the expressions "damages" (daños, in Spanish) and "special damages" (perjuicios, in Spanish) are used indiscriminately, it is necessary to specify and distinguish both concepts. Damage constitutes the loss incurred by the victim* (damnum emergens), *while special damage ("perjuicio") is made up of the profit or utility that has been lost or frustrated* (lucro cesans), *which could reasonably and probably be expected if the wrongful act had not occurred. VI.- Not all damage gives rise to an obligation to compensate. For this purpose, basically the following characteristics must come together to be an "indemnifiable damage": A) it must be true, real, and effective, and not merely possible or hypothetical; it cannot be based on alleged or speculative realizations. Damage does not lose this characteristic if its quantification turns out to be uncertain, indeterminate or of difficult appreciation or proof; neither should certainty be confused with the current time, since it is admissible to repair damage that is certain but future; likewise, future damage should not be confused with loss of profit or special damage, since the former refers to that which arises as a necessary consequence of the causal or generating event of the damage, i.e., its repercussions are not projected when the proceedings are initiated. As to the magnitude or amount (seriousness) of the damage, this constitutes a point of subjective concern of the injured party; however, the law cannot deal with claims based on insignificant*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 303 of 490

TRANSLATION

damages, derived from excessive susceptibility. B) There must be an injury to a legally relevant interest that deserves protection. Thus, there can be a direct and an indirect victim: the former is the victim of the harmful act, and the latter will be the victim's successors. C) It must be caused by a third party, and subsist; that is, if it has been repaired by the responsible party or a third party (insurer), it would not subsist. D) There must be a causal relationship between the unlawful act and the damage. VII.- Within the classes of damages, we first find material and corporal damages; the former affects the things or material goods that make up the person's property, while the latter affects the corporal and physical integrity. For legal scholars, the generic denomination of material or pecuniary damage usually includes the specific bodily injury and material damage, in the strict sense. The latter seems to be the best expression, since personal injury usually affects the financial interests of the injured party (payment of medical treatment, hospitalization expenses, medicines, etc.), lost earnings if the injury has made him unable to carry out his usual occupations (special damages), etc. This distinction was born in the Roman Law, since a distinction was made between the damage inferred to the things directly (damnun) and damage that injured the physical personality of the individual (injuria,). In the case of damage to property, the loss generated Is economically quantifiable. VIII.- Noneconomic damages (also known in the literature as incorporeal, non-pecuniary, pain and suffering, or affective damages, etc.) occur when the individual's sphere of non-pecuniary interests are harmed, but since their violation can have financial consequences, a distinction must be made between "pure" subjective noneconomic damages or damages of affect, and objective or "objectified" noneconomic damages. Subjective noneconomic damage is produced when a non-monetary right has been injured, without property repercussions, normally supposing an unjust disturbance of the individual's psychic conditions (displeasure, discouragement, desperation, loss of satisfaction of living, etc., e.g., the offense against honor, dignity, intimacy, the so-called damage to life in a relationship, grief for the death of a relative or loved one, etc.). Objective noneconomic damages injure a non-monetary right with repercussions on property, i.e., they generate economically valuable consequences (e.g., the case of the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

professional who loses his clientele in whole or in part because of the attributed fact). This distinction serves to distinguish the damage suffered by the individual in his social consideration (good name, honor, honesty, etc.) from the one suffered in the individual field (grief for the death of a relative), so one refers to the social part and the other to the emotional part of the person's life. Originally, this distinction arose to determine the scope of indemnifiable noneconomic damage, since in the beginning the doctrine was reluctant to compensate pure noneconomic damage because of its difficult quantification. For compensation, a distinction must be made between the different types of noneconomic damages. In the case of objective damages, the appropriate demonstration must be made, as in the case of pecuniary damages; but in the case of subjective noneconomic damages, since the amount cannot be precisely structured and demonstrated, it is left to the prudent discretion of the judge, who will take into account the circumstances of the case and the general principles of law and equity; the lack of evidence regarding the magnitude of the damages does not prevent a determination of the amount. The dogmatic difference between pecuniary and noneconomic damage does not exclude that, in practice, one and the other may occur concomitantly, which could be the case of injuries that generate physical pain or cause physical disfigurement or deformity (damage to health) and aesthetic damage (disruption of the physical harmony of the face or any other exposed part of the body), without the noneconomic damage being considered secondary or accessory, since it evidently has autonomy and peculiar characteristics. In sum, noneconomic damage consists of physical, psychological, affective or noneconomic pain or suffering inflicted by an unlawful act. Normally the fertile field of noneconomic damage is that of personality rights when they are violated." Based on the foregoing, it is evident that in the case of subjective noneconomic damages, the existence of direct evidence is not required, but rather certain criteria are applicable to it that delimit the discretion of the judge and that are derived from its own legal nature and from the evidence provided by the party and that have been developed by national jurisprudence. Thus, the following can

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

be indicated: **1). - General principles of law and equity:** The decision mentioned above establishes the general principles of law and equity as the first delimiting criterion. **2).- Presumptions inferred in the particular case:** As a second criterion to be used to determine the existence and extent of subjective pain and suffering, it has been mentioned that the judge may use presumptions for its recognition. In this sense, the First Chamber has indicated: "*Since its quantification cannot be precisely demonstrated, it is left to the prudent judgment of the judges, without requiring specific proof of its existence, since its determination is made* in re ipsa *(in itself), which implies that it is "consubstantial or inherent to the injury itself, it goes with the thing, it is understood in principle as a derivation of the fact or the adopted conduct" (resolution No. 125-F-S12009 issued at 3:35 p.m. on February 5, 2009). However, for its recognition, it is necessary that from the weighting of all the existing evidence in the case, the subjective affliction claimed as a consequence of the accused conduct must be inferred, even in an indicative way or by means of presumptions... As stated above, it is not feasible to structure and demonstrate the quantification of subjective pain and suffering in a precise manner, hence the need to establish it based on the circumstances of the case, the general principles of law and equity. The issues listed do not correspond to specific evidence, since they are related to personal characteristics of the plaintiff and alleged consequences of what the plaintiff suffered, which leads the complainant to mention Article 417 of the Code of Civil Procedure concerning humane presumptions. However, it also cannot be established that such presumptions are involved, nor that they are admissible as evidence, since for such purposes they must be the direct, precise, and logical consequence of a proven fact, which is not the case, and the Cassation Court judge does not specify from which proven facts he extracts the aspects he mentions...*" **(Vote 000295-F-S1-2014 issued at 11:30 a.m. on the sixth day of March, two thousand and fourteen, of the First Chamber of the Supreme Court of Justice).** In this regard, it should be noted that in order to apply the presumptions to a specific case as an element of conviction of this Court, the provisions of Article 417 of the Code of Civil Procedure must be fulfilled, as it

Digital signature of:
        RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
        MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6      RECEIVED NYSCEF: 10/26/2021

TRANSLATION

provides the following: *"Article 417.- Human presumption. Human presumptions only constitute proof if they are a direct, precise, and logical consequence of a proven fact. The proof of presumptions must be serious and in agreement with other evidence given in the proceedings."* With respect to the concept of presumption, the First Chamber of the Supreme Court of Justice has said the following: *"For a presumption to exist as a means of proof it is first necessary that there be a positive or negative event, a true event from which the one to be known must be deduced. The existence or non-existence of this event, broadly called a base fact, or more technically an indication, must be duly demonstrated in the proceedings in order to ensure the viability of the presumption. This can be deduced from Article 417 of the Code of Civil Procedure: "Human presumptions only constitute proof if they are a direct, precise and logical consequence of a proven fact." The Court has indicated that this type of presumption. "..is the result of the exercise of the discretion granted to the judge to* assess *the evidence, deriving then the presumption of other facts that have been held to be true," (no. 848-F, issued at 2:45 p.m. on October 31, 2001). This connection between the basic fact or indication and the event that is intended to be derived (a consequential event) must be direct and precise, and it is verified in accordance with purely logical norms, with the rules of human judgment, a task carried out by the judge vested with discretionary power according to his conscience and discernment. It is he who exclusively infers a fact or act from such evidence, according to his inner conviction within a framework of reasonability and rationality, in a logical prius that does not violate sound criticism; hence, his judgment is maintained, unless it is proved to be contrary to the evidence that has been shown, either because of a factual or legal error in their evaluation with respect to the basic or indicative facts, or because the inference borders on the absurd because it contradicts common sense or natural phenomena"* (judgment No. 25-F-2007, issued at 10:45 a.m. on January 19, 2007) (emphasis added). (In this regard, see, among others, judgments of the same Chamber, No. 27 issued at 10:30 a.m. on May 5, 1993, No. 217 issued at 3:00 p.m. on May 5, 1999; and No. 848 issued at 2:45 p.m. on October 31, 2001). **3) Criteria of reasonability and proportionality:** With regard to the application of these criteria, the following has been

RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 307 of 490

TRANSLATION

indicated: "It should be remembered that when compensating for subjective noneconomic damages, although it is not a question of quantifying the suffering - which is negligible, an attempt is made to determine monetary compensation for the injury, as a mechanism to which the law can resort, in order to repair - at ¡east in part - the offense caused (in this sense, see, among many others the judgment of this Court No. 1143-FS1 - 2012 issued at 9:10 a.m. on September 13, 2012). The amount awarded must arise from a prudent assessment by the judge, through which he avoids falling into extremes of meager, symbolic or - to the contrary - excessive compensation; therefore, he must rule in line with equity and the principles of reasonability and proportionality. With respect to the latter, the following has been indicated: "Reasonability is opposed to arbitrariness and refers to a pattern of justice with which the principle of legality is completed. From another angle, that of proportionality, it refers to a correspondence between the factual circumstances, the means employed and the decision adopted, (First Chamber, judgment No. 1292-F-SI-2012 issued at 9:55 a.m. on October 11, 2012). That is why, as regards the estimate of the subjective noneconomic damage, this Chamber has stated: "The judge's assessment within this inexorable framework allows for its quantification to be in accordance with the law and not to lead to disproportionate compensation that benefits or unjustifiably harms one of the parties. In other words, there must be a fair balance derived from the specific factual framework." (Decision No. 4-F-SI-20I2 issued at 8:50 a.m. on January 12, 2012). By virtue of the above, it has been said that: "equity and the assessment of the seriousness of the offense committed must be used and the personal circumstances and subjective repercussions on the victim must also be taken into account (marital status, age, cultural level, degree of family cohesion and coexistence, among others)." (First Chamber, judgment No. 279-F-S1-2011 issued at 9:30 a.m. on March 17, 2011; and in similar sense, see decision No. 318-F-S1-2011 issued at 9:25 a.m. on March 31, 2011) ...[11] **(Vote 001045-F-S1 -2013 issued at 9:05 a.m. on the fourteenth day of August, two thousand and thirteen, by the First Chamber of the Supreme Court of Justice). 4).- Causality:** Causality of the damage is another criterion of an unavoidable nature, while the actual cause of the damage may determine the scope and limits of the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

compensatory estimate. This can be clearly inferred from the following: "*The subjective noneconomic damage is seen in the shock, anguish and the feeling of helplessness caused by being unable to ask for medical and safety assistance, having -those who were in better physical condition- to walk long distances in search of help, neglecting not only the other injured passengers but also the product they were carrying, all because of the absence of cell phone service. In other words, the lack of cellular coverage, as well as the failure to report telephone reception problems at the scene, led as a causal link to subjective noneconomic damage translated into anguish, shock and helplessness.*" **(Vote 000507-F-S1 -2014 issued at 2:00 p.m. on the twenty-seventh day of March, two thousand and fourteen, by the First Chamber of the Supreme Court of Justice).** Consequently, it should be noted that it has been accepted that within the framework of the theory of the responsibility of the Public Administration, in principle, it would be valid to admit the possibility that the defendant can prove the existence of one of the circumstances that exempt it from responsibility established in Article 190 of the General Law of Public Administration, namely, *force majeure*, the victim's guilt or an act of a third party; or even prove the nonexistence or lesser gravity of what is claimed. Thus, it has been indicated that "*The amount to be fixed must be a faithful reflection of the circumstances described in the record, so that it is an appropriate sum, given the problems suffered by the injured party, caused by the unlawful criminal or civil acts of the agent or agents producing the damage. Since these presumptions are iuris tantum, they admit proof to the contrary, of which the defendant or responsible for causing the damage must be extremely diligent, since he has the burden of proof to disprove the presumptions of pain, suffering, embarrassment or tort and for that purpose, he can resort to any type of ordinary evidence.*" (Montero Piña Fernando. El Daño Moral, Page 61. Impresión Gráfica del Este). It must be noted that some legal doctrine has held that there are no grounds for exoneration when the level of intensity is excessive, in the case of any damage resulting from lawful and normal conduct. **5) The prudent assessment of the Judge:** On the other hand, always within the order of proportionality, reference is made to the "judge's prudent assessment" of the damage and its compensation, as follows: "*The evidence of this type*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 309 of 490

TRANSLATION

of injury is ''in re ipsa'' (in itself); the amount must be fixed in accordance with prudent judgment and based on the principles of reasonability and proportionality. In this regard, it is important to remember that the judge's assessment within this inexorable framework requires that its quantification be in accordance with the law and does not lead to disproportionate compensation that unjustifiably benefits one of the parties. In other words, they must maintain a fair balance derived from the specific factual situation. Therefore, this is not a question of quantifying the suffering, since it is negligible, but rather of establishing monetary compensation for the injury, the only mechanism to which the law can resort in order to repair, at least in part, the damage caused (in this regard, see judgment No. 537, issued at 10:40 a.m. on September 3, 2003, as quoted in resolutions No. 845-F-2007 issued at 10:05 a.m. on November 23, 2007, and No. 001-F-S 1-2009 issued at 9:05 a.m. on January 6, 2009). This Chamber has also stated: "The determination and quantification of the subjective noneconomic damage, then, is left to the fair and prudent assessment of the Judge, who will resort to human presumptions inferred from the proven facts. The human presumption is a logical judgment by the judge, by virtue of which a fact is considered probable, based on the general maxims of experience, which indicate the normal way in which things and facts happen..." (Decisions No. 878- F-2007 issued at 8:15 a.m. on December 14, 2007 and No. 001 -F-S 1 - 2009 issued at 9:05 a.m. on January 6, 2009, quoted in judgment No. 771-F-S 1-2011 issued at 1:30 p.m. on June 30, 2011). **(Vote 000520- F-SI-2014 issued at 9:08 a.m. on the tenth day of April, two thousand and fourteen, of the First Chamber of the Supreme Court of Justice).** In accordance with the foregoing, the recognition of noneconomic damages must be made on the understanding that, although direct evidence is not required, Judges must be particularly prudent and proceed to evaluate it under their reasonable appreciation, under criteria of equity, applying the human presumptions inferred from the circumstantial elements of the case of analysis, in order to determine the origin and quantum of the judgment on this matter within the limits of reasonability and proportionality. The foregoing is due to the fact that noneconomic damages are not for this Court the product of an arbitrary determination by the Judges, but rather the very consequence of the assessment that the Court must

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

make of the totality of the elements described above in the context of the case under analysis, so that it may fulfill the compensatory function of its legal nature and not imply unjust enrichment for those who claim to be affected without being so, or when, despite delimiting the external manifestations of the same, they do not demonstrate so in court, at least with circumstantial evidence. The absence of an objective situation that per se implies a noneconomic impact, together with the lack of indications as to its scope, as defined by the parties, means that there is no certainty as to its existence in the particular situation under analysis. In view of the foregoing, the claim for compensation filed by the plaintiff should be decided on the merits, **b) Criterion of the Court regarding the claimed noneconomic damage:** The plaintiff asks in its claim for recognition of subjective and objective noneconomic damages on account of the facts proven in these proceedings. However, this Court considers that this is not appropriate since the plaintiff is a legal entity. As such, it does not suffer subjective noneconomic damage, given that those who could have suffered it would be the individuals who composed it, and they are not plaintiffs in the proceedings. Additionally, in any case, it is necessary to indicate that there is no proof in this case that demonstrates, as evidence, the existence of any type of subjective or objective noneconomic damage caused by the facts that give rise to these proceedings, and the party merely invokes them, without providing any elements of conviction with respect to their scope and consequences. It is striking that the expert dares to make a determination of subjective noneconomic damage without having the technical knowledge to fix it and also because, by its nature, it is beyond his competence and the possibility of being quantified materially a priori. Therefore, this compensatory item should be rejected.

**VI.- On the inflation adjustment and interest requested:** The plaintiff has made the following request: *"in accordance with the provisions of Article 123 of the Code of Contentious Administrative Procedure, the amounts of the judgment shall also be updated to compensate for the variation in purchasing power, and interest shall be recognized on all the above items, which shall be paid starting from August 30, 2008, until fully paid, and shall be calculated in accordance with the provisions of Article 1163 of the Code of Civil*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
MOLINA, DECIDING JUDGE

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 311 of 490

TRANSLATION

*Procedure."* In this regard, in accordance with Article 123 of the Code of Contentious Administrative Procedure, the amounts subject to judgment are indexed in order to update the purchasing power of the amounts indicated, taking as a parameter the prime rate established for first-rate international banks. Similarly, the legal interest established in Article 1163 of the Civil Code must be applied to these items, with respect to the net profit component, items which must be recognized from August 30, 2008 until they are fully paid, as requested by the plaintiff; this is based on the line of jurisprudence of the First Chamber of the Supreme Court of Justice, which states: . *"..In principle it is feasible to jointly recognize interest (percentage of profit) and indexation (deflationary factor), since these aspects are distinct and autonomous, and therefore are not exclusive; this, of course, provided that the revenues awarded are net, since legal interest contains an added inflationary item. In addition, it is evident that these obligations can be awarded based on the judgment, in which the amount due was established and up to their effective payment..."* (judgment number 000293- F-SI-2016 issued at 9:45 a.m. on April 7, 2016, and in similar sense, judgments 000990-F-02 issued at 4:30 p.m. on December 18, 2002; 107 issued at 2:30 p.m., 108 issued at 3:00 p.m., both on July 10, 1992; 49 issued at 3:00 p.m. on May 19, 1995; 131 issued at 2:10 p.m. on December 18, 144 issued at 2:40 p.m. of December 23, both of 1998; and 14 issued on January 5, 2000, all of the First Chamber of the Supreme Court of Justice)

**VII.- Prior Defenses:** Notwithstanding the defenses already resolved during the course of the proceedings, and the defense of the statute of limitations rejected in previous considerations, the defendants filed the following defenses against the complaint:

A) VERIZON COMMUNICATIONS INC: filed a motion to dismiss based on lack of right, lack of active and passive ad *causam* and *procesum* standing.

1. With respect to the defenses of active and passive ad *causam* and *procesum* standing: The defenses of lack of standing should be rejected, considering that the plaintiff has demonstrated that the co-defendant is a part of the "Verizon" economic interest group and a party to a defaulted contractual relationship with ICE and to another contract with Trejos Hermanos Sucesores that was maliciously breached.

2. With regard to the defense of lack of ad *procesum* standing, it must be rejected,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6       RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 312 of 490

TRANSLATION

because the plaintiff has demonstrated that it has sufficient authority to exercise the respective legal representation.

3. With regard to the defense of lack of right, for the reasons indicated above, it is appropriate to admit it on a partial basis, only concerning the items not recognized in this judgment.

B) VERIZON INFORMATION SERVICES COSTA RICA LLC filed the defense of lack of right: For the reasons indicated above, it should be partially admitted, only concerning the items not recognized in this judgment.

C) INSTITUTO COSTARRICENSE DE ELECTRICIDAD filed the defenses of lack of active and passive standing and lack of right.

1. With respect to the defense of lack of passive standing, it should be accepted, for the reasons mentioned above, since there is no contractual relationship between the entity and the plaintiff. Therefore, there is no material legal relationship of a procedural nature that would allow the plaintiff to sue the entity being sued and thus appear as a defendant in this case.

2. As it is unnecessary, the Court omits any ruling on the rest of the defenses filed by Instituto Costarricense de Electricidad.

**VIII.-Costs:** Article 193 of the Code of Contentious Administrative Procedure establishes that procedural and personal costs are assessed against the defendant by the mere fact of being a defendant, a ruling that must be made even ex *officio,* pursuant to Article 119.2 of said Code. Since the co-defendants Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are not covered by the exceptions, they are jointly and severally liable for the payment of procedural and personal costs. The plaintiff shall pay procedural and personal costs to Instituto Costarricense de Electricidad.

<div align="center">

**THEREFORE**

</div>

The defenses of expiration of the statute of limitations, lack of active and passive standing and lack of ad procesum standing raised by the co-defendants Verizon Communications Inc and Verizon Information Services Costa Rica LLC are rejected and the defense of lack of right raised by the co-defendants is partially accepted. The defense of lack of passive

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6      RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 313 of 490

TRANSLATION

standing filed by Instituto Costarricense de Electricidad is admitted. Consequently, the complaint is partially accepted in all that is expressly indicated and is rejected in all that is not admitted in this operative part. Consequently, the following has been decided: **A)** The Court declares: **1.** That the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES COSTA RICA, LLC), was a subcontract employed by the contractor as means to perform the contract executed between the companies "GTE Information Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware with head offices in the city of Dallas, State of Texas, which identified themselves as the "GTE Consortium," and INSTITUTO COSTARRICENSE DE ELECTRICIDAD, as a result of the award of the contract to such Consortium in Public Bidding Proceedings No. 6378-T, conducted by ICE, in accordance with a resolution of the Board of Directors of ICE, adopted at regular meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, and approved by the Office of the Comptroller General of the Republic on December 13, 2000. **2.-** That the termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM (which changed its name to the VERIZON CONSORTIUM) caused the termination of the "Master Purchase Agreement" executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. **3.** That TREJOS HERMANOS SUCESORES S.A. did not have any liability for the events that caused the termination of the administrative contract entered into between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM. **4.** That TREJOS HERMANOS SUCESORES S.A. did not have any responsibility for the events that caused the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. **5.** That the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSEF DOC. NO. 6     RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 314 of 490

TRANSLATION

Telephone Directory Company, C por A. caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A..." **6.** That the defendant companies Verizon Communications Inc. and Verizon Information Services -Costa Rica- LLC are part of an economic interest group, successor of the economic interest group called GTE Consortium, which was awarded the contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, which was implemented through the Master Purchase Agreement executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. **7**. That "VERIZON COMMUNICATIONS INCORPORATED" is jointly and severally liable with the latter for all obligations incurred by "VERIZON INFORMATION SERVICES -COSTA RICA- LLC," with TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA." **8.-** That the defendant companies Verizon Communications Inc. and Verizon Information Services-Costa Rica- LLC are jointly and severally liable for the negative consequences suffered by the plaintiff company, which resulted from the termination of the Master Purchase Agreement executed on February 28, 2002 with the plaintiff Trejos Hermanos Sucesores S.A.." **9.-** That the clauses of the MASTER PURCHASE AGREEMENT executed between VERIZON and TREJOS HERMANOS SUCESORES regarding the release of VERIZON from civil liability for breach of contract are ineffective, including within that nullity, in particular, Clauses 24 and 28 of that agreement, without this ruling being limited to them, since it includes all the clauses exempting VERIZON from civil liability. B) Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are jointly and severally liable to pay the following amounts to the plaintiff: 1. For the investment in machinery: The amount of $2,582,156.00 (two million five hundred and eighty-two thousand one hundred and fifty-six dollars). 2. For increase in inventories: The amount of $2,860,696.00 (two million eight hundred and sixty thousand six hundred and ninety-six dollars). 3. For Operating Cash Flows not received during the 2004-2013 period for Directories in Costa Rica: The amount of $8,806,872 (eight million eight hundred and six thousand eight hundred and seventy-two dollars). 4. For Losses incurred from 2004 to 2007: The amount of $7,237,068 (seven million two hundred and thirty-seven thousand and sixty-eight dollars). 5. For interest paid: The amount of $ 983,825 (nine hundred and eighty-three

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)      INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6                                                                    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

thousand eight hundred and twenty- five dollars). 6. For damages caused by interruption of operations: The amount of $28,885,195 (twenty-eight million eight hundred and eighty-five thousand one hundred and ninety-five dollars). C) The amounts covered by the judgment are indexed in order to update the purchasing power of the amounts stated, taking as a parameter the prime rate established for first-rate international banks. Similarly, the legal interest established in Article 1163 of the Civil Code must be applied to these items, with respect to the <u>net profit</u> component, items which must be recognized from August 30, 2008 until they are fully paid. D) Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are jointly and severally liable for the payment of procedural and personal costs to the plaintiff. E) The plaintiff is ordered to pay procedural and personal costs to Instituto Costarricense de Electricidad.

**Rodrigo Alberto Campos Hidalgo**

**Marianella Álvarez Molina**                                    **Sergio Mena García**

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 316 of 490

TRANSLATION

- Verification Code -

PSKSOA47ICJ861

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



# Certificate of Accuracy

Tuesday, 26 October 2021

To whom it may concern,

We Trustpoint.One, hereby certify to the best of our knowledge and belief that the foregoing document described as "The Decision of the Contentious-Administrative and Civil Finance Court dated July 19, 2017" is a true and accurate translation of the original.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

If there is any additional information we can provide you, please do not hesitate to contact us.

Yours sincerely,

*Elizabeth Wozniak*

Elizabeth Wozniak
Project Manager
Trustpoint.One

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5(d)) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

EXPEDIENTE: 08-001505-1027 -CA
PROCESO DE CONOCIMIENTO
ACTOR:
TREJOS HERMANOS SUCESORES S.A.
DEMANDADOS:
INSTITUTO COSTARRICENSE DE ELECTRICIDAD
VERIZON COMMUNICATIONS INCORPORATED
VERIZON INFORMATION SERVICES -COSTA RICA- LLC

_____

66 - 2017- V

TRIBUNAL CONTENCIOSO ADMINISTRATIVO Y CIVIL DE HACIENDA. SECCIÓN QUINTA. SEGUNDO CIRCUITO JUDICIAL DE SAN JOSÉ.  Goicoechea, Edificio Anexo A, a las ocho horas del diecinueve de julio del año dos mil diecisiete.

Proceso de conocimiento interpuesto por TREJOS HERMANOS SUCESORES S.A. representado por ÁLVARO TREJOS FONSECA, mayor casado en segundas nupcias, Máster en Ciencias, vecino de San José, cédula de identidad número 1-0390-0895, actuando en su condición de Presidente con facultades de Apoderado Generalísimo sin limite de suma, EDUARDO SANCHO GONZÁLEZ, mayor, casado, abogado, vecino de Montes de Oca, cédula 1-380-073,   ANDRÉS MEZA VILLALOBOS, mayor de edad, abogado, casado, DIEGO BAUDRIT CARRILLO, casado, abogado, vecino de San José, con cédula número 1-323-212, carné del Colegio de Abogados 1155, LUIS GERARDO VILLANUEVA MONGE, mayor, casado una vez, abogado, vecino de Cartago, cédula de identidad No. 3-221-204, todos en su condición de Apoderados Especiales Judiciales, contra el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, representado en diferentes momentos procesales por ENRIQUE ROJAS FRANCO, mayor, casado, Abogado, vecino de Santa Ana, portador de la cédula de identidad número: uno-trescientos noventa-mil doscientos ciocuenta, carnet de Abogado No. 1184, GERMAN CALDERÓN



Firmado digital de:
ROBERTO GARITA NAVARRO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

carné 5995, DANNY FABRICIO SABORÍO MUÑOZ, mayor, soltero, cédula de identidad 1-903-770, carnet de Abogado N 16289, CARLOS CERDAS DELGADO, mayor, casado, cédula de identidad 1-896-201, carnet de Abogado N 15240, ANA VICTORIA ZAPATA CALVO, mayor, divorciada, abogada, vecina de Escazú, cédula uno-ochocientos noventa y dos- cuatrocientos noventa y uno, JUAN PABLO HERNANDEZ CORTES, mayor de edad, abogado, casado, todos en sus condiciones de Apoderados Especiales Judiciales, VERIZON COMMUNICATIONS INC., representado por ANDREA HULBERT VOLIO, mayor, casada, abogada, vecina de Santa Ana, portadora de la cédula de identidad número 9-100-121, ALEXANDER SALAZAR SOLÓRZANO, mayor. casado, abogado, uno-ochocientos treinta y cinco- trescientos noventa y ocho, vecino de Guachipelln de Escazú, en su condición de Apoderado Especial Judicial (poder folio 1170) JUAN CARLOS PIZARRO CORRALES, mayor, casado, abogado, vecino de San José, portador de la cédula de identidad número uno- ochocientos veinticinco- trescientos sesenta y seis, RODRIGO ALBERTO PEREZ GONZALEZ, mayor de edad, abogado, quien se constituye propiamente para la fase de conclusiones de la audiencia de juicio, y MARVIN CÉSPEDES MÉNDEZ, mayor, casado, abogado, vecino de San José, portador de la cédula de identidad número 1-531-965, quien representa a esta sociedad en la fase de alegados de saneamiento, alegatos de apertura e interrogatorio de testigos en audiencia de juicio,  en su condición de apoderados especiales judiciales y VERIZON INFORMATION SERVICES COSTA RICA LLC, representado por este último y por GINO CAPPELLA MOLINA, mayor, casado, abogado, vecino de San José, portador de la cédula de identidad número uno-quinientos sesenta y nueve doscientos veintiséis, en su condición de Apoderados Especiales Judiciales,

RESULTANDO

I.- Que el día quince de diciembre de 2008, la parte actora interpuso proceso de conocimiento ante este Tribunal y solicitó lo siguiente:

*"1. Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, por A (que cambió su razón social a VERIZON*

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*INFORMATION SERVICES COSTA RICA, LLC) constituyó un medio de ejecución del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephohe Directory Company C por A", empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000.*

*2).- Que el citado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A, fue del conocimiento del INSTITUTO COSTARRICENSE DE ELECTRICIDAD, que aprobó la intervención de TREJOS HERMANOS SUCESORES S.A. en la ejecución del contrato administrativa adjudicado al Consorcio GTE resultante de la Licitación Pública No. 6378-T promovida por el ICE.*

*3).- Que la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*

*4).- Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE.*

*5).- Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*

*6.- Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a*



Firmado digitalmente por:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DUARTE, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*TREJOS HERMANOS SUCESORES S.A.*

*7.- Que las empresas demandadas Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*

*8.- Que "VERIZON COMMUNICATIONS INCORPORATED" es el ente de mayor jerarquía de un grupo de interés económico del que forma parte "VERIZON INFORMATION SERVICES -COSTA RICA- LLC", por lo que la primera de esas sociedades responde solidariamente con la segunda por todas las obligaciones contraídas por "VERIZON INFORMATION SERVICES -COSTA RICA- LLC" , con TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA.*

*9).- Que las empresas demandadas Verizon Communications Inc. y Verizon Information Services -Costa Rica- LLC son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A.*

*10).- Que el INSTITUTO COSTARRICENSE DE ELECTRICIDAD desconoció los derechos e intereses legítimos de TREJOS HERMANOS SUCESORES S.A. derivados de la ejecución de la Licitación Pública No. 6378-T a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002, por lo que es responsable solidario con Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC de la indemnización de los daños y perjuicios sufridos por la actora por la extinción del citado Contrato Maestro de Compra suscrito el 28 de febrero del 2002.*

*11).- Que son nulas e ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON. .*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERBIA MARIA MUÑOZ MUÑOZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

12).- *Que los demandados el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y las empresas Verizon Communications Inc. y Verizon Information Services -Costa Rica. LLC deben pagarle a la parte actora, solidariamente, los daños y perjuicios irrogados, que liquidamos de la siguiente manera:*

| | |
|---|---|
| *a) Inversión en maquinaria* | *$2.582.156* |
| *b) Incremento en inventarios* | *$2.860.696* |
| *c) Flujos de Caja Operativos no recibidos 2004-2013 Directorios Costa Rica* | *$8.806.872* |
| *d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana* | *$ 7.912.999* |
| *e) Pérdidas realizadas 2004 a 2007* | *$7.237.068* |
| *f) Intereses pagados por THS* | *$ 983.825* |
| *g) Interrupción de Operaciones* | *$28.885.195* |
| *h) Daño Moral* | *$ 5.000.000* |

*i) De conformidad con lo que dispone el articulo 123 del Código Procesal Contencioso Administrativo se concederá, además, la actualización de las sumas de la condenatoria para compensar la variación en el poder adquisitivo y se reconocerán Intereses de todas las partidas anteriores que se pagarán a partir del 30 de agosto del 2008 y hasta que se cancelen totalmente, que se calcularán de conformidad con lo que dispone el articulo 1163 del Código Procesal Civil.*

13).- *Los demandados deberán pagar solidariamente a la parte actora las costas personales y procesales de este asunto".*

II.- Que mediante resolución de ocho horas del doce de enero del año dos mil nueve, se dio traslado de la demanda a las partes codemandadas.

III.- Que mediante escrito presentado el dia 3 de marzo de 2009, el Instituto Costarricense de Electricidad contestó la demanda opuesta e interpuso las defensas de falta de legitimación activa y pasiva,  falta de derecho y de falta de competencia

IV.- Que mediante escrito presentado el 6 de mayo de 2009, VERIZON COMMUNICATIONS INC., contestó la demanda e interpuso las defensas de falta de derecho, falta de legitimación ad causan y procesum activa y pasiva.



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

V.- Que mediante escrito presentado el 7 de mayo de 2009, VERIZON INFORMATION SERVICES COSTA RICA LLC, contestó la demanda e interpuso las defensas de falta de derecho, incompetencia e indebida integración de la litis.

VI.- Que la defensa de incompetencia fue rechazada mediante resolución 1078-2009 del Juez de Trámite. Ante recurso de inconformidad, lo resuelto fue confirmado por voto 000874-C-S1-2009 de las once horas quince minutos del veinticinco de agosto de dos mil nueve de la Sala Primera de la Corte Suprema de Justicia.

VII.- Que la defensa de indebida integración fue inicialmente rechazada mediante resolución 1080-2009, siendo así que posteriormente en resolución 3607-2010, se dispuso acoger la integración. Lo anterior fue confirmado por resolución 634-2010 de las diez y treinta de 29 de noviembre de 2010 del Tribunal de Apelaciones. En razón de lo anterior, se integró a la litis Verizon information services- Belize.

VIII.- Que al ser las  nueve horas y dieciocho minutos del nueve de junio del año dos mil nueve, se realizó la primera audiencia preliminar del presente proceso.

IX.- Que al ser las trece horas y cuarenta y cinco minutos del día veintitrés de setiembre del año dos mil diez, se realizó una segunda audiencia preliminar en el proceso. En la misma, se confirman pretensiones y se tiene por integrada a Verizon Information Services- Belize.

X.- Que al ser las ocho horas y cuarenta minutos del catorce de agosto del año dos mil doce, se realizó una tercera audiencia preliminar en el proceso. En la misma, mediante resolución número 1314-2012-T se rechaza la excepción de indebida acumulación de pretensiones opuesta en la misma. Asimismo, se determinan los hechos controvertidos.

XI.- Que al ser las ocho horas cuarenta y dos minutos del siete de septiembre del dos mil doce, se realizó la fase de admisión de prueba y como tal se admitió documental, testimonial y pericial.

XII.- Que una vez realizado el respectivo peritaje, mediante resolución de las diez horas y seis minutos del diecinueve de marzo del año dos mil catorce, se dio traslado del presente asunto a la Sección IV de este Tribunal.



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 324 of 490    RECEIVED NYSCEF: 10/26/2021

XIII.- Que mediante resolución de las nueve horas del cinco de mayo del año dos mil catorce, la correspondiente integración de la Sección IV de este Tribunal, hizo la devolución del correspondiente expediente al Juez de Trámite.

XIV.- Que mediante resolución de las ocho horas y cincuenta y dos minutos del veintidós de abril del año dos mil quince, se procedió a excluir del proceso a Verizon Information Services- Belize.

XV.- Que mediante resolución de las catorce horas y treinta y siete minutos del cuatro de abril del año dos mil dieciséis, el Juez de Trámite ordenó enviar el asunto a etapa de juicio.

XV.- Que mediante resolución de las once horas y cuarenta del veintitrés de junio del año dos mil dieciséis, esta Sección de Juicio procedió a convocar a audiencia oral en el presente proceso.

XVI.- Que los días 28 y 29 de junio de los corrientes se realizó la audiencia oral y público en el presente proceso. En la misma se determinó que el Lic. Marvin Céspedes Méndez era el representante de ambas codemandadas, según poderes que constan en autos, se admitió prueba para mejor resolver ofrecida por la parte actora, se escucharon alegatos de apertura, se evacuó la prueba pericial y testimonial, ofrecida, admitida y que se hizo llegar a la misma. Se tuvo por desistida por las codemandadas y además se declaró inevacuable la declaración de parte respectiva, en lo que corresponde al Instituto Costarricense de Electricidad, dado que en el momento procesal respectivo, su representación aún no se había hecho presente a la audiencia, dado que llegó a la misma en forma tardía. En la continuación de la audiencia del día 29 de junio, se apersonó el abogado Rodrigo Alberto Pérez González, en representación de Verizon Communications Inc. Finalmente se escucharon las conclusiones de las partes.

XVII.- Que en el proceso ante este Tribunal no se han observado nulidades que deban ser subsanadas y la sentencia se dicta dentro del plazo establecido al efecto por el numeral 111.1 del Código Procesal Contencioso Administrativo, dado que el término de 15 días de la referida norma vence el 20 de julio de los corrientes. Previa deliberación y por unanimidad.-



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Redacta el Juez Campos Hidalgo, con el voto afirmativo de los jueces Álvarez

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Molina y Mena García,

CONSIDERANDO

I.- <u>Sobre la teoría del caso de la parte actora y sus principales razonamientos</u>: Que de una revisión de la demanda y de los respectivos razonamientos en audiencia de juicio, la parte actora funda sus pretensiones en los siguientes argumentos:

a) Argumentos de carácter general:

1. Que la impresión de guías telefónicas tiene como naturaleza ser un servicio público, por lo que correspondía al ICE velar por su debida prestación. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

2. Que la extinción del contrato ICE - GTE (VERIZON) tuvo el efecto inmediato de hacer imposible la ejecución del contrato GTE (VERIZON) - sociedad actora, por lo que las consecuencias negativas que esa imposibilidad de ejecución (daños y perjuicios causados a la sociedad actora) descansa en la extinción del primero. *(argumentos de la demanda)*

3. Que hay dos relaciones contractuales: ICE - GTE (VERIZON) y GTE (VERIZON) - Sociedad actora y además existe una relación extracontractual que es ICE-sociedad actora. *(argumentos de la demanda)*

b) Argumentos relacionados al Instituto Costarricense de Electricidad:

1. Que en el ICE, las sociedades codemandadas y la empresa actora existe una relación <u>contractual compleja</u>, en donde los los diferentes acuerdos se interconectan entre sí para alcanzar un resultado patrimonial y donde el resultado final requiere el concurso de cada interviniente. Por lo anterior, las acciones del complejo contractual está orientada al objeto negocial común por lo que la parte no concurra al mismo debe resarcir, por su actuación u omisión antijurídica. Señala que las partes, aunque no son contratantes directos entre sí, ambos tenían conocimiento recíproco de su participación en la actividad material contratada (la producción de directorios telefónicos) e incluso el ICE mantenía un control y visitas periódicas a la planta de la actora para supervisar la correcta impresión de los directorios telefónicos. Indica que la aprobación del



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GONZALEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Contrato Maestro de Impresión por parte del ICE, lo involucró necesariamente en la relación jurídica que es el fundamento de este litigio. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Baudrit Carrillo).*

2. Que el ente se encuentra demandado por desarrollar una licitación que exigía a la contratista que la impresión de las guías fuera en en el país. Es por este motivo que la sociedad actora rubrica un contrato con las codemandadas que fue presentado a conocimiento del ICE, el cual tenía control sobre dicha empresa sub contratada. Al terminar el ente su contrato con la contratista, se encontraba obligado a continuar prestando el respectivo servicio público y a pesar de que sabía que existía una empresa que elaboraba las guías telefonicas, se relacionó solo con el grupo Verizon, sin involucrar a la sociedad actora. En razón de lo anterior, estima que aplica la <u>responsabilidad extra contractual</u> del artículo 190 de la Ley General de la Administración Pública, por no haber dado oportunidad a la actora de ejercer sus derechos ante la indicada decisión administrativa. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Villanueva Monge y Sancho González).*

3. Que el mecanismo contractual empleado por el ICE para la elaboración y distribución de guías telefónicas no fue el correcto, habida cuenta que estamos en presencia de un servicio público, de conformidad con la Procuraduría General de la República. *(argumento expresado en la demanda y en audiencia de juicio por el apoderado Sancho González).*

4. Que al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación. *(argumento expresado en la demanda y en audiencia de juicio por el apoderado Sancho González).*

5. Que los daños y perjuicios sufridos por la actora por el incumplimiento objetivo de su contrato con GTE (VERIZON) fueron generados por la actuación del ICE, que dio por resuelto su contrato con GTE (VERIZON), sin respetar los intereses legítimos que la actora tenía en esa contratación, con lo que violentó el principio *Neminem laedere, no dañar a otros.* Estima que el ICE incurrió en responsabilidad civil



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 6

INDEX NO. UNASSIGNED

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 327 of 490

RECEIVED NYSCEF: 10/26/2021

conforme la aplicación de los principios de la Ley General de la Administración Pública (artículos 190 y siguientes), ya sea que se considere su actuación lícita (artículos 194 y 195) o ilícita (artículos 191 y 192). El artículo 1045 del Código Civil también es fundamento de esa responsabilidad. *(argumento expresado en la demanda y en audiencia de juicio por el apoderado Sancho González).*

c) Argumentos relacionados con las empresas codemandadas:

1. Que el Grupo GTE negoció con la parte actora las condiciones futuras para incorporar en los trabajos de edición e impresión, los avances tecnológicos para mejorar la calidad de los trabajos. Consecuentemente, se le impuso obligatoriamente, la adquisición de los equipos más modernos y la ampliación de la planta física. De conformidad con lo anterior, la actora indica, se endeudó con créditos bancarios y comerciales, seriamente para poder adquirir los nuevos equipos y ampliar su planta industrial. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

2. Que el Grupo GTE se fusionó con la firma Atlantic Bell y se formó el Grupo VERIZON, que mantuvo con el ICE todos los derechos, deberes, obligaciones y garantías originalmente otorgadas por el Grupo inicial y con garantía solidaria entre las sociedades VERIZON. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

3. Que la empresa Verizon Information Services - Costa Rica- LLC  incumplió el contrato  suscrito por ella con el ICE. No obstante, de manera falsa al romper su relación contractual con la sociedad actora, Verizon Information Services - Costa Rica- LLC, le indicó que el responsable del rompimiento contractual era el indicado ente. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

4. Que la firma GTE CORPORATION, Holding del Grupo GTE, al expresar que otorgó su garantía plena respaldada por sus estados financieros, que podían usarse en la licitación pública 6378-T del ICE para acreditar la capacidad financiera del Consorcio, que actuaba entonces como oferente y que otorgaba, también, su garantía para ser conjuntamente responsable con las empresas del Consorcio, por todas las obligaciones que éste adquiera como oferente y como adjudicatario, adquirió, irremediablemente, la condición de responsable solidario



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

no sólo del Consorcio, sino de la plena ejecución del contrato y por ello, también responsable conjuntamente con el ICE de los resultados de la negociación.

5. Que Verizon Information Services- Costa Rica- LLC incurrió en un incumplimiento doloso, en tanto que quería dejar sus negocios en el país. Consecuentemente considera que las cláusulas exonerativas de responsabilidad civil del respectivo contrato son ineficaces cuando están referidas a un incumplimiento doloso, de conformidad con lo dispuesto por el artículo 701 del Código Civil. Y el incumplimiento es doloso, dado que las codemandadas pudieron cumplir sin tener obstáculos materiales para ello, pero no ejecutaron sus obligaciones. *(argumento expresado en la demanda y en audiencia de juicio por los apoderados Baudrit Carrillo y Sancho González)*

6. Que el incumplimiento de Verizon está claramente demostrado en los autos. En razón del mismo, la parte actora no pudo cancelar los créditos bancarios y comerciales adquiridos, cesara en los pagos con relación a los proveedores de materia prima y los alquileres, cesó en el pago de los salarios y derechos laborales de sus empleados y se vio conducida al cierre de sus actividades y al paro permanente de su giro comercial. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

7. Que el Contrato que firmó la actora con el Grupo GTE (luego Grupo VERIZON) y que aprobó y autorizó el ICE, es por su naturaleza un contrato que se rige por los principios del servicio público y queda regulado por sus principios, normas y valores. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

8. Que el infortunio comercial de la actora se origina en el incumplimiento del contrato formalizado con el Grupo GTE, reconocido como el nexo derivado de la licitación y en el contrato firmado con Grupo VERIZON, como subcontrato. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

9. Que GTE CORPORATION por virtud de una fusión de empresas en los Estados Unidos de América, se transformó en VERIZON COMMUNICATIONS INC., Holding del Grupo VERIZON, por lo que las relaciones derivadas del Contrato Administrativo de la licitación Pública Internacional 6378-T y sus efectos jurídicos


Firmado digital por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SEGUNDA MEDINA OROZCO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

para el cumplimientos de sus deberes y obligaciones, no sufrieron alteración alguna. Consecuentemente, las empresas demandadas Verizon Communications Inc: y Verizon Information Services - Costa Rica- LLC integran un grupo de interés económico, que convencionalmente podemos llamar GRUPO VERIZON. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

10. Que la extinción del contrato ICE- GTE (VERIZON) constituye un incumplimiento objetivo del contrato GTE (VERIZON) - sociedad actora, que es imputable a GTE (VERIZON), por lo que ésta entidad debe responder por los daños y perjuicios causados, según el principio general de la responsabilidad contractual establecido en el artículo 702 del Código Civil. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

11. Que las cláusulas exonerativas de responsabilidad civil que por imposición de VERIZON se incluyeron en el contrato maestro de compra, necesariamente son ineficaces por principios imperativos de Derecho Público, dado que si bien el contrato Verizon - THS se suscribió con las formas de un acuerdo comercial, por su objeto y por sus efectos es de naturaleza administrativa, al ser para la prestación de un servicio público. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

12. Que las cláusulas exonerativas están integradas a un contrato de adhesión, ya que el contenido de ese acuerdo sólo permitía la aceptación o el rechazo por parte de la socieda actora, y la nulidad de tales cláusulas resulta de su naturaleza abusiva, de conformidad con artículo 1023, inciso m), del Código Civil y en el artículo 42 de la Ley 7 472 de 19 de enero de 1995 (Ley de Promoción de la Competencia y Defensa Efectiva del Consumidor). *(argumentos de la demanda)*

II.- <u>Sobre la teoría del caso del INSTITUTO COSTARRICENSE DE ELECTRICIDAD y sus principales razonamientos</u>: Que de una revisión de la contestación de la demanda y los respectivos argumentos en audiencia de juicio, la representación del ICE se funda en los siguientes argumentos:

1. La elaboración de guías telefónicas no es un servicio público, siendo así que en todo caso cuando sucedieron los hechos, el ICE optó por no cobrar las llamadas al 113 y además, realizó una contratación administrativa con RACSA para su



Firma digital
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GONZÁLEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

elaboración. En este orden de ideas indica que las telecomunicaciones eran un servicio público al inicio y ahora es un servicio disponible al servicio público, mas las guías telefónicas no se comprenden dentro de este concepto.

2. Que el contrato entre la actora y las codemandadas es un contrato privado que no se rige por los principios de servicio público.

3. Que la resolución del contrato entre ICE y las codemandas no debía ser consultado a la sociedad actora.

4. Que la relación contractual de la sociedad actora era con las codemandadas, las cuales optaron sub contratar con ésta, de conformidad con las atribuciones que permitía la Ley de la Contratación Administrativa. En este orden de ideas las inversiones hechas por la sociedad actora, no era sólo para satisfacer las necesidades del ICE sino también para prestar servicios en otros lugares de la región. Indica que el cartel pedía imprimir las guías en Costa Rica, mas no en la sociedad actora.

5. Que el contrato con las sociedades codemandadas fue resuelto por razones de interés público, dado que éstas unilateralmente decidieron reestructurar la guía del año 2005, infringiendo las cláusulas del contrato

6. Que la relación entre Verizon y la sociedad actora es anterior a la licitación pública 6378-T, por lo que al ICE no le correspondía refrendar ese contrato privado.

7. Que el conocimiento que tuvo el ICE de la relación entre las codemandadas y la actora, se dio en razón de que ésta era una simple sub contratista de aquellas.

8. Que en el caso en examen no estamos en presencia de un relación contractual compleja, dado que estamos en una contratación administrativa, caracterizada por la existencia de cláusulas exhorbitantes.

9. Que el ICE no tenía ningún obligación de realizar comunicación alguna a la actora, dado que ésta no era su proveedora.

10. Que no corresponde al ICE responder por maquinaria adquirida por la actora para elaborar las guías telefónicas de República Dominicana.

III.- <u>Sobre la teoría del caso de VERIZON COMMUNICATIONS INCORPORATED y VERIZON INFORMATION SERVICES -COSTA RICA- LLC y sus principales razonamientos.</u> Que de una revisión de la contestación de la demanda y los



Firmado digitalmente por:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

respectivos argumentos en audiencia de juicio, la representación de las sociedades codemandadas se funda en los siguientes razonamientos:

1. Que si la empresa actora tomó la decisión de endeudarse, ello se debió a una decisión de negocios propia.

2. Que la actora vendió la maquinaria adquirida, lo cual no es tomado en consideración por ésta a hora de invocar pérdidas.

3. Que la cláusula objetada tiene su lógica en el sentido de que Verizon solo tiene un negocio en Costa Rica y era ilógico su vigencia si el ICE le terminaba el contrato de guías telefónicas.

4. Que la cláusula objetada por la parte actora fue negociada con ella y no es nula por las disposición del artículo 1023 del Código Civil.

5. Que la relación entre Verizon y la parte actora es exclusivamente privada.

6. Que los daños y perjuicios son accesorios al tema de la nulidad contractual, siendo así que las partes no supieron ejercer las pretensiones anulatorias, dado que primero debe pedir la resolución contractual y luego el pago de daños y perjuicios. Por lo anterior, el Tribunal tiene una imposibilidad material para condenar en daños y perjuicios, porque antes no se pidió resolución contractual.

7. Que en el caso de marras debe aplicarse el artículo 701 del Código Civil, que indica que el dolo no se presume, por lo que se debe demostrar, siendo así que el mero incumplimiento no significa per se una conducta dolosa.

8. Que no es cierto que formaran un grupo de interés económico ni han formado parte de relación contractual alguna con el ICE o la actora.

9. Que no es cierto que Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. y Verizon Directorias Corp. son empresas subsidiarias de Verizon Communications Incorporated y que esta última constituya el holding del grupo.

10. Que con relación al plazo del contrato, en la cláusula 2.(b) del mismo se estableció un rango entre 48 meses a 168 meses, quedando en todo caso la vigencia del contrato supeditada a la vigencia del contrato con el ICE, dada la naturaleza del contrato y que Verizon no tenía otros negocios en Costa Rica

11. Que el problema que tuvo la actora con su planta y los equipos fue que éstos eran obsoletos y los costos de producción con esos equipos eran más altos y la

Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA JIMÉNEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

productividad también era menor en el tiempo de impresión.

12. Que resulta falsa la afirmación hecha por el representante de la actora, de que el contrato con GTE se firmó por un plazo de 168 meses, ya que en la cláusula 28 (b) se estableció que la vigencia del contrato de Verizon con la actora, estaba supeditada y dependía de la vigencia del contrato de Verizon con el ICE, lo cual era previsible y negociado por las partes desde el primer contrato que firmó la actora. Consecuentemente, la terminación que se hizo del contrato con la actora estaba prevista como causal válida y convenida en forma anticipada por ambas partes en el apartado (b) de la cláusula. 28 del Contrato de Compra.

13. Que la terminación no implicaba en ningún caso responsabilidad para ninguna de las partes, debido a que la terminación anticipada del contrato surge como consecuencia directa del hecho o acción de un tercero, que en el caso en particular fue el ICE.

14. Que se suponía que la actora no dependía de la existencia de un solo contrato y que una empresa con la experiencia y trayectoria nacional e internacional de casi cien años mantenía una variedad de clientes que le garantizaban una solvencia y el manejo adecuado de las finanzas y los flujos de caja, para hacerle frente a sus obligaciones crediticias ante una eventual contingencia.

15. Que las cláusulas 24 y 28 de exoneración de responsabilidad civil contractual y de limitación de responsabilidad civil contractual, específicamente los incisos b) y e) de la cláusula 28, fueron negociadas y aceptadas por el representante de la sociedad actora como una cuestión lógica y razonable para ambas partes, porque la vigencia del contrato con esta dependía de la vigencia del contrato con el ICE y era conocido por la actora que Verizon no tenía otros negocios en Costa Rica.

16. Que la actora en ningún caso demostró que la compañía GTE Corporation se convirtió en Verizon Communications Inc.

17. Que la parte actora reconoce que la ejecución del contrato se mantuvo en condiciones normales cerca de cuatro años, lo cual nos dice que el contrato se ejecutó en el rango de 48 meses establecidos en el punto b) de la cláusula 2 del plazo



Firmado digitalmente de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 333 of 490    RECEIVED NYSCEF: 10/26/2021

18. Que la actora pretende engañar que el contrato firmado con Verizon es un subcontrato del contrato suscrito entre el ICE y Verizon, lo cual no es cierto y constituye una aberración jurídica.

19. Que el problema del cierre de operaciones de la sociedad actora resultó la consecuencia inmediata de la mala administración de los negocios.

20. Que la garantía solidaria de GTE Corporation otorgada al ICE no se puede presumir ni mucho menos pensar que se transfiere en beneficio de terceros.

IV.- <u>Del objeto del proceso</u>: De lo expresado por las partes, tanto en sus pretensiones como argumentos, el objeto del presente proceso estriba en determinar la responsabilidad de las partes codemandadas, con motivo de los hechos establecidos en la demanda, así como la existencia del daño invocado.

V.- <u>Razonamiento del Tribunal</u>.

V.I.- En particular sobre los hechos probados: De esta naturaleza, y de importancia para la resolución del asunto, durante el proceso para este Tribunal han quedado demostrados los siguientes hechos:

a) Hechos probados con respecto a las relaciones jurídicas existentes entre el ICE las sociedades codemandadas:

1. Que la sociedad actora es una empresa con amplia experiencia en la elaboración de guías telefónicas. (documentos 1 a 4 del expediente de prueba de la parte actora)

2. Que la empresa GTE (General Telephone Directory Company) ha contratado con el Instituto Costarricense de Electricidad, desde 1975 la elaboración de guías telefónicas en Costa Rica. *(prueba documento número 5 aportado por la parte actora, declaración de Jose Maria Quirós Alfaro)*

*3.* Que en ese período la impresión de las guías telefónicas fue contratada por GTE con la empresa actora, la cual fungía como subcontratista. *(prueba documento número 5 aportado por la parte actora)*

*4.* Que el Instituto Costarricense de Electricidad realizó la licitación pública 6378-T para *"Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información" (documento 17 del expediente de prueba de la parte actora)*

5. Que el indicado cartel señaló que si un oferente fuera parte de un grupo empresarial o Holding, deberá presentar los estados financieros de éstas, en cuyo



Firmado digitalmente de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO RIVERA VILLALOBOS,
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

caso el grupo empresarial es solidariamente responsable con el oferente de la totalidad de obligaciones contractuales. *(documento 17 del expediente de prueba de la parte actora)*

6. Que con fecha 10 de agosto de 1999, el Consorcio GTE presentó oferta para participar en la contratación administrativa Licitación Pública 6378-T *(documento 13 del expediente de prueba del actor)*

7. Que con fecha diez de marzo del año 2000, el Instituto Costarricense de Electricidad y el Consorcio GTE suscribieron el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* *(documento 6 del expediente de prueba del actor)*

8. Que el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* dispuso en cuanto a la posibilidad de sub contratar por parte de la empresa contratista, lo siguiente: *"De acuerdo con lo establecido en la cláusula 2.13.1. del cartel GTE acepta que puede subcontratar con la aprobación previa y escrita del ICE hasta el 50% del desarrollo, producción y distribución de las Guías Telefónicas, sin que esta aprobación obligue al ICE a solidarizarse en caso de incumplimiento del subcontratista. La sub contratación no relevará a GTE de su responsabilidad por la ejecución total del contrato.."* (documento 6 del expediente de prueba del actor)

9. Que el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* dispuso en cuanto a la producción de las guías telefónicas, lo siguiente: *"De acuerdo con la experiencia de los últimos años GTE ha producido la totalidad de la Guía Telefónica en territorio costarricense, contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia tecnológica en beneficio de ciudadanos costarricenses y de la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general. Consecuentemente con lo anterior, el ICE solicita y GTE acepta que durante la ejecución del presente contrato, la totalidad de las etapas y procesos de producción de la Guía Telefónica del ICE sea realizada por GTE en Costa Rica".* (documento 6 del expediente de prueba del actor)



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

10. Que el *"Contrato para Edición de la Guía Telefónica y Desarrollo e*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     Case 1:21-cv-08928  Document 1-1  Filed 11/01/21  Page 335 of 490     RECEIVED NYSCEF: 10/26/2021

*Implementación de Servicios de Información entre el ICE y GTE*" dispuso en cuanto al cambio de nombre del contratista, lo siguiente: "*En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas*" (*documento 6 del expediente de prueba del actor*)

*11.* Que la empresa GTE Information Service pasó a denominarse, Verizon Information Services Inc, la empresa GTE Directories Corporation pasó a llamarse Verizon Directories Corp y General Telephone Directory Company C por A cambió de nombre a Verizon Information Service Costa Rica, LLC. (*documento 6, correspondiente a un foliado que va del folio 3045 a 3022  del expediente de prueba del actor*)

*12.* Que los representantes legales de Verizon Information Services, Inc, Verizon Directorias Corp. y Verizon Information Services-Costa Rica, LLC, aceptaron los derechos y obligaciones con motivo de la licitación 6378-T y del contrato derivado de la misma" (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

13. Que VERIZON Information Services - Costa Rica, LLC, le envió a la Dirección de Proveeduría del ICE una nota con fecha 16 de mayo del 2002, en la que le manifiesta, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE. (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

14. Que  GTE se fusionó con la firma americana Bell Atlantic y como resultado de la fusión se creó el GRUPO VERIZON,  sustituyendose  la razón social de GTE por el GRUPO VERIZON (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

15. Que VERIZON Information Services, Inc. y VERIZON Directories Corp. realizaron declaraciones de Mantenimiento de Compromisos ante el ICE, en lo que respecta


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

a los derechos y obligaciones establecidos en el acuerdo de consorcio del 9 de agosto de 1999; en la oferta presentada al ICE por GTE Consortium el día 26 de agosto de 1999 y en el contrato firmado entre el ICE y GTE Consortium el día 10 de marzo de 2000  comprometiendo a las dos empresas comitentes y a VERIZON Information Services- Costa Rica, LLC. (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

*16.* Que mediante oficio DI-AA-875 de fecha 13 de diciembre de 2000, la Unidad de Autorizaciones y Aprobaciones de la División de Desarrollo Institucional de la Contraloría General de la República aprueba el denominado *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"  (documento 6 del expediente de prueba del actor)*

*17.* Que en el año 2004 Verizon Information Services CR. propuso al ICE varios ajustes al contrato rubricado para la edición de guías telefónicas, y además el 13 de mayo de ese año propuso revisar la elaboración de las mismas, siendo así que el Sub Gerente de Telecomunicaciones, del ente mediante oficio 6000-41046-2004 de 15 julio de 2004, le indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004.  (documento 32, 33 y 34 del expediente de prueba del actor)

18. Que con nota de fecha 8 de setiembre de 2004, recibido en la Proveeduría el 16 de diciembre de ese año, el Vice Presidente de Verizon Information Services CR, le indica al Sub Gerente de Comunicaciones del ICE que en razón de que no se obtuvo respuesta a la nota del 13 de mayo de los corrientes, se tendrá por aplicado el silencio positivo a la petición.   (documento 32, 33 y 34 del expediente de prueba del actor)

19. Que mediante oficio 6000-52278-2004 de 14 de setiembre de 2004 el Sub Gerente de Telecomunicaciones del ICE rechaza la aplicación del silencio positivo, habida cuenta que mediante oficio mediante oficio 6000-41046-2004 de 15 julio de 2004, se indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004,en respuesta a la propuesta de 13 de mayo de ese año para  revisar la elaboración de las mismas. En respuesta  mediante nota de 8 de noviembre de 2004, el Vice Presidente de



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO PINTO GARITA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Verizon le indica al indicado Sub Gerente que el silencio positivo operó de pleno derecho, al no haberse contestado en 30 días hábiles. A lo anterior, mediante oficio 600-64540-2004 de 18 de noviembre de 2004, se le contesta que en el caso de marras no resulta procedente la aplicación del silencio positivo, tal y como lo interpreta la contratista. (documento 35, 36 y 40  del expediente de prueba del actor)

20. Que mediante oficio SI-0726-11-04 de 15 de noviembre de 2004, la Jefe del Proceso de Servicios de Información del ICE le indica al Gerente General de Verizon que no ha ampliado la vigencia de la garantía de cumplimiento pedida desde el 30 de junio de 2004, según oficio 6000-35344-2004 y que la estructura de la Guía Telefónica del Área Metropolitana presenta incumplimientos en desacato a lo indicado en las notas 6000-41046-2004 y 6000-522678-2004.  (documento 38 del expediente de prueba del actor)

21. Que el 12 de noviembre 2004 el ICE ordenó a las Notarias públicas Leda. Patricia Hernández Salazar y Licda. Ligia Picado Arguedas, levantar actas notariales del resultado de las visitas que hacen en el local industrial de THS, en donde se hizo constar que en las guías telefónicas en elaboración, no se incluyeron los registros de los clientes de provincias y se constató que al imprimir las páginas blancas residenciales de la Guía Telefónica del Área Metropolitana, se hizo con los registros únicamente de San José, excluyendo los abonados de la zona de Los Santos y de las Provincias (documento 37 del expediente de prueba del actor).

22. Que mediante oficio S.I.0730-11-04 se comunicó a Verizon, minuta de una reunión efectuada con sus personeros, en donde se le indica que se incumplía las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación y segunda del contrato (documento 39 del expediente de prueba del actor).

23. Que el 18 de noviembre 2004, con nota 6000-64540-2004, la Subgerencia de Telecomunicaciones responde la nota del 8 de ese mes de Verizon, manifestándole nuevamente que debía mantener el formato de las guías telefónicas del año 2004 (documento 40 del expediente de prueba del actor).

24. Que mediante acuerdo de artículo 10 de sesión 5649 de 23 de noviembre de 2004 del Consejo Directivo del ICE se dispuso indicar a la empresa contratista que



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

se rechaza cualquier intención de modificar unilateralmente las condiciones contractuales pactadas. (documentos 41 y 42 del expediente de prueba del actor)

25. Que el 2 de diciembre de 2004 en visita que se realizó en las instalaciones de la actora, la Notaria pública Licda. Yaila Paola Sánchez, levantó una acta notarial en la que se constata que estaban impresos 103.000 ejemplares de las páginas blancas residenciales del Área Metropolitana y que la imprenta no había recibido ningún tipo de orden para modificar el proceso de impresión y encuadernación; sino que trabaja con las órdenes de compra entregadas por Verizon, las cuales no fueron modificadas por esta (documento 44 del expediente de prueba del actor).

26. Que mediante oficio SI-759-12-04 de 13 de diciembre de 2004 se solicitó iniciar procedimiento de resolución contractual a la empresa Verizon Information Services CR por no ajustarse al contrato rubricado y los requerimientos del ente. (documento 45 del expediente de prueba del actor)

27. Que mediante oficio 5225-69163-2004 de AEG-0572-2004 de 14 de diciembre de 2004 se dio inicio a procedimiento de resolución contractual. (documento 46 del expediente de prueba del actor)

28. Que mediante oficio 6000-27733-2005 de SGT-2326-2005 de 1 de junio de 2005 se resuelve el contrato entre el ICE y Verizon Information Services Costa Rica LLC por incumplimiento contractual de esta última. Lo anterior fue confirmado mediante oficio 0150-36359-2005 de GG-680-2005 de 8 de julio de 2005 de la Gerencia General del ente. (documento 58 y 59 del expediente de prueba del actor, declaración testimonial de Jose María Quirós Alfaro)

29. Que mediante resolución de las quince horas del cuatro de diciembre de 2015 en laudo arbitral en proceso de la misma naturaleza interpuesto por el ICE contra Verizon Information Services Costa Rica LLC, se condena a esta última al pago de diferentes sumas en virtud de haberse demostrado que incurrió en incumplimiento contractual. (prueba para mejor resolver ofrecida por la parte actora en audiencia de juicio, declaración testimonial de Jose María Quirós Alfaro)



30. Que en todo momento la relación contractual y la coordinación para su ejecución, así como los pagos respectivos se realizaron entre el ICE y Verizon

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ARAYA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Information Services Costa Rica LLC, de manera exclusiva. (declaración testimonial de Jose María Quirós Alfaro)

31. Que fue voluntad de Verizon no continuar negociando en el país la elaboración de guías telefónicas. (*declaración de José María Quirós Alfaro, ex Gerente de la indicada empresa*)

b) Hechos probados de relevancia para la resolución del presente asunto relacionados con la vinculación entre las sociedades codemandadas y la parte actora:

1. Que GTE suscribió con la actora un contrato de "agencia y cooperación mutua" el 8 de mayo de 1997. Dentro de las cláusulas de este Convenio, en el Anexo B Punto 5 se estableció que GTE Information Services le otorgó a la actora el estatus de "*preferred vendar*" o suplidor preferido para Centroamérica incluyendo Panamá y el Caribe, definido en · el Anexo 2 como una serie de treinta y dos (32) países incluyendo República Dominicana y Puerto Rico. (documento número 10 del expediente de prueba de la parte actora)

2. Que el 21 de enero de 2000, GTE suscribió un nuevo contrato con la sociedad actora y además encargó a ésta la impresión y edición de guías telefónicas incluyendo las de Costa Rica y Belice. (documento 11 del expediente de prueba de la parte actora)

3. Que la sociedad actora y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, suscribieron el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, en donde respecto del plazo indicó la cláusula 2.b: "*Este Contrato será efectivo únicamente cuando se cumplan los dos siguientes requisitos: (i) al momento de la ejecución de este Contrato por las partes; (ii) al momento de la ejecución de un contrato entre el Instituto Costarricense de Electricidad (ICE) y el Comprador, celebrado como resultado de una licitación del Comprador a la Oferta Pública 6378-T. En el momento que los requisitos mencionados sean cumplidos, la fecha efectiva (la "Fecha Efectiva") de este contrato será a partir de la ejecución del contrato mencionado en la sub-sección (ii) de esta Sección 2(a)...*" (documento 19 del expediente de prueba de la actora)

4. Que el contrato número VIS-2001-21-IP denominado Contrato Maestro de



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Compra, suscrito entre el Instituto Costarricense de Electricidad y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, dispuso en cuanto a su terminación, lo siguiente: " *28. TERMINACIÓN. (a) El Comprador puede terminar este Contrato al notificarle al Vendedor por escrito con al menos (90) días de anticipación de dicha terminación si las partes no pueden acordar cualquier revisión de precio de acuerdo a este Contrato, cualquier reforma a este Contrato de conformidad a la Sección 28 (c) anterior o el precio para nuevas opciones o especificaciones que el Comprador puede requerir, sin importar si dichas nuevas opciones o especificaciones están dentro de la capacidad actual del Vendedor. (b) El Comprador puede terminar este Contrato inmediatamente en cualquier momento si durante el Plazo del Contrato, el Contrato ente el Comprador y el ICE descrito en la Seccion 2, Plazo, es terminado por cualquier razón...*" *(documento 19 del expediente de prueba de la actora)*

5. Que el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, suscrito entre el Instituto Costarricense de Electricidad y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, se regulaba por el Código Civil y el Código de Comercio de Costa Rica *(cláusula 35, documento 19 del expediente de prueba de la actora)*

6. Que el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, suscrito entre el Instituto Costarricense de Electricidad y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, comprendía la elaboración de guías telefónicas en Costa Rica y Belice *(anexo A, documento 19 del expediente de prueba de la actora)*

7. Que el indicado contrato maestro era por un plazo máximo de 168 meses (cláusula 2.b del contrato), para producir, empacar y distribuir los directorios telefónicos, de conformidad con el contrato firmado entre el Consorcio GTE y el ICE *(documento 19 del expediente de prueba de la actora)*

8. Que con fecha 15 de octubre de 1999 el Presidente de GTE Directories International propone términos a convenir sobre la elaboración de directorios telefónicos para la República Dominicana *(documento 22 del expediente de prueba de la actora)*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO GERARDO CAMPOS SALAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

9. Que el 14 de octubre de 2004 la actora y Verizon Information Services - Costa Rica- LLC suscribieron el "*Cronograma de Producción, Guía Provincias 2005*", donde se establecen las condiciones para la confección de los libros correspondientes a esa guía en particular. En dicho cronograma se señala como fecha límite, para modificar el número de páginas y la cantidad de libros, el día 15 de diciembre de 2004 (documento número 28 del expediente de prueba del actor).

10. Que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information services- Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro. (documento número 68 del expediente de prueba del actor)

11. Que en la indicada nota el Gerente General de Verizon en Costa Rica, le indica a la sociedad actora que "... *el ICE irrespetó los derechos contractuales y aquellos establecidos por ley de mi representada y procedió a iniciar un procedimiento administrativo para la resolución del contrato, utilizando los medios públicos para distorsionar la realidad de los hechos*" (documento número 68 del expediente de prueba del actor)

12. Que la empresa Verizon information services- Costa Rica LLC le pidió a la sociedad actora modernizar sus equipos para enfrentar cambios tecnológicos y requerimientos de contratantes. (declaraciones testimoniales de José María Quirós Alfaro y Guillermo Navarro Céspedes, documentos 10 y 24 del expediente de prueba del actor)

13. Que la señora MARIANNE DROST, ciudadana norteamericana, otorgó poderes y actúo en su condición de Secretaria Corporativa de las firmas VERIZON COMMUNICATIONS INC., y de VERIZON INFORMATION SERVICES-COSTA RICA, LLC. (folios 1183 a 1188 del expediente judicial)

c) Hechos probados con relación a la existencia de los daños invocados:

1. Que con fecha 25 y 26 de febrero de 1999, el señor Bruce Wataru hizo visita a las instalaciones de la sociedad actora y realizó una serie de observaciones con respecto a las instalaciones y equipo de la misma. (documento 10 de prueba del expediente del actor)


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

2. Que el 15 de noviembre de 1999 se llevó a cabo una reunión de los señores

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Álvaro y Alonso Trejas Fonseca y don Guillermo Navarro, entonces Presidente, Vicepresidente y Gerente de Producción de THS, respectivamente, con el Director de "Printing" de GTE Directorias International con el propósito de: 1) evaluar el progreso realizado en el proyecto de las mejoras en la planta; 2) asistir en desarrollar un proyecto formal para dar un seguimiento cercano al proyecto de la nueva planta; 3) acordar un plan de contingencia en caso que THS no cumpliera con las fechas de instalación de los nuevos equipos y planta, el cual consistía en contratar otra planta en Estados Unidos, sobre todo, en caso de que no se adquirieran los equipos a tiempo; 4) evaluación de la compra potencial del equipo, con la específica asistencia del consultor recomendado por GTE, señor Bill Snell (documento 24 de prueba del actor).

3. Que en febrero del 2000, la actora adquirió una moderna máquina rotativa Heidelberg, una línea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta. Lo anterior, para cumplir los requerimientos del señor Wataru y la disposición (j) de la cláusula 16 del Contrato Maestro de Compra. La compra de la Máquina Rotativa y todo el equipo accesorio marca Heidelberg con un costo de adquisición de C. 955.116.741,00 (documentos 10, 19 y 20 del expediente de prueba del actor)

4. Que atendiendo a los requerimientos del señor Wataru, la sociedad actora alquiló dos naves industriales en la Zona Franca Zeta, en Guadalupe de Cartago, propiedad de INMOBILIARIA ZOROASTER S.A., con todos sus equipos, oficinas y bodega, según contrato que se suscribe con la propietaria de fecha primero de julio de dos mil cuatro (declaración testimonial de Guillermo Navarro Céspedes, documento 21, expediente de prueba del actor)

5. Que el el 15 de julio del 2004 el Consorcio contratista del Grupo Verizon tramitó, en papelería de la Compañia General de Directorios C.por.A, con oficinas en San José, Costa Rica, subsidiaria de GTE Corporation según consta en el mismo documento, la orden de compra 4568 para la impresión de las Guías Telefónicas para Área Metropolitana por la suma total de $ 3,033,625.60 y el día 20 de agosto del 2004, la orden de compra 4582, por la suma de $ 2,134,503 por las Guías Telefónicas de Provincias, para un total de $ 5,168,128.oo para las Guías


Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A,DECISOR/A
SERGIO MENA GARCIA, JUEZ/A,DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

correspondientes al año 2005. Las órdenes de compra indicadas en el Hecho anterior fueron sustituidas por Verizon por la número 4612 del 3 de noviembre del 2004 para las Guías del Área Metropolitana por la suma de$ 2,120,828 y por la número 4644 del 17 de diciembre del 2004 para las Guías de Provincias, por la suma de $ 1,254,023, para un total de $ 3,374,851, o sea, con una disminución extemporánea, de$ 1,793.277 (documento 30 del expediente de prueba del actor).

6. Que las últimas órdenes de compra implicaron reducción del número de páginas de las guías telefónicas y el número de libros así como una conformación y composición de las guías distinta a la que había convenido GTE en su contrato con el ICE (documento 30 del expediente de prueba del actor)

7. Que en virtud de la falta de pago por las obligaciones adquiridas para la maquinaria la acreedora inicia un proceso ejecutivo prendario que con el expediente número 06-001956- 0640-CI, en el Juzgado Civil de Mayor Cuantía de Cartago, siendo así que a las :30 horas del 6 de junio de 2007, se realizó el remate del equipo pignorado y por auto de 9:23 horas del 19 de agosto de 2007, se ordenó la puesta en posesión del mismo a HEIDELBERG PRINT FINANCE AMERICAS INC, rematario, lo que se ejecuta a las 14:00 horas del 31 de octubre de 2007 (documento 69 del expediente de prueba del actor).

8. Que la sociedad actora se vio obligada a incurrir en mora con los pagos de las rentas por el alquiler de las naves industriales de Inmobiliaria Zoroaster S.A., por lo que se suscribió una escritura pública, que corresponde a la número 144, que se inicia al folio 133 vuelto del tomo primero del Protocolo de la Notaria LAURA MÓNICA ZAMORA ULLOA, a las doce horas del 23 de marzo de 2006, mediante la cual la actora se comprometió a pagar hasta por la suma de DOSCIENTOS MIL DOSCIENTOS VEINTITRÉS DÓLARES CON SETENTA Y CINCO CENTAVOS (US$ 200,223,75), indicándose en la cláusula segunda de dicho documento lo siguiente: "... *SEGUNDA Sustitución de deuda. Esta constitución de deuda, sustituye las mensualidades  atrasadas por concepto de alquiler adeudados por El Deudor -(TREJOS HERMANOS SUCESORES)- correspondientes a los meses de julio de dos mil cinco hasta marzo de dos mil seis inclusive, a razón de nueve meses de mensualidad, según contrato de arrendamiento suscrito entre Acreedor y Deudor,*



Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO JARA VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*de fecha primero de julio de dos mil cuatro, arrendamiento que se ejecuta en la propiedad del Acreedor, finca inscrita a Folios Reales tres- uno nueve cero ocho siete tres- cero cero cero y tres- uno nueve cinco ocho nueve ocho- cero cero cero, lo cual expresamente acepta El Acreedor"* ... Asimismo, se establecieron intereses mediante cuotas mensuales de veintidós mil doscientos cuarenta y siete dólares con ochenta y tres céntimos hasta cancelar la totalidad de la obligación (documento 70 del expediente de prueba de la parte actora).

9. Que ante el incumplimiento de lo pactado, Inmobiliaria Zoroaster S.A., presenta ante el Juzgado Civil de Mayor Cuantía de Cartago, proceso ejecutivo simple que ocupa el expediente número 06-001846-0640-CI, que culmina con sentencia, acogiendo la excepción de pago parcial y condena a la actora a pagar cincuenta y seis mil ciento ocho dólares con diez céntimos de dólar (US$ 156,108.10) (documento 71 de prueba).

10. Que la actora concretó la venta en condiciones muy desfavorables, de prácticamente todos sus activos en equipos y mejoras en los inmuebles de la Arrendante, a la empresa de capital colombiano CONDOR EDITORES DE COSTA RICA, S.A., la cual convino con Inmobiliaria Zoroaster S.A. en el arrendamiento de las naves industriales de la Zona Franca Zeta en Cartago, adquieren el equipo rematado por HEIDELBERG PRINT FINANCE AMERICAS INC., en condiciones favorables y ya instalado en esas naves industriales, al igual que el resto del equipo de THS pignorado al Banco Nacional de Costa Rica y al Banco Interfin (documento 73 del expediente de prueba del actor).

11. Que la actora llegó a un acuerdo con Inmobiliaria Zoroaster S.A., con fecha 28 de marzo de 2007, titulado *"Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda"*, en donde entrega la nave industrial donde se encuentra la máquina rotativa y el restante equipo de impresión, puesto que con anterioridad ya se había entregado la otra nave donde se encontraban las oficinas y bodega y otorgan ambas partes el finiquito en ese sentido, pero al mismo tiempo señala que Inmobiliaria Zoroaster S.A. reconoce haber recibido a la fecha dos pagos - (que en el proceso de desahucio no se habían podido acreditar)-, por una suma total de cincuenta y cinco mil dólares estadounidenses, así como tener a su haber un depósito de garantía por la suma de treinta y nueve



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIA MENA MORA
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

mil dólares, todo lo cual expresamente autoriza la actora lo aplique Inmobiliaria Zoroaster S.A. al total adeudado. Independientemente de que los procesos judiciales dichos puedan continuar, la actora se compromete a cancelar el total adeudado que oportunamente se determine, una vez hechas esas deducciones junto con los intereses pactados y costas, hasta su efectivo pago, en un plazo perentorio, reconociendo ambas partes que hay una instrucción expresa en el "Fideicomiso Trejos Hermanos- Fiduciaria Castro Garnier", por la cual se debe cancelar lo adeudado a Inmobiliaria Zoroaster S.A., en cuanto la actora, reciba el pago de sumas que se le deben por diferentes negocios pendientes de cancelación, como por ejemplo, una deuda pendiente de Radiográfica Costarricense, S.A. (documento 74 del expediente de prueba del actor).

12. Que la actora arrendó con opción de compraventa a DACONDOR Q.C.R. SOCIEDAD ANÓNIMA, que luego, con fecha 29 de mayo de 2007, cede sus derechos a la misma empresa dicha CONDOR EDITORES DE COSTA RICA, S.A. sobre los restantes activos industriales de la empresa, por una fracción de los pasivos, tanto en Transamérica Bank & Trust Co. Ud., (subsidiaria de Banco Interfin), en el Banco Nacional de Costa Rica y con Banco Improsa S.A. En el caso concreto de Transamérica Bank & Trust Co. Ud., esos pasivos corresponden a una línea de crédito que se le otorgó, con base en las magníficas perspectivas que se tenían y luego de los estudios bancarios donde se analizaron los contratos celebrados con Verizon, para la confección de los directorios telefónicos de República Dominicana y de Costa Rica (documento 75 del expediente de prueba del actor).

13. Que luego de finalizado el contrato maestro con las codemandadas, la actora ejecutó un contrato con RACSA (declaración de Guillermo Navarro Céspedes y documento 74 del expediente de prueba del actor, en donde se menciona una deuda pendiente de pago por parte de RACSA)

14. Que los daños estimados a la parte actora con motivo del rompimiento doloso del Contrato Maestro son los siguientes:

| a) Inversión en maquinaria | $2.582.156 |
|---|---|
| b) Incremento en inventarios | $2.860.696 |
| c) Flujos de Caja Operativos no recibidos | $8.806.872 |



Firmado digitalmente de:
RODOLFO AUGUSTO HERNÁNDEZ TRICARICO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISORA
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

| | |
|---|---|
| *2004-2013 Directorios Costa Rica* | |
| *d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana* | *$ 7.912.999* |
| *e) Pérdidas realizadas 2004 a 2007* | *$7.237.068 menos la contratación que se hubiere realizado en ese período con RACSA. S.A.* |
| *f) Intereses pagados por THS* | *$ 983.825* |
| *g) Interrupción de Operaciones* | *$28.885.195* |

(documento 77 del expediente de prueba del actor, informe económico financiero elaborado por el Lic. Tomás Evans Salazar e informe pericial de Ramón Humberto Romero Rodríguez, Contador Público Autorizado y Perito Actuario Matemático, visible a folios 947 a 957 del expediente judicial)

d) Otros hechos probados de relevancia para el presente asunto:

1. Que el Consejo Directivo del ICE dispuso la elaboración de guías telefónicas para el año 2006 con RACSA. (pruebas 63, 65 y 66 del expediente de prueba de la parte actora)

2. Que el ICE adoptó como medida cautelar ante el incumplimiento de Verizon, liberar el cobro del servicio de información del número 113 (documento 61 del expediente de prueba del actor)

V.II.- En particular sobre los hechos no probados: De esta naturaleza, y de importancia para la resolución del asunto, durante el proceso para este Tribunal no han quedado demostrados los siguientes hechos:

a) Que el ICE haya participado en algún momento en el proceso de aprobación de la contratación de la empresa actora, realizado por las sociedades codemandadas. (no hay prueba en autos y la declaración del testigo Róger Echeverría Coto se limitó a manifestar de manera genérica que el ICE aprobada sub contrataciones, mas sin especificar que haya aprobado de manera concreta el contrato ente Trejos Hermanos Sucesores y las empresas codemandadas)

b) Que las cláusulas eximentes de responsabilidad civil contenidas en el contrato maestro suscrito por la sociedad actora y los otros contenidos contractuales, hayan sido impuesto por esta última en un contrato de adhesión y que la actora no estuviera en condiciones de poder modificar en nada el contenido

Firmado digital de:
RODRIGO (...) (...), JUEZ/A (...)
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

contractual preestablecido por Verizon Information Services - Costa Rica- LLC. (no se aportó prueba a los autos en tal sentido)

c) Que se hayan presentado atrasos significativos en compromisos de la actora con la Caja Costarricense de Seguro Social y otras Instituciones Públicas. (no se aporto prueba a los autos en tal sentido)

d) Que la actora haya realizado otros negocios con la maquinaria e instalaciones adquirida y arrendada para la elaboración de guías telefónicas. (no se aportó prueba en tal sentido)

e) Que los daños invocados sean imputables a la actora, al ente demandado. (no hay prueba)

f) Que la actora haya incurrido en inversiones errores por una mala gestión de negocios (no hay prueba)

g) Que el contrato maestro suscrito haya contemplado la elaboración de guías telefónicas en República Dominicana.(no hay prueba)

h) Que la actora haya sufrido una lesión de orden moral. (no hay prueba)

V.III.- Sobre la falta de competencia reiterada en audiencia de juicio: Como una parte significativa de sus argumentos, el representante de Verizon Information Services Costa Rica LLC reiteró alegatos en el sentido de que en el presente caso, el Tribunal de Juicio se encuentra impedido de resolver por el fondo dada la existencia de una falta de competencia por su parte. En este orden de ideas, invoca la existencia de errores y omisiones por parte de la Sala Primera de la Corte Suprema de Justicia a la hora de definir la competencia e indica que la misma se limitó a determinar la existencia de un sujeto público en el proceso, sin valorar las pretensiones de fondo. Al respecto, de manera expresa en audiencia oral se le indicó al indicado abogado que mediante voto 000874-C-S1-2009 de las once horas quince minutos del veinticinco de agosto de dos mil nueve de la Sala Primera de la Corte Suprema de Justicia, la competencia de este Tribunal se encuentra  definida, por lo que cualquier discusión al respecto, se encuentra debidamente precluida. Dado lo anterior, resulta ocioso e innecesario profundizar respecto este argumento de la defensa de las partes de demandadas.



V.IV.- Sobre la defensa de prescripción opuesta:  a) En sus alegatos de cierre el representante  de la codemandada Verizon Communications Inc invocó la

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VARELA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

aplicación del artículo 984 del Código de Comercio en tanto dispone: "*ARTÍCULO 984.- Salvo lo expresamente dispuesto en otros capítulos de este Código, todo derecho y su correspondiente acción prescriben en cuatro años, con las siguientes salvedades que prescribirán en un año: a) Las acciones de nulidad de los acuerdos tomados por las asambleas de accionistas o consejos de administración de sociedades comerciales; las de reclamaciones por vicios de las cosas vendidas con garantía de buen funcionamiento; y las de responsabilidad de los administradores, gerentes, directores y demás miembros de la administración de sociedades; b) Las acciones para cobrar intereses, alquileres, arrendamientos o rentas; c) Las acciones de los empresarios, para cobrar el valor de las obras que ejecutaren por destajo; d) Las acciones para cobrar el uso de cualquier otro derecho sobre bienes muebles; y e) Las acciones derivadas de ventas al por mayor y al detalle a otros comerciantes o al consumidor directamente*". b) La representación de la parte actora realizó en contra de esta defensa dos razonamientos, a saber: 1. Precluyó la posibilidad de oponer esta defensa.  2. No estamos en presencia de los supuestos del artículo 984 del Código de Comercio de un año, sino de 4 años para la interposición de la demanda. c) Criterio del Tribunal: De conformidad con una lectura de las pretensiones se advierte que la parte actora solicita el pago de los daños y perjuicios causados con motivo del incumplimiento contractual que alega doloso de las sociedades y el ente codemandado. En razón de lo anterior, estima este Tribunal que en el caso de marras estamos ante un plazo de prescripción de 4 años. En este orden de ideas, se advierte que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information Services- Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro, siendo así que la demanda fue interpuesta el día 15 de diciembre de 2008. El 28 de enero de 2009 la demanda fue notificada al representante de Verizon Information Services Costa Rica LLC y el día 18 de marzo de 2009 a la representante de Verizon Communications Inc. Consecuentemente, estima este Tribunal que procede rechazar la defensa opuesta, habida cuenta que la demanda fue notificada sin que haya operado la prescripción cuatrienal. Adicionalmente, se le hace ver a la parte actora que de conformidad con el



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SENTENCIA
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

artículo 67.1 del Código Procesal Contencioso Administrativo, la posibilidad de interponer esta defensa no se encontraba precluída, habida cuenta que la parte codemandada la alegó antes de la conclusión de la audiencia de juicio.

V.V.-Determinación de la existencia de responsabilidad del Instituto Costarricense de Electricidad: a) La representación de la parte actora funda sus razonamientos con respecto a la responsabilidad del ICE en los siguientes argumentos básicos: 1) Entre el ICE, las sociedades codemandadas y la empresa actora existe una relación contractual compleja, en donde los los diferentes acuerdos se interconectan entre sí para alcanzar un resultado patrimonial y donde el resultado final requiere el concurso de cada interviniente. 2) La aprobación del Contrato Maestro de Impresión por parte del ICE, lo involucró con las partes suscribientes del mismo. 3) Al terminar el ente su contrato con la contratista, se encontraba obligado a continuar prestando el respectivo servicio público y a pesar de que sabía que existía una empresa que elaboraba las guías telefónicas, se relacionó solo con el grupo Verizon, sin involucrar a la sociedad actora. 4) El mecanismo contractual empleado por el ICE para la elaboración y distribución de guías telefónicas no fue el correcto, habida cuenta que estamos en presencia de un servicio público, 5) Al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación. 6) Los daños y perjuicios sufridos por la actora por el incumplimiento objetivo de su contrato con GTE (VERIZON) fueron generados por la actuación del ICE, que dio por resuelto su contrato con GTE (VERIZON), sin respetar los intereses legitimos que THS tenía en esa contratación, con lo que violentó el principio *Neminem laedere* -no dañar a otros-. b. La representación del ente demandado funda sus razonamientos de contestación a la parte actora, en los siguientes argumentos básicos: 1. La elaboración de guías telefónicas no es un servicio público. 2. El contrato entre la actora y las codemandadas es un contrato privado que no se rige por los principios de servicio público. Consecuentemente, La resolución del contrato entre ICE y las codemandas no debía ser consultado a la sociedad actora. 3. La


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

relación contractual de la sociedad actora era con las codemandadas, las cuales optaron sub contratar con ésta, de conformidad con las atribuciones que permitía la Ley de la Contratación Administrativa. 4. Las inversiones hechas por la sociedad actora, no era sólo para satisfacer las necesidades del ICE sino también para prestar servicios en otros lugares de la región. 5. El cartel pedía imprimir las guías en Costa Rica, mas no en la sociedad actora. 6. El contrato con las sociedades codemandadas fue resuelto por razones de interés público, dado que éstas unilateralmente decidieron reestructurar la guía del año 2005, infringiendo las cláusulas del contrato. 7. El conocimiento que tuvo el ICE de la relación entre las codemandadas y la actora, se dio en razón de que ésta era una simple sub contratista de aquellas. 8. Que en el caso en examen no estamos en presencia de un relación contractual compleja, dado que estamos en una contratación administrativa, caracterizada por la existencia de cláusulas exhorbitantes. 9. No corresponde al ICE responder por maquinaria adquirida por la actora para elaborar las guías telefónicas de República Dominicana. <u>c) A continuación este Tribunal procederá al análisis particularizado de cada argumento</u>: 1.- Sobre el primer argumento medular expresado por la parte actora: Hecho un análisis de los argumentos esgrimidos por las partes y de la prueba recabada en autos, estima este Tribunal que no lleva razón la parte actora al invocar la existencia de una relación contractual compleja que vincule a esta y el Instituto Costarricense de Electricidad. Lo anterior, en tanto que en el caso de examen estamos en presencia de dos relaciones jurídicas diferentes y definidas, siendo la <u>primera</u> ella propia del derecho público, sea la vinculación entre el ente y Verizon Information Services Costa Rica LLC, y la <u>segunda</u>, una relación propia del derecho privado, entre esta última sociedad y Trejos Hermanos Sucesores S.A.. En este orden de ideas, estima este Tribunal que el análisis a realizar debe efectuarse de manera diferenciada, tomando en cuenta la naturaleza de ambas relaciones jurídicas, siendo la sociedad actora una empresa sub contratada por Verizon Information Services Costa Rica LLC, pero sin que se derive de esta última relación, una obligación contractual del ICE para con Trejos Hermanos Sucesores S.A. En autos se ha tenido por demostrado que el Instituto Costarricense de Electricidad realizó la licitación pública 6378-T para *"Edición de la Guía Telefónica*



Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GRILLO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 351 of 490    RECEIVED NYSCEF: 10/26/2021

*y Desarrollo e Implementación de Servicios de Información"*, siendo así que con fecha 10 de agosto de 1999, el Consorcio GTE presentó oferta para participar en la contratación administrativa Licitación Pública 6378-T. En razón de que se le adjudicó la respectiva contratación, con fecha diez de marzo del año 2000, el Instituto Costarricense de Electricidad y el Consorcio GTE suscribieron el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* . En este orden de ideas, el referido acuerdo de voluntades dispuso en cuanto a la posibilidad de sub contratar por parte de la empresa contratista, lo siguiente: *"De acuerdo con lo establecido en la cláusula 2.13.1. del cartel GTE acepta que puede subcontratar con la aprobación previa y escrita del ICE hasta el 50% del desarrollo, producción y distribución de las Guías Telefónicas, sin que esta aprobación obligue al ICE a solidarizarse en caso de incumplimiento del subcontratista. La sub contratación no relevará a GTE de su responsabilidad por la ejecución total del contrato.."* . La indicada disposición debe analizarse de conformidad con lo dispuesto en otra cláusula del contrato, que dispuso lo siguiente: *"De acuerdo con la experiencia de los últimos años GTE ha producido la totalidad de la Guía Telefónica en territorio costarricense, contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia tecnológica en beneficio de ciudadanos costarricenses y de la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general. Consecuentemente con lo anterior, el ICE solicita y GTE acepta que durante la ejecución del presente contrato, la totalidad de las etapas y procesos de producción de la Guía Telefónica del ICE sea realizada por GTE en Costa Rica"* Como se advierte de los autos, y dada la existencia de una relación de larga data, la sociedad actora y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, suscribieron el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, en donde respecto del plazo del mismo, se indicó: *"Este Contrato será efectivo únicamente cuando se cumplan los dos siguientes requisitos: (i) al momento de la ejecución de este Contrato por las partes; (ii) al momento de la ejecución de un contrato entre el Instituto Costarricense de Electricidad (ICE) y el Comprador, celebrado como resultado de una licitación*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA SÁNCHEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*del Comprador a la Oferta Pública 6378-T. En el momento que los requisitos mencionados sean cumplidos, la fecha efectiva (la "Fecha Efectiva") de este contrato será a partir de la ejecución del contrato mencionado en la sub-sección (ii) de esta Sección 2(a)..."* Por otra parte este último acuerdo de voluntades privado, se regulaba por el Código Civil y el Código de Comercio de Costa Rica (ver cláusula 35, documento 19 del expediente de prueba de la actora) y fue rubricado para en principio, la elaboración de guías telefónicas en Costa Rica y Belice. Consecuentemente, estamos en presencia de una sub contratación realizada por las empresas dichas con la sociedad actora, a fin de que aquellas pudieran ejecutar a cabalidad el contrato originado con motivo de la licitación pública 6378-T. No es óbice indicar que si bien la relación contractual original del ICE se realizó con GTE, posteriormente operó una modificación, por lo que la figura de contratista la ocupó al momento de los hechos objeto del presente proceso, el grupo de interés económico Verizon, tal y como se indicará posteriormente. De conformidad con lo indicado anteriormente, se advierte que no existe una vinculación directa entre el ICE y la sociedad actora y tampoco es viable partir de la existencia de una relación contractual compleja, propia del derecho privado. Para tales efectos, este Tribunal debe distinguir entre esta última figura y la sub contratación en derecho administrativo. En el caso de la denominada <u>relación jurídica compleja</u>, estima este Tribunal que estamos en presencia de diferentes partes que concurren al cumplimiento de un objeto negocial común, por lo que todas las acciones realizadas por el complejo contractual deben estar orientadas hacia tal fin. En este orden de ideas, las partes, aunque no necesariamente sean contratantes directas entre sí, todos vinculados directamente con todos, tienen conocimiento recíproco de su participación en la actividad material contratada, la cual es necesaria dentro de la relación compleja desarrollada y si una de las mismas no concurre en el cumplimiento de sus obligaciones para con las demás, debe resarcir, para indemnizar los daños antijurídicos ocasionados por su incumplimiento. Existe entonces, plena conciencia de la vinculación contractual entre unas y otras y de las consecuencias de la participación y del no cumplimiento obligacional frente a ese objeto común. Como se advierte, en estos casos, se parte de una relación de



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DIAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

primer grado entre unos y otros participantes, donde los aportes pueden ser diferentes y de mayor impacto en el objeto negocial, mas siempre manteniendo una complementariedad entre ellos. En el caso de este primer supuesto, se evidencian características tales como: a) La unión en el plano fáctico de diferentes contratos conforme a la voluntad de los interesados y a la unidad del fin perseguido b) Existe una función económico social y fines concretos que las diferentes partes de la relación pretenden obtener c) Se advierte la existencia de un control social de una o varias partes. d) El conjunto es considerado como una unidad jurídicamente orgánica y, por lo tanto, interrelacionada, por lo que debe partirse del contenido esencial del marco contractual, al momento del análisis de cualquier visicitud que afronte el mismo. Como se advierte, estamos en presencia de un entramado contractual, en el cual los contratos pueden tener su causa propia, mas responden a una finalidad común y entre ellos existía un equilibrio de prestaciones , que no se puede romper incausadamente por una de las partes, sin que surja el deber de indemnizar. Lo anterior, en tanto que entre las partes surge una relación social sistémica de la cual surgen recíprocos deberes dirigidos a proteger la esfera de intereses compartidos. De la misma surgen deberes consecuentes de diligencia, buena fe, lealtad, de cumplimiento de obligaciones principales y accesorias, entre otras, y el marco de la voluntad de las partes se orienta hacia las mismas, con plena conciencia del funcionamiento del entramado y su operación. Estamos en presencia entonces, de relaciones no lineales, en el sentido de que la misma no se traduce en el mero deber de prestación frente la existencia de una contraprestación, sino ante una relación de carácter global que puede albergar en su seno diversos vínculos y situaciones jurídicas orientadas hacia un mismo fin negocial. En el caso de análisis, se advierte cómo el juicio de reproche realizado por la actora se orienta a presumir el incumplimiento de una obligación derivada de su teoría respecto de la existencia de un relación contractual, sea el deber de preservar la integridad y patrimonio de las partes (interés de protección) y que traduce en una obligación de aviso y una de conservación. No obstante, diferente es la situación de la <u>sub contratación</u>, en tanto que la misma surge cuando uno de los obligados en una relación contractual básicamente binaria, acude a terceros para obtener bienes



RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DÍAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

o servicios que resultan necesarios para cumplir las obligaciones contractuales primarias. En este orden de ideas, existe un relación de primer nivel en el contrato inicial, siendo así que una de las partes, por su cuenta y riesgo y de manera exclusiva según su voluntad, acude a entablar una o varias relaciones contractuales de segundo nivel con sub contratistas, en tanto que éstos poseen los medios para que el contratista cumpla su carga obligacional. Consecuentemente, estamos en presencia de un contrato principal y un contrato secundario suscrito por una de las partes, para la realización de alguna de las prestaciones que son, a su vez, objeto del contrato principal o que contribuyen al menos al cumplimiento. Es evidente entonces que la sub contratación nace con motivo de la especialización de las organizaciones empresariales y la imposibilidad material que un contratista tenga a su alcance todos los bienes y servicios necesarios para el cumplimiento de la obligación principal. Consecuentemente, la sub contratación opera en diferentes niveles y si bien, resulta indudable que de la buena operación de la sub contratación depende la debida ejecución de la contratación principal, no es dable verla como un entramado, dada la naturaleza *instrumental* de aquella para con el contrato rubricado por la contratista. Así el destino del contrato secundario o sea el originado con la sub contratación no debe tener una consecuencia jurídica o fáctica directa en la ejecución del contrato principal, es decir, el incumplimiento del sub contratista no releva al contratista de cumplir en tiempo y forma los términos y condiciones del contrato principal. A la inversa, el incumplimiento del contratista no obliga ni vincula a sus sub contratistas, por lo que el contratante o en este caso la Administración, podrá pedir responsabilidad sólo al obligado principal, dado que ese el vinculo contractual que adquirió. Lo anterior, es acorde con lo dispuesto en el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* en cuanto dispuso respecto a la posibilidad de sub contratar por parte de la empresa contratista, lo siguiente: *"De acuerdo con lo establecido en la cláusula 2.13.1. del cartel GTE acepta que puede subcontratar con la aprobación previa y escrita del ICE hasta el 50% del desarrollo, producción y distribución de las Guías telefónicas, sin que esta aprobación obligue al ICE a solidarizarse en caso de*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*incumplimiento del subcontratista. La sub contratación no relevará a GTE de su responsabilidad por la ejecución total del contrato..".* De lo anterior, se evidencia que el contrato surgido con motivo de una sub contratación o secundario, es derivado o dependiente de otro previo primario, el cual no se ve agotado por aquel y excede los alcances del secundario, dado que es un vinculo contractual diferenciado y diferenciable. Consecuentemente, no es dable ni presumir solidaridad de la Administración como contratante frente al sub contratista por los incumplimientos del contratista, ni mucho menos una relación jurídica que trasciende en complejidad más allá de esta vinculación de segundo nivel, en donde entre la parte contratante y el sub contratista, no hay vinculación directa, sino que estará siempre de por medio la contratista, como obligada en el cumplimiento del objeto contractual. No obstante, es menester hacer una precisión, en tanto que en la relación contratante y contratista, la Administración, puede imponer a éste determinadas obligaciones referentes al interés público o al cumplimiento del ordenamiento, dado que la carga obligacional en tal caso, esta atravesada de manera transversal tanto por las regulaciones de orden público que aplican a la materia como a la existencia misma de las cláusulas exhorbitantes y la naturaleza misma del objeto contractual. En el caso en examen, Verizon Information Services Costa Rica LLC sub contrató a la empresa actora, en tanto que además de que se imponía la elaboración de las guías en territorio nacional, se demostró alto grado de experticia en el tema, una larga relación contractual previa al contrato objeto de la presente resolución y la existencia de un reconocimiento contractual a la posibilidad de que la empresa contratista pudiera acudir a esta modalidad para poder cumplir sus obligaciones contractuales. Consecuentemente, no lleva razón la parte actora al indicar una relación jurídica diferente a la sub contratación ni ha demostrado que en el caso de análisis haya operado una vinculación diferente a la prevista en la norma cartelaria o que Trejos Hermanos Sucesores no haya tenido una relación de segundo nivel o que formara parte de un entramado contractual que permitiera presumir la existencia de una relación contractual compleja. Por el contrario, la propia prueba aportada por la parte actora demuestra que su vinculación tiene un carácter secundario para con el ICE y que existía pleno conocimiento de tal



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

relación. Inclusive las declaraciones de los testigos Quirós Alfaro y Navarro Céspedes ofrecidos por la parte actora confirman que no había relación directa entre el ente y la sociedad actora, por lo que no es dable suponer una relación más allá de la que se ha tenido por demostrada, sea la que poseía el ente con el grupo Verizon. Adicionalmente, no podemos obviar que estamos en presencia de una contratación administrativa de un ente público- empresa estatal, por lo que estimamos incorrecto pretender la prevalencia de una figura propia del derecho privado por sobre un mecanismo previsto para el cumplimiento de los fines públicos, como es la sub contratación. Si bien somos conocedores que la Ley de la Contratación Administrativa de la época preveía la sub contratación para los contratos de ejecución o construcción de obra pública, lo cierto es que vía jurisprudencia administrativa y jurisdiccional se fue abriendo la posibilidad de emplear dicho mecanismo en otras figuras contractuales, hasta llegar a la redacción actual normativa que sí permite expresamente dicha figura para otros tipos de contratos administrativos. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede rechazar este primer argumento de la parte actora.  2.- La parte actora invoca que la aprobación del Contrato Maestro de Impresión por parte del ICE, lo involucró con las partes suscribientes del mismo. Al respecto, estima este Tribunal que en primer término no hay pruebas de que el ente haya tenido participación en la aprobación ex ante o ex post del referido contrato, habida cuenta que el testigo ofrecido para tal efecto, manifestó no recordar haber emitido acto alguno de aprobación del mismo, ni tampoco dicha manifestación de voluntad se evidencia del acuerdo de voluntades rubricado por la sociedad actora. Por otra parte no es lo mismo indicar que aprobó el contrato que aprobó la figura del sub contratista. Lo anterior, por cuanto, de conformidad con el texto contractual, el ICE aprobaba la posibilidad de sub contratar y el sub contratista en particular, mas no los acuerdos concretos del contratista con éste. En este orden de ideas, no debemos obviar que estamos en un contrato con una empresa pública, ente estatal, en donde la carga obligacional está permeada por el propio ordenamiento y el interés público. Por consiguiente, la imposición de aprobación previa de la figura del sub contratista tiene razonabilidad en orden a



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DELGADO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

lo indicado, habida cuenta que la administración mediante dicho mecanismo

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

cautela que el sub contratado no esté afecto a prohibiciones o inhabilitado, entre otros aspectos . Es lógico, pues, que, como se ha afirmado, la actividad de la subcontratación esté regulada por normas de carácter público que limitan en algunos aspectos la autonomía de la voluntad de las partes, mas lo anterior no implica de ninguna manera que se desdibuje la naturaleza jurídica de la relación más allá de sus alcances en perjuicio de la contratante y el interés público. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. 3.- Adicionalmente, la parte actora indica que estamos ante un servicio público, por lo que cualquier contrato suscrito en esta materia, se ampara a dicha naturaleza jurídica. Invoca la aplicación de un criterio de la Procuraduría General de la República. Por lo anterior, indica que al terminar el ente su contrato con la contratista, se encontraba obligado a continuar prestando el respectivo servicio público y a pesar de que sabía que existía una empresa que elaboraba las guías telefónicas, se relacionó solo con el grupo Verizon, sin involucrar a la sociedad actora. Al respecto estima este Tribunal que no lleva razón la parte actora. En primer término considera este Colegio que en el caso de análisis, no estamos en presencia de un servicio público. En este orden de ideas, el artículo 3 de la Ley No. 7593, del 9 de agosto de 1996, define el servicio público de la siguiente manera: *"a) Servicio Público: el que por su importancia para el desarrollo sostenible del país sea calificado como tal por la Asamblea Legislativa, con el fin de sujetarlo a las regulaciones de esta ley"*. En el anterior orden de ideas, se advierte que la norma deja en manos del legislador la calificación de una actividad económica en un momento histórico determinado, como servicio público. Dicha declaratoria o *"publicatio"* ha sido reconocida por la Sala Constitucional, de la siguiente manera: *"Por ejemplo, el artículo 3 de la Ley de la Autoridad Reguladora de los Servicios Públicos contiene varias definiciones, entre ellas la de servicio público, como toda actividad que por su importancia para el desarrollo sostenible del país sea calificada como tal por la Asamblea Legislativa, con el fin de sujetarla a las regulaciones de esta ley. Como puede apreciarse, la determinación de si una necesidad es de interés público no es una cuestión jurídica, sino de hecho y circunstancial, que obliga –como ya se dijo- a un juicio de oportunidad y conveniencia. <u>No existen actividades que por</u>*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO PHILIPP GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 358 of 490     RECEIVED NYSCEF: 10/26/2021

*'naturaleza' o imperativos del Derecho Constitucional sean propias del servicio público, sino que eso dependerá de cada sociedad, sus necesidades y en el ámbito –privado o público- en que estas se satisfagan de mejor manera.*" *(voto n.° 517-98, de 14:32 horas del 26 de agosto de 1998). Lo subrayado no es del original.* En este orden de ideas, advierte este Tribunal que el articulo 2 del decreto Ley 449 de 8 de abril de 1949, no determinó que las guías telefónicas puedan ser consideradas como un servicio público, y en este orden de ideas, dispuso: "*"Articulo 2.- Las finalidades del Instituto, hacia la consecución de las cuales se dirigirán todos sus esfuerzos y programas de trabajo, serán las siguientes: ..h) Procurar el establecimiento, mejoramiento, extensión y operación de los servicios de comunicaciones telefónicas, telegráficas, radiotelegráficas y radiotelefónicas, para lo cual tendrá de pleno derecho la concesión correspondiente por tiempo indefinido*" Tampoco se advierte que la Ley de la Autoridad Reguladora de los Servicios Públicos, Ley No. 7593, del 9 de agosto de 1996, haya considerado la elaboración de las guías como tales, por lo que cualquier interpretación extensiva resulta improcedente si no se advierte expresamente la voluntad del legislador en tal sentido. En todo caso, de partir del supuesto alegado por la parte actora, ello no quiere decir que los eventuales sub contratistas de una empresa contratista deban ser considerados como regidos por una relación extensiva de derecho público entre el ente y ellos, habida cuenta que su vinculación contractual no es con aquel, sino con la empresa que sería la prestadora y que los contrata. Por otra parte es de advertir, como un razonamiento adicional que lleva al rechazo de esta argumentación, que la elaboración per se de las guías telefónicas, no cumple las condiciones para ser considerado como servicio público. En este sentido, es servicio público aquel que reúna ciertas características tales como: a) ser una actividad esencial de interés general b) la demanda del mismo resulta cautiva y por ende implica lucro. c) Existe la publicatio de por medio por parte del legislador. d) Un tercero, no podría pretender explotar el servicio sin un acto habilitante de la Administración, habida cuenta que ésta es la titular del mismo. e) El concesionario no ejerce potestades de imperio f) La Administración mantiene control y responsabilidad sobre el servicio. En orden a lo anterior, se aplica el ordinal 4° de la Ley General de la Administración Pública en tanto, en dispone *"La*



Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*actividad de los entes públicos deberá estar sujeta en su conjunto a los principios fundamentales del servicio público, para asegurar su continuidad, su eficiencia, su adaptación a todo cambio en el régimen legal o en la necesidad social que satisfacen y la igualdad en el trato de los destinatarios o beneficiarios"* En el caso en examen, estima este Tribunal que la elaboración de guías telefónicas es un medio más para el cumplimiento de servicio público, es un instrumento, mas no esta última figura en sí misma. Consecuentemente hacer las guías, de modo alguno puede llegar a ser considerado como servicio público y cualquier interpretación extensiva que pretenda darle tal carácter resulta errónea y contraria a derecho. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. 4) Invoca la parte actora que el mecanismo contractual empleado por el ICE para la elaboración y distribución de guías telefónicas no fue el correcto, habida cuenta que estamos en presencia de un servicio público. Al respecto, procede la aplicación de las consideraciones realizadas anteriormente, en tanto que a criterio de este Tribunal en el caso del objeto contractual no estamos en presencia de un servicio público como tal, siendo así que en todo caso, de haber existido un procedimiento de contratación administrativa erróneo, lo que procedía era aplicar la figura de la contratación irregular – lo que como se ha dicho, no es la situación de análisis- mas sin que esto implique obligación contractual o inclusive extra contractual, tal y como se dirá, con la sub contratista. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. 5) Alega también la parte actora que al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación. Al respecto, consta en autos que el ente adoptó medidas frente al rompimiento contractual con Verizon Information Services Costa Rica LLC, siendo así que en todo caso, no existía vinculo contractual o norma que obligara al ente a contratar de manera contingente a la sociedad actora. <u>Conclusión</u>: De conformidad con los anteriores



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

razonamientos, procede rechazar este argumento de la parte actora. 6. Estima este Tribunal que tampoco estamos en presencia de una responsabilidad civil extra contractual, en tanto que no se advierte la existencia de norma alguna que haya impuesto al ente la obligación de informar a los sub contratistas de la situación patológica a que se llega en una relación contractual con uno de los adjudicatarios y contratistas de una licitación pública. Como se ha indicado, estamos en presencia de una sola relación contractual entre el ICE y Verizon Information Services Costa Rica LLC, por lo que las obligaciones del ente se agotan en la misma. Cualquier relación jurídica que haya adoptado Verizon Information Services Costa Rica LLC, con terceros ni obliga, ni vincula al ente en cuanto a obligaciones contractuales y extra contractuales no pactadas. Admitir lo contrario, implicaría llegar al absurdo de que el ente se encuentra obligado a comunicar a todos los sub contratistas, proveedores y empleados de un contratista, cuando se haya roto la relación contractual, lo cual evidente es desproporcionado, infundado e implicaría una carga al ente que trasciende la normativa y la relación contractual respectiva. En este orden de ideas, tampoco se ha demostrado que el ICE haya causado un daño que se encuentre directamente vinculado con sus conductas y omisiones y por el contrario, de los propios argumentos y prueba recabada en autos, se evidencia que cualquier lesión causada sería provocada por el hecho de un tercero, mas no el ente público dicho. En el caso del ente demandado, en principio, sus obligaciones se agotan en su relación con la empresa contratista y es a esta a quien le corresponde responder frente a sus sub contratistas, así como a estos responder para con la sociedad que los contrató. Lejos de ser la contratación administrativa una relación obligacional de carácter triangular, estamos en una obligación sinalagmática, en donde el incumplimiento demostrado de la contratista frente al ICE, no debe servir de justificación para alegar daños extra contractuales sin nexo causal con el ente dicho. Consecuentemente, no ha demostrado la parte actora los supuestos del artículo 190 y siguientes de la LGAP para que opere la responsabilidad extra contractual de la administración pública y además, es evidente que no opera el artículo 1045 del Código Civil, aplicable a la relación entre sujetos de derecho privado. Conclusión: De conformidad con los anteriores



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 361 of 490    RECEIVED NYSCEF: 10/26/2021

razonamientos, procede rechazar este argumento de la parte actora. Razonamiento final: No es óbice indicar que no es procedente pretender la existencia de una presunta solidaridad en materia de responsabilidad del ente con las sociedades codemandadas frente a la actora, cuando como en el caso no se ha demostrado una relación jurídica <u>directa</u> del ICE frente a Trejos Hermanos Sucesores S.A. capaz de generar efectos jurídicos y no hay norma que prevea tal supuesto.

V.VI.- De conformidad con las anteriores consideraciones, procede rechazar la demanda en lo que respecto al Instituto Costarricense de Electricidad, por estimarse que no lleva razón la parte actora en ninguno de los argumentos invocados y al no haberse determinado la existencia de algún tipo de vínculo contractual y la sociedad actora, que haya generado un daño contractual o extracontractual vinculado con un nexo causal con alguna de sus conductas u omisiones.

V.VII.- Determinación de la existencia de responsabilidad de la codemandada Verizon Information Services - Costa Rica- LLC: a) La representación de la parte actora funda sus razonamientos con respecto a la responsabilidad de Verizon Information Services - Costa Rica- LLC en los siguientes argumentos básicos: 1) El Contrato que firmó la actora con el Grupo GTE (luego Grupo VERIZON) y que aprobó y autorizó el ICE, es por su naturaleza un contrato que se rige por los principios del servicio público y queda regulado por sus principios, normas y valores. Consecuentemente, las cláusulas exonerativas de responsabilidad civil que por imposición de VERIZON se incluyeron en el contrato maestro de compra, necesariamente son ineficaces por principios imperativos de Derecho Público, dado que si bien el contrato Verizon - THS se suscribió con las formas de un acuerdo comercial, por su objeto y por sus efectos es de naturaleza administrativa, al ser para la prestación de un servicio público. 2) La empresa Verizon Information Services - Costa Rica- LLC incumplió el contrato suscrito por ella con el ICE. No obstante, de manera falsa al romper su relación contractual con la sociedad actora, le indicó que el responsable del rompimiento contractual era el indicado ente incurrió en un incumplimiento doloso, en tanto que quería dejar sus negocios en el país. Consecuentemente considera que las cláusulas



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

exonerativas de responsabilidad civil del respectivo contrato son ineficaces cuando están referidas a un incumplimiento doloso, de conformidad con lo dispuesto por el artículo 701 del Código Civil. 3) La extinción del contrato ICE - GTE (VERIZON) constituye un incumplimiento objetivo del contrato GTE (VERIZON)-sociedad actora, que es imputable a GTE (VERIZON), por lo que ésta entidad debe responder por los daños y perjuicios causados, según el principio general de la responsabilidad contractual establecido en el artículo 702 del Código Civil. 4) Las cláusulas exonerativas están integradas a un contrato de adhesión, ya que el contenido de ese acuerdo sólo permitía la aceptación o el rechazo por parte de la sociedad actora, y la nulidad de tales cláusulas resulta de su naturaleza abusiva, de conformidad con artículo 1023, inciso m), del Código Civil y en el artículo 42 de la Ley 7 472 de 19 de enero de 1995 (Ley de Promoción de la Competencia y Defensa Efectiva del Consumidor). b) La representación de Verizon Information Services - Costa Rica- LLC alega en su descargo que : 1. La cláusula objetada tiene su lógica en el sentido de que verizon solo tiene un negocio en Costa Rica y era ilógico su vigencia si el ICE le terminaba el contrato de guías telefónicas, siendo así que la misma  fue negociada con la actora y no es nula por las disposición del artículo 1023 del Código Civil. Con relación al plazo del contrato, en la cláusula 2.(b) del mismo se estableció un rango entre 48 meses a 168 meses, quedando en todo caso la vigencia del mismo supeditada a la vigencia del contrato con el ICE, dada la naturaleza del contrato y que Verizon no tenía otros negocios en Costa Rica. 2. La relación entre Verizon y la parte actora es exclusivamente privada. La actora pretende engañar que el contrato firmado con Verizon es un subcontrato del contrato suscrito entre el ICE y Verizon, lo cual no es cierto y constituye una aberración jurídica. 3. En el caso de marras debe aplicarse el artículo 701 del Código Civil, que indica que el dolo no se presume, por lo que se debe demostrar, siendo así que el mero incumplimiento no significa per se una conducta dolosa. 4. La terminación del contrato, no implicaba en ningún caso responsabilidad para ninguna de las partes, debido a que la terminación anticipada del contrato surge como consecuencia directa del hecho o acción de un tercero, que en el  caso en particular fue el ICE. 5. Las cláusulas  24  y  28  de  exoneración de responsabilidad civil contractual y de


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

limitación de responsabilidad civil contractual, específicamente los incisos b) y e) de la cláusula 28, fueron negociadas y aceptadas por el representante de la sociedad actora . 5. La parte actora reconoce que la ejecución del contrato se mantuvo en condiciones normales cerca de cuatro años, lo cual nos dice que el contrato se ejecutó en el rango de 48 meses establecidos en el punto b) de la cláusula 2 del Plazo. c) <u>A continuación este Tribunal procederá al análisis particularizado de cada argumento</u>: 1. En orden al razonamiento indicado en el considerando anterior, para este Tribunal es claro que la relación entre la sociedad actora y la empresa Verizon Information Services - Costa Rica- LLC no es propia del derecho público, ni implica la prestación de un servicio público. Como se ha indicado de manera extensa anteriormente, en el caso indicado, hay una relación propia del derecho privado, en donde Trejos Hermanos Sucesores es sub contratista de Verizon Information Services - Costa Rica- LLC, siendo esta última la única que rubricó un contrato regido por las regulaciones de derecho público con el ICE. Consecuentemente, no es cierto que las regulaciones propias mediante el cual se da el traslado de un servicio público, le sean aplicables a la indicada relación contractual. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. 2. Por otra parte no ha demostrado la actora la existencia de un contrato de adhesión entre el contrato que suscribió con Verizon Information Services - Costa Rica- LLC y por el contrario, debe partirse de la libre voluntad a la hora de rubricar el contrato, conforme a los acuerdos que hayan adoptado las partes. Adicionalmente, la relación preexistente entre la sociedad actora con GTE descarta cualquier posibilidad de imposibilidad de revisar los términos y condiciones pactadas o de una relación de mera adhesión. Debe recordar la parte actora que a diferencia de las relaciones contractuales fundadas en la negociación, una parte redacta en exclusiva ese contenido, sin dejar intervenir a la otra y ésta se limita a adherirse a la formulación redactada por el profesional. Consecuentemente, no es dable presumir que un vinculo contractual posee tal naturaleza si no posee carácter masivo, tiene una vocación de generalidad y no se advierten tratativas preliminares a la rúbrica del contrato, que evidencien la conformación de la voluntad. Los requerimientos previos hechos por GTE y luego a Verizon sobre la



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

maquinaria empleada y la calidad del producto no puede ser considerados como una posibilidad unilateral a la actora de su parte hacia la cual la misma debía adherirse, sino como condiciones necesarias para mantener y continuar una relación contractual, dentro de un marco negocial y una sociedad de mercado en donde opera el libre juego de la oferta y la demanda y en la cual los agentes económicos pueden establecer a sus contratistas los requerimientos de calidad que estimen convenientes para obtener un producto final conforme a sus intereses comerciales. Ni siquiera se puede hablar de una relación de consumo o de demostración de un desequilibrio contractual obligacional que pueda hacer presumir tal invocación. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. 3. La parte actora invoca incumplimiento contractual imputable de la codemandada Verizon Information Services - Costa Rica- LLC  en su relación con el ICE. Al respecto, este Tribunal da por probado este hecho, en razón de que mediante oficio 6000-27733-2005 de SGT-2326-2005 de 1 de junio de 2005 se resuelve el contrato entre el ICE y Verizon Information Services Costa Rica LLC por incumplimiento contractual de esta última. Lo anterior fue confirmado mediante oficio 0150-36359-2005 de GG-680-2005 de 8 de julio de 2005 de la Gerencia General del ente. Lo anterior fue confirmado mediante resolución de las quince horas del cuatro de diciembre de 2015 en laudo arbitral en proceso de la misma naturaleza interpuesto por el ICE contra Verizon Information Services Costa Rica LLC, en donde se condena a esta última al pago de diferentes sumas en virtud de haberse demostrado que incurrió en incumplimiento contractual. (prueba para mejor resolver ofrecida por la parte actora en audiencia de juicio). Así las cosas existe un acto administrativo firme y un laudo arbitral que demuestran el incumplimiento invocado. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede acoger este argumento de la parte actora. 3. La parte actora invoca incumplimiento contractual doloso imputable de Verizon Information Services - Costa Rica- LLC en su relación con Trejos Hermanos Sucesores S.A. Al respecto, este Tribunal da por probado este hecho, en razón de que la indicada codemandada, de manera deliberada provocó el rompimiento de su relación contractual con el Instituto Costarricense de Electricidad, tal y



Firma digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ÁVILA JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

como se analizará a continuación. En autos se ha tenido por demostrado que en el año 2004 Verizon Information Services CR. propuso al ICE varios ajustes al contrato rubricado para la edición de guías telefónicas, y además el 13 de mayo de ese año propuso revisar la elaboración de las mismas, siendo así que el Sub Gerente de Telecomunicaciones, del ente mediante oficio 6000-41046-2004 de 15 julio de 2004, le indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004.  Con posterioridad, mediante nota de fecha 8 de setiembre de 2004, recibido en la Proveeduría el 16 de diciembre de ese año, el Vice Presidente de Verizon Information Services CR, le indica al Sub Gerente de Comunicaciones del ICE que en razón de que no se obtuvo respuesta a la nota del 13 de mayo de los corrientes, se tendrá por aplicado el silencio positivo a la petición.  Mediante oficio 6000-52278-2004 de 14 de setiembre de 2004 el Sub Gerente de Telecomunicaciones del ICE rechaza la aplicación del silencio positivo, habida cuenta que mediante oficio mediante oficio 6000-41046-2004 de 15 julio de 2004, se indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004, en respuesta a la propuesta de 13 de mayo de ese año para  revisar la elaboración de las mismas. Posteriormente, mediante nota de 8 de noviembre de 2004, el Vice Presidente de Verizon le indica al indicado Sub Gerente que el silencio positivo operó de pleno derecho, al no haberse contestado en 30 días hábiles. A lo anterior, mediante oficio 600-64540-2004 de 18 de noviembre de 2004, se le contesta que en el caso de marras no resulta procedente la aplicación del silencio positivo, tal y como lo interpreta la contratista. A mayor abundamiento, por oficio SI-0726-11-04 de 15 de noviembre de 2004, la Jefe del Proceso de Servicios de Información del ICE le indica al Gerente General de Verizon que no ha ampliado la vigencia de la garantía de cumplimiento pedida desde el 30 de junio de 2004, según oficio 6000-35344-2004 y que la estructura de la Guía Telefónica del Área Metropolitana presenta incumplimientos en desacato a lo indicado en las notas 6000-41046-2004 y 6000-522678-2004.  De manera adicional, por acuerdo de artículo 10 de sesión 5649 de 23 de noviembre de 2004 del Consejo Directivo del ICE se dispuso indicar a la empresa contratista que se rechaza cualquier intención de modificar unilateralmente las condiciones



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

contractuales pactadas. Dado el incumplimiento de lo requerido, mediante oficio SI-759-12-04 de 13 de diciembre de 2004 se solicitó iniciar procedimiento de resolución contractual a la empresa Verizon Information Services CR por no ajustarse al contrato rubricado y los requerimientos del ente. En consecuencia, por oficio 5225-69163-2004 de AEG-0572-2004 de 14 de diciembre de 2004 se dio inicio a procedimiento de resolución contractual, siendo así que por medio de oficio 6000-27733-2005 de SGT-2326-2005 de 1 de junio de 2005 se resuelve el contrato entre el ICE y Verizon Information Services Costa Rica LLC por incumplimiento contractual de esta última. Lo anterior fue confirmado mediante oficio 0150-36359-2005 de GG-680-2005 de 8 de julio de 2005 de la Gerencia General del ente. Para este Tribunal, no está de más indicar que de ninguna manera podría haber invocado la parte demandada la existencia de un silencio positivo, por los siguientes motivos: a) Previo a su invocación, el ICE ya había hecho una manifestación expresa denegatoria, por lo que cualquier gestión posterior en contrario invocando un acto presunto es improcedente e irrelevante. b) La petición no se enmarcaba dentro de los supuestos del artículo 16 de la Ley de la Contratación Administrativa, dado que no era una gestión para ejecutar el objeto contractual, sino para su modificación en detrimento de lo pactado. c) El silencio positivo no opera de pleno derecho, sino que debe complementarse con las disposiciones del artículo 7 de la Ley de Protección al ciudadano del exceso de requisitos y trámites administrativos, lo cual no fue cumplido. Consecuentemente de los hechos probados se advierte la existencia de conciencia y voluntad de Verizon Information Services Costa Rica LLC de incumplir la relación contractual con el ICE y se advierte conocimiento que el indicado rompimiento contractual incidiría abiertamente en su relación con la sociedad actora. En este orden debe tomarse en consideración que el incumplimiento doloso contractual se configura cuando el mismo es consciente y voluntario, sin que necesariamente implique una intencionalidad de causar daño. Este incumplimiento, tendrá como consecuencia la ineficacia de cláusulas de exoneración o limitación de responsabilidad pactadas. En este sentido, para hablar de dolo obligacional, no dolo in contrahendo (que es vicio de la voluntad), el incumplimiento debe reunir dos requisitos para que sea doloso: a) la previsión


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

del sujeto de no cumplir (elemento negativo) y b) la posibilidad concreta del sujeto de cumplir (elemento positivo). Es decir el contratista decide no cumplir, a pesar de estar en condiciones de hacerlo. No obstante, opta por no ejecutar la prestación. La consciencia de la ilicitud y el cumplimiento de los elementos indicados anteriormente, operan en el caso de análisis, dado que de la prueba se evidencia que la codemandada tenía conocimiento del carácter contrario de su comportamiento respecto del derecho y, pese a ello, incumplió. Consecuentemente, la inexcusabilidad del cumplimiento determina la concurrencia de dolo, y la intencionalidad de no cumplir, dado que la sociedad codemandada nunca demostró, ni en sede administrativa, ni en el arbitraje, ni en este proceso, hecho objetivamente relevante que justificara su incumplimiento. Por el contrario, hay prueba de la previsibilidad del incumplimiento y sus consecuencias. Así en autos se evidencia, las siguientes comunicaciones al respecto por parte del ICE: a) Mediante oficio 6000-41046-2004 de 15 julio de 2004, se le indicó a Verizon que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004. b) Con oficio 6000-52278-2004 de 14 de setiembre de 2004 el Sub Gerente de Telecomunicaciones del ICE rechaza la aplicación del silencio positivo, habida cuenta que mediante oficio mediante oficio 6000-41046-2004 de 15 julio de 2004. c) Mediante oficio 600-64540-2004 de 18 de noviembre de 2004, se le contesta a Verizon que en el caso de marras no resulta procedente la aplicación del silencio positivo, tal y como lo interpreta la contratista. d) Mediante oficio SI-0726-11-04 de 15 de noviembre de 2004, la Jefe del Proceso de Servicios de Información del ICE le indica al Gerente General de Verizon que no ha ampliado la vigencia de la garantía de cumplimiento pedida desde el 30 de junio de 2004, según oficio 6000-35344-2004 y que la estructura de la Guía Telefónica del Área Metropolitana presenta incumplimientos en desacato a lo indicado en las notas 6000-41046-2004 y 6000-522678-2004. e) El 12 de noviembre 2004 el ICE ordenó a las Notarias públicas Leda. Patricia Hernández Salazar y Licda. Ligia Picado Arguedas, levantar actas notariales del resultado de las visitas que hacen en el local industrial de THS, en donde se hizo constar que en las guías telefónicas en elaboración, no se incluyeron los registros de los clientes de provincias y se constató que al imprimir



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ARTAVIA BARRANTES
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

las páginas blancas residenciales de la Guía Telefónica del Área Metropolitana, se hizo con los registros únicamente de San José, excluyendo los abonados de la zona de Los Santos y de las Provincias. f) Mediante oficio S.l.0730-11-04 se comunicó a Verizon, minuta de una reunión efectuada con sus personeros, en donde se le indica que se incumplía las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación y segunda del contrato. g) El 18 de noviembre 2004, con nota 6000-64540-2004, la Subgerencia de Telecomunicaciones responde la nota del 8 de ese mes de Verizon, manifestándole nuevamente que debía mantener el formato de las guías telefónicas del año 2004. h) Mediante acuerdo de artículo 10 de sesión 5649 de 23 de noviembre de 2004 del Consejo Directivo del ICE se dispuso indicar a la empresa contratista que se rechaza cualquier intención de modificar unilateralmente las condiciones contractuales pactadas. i) El 2 de diciembre de 2004 en visita que se realizó en las instalaciones de la actora, la Notaria pública Yaila Paola Sánchez, levantó una acta notarial en la que se constata que estaban impresos 103.000 ejemplares de las páginas blancas residenciales del Área Metropolitana y que la imprenta  no había recibido ningún tipo de orden para modificar el proceso de impresión y encuadernación; sino que trabaja con las ´órdenes de compra entregadas por Verizon, las cuales no fueron modificadas por esta. Por lo anterior, concurren los supuestos necesarios para determinar el incumplimiento doloso de la codemandada, que hacen que a pesar de lo dispuesto en la cláusula 28 del contrato maestro,  tenga el deber de responder por los daños causados a la actora con motivo de su incumplimiento en aplicación del artículo 701 y 702 del Código Civil. Lo anterior, dado que dicho incumplimiento demostrado con el ICE, como se ha dicho implica también una falta de cumplimiento voluntario y por ende doloso de la  relación contractual con la actora y que se traduce en el hecho demostrado que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information services-Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro. En este orden de ideas, debe notarse que el criterio de imputación subjetivo del dolo, implica la existencia de un ánimo incumpliente, de la previsibilidad no tanto intención, antijurídica de causar daño al otro contratante, o del comportamiento de quien


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO FRANCISCO BLANDINO VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

no tiene  intención de hacer honor a los compromisos contractuales. En el caso de marras, lo anterior se demuestra con base en las siguientes consideraciones, debidamente demostradas en autos: a) El rompimiento de la resolución contractual de la sociedad codemandada con el ICE no fue por rescisión (sea por motivos de interés público o acuerdo entre partes), sino por resolución contractual, sea por incumplimiento deliberado de la contratista. b) De la prueba se desprende la conciencia y conocimiento del incumplimiento y de sus consecuencias. En sendos actos administrativos con la debida antelación, se le previno no modificar las guías telefónicas y a pesar de ello la codemandada continuó con su actuar incumpliente. c) Hubo posibilidad de la contratista de corregir su conducta. Las prevenciones de no modificación de las guías se extendieron por varios meses y bien podría haber la sociedad codemandada haber corregido su actuación oportunamente, mas no lo hizo. d) Los cambios en el objeto contractual fueron unilaterales, deliberados y sin que se evidencie prueba de la necesidad de su ejecución. e) La contratista no podía alegar ni desconocimiento de la forma de operación del ente ni del ordenamiento jurídico aplicable, dado que su relación contractual con el ICE, databa de varios años en el pasado. f) Existe laudo firme que reconoce expresamente el incumplimiento imputable a la contratista. g) A pesar de que el contrato maestro preveía además la elaboración de guías telefónicas para República Dominicana, se opta por finiquitar la relación contractual en su totalidad. h) La sana crítica hace ver que existía la posibilidad de que la sociedad codemandada tuviera previsibilidad de que su incumplimiento generaría un daño bifrontal, es decir, no sólo para contra su contra parte inmediata (sea el ICE y el interés público) sino también para el contrato surgido con motivo de la relación incumplida, sea con la sociedad actora. I) No existía alternativa alguna para el ente contratante y para la sociedad actora al momento en que se perfecciona el incumplimiento. En su contestación, la parte demandada invoca la existencia de las disposiciones del artículo 701 del Código Civil que establece: "*ARTÍCULO 701.- El dolo no se presume, y quien lo comete queda siempre obligado a indemnizar los daños y perjuicios que con él ocasione, aunque se hubiere pactado lo contrario*". Con relación al artículo 701 del Código Civil, el voto 359-2014 de las once horas treinta



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MATA ...............................
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

minutos del treinta y uno de octubre de dos mil catorce, de la Sección segunda del Tribunal Segundo Civil, dispuso lo siguiente: *"Este artículo determina la nulidad de las cláusulas limitativas de responsabilidad derivada del dolo. Esta disposición hace referencia a que si existe un INCUMPLIMIENTO CONTRACTUAL DOLOSO y se ha convenido en una cláusula limitativa de responsabilidad, esa cláusula es nula. Por interpretación analógica, la doctrina enseña que igual sucede en los casos de incumplimiento contractual culposo, si hay pacto de limitación de responsabilidad, la consecuencia es la misma, es decir, ese convenio es nulo, pues el deudor podría a su antojo cumplir o no cumplir y quedar exento de la responsabilidad indemnizatoria que se deriva de todo incumplimiento, lo que le permitiría obligarse bajo condición puramente potestativa, que equivale a que pueda obligarse a nada, lo que resulta inadmisible; pero además, porque la responsabilidad contractual sólo se puede desplazar por el hecho del acreedor, la fuerza mayor o el caso fortuito, según el 702,nunca por pacto..."* La parte actora indica que la cláusula 28 del contrato maestro le releva de responsabilidad por cuanto el contrato podía ser cesado, según lo indicado en la misma, que disponía: " *28. TERMINACIÓN. (a) El Comprador puede terminar este Contrato al notificarle al Vendedor por escrito con al menos (90) días de anticipación de dicha terminación si las partes no pueden acordar cualquier revisión de precio de acuerdo a este Contrato, cualquier reforma a este Contrato de conformidad a la Sección 28 (c) anterior o el precio para nuevas opciones o especificaciones que el Comprador puede requerir, sin importar si dichas nuevas opciones o especificaciones están dentro de la capacidad actual del Vendedor. (b) El Comprador puede terminar este Contrato inmediatamente en cualquier momento si durante el Plazo del Contrato, el Contrato ente el Comprador y el ICE descrito en la Seccion 2, Plazo, es terminado por cualquier razón... e. Al momento de la terminación de este contrato, el comprador no será responsable para con el vendedor de la compensación por daños de ningún tipo o naturalez, ya sea por la pérdida por parte del vendedor de ganancias, gastos, inversiones o compromisos presentes o futuros hechos en conexión con este Contrato, o en conexión con el establecimiento, desarrollo o mantenimiento de los negocios del Vendedor, o por cualquier otra causa o cosa, siempre que la terminación no*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO SALAS ALVARADO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

perjudique o afecte los derechos o responsabilidades del vendedor o el comprador con respecto a los directorios previamente producidos bajo este Contrato, o cualquier deuda que tenga cualquier parte con la otra..." Al respecto y de conformidad con lo indicado y al haberse tenido por debidamente demostrado el dolo por parte de Verizon Information Services Costa Rica LLC, es criterio de este Tribunal que la cláusula invocada por ésta no justifica el incumplimiento doloso realizado y traducido en el rompimiento unilateral del referido contrato maestro, dado que parte de otros supuestos diferentes, en donde esta contratista no hubiera sido la que provocara el rompimiento contractual con el ICE. Para este Tribunal se ha demostrado una evidente antijuricidad de la conducta de Verizon Information Services Costa Rica LLC que tiene un doble efecto jurídico, uno inmediato y otro mediato. Lo anterior por cuanto el incumplimiento voluntario y conciente de la indicada sociedad del contrato surgido con motivo de la licitación 6378-T, se tradujo en efectos jurídicos para con el ICE, pero también para la sociedad actora, en tanto que las mismas disposiciones de la vigencia contractual del contrato maestro suscrito con Trejos Hermanos Sucesores S.A. dependían de la relación existente con el ente. Así se evidencia de la cláusula 2.b invocada por la demandada, cuando dispone: "*Este Contrato será efectivo únicamente cuando se cumplan los dos siguientes requisitos: (i) al momento de la ejecución de este Contrato por las partes; (ii) al momento de la ejecución de un contrato entre el Instituto Costarricense de Electricidad (ICE) y el Comprador, celebrado como resultado de una licitación del Comprador a la Oferta Pública 6378-T. En el momento que los requisitos mencionados sean cumplidos, la fecha efectiva (la "Fecha Efectiva") de este contrato será a partir de la ejecución del contrato mencionado en la sub-sección (ii) de esta Sección 2(a)...*" De conformidad con lo anterior, es criterio del Tribunal que estamos en un caso particular en donde las disposiciones propias de la cláusula 28 del indicado Contrato Maestro, así como cualquier otra cláusula que se estimare legitimante de un rompimiento contractual incausado sin responsabilidad para la sociedad codemandada, se torna ineficaz ante el incumplimiento doloso incurrido. En este sentido, debe entenderse que el dolo que se ha tenido por demostrado se extiende de la falta de cumplimiento con el



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIA MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

ICE con respecto al contrato surgido con motivo de la licitación 6378-T hacia el contrato maestro rubricado entre la parte actora y Verizon Information Service-Costa Rica LLC, habida cuenta que como se ha demostrado este último dependía de la existencia y vigencia de aquel, por lo que la lógica indica que el incumplimiento doloso de la relación contractual con el ente, necesariamente impactaría en un incumplimiento doloso para con Trejos Hermanos Sucesores, tal y como se ha demostrado, efectivamente llegó a suceder.  Consecuentemente, procede aplicar el Código Civil, en tanto dispone en su artículo 22, lo siguiente: *"...Todo acto u omisión en un contrato, que por la intención de su autor, por su objeto o por las circunstancias en que se realice, sobrepasa manifiestamente los limites normales del ejercicio de un derecho, con daño para tercero o para la contraparte, dará lugar a la correspondiente indemnización y a la adopción de las medidas judiciales o administrativas que impidan la persistencia en el abuso."* Para este Tribunal es claro que si el acreedor alega el dolo, no basta con demostrar el incumplimiento, sino que el dolo debe ser probado para que genere las consecuencias jurídicas correspondientes (artículos 701 y 705 del Código Civil). (Sentencias de la Sala Primera de la Corte Suprema de Justicia, número 320 de las 14:20 hrs. del 9 de noviembre de 1990.  En igual sentido, pueden consultarse, entre otros, los fallos números 354 de las 10 hrs. del 14 de diciembre de 1990, 103 de las 14:50 hrs. del 28 de junio de 1991, 17 de las 15 hrs. del 27, 20 de las 14:45 hrs. del 31, ambas de enero de 1992, 45 de las 14:15 hrs. del 11 de junio de 1997, 53 de las 15:10 hrs. del 27 de mayo de 1998, 589 de las 14:20 hrs. del 1 de octubre de 1999, 36 de las 15:40 hrs. del 10 de enero y, 509 de las 14:25 hrs. del 11 de julio, ambas del 2001), no obstante en el caso de marras, estima este Colegio demostrada la intencionalidad de faltar al cumplimiento de las obligaciones contractuales por parte de la sociedad codemandada, siendo así que para eximirse de responsabilidad, ésta debió entonces demostrar que la causa del incumplimiento ha sido el hecho del acreedor, el caso fortuito o la fuerza mayor (artículo 702 ibidem): mas en el caso de análisis no fue así. En este sentido, no puede indicarse que el daño haya sido provocado por el hecho de un tercero, es decir el Instituto Costarricense de Electricidad, habida cuenta que el rompimiento no se dio por su decisión unilateral propiamente dicha, sino que la causa de la decisión del ente



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA SEGURA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

fue el incumplimiento contractual demostrado y doloso de Verizon Verizon Information Services Costa Rica LLC, y ante el cual, el ente debió proceder a dar finalizada su relación contractual. Si Verizon Information Services Costa Rica LLC no hubiera incumplido su contrato con el ICE, la relación contractual con la sociedad actora hubiera discurrido normalmente, prueba de la vinculación de una con otra y de la existencia de un dolo en la contratación pública que impactó dolosamente en la contratación privada. Nótese como la justificación dada por la sociedad codemandada es precisamente el rompimiento contractual que ella misma provocó de manera unilateral y dolosa. Así lo indica el texto de la respectiva carta, en tanto indica: "*Ante la situación anteriormente descrita, llamamos a su atención la cláusula 28, inciso b) del contrato suscrito entre VISCR y Trejos Hermanos Sucesores S.A. titulado "Master Purchase Agreement", la cual establece claramente que VISCR puede dar por terminado el contrato referido de manera inmediata cuando el contrato entre VISCR y el ICE sea terminado por cualquier causa...*" Para este Tribunal es claro, de la anterior cita, que la parte actora provocó un doble rompimiento contractual, uno de manera inmediata y otra mediata, con plena convicción en ambos de no cumplir y con la posibilidad de cumplimiento no realizada, según los hechos objetivos que se han tenido por demostrados. Si bien la parte actora negoció y aceptó las cláusulas de exoneración de responsabilidad, lo cierto es que las mismas se tornan entonces ineficaces ante la existencia de un incumplimiento doloso. 4. Como consideración adicional, debe tomarse en consideración que si bien la sociedad demandada alega que la actora reconoce que la ejecución del contrato se mantuvo en condiciones normales cerca de cuatro años, lo cual nos dice que el contrato se ejecutó en el rango de 48 meses establecidos en el punto b) de la cláusula 2 del Plazo, lo cierto es que la invocación para el cese de la relación contractual, como se ha demostrado, es el rompimiento contractual con el ICE y no otro motivo, por lo que la causa cierta, real, efectiva y necesariamente para el rompimiento contractual con Trejos Hermanos Sucesores es el incumplimiento deliberado y doloso y la resolución contractual consecuente de Verizon Information Services Costa Rica LLC con el ICE y no otro motivo, por lo que se reafirma el análisis realizado anteriormente. Prueba del dolo existente con



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

respecto a la sociedad actora, es que en la nota en donde de manera escueta se da por rota la relación contractual con ella, el Gerente General de Verizon en Costa Rica, indica que "... *el ICE irrespetó los derechos contractuales y aquellos establecidos por ley de mi representada y procedió a iniciar un procedimiento administrativo para la resolución del contrato, utilizando los medios públicos para distorsionar la realidad del los hechos*". Como se ha determinado, esta afirmación no es correcta y por tanto de manera deliberada induce a error, por cuanto imputa al ente la responsabilidad por el incumplimiento contractual, siendo así que está debidamente demostrado que el rompimiento con el ICE, operó por la falta de cumplimiento de las obligaciones contractuales de la empresa contratista. A mayor abundamiento el ex Gerente de Verizon en el país afirmó que fue voluntad de Verizon no continuar negociando en el país la elaboración de guías telefónicas. *(ver declaración de José María Quirós Alfaro).* Por consiguiente, estima este Tribunal que estamos en presencia de un incumplimiento doloso en perjuicio de la sociedad actora y por ende genera responsabilidad contractual y consecuentemente es indemnizable todo daño derivado del mismo. <u>Conclusión</u>: De conformidad con los anteriores razonamientos, procede acoger este argumento de la parte actora.

V.VIII.- Argumento relacionado con la falta de solidaridad de la empresa codemandada con la garantía solidaria de GTE Corporation: La parte demandada alega que la garantía solidaria de GTE Corporation otorgada al ICE no se puede presumir ni mucho menos pensar que se transfiere en beneficio de terceros. Al respecto, consta en autos que mediante escrito de fecha 28 de agosto de 2002, Verizon Information Services Costa Rica, LLC, expresó lo siguiente al ICE: "11.- *MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS. De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el Mantenimiento de Obligaciones y Derechos, firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directorias Corp. y Verizon Information Services-Costa Rica, LLC, en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma.* Adicionalmente, la cláusula Vigésima Quinta del contrato entre el ICE y el



Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO... MENA... ehh.... hhh
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Consorcio GTE estipuló lo siguiente: "*En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas*" De conformidad con lo anterior además de lo dispuesto expresamente, hubo manifestación expresa de la codemandada en cuanto al mantenimiento de las obligaciones contraídas originalmente por el grupo GTE. Consecuentemente, también procede el rechazo de este argumento.

V.IX- Análisis de argumento complementario: Como argumento adiciona, la codemandada alegó en audiencia de juicio que los daños y perjuicios son accesorios al tema de la  nulidad contractual, siendo así que las partes no supieron ejercer las pretensiones anulatorias, dado que primero debe pedir la resolución contractual y luego el pago de daños y perjuicios. Por lo anterior, el Tribunal tiene una imposibilidad material para condenar en daños y perjuicios, porque antes no se pidió resolución contractual.  Al respecto, debe tomar en cuenta el abogado de la parte demandada que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information services- Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro. Por lo anterior, fue su propia representada la que dio por terminada unilateralmente la relación contractual respectiva y por ende abrió la posibilidad de que la parte actora ejerciera sus pretensiones indemnizatorias, con base precisamente, en el rompimiento del contrato suscrito entre ella y  Verizon information services- Costa Rica LLC. Consecuentemente, también procede el rechazo de este argumento.

V.X.- De conformidad con los anteriores razonamientos, estima este Tribunal que se puede determinar un incumplimiento dolososo de la codemandada Verizon information services- Costa Rica LLC, en perjuicio de la sociedad actora y por consiguiente corresponde determinar su deber de indemnizar los daños y perjuicios que haya causado con motivo del mismo.-

V.XI.- Argumentos de la parte actora con respecto de la empresa Verizon Communications Inc.: a) La representación de la parte actora funda sus



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

razonamientos con respecto a la responsabilidad de Verizon Verizon Communications Inc. en los siguientes argumentos básicos: 1) El Grupo GTE se fusionó con la firma Atlantic Bell y se formó el Grupo VERIZON, que mantuvo con el ICE todos los derechos, deberes, obligaciones y garantías originalmente otorgadas por el Grupo inicial y con garantía solidaria entre las sociedades VERIZON, siendo así que GTE CORPORATION por virtud de una fusión de empresas en los Estados Unidos de América, se transformó en VERIZON COMMUNICATIONS INC., Holding del Grupo VERIZON, por lo que las relaciones derivadas del Contrato Administrativo de la Licitación Pública Internacional 6378-T y sus efectos jurídicos para el cumplimientos de sus deberes y obligaciones, no sufrieron alteración alguna. Consecuentemente, las empresas demandadas Verizon Communications Inc: y Verizon Information Services - Costa Rica- LLC integran un grupo de interés económico, que convencionalmente podemos llamar GRUPO VERIZON. b) La codemandada contesta bajo los siguientes argumentos: 1) La actora en ningún caso demostró que la compañía GTE Corporation se convirtió en Verizon Communications Inc., 2) No es cierto que formaran un grupo de interés económico ni han formado parte de relación contractual alguna con el ICE o la actora. 3) No es cierto que Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. y Verizon Directorias Corp. son empresas subsidiarias de Verizon Communications Incorporated.  c) Criterio del Tribunal: En autos se ha tenido por demostrado que las firmas comerciales "GTE Information Services Incorporated", "GTE Directorias Corporation" y "General Telephone Directory Company C por A", empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, sometieron oferta conjunta, bajo la formalidad de consorcio  en la Licitación Pública No. 6378-T promovida por el ICE y para todos los efectos relacionados con ese concurso público, se identificaron como el Consorcio GTE. Consta en autos que la contratación fue adjudicada al indicado Consorcio por el Consejo Directivo del ICE, en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, acuerdo publicado en el Alcance No. 10 a La Gaceta No. 28 del 9 de febrero del 2000. En este orden de ideas, en la cláusula Vigésima Quinta del contrato, el ICE y el Consorcio, se



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA SALAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

estipuló lo siguiente: "*En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que  sustituyan los nombres de las entidades jurídicas aquí representadas*" Con posterioridad, el 16 de mayo de 2002, VERIZON Information Services - Costa Rica, LLC, le envió a la Dirección de Proveeduría del ICE la nota de fecha 16 de mayo del 2002, en la que le manifiesta, entre otras cosas, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE. Consecuentemente al funcionarse GTE con  Bell Atlantic pasó a formar el denominado Grupo Verizon, integrado por Verizon Information Services, Inc., Verizon Directories Corporation y Verizon Information Services-Costa Rica, LLC. Para poder determinar la presencia de un grupo de interés económico, debe tomarse en cuenta que el mismo opera cuando un grupo de personas físicas o jurídicas  mantienen vínculos e intereses comunes y coordinan sus actividades para lograr un determinado objetivo común. Adicional lo anterior, se presenta control, la autonomía y la unidad de comportamiento en el mercado. En este orden de ideas, puede darse un control de una empresa de controladora hacia otras o puede ser potencial, cuando opera la posibilidad de efectuar el indicado control aunque no exista un vínculo jurídico centralizado y jerarquizado. Consecuentemente la autonomía formal societaria trasciende hacia  los intereses del grupo o de la entidad económica. Por lo anterior, si bien cada sujeto del grupo mantiene una personalidad jurídica formal, en la práctica, trascendiendo de las formas, los factores de producción de cada una de ellas irá orientada a un fin económico determinado común y la voluntad estará supeditada a la figura líder o madre en algunos casos o a la decisión integrada, mas no particular de cada uno.  Es así como cada integrante llega a actuar de manera tal que el conjunto se comporta funcionalmente como una sola persona en el mercado, con un sujeto dominante y uno o varios secundarios. En el caso de análisis, consta



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

en autos que la representación legal de las empresas codemandadas es la

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

misma, además de su evidente similitud de la denominación social. Lo anterior por cuanto, consta en el expediente judicial que MARIANNE DROST, ciudadana norteamericana, actúa en su condición de Secretaria Corporativa de la firma VERIZON COMMUNICATIONS INC., y de VERIZON INFORMATION SERVICES-COSTA RICA, LLC., por lo cual queda en evidencia el control común y la relación que ambas guardan, además de las consideraciones hechas ut supra sobre la genésis del grupo Verizon. Lo anterior, en tanto que las diferentes sociedades del mismo se constituyen de manera conjunta (Verizon Information Services, Inc., Verizon Directories Corporation y Verizon Information Services-Costa Rica, LLC.), mantienen vinculos desde su constitución (ver nota de Michael Quinn Neal visible a folios 2964 y 2965 del expediente administrativo del ICE) y Verizon Communications Inc no es extraña a este grupo económico, por el motivo dicho, máxime tomando en consideración que por la similitud fonética no sería posible que una sociedad no vinculada al grupo pueda usar la denominación "Verizon". Es por este motivo que debe entenderse que el artículo 1025 del Código Civil no resulta aplicable al caso, habida cuenta que la existencia del grupo de interés económico vincula en materia de responsabilidad a la codemandada. Consecuentemente, Verizon Communications Inc. concurre solidariamente en la responsabilidad correspondiente al integrar el grupo de interés económico denominado "Verizon".

Conclusión: Se rechaza el argumento de la codemandada Verizon Communications Inc..

V.XII.- De conformidad con los anteriores razonamientos, estima este Tribunal que se puede determinar la existencia de un grupo de interés económico entre las empresas del grupo Verizon y donde consecuentemente la sociedad Verizon Communications Inc. debe responder solidariamente por el incumplimiento doloso de la codemandada Verizon information Services- Costa Rica LLC, en perjuicio de la sociedad actora y por consiguiente corresponde determinar su deber de indemnizar los daños y perjuicios que haya causado con motivo del mismo.-

V.XIIII.- Sobre las pretensiones declarativas establecidas en la demanda: Con base en los razonamientos de fondo hechos en los considerandos anteriores,



Firmado digitalmente de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

procede resolver las pretensiones declarativas interpuestas, de la siguiente manera: Pretensión número 1: La indicada pretensión establece: "*1. Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A (que cambió su razón social a VERIZON INFORMATION SERVICES COSTA RICA, LLC) constituyó un medio de ejecución del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephohe Directory Company C por A", empresas de los Estados Unidos de américa, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000*. De conformidad con el análisis realizado y la prueba recabada, estima este Tribunal procede acoger esta pretensión, en el entendido de que el indicado Contrato Maestro corresponde a una sub contratación realizada por la parte sub contratista con la empresa actora, como un medio reconocido contractualmente para lograr el cumplimiento del respectivo objeto contractual.

Pretensión 2: La pretensión indica lo siguiente: "*2).- Que el citado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A, fue del conocimiento del INSTITUTO COSTARRICENSE DE ELECTRICIDAD, que aprobó la intervención de TREJOS HERMANOS SUCESORES S.A. en la ejecución del contrato administrativo adjudicado al Consorcio GTE resultante de la Licitación Pública No. 6378-T promovida por el ICE*". Como se ha indicado anteriormente, no se demostró en autos que el indicado Contrato Maestro de Compra haya sido del conocimiento de funcionario alguno del ICE, por lo que procede el rechazo de esta pretensión.



Pretensión 3: Esta pretensión indica: "*3).- Que la extinción del contrato

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ARCE, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

administrativo celebrado entre el *INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A."* Tal y como consta en autos, el representante de Verizon invocó el rompimiento del contrato suscrito por ella con el ICE, para dar por concluído el contrato maestro de compra suscrito por ella con la parte actora. Por consiguiente procede acoger esta pretensión.

Pretensión 4: La parte actora pide se declare: "*4).- Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE*". Al respecto, no consta prueba alguna de hecho u omisión de la actora que provocara o contribuyera al rompimiento contractual entre el ICE y Verizon Information Services Costa Rica LLC y por el contrario se determina un incumplimiento doloso de dicha relación contractual por parte de esta. Por consiguiente procede acoger esta pretensión.

Pretensión 5: La parte actora pide se resuelva que: "*5.- Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*" Al respecto, no consta prueba alguna de hecho u omisión de la actora que provocara o contribuyera al rompimiento contractual entre la actora ICE y Verizon Information Services Costa Rica LLC y por el contrario se determina un incumplimiento doloso de dicha relación contractual por parte de esta. Por consiguiente procede acoger esta pretensión.

Pretensión 6: La parte actora pide se resuelva que: "*6.- Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A*". Esta pretensión se terminará en el considerando siguiente, una vez realizado el análisis de la prueba de los daños invocados.


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Pretensión 7: La parte actora solicita se declare: "*7.- Que las empresas*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

demandadas Verizon Communications Inc., *Verizon Information Services -Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A."* De conformidad con el análisis realizado anteriormente, este Tribunal ha podido determinar la existencia de un grupo de interés económico en donde las indicadas sociedades forman parte. Consecuentemente, procede acoger lo pedido.

Pretensión 8: *La parte actora pide se declare: ".- Que "VERIZON COMMUNICATIONS INCORPORATED" es el ente de mayor jerarquía de un grupo de interés económico del que forma parte "VERIZON INFORMATION SERVICES -COSTA RICA- LLC", por lo que la primera de esas sociedades responde solidariamente con la segunda por todas las obligaciones contraídas por "VERIZON INFORMATION SERVICES -COSTA RICA- LLC", con TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA"* Al respecto, no demostró la parte actora la condición jerárquica invocada para Verizon Commmunications Inc, por lo que procede rechazar este extremo de la pretensión, mas en en el entendido de que se acoge el extremo de la pretensión referente a su responsabilidad solidaria, al formar parte del grupo de interés económico dicho.

Pretensión 9: La parte actora pide se resuelva que: *"9).- Que las empresas demandadas Verizon Communications Inc. y Verizon Information Services -Costa Rica- LLC son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A"* De conformidad con las consideraciones hechas anteriormente respecto de la participación de Verizon Information Services -Costa Rica- LLC en los hechos que se han tenido por demostrados y la existencia de un grupo de interés económico en donde forma parte Verizon Communications Inc., procede acoger esta pretensión.

Pretensión 10: La parte actora solicita que se declare que: *"10).- Que el INSTITUTO*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

COSTARRICENSE DE ELECTRICIDAD *desconoció los derechos e intereses legítimos de TREJOS HERMANOS SUCESORES S.A. derivados de la ejecución de la Licitación Pública No. 6378-T a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002, por lo que es responsable solidario con Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC de la indemnización de los daños y perjuicios sufridos por la actora por la extinción del citado Contrato Maestro de Compra suscrito el 28 de febrero del 2002"* En razón de que se ha determinado que la actora no posee ninguna relación jurídica directa con el ICE ni se ha demostrado la existencia de algún derecho subjetivo o interés legítimo derivado de la ejecución de la licitación pública 6378- T que haya sido lesionado con motivo de conducta u omisión del ente, procede el rechazo de esta pretensión, según el análisis realizado en considerandos anteriores.

Pretensión 11: La parte actora pide se declare: *"11).- Que son nulas e ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON."* De conformidad con el análisis hecho en la presente resolución y la prueba aportada a los autos, estima procedente determinar la ineficacia de las referidas cláusulas ante el incumplimiento doloso demostrado por parte de las sociedades codemadadas. No demostró la parte actora que las indicadas cláusulas hayan formado parte de un contrato de adhesión o que reúnan las condiciones para su anulación, por lo que en este extremo, se rechaza lo pedido.

Pretensión 12 y 13: Corresponden a pretensiones puramente indemnizatorias que se analizará en el considerando siguiente.

V.XIV.- Sobre los daños materiales invocados: a) Para justificar los daños invocados, la parte actora alega lo siguiente: 1) En razón del incumplimiento, no pudo cancelar  créditos bancarios y comerciales adquiridos, tuvo que cesar en los pagos con relación a los proveedores de materia prima y los alquileres, cesó en el pago de los salarios y derechos laborales de sus empleados y se vio



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

conducida al cierre de sus actividades y al paro permanente de su giro comercial. 2) El Grupo GTE negoció con la parte actora las condiciones futuras para incorporar en los trabajos de edición e impresión, los avances tecnológicos para mejorar la calidad de los trabajos. Consecuentemente, se le impuso obligatoriamente, la adquisición de los equipos más modernos y la ampliación de la planta física. De conformidad con lo anterior, la actora indica, se endeudó con créditos bancarios y comerciales, seriamente para poder adquirir los nuevos equipos y ampliar su planta industrial. b) En su contestación de la demanda, las sociedades actoras alegaron que: 1) Si la empresa actora tomó la decisión de endeudarse, ello se debió a ue una decisión de negocios propia. 2) La actora vendió la maquinaria adquirida, lo cual no es tomado en consideración por ésta a hora de invocar pérdidas. 3) El problema que tuvo la actora con su planta y los equipos fue que éstos eran obsoletos y los costos de producción con esos equipos eran más altos y la productividad también era menor en el tiempo de impresión. 4) Se suponía que la actora no dependía de la existencia de un solo contrato y que una empresa con la experiencia y trayectoria nacional e internacional de casi cien años mantenía una variedad de clientes que le garantizaban una solvencia y el manejo adecuado de las finanzas y los flujos de caja, para hacerle frente a sus obligaciones crediticias ante una eventual contingencia. 5) El problema del cierre de operaciones de la sociedad actora resultó la consecuencia inmediata de la mala administración de los negocios. c) Criterio del Tribunal con respecto a los extremos cobrados por concepto de daño material: En autos se ha tenido por demostrado que con fecha 25 y 26 de febrero de 1999, el señor Bruce Wataru hizo visita a las instalaciones de la sociedad actora y realizó una serie de observaciones con respecto a las instalaciones y equipo de la misma. Posteriormente, el 15 de noviembre de 1999 se llevó a cabo una reunión de los señores Álvaro y Alonso Trejas Fonseca y don Guillermo Navarro, entonces Presidente, Vicepresidente y Gerente de Producción de THS, respectivamente, con el Director de "Printing" de GTE Directories International con el propósito de: 1) evaluar el progreso realizado en el proyecto de las mejoras en la planta; 2) asistir en desarrollar un proyecto formal para dar un seguimiento cercano al proyecto de la nueva planta; 3) acordar un plan de contingencia en caso que THS no



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

cumpliera con las fechas de instalación de los nuevos equipos y planta, el cual consistía en contratar otra planta en Estados Unidos, sobre todo, en caso de que no se adquirieran los equipos a tiempo; 4) evaluación de la compra potencial del equipo, con la específica asistencia del consultor recomendado por GTE, señor Bill Snell. Consecuencia de lo anterior,  en febrero del 2000, la actora adquirió una moderna máquina rotativa Heidelberg, una linea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas  y mecánicas de la nueva planta. Lo anterior, para cumplir los requerimientos del señor Wataru y la disposición (j) de la cláusula 16 del Contrato Maestro de Compra. La compra de la Máquina Rotativa y todo el equipo accesorio marca Heidelberg con un costo de adquisición de C. 955.116.741,00. Adicionalmente, atendiendo a los requerimientos del señor Wataru, la sociedad actora alquiló dos naves industriales en la Zona Franca Zeta, en Guadalupe de Cartago, propiedad de INMOBILIARIA ZOROASTER S.A., con todos sus equipos, oficinas y bodega, según contrato que se suscribe con la propietaria de fecha primero de julio de dos mil cuatro. El 15 de julio del 2004 el Consorcio contratista del Grupo Verizon tramitó, en papelería de la Compañía General de Directorios C.por.A, con oficinas en San José, Costa Rica, subsidiaria de GTE Corporation según consta en el mismo  documento, la orden de compra 4568 para la impresión de las Guías  Telefónicas para Área Metropolitana por la suma total de $ 3,033,625.60 y el día 20 de agosto del 2004, la orden de compra 4582, por la suma de $ 2,134,503 por las Guías Telefónicas de Provincias, para un total de $ 5,168,128.oo para las Guías correspondientes al año 2005. Las órdenes de compra indicadas en el Hecho anterior fueron sustituídas por Verizon por la número 4612 del 3 de noviembre del 2004 para las Guías del Área Metropolitana por la suma de$ 2,120,828 y por la número 4644 del 17 de diciembre del 2004 para las Guías de Provincias, por la suma de $ 1,254,023, para un total de $ 3,374,851, o sea, con una disminución extemporánea, de$ 1,793.277 (documento 30 del expediente de prueba del actor). Se ha demostrado que las últimas órdenes de compra implicaron reducción del número de páginas de las guías telefónicas y el número de libros así como una conformación y composición de las guías distinta a la que había convenido GTE en su contrato con el ICE. Con posterioridad el



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

contrato entre la actora y el Grupo Verizon fue resuelto con motivo del incumplimiento doloso de éste, lo que se ha demostrado en el proceso, siendo así que en virtud de lo anterior, la sociedad actora deja de honrar sus obligaciones con la vendedora de la maquinaria, siendo así que esta inicia un proceso ejecutivo prendario que con el expediente número 06-001956- 0640-CI, en el Juzgado Civil de Mayor Cuantía de Cartago, y a las :30 horas del 6 de junio de 2007, se realizó el remate del equipo pignorado y por auto de 9:23 horas del 19 de agosto de 2007, se ordenó la puesta en posesión del mismo a HEIDELBERG PRINT FINANCE AMERICAS INC, rematario, lo que se ejecuta a las 14:00 horas del 31 de octubre de 2007. De manera adicional se ha demostrado que la sociedad actora se vio obligada a incurrir en mora con los pagos de las rentas por el alquiler de las naves industriales de Inmobiliaria Zoroaster S.A., por lo que se suscribió una escritura pública, que corresponde a la número 144, que se inicia al folio 133 vuelto del tomo primero del Protocolo de la Notaria LAURA MÓNICA ZAMORA ULLOA, a las doce horas del 23 de marzo de 2006, mediante la cual la actora se comprometió a pagar hasta por la suma de DOSCIENTOS MIL DOSCIENTOS VEINTITRÉS DÓLARES CON SETENTA Y CINCO CENTAVOS (US$ 200,223,75), indicándose en la cláusula segunda de dicho documento lo siguiente: "... *SEGUNDA Sustitución de deuda. Esta constitución de deuda, sustituye las mensualidades  atrasadas por concepto de alquiler adeudados por El Deudor - (TREJOS HERMANOS SUCESORES)- correspondientes a los meses de julio de dos mil cinco hasta marzo de dos mil seis inclusive, a razón de nueve meses de mensualidad, según contrato de arrendamiento suscrito entre Acreedor y Deudor, de fecha primero de julio de dos mil cuatro, arrendamiento que se ejecuta en la propiedad del Acreedor, finca inscrita a Folios Reales tres- uno nueve cero ocho siete tres- cero cero cero y tres- uno nueve cinco ocho nueve ocho- cero cero cero, lo cual expresamente acepta El Acreedor*" ... Asimismo, se establecieron intereses mediante cuotas mensuales de veintidós mil doscientos cuarenta y siete dólares con ochenta y tres céntimos hasta cancelar la totalidad de la obligación (documento 70 del expediente de prueba de la parte actora). 9. Que ante el incumplimiento de lo pactado, Inmobiliaria Zoroaster S.A.,   presenta ante el Juzgado Civil de Mayor Cuantía de Cartago, proceso ejecutivo simple que ocupa



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 386 of 490    RECEIVED NYSCEF: 10/26/2021

el expediente número 06-001846-0640-CI, que culmina con sentencia, acogiendo la excepción de pago parcial y condena a la actora a pagar cincuenta y seis mil ciento ocho dólares con diez céntimos de dólar (US$ 156,108.10). Dado lo anterior la actora concretó la venta de prácticamente todos sus activos en equipos y mejoras en los inmuebles de la Arrendante, a la empresa de capital colombiano CONDOR EDITORES DE COSTA RICA, S.A., la cual convino con Inmobiliaria Zoroaster S.A. en el arrendamiento de las naves industriales de la Zona Franca Zeta en Cartago, adquieren el equipo rematado por HEIDELBERG PRINT FINANCE AMERICAS INC., en condiciones favorables y ya instalado en esas naves industriales, al igual que el resto del equipo de THS pignorado al Banco Nacional de Costa Rica y al Banco Interfin (documento 73 del expediente de prueba del actor). Finalmente, la actora llegó a un acuerdo con Inmobiliaria Zoroaster S.A., con fecha 28 de marzo de 2007, titulado *"Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda"*, en donde manifiesta entregar la nave industrial donde se encuentra la máquina rotativa y el restante equipo de impresión, puesto que con anterioridad ya se había entregado la otra nave donde se encontraban las oficinas y bodega y otorgan ambas partes el finiquito en ese sentido, pero al mismo tiempo señala que Inmobiliaria Zoroaster S.A. reconoce haber recibido a la fecha dos pagos -(que en el proceso de desahucio no se habían podido acreditar)-, por una suma total de cincuenta y cinco mil dólares estadounidenses, así como tener a su haber un depósito de garantía por la suma de treinta y nueve mil dólares, todo lo cual expresamente autoriza la actora lo aplique Inmobiliaria Zoroaster S.A. al total adeudado. Independientemente de que los procesos judiciales dichos puedan continuar, Trejos Hermanos Sucesores se compromete a cancelar el total adeudado que oportunamente se determine, una vez hechas esas deducciones junto con los intereses pactados y costas, hasta su efectivo pago, en un plazo perentorio, reconociendo ambas partes que hay una instrucción expresa en el "Fideicomiso Trejos Hermanos- Fiduciaria Castro Garnier", por la cual se debe cancelar lo adeudado a Inmobiliaria Zoroaster S.A., en cuanto reciba el pago de sumas que se le deben por diferentes negocios pendientes de cancelación, como por ejemplo, una deuda pendiente de Radiográfica Costarricense, S.A. Con fecha 29 de mayo de 2007, la actora arrendó con opción



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

de compraventa a DACONDOR Q.C.R. SOCIEDAD ANONIMA, que luego, cede sus derechos a la misma empresa dicha CONDOR EDITORES DE COSTA RICA, S.A. sobre los restantes activos industriales de la empresa, por una fracción de los pasivos, tanto en Transamérica Bank & Trust Co. Ud., (subsidiaria de Banco Interfin), en el Banco Nacional de Costa Rica y con Banco Improsa S.A. De conformidad con lo anterior, estima este Tribunal que existe una vinculación causal entre la adquisición de la maquinaria y el arrendamiento de instalaciones con la relación contractual entablada con GTE y posteriormente con el Grupo Verizon, siendo el incumplimiento doloso de Verizon Information Services Costa Rica LLC, el que provocara tanto la falta de pago del equipo y arrendamientos como las restantes afectaciones económicas que se han tenido como demostradas y derivadas de los mismos. Para este Tribunal es evidente que las indicaciones iniciales de Bruce Wataru deben ser complementadas en cuando a su análisis con la cláusula 16. (j) del Contrato Maestro que estableció lo siguiente: "*El Vendedor deberá comenzando con los primeros Directorios producidos bajo este Contrato, cumplir con todos los requisitos técnicos para imprimir y fabricar los Directorios para los cuales el Comprados (sic) ha colocado Órdenes, incluyuendo, pero sin limitarse a; la capacidad técnica de suministrar reborde blanco y "proceso de cuatro colores" según se comprendan aquellos términos en la industria de impresión.*" Como se advierte, la relación contractual de la sociedad actora con Verizon Information Services Costa Rica LLC, tenía como antecedente la necesidad de cambiar el equipo de trabajo de Trejos Hermanos Sucesores, siendo así que esta sociedad debió incurrir en compromisos para poder ajustarse a los requerimientos de la contratante. No es cierto que la decisión de modificación del equipo o de ubicación de instalaciones obedezca a una mala decisión empresarial, sino que responde a la evidente necesidad de mantenimiento de la relación contractual entre ambas partes. Por lo anterior, el daño inicial se traduce en el valor de la maquinaria adquirida en el entendido a que al mismo, se le debe deducirse el costo de su venta, según se indicará a continuación. Adicional al indicado daño, la parte actora considera como daño, lo siguiente: a) las diferencias de la existencias, entre los períodos que van de 1997 a 1999 y entre el 2000 y el 2004,



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DE LA CRUZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

como producto de la inversión necesaria en capital de trabajo para dar

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

cumplimiento a los requerimientos de la contratación. b) los flujos previstos y no realizados desde el período 2004 al 2013. c) las pérdidas resultantes para los períodos comprendidos entre el año 2004 y el 2007 d) intereses pagados a Banco Cuscatlán y a la empresa proveedora del equipo Heildelberg, según su fecha de registro contable, y sus importes fueron llevados a valor futuro. e) lucro cesante con motivo del cierre de operaciones. Todos estos extremos se reconocen en tanto que el cierre de operaciones de la sociedad actora y que se evidencia de la venta de su maquinaria y activos, implicó que las consecuencias del incumplimiento impactaran en el tiempo con un efecto continuado, dado que impidió el mantenimiento y hasta expansión del negocio. Adicionalmente, no ha demostrado las partes demandadas la improcedencia o el carácter infundado de lo pedido y por consiguiente procede la aplicación del artículo 317 del Código Procesal Civil, en tanto que les correspondía a ellas probar que los daños invocados o no existían o no estaban ligados causalmente con su incumplimiento contractual doloso, lo cual no se dio. Considera este Colegio que los rubros indicados se justifican por los siguientes motivos: a) Está demostrado que la actora adquirió una una moderna máquina rotativa Heidelberg, una linea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta, estas inversiones, fundado en la expectativa de que su relación contractual con GTE y luego con Verizon databa de décadas atrás y que el Contrato Maestro tenía un horizonte de 168 meses, que le permitía recuperar la inversión. Esto motiva el reconocimiento de valor de maquinaria e intereses pagados por la misma. b) La larga relación ex ante y el hecho probado de que el 14 de octubre de 2004 de conformidad con los términos del contrato entre THS y GTE, las partes involucradas suscribieron el "Cronograma de Producción, Guía Provincias 2005, justifican las diferencias en existencias, los flujos previstos y las perdidas puestas al cobro en la demanda. c) La expectativa razonable generada con motivo de la relación previa, el contrato previsto y el cumplimiento de los requerimientos de la parte contratante justifican el lucro cesante, habida cuenta que estamos en presencia de un comprobado detrimento patrimonial o de otra naturaleza dejado de percibir, el cual resultaba razonable, y esperable de no



Firma/s digital/es
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA LÓPEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 389 of 490

RECEIVED NYSCEF: 10/26/2021

haber acaecido el incumplimiento ilegítimo. Esa afectación trasciende el contrato y su período de vigencia, habida cuenta que las consecuencias de su incumplimiento fueron tan graves que llevaron a la extinción de la actora en el ejercicio de sus actividades económicas al verse obligada a vender maquinaria y activos y pagar las deudas generadas con motivo del contrato rubricado con Verizon Information Services Costa Rica LLC. En este orden de ideas, la interrupción de operaciones se traduce en perjuicio o lucro cesante, no sólo porque se le impidió a la actora obtener una utilidad con motivo de la ejecución contractual del Contrato Maestro, sino también de las ganancias que a futuro podría haber obtenido de haberse mantenido en operación. En este sentido, estimamos que el incumplimiento doloso de Verizon Information Services Costa Rica LLC fue determinante para que la actora no pudiera seguir operando y fuere afectada de manera definitiva. Por lo anterior, estimamos procedente tomar en consideración como parte de la afectación sufrida que el rompimiento abrupto de la relación contractual primaria de la empresa (tal y como lo sostiene el perito judicial) incidió en su imposibilidad de operación a futuro. Diferente si hubiera sido la situación si el incumplimiento le hubiera sido imputable a la sociedad actora o si hubiere fenecido normalmente el contrato, habida cuenta que las consecuencias de no continuación del mismo, tendrían que haber sido asumidas por Trejos Hermanos Sucesores como parte del riesgo empresarial de depender de una relación comercial. Para este Tribunal, de una valoración integral de la prueba, se evidencia la existencia de una <u>probabilidad</u> de que de no haberse roto la relación contractual abrupta, incausada y dolosamente por parte de Verizon Information Services Costa Rica LLC, la parte actora se hubiera mantenido en el ejercicio de sus actividades económicas. La situación de la actora, trasciende de la mera posibilidad en tanto que durante el ejercicio de una ejecución normal del contrato, habría podido existir la probabilidad de recuperar inversiones, pagar deudas, y dar oportunidad de explorar alternativas de negocios. Como se evidencia de los autos, esto no pudo operar, dado que el rompimiento anticipado provocado por la codemandada, afectó las proyecciones económicas de la actora  y seguridad que  le brindaba el contrato rubricado. Consecuentemente se ha probado el acaecimiento de un hecho que



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

fue desarrollando todas sus consecuencias, esperables de acuerdo al curso ordinario de los acontecimientos, y que reiteramos no habría ocurrido si hacemos exclusión hipotética del incumplimiento de la codemandada. Por lo anterior, resulta indemnizable dada la certidumbre de que la empresa hubiera seguido operando si se hubiera dado debida ejecución del objeto contractual por parte de la sociedad contratante. Si como se ha demostrado, Verizon Information Services Costa Rica LLC hizo incurrir a la actora en inversiones cuantiosas y si resulta evidente de la relación contractual y el tipo de actividad que existía una marcada dependencia de la solvencia financiera de Trejos Hermanos Sucesores de su vinculación con los contratos para elaboración de guías telefónicas, es lógico suponer, de conformidad con la sana crítica racional, que la contratante tenía plena conciencia que su rompimiento contractual impactaría en la vida misma de su contratista y en su operación comercial. Así las cosas, el denominado daño por "interrupción de operaciones", no era algo meramente contingente sino de probable acaecimiento y que como tal, debe ser comprendido dentro de los daños a ser indemnizados. Consecuentemente, la existencia de un incumplimiento doloso es determinante para considerar que la dupla conocimiento- evitabilidad por parte de Verizon Information Services Costa Rica LLC inciden en determinar su responsabilidad contractual, no solamente por los daños y afectaciones sufridas durante el período de vigencia contractual, sino en cualquiera posterior, directamente relacionado desde el punto de vista causal con las consecuencias del hecho antijurídico demostrado a la contratante. Consecuentemente, procede acoger la pretensión 6 de la demanda, en tanto dispone: "6.- *Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A".* De conformidad con lo anterior, se condena a las sociedades codemandadas a pagar los rubros indicados, de manera solidaria.

V.XV.- Sobre los Montos liquidados: a) En su demanda, la parte actora ejerce una pretensión de condena de la siguiente manera: "*12).- Que los demandados el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y las empresas Verizon*


Firma(s) digitales
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MESA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*Communications Inc.* y *Verizon Information Services -Costa Rica. LLC* deben pagarle a la parte actora, solidariamente, los daños y perjuicios irrogados, que liquidamos de la siguiente manera:

| | |
|---|---|
| a) Inversión en maquinaria | $2.582.156 |
| b) Incremento en inventarios | $2.860.696 |
| c) Flujos de Caja Operativos no recibidos 2004-2013 Directorios Costa Rica | $8.806.872 |
| d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana | $ 7.912.999 |
| e) Pérdidas realizadas 2004 a 2007 | $7.237.068 |
| f) Intereses pagados por THS | $ 983.825 |
| g) Interrupción de Operaciones | $28.885.195 |

b) La objeción de las partes demandadas respecto de estos extremos se relacionan con la causalidad de los daños invocados (dado que alegan mala gestión de negocios y decisiones empresariales), el hecho de que a su criterio en los cálculos no se tomó en cuenta la venta posterior de la maquinaria y la existencia de un contrato posterior con Radiográfica Costarricense S.A. c) Al respecto, este Tribunal estima procedente acoger el quantum de los rubros indicados, con las precisiones que se indicarán por los siguientes motivos: 1. Los cálculos dichos se fundan en el estudio técnico elaborado por el Lic. Tomás Evans Salazar aportado como prueba por la parte actora y ratificado por el perito judicial Ramón Humberto Romero Rodríguez, Contador Público Autorizado y Perito Actuario, quien indicó en lo que interesa en su peritaje, lo siguiente: *"SOBRE EL ESTUDIO REALIZADO POR EL LIC. TOMÁS EVANS SALAZAR. Este profesional procedió a efectuar un exhaustivo análisis denominado: estudio elaborado por el Licenciado Tomás Evans Salazar, miembro del Colegio de Profesionales en Ciencias Económicas, carné 11968, que se adjuntó como prueba pericial. De su análisis se pudo concluir: I. Se confirmó la información contable (registros contables y estados financieros auditados) con que se fundamentaron las estimaciones de los periodos del 31 de diciembre de 1990 al 31 de marzo del 2004. 2. Se corroboró que las tasas aplicables a los cálculos efectuados corresponden a tasas promedio calculadas y cuya fuente fue el Banco Central de Costa Rica. 3.*


Firmado digital de:
ROMÁN BRESCIANI QUIRÓS, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*También se determinó que el enfoque de dicho estudio se hizo con criterio conservador, usando las herramientas de aplicación normal en materia de información prospectiva y retrospectiva, utilizando las fórmulas necesarias para determinar: - promedios, - valores futuros, - valores actuales, - estimaciones basadas en regresiones y otros. IV.- EN RELACION CON LA INVERSIÓN EN MAQUINARIA. La fórmula de cálculo del valor futuro de las inversiones registradas contablemente menos el precio de venta de la máquina rotativa y sus complementos, es la fórmula adecuada. Se hizo con fecha de corte del 31 de agosto del 2008. La tasa aplicada del 16,94% anual promedio, me parece que es razonable. Importe de este rubro US $ 2.582.156.00. Se comprobó pues, que el cálculo del monto reclamado por inversión en maquinaria por $2.582.156 es conecto y basado en una actualización a agosto del 2008 de su costo de adquisición menos el valor con que fue rematada la misma. También se concluyó que la referida inversión se realizó para atender los requerimientos técnicos de los contratos ICE- Consorcio GTE (luego Velizon) y de estas empresas con la actora. Por lo que su pérdida es un daño comprobado en el patrimonio de la actora originado en los hechos de esta demanda. V.- EN RELACIÓN CON LOS INCREMENTOS EN INVENTARIOS. Se calculó el valor futuro del incremento de la inversión realizada en inventarios comparando el promedio de los periodos 1997 al1999 con los niveles de inventario del periodo 2000 al 2004. Este cálculo se considera razonable. La fecha de corte que se consideró fue la del 31 de agosto del 2008. Asimismo la tasa anual promedio pasiva aplicable se consideró razonable. Importe de este rubro US $ 2.860.696.00. Se comprobaron como conectos y ajustados a la técnica, los cálculos para el monto reclamado por concepto de aumento de inventarios por $2.860.696.00. Coincido con el Lic. Evans que estas variaciones fueron producto de la inversión necesaria en capital de trabajo, para dar cumplimiento a los requerimientos de la contratación y por lo tanto su pérdida es un daño comprobado en el patrimonio de la actora originado en los hechos de la demanda objeto de este proceso. VI.- EN RELACIÓN CON LAS GANANCIAS NO REALIZADAS PARA EL PERÍODO 2004-2013, PARA COSTA RICA Y REPUBLICA DOMINICANA. Se revisó el cálculo de los valores futuros y presentes de los flujos de efectivo que la empresa hubiese generado con apego a los términos*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

de la contratación y según la estimación de ingresos basada en los millares de páginas previstos, este cálculo se encontró conecto. La fecha de corte con que se hizo fue la del 31 de agosto del 2008. Se utilizó una tasa promedio del 2, 79 % anual y se usó una tasa de inflación promedio USA del 3,54% anual. La empresa THS, según pude constatar con vista a los estados financieros y a la realidad productiva y de cabal cumplimiento de los contratos que esta esperaba un horizonte estable y amparado a la práctica contractual, para continuar por el plazo del 2004 al 2013 sin ninguna dificultad y en forma normal como se había venido sucediendo en los últimos 25 años. Importe de este rubro US $ 16.719.871.00. Se comprobaron como ·correctos y ajustados a los principios contables y financieros generalmente aceptados, los cálculos y la determinación de los flujos previstos y no realizados de los directorios telefónicos de Costa Rica desde el periodo 2004 al 2013 por un monto neto de $8.806.872.00 hasta el 31 de agosto del 2008 (fecha del estudio). Se comprobaron como conectos los precios y plazos contractuales y las hojas de cálculo de las proyecciones de ingresos y costos y el resultado del daño y perjuicio cuantificado. Efectivamente se comprobó que conservadoramente, la empresa actora pudo haber contado con esos flujos netos de efectivo de no haber ocurrido los hechos que provocaron la terminación del contrato de elaboración de las guías telefónicas de Costa Rica por causas ajenas a ella. VII.- DE IGUAL FORMA SE COMPROBARON LOS FLUJOS PREVISTOS Y NO REALIZADOS DE LOS DIRECTORIOS DE REPÚBLICA DOMINICANA POR UN MONTO DE US $7.912.999,00, HASTA EL 31 DE AGOSTO DEL 2008. Y se consideraron correctos y ajustados a la técnica. Cabe señalar que si bien la empresa actora no contaba con un contrato por todo el plazo calculado, se pudo comprobar con base en los informes auditados y órdenes de compra de diferentes años que la empresa venia elaborando dichos directorios durante más de veinte años y el contrato de Costa Rica con el grupo GTE (luego Verizon) preveía la contratación de dichos directorios como proveedor preferente y coincidieron los hechos de este proceso con la venta de las operaciones de la corporación Verizon en República Dominicana, descritos anteriormente, para impedir que la empresa contara con esos flujos netos, que en circunstancias normales pudo haber recibido. Por lo tanto se considera razonable que dichos



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ARNOLDO LÓPEZ MORALES, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

montos constituyan daños y perjuicios en el patrimonio de la actora. VID.- EN RELACION CON LAS PÉRDIDAS REALIZADAS PARA EL PERÍODO 2004-2007. Se revisó el cálculo por el cual se llevaron a valor futuro las pérdidas resultantes para los periodos comprendidos entre el año 2004 y el 31 tle diciembre del 2007, este cálculo se consideró correcto. La fecha de corte con que se hizo fue la del 31 de agosto del 2008. Y la tasa aplicada fue igualmente del 2. 79 % anual promedio. Importe de este rubro US $ 7.237.068.00. Se comprobó entonces, como correcto y ajustado a la técnica el cálculo de la pérdidas realizadas del 2004 al 2007 con un valor actualizado al 31 de agosto del 2008 de $7.237.068. Se pudo comprobar con base en los datos ·contables que dmante el 2004 y 2005 hay una reducción de los ingresos producto de lo ·arriba indicado, con la pérdida de confianza de otros clientes y la estructura de costos fijos de la empresa que llevan a las pérdidas incurridas. Todo lo cual permite establecer que esas pérdidas de la empresa actora se derivan de los hechos de la demanda objeto de este proceso. IX.- EN RELACION CON LOS INTERESES PAGADOS POR LA ACTORA Se revisó el cálculo de los intereses pagados al Banco Cuscatlán y a la empresa proveedora de Heildelberg según su fecha de registro contable, y sus importes fueron llevados al valor futuro, considerándose este cálculo correcto. La fecha de corte usada fue la del 31 de agosto del 2008 y se utilizó una tasa del 2.79 % anual promedio. Importe de este rubro US $983.825.00. Se verificó como correcto el cálculo de los intereses pagados a la empresa que fmanció la maquinaria rotativa Heidelberg Finance Corp. y al Banco Cuscatlán quien financió la compra de otra maquinaria y la actualización de su valor al 31 de agosto del 2008 por un valor de $983.825.00. Se consideró que dichos pagos fueron originados también en los requisitos técnicos de los contratos rescindidos por razones ajenas a la voluntad y responsabilidad de la empresa actora. X.- EN RELACIÓN CON LA INTERRUPCION DE OPERACIONES. Se usó la información de los estados financieros auditados para los años de 1991 a 1999, se proyectaron los flujos de efectivo que la empresa hubiese generado sin que mediara en sus operaciones la participación del contrato con Verizon. Este cálculo se consideró razonablemente conecto. Aquí cabe recalcar que siendo Verizon la cliente principal de THS y el contrato de 168 meses la base del negocio, en ausencia de este la empresa no tiene posibilidades



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ARSENIO VALENCIANO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*de continuar operaciones, por lo que se considera adecuada la utilización de la fórmula de la perpetuidad y que la pérdida del contrato no se dio por deficiencias o imputable a la autora. Importe de este rubro US $28.885.195.00. En otras palabras, se comprobó como correcto, ajustado a la técnica y · prácticas contables y financieras, el cálculo del monto reclamado por concepto de interrupción de operaciones por un valor al 31 de agosto de~ 2008 de US $28.885.195.00. Efectivamente la empresa tenía casi cien años de existencia cuando por hechos ajenos a su voluntad pierde el contrato de elaboración de los directorios telefónicos de Costa Rica que tenía contratados hasta por un periodo de 168 meses (14 años), los cuales venía elaborando durante esos mismos casi cien años. Se pudo verificar, con base en los registros contables e informes auditados, que por el peso de este negocio en sus operaciones y en su flujo de caja, la empresa no podía continuar operando sin el mismo. Asimismo y en virtud de lo estable de los resultados sus operaciones, medido tanto por la utilidad bruta como por la utilidad antes de intereses, impuestos, depreciación y amortización ( UAllDA) de los quince años previos a los hechos, es correcto calcular una perpetuidad de los flujos de efectivo de las operaciones de la empresa actora, como lo hizo el Lic. Evans y considerar como un daño en perjuicio de la actora la interrupción de sus operaciones centenarias. XI.- RESUMEN. El cálculo de daños y perjuicios por incumplimiento de contratos con Verizon Information Services Costa Rica, LLC, Verizon Information Services- Belice, LLC y GTE Directorios República Dominicana, C por A. elaborado por el Lic. Tomás Evans Salazar por un monto de $59.268.811.00 calculados al 31 de agosto del 2008 es correcto y exacto y fue elaborado de acuerdo a los principios contables y financieros generalmente aceptados y aplicando la técnica correcta".* 2. No ha demostrado las partes demandadas lo contrario y por consiguiente procede la aplicación del artículo 317 del Código Procesal Civil, en tanto que les correspondía a ellas desvirtuar media prueba técnica que los montos fijados y los conceptos determinados no se ajustaran a la verdad o a la técnica aplicable. 3. Los cálculos de indemnización por inversión de maquinaria realizados por  el Lic. Tomás Evans Salazar en estudio aportado como prueba por la parte actora y ratificado por el perito judicial



Ramon Humberto Romero Rodríguez, Contador Público Autorizado y Perito

Firma Originals
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERSIA VEGA ARIAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Actuario, si contemplan la venta de la maquinaria. Así lo indica expresamente al señalar que en este caso se tomó en cuenta el "*Cálculo de valor futuro de inversiones registradas contablemente menos el precio de venta de la máquina rotativa y sus complementos*". 4. Las sumas determinadas en los documentos en mención, tanto de Evans Salazar como Romero Rodríguez se fundan en la técnica aplicable, son coincidentes y comprenden los rubros de maquinaria, incremento en inventarios, flujos de caja operativos según el contrato, pérdidas realizadas, intereses pagados y afectación por interrupción de operaciones. En este sentido, advierte este Tribunal que en los indicados documentos con respecto a la maquinaria se procedió a actualizar el costo del equipo y maquinaria a la fecha de la firmeza de la subasta judicial, así como los importes por depreciación de la misma, determinándose la pérdida, como diferencia entre el valor neto de la maquinaria al 30 de junio de 2007 (fecha del remate) y el precio de venta de la misma. Adicionalmente, se llevó a valor futuro las variaciones de inventario, se determinó los flujos previstos y no realizados efectivamente, proyectando el consumo de millares de páginas obtenidos entre el año 2000 y 2003, junto con otras variables de cálculo, con el fin de determinar cómo la no continuación del contrato afectó dicho concepto. Por otra parte, se llevó a valor futuro las pérdidas resultantes para los períodos entre 2004 y 2007, los cargos por concepto de intereses pagados a Banco Cuscatlán y la empresa Heidelberg y cuyos importes fueron llevados a valor futuro. Finalmente, se calculó la interrupción de operaciones, tomando en consideración, pronósticos matemáticos de los resultados de ingresos económicos para el período 2000-2014 con base en las tendencias del período 1991 a 1999. La parte demandada no objetó ni aportó prueba que desvirtuara, la metodología ni las fechas estimadas para valor futuro de las pérdidas realizadas, la tasas de interés aplicadas, proyecciones, cálculos, metodologías o las conclusiones obtenidas. Por lo anterior, este Tribunal no cuenta con elementos de convicción que permitan cuestionar los alcances de los documentos objeto de análisis. Consecuentemente procede reconocer los montos indicados por la parte actora y en el entendido que las sumas adicionales contempladas en el peritaje del Lic. Romero Rodríguez escapan del objeto del peritaje solicitado y de las pretensiones esgrimidas en la demanda, por lo que no



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SELEN/MMA LARA PIEDRA
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

procede su reconocimiento. Al monto indicado, se le deberá deducir las sumas que se le hayan pagado a la actora por parte de Radiográfica Costarricense S.A., por concepto de cualquier contrato de elaboración de guías telefónicas que se haya realizado con posterioridad al rompimiento contractual por parte de Verizon Information Services Costa Rica LLC. Asimismo, estima este Tribunal oportuno deducir los montos correspondientes a lo siguiente:

| d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana | $ 7.912.999 |
|---|---|

Lo anterior, en tanto que el contrato maestro no contemplaba directorios para ese país, como se advierte del texto del mismo y las alegaciones de la parte actora se dirigen al incumplimiento de dicho objeto contractual exclusivamente no hay prueba de otro contrato debidamente rubricado que haya sido incumplido por la misma causa petendi del presente proceso. Por consiguiente, se condena de manera solidaria a Verizon Communications Inc y Verizon Information Services Costa Rica LLC  al pago de las indicadas sumas.

V.XI.- Sobre los daños morales invocados: Como parte de los daños puestos al cobro, la parte actora invoca la existencia de un daño moral fundado en los hechos que dan base a la demanda. Con relación al daño moral, conviene hacer las siguientes precisiones. El reconocimiento de la responsabilidad del Estado por daños puramente morales se encuentra implícito en la lectura complementaria de los artículos 9 y 41  de la Constitución Política, habida cuenta que en el primero no se realiza en ningún tipo de distinción con respecto a la responsabilidad del Estado y en el segundo, se hace expresamente referencia a la posibilidad de tutelar intereses "morales", entre los cuales, se encuentra la posibilidad de resarcir tanto el daño moral subjetivo, como el objetivo. Por otra parte, la Convención Americana de Derechos Humanos, dispuso sobre este tema:

"Artículo 11: 1. Toda persona tiene derecho al respeto de su honra y al reconocimiento de su dignidad. 2. Nadie puede ser objeto de injerencias arbitrarias o abusivas en su vida privada, en la de su familia, en su domicilio o en su correspondencia, ni de ataques ilegales a su honra o reputación. 3. Toda persona tiene derecho a la protección de la ley contra esas injerencias o esos



Firmado digital de:
ROBERTO GARITA NAVARRO (FIRMA) VALERACION?
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

ataques." *Artículo 24: Todas las personas son iguales ante la ley. En consecuencia, tienen derecho, sin discriminación, a igual protección de la ley."* "*Artículo 5.1: Toda persona tiene derecho a que se respete su integridad física, psíquica y moral.*" Inclusive de manera previa a que entrara a regir la Constitución Política de 1949 o se aprobara dicha Convención a finales de la década de los 60, desde el siglo XIX, el numeral 59 del Código Civil preceptúa: "*Se establece el derecho a obtener indemnización por daño moral, en los casos de lesión a los derechos de la personalidad*" En materia del derecho administrativo nacional propiamente, el artículo 197 de la Ley General de la Administración Pública, dispuso: "*Cabrá responsabilidad por el daño de bienes puramente morales, lo mismo que por el padecimiento moral y el dolor físico causados por la muerte o por la lesión inferida, respectivamente*". No obstante lo anterior, procede realizar algunas precisiones sobre la materia, con base en la doctrina y sendas resoluciones judiciales emitidas en la materia, dadas las particularidades existentes con respecto a este tipo de daño, habida cuenta que en el caso del daño moral subjetivo, al afectarse la esfera más íntima del individuo,  no pueden aplicarse las reglas comunes con respecto a la prueba del daño, cuando la afectación se realiza en el patrimonio del sujeto.  En este orden de ideas, se ha dicho, "*Para probar el daño moral en su existencia y entidad no es necesario aportar prueba directa, sino que el juez deberá apreciar las circunstancias del hecho y las cualidades de la victima para establecer objetiva y presuntivamente el agravio moral en la órbita reservada de la intimidad del sujeto pasivo. No creemos que el agravio moral deba ser objeto de prueba directa, pues ello resulta absolutamente imposible por la índole del mismo que reside en lo más íntimo de la personalidad, aunque se manifiesta a veces por signos exteriores que pueden no ser una auténtica expresión ... nadie puede indagar el espíritu de otro tan profundamente como para poder afirmar con certeza la existencia y la intensidad del dolor, la verdad de un padecimiento, la realidad de la angustia o de la decepción*" (Bustamante Alsina, "Equitativa valuación del daño no mensurable", 1990. p 655 y 656). Las anteriores consideraciones tienen como fundamento la apreciación de que el daño moral debe ser visto como *in re ipsa*  o *en sí mismo*,  dado que para tener configurado un perjuicio espiritual, no resulta necesario probar de manera



Firma digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DÍAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

directa, el sufrimiento o depresión exteriorizados hacia terceros, dado que implica más bien la alteración del equilibrio existencial de las personas, dentro de su ámbito más íntimo y no necesariamente dado a conocer o exteriorizado en toda su dimensión hacia terceros, en tanto que esto último está en función de la personalidad de cada individuo lesionado y partiendo de que las reacciones del humano tienen diversas formas y oportunidades de manifestación. Por lo anterior, en el caso de que se demostrara la existencia de una conducta (muerte de un ser querido, pérdida o lesión de un bien moral o patrimonial, afectación a derechos fundamentales, etc) que pudiere afectar el ámbito de intimidad de la persona - por provocar dolor, angustia, sufrimiento, etc-, se interpreta que necesariamente podría existir un daño moral, siendo así que la intensidad de éste y por ende el medio para su resarcimiento, se determinarán de conformidad con los criterios que a continuación analizaremos en este mismo considerando. Es entonces, en función de los derechos subjetivos menoscabados, que podemos hablar de la existencia de un daño moral, dado que éste se producirá ante la violación de alguno de los derechos inherentes de la personalidad y que por ende son considerados extrapatrimoniales. Es por ello, que se habla que el daño moral surge con el mero acaecimiento demostrado de la actuación formal o material de la Administración u omisión de actuación que vulnera dichos derechos, mas debiendo tomarse en consideración las particulares circunstancias del caso y la existencia de indicios que así evidencien su cumplimiento en un caso en particular. En este orden de ideas, conviene hacer referencia a lo siguiente:*"Siendo el agravio moral la consecuencia necesaria e ineludible de la violación de algunos de los derechos de la personalidad de un sujeto, la demostración de la existencia de dicha transgresión importará, al mismo tiempo, la prueba de la existencia del daño. La determinación de la existencia de un daño moral puede efectuarse de una manera tan objetiva como la comprobación de un agravio patrimonial. Se hace necesario a tal fin sólo confrontar un hecho con la norma jurídica que otorga a favor de un sujeto un derecho inherente a la personalidad, para comprobar si el primero constituye o no violación de lo preceptuado en la segunda.." Brebbia Roberto. El Daño Moral. Editorial Orbir.* En este orden de ideas, considera este Tribunal que conviene hacer



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

algunas precisiones con respecto al daño moral que serán plenamente aplicables para la resolución de la ejecución sometida a su conocimiento:  En primer término, debe destacarse que en materia de daño moral hablamos de una <u>función compensadora</u> y no de la equivalencia buscada en el caso del daño material. Adicionalmente, no debe obviarse que el daño moral no escapa de la <u>certeza</u> con relación a que éste debe ser consecuencia de la actuación u omisión de la administración, así como debe ser cierto el interés lesionado de la persona que lo invoca. En este orden de ideas, se ha indicado lo siguiente:" *El daño moral no es el dolor, la pena, la angustia sino la minoración espiritual derivada de la lesión a un interés no patrimonial. Dicho detrimento existe aunque falte comprensión por parte del damnificado del perjuicio sufrido; en ausencia de lágrimas; inclusive cuando la victima no se encuentre en condiciones físicas o "siquicas" para "sentir" pena, dolor o angustia (v.gr. una persona descerebrada). El disvalor subjetivo existe cuando la victima haya "madurado" ese dolor y quizás, dejado de "sentirlo". Así concebida la cuestión, se advierte de inmediato que el daño moral puede derivar sus efectos hacia el futuro, con suficiente grado de certeza...*" (Daniel Pizarro Ramón Daño Moral. Ed. Hammurabi. Página 105). Esta certeza implica entonces que si bien el daño moral posee una naturaleza in re ipsa y hay afectaciones que por su propia naturaleza devienen en una lesión de tal naturaleza, tal y como se ha indicado, en determinadas circunstancias en que su alegación se genérica o haya sido delimitada en determinado sentido a la hora de ser precisado en la demanda,  no implica una automaticidad tal que releve a la parte que se dice afectada, de su deber de aportar indicios que contribuyan a que el Juez pueda comprobar sus alcances en el caso en particular. Con respecto a la necesidad de la prueba indirecta en la determinación del daño moral,  se ha indicado lo siguiente: "...*Esta Sala avala la existencia del daño moral, pero reitera que éste corresponde a un menoscabo a la esfera extrapatrimonial, en este caso el concedido fue el de tipo subjetivo, es decir, el puro o de afección, el cual se traduce en afecciones en las condiciones animicas del individuo, si bien no requiere de prueba directa si necesita de prueba al menos indirecta que permita al juzgador su fijación.... (voto 000290-F-*



S1-2014 de las diez horas cinco minutos del seis de marzo de dos mil catorce de la

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA MENA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Sala Primera de la Corte Suprema de Justicia). Por otra parte, el daño moral es de orden personal, en función de la afectación de un interés legítimo del afectado. Con relación a los alcances del daño moral en nuestro país, la Sala Primera en su voto N 112 de las 14 horas 15 minutos del 15 de julio de 1992, reiteradamente citado y aplicado por diferentes instancias jurisdiccionales, indicó: " *IV.- El daño constituye uno de los presupuestos de la responsabilidad civil extracontractual, por cuanto el deber de resarcir solamente se configura si ha mediado un hecho ilícito dañoso que lesione un interés jurídicamente relevante, susceptible de ser tutelado por el ordenamiento jurídico. El daño, en sentido jurídico, constituye todo menoscabo, pérdida o detrimento de la esfera jurídica patrimonial o extrapatrimonial de la persona (damnificado), el cual provoca la privación de un bien jurídico, respecto del cual era objetivamente esperable su conservación de no haber acaecido el hecho dañoso. Bajo esta tesitura, no hay responsabilidad civil si no media daño, así como no existe daño si no hay damnificado. Por otra parte, sólo es daño indemnizable el que se llega a probar (realidad o existencia), siendo ello una cuestión de hecho reservada al prudente arbitrio del juzgador. En suma, el daño constituye la brecha perjudicial para la victima, resultante de confrontar la situación anterior al hecho ilícito con la posterior al mismo. V.- En muchas ocasiones se utilizan indiscriminadamente las expresiones "daños" y "perjuicios". Es menester precisar y distinguir ambos conceptos. El daño constituye la pérdida irrogada al damnificado (damnum emergens), en tanto el perjuicio está conformado por la ganancia o utilidad frustrada o dejada de percibir (lucro cesans), la cual era razonable y probablemente esperable si no se hubiese producido el hecho ilícito. VI.- No cualquier daño da pie a la obligación de resarcir. Para tal efecto, han de confluir, básicamente las siguientes características para ser un "daño resarcible": A) Debe ser cierto; real y efectivo, y no meramente eventual o hipotético, no puede estar fundado en realizaciones supuestas o conjeturables. El daño no pierde esta característica si su cuantificación resulta incierta, indeterminada o de difícil apreciación o prueba; tampoco debe confundirse la certeza con la actualidad, pues es admisible la reparación del daño cierto pero futuro; asimismo, no cabe confundir el daño futuro con el lucro cesante o perjuicio, pues el primero está referido a aquél que surge como una*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 402 of 490    RECEIVED NYSCEF: 10/26/2021

consecuencia necesaria derivada del hecho causal o generador del daño, es decir, sus repercusiones no se proyectan al incoarse el proceso. En lo relativo a la magnitud o monto (seriedad) del daño, ello constituye un extremo de incumbencia subjetiva única del damnificado, empero el derecho no puede ocuparse de pretensiones fundadas en daños insignificantes, derivadas de una excesiva susceptibilidad. B) Debe mediar lesión a un interés jurídicamente relevante y merecedor de amparo. Así puede haber un damnificado directo y otro indirecto: el primero es la víctima del hecho dañoso, y el segundo serán los sucesores de la víctima. C) Deberá ser causado por un tercero, y subsistente, esto es, sí ha sido reparado por el responsable o un tercero (asegurador) resulta insubsistente. D) Debe mediar una relación de causalidad entre el hecho ilícito y el daño. VII.- Dentro de las clases de daños, se encuentra en primer término el daño material y el corporal, siendo el primero el que incide sobre las cosas o bienes materiales que conforman el patrimonio de la persona, en tanto el segundo repercute sobre la integridad corporal y física. En doctrina, bajo la denominación genérica de daño material o patrimonial, suelen comprenderse las específicas de daño corporal y de daño material, en sentido estricto. La segunda parece ser la expresión más feliz, pues el daño corporal suele afectar intereses patrimoniales del damnificado (pago de tratamiento médico, gastos de hospitalización, medicamentos, etc.), ganancias frustradas si el daño lo ha incapacitado para realizar sus ocupaciones habituales (perjuicios), etc.. Esta distinción nació en el Derecho Romano, pues se distinguía entre el daño inferido a las cosas directamente (damnun) y el que lesionaba la personalidad física del individuo (injuria). En el daño patrimonial el menoscabo generado resulta ser valorable económicamente. VIII.- El daño moral (llamado en doctrina también incorporal, extrapatrimonial, de afección, etc.) se verifica cuando se lesiona la esfera de interés extrapatrimonial del individuo, empero como su vulneración puede generar consecuencias patrimoniales, cabe distinguir entre daño moral subjetivo "puro", o de afección, y daño moral objetivo u "objetivado". El daño moral subjetivo se produce cuando se ha lesionado un derecho extrapatrimonial, sin repercutir en el patrimonio, suponiendo normalmente una perturbación injusta de las condiciones anímicas del individuo (disgusto, desánimo, desesperación,



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*pérdida de satisfacción de vivir, etc., vg. el agravio contra el honor, la dignidad, la intimidad, el llamado daño a la vida en relación, aflicción por la muerte de un familiar o ser querido, etc.). El daño moral objetivo lesiona un derecho extrapatrimonial con repercusión en el patrimonio, es decir, genera consecuencias económicamente valuables (vg. el caso del profesional que por el hecho atribuido pierde su clientela en todo o en parte). Esta distinción sirve para deslindar el daño sufrido por el individuo en su consideración social (buen nombre, honor, honestidad, etc.) del padecido en el campo individual (aflicción por la muerte de un pariente), así uno refiere a la parte social y el otro a la afectiva del patrimonio. Esta distinción nació, originalmente, para determinar el ámbito del daño moral resarcible, pues en un principio la doctrina se mostró reacia a resarcir el daño moral puro, por su difícil cuantificación. Para la indemnización debe distinguirse entre los distintos tipos de daño moral. En el caso del objetivo, se debe hacer la demostración correspondiente como acontece con el daño patrimonial; pero en el supuesto del daño moral subjetivo al no poder estructurarse y demostrarse su cuantía de modo preciso, su fijación queda al prudente arbitrio del juez, teniendo en consideración las circunstancias del caso, los principios generales del derecho y la equidad, no constituyendo la falta de prueba acerca de la magnitud del daño óbice para fijar su importe. La diferencia dogmática entre daño patrimonial y moral no excluye que, en la práctica, se presenten concomitantemente uno y otro, podría ser el caso de las lesiones que generan un dolor físico o causan una desfiguración o deformidad física (daño a la salud) y el daño estético (rompimiento de la armonía física del rostro o de cualquier otra parte expuesta del cuerpo), sin que por ello el daño moral se repute como secundario o accesorio, pues evidentemente tiene autonomía y características peculiares. En suma el daño moral consiste en dolor o sufrimiento físico, psíquico, de afección o moral infligido con un hecho ilícito. Normalmente el campo fértil del daño moral es el de los derechos de la personalidad cuando resultan conculcados.*" Con base en lo anterior, se evidencia que en el caso del daño moral subjetivo, no se requiere de la existencia de una prueba directa, sino que le es aplicable determinados criterios que delimitan la discrecionalidad del juzgador, que desprenden de su propia naturaleza jurídica y de los indicios



Firma/original de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ROMO LARIOS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 404 of 490    RECEIVED NYSCEF: 10/26/2021

aportados por la parte y que han sido desarrollados por la jurisprudencia nacional. Así, se pueden indicar los siguientes: 1).- Principios generales del derecho y la equidad: En la resolución mencionada ut supra se establece como primer criterio delimitador, los principios generales del derecho y la equidad. 2).- Presunciones inferidas en el caso particular: Como segundo criterio a emplear para la determinación de la existencia y alcances de un daño moral subjetivo, se ha hecho referencia a que el Juzgador puede hacer uso de las presunciones para su reconocimiento. En este sentido, la Sala Primera ha indicado: "*Al no poderse demostrar de modo preciso su cuantificación, esta queda al prudente arbitrio de por los juzgadores, sin que se requiera prueba concreta sobre su existencia, ya que su determinación se hace in re ipsa, lo que implica que es "consustancial o inherente a la lesión misma, va con la cosa, se entiende en principio como derivación del hecho o la conducta adoptada.*" (fallo 125-F-S1-2009 de las 15 horas 35 minutos del 5 de febrero de 2009). *Sin embargo, para su reconocimiento es necesario que de la ponderación de todas las probanzas existentes en autos se logre colegir, aún de forma indiciaria o mediante presunciones, la aflicción subjetiva reclamada como consecuencia de la conducta acusada... Como se dijo supra la cuantificación del daño moral subjetivo no es factible estructurarla y demostrarla de manera precisa, de ahí la necesidad de establecerla a partir de las circunstancias propias del caso, los principios generales del derecho y la equidad. Los puntos enlistados no corresponden a pruebas concretas, pues se relacionan con características personales del actor y supuestas consecuencias de lo padecido por el accionante, ello hace que el recurrente mencione el precepto 417 del CPC atinente a las presunciones humanas. Sin embargo, tampoco puede establecerse que se trate de ese tipo de presunciones, ni que sean admisibles como prueba, pues para esos efectos deben resultar consecuencia directa, precisa y lógicamente deducida de un hecho comprobado, situación que no se observa y el casacionista no especifica de cuáles hechos acreditados extrae los aspectos que menciona...*" (voto 000295-F-S1-2014 de las once horas treinta minutos del seis de marzo de dos mil catorce de la Sala Primera de la Corte Suprema de Justicia). En este orden de ideas, conviene acotar que para poder aplicar las



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

presunciones a un caso concreto como elemento de convicción de este Tribunal, se deben cumplir las disposiciones del artículo 417 del Código Procesal Civil, en tanto dispone lo siguiente: "*Artículo 417.- Presunción humana. Las presunciones humanas solo constituyen prueba si son consecuencia directa, precisa y lógicamente deducida de un hecho comprobado. La prueba de presunciones deberá ser grave y concordar con las demás rendidas en el proceso*". Con respecto a la figura de la presunción, ha dicho, la Sala Primera de la Corte Suprema de Justicia lo siguiente: "*Para que exista una presunción como medio de prueba es necesario, en primer término, que se de un acontecimiento positivo o negativo, cierto del que ha de deducirse el que se quiere conocer. La existencia o inexistencia de este acaecimiento denominado en sentido amplio hecho base, o más técnicamente indicio, tiene que estar debidamente acreditado en el proceso para que asegure la viabilidad de la presunción. Así se deduce del articulo 417 del Código Procesal Civil: "Las presunciones humanas sólo constituyen prueba si son consecuencia directa, precisa y lógicamente deducida de un hecho comprobado". La Sala ha indicado que este tipo de presunción "…es el resultado del ejercicio de la discrecionalidad otorgada al juzgador para apreciar la prueba, derivando entonces la presunción de otros hechos que se han tenido por ciertos" (no. 848-F, de las 14 horas 45 minutos del 31 de octubre del 2001). Esta conexión, que debe ser directa y precisa, entre el hecho base o indicio y el acaecimiento que se pretende derivar (hecho consecuencia), se verifica con arreglo a normas puramente lógicas, a las reglas del criterio humano, tarea que lleva a cabo el Juez investido de poder discrecional según su conciencia y discernimiento. Es éste quien de modo exclusivo infiere de tal prueba un hecho o acto, según su convicción interna le inspire dentro de un marco de razonabilidad y racionalidad, en un prius lógico que no atente con la sana crítica, de ahí que, su juicio se mantiene, salvo se demuestre ser contrario a la evidencia que las pruebas ostentan, ya sea por mediar error de hecho o de derecho en su estimación respecto de los hechos base o indiciarios, o bien, que la inferencia raye en lo absurdo por contrariar el sentido común o los fenómenos naturales*" (sentencia no. 25-F-2007, de las 10 horas 45 minutos del 19 de enero de 2007) (la negrita no es del original). (Sobre el particular, pueden consultarse entre otras, las



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

sentencias de la misma Sala no. 27 de las 10 horas 30 minutos del 5 de mayo de 1993, no. 217 de las 15 horas del 5 de mayo de 1999 y no. 848 de las 14 horas 45 minutos del 31 de octubre del 2001). 3) Criterios de racionalidad y proporcionalidad: Con relación a la aplicación de estos criterios, se ha indicado lo siguiente: *"Conviene recordar que, cuando se indemniza el daño moral subjetivo, si bien no se trata de cuantificar el sufrimiento –que es inapreciable–, se procura fijar una compensación monetaria a su lesión, como mecanismo al cual puede acudir el derecho, para así reparar –al menos en parte– la ofensa causada (en ese sentido puede verse, entre muchas otras, la sentencia de esta Sala no. 1143-F-S1-2012 de las 9 horas 10 minutos del 13 de setiembre de 2012). El monto conferido debe surgir de una prudente valoración del juez, mediante la cual se evite caer en extremos de indemnizaciones exiguas, simbólicas o –por el contrario– excesivas; lo que impone resolver, entonces, conforme a la equidad y los principios de razonabilidad y proporcionalidad. Respecto de estos últimos se ha indicado: "lo razonable se opone a lo arbitrario y remite a una pauta de justicia con la cual se completa el principio de legalidad. Desde otro ángulo, el de proporcionalidad, se refiere a una correspondencia entre las circunstancias de hecho, los medios empleados y la decisión adoptada, […]."* (Sala Primera, sentencia no. 1292-F-S1-2012 de las 9 horas 55 minutos del 11 de octubre de 2012). Es por ello que, en cuanto a la estimación del daño moral subjetivo, esta Cámara ha señalado: *"La valoración del juez dentro de ese marco inexorable, permite que su cuantificación sea acorde a derecho y no lleve a indemnizaciones desproporcionadas que beneficien o perjudiquen injustificadamente a una de las partes. Es decir, deben guardar un justo equilibrio derivado del cuadro fáctico específico."* (Resolución no. 4-F-S1-2012 de las 8 horas 50 minutos del 12 de enero de 2012). En virtud de lo anterior se ha dicho que: *"ha de acudirse a la equidad y a la valoración de la gravedad de la falta cometida y deben tenerse en cuenta, también las circunstancias personales y repercusión subjetiva en la víctima (estado civil, edad, nivel cultural, grado de cohesión y convivencia familiar, entre otros)."* (Sala Primera, sentencia no. 279-F-S1-2011 de las 9 horas 30 minutos del 17 de marzo de 2011; en similar sentido véase también la resolución no. 318-F-S1-2011 de las 9 horas 25 minutos del 31 de marzo de 2011)..." (voto 001045-F-S1-2013 de



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

las nueve horas cinco minutos del catorce de agosto de dos mil trece de la Sala Primera de la Corte Suprema de Justicia). 4).- La causalidad: La causalidad del daño es otro criterio de naturaleza insoslayable, en tanto que la causa real de éste puede determinar los alcances y limites de la estimación reparadora. Esto se puede inferir claramente al indicarse lo siguiente: "*El daño moral subjetivo se otorga por la conmoción, angustia y la sensación de impotencia ocasionada, al verse imposibilitados de pedir ayuda médica y de seguridad, teniendo -quien se encontraba en mejor condición fisica- que caminar largas distancias en búsqueda de ayuda, descuidando no solo a los otros pasajeros heridos sino también el producto que transportaba, todo por la ausencia del servicio celular. Es decir, la falta de cobertura celular, así como la omisión de informar los problemas de recepción telefónica en el lugar de los hechos condujo como nexo causal al daño moral subjetivo traducido en angustia, conmoción e impotencia..*" (voto 000507-F-S1-2014 de las catorce del veintisiete de marzo de dos mil catorce de la Sala Primera de la Corte Suprema de Justicia). Por consiguiente, debe advertirse que se ha aceptado que dentro del marco de la teoría de la responsabilidad de la Administración Pública, en tesis de principio, sería válido admitir la posibilidad de que el demandado puede probar la existencia de una de las circunstancias eximentes de responsabilidad establecidas en el artículo 190 de la Ley General de la Administración Pública, a saber, la fuerza mayor, la culpa de la victima o de un hecho de un tercero; o inclusive probar su inexistencia o menor gravedad de lo invocada. Es así como se ha indicado que "*La cantidad que se fije, debe ser fiel reflejo de las circunstancias descritas en el expediente, para que resulte una suma apropiada, dado los problemas sufridos por el perjudicado, causados por los actos ilicitos penales o civiles del agente o de los agentes productores del daño. En razón de que esas presunciones son iuris tantum, admiten prueba en contrario, de lo cual debe ser sumamente diligente el demandado o sujeto activo del daño, ya que le corresponde la carga de la prueba para desvirtuar las presunciones de dolor, sufrimiento, mortificación o agravio y para ello puede acudir a cualquier tipo de prueba ordinaria.*" (Montero Piña Fernando. El Daño Moral, Página 61. Impresión Gráfica del este). No sin advertir que alguna doctrina ha sostenido que cualquier daño producto de una



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA MADRIGAL, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 408 of 490

RECEIVED NYSCEF: 10/26/2021

conducta lícita y normal, cuando el nivel de intensidad es excesivo, no procede ningún tipo de eximente. 5) La prudente apreciación del Juzgador: Por otra parte, siempre dentro del orden de la proporcionalidad, se habla de la *"prudente apreciación del Juez"* del daño y su resarcimiento, de la siguiente manera: *"La prueba de este tipo de lesión es "in re ipsa", el monto debe fijarse de acuerdo con el prudente arbitrio y con base en los principios de razonabilidad y proporcionalidad. Al respecto, es importante recordar que la valoración del juez dentro de ese marco inexorable, obliga que su cuantificación sea acorde a derecho y no lleve a indemnizaciones desproporcionadas que beneficien injustificadamente a una de las partes. Es decir, deben guardar un justo equilibrio derivado del cuadro fáctico específico. No se trata, entonces, de cuantificar el sufrimiento, pues es inapreciable, sino de fijar una compensación monetaria a su lesión, único mecanismo al cual puede acudir el derecho, para así reparar, al menos en parte la afectación (al respecto puede consultarse el fallo no. 537 de las 10 horas 40 minutos del 3 de septiembre del 2003, según se cita en las resoluciones no. 845-F-2007 de las 10 horas 5 minutos del 23 de noviembre de 2007 y no. 001-F-S1-2009 de las 9 horas 5 minutos del 6 de enero de 2009). También, ha estimado esta Sala: "La determinación y cuantificación del daño moral subjetivo entonces, queda a la equitativa y prudente valoración del Juzgador, quien acude para ello a presunciones del ser humano inferidas de los hechos comprobados. La presunción humana es un juicio lógico del juez, en virtud del cual se considera probable un hecho, con fundamento en las máximas generales de la experiencia, que indican cuál es el modo normal como suceden las cosas y los hechos ..."* (resoluciones no. 878-F-2007 de las 8 horas 15 minutos del 14 de diciembre de 2007 y no. 001-F-S1-2009 de las 9 horas 5 minutos del 6 de enero de 2009 citadas en la sentencia no. 771-F-S1-2011 de las 13 horas 30 minutos del 30 de junio de 2011). (voto 000520-F-S1-2014 de las nueve horas ocho minutos del diez de abril de dos mil catorce de la Sala Primera de la Corte Suprema de Justicia). De conformidad con lo anterior, el reconocimiento del daño moral debe realizarse en el entendido de que si bien no requiere prueba directa, los Juzgadores deben tener especial prudencia y proceder a su valoración bajo su razonable apreciación, bajo criterios de equidad, aplicando las presunciones del



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO UREÑA VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

hombre inferidas de los elementos circunstanciales del caso de análisis, a efecto de determinar la procedencia y el quantum de la sentencia condenatoria por este extremo dentro de los límites de la razonabilidad y la proporcionalidad. Lo anterior, debido a que el daño moral no es para este Tribunal, producto de una fijación arbitraria de los Juzgadores, sino consecuencia misma del ejercicio valorativo que deberá realizar el Tribunal de la integralidad de los elementos descritos anteriormente en el contexto propio del caso de análisis, a fin de que cumpla la función compensatoria de su naturaleza jurídica y no implique un enriquecimiento sin causa para el que se dice afectado sin serlo o cuando, a pesar de que delimite las manifestaciones externas del mismo, no lo demuestre así en juicio, al menos con prueba indiciaria. La ausencia de una situación objetiva que *per se* implique una afectación moral, aunado a la carencia de indicios sobre los alcances de ésta, según lo delimitado por las partes, hacen que exista una ausencia de certeza sobre su existencia en la situación particular de análisis. Hechas las anteriores consideraciones, procede resolver por el fondo, la pretensión indemnizatoria mantenida por la parte actora. b) Criterio del Tribunal respecto del daño moral pretendido: La parte actora pide en su demanda, se le reconozca un daño moral subjetivo y objetivo con motivo de los hechos probados en el presente proceso, no obstante estima este Colegio que no resulta procedente, en tanto que la parte actora es una persona jurídica que como tal no sufre un daño moral subjetivo, habida cuenta que los que lo podrían haber sufrido, serían las personas que la conformaron y éstas no son actoras en el proceso. Adicionalmente, en todo caso, es menester indicar que no consta en autos prueba alguna que demuestre a manera de indicio, la existencia de algún tipo de daño moral subjetivo u objetivo ocasionado con motivo de los hechos que originan el presente proceso y la parte se limita a su invocación, mas sin aportar elementos de convicción respecto de su alcance y consecuencias. Llama la atención de que el señor Perito se atreva a realizar una determinación de daño moral subjetivo, sin contar con los conocimientos técnicos para su fijación y siendo así que además por la naturaleza del mismo, escapa en todo a su competencia y a la posibilidad de ser cuantificado materialmente apriori. Así las cosas, procede el rechazo de este extremo indemnizatorio.



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA BRENES, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

VI.- Sobre la indexación e intereses solicitados: La parte actora solicita lo siguiente: "*De conformidad con lo que dispone el artículo 123 del Código Procesal Contencioso Administrativo se concederá, además, la actualización de las sumas de la condenatoria para compensar la variación en el poder adquisitivo y se reconocerán Intereses de todas las partidas anteriores que se pagarán a partir del 30 de agosto del 2008 y hasta que se cancelen totalmente, que se calcularán de conformidad con lo que dispone el artículo 1163 del Código Procesal Civil*". Al respecto, de conformidad con el canon 123 del Código Procesal Contencioso Administrativo, sobre la sumas objeto de condena procede la indexación prevista consistente en la actualización del poder adquisitivo de los montos indicados, tomando como parámetro la tasa prime rate establecida para los bancos internacionales de primer orden. De igual manera, sobre estas partidas, debe aplicarse el interés legal previsto en el artículo 1163 del Código Civil, en lo que corresponde al componente de <u>utilidad neta</u>, rubros que deberán ser reconocidos desde el 30 de agosto del 2008 y hasta que se cancelen totalmente, según lo solicitado por la parte actora. Lo anterior, fundado en la linea jurisprudencial de la Sala Primera de la Corte Suprema de Justicia que indica, "*…en principio resulta factible reconocer de forma conjunta intereses (porcentaje de utilidad) e indexación (factor deflacionario), dado que tales aspectos son distintos y autónomos, por lo que no son excluyentes. Lo anterior, claro está, siempre que los réditos concedidos sean los netos, dado que el interés legal contiene agregado un rubro inflacionario. Además, es evidente, dichos extremos tratándose de obligaciones de valor, es posible concederlos a partir de la sentencia donde se estableció el monto debido y hasta su efectivo pago...*" (sentencia número 000293-F-S1-2016 dictada a las 09:45 horas del 07 de abril de 2016 y en sentido similar, sentencias 000990-F-02 de las 16:30 del 18 de diciembre del 2002; 107 de las 14:30 horas, 108 de las 15 horas, ambas del 10 de julio de 1992; 49 de las 15 horas del 19 de mayo de 1995; 131 de las 14:10 horas del 18 de diciembre, 144 de las 14:40 horas del 23 de diciembre, ambas de 1998 y 14 del 5 de enero de 2000, todas de la Sala Primera de la Corte Suprema de Justicia)

VII.- Defensas previas: Sin perjuicio de las defensas ya resueltas durante el curso del proceso y la de prescripción rechazada en considerandos anteriores, en su



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO SILVA ZELEDON, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

demanda las partes demandadas oponen las siguientes defensas:

A) VERIZON COMMUNICATIONS INC: Interpone la excepción de falta de derecho, falta de legitimación ad causan y procesum activa y pasiva.

1. Con respecto a las defensas de falta de legitimación ad causan y procesum activa y pasiva: Al respecto, procede rechazar las defensas de falta de legitimación, habida cuenta que la parte actora demuestra que la codemandada forma parte del grupo de interés económico "Verizon" suscribiente de una relación contractual incumplida con el ICE y de otro contrato incumplido dolosamente con Trejos Hermanos Sucesores.

2. Con respecto a la defensa de falta de legitimación ad procesum; debe rechazarse, dado que la parte actora demuestra tener poder suficiente para ejercer la representación legal respectiva.

3. Con respecto a la defensa de falta de derecho, por los motivos indicados anteriormente, procede acogerla parcialmente, únicamente en cuanto a los extremos no reconocidos en la presente sentencia.

B) VERIZON INFORMATION SERVICES COSTA RICA LLC interpone la defensa de falta de derecho: Por los motivos indicados anteriormente, procede acogerla parcialmente, únicamente en cuanto a los extremos no reconocidos en la presente sentencia.

C) El INSTITUTO COSTARRICENSE DE ELECTRICIDAD, opone las defensas de falta de legitimación activa y pasiva, falta de derecho.

1. Con respecto a la defensa de falta de legitimación pasiva, procede acoger la misma, por los motivos dichos anteriormente, al no mediar ninguna relación contractual entre el ente y la sociedad actora. Por ende, no existe una relación jurídico material, de naturaleza procesal que permita al actor demandar al ente accionado y de ese modo figurar como demandado dentro de esta causa.

2. Por innecesario se omite pronunciamiento sobre el resto de defensas opuestas por el Instituto Costarricense de Electricidad.

VIII.-Costas: El artículo 193 del Código Procesal Contencioso Administrativo establece que las costas procesales y personales se imponen al vencido por el solo hecho de serlo, pronunciamiento que debe hacerse incluso de oficio, al tenor del numeral 119.2 ibídem. En razón de no estarse las codemandadas Verizon



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VARELA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Communications Inc y Verizon Information Services Costa Rica LLC en los supuestos de excepción, procede la condena solidaria al pago de costas procesales y personales. Corresponde a la parte actora el pago de costas procesales y personales al Instituto Costarricense de Electricidad.

POR TANTO

Se rechazan las defensas de prescripción, falta de legitimación activa y pasiva y falta de legitimación ad procesum opuestas por las codemandadas Verizon Communications Inc y Verizon Information Services Costa Rica LLC y se acoge parcialmente la de falta de derecho opuestas por las mismas. Se acoge la defensa de falta de legitimación pasiva opuesta por el Instituto Costarricense de Electricidad. En consecuencia, se acoge parcialmente la demanda en todo aquello que se indica expresamente y se deniega en todo lo que no se acoja en la presente parte dispositiva. Por consiguiente, se resuelve lo siguiente: A) Se declara: 1. Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A (que cambió su razón social a VERIZON INFORMATION SERVICES COSTA RICA, LLC) constituyó una sub contratación que empleó la contratista como medio de ejecución del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephohe Directory Company C por A", empresas de los Estados Unidos de américa, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000. 2.- Que la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos


Firmado digitalmente de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ARENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Hermanos Sucesores S.A. con General Telephone Directory Company, C por A." 3. Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE. 4. Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. 5. Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A". 6. Que las empresas demandadas Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A." 7. Que "VERIZON COMMUNICATIONS INCORPORATED" responde solidariamente con la segunda por todas las obligaciones contraídas por "VERIZON INFORMATION SERVICES -COSTA RICA- LLC" , con TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA" 8.- Que las empresas demandadas Verizon Communications Inc. y Verizon Information Services -Costa Rica- LLC son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A" 9.-  Que son ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON. B) Se condena de manera solidaria a Verizon Communications Inc y Verizon Information Services



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Costa Rica LLC a pagar a la sociedad actora, las siguientes sumas: 1. Por concepto de inversión en maquinaria: La suma de $2.582.156,00 (dos millones quinientos ochenta y dos mil ciento cincuenta y seis dólares). 2. Por concepto de incremento en inventarios: La suma de $2.860.696,00 (dos millones ochocientos sesenta mil seiscientos noventa y seis dólares. 3. Por concepto de Flujos de Caja Operativos no recibidos en el período 2004-2013 por concepto de Directorios Costa Rica, la suma de $8.806.872 (ocho millones ochocientos seis mil ochocientos setenta y dos dólares. 4. Por concepto de Pérdidas realizadas en el período 2004 a 2007, la suma de $7.237.068 (siete millones doscientos treinta y siete mil sesenta y ocho dólares). 5. Por concepto de intereses pagados, la suma de $ 983.825 (novecientos ochenta y tres mil ochocientos veinticinco dólares. 6. Por concepto de daños por interrupción de operaciones, la suma suma de $28.885.195 (veintiocho millones ochocientos ochenta y cinco mil ciento noventa y cinco dólares). C) Sobre la sumas objeto de condena procede la indexación prevista consistente en la actualización del poder adquisitivo de los montos indicados, tomando como parámetro la tasa prime rate establecida para los bancos internacionales  de primer orden. De igual manera, sobre estas partidas, debe aplicarse el interés legal previsto en el artículo 1163 del Código Civil, en lo que corresponde al componente de <u>utilidad neta</u>, rubros que deberán ser reconocidos desde el 30 de agosto del 2008 y hasta que se cancelen totalmente. D) Corresponde a Verizon Communications Inc y Verizon Information Services Costa Rica LLC de manera solidaria, el pago de costas procesales y personales a la sociedad actora. E) Corresponde a la parte actora el pago de costas procesales y personales al Instituto Costarricense de Electricidad.

Rodrigo Alberto Campos Hidalgo

Marianella Álvarez Molina                                                 Sergio Mena García



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 6     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 415 of 490     RECEIVED NYSCEF: 10/26/2021

- Código Verificador -

PSKSOA47ICJ861



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# Exhibit C

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

First Chamber of the Court
Decision No. 02017 - 2020

**Decision Date: June 25, 2020**
**Case Record: 08-001505-1027-CA**
**Written by: Román Solís Zelaya**
**Analyzed by: FIRST CHAMBER**

[Logo:] First Chamber
Supreme Court of Justice
**\*080015051027CA\***

# Text of the Decision

**FILE 08-001505-1027-CA**
**DES. 002017-F-S1-2020**
**FIRST CHAMBER OF THE COURT OF JUSTICE**. San José, at 9 :00 a.m. of June twenty-fifth of two thousand twenty.
In the declaratory proceeding established by **TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA**, represented by its president with broadest power of attorney with no limitation as to amount, Alvaro Trejos Fonseca, ID card No. 1-0390-0895, married for the second time, master's degree in science; against **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** (Costa Rican Institute of Electricity), **VERIZON COMMUNICATIONS INC. and VERIZON INFORMATION SERVICES COSTA RICA LLC**, also included as special legal representatives of the plaintiff, are Mr. Eduardo Sancho González Esq., ID card No. 1-380-073, Mr. Andrés Meza Villalobos Esq., ID card No. 2-638-788, Mr. Diego Baudrit Carrillo Esq., ID card No. 1-323-212 and Mr. Luis Gerardo Villanueva Monge Esq., ID card No. 3-221-204, resident of Carthage; by the co-defendant Institute, Ms. Ana Victoria Zapata Calvo Esq., ID card No. 1-892-491, divorced and Mr. Carlos Cerdas Delgado Esq., ID card No. 1- 896-201, Mr. Juan Pablo Hernández Cortés Esq., ID card No. 1-849-120, both with no domicile specified; for Verizon Communications Incorporated, Ms. Andrea Hulbert Volio Esq., ID card No. 9- 100-121 and Mr. Alexander Salazar Solorzano Esq., ID card No. 1-835-398, Mr. Juan Carlos Pizarro Corrales Esq., ID card No. 1-825-376, Mr. Rodrigo Alberto Pérez González Esq., ID card No. 4-211- 250, with no marital status and domicile specified and Marvin Cespedes Mendez, ID card No. 1-531- 965; and, by Verizon Information Services Costa Rica LLC, Mr. Gino Capella Molina Esq., ID card No. 1-569-226. Individuals are of legal age and, with the exceptions set forth, married, lawyers and residents of San José. The co-defendant companies are filing a cassation appeal against judgment No. 66- 2017-V, issued by the Court for Administrative Litigation, Fifth Section, at 8 a.m. on July 19, 2017.
**Reported by Judge Solis Zelaya**

**WHEREAS**

**I.-** In the light of the facts regarded as proven, on March 10, 2000, Instituto Costarricense de Electricidad (ICE in future references) and the GTE Group (hereinafter GTE) signed the *"Contract for the Publication of the Telephone Directory and Development and Implementation of Information Services between ICE and GTE"* (administrative procurement Public Tender 6378-T). This agreement established subcontracting of up to 50% of the development, production, and distribution of telephone directories, upon written authorization from ICE (Clause 2.13.1). In addition, it was established that all the stages of execution of the contract would be carried out in Costa Rica and, in the event of a name change as a result of merger or association with another company, the contract would remain unchanged and in force between the parties, under the new legal names of the legal entities. As the result of the above contract, on February 28, 2002, Verizon and Trejos Hermanos Sucesores S.A. (hereinafter THS) signed the Master Purchase Contract VIS-2001-21-IP for the preparation, packaging, and distribution of telephone directories in Costa Rica and Belize, for a term of 168 months (regulated by the Civil Code -hereinafter CC- and the Commercial Code -CoCo in future references). As a requirement of effectiveness, it was established that the Master Contract would be subject to the execution of the contract concluded on the occasion of tender 6378-T (Clause 2.b). Regarding its termination, it was established that the buyer could terminate the contract when it could not agree on any price review or reform. To do so, it had to notify the seller in writing at least 90 days in advance. It could also terminate the contractual relationship immediately, if during the term of the contract, the agreement signed between ICE and Verizon was terminated for any reason (Clause 28). In another vein, THS was asked to modernize its equipment to address the technological changes and requirements of the contractors. On May 16, 2002, GTE informed the Department of Supplies of ICE that General Telephone Directory Company C por A changed its name to Verizon Information Service Costa Rica, LLC (hereinafter Verizon LLC) and requested that the name change of the GTE member companies be deemed to have been officially communicated. GTE then merged with Bell Atlantic and created the Verizon Group, thus replacing the name of GTE for Verizon Group (hereinafter Verizon). In 2004, Verizon proposed making adjustments to the contract to ICE. On May 13 of that year, it raised the review of telephone directories to the Telecommunications Office (hereinafter Office). By means of official note 6000-41046-2004 of July 15, 2004, the Office informed Verizon that the 2005 telephone directories had to maintain the same structure and quantity of copies as those of 2004. On October 14 of that year Verizon and THS signed the *"Production Schedule, Provinces Directory 2005,"* establishing December 15 as the deadline for changing the number of pages and the number of books. The Vice President of Verizon, by note dated September 8, 2004 informed the Department of Supplies of ICE (received on December 16, 2004) that since it had not received a response to the note dated May 13, 2004, it would consider the tacit consent applied. In official note 6000-52278-2004 of September 14, 2004, the Office rejected the application of tacit consent. It stated that the request had been dealt with by official note 6000-41046- 2004 of July 15, 2004 and reaffirmed that the structure and quantity of copies of the telephone directories should be equal to that of 2004. Through the note dated November 8,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

2004, the Vice-President of Verizon insisted that he had not received a response within 30 business days and, therefore, tacit consent applied. In the official note 600-64540-2004 of November 18, 2004, the Office reiterated that the application of tacit consent was inappropriate. In official note SI-0726-11-04 of November 15, 2004, the Information Service Process Unit of ICE informed the General Manager of Verizon that the validity of the performance bond requested on June 30, 2004 had not been extended (official note 6000-35344-2044) and pointed out that the structure of the telephone directories contained violations of notes 6000-41046-2004 and 6000-52278-2004. During a visit to the THS industrial premises (November 12, 2004), ICE issued notarial records where it recorded the existence of copies of residential white pages of telephone directories that excluded the information of subscribers from Los Santos and the provinces. In official note S.1.0730-11-04, Verizon was informed of the breach of Clauses 3.1 and 3.4.1.3 of the Request for Public Tender and the second clause of the contract. In Article 10 of the meeting No. 5649 held on November 23, 2004, a definition was made to reject the attempt to unilaterally amend the agreed upon contractual conditions. On December 2, 2004, on a visit to the plaintiff's premises, ICE verified that THS, following the purchase orders delivered by Verizon, had made 103,000 copies of residential white pages of the Metropolitan Area containing unauthorized modifications to the printing and binding design. As a result of the breach of the agreed requirements, the Office initiated a contractual resolution procedure (official note 5225-69163-2004 of December 14, 2004) against Verizon, which ended with the termination of the contract (official note 6000-27733-2005 of SGT-2326-2005 dated June 1, 2005, ratified by official note 0150-36359-2005 of GG-680-2005 of ICE's General Management). By means of a note dated September 2, 2005, the general manager of Verizon informed THS that because ICE had disrespected the contractual rights and, distorting the reality of the facts, had initiated an administrative procedure to terminate the contract arising out of public tender 6378-T, he considered the contractual relationship resulting from the master contract terminated. In the arbitration award at 3:00 p.m. of December 4, 2015, issued within the arbitral proceedings established by ICE against Verizon LLC, the latter was ordered to pay various sums of money for having incurred in a breach of contract.

**II.- THS** sued ICE and the companies Verizon Co. and Verizon LLC (pages 1 to 92). It requested the Court declare the admissibility of the claim in all aspects thereof and the codefendants will be ordered to jointly and severally pay the damages and losses, as well as the personal and procedural costs of the proceedings. It that the Master Purchase Agreement be defined as a means of execution of the contract entered into by and between the GTE Consortium (now Verizon LLC and Verizon Co.) and **ICE**. In addition, it requested that it be established that the termination of the administrative contract would cancel the master contract, even if THS had no responsibility whatsoever in the facts generating the termination. ICE replied on pages 292 to 345. It opposed the preliminary defense of lack of jurisdiction and the exception of lack of standing in its two modalities. **Verizon** answered negatively and filed the preliminary defenses of lack of jurisdiction, the necessary joinder of defendants and the plea of lack of legal basis. At the hearing held on September 23, 2010, the preliminary defense of necessary joinder of defendants was accepted and Verizon LLC was included in the action. Also, by decision No. 1078-2009 the preliminary defense of competition was rejected. Subsequently, that decision was confirmed by the First Chamber by means of vote 00874-C-S1-2009 of 11:15 a.m. of August 25, 2009. The **Court** in judgment No. 66-2017-V of 8:00 a.m. of July 19, 2017, rejected the defenses of limitation, lack of legal standing as claimant and defendant and lack of procedural legal standing opposed by the co-defendants and partially accepted the lack of right filed by them. It accepted the exception of lack of standing as defendant opposed by ICE. It declared the claim partially admissible. It established the following: 1) the "Master Purchase Agreement" was a subcontracting between HTS [sic] and GTE (now Verizon LLC); 2) the termination of the administrative contract entered into by and between ICE and Verizon had led to the termination of the contract recently mentioned; 3) THS had no responsibility whatsoever in the events that caused the termination of the administrative contract and the "Master Purchase Agreement;" 5) the termination of the master contract had caused immediate and direct damages and losses to THS; 6) Verizon Co. and Verizon LLC were part of an economic group successor to GTE; 7) Verizon Co. was joint and severally liable for the obligations contracted by Verizon LLC and for the negative consequences caused to THS with the termination of the Master Purchase Agreement; 9) Clauses No. 24 and 28 of that contract mentioned were ineffective in respect of waiving Verizon's civil liability for contractual breach. It also ordered the co-defendants to pay the plaintiff the sums of: $2,582,156.00 for machinery investment; $2,860,696.00 for inventory increase; $8,806,872 for operating cash flow corresponding to the period 2004-2013; $7,237,068.00 for losses of the period 2004-2007; $983,825.00 for interest paid; $28,885,195.00 for damages from interruption of operations. It ordered adjustment for inflation and interest payments on the amounts indicated above. It imposed on the co-defendants the joint payment of personal and procedural costs in favor of the plaintiff company and, on THS, the payment of the personal and procedural costs in favor of ICE. Verizon LLC requested the incorporation and clarification of the vote No. 66-2017-V, which was rejected by means of decision No. 66- 2017-V-BIS of 8:00 a.m. of August 8, 2017. Dissenting, the co-defendants resorted to the appeal.

**Appeal for procedural reasons**

**III.-** The cassation appellants raise six grievances. As the remedies raised are identical in the number of violations and their content, they will be addressed together. In the first reason, the appellants argue lack of jurisdiction on the basis of the matter. They indicate that what is discussed in this case is a contract between private individuals, the termination of which is governed by an arbitration clause. Hence, administrative contentious jurisdiction does not have the authority to judge the merit. In their view, a declaration of lack of jurisdiction should be issued and the case should be transferred to the appropriate court. They claim a violation of Articles 7, 8 and 10 of the CPC. They add that during the trial the exception of lack of jurisdiction was established.

**IV.-** In the case under dispute, the plaintiff directs its claims to ICE and Verizon. It argues against the former, because it is the body with which Verizon signed the contract for the public tender 6378-T that grants the possibility of carrying out a subcontracting for the execution of what was agreed therein; and, against the latter, because it is with that company that the master contract was signed for the preparation, packaging and distribution of telephone directories in Costa Rica and Belize. Note, in the case of the plaintiff, both in the body and the co-defendant companies, they were responsible for the early termination of the master contract and the damage caused. From there, raise the claim before the contentious court. Verizon LLC and ICE filed the exception of lack of jurisdiction. The codefendant corporation argues that there is an arbitration clause and, the body argues that the settlement a matter between private individuals. The First Chamber of the Supreme Court of Justice, in decision No. 000874-C-S1-2009 of 11:15 a.m. of 2009, points out that the cases where discussion is around the financial liability of the Public Administration (including the Autonomous Institutions, such as ICE) are specific to the civil jurisdiction of finance (Article 97 of the Organic Law of the Judiciary-hereinafter LOPJ [*Ley Organica del Poder Judicial*]) and, therefore, the hearing of the matter corresponded to the contentious

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 7    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 419 of 490    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

administrative court. During the oral hearing, the co-defendants insisted on the lack of jurisdiction and the Court told them that the matter had precluded. The principle of preclusion is intended to order debate and to enable the process to progress in the manner determined by the legislator. Thus, as repeatedly indicated by this decision-making body, after said stage of proceeding of the case has passed, progress is made towards the next stage, without the possibility of going back to a surpassed stage. (Please refer to judgments 793 of 10:00 a.m. of November 27, 2008 and No. 615 of 9:00 a.m. of May 20, 2010). On the basis of the foregoing, this Chamber agrees with what the Court has stated regarding the fact that the issue of jurisdiction is a precluded aspect, where this Chamber has already determined which court will hear it. The argument that the Court must decline its jurisdiction to hear the matter because it had been established that the claims against ICE were not substantiated and, the body had no responsibility whatsoever for the impairment caused by the breach of the master contract, is not accepted. In accordance with rule 37 of the CPC applicable by extension in accordance with number 220 of the CPCA, the jurisdiction of a court is only lost when the process was decided, the sentence was executed, the person judging conducted the procedural act as entrusted (Article 36 of the CPC); it is a supplementary process that must be handled by the judge hearing the main process or when the person judging is declared unqualified by virtue of impediment, excuse or recusal. In the case under examination, none of the mentioned assumptions occurred. Therefore, the co-plaintiffs claim that lack of jurisdiction was declared and the hearing and ruling on the matter was delegated to another court on the ground that it was established that ICE was not liable for the damage caused to THS is not correct. That determination is not found in any of the cases of the civil procedural rules mentioned above, nor does it represent assuming jurisdiction over the matter (Article 4 of the Organic Law of the Judiciary). On the basis of the above, the claim must be rejected.

**Appeal for substantive reasons**

**V.-** On the second issue raised entitled *"Arbitral tribunal has jurisdiction for available property matters,"* the appellants hold that the Chamber of Judges delved into the analysis of a private contract containing an arbitration clause and, therefore, its hearing corresponds to the Arbitral Tribunal. In this way it fails to comply with the provisions of Article 66 of the General Law on Public Administration (hereinafter LGAP [*Ley General de la Administración Pública*]) and section number 67 paragraph f) of the Law on Alternative Dispute Resolution and Promotion of Social Peace (RAC [*Ley de Resolución Alterna de Conflictos y Promoción de la Paz Social*] in future references),

**VI.-** As stated by the appellants, the Court is deciding about a contract that it does not have jurisdiction over. However, this Division observes, in the case under examination, what was analyzed and resolved is the *"Contract for the Publishing of the Telephone Directory and Development and Implementation of Information Services between ICE and GTE"* (public note 6378-T), not the master contract as claimed by the cassation applicants. That is, what the Court established was the willful misconduct by the co-defendants, upon disregarding the repeated letters sent by ICE (Official notes 6000-41046-2004 of July 15, 2004, 6000-52278-2004 of September 14, 2004 and 600-64540-2004 of November 18, 2004), explicitly expressing its disagreement with the suggested amendments and, emphasizing that the structure and quantity of copies of the telephone directories for 2005 had to be in line with what was agreed (same as 2004). Said breach resulted in the termination of the administrative contract (official note 6000-27733-2005 of SGT-2326-2005 of June 1, 2005, ratified by the official note 0150-36359-2005 of GG-680-2005 of ICE's General Management) and, subsequently, the termination of the master contract, since it was about a *"subcontracting"* for the execution of the contract for the editing of telephone directories. As can be observed, this analysis does not imply the termination of the master contract but of the administrative contract entered into by and between ICE and the GTE Consortium (now Verizon), which is why this Chamber considers that the administrative and arbitral rules claimed to have been violated (Article 66 of the LGAP and rule 67 paragraph f) of the RAC Law) were not breached. There is also no incorrect assessment of the master contract which was provided as evidence. Consequently, the claim must be rejected.

**VII.-** In the **third** claim, what the appellants reject is the interpretation of the type of contract. They say that the fact that Master Purchase Agreement No. VIS-2001-21-IP was included within that type of contract is an error that leads to the incorrect application of the Administrative Contracting Law (hereinafter LCA) and also breaches the principle of intangibility of own acts (Constitutional Article 34) and section numbers 7, 9, 11 and 41 of the Political Constitution, rules 6 and 9 of the LGAP, Articles 58 and 62 of the LCA, numbers 69 and 149 of the LCA Regulation (RLCA [Reglamento de la LCA] in future references) RLCA and precepts 18, 19, 20, 21 and 22 of the Civil Code (hereinafter CC). They explain, according to the limitations of rules 22 and 22 bis of the LCA and the criteria of the Comptroller General of the Republic, that a subcontracting relationship is an accessory relationship of the main one, under a private nature, which is applied in public works construction or execution agreements. Hence, ICE's attempt to set it within that type exceeds the limitations provided for in the LCA and violates the principles of legality and intangibility of own acts. In another vein, they point out the error that, in their opinion, the Court commits by granting more legal life to the subcontract than to the main contract. They affirm that if the term of the public tender No. 6378-T was 96 months (2001 to 2008), it is not feasible for the maximum term of the master contract to be 168 months, as has been established in the proven fact No. 7 of the judgment appealed. This contradiction leads to the imposition of exorbitant, unreasonable, disproportionate, and illegal sums for compensation.

**VIII.-** Regarding the subcontracting, **the Court** states:"[...] *arises when one of the liable parties in a basically binary contractual relationship resorts to third parties to obtain goods or services that are necessary to fulfill primary contractual obligations. In this vein, there is a first-level relationship in the initial contract, in which one of the parties, at its own expense and risk and exclusively according to its will, chooses to enter into one or more second-level contractual relationships with sub-contractors, while these have the means for the contractor to meet its obligation burden.* (Emphasis added) *Consequently, we are in the presence of a main contract and a secondary contract entered into by one of the parties, for the execution of one of the services that is, in turn, the object of the main contract or at least contributes to its fulfilment. It is clear then that sub-contracting arises on the basis of the specialization of business organizations and the material impossibility for a contractor to have at its disposal all the goods and services necessary for the fulfilment of the main obligation. Consequent, subcontracting operates at different levels and while it is clear that the good operation of the sub-contract depends on the proper execution of the main procurement, it is not necessary to see it as a structural framework, given its instrumental nature with the contract initialized by the contractor.* (Emphasis added) *Thus, the destination of the secondary contract, that is, the one originating with the sub-contract, must not have a direct legal or factual consequence in the execution of the main contract; in other words, a breach by the subcontractor does not relieve the contractor*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

*from complying in a timely manner with the terms and conditions of the main contract.* [...]" As transcribed, the Chamber of Judges concluded that although the LCA originally established subcontracting for public works construction or execution contracts, the possibility of using this category in other types of administrative procurement had been opened up via jurisprudence. They determined that the contract with ICE allowed for the subcontracting of a company for the development, production, and distribution of the Telephone Directories, without this constituting an obligation for the entity in case of non- compliance, but without relieving GTE (today Verizon) of its responsibility for the final execution of the contract. They established the prevalence of administrative procurement (mechanism for the fulfillment of public purposes) over the master contract (type of private law). Regarding the end of the term of the subcontracting, they considered proven that the maximum term agreed for the production, packaging and distribution of telephone directories was 168 months (Clause 2.b of the master contract - Group of proven facts Recital V.I; paragraph b), sub-paragraph 7).

**IX.-** In essence, the cassation appellants disagree with the category of subcontracting granted to the Master Purchase Contract No. VIS-2001-21-IP and, with the compensation awarded to THS on the basis of that qualification. Prior to the analysis of the claim, reference should be made to the types of administrative contracts and subcontracting. The administrative contract is defined as the meeting of minds that is concluded between a public body (public administration) and a subject of private law or two public bodies. Subcontracting, on the other hand, is not in itself a form of participation in the contract; rather, it implies that the successful tenderer contracts with a third party totally unrelated to the contract, for execution of a part of what was agreed (Article 62 of the LCA and rule 69 of the RLCA). In this matter, according to the file, GTE (now Verizon) was awarded the public tender No. 6378-T. As a result, it signed with ICE the *"Contract for the Edition of the Telephone Directory and Development and Implementation of Information Services between ICE and GTE.* "In clause 2.13.1 of that agreement, Verizon was granted the possibility of subcontracting a company for the development, production and distribution of telephone directories up to 50% of the total contract. This is how Verizon signed the VIS- 2001-21-IP Master Purchase Agreement with THS. The foregoing makes it possible to understand that the master contract originates as a subcontracting of the administrative contract entered into by and between ICE and GTE (now Verizon), which is why this Chamber believes that the Court's interpretation of the type of subcontracting is correct.

**X.-** Having established the admissibility of the type of subcontracting, it is necessary to analyze whether or not the liability exclusions agreed in the master contract apply, in order to determine whether or not an incorrect assessment of the agreement was made (evidence alleged to be poorly appreciated). In everything of interest, Clause 28 of the master contract indicates that Verizon could terminate the agreement immediately at any time if the contract with ICE was terminated for any reason. In addition, it was established that it would not be responsible for the compensation of damages (losses, profits, expenses, investments, among others) as long as the termination did not harm or affect THS's rights and responsibilities with respect to previously produced directories or any other debts held between the parties. In the case under examination, when the termination of the master contract was communicated, THS had in stock at least 103,000 copies of the white pages of the telephone directories and had acquired debts with other entities to purchase the machinery necessary to comply with the development, production, and distribution of telephone directories. Those situations are in line with the above-mentioned cases of impediment which made it impossible to apply the liability exclusion provided for in the clause, and compensation is therefore appropriate.

**XI.-** Furthermore, in this filing, the appellants bring up other aspects of disconformity. First of all, they refer to the impediment to use of the type of subcontract in non-public works administrative contracts (Articles 58 and 62 of the LCA and section number 69 of the RLCA). They explain that the master contract signed between Verizon and THS is made for the procurement of supplies; therefore, it cannot be qualified as subcontracting. On this subject, it should be noted that the use of the type of subcontracting has been extended to other types of administrative contracts, in which, as in the case at hand, its use is established by means of meeting of minds of the contractors, through tender documents clause. That Court therefore considers that it is in the presence of a subcontracting.

Second, they claim the breach of the principle of intangibility of one's own acts (Constitutional Article 34). With regard to this issue, it should be borne in mind that the transgression alleged is given by the cancellation of the formal act establishing rights, without the prior declaration of the act as harmful. In the present case, the dispute is not a formal act establishing rights, but the termination of an administrative contract because of the "intentional" contractual breach by the co-defendants. Ergo, the alleged violation does not occur. Lastly, the appellants refute the term of 168 months granted to the subcontracting. In this regard, it must be indicated, that said term was granted by common agreement of the parties in clause 2.b of the Master Agreement No. VIS-2001-21-JP. It is therefore not true that it was the Chamber of Judges that established the duration of the subcontracting. As stated above, it is the understanding of this Chamber that Master Contract No. VIS-2001-21-JP was correctly appreciated. We agree with the Court that we are in the presence of a subcontracting, where one of its clauses defines the maximum term for the production, packaging, and distribution of telephone directories; and that its cause of termination is due to the "intentional" contractual breach by the co-defendants of the administrative contract arising out of the public tender No. 6378-T. Consequently, there is no transgression of the principle of intangibility of one's own acts and the rules invoked as ignored, therefore the claim is rejected.

**XII.-** In the **fourth** procedural defect, the petitioners allege the omission of the expert report provided by the plaintiff. They point out that the evidentiary element excludes the contract signed between THS and Radiográfica Costarricense S.A. (RACSA in future reference) on April 28, 2006. This omission results in a bias in the monetary income (gains) received by THS since that date and violates the principles of the International Financial Reporting Standards (hereinafter IFRS) and grants unjustified enrichment by granting THS overvalued sums for machinery investment, cash flows not received, realized losses from 2004 to 2007 and interruption of operations. They state that the mistake in the expert report occurs because the plaintiff, instead of asking Mr. Ramón Humberto Romero Rodríguez to examine the accounting books demonstrating his financial-accounting status, requests the corroboration of the study carried out by Mr. Tomás Evans Salazar, which, as indicated, is biased. They invoke the violation of section number 267 of the CoCo.

**XIII.-** With respect to the contract entered into by and between THS and RACSA, the **Court** in Recital V.XV.- of the contested judgment, indicated: *"V.XV.- On the Amounts settled [...] It is necessary to deduct from the indicated amount the sums that have been paid to the plaintiff by Radiográfica Costarricense S.A., for any contract for the preparation of telephone directories that has been executed after the contract breach by Verizon Information Services Costa Rica LLC.* [...] "In that same section, regarding the reports of Mr. Tomás Evans Salazar and Mr. Ramón Humberto Romero Rodríguez, it stated: *"4. The sums determined in the*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 7    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 421 of 490

TRANSLATION

documents mentioned, both of Evans Salazar and Romero Rodríguez, are based on the applicable technique, are coincidental and include the items of machinery, increase in inventories, operating cash flows according to the contract, realized losses, interest paid and impact for interruption of operations.

*[...] The defendant did not object or provide evidence that would undermine the methodology or the estimated dates for future value of the realized losses, the interest rates applied, projections, calculations, methodologies or conclusions obtained. Therefore, this Court has no inculpatory evidence that would allow questioning the scopes of the documents under analysis.* (Emphasis added) [...]"

**XIV.-** On this issue raised, the appellants allege the omission of the expert evidence. However, as stated in the previous Recital, the Court does consider that element of proof. This is evidenced from the statement of the Chamber of Judges regarding the fact that it is necessary to reduce the sums paid by RACSA to THS from the recognized amount for any contract for elaboration of telephone directories after the breach of contract with Verizon; as well as the indication of the lack of objection against the evidence or the submission of another element of proof to undermine the methodology used by Mr. Evans Salazar and Mr. Romero Rodríguez. Hence, although what the cassation applicants alleged is the omission of the expert report provided by THS (exclusion from the contract with RACSA and the accounting books), this Chamber should consider that what is being argued is the Court's assessment of that element of proof. Moreover, in the view of this Chamber, the appellants are seeking to re-enter the analysis of their opposition to the opinion, which was decided by the courts at the appropriate stage of the proceedings. Based on what has been stated above, the claim is unacceptable, so it will be rejected.

**XV.-** In the **fifth** judicial review, the appellants invoke the defense based on the statute of limitations. They allege the violation of paragraph e) of Article 984 of the CoCo, section number 155 of the Code of Civil Procedure (hereinafter CPC) and the principle of legal certainty. The cassation applicants hold that since the Master Contract is an agreement for the production and preparation of telephone directories, the limitation term provided for in Article 984 paragraph e) of the CoCo applies. From that point of view, if the notification of the term of the contractual relationship was made to THS on September 2, 2005, the period to file claim VI ended on September 2, 2006. However, the plaintiff filed the claim on December 15, 2008 (pages 1 to 93 of the electronic file) and reported the notification order on January 28, 2008; therefore, in light of the abovementioned rule, the statutory limitation period was exceeded. Nevertheless, the Court without cause and any indication whatsoever of the rule it is applying, is using a four-year limitation calculation and denies the defense.

**XVI.-** With regard to the defense based on the statute of limitations, the **Court** stated: " ***V.IV- On the motion to dismiss based on statute*** *of limitation opposed: a) In its dosing arguments, the representative of the co-defendant Verizon Communications Inc. invoked the application of Article 984 of the Commercial Code [...] In accordance with a reading of the claims, it is noted that the plaintiff requests the payment of damages and losses caused in connection with the contractual breach alleged to be willful by the codefendant companies and entity. On the basis of the foregoing, the Court considers that in the case at hand we are faced with a limitation period of 4 years. In this vein, we see that in a note dated September 2, 2005, the General Manager of Verizon Information Services- Costa Rica LLC informed the defendant that it was terminating the contractual relationship arising out of the respective master contract, and the claim was filed on December 15, 2008. On January 28, 2009, the claim was notified to the representative of Verizon Information Services Costa Rica LLC and on March 18, 2009, to the representative of Verizon Communications Inc. Consequently, this Court considers that it is appropriate to reject the defense opposed, since the claim was notified without having applied the four-year limitation. [...]"*

**XVII.-** In the case under examination, the thesis of the cassation appellants is that because the actions of the Master Contract corresponded to the production and preparation of the telephone directories agreed in the Master Contract, the application of the one-year limitation provided for in paragraph e) of the section number 984 of the CoCo, was appropriate. However, the Court differs from what was argued by the co-defendants. In its view, the plaintiff's claims were intended for the recognition of the damages and losses caused in connection with the willful contractual breach of the co-defendants and, therefore, the four-year term also provided for in the above-mentioned rule was applicable. In this regard, this Chamber affirms that the purpose of the Master Purchase Contract VIS-2001-21-IP was the preparation, packaging, and distribution of telephone directories in Costa Rica and Belize. Paragraph e) of Article 984 of the CoCo literally states: "[...]e) *Actions derived from wholesale and retail sales to other merchants or consumers directly.*" Therefore, the object of the agreement and the provisions of paragraph e) of the rule recently mentioned are not concurrent, as THS is not "selling" the telephone directories. Therefore, the application of the provisions of the abovementioned paragraph is inappropriate. Instead, the application of the four-year limitation period determined by the Chamber of Judges becomes applicable. What was stated by the co-defendants is unacceptable in terms of the fact that the Court does not indicate the rule applied for the determination of the four-year limitation period, since at the beginning of the recital where there is a decision on this subject, it is clearly stated that the content of Article 984 of the CoCo is being analyzed. From there, it can be easily inferred that what was decided is limited to that rule. The violation of section number 155 of the CPC and the principle of legal certainty is also observed, since the subject of the limitation period was resolved in section V.IV of the judgment under appeal and the valid and existing rules applicable to the case were observed. Therefore, this Chamber agrees with the provisions of the Court and proceeds to reject of the breach invoked.

**XVIII.-** In the **sixth** mistake, they allege indirect violation for undue assessment of the evidence. They indicate that the erroneous assessment of the powers granted by the Corporate Secretary of Verizon LLC and Verizon Co., Marianne Drost and the documents No. 6 and 15 of the plaintiff's evidence file (change of company name, merger and acceptance of rights and obligations of the tender 6378-T and the sub-contracting), makes the Court, on the basis of a phonetic and business name similarity, consider as demonstrated the existence of an economic interest group between the companies indicated above. On the other hand, they point out that the transformation of the company GTE to Verizon LLC, Verizon Co. and the intentional or abusive acts by the co-defendants were never proven, so the rule of financial liability of the legal entities is not applicable. They refer to the breach of section number 82 paragraph 4) of the CPCA.

**XIX.-** Regarding the transformation of the company GTE to Verizon LLC, Verizon Co., the **Court** indicated: *"V.I.- In particular on the facts proven: [...] a) Proven facts with respect to the legal relations between ICE and co-defendant companies: [...] 11. That the company GTE Information Service was renamed Verizon Information Services Inc, the company GTE Directories Corporation was renamed Verizon Directories Corp and General Telephone Directory Company C por A was renamed Verizon*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 7    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 422 of 490    RECEIVED NYSCEF: 10/26/2021

TRANSLATION

Information Service Costa Rica, LLC. (Document 6, corresponding to pages 3045 to 3022 of the plaintiff's evidence file) 12. That legal representatives of Verizon Information Services, Inc, Verizon Directories Corp, and Verizon Information Services-Costa Rica, LLC, accepted the rights and obligations in connection with the tender 6378-T and the contract derived therefrom" (pages 3035, 3036 and 3037 of the administrative files, document No. 15 of the plaintiff's evidence file). 13. That VERIZON Information Services-Costa Rica, LLC, sent to the Department of Supplies of ICE a note dated May 16, 2002, in which it states that "General Telephone Directory Company C por A" changed its name to Verizon Information Services Costa Rica, LLC, and requests to consider officially communicated the change of the corporate name of the companies that form the GTE Consortium, (pages 3035, 3036 and 3037 of the administrative files, document No. 15 of the plaintiff's evidence file). 14. That GTE merged with the American firm Bell Atlantic and as a result of the merger, the VERIZON GROUP was created, replacing the corporate name of GTE with that of VERIZON GROUP (pages 3035, 3036 and 3037 of the administrative fie, document No. 15 of the plaintiff's evidence file). " Having proven the merger of GTE with Bell Atlantic and the renaming of Verizon Group, as well as the merger of the corporation, the Chamber of Judges, established: "VIII. - **Argument related to the lack of joint and several liability of the co-defendant company with the joint and several guarantee of GTE Corporation**: [...] it is stated for the record in the file that, by legal brief dated August 28, 2002, Verizon Information Services Costa Rica, LLC, expressed the following to ICE: "**11.- MAINTAINING ALL OBLIGATIONS AND RIGHTS.** As required in the note of June 18, 2002, I am also attaching to this document an AFFIDAVIT on Maintaining Obligations and Rights, signed by the legal representatives of Verizon Information Services, Inc, Verizon Directorías Corp, and Verizon Information Services-Costa Rica, LLC, in which they accept the rights and obligations arising out of the tender 6378-T and the contract derived therefrom" (emphasis added). In addition, the Twenty-fifth clause of the contract between ICE and the GTE Consortium stipulated the following: "In the event that by modification of the law governing ICE, this entity changes its name or that, for its part, GTE changes its name as a result of merging or partnering with another company, in both cases this Contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented herein" In accordance with the above, in addition to what has been expressly established, there was an express statement by the co-defendant regarding the maintenance of the obligations originally undertaken by the GTE group. [..] (Emphasis added) 'As for the powers granted by Mrs. Marianne Drost, in her capacity as Corporate Secretary of Verizon LLC and Verizon Co. (evidence on pages 1183 to 1188 of the court record), it said: **b) Proven facts of relevance for the decision in the present case relating to the link between the co-defendant companies and the plaintiff:** [...] 13. That Ms. MARIANNE DROST, a U.S. citizen, granted powers and acted in her capacity as Corporate Secretary of the firms VERIZON COMMUNICATIONS INC., and VERIZON INFORMATION SERVICES-COSTA RICA, LLC. (Pages 1183 to 1188 of the court record)."

**XX.-** Prior to determining whether or not the assessment of documents No. 6 and 15 and the powers granted by Ms. Marianne Drost as Corporate Secretary of the firms Verizon Communications Inc. and Verizon Information Services-Costa Rica, LLCC (evidence provided by THS) was correctly carried out, it is relevant to define what is an economic interest group (hereinafter GIE [grupo de interés económico]). In commercial matters, the GIE is a group of individuals or entities of an original legal nature, other than the company and the association, with related commercial and financial interests. Its purpose is to facilitate the exercise of the economic activity of its members, by the fact of putting together certain aspects of that activity. The General Superintendence of Financial Institutions (hereinafter Sugef [Superintendencia General de Entidades Financieras]) in Article No. 8 of the agreement SUGEF 5-04 on 'Regulation on credit limits to individuals and economic interest groups," approved by the National Council for the Supervision of the Financial System through Article 15 of the minutes of the Meeting No. 480-2004, held on November 4, 2004 (published in the Official Journal La Gaceta No. 227 of November 19, 2004), defines the GIE as: "Formation of economic interest groups. An economic interest group shall be formed by the group of two or more having significant financial, administrative, or economic relations with each other, identified in accordance with Articles 4, 5, 6 and 7 of that regulatory body, as well as by persons through whom administrative and economic relations are constituted in accordance with paragraph a) of Article 6 and paragraph b) of Article 7 of this regulation. Persons who are part of an economic interest group may or may not be linked to the entity.

For persons linked, in addition to the provisions of this Regulation, the provisions of the "Regulation on the Group Linked to the Entity" will govern. Precepts 4, 5, 6 and 7 of that regulation determine the parameters of identification of the groups and significant financial, administrative, and economic relationships that must exist between those who form that GIE.

**XXI.-** In the case under examination, GTE and the American firm, Bell Atlantic, merged to increase their assets. This unification led to a change in the company name from GTE Information Service to Verizon Information Services Inc; GTE Directories Corporation to Verizon Directories Corp.; and General Telephone Directory Company C to Verizon Information Service Costa Rica, LLC., which cannot be seen as a simple name change or phonetic similarity, as the companies involved benefited from related factors such as: real estate, buildings and others. Thus, since there is an economic, administrative, and financial relationship of both companies; this Chamber considers that we are in the presence of a GIE. If we add to this the fact that ICE was aware that a situation of this type (merger or association) could occur, and had established that the agreement should be maintained "unchanged and in force" under the new names (pages 3022 to 3045 of the administrative file), upon the aforementioned merger, the legal representatives of Verizon as a GIE assumed the rights and obligations contracted in the tender 6378-T and the Contract for Editing the Telephone Directory and Development and Implementation of Information Services between ICE and GTE. Ergo, the undue assessment of documents No. 6 and 15 claimed by the co-defendants is not granted. As for the special legal powers granted by Ms. Marianne Drost in her capacity as Corporate Secretary of Verizon LLC and Verizon Co., having seen the court record (pages 1183 and 1188); it should be noted that in deed No. 1 at 3:00 p.m. of March 25, 2009, granted before the notary Fernando Vargas Winiker in the City of Basking Ridge, New Jersey; Ms. Drost's powers to grant the above-mentioned powers and their validity are accredited. Hence, the alleged incorrect assessment is not admitted. As from all the foregoing, it is appropriate to reject the reason.

**XXII.-** On the merits of the foregoing, it is necessary to reject the remedies raised, with their costs being borne by those who filed it (paragraph 3) of rule 150 of the CPCA).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 7                                                                      RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 423 of 490

TRANSLATION

**THEREFORE**

The remedies filed, with their costs borne by the claimants, are inadmissible.

|  |  |
|---|---|
| | **Luis Guillermo Rivas Loáiciga** |
| **Román Solís Zelaya** | |
| | **Rocío Rojas Morales** |
| **William Molinari Vílchez** | **José Rodolfo León Díaz** |

MCAMPOSS

**This is a true copy of the original-Taken from Nexus PJ el <u>19-08-2020 11:11:50</u>**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



# <u>Certificate of Accuracy</u>

Tuesday, 26 October 2021

To whom it may concern,

We Trustpoint.One, hereby certify to the best of our knowledge and belief that the foregoing document described as "The Decision of the First Chamber of the Court of Justice dated June 25, 2020" is a true and accurate translation of the original.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

If there is any additional information we can provide you, please do not hesitate to contact us.

Yours sincerely,

*Elizabeth Wozniak*

Elizabeth Wozniak
Project Manager
Trustpoint.One

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Sala Primera de la Corte**

Resolución Nº 02017 - 2020

**Fecha de la Resolución:** 25 de Junio del 2020
**Expediente:** 08-001505-1027-CA
**Redactado por:** Román Solís Zelaya
**Analizado por:** SALA PRIMERA

# Texto de la Resolución



*080015051027CA*

**EXP. 08-001505-1027-CA**
**RES. 002017-F-S1-2020**
**SALA PRIMERA DE LA CORTE SUPREMA DE JUSTICIA.** San José, a las nueve horas del veinticinco de junio de dos mil veinte.
En el proceso de conocimiento establecido por **TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA**, representado su presidente con facultades de apoderado generalísimo sin límite de suma, Álvaro Trejos Fonseca, cédula de identidad no. 1-0390-0895, bínubo, máster en ciencias; contra el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD**, **VERIZON COMMUNICATIONS INC.** y **VERIZON INFORMATION SERVICES COSTA RICA LLC.** Figuran además, como apoderados especiales judiciales, de la actora, los licenciados Eduardo Sancho González, cédula de identidad no. 1-380-073, Andrés Meza Villalobos, cédula de identidad no. 2-638-788, Diego Baudrit Carrillo, cédula de identidad no. 1-323-212 y Luis Gerardo Villanueva Monge, cédula de identidad no. 3-221-204, vecino de Cartago; por el Instituto co-demandado, la licenciada Ana Victoria Zapata Calvo, cédula de identidad no. 1-892-491, divorciada y los licenciados Carlos Cerdas Delgado, cédula de identidad no. 1-896-201, Juan Pablo Hernández Cortés, cédula de identidad no. 1-849-120, ambos de domicilio no indicado; por Verizon Comunication Incorporated, la licenciada Andrea Hulbert Volio, cédula de identidad no. 9-100-121 y los licenciados, Alexander Salazar Solórzano, cédula de identidad no. 1-835-398, Juan Carlos Pizarro Corrales, cédula de identidad no. 1-825-376, Rodrigo Alberto Pérez González, cédula de identidad no. 4-211-250, de estado civil y domicilio no indicados y Marvin Céspedes Méndez, cédula de identidad no. 1-531-965; y, por Verizon Information Services Costa Rica LLC, el licenciado Gino Capella Molina, cédula de identidad no. 1-569-226. Las personas físicas son mayores de edad y, con las salvedades hechas, casados, abogados y vecinos de San José. Las sociedades co-demandadas formulan recurso de casación contra la sentencia no. 66-2017-V, emitida por el Tribunal Contencioso Administrativo, Sección Quinta, a las 8 horas del 19 de julio de 2017.
**Redacta el magistrado Solís Zelaya**

**CONSIDERANDO**

**I.-** A la luz de los hechos tenidos por probados, el 10 de marzo de 2000, el Instituto Costarricense de Electricidad (en futuras referencias ICE) y el Grupo GTE (en adelante GTE) suscribieron el "*Contrato para la Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE*" (contratación administrativa Licitación Pública 6378-T). En dicho convenio se acordó subcontratar hasta el 50% del desarrollo, producción y distribución de las guías telefónicas, previa autorización escrita del ICE (cláusula 2.13.1). Asimismo, se dispuso, la totalidad de las etapas de ejecución del contrato se realizarían en Costa Rica y, en caso de cambio de nombre por fusión o asociación con otra empresa, el contrato permanecería invariable y vigente entre las partes, bajo las nuevas denominaciones legales de las entidades jurídicas. Derivado del contrato supra indicado, el 28 de febrero de 2002, Verizon y Trejos Hermanos Sucesores S.A. (en adelante THS) suscribieron el Contrato Maestro de Compra VIS-2001-21-IP para la elaboración, empaque y distribución de las guías telefónicas en Costa Rica y Belice, por un plazo de 168 meses (regulado por el Código Civil -en adelante CC- y el Código de Comercio -en futuras referencias CoCo). Como requisito de efectividad, se estableció la sujeción del Contrato Maestro a la ejecución del contrato celebrado con motivo de la licitación 6378-T (cláusula 2.b). En cuanto a su terminación, se dispuso que el comprador pudiera finalizar el contrato cuando no pudiera acordar cualquier revisión de precio o reforma. Para ello, debía notificar por escrito al vendedor con al menos 90 días de anticipación. También podía dar por terminada la relación contractual de manera inmediata, si durante el plazo del contrato, el convenio suscrito entre el ICE y Verizon era terminado por cualquier razón (cláusula 28). En otro orden de ideas, se le pidió a THS modernizar sus equipos para enfrentar los cambios tecnológicos y requerimiento de los contratantes. El 16 de mayo de 2002, GTE informó a la Dirección de Proveeduría del ICE que General Telephone Directory Company C por A cambió de nombre a Verizon Information Service Costa Rica, LLC (sucesivamente Verizon LLC) y se pidió tener oficialmente comunicado el cambio de razón social de las

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

por Grupo Verizon (en lo sucesivo Verizon). En el año 2004 Verizon le propuso al ICE hacer unos ajustes al contrato. El 13 de mayo de ese año, planteó a la Subgerencia de Telecomunicaciones (en adelante Subgerencia) la revisión de las guías telefónicas. Mediante oficio 6000-41046-2004 del 15 de julio de 2004, la Subgerencia le indicó a Verizon que las guías telefónicas del año 2005 debían mantener la misma estructura y cantidad de ejemplares del 2004. El 14 de octubre de ese año Verizon y THS suscribieron el *"Cronograma de Producción, Guía Provincias 2005"*, señalando el 15 de diciembre como fecha límite para modificar el número de páginas y la cantidad de libros. El vicepresidente de Verizon, mediante nota de data 8 de setiembre de 2004 informó al Departamento de Proveeduría del ICE (recibida el 16 de diciembre de 2004) que al no haber recibido respuesta a la nota de fecha 13 de mayo de 2004, tendría por aplicado el silencio positivo. En oficio 6000-52278-2004 del 14 de setiembre de 2004, la Subgerencia rechazó la aplicación del silencio positivo. Indicó, la petición había sido atendida mediante oficio 6000-41046-2004 del 15 de julio de 2004 y reiteró que la estructura y cantidad de los ejemplares de las guías telefónicas debía ser igual a la del año 2004. A través de la nota de data 8 de noviembre de 2004, el vicepresidente de Verizon insistió en que no había tenido respuesta dentro del plazo de 30 días hábiles y, por tanto, aplicaba el silencio positivo. En oficio 600-64540-2004 del 18 de noviembre de 2004 la Subgerencia reiteró que la aplicación del silencio positivo era improcedente. En oficio S1-0726-11-04 del 15 de noviembre de 2004, la Jefatura del Proceso de Servicios de Información del ICE informó al gerente general de Verizon que la vigencia de la garantía de cumplimiento pedida el 30 de junio de 2004 no se había ampliado (oficio 6000-35344-2044) y destacó, la estructura de las guías telefónicas presentaba incumplimientos en desacato de notas 6000-41046-2004 y 6000-52278-2004. Durante una visita al local industrial de THS (12 de noviembre de 2004), el ICE levantó unas actas notariales donde hizo constar la existencia de ejemplares de las páginas blancas residenciales de las guías telefónicas que excluían la información de los abonados de Los Santos y las provincias. En oficio S.I.0730-11-04 se le comunicó a Verizon el incumplimiento de las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación Pública y la segunda del contrato. En el artículo 10 de la sesión no. 5649 efectuada de 23 de noviembre de 2004, se acordó rechazar el intento de modificación unilateral de las condiciones contractuales pactadas. El 2 de diciembre de 2004, en visita realizada a las instalaciones de la actora, el ICE comprobó que THS, siguiendo las órdenes de compra entregadas por Verizon, había confeccionado 103.000 ejemplares de páginas blancas residenciales del Área Metropolitana que contenían modificaciones en el diseño de impresión y encuadernación no autorizadas. Como consecuencia de la violación de los requerimientos pactados, la Subgerencia inició un procedimiento de resolución contractual (oficio 5225-69163-2004 del 14 de diciembre de 2004) en contra de Verizon, el cual finalizó con la rescisión del contrato (oficio 6000-27733-2005 de SGT-2326-2005 del 1 de junio de 2005, ratificado por el oficio 0150-36359-2005 de GG-680-2005 de la Gerencia General del ICE). Mediante nota de data 2 de setiembre de 2005, el gerente general de Verizon informa a THS  que debido a que el ICE había irrespetado los derechos contractuales y, distorsionando la realidad de los hechos había iniciado un procedimiento administrativo para la resolución del contrato originado de licitación pública 6378-T, daba por finalizada la relación contractual originada en el contrato maestro. En laudo arbitral de las 15 horas del 4 de diciembre de 2015, dictada dentro del proceso arbitral establecido por el ICE contra Verizon LLC, se condenó a la última al pago de diversas sumas de dinero por haber incurrido en incumplimiento contractual.

**II.- THS** demandó al ICE y a las empresas Verizon Co. y Verizon LLC (folios 1 a 92). Solicitó, se declarara con lugar la demanda en todos sus extremos y se condenara a las co-accionadas al pago solidario de los daños y perjuicios, así como las costas personales y procesales del proceso. Pidió, se calificara al Contrato Maestro de Compra como un medio de ejecución del contrato celebrado entre el Consorcio GTE (hoy Verizon LLC y Verizon Co.) y el ICE. Además, se estableciera, la extinción del contrato administrativo suprimía el contrato maestro, aunque THS no tuviera responsabilidad alguna en los hechos generadores de la rescisión.   El **ICE** contestó a folios 292 a 345. Opuso, la defensa previa de falta de competencia y la excepción de falta de legitimación en sus dos modalidades. **Verizon**, contestó negativamente e interpuso las defensas previas de falta de competencia, litis consorcio pasivo necesario y la excepción de falta de derecho. En la audiencia celebrada el 23 de setiembre de 2010, se acogió la defensa previa de litis consorcio pasivo necesario y se integró a la litis a Verizon LLC. Asimismo, mediante resolución no. 1078-2009 se rechazó la defensa previa de competencia. Posteriormente, esa decisión fue confirmada por la Sala Primera mediante voto 00874-C-S1-2009 de las 11 horas 15 minutos del 25 de agosto de 2009. El **Tribunal** en sentencia no. 66-2017-V de las 8 horas del 19 de julio de 2017, rechazó las defensas de prescripción, falta de legitimación activa y pasiva y falta de legitimación ad procesum opuestas por las co-demandadas y acogió parcialmente la de falta de derecho interpuesta por las mismas. Acogió la excepción de falta de legitimación pasiva opuesta por el ICE. Declaró parcialmente con lugar la demanda. Estableció: 1) el "Contrato Maestro de Compra" era una subcontratación entre HTS y GTE (hoy Verizon LLC); 2) la extinción del contrato administrativo celebrado entre el ICE y Verizon, había provocado la extinción del contrato de reciente cita; 3) THS no tenía responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo y el "Contrato Maestro de Compra"; 5) la extinción del contrato maestro había causado los daños y perjuicios inmediatos y directos a THS; 6) Verizon Co. y Verizon LLC integraban un grupo económico sucesor a GTE; 7) Verizon Co. respondía solidariamente tanto por las obligaciones contraídas por Verizon LLC, como por consecuencias negativas ocasionadas a THS con la extinción del Contrato Maestro de Compra; 9) las cláusulas nos. 24 y 28 del citado contrato eran ineficaces respecto de la exoneración de responsabilidad civil de Verizon por incumplimiento contractual. Asimismo, condenó a las co-demandadas a pagarle a la actora las sumas de: $2.582.156,00 por inversión de maquinaria; $2.860.696,00 por incremento en inventarios; $8.806.872 por concepto de flujo de caja operativos correspondientes al periodo 2004-2013; $7.237.068,00 por pérdidas del periodo 2004-2007; $983.825,00 por intereses pagados; y, $28.885.195,00 por daños por interrupción de operaciones. Ordenó la indexación y el pago de intereses sobre los montos supra indicados. Impuso a las co-demandadas al pago solidario de las costas personales y procesales a favor de la sociedad actora y, a THS al pago de las costas personales y procesales a favor del ICE. Verizon LLC solicitó adición y aclaración del voto no. 66-2017-V, la cual se rechazó mediante resolución no. 66-2017-V-BIS de las 8 horas del 8 de agosto de 2017. Inconformes, las co-demandadas acuden a casación.

**Recurso por motivos procesales**

**III.-** Las casacionistas formulan **seis** agravios. En virtud de que los recursos formulados son idénticos en el número de quebrantos y su contenido, se abordarán de manera conjunta. En el **primer** motivo, las recurrentes arguyen incompetencia en razón de la materia. Indican, lo debatido en este asunto es una contratación entre particulares, cuya terminación está regulada por una

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

criterio, lo procedente es la declaración de incompetencia y el traslado del caso al órgano jurisdiccional competente. Invoca quebranto de los artículos 7, 8 y 10 del CPC. Agregan, durante el juicio estableció la excepción de falta de competencia.

**IV.-** En el sub lite, la parte actora dirige sus pretensiones hacia el ICE y Verizon. Contra el <u>primero</u>, por ser el ente con el que Verizon suscribe el contrato por la licitación pública 6378-T que otorga la posibilidad de realizar una subcontratación para la ejecución de lo ahí pactado; y, contra el segundo, porque es con dicha empresa que se suscribe el contrato maestro para la elaboración, empaque y distribución de las guías telefónicas en Costa Rica y Belice. Denótese, para la accionante, tanto en el ente como las empresas co-demandadas, eran responsables de la terminación anticipada del contrato maestro y el daño producido. De ahí, plantee la demanda ante la sede contenciosa. <u>Verizon LLC</u> y el <u>ICE</u> interpusieron la excepción de incompetencia. La corporación co-demandada arguye la existencia de una cláusula arbitral y, el ente que lo dirimido es un asunto entre privados. La Sala Primera de la Corte Suprema de Justicia, en resolución no. 000874-C-S1-2009 de las 11 horas 15 minutos de 2009, señala que los casos donde se discute sobre la responsabilidad patrimonial de la Administración Pública (incluidas las Instituciones Autónomas, como el ICE), son propios de la jurisdicción civil de hacienda (artículo 97 de la Ley Orgánica del Poder Judicial- en adelante LOPJ) y, por tanto, el conocimiento del asunto correspondía a la sede contenciosa administrativa. Durante la audiencia oral las co-accionadas insisten sobre la incompetencia y el Tribunal les indica que el tema esta precluido. El principio de preclusión pretende ordenar el debate y posibilitar el avance del proceso en la forma determinada por el legislador. Así, según lo ha indicado de manera reiterada este órgano decisor, transcurrido dicho estadio procesal de la lite, se avanza hacia la etapa siguiente, sin que exista la posibilidad de retroceder hacia una etapa superada. (Consúltense las sentencias 793 de 10 horas del 27 de noviembre de 2008 y no. 615 de las 9 horas del 20 de mayo de 2010). Con base en lo expuesto, coincide esta Sala con lo indicado por el Tribunal, respecto a que el tema de la competencia es un aspecto precluido, en donde esta Sala ya ha determinado cuál es la sede a la que corresponde su conocimiento. La tesis de que el Tribunal debe declinar su competencia para conocer del asunto por haberse establecido que las pretensiones contra el ICE no eran fundamentadas y, el ente no tenía responsabilidad alguna por el menoscabo causado con el rompimiento del contrato maestro, no es de recibo. De conformidad con el canon 37 del CPC de aplicación supletoria por remisión del ordinal 220 del CPCA, la competencia de un órgano jurisdiccional se pierde únicamente cuando el proceso fue decidido, la sentencia ejecutada, la persona juzgadora realizó el acto procesal que se le encomendó (artículo 36 del CPC), es un proceso accesorio que debe pasar al juzgador que conoce el proceso principal o cuando la persona juzgadora es declarada inhábil en virtud de impedimento, excusa o recusación. En el caso de examen, ninguno de los supuestos de reciente cita se produce. Por tanto, resulta improcedente lo pretendido por las co-demandantes en cuanto a que se declare la incompetencia y se delegue el conocimiento y resolución del asunto a otro órgano jurisdiccional por haberse establecido que el ICE no era responsable del daño producido a THS. Esa determinación no se configura en ninguno de los supuestos de la normativa procesal civil supra indicada, ni representa una avocación del asunto (artículo 4 de la Ley Orgánica del Poder Judicial). Con base en lo expuesto, deberá rechazarse el cargo.

**Recurso por motivos sustantivos**

**V.-** En el segundo embate titulado "***Tribunal arbitral es competente para materia patrimonial disponible"***, los recurrentes sostienen, la Cámara de Jueces, ingresa al análisis de un contrato de carácter privado que contiene una cláusula arbitral y, por ende, su conocimiento corresponde al Tribunal Arbitral. De esa forma incumple con lo preceptuado en el artículo 66 de la Ley General de la Administración Pública (en lo sucesivo LGAP) y el numeral 67 incisos f) de la Ley de Resolución Alterna de Conflictos y Promoción de la Paz Social (en futuras referencias RAC),

**VI.-** Según lo manifestado por las recurrentes, el Tribunal resuelve sobre un contrato cuyo conocimiento le está vedado. Sin embargo, observa esta Cámara, en el caso de examen, lo analizado y resuelto es el "*Contrato para la Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE*" (licitación pública 6378-T), no el contrato maestro como lo afirman las casacionistas. Véase, lo establecido por el Tribunal fue la actuación dolosa por parte de las co-accionadas, al desatender las repetidas misivas enviadas por el ICE (Oficios 6000-41046-2004 del 15 de julio de 2004, 6000-52278-2004 del 14 de setiembre de 2004 y 600-64540-2004 del 18 de noviembre de 2004), manifestando explícitamente su desacuerdo con las modificaciones sugeridas y, enfatizando, la estructura y cantidad de ejemplares de las guías telefónicas para el 2005 debía ajustarse a lo pactado (igual al 2004). Dicho incumplimiento generó **la recisión del contrato administrativo** (oficio 6000-27733-2005 de SGT-2326-2005 del 1 de junio de 2005, ratificado por el oficio 0150-36359-2005 de GG-680-2005 de la Gerencia General del ICE) y, subsecuentemente, la terminación del **contrato maestro**, por tratarse de **una *"subcontratación"* para la ejecución del contrato para la edición de las guías telefónicas**. Según puede observarse, dicho análisis no implica la resolución del contrato maestro sino del contrato administrativo celebrado entre el ICE y Consorcio GTE (hoy Verizon), razón por la cual, estima esta Sala, la normativa administrativa y arbitral que se endilga violentada (artículo 66 de la LGAP y canon 67 inciso f) de la Ley RAC) no fue quebranta. Tampoco se da la incorrecta apreciación del contrato maestro al fuera aportado como prueba. En consecuencia, deberá rechazarse el cargo.

**VII.-** En el **tercer** cargo, lo reprochado por las recurrentes es la interpretación de la figura de la contratación. Dicen, el haberse incluido el Contrato Maestro de Compra no. VIS-2001-21-IP dentro de ese tipo de figura es un error que conlleva la incorrecta aplicación de la Ley de Contratación Administrativa (sucesivamente LCA) y quebranta, además, el principio de intangibilidad de los actos propios (artículo 34 constitucional) y los numerales 7, 9, 11 y 41 de la Constitución Política, los cánones 6 y 9 de la LGAP, los artículos 58 y 62 de la LCA, los ordinales 69 y 149 del Reglamento de la LCA (en futuras referencias RLCA) RLCA y los preceptos 18, 19, 20, 21 y 22 del Código Civil (en lo sucesivo CC). Explican, según las limitaciones de las normas 22 y 22 bis de la LCA y el criterio de la Contraloría General de la República, la subcontratación es una relación accesoria de la principal, revestida de carácter privado que procede en convenios de ejecución o construcción de obra pública. De ahí, el intento del ICE por configurarlo dentro esa figura excede las limitaciones previstas en la LCA y violenta los principios de legalidad e intangibilidad de los actos propios. En otro orden de ideas, resaltan el error que a su juicio comete el Tribunal al otorgar mayor vida jurídica al subcontrato que al contrato principal. Exponen, el plazo de la licitación pública no. 6378-T era de 96 meses (2001 al 2008), no es factible que el plazo máximo del contrato maestro sea de 168 meses como se tiene acreditado en el hecho probado no. 7 de la sentencia impugnada. Esa

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

indemnización.

**VIII.-** Respecto a la figura de la subcontratación, el **Tribunal** indica: "[…] *surge cuando uno de los obligados en una relación contractual básicamente binaria, acude a terceros para obtener bienes o servicios que resultan necesarios para cumplir las obligaciones contractuales primarias. En este orden de ideas, existe una relación de primer nivel en el contrato inicial, siendo así que una de las partes, por su cuenta y riesgo y de manera exclusiva según su voluntad, acude a entablar una o varias relaciones contractuales de segundo nivel con sub contratistas, en tanto que éstos poseen los medios para que el contratista cumpla su carga obligacional.* (El subrayado no corresponde al original) *Consecuentemente, estamos en presencia de un contrato principal y un contrato secundario suscrito por una de las partes, para la realización de alguna de las prestaciones que son, a su vez, objeto del contrato principal o que contribuyen al menos al cumplimiento. Es evidente entonces que la sub contratación nace con motivo de la especialización de las organizaciones empresariales y la imposibilidad material que un contratista tenga a su alcance todos los bienes y servicios necesarios para el cumplimiento de la obligación principal. Consecuentemente, la sub contratación opera en diferentes niveles o si bien, resulta indudable que de la buena operación de la sub contratación depende la debida ejecución de la contratación principal, no es dable verla como un entramado, dada la naturaleza instrumental de aquella para con el contrato rubricado por la contratista.* (Lo destacado es suplido) *Así el destino del contrato secundario o sea el originado con la sub contratación no debe tener una consecuencia jurídica o fáctica directa en la ejecución del contrato principal, es decir, el incumplimiento del sub contratista no releva al contratista de cumplir en tiempo y forma los términos y condiciones del contrato principal.* […]" Según lo trascrito, la Cámara de Juzgadores concluyó, aunque la LCA originalmente preveía la subcontratación para los contratos de ejecución o construcción de obra pública, vía jurisprudencial se había abierto la posibilidad de utilizar esta figura en otros tipos de contratación administrativa. Determinaron que el contrato con el ICE permitía subcontratar a una empresa para el desarrollo, producción y distribución de las Guías Telefónicas, sin que ello constituyera una obligación para el ente en caso de incumplimiento, pero sin relevarse al GTE (hoy Verizon) de su responsabilidad por la ejecución total del contrato. Establecieron la prevalencia de la contratación administrativa (mecanismo para el cumplimiento de los fines públicos) frente al contrato maestro (figura de derecho privado). Tocante al término del plazo de la subcontratación, tuvieron por acreditado que el plazo máximo pactado para la producción, empaque y distribución de los directorios telefónicos fue de 168 meses (cláusula 2.b del contrato maestro – Elenco de hechos probados Considerando V.I; inciso b), subinciso 7).

**IX.-** En lo medular, las casacionistas discrepan de la categoría de subcontratación que se otorga al Contrato Maestro de Compra no. VIS-2001-21-IP y, de la indemnización que se concede a THS a partir de dicha calificación. Previo al análisis del cargo, conviene hacer referencia de las figuras del contrato administrativo y la subcontratación. Se define al contrato administrativo el acuerdo de voluntades que se celebra entre un ente público (administración pública) y un sujeto de derecho privado; o dos entes públicos. La subcontratación, por su parte, no es en sí misma una forma de participación en el contrato, sino que implica que el adjudicatario del concurso acuerda con un tercero totalmente ajeno a la contratación, la realización de una parte de lo pactado (artículo 62 de la LCA y el canon 69 del RLCA). En este asunto, según consta en autos, GTE (hoy Verizon) resultó adjudicataria de la licitación pública no. 6378-T. De esta manera, suscribió con el ICE el *"Contrato para la Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE."* En la cláusula 2.13.1 de dicho convenio, se otorgó a Verizon la posibilidad de subcontratar a una empresa para la realización del desarrollo, producción y distribución de las guías telefónicas hasta en un 50% del total del contrato. Es así como Verizon suscribe con THS el Contrato Maestro de Compra VIS-2001-21-IP. Lo expuesto, permite entrever, el contrato maestro se origina como una subcontratación del contrato administrativo celebrado entre el ICE y GTE (hoy Verizon), razón por la cual, estima esta Sala, la interpretación realizada por el Tribunal respecto a la figura de subcontratación es correcta.

**X.-** Establecida la procedencia de la figura de la subcontratación, deviene analizar si aplican o no los eximentes de responsabilidad acordados en el contrato maestro, para determinar si se hizo o no la incorrecta apreciación del convenio (prueba que se alega mal apreciada). En lo de interés, la cláusula 28 del contrato maestro indica que Verizon podía terminar el convenio de manera inmediata en cualquier momento, si el contrato con el ICE era terminado por cualquier razón. Además, se establecía, no sería responsable de la compensación por los daños (pérdidas, ganancias, gastos, inversiones, entre otros) siempre que la terminación no perjudicara o afectara los derechos y responsabilidades de THS con respecto a los directorios previamente producidos o cualquier otra deuda que tuvieran entre las partes. En el caso de examen, cuando se comunicó la terminación del contrato maestro, THS tenía en existencia al menos 103.000 ejemplares de las páginas blancas de las guías telefónicas y había adquirido deudas con otras entidades para comprar la maquinaria necesaria para cumplir con el desarrollo, producción y distribución de las guías telefónicas. Esas situaciones se ajustan a los supuestos de impedimento supra indicados que imposibilitaban la aplicación de la eximente de responsabilidad prevista en la cláusula, por lo que procede la indemnización.

**XI.-** Adicionalmente, en este agravio, las recurrentes señalan otros aspectos de disconformidad. En primer término, refieren el impedimento para utilizar la figura de la subcontratación en contratos administrativos que no sean obra pública (artículos 58 y 62 de la LCA y numeral 69 del RLCA). Explican, el contrato maestro suscrito entre Verizon y THS se efectúa para la adquisición de suministros, por lo que no puede calificarse como subcontratación. En torno a este tema, cabe indicar, el uso de la figura de la subcontratación se ha extendido a otros tipos de contratos administrativos, en los cuales, tal y como en el caso que nos ocupa, su utilización se dispone por medio de acuerdo de las voluntades de los contratantes, vía cláusula cartelaria. Por tanto, estima este Órgano jurisdiccional, no se está en presencia de una subcontratación. Como segundo aspecto, reclaman el quebranto del principio de intangibilidad de los actos propios (artículo 34 constitucional). Con relación a este tema, debe tenerse presente, la endilgada transgresión se da por la anulación del acto declarativo de derechos, sin previa declaración del acto como lesivo. En el presente asunto, lo debatido no es un acto declarativo de derechos, sino la extinción de un contrato administrativo a causa del incumplimiento contractual "doloso" por parte de las co-demandadas. Ergo, la endilga violación no se da. Como último punto, las recurrentes refutan el plazo de 168 meses otorgado a la subcontratación. Al respecto, debe indicarse, dicho plazo fue otorgado de común acuerdo por las partes en la cláusula 2.b del Contrato Maestro no. VIS-2001-21-JP. Por tanto, no es cierto que fuera la Cámara de Juzgadores la que estableció el tiempo de duración de la subcontratación. Conforme lo expuesto, a criterio de esta Sala,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

presencia de una subcontratación, donde en una de sus cláusulas se define el plazo máximo para la producción, empaque y distribución de los directorios telefónicos; y, cuya causa de terminación obedece al incumplimiento contractual "doloso" por parte de las co-accionadas del contrato administrativo derivado de la licitación pública no. 6378-T. En consecuencia, no se produce la transgresión del principio de intangibilidad de los actos propios y la normativa que se invoca soslayada, por lo que sobrevendrá el rechazo del agravio.

**XII.-** En el **cuarto** vicio, las promoventes alegan la preterición del informe pericial aportado por la parte actora. Destacan, ese elemento probatorio, excluye el contrato suscrito entre THS y Radiográfica Costarricense S.A. (en futuras referencias RACSA) el 28 de abril de 2006. Dicha omisión produce un sesgo en los ingresos monetarios (ganancias) percibidos por THS desde esa fecha e incumple con los principios de las Normas Internacionales de Información Financiera (sucesivamente NIIF) y concede un enriquecimiento sin causa al otorgar a THS sumas sobrevaloradas por concepto de inversión de maquinaria, flujos de caja no recibido, pérdidas realizadas del 2004 a 2007 e interrupción de operaciones. Relatan, el yerro en el peritaje se produce debido a que la accionante en lugar de pedir al señor Ramón Humberto Romero Rodríguez, que se examinaran los libros contables que demuestran su estado financiero-contable, solicita la corroboración del estudio realizado por el señor Tomás Evans Salazar, el cual, tal y como lo indicó, se encuentra sesgado. Invocan la violación del numeral 267 del CoCo.

**XIII.-** Respecto del contrato suscrito entre THS y RACSA, el **Tribunal** en el Considerando V.XV.- del fallo impugnado, indicó: "*V.XV.- Sobre los Montos liquidados* […] *Al monto indicado, se le deberá deducir las sumas que se le hayan pagado a la actora por parte de Radiográfica Costarricense S.A., por concepto de cualquier contrato de elaboración de guías telefónicas que se haya realizado con posterioridad al rompimiento contractual por parte de Verizon Information Services Costa Rica LLC.* […]" En ese mismo apartado, tocante a los informes de los señores Tomás Evans Salazar y Ramón Humberto Romero Rodríguez, dijo: "*4. Las sumas determinadas en los documentos en mención, tanto de Evans Salazar como Romero Rodríguez se fundan en la técnica aplicable, son coincidentes y comprenden los rubros de maquinaria, incremento en inventarios, flujos de caja operativos según el contrato, pérdidas realizadas, intereses pagados y afectación por interrupción de operaciones.* […] La parte demandada no objetó ni aportó prueba que desvirtuara, la metodología ni las fechas estimadas para valor futuro de las pérdidas realizadas, las tasas de interés aplicadas, proyecciones, cálculos, metodologías o las conclusiones obtenidas. *Por lo anterior, este Tribunal no cuenta con elementos de convicción que permitan cuestionar los alcances de los documentos objeto de análisis.* (El subrayado es suplido) […]"

**XIV.-** En este embate, los recurrentes acusan la preterición de la prueba pericial. Sin embargo, según se indicó en el Considerando anterior, el Tribunal sí valora ese elemento probatorio. Ello se evidencia de lo dicho por la Cámara de Juzgadores respecto a que deben rebajarse al monto reconocido, las sumas pagadas por RACSA a THS, por concepto de cualquier contrato de elaboración de las guías telefónicas posterior al rompimiento contractual con Verizon; así como de la indicación de la falta de objeción contra la prueba o el aporte de otro elemento probatorio para desvirtuar la metodología utilizada por los señores Evans Salazar y Romero Rodríguez. De ahí, estime esta Cámara, aunque lo alegado por las casacionistas es la preterición del informe pericial aportado por THS (exclusión del contrato con RACSA y los libros contables), lo que se debate es la valoración que hace el Tribunal de ese elemento probatorio. Pero, además, a juicio de esta Sala, las recurrentes pretenden ingresar nuevamente al análisis de la oposición al dictamen, aspecto resuelto por las personas juzgadoras en el momento procesal oportuno. Con base en lo anteriormente expuesto, el cargo no es de recibo, por lo que procederá su rechazo.

**XV.-** En la **quinta** censura, los recurrentes invocan la excepción de prescripción. Alegan el quebranto del inciso e) del artículo 984 del CoCo, y el numeral 155 del Código Procesal Civil (en lo sucesivo CPC) CPC y el principio de seguridad jurídica. Las casacionistas sostienen que al ser el Contrato Maestro un acuerdo para la producción y confección de las guías telefónicas, aplica el plazo prescriptivo previsto en el artículo 984 inciso e) del CoCo. Desde esa óptica, si la notificación del término de la relación contractual se notificó a THS el 2 de setiembre de 2005, el plazo para la interposición de la demandaVI fenecía el 2 de setiembre de 2006. Sin embargo, la actora plantea la demanda hasta el 15 de diciembre de 2008 (folios 1 a 93 del expediente electrónico) y el auto de intimación notificado hasta el 28 de enero de 2008, por lo que, a la luz de la norma supra citada, el plazo prescriptivo estaba sobrepasado. Pese a ello, el Tribunal sin motivación e indicación alguna de la norma que aplica, efectúa un conteo de prescripción de cuatro años y deniega la excepción.

**XVI.-** Respecto a la excepción de prescripción, el **Tribunal** señaló: "*V.IV.- Sobre la defensa de prescripción opuesta: a) En sus alegatos de cierre el representante de la codemandada Verizon Communications Inc invocó la aplicación del artículo 984 del Código de Comercio* […] *De conformidad con una lectura de las pretensiones se advierte que la parte actora solicita el pago de los daños y perjuicios causados con motivo del incumplimiento contractual que alega doloso de las sociedades y el ente codemandados. En razón de lo anterior, estima este Tribunal que en el caso de marras estamos ante un plazo de prescripción de 4 años. En este orden de ideas, se advierte que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon Information Services- Costa Rica LLC informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro, siendo así que la demanda fue interpuesta el día 15 de diciembre de 2008. El 28 de enero de 2009 la demanda fue notificada al representante de Verizon Information Services Costa Rica LLC y el día 18 de marzo de 2009 a la representante de Verizon Communications Inc. Consecuentemente, estima este Tribunal que procede rechazar la defensa opuesta, habida cuenta que la demanda fue notificada sin que haya operado la prescripción cuatrienal.* […]"

**XVII.-** En el caso de examen, la tesis de los casacionistas es que, debido a que las acciones del Contrato Maestro correspondían a la producción y confección de las guías telefónicas pactada en el Contrato Maestro, procedía la aplicación del plazo prescriptivo de un año, dispuesto en el inciso e) del numeral 984 del CoCo. No obstante, el Tribunal difiere de lo argumentado por las co-demandadas. En su criterio, las pretensiones de la actora estaban dirigidas al reconocimiento *de* los daños y perjuicios causados con motivo del incumplimiento contractual doloso de las co-accionadas y, por ende, resultaba aplicable el plazo de cuatro años también previsto en el canon supra citado. Al respecto, observa esta Cámara, el objeto del Contrato Maestro de Compra VIS-2001-21-IP era la elaboración, empaque y distribución de las guías telefónicas en Costa Rica y Belice. El inciso e) del artículo 984 del CoCo, literalmente reza: "[…]*e) Las acciones derivadas de ventas al por mayor y al detalle a otros comerciantes o al consumidor directamente.*" Véase, el objeto del convenio y lo dispuesto en el inciso e) de la norma de reciente cita no son coincidentes, ya que

This is a copy of a pending document. Because this document bears the legend that appears at the top of this document which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 430 of 490

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 10/26/2021

señalado ut supra. Contrario sensu, deviene la aplicación del plazo prescriptivo cuatrienal determinado por la Cámara de Juzgadores. No es de recibo lo esbozado por los co-demandados, respecto a que el Tribunal no indica la norma aplicada para la determinación del plazo de los cuatro años de prescripción, toda vez que a inicios del considerando donde se resuelve sobre este tema, se señala claramente que se está analizando el contenido del artículo 984 del CoCo. De ahí, puede colegirse fácilmente que lo decidido se circunscribe a esa norma. Tampoco se observa la violación del numeral 155 del CPC y el principio de seguridad jurídica, ya que el tema de la prescripción fue resuelto en el aparte V.IV de la sentencia recurrida y se observaron las normas válidas y vigentes aplicables al caso. Por consiguiente, coincide esta Cámara con lo dispuesto por el Tribunal y procederá el rechazo del quebranto invocado.

**XVIII.-** En el **sexto** yerro, alegan violación indirecta por indebida valoración de la prueba. Indican, la errónea apreciación de los poderes otorgados por la Secretaria Corporativa de Verizon LLC y Verizon Co., Marianne Drost  y de los documentos nos. 6 y 15 del expediente de prueba del actor (cambio de denominación de la empresa, fusión y aceptación de derechos y obligaciones de la licitación 6378-T y de la sub contratación); provoca que el Tribunal, a partir de una similitud fonética y de denominación social, tenga por demostrada la existencia de un grupo de interés económico entre las empresas supra indicadas. Por otra parte, destacan, la transformación de la compañía GTE a Verizon LLC, Verizon Co. y el actuar doloso o abusivo por parte de las co-demandadas nunca fue probado, por lo que la regla de la responsabilidad patrimonial de las personas jurídicas no es aplicable. Refieren el quebranto del numeral 82 inciso 4) del CPCA.

**XIX.-** En torno a la transformación de la compañía GTE a Verizon LLC, Verizon Co., el **Tribunal**, indicó:  *"V.I- En particular sobre los hechos probados:* [...] *a) Hechos probados con respecto a las relaciones jurídicas existentes entre el ICE las sociedades codemandadas:* [...] *11. Que la empresa GTE Information Service pasó a denominarse, Verizon Information Services Inc, la empresa GTE Directories Corporation pasó a llamarse Verizon Directories Corp y General Telephone Directory Company C por A cambió de nombre a Verizon Information Service Costa Rica, LLC. (Documento 6, correspondiente a un foliado que va del folio 3045 a 3022 del expediente de prueba del actor) 12. Que los representantes legales de Verizon Information Services, Inc, Verizon Directorias Corp. y Verizon Information Services-Costa Rica, LLC, aceptaron los derechos y obligaciones con motivo de la licitación 6378-T y del contrato derivado de la misma" (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor). 13. Que VERIZON Information Services- Costa Rica, LLC, le envió a la Dirección de Proveeduría del ICE una nota con fecha 16 de mayo del 2002, en la que le manifiesta, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE. (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor). 14. Que GTE se fusionó con la firma americana Bell Atlantic y como resultado de la fusión se creó el GRUPO VERIZON, sustituyéndose la razón social de GTE por el GRUPO VERIZON (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor)."* Teniendo por probada la fusión de GTE con Bell Atlantic  y el cambio de nombre de Grupo Verizon, así como la fusión  la corporación, la Cámara de Juzgadores, estableció: *"VIII.- Argumento relacionado con la falta de solidaridad de la empresa codemandada con la garantía solidaria de GTE Corporation:* [...] consta en autos que mediante escrito de fecha 28 de agosto de 2002, Verizon Information Services Costa Rica, LLC, expresó lo siguiente al ICE: *"11.- MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS. De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el Mantenimiento de Obligaciones y Derechos, firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directorias Corp. y Verizon Information Services-Costa Rica, LLC, <u>en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma"</u> (lo subrayado no es del original). Adicionalmente, la cláusula Vigésima Quinta del contrato entre el ICE y el Consorcio GTE estipuló lo siguiente: "En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos <u>el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas" De conformidad con lo anterior además de lo dispuesto expresamente, hubo manifestación expresa de la codemandada en cuanto al mantenimiento de las obligaciones contraídas originalmente por el grupo GTE.</u>*[...] (lo destacado no corresponde al original)"* En cuanto a los poderes otorgados por la señora Marianne Drost, en su calidad de Secretaria Corporativa de Verizon LLC y Verizon Co. (prueba visible a folios 1183 a 1188 del expediente judicial), señaló: *b) Hechos probados de relevancia para la resolución del presente asunto relacionados con la vinculación entre las sociedades codemandadas y la parte actora:* [...] *13. Que la señora MARIANNE DROST, ciudadana norteamericana, otorgó poderes y actuó en su condición de Secretaria Corporativa de las firmas VERIZON COMMUNICATIONS INC., y de VERIZON INFORMATION SERVICES-COSTA RICA, LLC. (folios 1183 a 1188 del expediente judicial)"*

**XX.-** Previo a determinar si se realizó o no correctamente la valoración de los documentos nos. 6, 15 y los poderes otorgados por la señora Marianne Drost en su condición de Secretaria Corporativa de las firmas Verizon Communications Inc. y Verizon Information Services-Costa Rica, LLCC (prueba aportada por THS), resulta pertinente definir qué es un grupo de interés económico (en adelante GIE).  En materia comercial, el GIE es un conjunto de personas físicas o morales de naturaleza jurídica original, distinta de la sociedad y de la asociación, con intereses comerciales y financieros afines. Su objeto es facilitar el ejercicio de la actividad económica de sus integrantes, por el hecho de poner en común ciertos aspectos de dicha actividad. La Superintendencia General de Entidades Financieras (en lo sucesivo Sugef) en el artículo no. 8 de acuerdo SUGEF 5-04 del *"Reglamento sobre límites de crédito a personas individuales y grupos de interés económico"*, aprobado por el Consejo Nacional de Supervisión del Sistema Financiero mediante artículo 15 del acta de la Sesión no. 480-2004, celebrada el 4 de noviembre de 2004 (publicado en el Diario Oficial La Gaceta no. 227 del 19 de noviembre de *2004)*, define al GIE como: *"Conformación de los grupos de interés económico. Un grupo de interés económico estará conformado por el conjunto de dos o más personas que mantengan relaciones financieras, administrativas o patrimoniales significativas entre sí, identificadas según los artículos 4, 5, 6 y 7 de este cuerpo normativo, así como por las personas por medio de las cuales se constituyan las relaciones administrativas y patrimoniales según el inciso a) del artículo 6 y el inciso b) del artículo 7 de este Reglamento. Las personas que formen parte de un grupo de interés económico podrán estar o* no vinculadas a la entidad. Para las personas vinculadas, adicionalmente a lo dispuesto en este Reglamento, regirá lo dispuesto en

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*el "Reglamento sobre el Grupo Vinculado a la Entidad."* Los preceptos 4, 5, 6 y 7 del referido reglamento determinan los parámetros de identificación de los grupos y relaciones financieras, administrativas y patrimoniales significativas que deben existir entre quienes conforman ese GIE.

**XXI.-** En el caso de examen, GTE y la firma americana Bell Atlantic se fusionaron para aumentar sus patrimonios. Esa unificación produjo un cambio en la denominación social de GTE Information Service a Verizon Information Services Inc; GTE Directories Corporation a Verizon Directories Corp.; y, General Telephone Directory Company C a Verizon Information Service Costa Rica, LLC., el cual no puede verse como un simple cambio de nombre o una similitud fonética, ya que las empresas involucradas se beneficiaron de factores afines tales como: inmuebles, edificaciones y otros. Así, al existir una relación financiera, administrativa y patrimonial de ambas empresas; estima esta Sala, se está en presencia de un GIE. Ahora bien, si a lo indicado añadimos, el ICE previendo que una situación de este tipo (fusión o asociación) había dispuesto que el convenio se mantuviera *"invariable y vigente"* bajo las nuevas denominaciones (folios 3022 a 3045 del expediente administrativo), al darse la mencionada fusión, los representantes legales de Verizon como un GIE, asumieron los derechos y obligaciones contraídos en la licitación 6378-T y el Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE. Ergo, no se aprecia la indebida valoración de los documentos nos. 6 y 15 que acusan las co-demandadas. En cuanto a los poderes especiales judiciales otorgados por la señora Marianne Drost en su condición de Secretaria Corporativa de Verizon LLC y Verizon Co., visto el expediente judicial (folios 1183 y 1188); debe señalarse, en la escritura no. 1 de las 15 horas del 25 de marzo de 2009, otorgada ante el notario Fernando Vargas Winiker en la Ciudad de Basking Ridge, New Yersey; se acreditan las facultades de la señora Drost para dar los poderes supra citados y la validez de los mismos. De ahí, no se dé la incorrecta valoración alegada. A partir de lo expuesto, por lo que procederá rechazar el motivo.

**XXII.-** En mérito de lo expuesto, se impone rechazar los recursos formulados, con sus costas a cargo de quienes lo interpusieron (inciso 3) del canon 150 del CPCA).

<div align="center">

**POR TANTO**

</div>

Se declara sin lugar los recursos interpuestos, con sus costas a cargo de las promoventes.

<div align="center">

**Luis Guillermo Rivas Loáiciga**

</div>

**Román Solís Zelaya**                                          **Rocío Rojas Morales**

**William Molinari Vílchez**                                    **José Rodolfo León Díaz**

MCAMPOSS

<div align="center">

**Es copia fiel del original - Tomado del Nexus PJ el: <u>19-08-2020 11:11:50</u>.**

</div>

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit D

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 8     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 433 of 490    RECEIVED NYSCEF: 10/26/2021

TRANSLATION



**Case 08-001505-1027-CA**

**Res. 000500-F-S1-2021**

     **FIRST CHAMBER OF THE SUPREME COURT OF JUSTICE.** San José, at eight hours forty-five minutes a.m. on March ninth, two thousand twenty-one.

     In a hearing procedure established **by TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA** against **INSTITUTO COSTARRICENSE DE ELECTRICIDAD [Costa Rican Electricity Institute], VERIZON COMMUNICATIONS INC.** and **VERIZON INFORMATION SERVICES COSTA RICA LLC.,** the special legal representative of the defendant companies formulates three motions for dismissal against the judgment of this Court no. 2017-F-S1-2020 of nine o'clock a.m. on June 25, 2020.

**Judge Solís Zelaya writes**

<div align="center">

**WHEREAS**

</div>

     **I.** In this case, the co-defendants Verizon Communications Inc. and Verizon Information Services Costa Rica LLC filed a cassation appeal against judgment no. 66-2017-V of eight o'clock a.m. on July 19, 2017, of Section V of the Contentious Administrative Court. This Chamber addressed it in its judgment no. 2017-F-S1-2020 of nine o'clock a.m. on June 25, two thousand twenty. Thereafter, the appellants filed three motions for absolute dismissal. The first two on July 17 and the last on July 20 of the same year. In the **first,** attorney Luis Carlos García Rivera alleges the following.

This is a copy of a document issued electronically with a digital signature (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 8                                                                      RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 434 of 490

TRANSLATION

The judgment lacks justification, assessment and congruence that demonstrates the analysis of the appeal, the evidence in the case file, the facts of the lawsuit and the evidence presented in the trial. The *"cursory"* examination demonstrates *"**poverty** of the Chamber's presentation"* and *"the **lightness** with which a Court of law of this caliber resolved the appeal"*. (bolding added). The analysis of the merits is almost null and void and, furthermore, it does not *"discuss and evaluate various points of the trial",* accepting as valid the weak and legally invalid arguments put forward by the lower court. According to the text of the contract, the only condition for its termination was simple communication, so that the award of damages has no basis. In addition, the claimant never alleged or demonstrated that the termination of the contract between the Costa Rican Electricity Institute (ICE) and Verizon was fraudulent. The termination occurred because Verizon made a proposal to ICE for the printing of telephone directories according to the Costa Rican market and distribution by provinces. The discussion was about a different way of printing the directories and the manner of distribution. It is not possible to speak of fraudulent termination because ICE did not accept a more realistic and economical business proposal. "*Now, this Chamber, **following the game of the claimant's counsel** and of the Contentious Administrative Court, reiterates on several occasions said concept without even analyzing whether there was legal support to arrive at that **false** qualification"* (bolding added). The concept of willful misconduct does not apply to the termination of the lawsuit between ICE and Verizon, because the latter did not charge for the printing of the directories and then, without any justification, failed to comply, abandoning its contractual and legal obligations. According to the ruling, the claimant had to modernize its equipment to face technological changes and the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Phones: (506) 2295-3658 or 2295-3659, email: sala_primera@poder-judicial.go.cr

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 435 of 490

TRANSLATION

requirements of the contractors, an argument that is **"false"** (emphasis added) because the claimant, in its lawsuit, admitted that it decided to invest in equipment as a result of a business decision of the company. It is *"false* " (bolding not original) that Verizon Co. was jointly and severally liable for both the obligations incurred by Verizon LLC and the negative consequences caused to the claimant by the termination of the master purchase agreement. Therefore, the award of damages lacks legal and technical grounds. "*Moreover, the guilty verdict* **is based on false premises that have been so assembled to not only assemble and put together a set of false facts but also to justify the exaggerated guilty verdict.**" (Emphasis added). The Chamber and the Court support a **"false and misleading**" thesis, **"for the sole purpose of accepting the claim and ordering the defendant to pay the alleged damages in an exaggerated and disproportionate manner".** (Bolding added). To assert willful misconduct, Verizon's actions were "*misrepresented*" by stating that the willfulness arose from explicitly stating its disagreement with the suggested modifications. This thesis demonstrates the lack of a "*serious, valid and solid*" case, since the fact that Verizon expressed its disagreement with the suggested modifications does not demonstrate willful misconduct. If it had evaluated this criterion in a "*serious and* **honest** *manner, it should have modified the concept of the entire systemic skeleton of the judgment, which does not withstand the slightest discussion (...) the entire scaffolding of the judgment would fall and therefore the* **false** *argument of Verizon's fraudulent action because a disagreement does not mean that it is fraudulent (...)*". (Emphasis added.) It is also alleged that when the contract between Verizon and THS was terminated, the latter had at least 103 copies of the white pages in stock and had acquired debts with

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 436 of 490

TRANSLATION

other entities to purchase the necessary machinery. This is false because the exact amount is not indicated, in addition to the fact that it paid the claimant for the cost of all the prints that were in the warehouse, so it assumed the cost of the losses. The claimant assumed the business risk by acquiring machinery to carry out the development of telephone directories. This was not an imposition by Verizon. This thesis, moreover, was not presented by the claimant in the facts of the case. **"It denotes favoritism in favor of THS on the part of this Court of Cassation** (sic) by openly stating: "These situations are in line with the above-mentioned cases of impediment that make it impossible to apply the exemption from liability provided for in the clause, and therefore the compensation is appropriate." (The highlighting is not from the original). Another serious flaw consisted of the fact that at the trial stage it alleged that the claimant's attorneys never requested the termination of the master agreement but settled the alleged damages. According to the jurisprudence, damages cannot be awarded if the resolution was not previously decreed. ICE's claim is independent from that of the claimant and the scope of ICE's claim does not benefit it in any way, so it cannot be alleged that Verizon's breach declared in administrative proceedings covers the omission of not having requested the contractual termination in this process. The Chamber **"covers up"** (emphasis added) the omission that TSH [sic - THS] never requested the termination of the contract by indicating that it was a fraudulent act. "In conclusion XI again **in bad faith this Court** continues to exploit the concept of fraudulent breach of contract, to which I am not going to refer, and I refer to what was stated above since it is a **play on words made with ill intent** to justify a judgment and a situation that **are not true."** (bolding added) According to Article 267 of the Code of Commerce, the

This is a copy of Phones (506) 2295-3658 or 2295-3659, email sala_primera@poder-judicial.go.cr NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 8                                                        RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 437 of 490

TRANSLATION

accounting books serve to demonstrate the accounting situation of the company, but the expert witness Humberto Romero did not examine them and only relied on the study carried out by Tomás Evans Salazar. Proof cannot arise from an accountant's certification that may insert inaccurate data and information. The expert's report lacks probative value because he did not conduct an examination of the company's accounts. It is not true that it failed to object or provide evidence that would undermine the methodology and dates estimated for future value, since the Chamber was not careful to review the written argumentation discussed in the trial. The expert only transcribed the estimates of Tomás Evans. In this regard, the appeal of cassation was rejected in 17 lines without serious criteria and analysis. In 5 lines it rejects "another serious ground to be analyzed" - which it does not specify-. **"What** (sic) **sadness of the justice we have in the highest Court in the country. It gives the impression that despite the stature of their duties** (sic) **and with all that is ordered by Article 28.1 this is not an obstacle to deciding contrary to law."** (emphasis added). Conclusion XV does not analyze the proposed censorship and only transcribes information without any study whatsoever. In Conclusion XVI, the statute of limitations objection was rejected without valid reasoning, and it is only stated that it was an attempt to collect damages. The statute of limitations is not assessed by what is requested in the claim, but by the contractual nature of the relationship that binds the parties. In the analysis of the existence of an economic interest group, it is a "*pity*" that phonetic similarity is used. The ruling could not make use of the concept of companies of the same economic group developed by Sugef, because it is oriented to financial matters. In order to hold a foreign company liable, this Court "*resorts to* **fallacy, deceit and lies** *to tie up a situation that*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 8                                                    RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 438 of 490

TRANSLATION

*has no legal basis". (...) Finally, how* (sic) **do judges of the stature of this Court dare to consider as proven the existence of Verizon as part of the economic interest group** *without even proving the different administrative, executive and managerial links and, above all, the relationship between each of the different companies. (...)* **One can only understand that in order to prove the unprovable in this case and pave the way to finding for the claimant, these atrocities to the law are committed in the name of a justice that does not exist."** (bolding added). It requests the absolute dismissal of the judgment and the ordering of the integration of a substitute court to hear the appeal. In the **second motion,** attorney Luis Carlos García Rivera alleges that he challenged the heads of this body, an action that, by then, had not been processed. In addition, he had filed a complaint before the Judicial Inspection Body, which was rejected by the Plenary Court, *"alleging without real grounds that the Court cannot analyze the judgments rendered, which is not true because in said complaint the defects of the lack of application of the Civil (sic), Contentious Administrative and Procedural Law, both litigious and civil, were stated in a very punctual and exact manner. (...) Despite the fact that the members of the Plenary Court have the competence to examine the correct application of the rules of law, they refused to do so under a simple excuse (...)".* The complaint was based on the lack of substantiation of the resolutions in view of *"the diversity of arguments and norms that they never wanted to refer to (...)".* In these proceedings, the judges did not apply the law or the reiterated jurisprudence of the Chamber in *"very specific matters,* **going to the extreme of modifying and justifying conducts that were previously reprehensible for the same members of the First Chamber, all of which shows us that they have**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Phones: (506) 2295-3658 or 2295-3659, email sala_primera@poder-judicial.go.cr

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 8     Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 439 of 490     RECEIVED NYSCEF: 10/26/2021

TRANSLATION

*maintained a direct interest in the resolution of the matters of my clients".*

*(emphasis added).* In addition, a criminal complaint was filed - of which no further details were provided -. By virtue of the foregoing, the absolute dismissal of the aforementioned judgment is claimed. In its opinion, as the resolution of the challenge was pending, in addition to the existence of a complaint and a criminal charge in process, the members of this Chamber were inhibited from issuing the respective judgment under the terms of Article 100 of the Code of Contentious Administrative Procedure and Article 2.4 of the Civil Procedural Code because "*there is no doubt that* **the actions of the judges were opposed to the sound practices of legality and morality** *by forcibly ruling on a case in which they were duly challenged (...)* **clearly and forcefully flouting public order rules (...) the judges have shown a direct interest in ruling on this case and others of my client. (...)**". (Emphasis added.) Since the challenge was not processed, they lost jurisdiction to issue a judgment, which is null and void. In the **third motion,** attorney Luis Carlos García Rivera insists, in relation to the consideration that the co-defendants are part of an economic interest group, that the Chamber used arguments "without legal value or evidentiary support", since it cited a regulation of the General Superintendence of Financial Entities related to credit limits for individuals and economic interest groups, oriented to a particular and different activity, so that he is concerned and "*saddened*" by the "*lack of analysis and true legal grounds*" of both judgments, which shows a lack of foundation and inconsistency.

    **II.** First of all, it is necessary to point out that these proceedings must be processed and ruled on pursuant to the regulations set forth in the Code of Civil Procedure in force, in accordance with the provisions of its Transitional Provisions I and

This is a copy of Phone: (506) 2295-3658 or 2295-3659, email: sala_primera@poder-judicial.go.cr NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

II, - a rule which, moreover, is the one invoked by the appellant as the basis for its action - while the Code of Contentious Administrative Procedure lacks regulations in this regard, so that, by virtue of the provisions of its numeral 220, it is necessary to resort to the common procedural rules, due to their supplementary nature for this matter. Now, as to its allegations, it is clear that the **first and third motions**, it criticizes - or intends to criticize - the merits of judgment no. 2017-F-S1-2020 of this Chamber of nine o'clock a.m. on June 25, 2020. In summary, it alleges the following: 1. lack of analysis of its cassation appeal - without specifying which claim was overlooked - , 2. inadmissibility of the award of damages, 3. the conduct of its client cannot be classified as fraudulent, 4. the opposing party never requested the ruling, therefore damages could not be awarded, 5. the expert opinion is not valid, 6. its arguments - which it does not detail - were ruled upon in a few lines, which shows a lack of analysis, 7. in certain recitals of the judgment there was no reasoning - which it justifies only in its statement - and; 8. the defendants are not part of a group of economic interest. Its **third motion,** it is worth clarifying, revolves solely around this last aspect. Now, in the **second** motion, it claims dismissal of the ruling due to a pending challenge, the filing of a complaint before the Plenary Court which, according thereto, was rejected, and the processing of an unspecified criminal complaint.

**III.** The interim proceedings are inadmissible for the following reasons. According to Article 152 paragraph 3) of the Code of Contentious Administrative Procedure, the judgments of this Chamber only admit review appeals, not motions, which renders the filed motions inadmissible. The same answer can also be reached through the ordinary civil procedural rules. It should be noted that according to Article 33.3 of the Code of Civil Procedure in force, a motion for dismissal after the issuance of the final judgment can

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

TRANSLATION

only be alleged in proceedings in which review does not proceed. According to Article 72 ibidem, the review proceeds against rulings that have the effect of res judicata. The judgment of the ordinary proceeding - or of hearing procedure - produces res judicata material (numeral 64 ibidem), so that it only admits an appeal for review, but not a motion for dismissal. That is to say, under both regulations, the challenged ruling could only be challenged by means of an appeal for review - through the grounds for review provided for this purpose - and not by means of motions for dismissal. This makes the motions inadmissible. Now, <u>even disregarding the above,</u> and for further reasons, according to the civil procedural regulations (applicable in this matter due to its supplementary vocation already mentioned in view of the lack of provisions in the procedural litigation area), dismissal can only be decreed when it causes a lack of proper defense (article 32.1). None of the allegations contained in his motions are aimed at showing that the decision of this Chamber, issued on the occasion of his cassation appeal, placed him in such a situation. Rather, his recriminations criticize - without any basis other than his own statement - the rejection of his appeal, and at the same time he formulates a series of serious charges related to, according to him, conduct of these members that is far from the principle of impartiality of the judge. Such accusations, besides being reckless, unfounded and, moreover, obstinate to the point of using disproportionate and disrespectful epithets, lose sight of the fact that his professional work should have channeled the defense of the interests of his clients, through the available legal channels and remedies, **demonstrating that the law protected his claims,** which he failed to do in a timely manner. Therefore, the manner - and the tone - of criticizing this body with ad hominem fallacies, without demonstrating, by any means,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Phones: (506) 2295-2658 or 2295-3659, email sala_primera@poder-judicial.go.cr

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 442 of 490

TRANSLATION

deference to the law in the ruling of this body, is wrong. Thus, his arguments actually

hide a revocation of the judgment, a non-existent procedure in the Costa Rican legal

system - there is no revocation of judgments - and therefore, in the end, also for these

reasons, it should be denied. It is worth reminding the appellant that, as he rightly points

out, the complaint he filed against the majority of the undersigned, before the Plenary

Court, on the occasion of the decision of this Chamber in an arbitration proceeding, was

duly rejected (Session no. 02-19 of January 21, 2019, Article XVIII and Session no. 13-19

of March 25, 2019, Article XXIV). The same happened with the challenge, submitted on

April 2, 2019, in this matter and rejected in ruling 48-F-S1-2021 of 10:00 a.m. on January

13, 2021, of this Chamber. It is worth reminding the appellant that this last action was

justified by the fact that, according to the appellant, since the analysis of the cassation

appeal he had filed was pending, it was not up to the then members of the Court to issue

a judgment on the merits, due to the pending complaint before the Plenary Court.

However, contrary to his statement, in which he was untruthful, by that time the

complaint had already been resolved, including by way of reinstatement. Finally, with

respect to the criminal proceeding he cites, it is important to make a clarification. This

Chamber, as stated, issued a judgment on the merits, in this matter, in its judgment

2017-F-S1-2020 of nine o'clock a.m. on June 25, 2020. At that time, most of us

undersigned were **not aware of the complaint that had been filed** before the

Attorney General's Office by Mr. Luis Carlos García Rivera - special legal representative of

Verizon Information Services LLC-. This information was known to the defendants until

the end of August of that year, when we were notified of the dismissal issued by the Third

Chamber in its judgment no. 2020-1007 of 2:12 p.m. on August 7, 2020, in which the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Phones: (506) 2295-3658 or 2295-3659, email sala_primera@poder-judicial.go.cr

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

Attorney General's request to that effect was granted. This dismissal was notified to us - the defendants - at the end of August 2020, as stated, so that the judgment of this Chamber, now challenged by way of several motions for dismissal, **was taken without having notice of the criminal proceeding initiated by Mr. Garcia Rivera**. Therefore, such complaint cannot be insinuated as a reason for subjective incompetence - for loss of impartiality - to issue a judgment on the merits in this litigation, since it was only known to the claimant, not to the respondents. Therefore, in spite of all its multiple motions and dilatory actions, no reason has been found - nor was it found - to affect the subjective competence of the members of this body. Finally, it is important to remind the party that its extrajudicial actions against the majority of the members of this body, coupled with accusations of partiality, have been based solely on its own statements, since with respect to the complaint and the challenge, they have not been accompanied by a minimum demonstration of subjective disqualification of any of the persons who make up this body in the fulfillment of their constitutional or legal duties, and we have been constrained to resolve the dispute in **accordance with the law, based on the arguments of the parties. If the arguments of any of the litigants are deficient, technically weak or simply contrary to the law, it is not up to this body to rule in order to satisfy the interests - or pressures - of any of the parties, but instead to protect the legal system, since that is the function of justice entrusted to this body.** In short, for all these reasons, the motion, apart from the above, would not be admissible on the merits either.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

## THEREFORE

The three motions for annulment are declared inadmissible. Return the case file, without further delay, to the Court of origin.

**Luis Guillermo Rivas Loáiciga**

**Román Solís Zelaya**                                    **Rocio Rojas Morales**

**William Molinari Vílchez**                          **Damaris Vargas Vasquez**

Rosalena

Phones (506) 2295-3658 or 2295-3659, email sala_primera@poder-judicial.go.cr

This is a copy of a document electronically issued and signed under article 6 Act 8454. NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



# <u>Certificate of Accuracy</u>

Tuesday, 26 October 2021

To whom it may concern,

We Trustpoint.One, hereby certify to the best of our knowledge and belief that the foregoing document described as "The Decision of the First Chamber of the Court of Justice dated March 9, 2021" is a true and accurate translation of the original.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

If there is any additional information we can provide you, please do not hesitate to contact us.

Yours sincerely,

*Elizabeth Wozniak*

Elizabeth Wozniak
Project Manager
Trustpoint.One

3200 Cobb Galleria Parkway          Trustpoint.One/translate-one                      page 1 of 1
Suite 200                           p: 412.261.1101
Atlanta, GA 30339                   e: translate-one@

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



Exp. 08-001505-1027-CA

Res. 000500-F-S1-2021

    SALA PRIMERA DE LA CORTE SUPREMA DE JUSTICIA. San José, a las ocho horas cuarenta y cinco minutos del nueve de marzo de dos mil veintiuno.

    En proceso de conocimiento establecido por TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA contra el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, VERIZON COMMUNICATIONS INC. y VERIZON INFORMATION SERVICES COSTA RICA LLC., el apoderado especial judicial de las sociedades demandadas formula tres incidentes de nulidad contra la sentencia de esta Sala no. 2017-F-S1-2020 de las nueve horas del 25 de junio de 2020. Redacta el magistrado Solís Zelaya

<div align="center">CONSIDERANDO</div>

    I. En este asunto, las codemandadas Verizon Communications Inc. y Verizon Information Services Costa Rica LLC plantearon recurso de casación contra la sentencia no. 66-2017-V de las ocho horas del 19 de julio de 2017 de la Sección V del Tribunal Contencioso Administrativo. Esta Sala lo resolvió en su sentencia no. 2017-F-S1-2020 de las nueve horas del 25 de junio de dos mil veinte. Luego de ello, los recurrentes plantearon tres incidentes de nulidad absoluta. Los dos primeros el 17 de julio y el último el 20 de julio de ese mismo año. En el primero, el licenciado Luis Carlos García Rivera alega lo siguiente. La sentencia carece de fundamentación,

This is a copy of Teléfonos (506) 2295-3658 o 2295-3659 correo electrónico sala_primera@poder-judicial.go.cr b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

valoración y congruencia  que demuestre el análisis del recurso de casación, las probanzas existentes en autos, los hechos de la demanda y la prueba evacuada en el debate. El examen "*somero*" demuestra "*pobreza de la exposición de la Sala*" y "*la ligereza con que un Tribunal  de derecho de este calibre resolvió el recurso de casación.*" (la negrita se añade). El análisis de fondo es casi nulo y, además, no se "*entra a discutir y valorar diversos puntos del debate*", dando por buenos los argumentos débiles y carentes de valor jurídico expuestos por el Tribunal de instancia. Conforme al texto del contrato,  la única condición para terminarlo   era la simple comunicación, por lo que la condena en daños y perjuicios no tiene ningún sustento. Además, la parte actora nunca alegó ni demostró que la terminación del contrato entre el Instituto Costarricense de Electricidad (ICE) y Verizon fuera dolosa. La terminación se dio porque Verizon realizó una propuesta al ICE de impresión de guías telefónicas acorde al mercado costarricense y de distribución por provincias. La discusión versó sobre una forma  diferente de imprimir las guías y la forma de distribución. No se puede hablar de terminación dolosa porque el ICE no aceptó una propuesta de negocio más realista y económica. "*Ahora bien, esta Sala siguiendo el juego del abogado de la parte actora y del Tribunal Contencioso, reitera en varias oportunidades dicho concepto sin ni siquiera analizar si hubo sustento legal para llegar a esa falsa calificación*" (la negrita se suple). El concepto doloso no aplica a la terminación de la demanda entre el ICE y Verizon, porque no se trató que esta última cobrara por la impresión de las guías y, luego, sin justificación alguna, incumpliera dejando abandonadas sus obligaciones contractuales y legales. Según el fallo, la actora debió modernizar sus equipos para enfrentar cambios tecnológicos y requerimientos de los

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

contratantes, argumento que es "*falso*" (se añade el énfasis) porque la actora, en su demanda, admitió que decidió invertir en equipos por una decisión de negocio de la empresa. Es "*falso*" (la negrita no proviene del original) que Verizon Co. respondía solidariamente tanto por las obligaciones contraídas por Verizon LLC, como por las consecuencias negativas ocasionadas a la actora con la extinción del contrato maestro de compra. Por ello, la condena en daños y perjuicios carece de fundamento legal y técnico. "*Además, la condenatoria parte de premisas falsas engranadas de tal forma para montar y armar el elenco no solo de hechos falsos sino justificar la exagerada condenatoria .*" (El destacado es suplido). La Sala y el Tribunal apoyan una tesis "*falsa y engañosa*", "*con el único propósito de acoger la demanda y condenar al pago de supuestos daños de manera exagerada y desproporcionada.*" (La negrita se añade). Para afirmar la conducta dolosa, se "*tergiversó*" la actuación de Verizon, señalando que el dolo surgió de manifestar explícitamente su desacuerdo con las modificaciones sugeridas. Esta tesis demuestra falta de argumentación "*seria, válida y sólida*" pues el que Verizon manifestara su desacuerdo con las modificaciones sugeridas, no demuestra conducta dolosa. De haber valorado ese criterio en forma "*seria y honesta debió modificar el concepto de todo el esqueleto sistémico de la sentencia que no aguanta la mínima discusión (...) todo el andamiaje de la sentencia se caería y por ende el falso argumento de la actuación dolosa de Verizon porque un desacuerdo no significa que sea doloso (...)*". (El énfasis es suplido). Se afirma también que cuando se terminó el contrato entre Verizon y THS esta última tenía en existencia al menos 103 ejemplares de las páginas blancas y había adquirido deudas con otras entidades para comprar maquinaria necesaria. Esto es falso

This is a copy of ... Teléfonos: (506) 2295-3658 o 2295-3659 correo electrónico sala_primera@poder-judicial.go.cr ...b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

porque no se indica el monto exacto, además de que le canceló a la actora el costo de todas las impresiones que estaban en bodega, por lo que asumió el costo de las pérdidas. La actora asumió el riesgo del negocio al adquirir maquinaria para cumplir con el desarrollo de las guías telefónicas. No se trató de una imposición de Verizon. Esta tesis, además, no fue expuesta por la actora en los hechos del proceso. "*Se denota favoritismo a favor de THS de parte de este Tribunal de Casación* (sic) *al indicar abiertamente:* "*Estas situaciones se ajustan a los supuestos de impedimento supra indicados que imposibilitan la aplicación de la eximente de responsabilidad prevista en la cláusula, por lo que procede la indemnización.*" (El destacado no proviene del original). Otro grave vicio consistió en que en la etapa de juicio alegó que los abogados de la actora nunca solicitaron la resolución del contrato maestro, pero liquidaron los supuestos daños y perjuicios. Conforme a la jurisprudencia no se puede condenar en daños y perjuicios si previamente no se decretó la resolución. La demanda del ICE es independiente de la de la actora y los alcances de la del ICE en nada le benefician, por lo que no podría alegarse que el incumplimiento de Verizon declarado en vía administrativa cubre la omisión de no haber solicitado en este proceso la resolución contractual. La Sala "*encubre*" (énfasis añadido) la omisión de que TSH nunca pidió la resolución contractual indicando que se trató de una actuación dolosa. "*En el considerando XI nuevamente de mala fe este Tribunal sigue explotando el concepto de incumplimiento contractual doloso, al cual no voy a referirme y me remito a lo expuesto antes ya que se trata de un juego de palabras hecho con la mala intención para justificar una sentencia y una situación que no son ciertas.*" (la negrita es suplida) Conforme al artículo 267 del Código de Comercio,

This is a copy of Teléfonos: (506) 2295-3658 o 2295-3659, correo electrónico sala_primera@poder-judicial.go.cr b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 8    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 450 of 490    RECEIVED NYSCEF: 10/26/2021

los libros contables sirven para demostrar la situación contable de la empresa, pero el perito Humberto Romero no los examinó y sólo se basó en el estudio realizado por Tomás Evans Salazar. La prueba no puede surgir de una certificación de un contador que puede insertar datos e información inexacta. El informe del perito carece de valor probatorio porque no realizó un examen de la contabilidad de la empresa. No es cierto que omitió objetar o aportar prueba que desvirtuara la metodología y fechas estimadas para valor futuro, pues la Sala no tuvo el cuidado de revisar la argumentación escrita y discutida en el debate. El perito tan sólo transcribió las estimaciones de Tomás Evans. Al respecto, el reclamo ante casación fue rechazado en 17 líneas sin criterio y análisis serio. En 5 líneas se rechaza "*otro motivo serio de ser analizado*" -que no especifica-."*Que* (sic) *tristeza de la justicia que tenemos en el más alto Tribunal del país. Da la impresión que a pesar altura de sus cargos* (sic) *y con todo lo ordenado por el artículo 28.1 ello no es óbice para resolver contrario a Derecho.*" (el énfasis se añade). En el Considerando XV no se analiza la censura planteada y tan sólo se transcribe información sin realizar estudio alguno. En el Considerando XVI se rechazó la excepción de prescripción sin razonamiento válido y tan sólo se expone que se trató de cobrar daños y perjuicios. La prescripción no se valora por lo que se pida en la demanda, sino por la naturaleza contractual de la relación que une a las partes. En el análisis de la existencia de un grupo de interés económico provoca "*lástima*" que se use la similitud fonética. El fallo no podía echar mano al concepto de empresas del mismo grupo económico desarrollado por Sugef, porque se orienta al tema financiero. Para hacer responsable a una empresa extranjera, este Tribunal "*acude a la falacia, al engaño y a la mentira , para*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Teléfonos: (506) 2295-3658 o 2295-3659, correo electrónico sala_primera@poder-judicial.go.cr

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 8    Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 451 of 490

RECEIVED NYSCEF: 10/26/2021

amarrar una situación que no tiene ningún fundamento jurídico."(...) Finalmente, como (sic) se atreven jueces de la envergadura de este Tribunal a tener por probada la existencia de que Verizon forma parte del Grupo de interés económico sin ni siquiera probar los distintos nexos administrativos, ejecutivos, directivos y sobre todo la relación entre cada una de las distintas empresas. (...) No queda más que entender que por tener por probado lo indemostrable en este proceso y allanar el camino para darle la razón al actor se cometen estas atrocidades al derecho en nombre de una justicia que no existe." (la negrita se suple). Solicita la nulidad absoluta de la sentencia y se ordene la integración de un tribunal suplente para conocer del recurso. En el segundo incidente, el abogado Luis Carlos García Rivera alega que recusó a los titulares de este órgano, gestión que, para entonces, no había sido tramitada. Además, había planteado un recurso de queja ante la Inspección Judicial, rechazada por Corte Plena, "alegando sin verdadero fundamento que la Corte no puede analizar las sentencias dictadas, lo cual no es cierto porque en dicha queja se expusieron de manera muy puntual y exacta los vicios de la falta de aplicación de la Ley Civil (sic), Contenciosa administrativa y procesal tanto contenciosa como civil. (...) A pesar de que los miembros de la Corte Plena tienen competencia para examinar la aplicación correcta de las normas del derecho se negaron a hacerlo bajo una simple excusa (...)". La queja se fincó en la falta de fundamentación de las resoluciones frente a "la diversidad de argumentos y normas sobre las que nunca quisieron referirse (...)". En estos procesos los magistrados no aplicaron el derecho ni la jurisprudencia reiterada de la Sala en "temas muy puntuales, llegando al extremo de modificar y justificar

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*conductas que antes fueron reprochables para los mismos miembros de la Sala Primera, todo lo cual nos demuestra que han mantenido un interés directo en la resolución de los asuntos de mis representadas."* *(el énfasis es añadido).* Además, fue planteada una denuncia penal -de lo que no da mayores datos-. En virtud de lo anterior, reclama la nulidad absoluta de la sentencia antes referida. En su criterio, estando pendiente de resolver la recusación, sumado a la existencia de una queja y de una denuncia penal en trámite, los integrantes de esta Sala estaban inhibidos para dictar la respectiva sentencia en los términos del artículo 100 del Código Procesal Contencioso Administrativo y el artículo 2.4 del Código Procesal Civil pues *"no queda duda alguna que la actuación de los magistrados se opuso a las sanas prácticas de legalidad y moralidad al resolver a la fuerza un proceso en el que se encontraban debidamente recusados (...) burlando de manera clara y contundente normas de orden público (...) los magistrados han manifestado un interés directo en la resolución de este caso y otros de mi representada (...)".* (El énfasis se añade). Al no tramitarse la recusación, perdieron competencia para dictar sentencia, que es nula. En el tercer incidente, el abogado Luis Carlos García Rivera insiste, en relación con la consideración de que las codemandadas forman parte de un grupo de interés económico, que la Sala usó argumentos *"sin valor jurídico ni sustento probatorio"*, pues citó un reglamento de la Superintendencia General de Entidades Financieras relacionado con los límites de crédito a personas individuales y de interés económico, orientado a una actividad particular y distinta, de modo que tiene preocupación y *"tristeza"* por la *"carencia de análisis y de verdaderos fundamentos legales"* de ambas sentencias, lo que da cuenta

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

de falta de fundamentación e incongruencia.

II. En primer término, es preciso deslindar que estas gestiones han de ser tramitadas y resueltas con base en la normativa dispuesta por el Código Procesal Civil vigente, a tenor de lo dispuesto en sus Transitorios I y II, -norma que, además, es la invocada por el incidentista como base de su gestión- en tanto el Código Procesal Contencioso Administrativo carece de regulación al respecto, de modo que, en virtud de lo dispuesto por su numeral 220, corresponde acudir a la normativa procesal común, en virtud de su carácter supletorio para esta materia. Ahora bien, en cuanto a sus alegatos, es claro que el primer y tercer incidente, critica -o pretende hacerlo- el fondo de la sentencia no. 2017-F-S1-2020 de esta Sala de las nueve horas del 25 de junio de 2020. En resumen, alega lo siguiente: 1. falta de análisis de su recurso de casación -sin precisar qué agravio fue soslayado-, 2. improcedencia de la condena en daños y perjuicios, 3. la conducta de su representada no puede calificarse de dolosa, 4. la contraparte nunca solicitó la resolución, por lo que no podían otorgársele daños y perjuicios, 5. el criterio pericial no es válido, 6. se resolvieron sus alegatos -que no detalla- en pocas líneas, lo que demuestra falta de análisis, 7. en determinados considerandos del fallo no hubo razonamiento -lo que justifica únicamente en su dicho-y; 8. las accionadas no forman parte de un grupo de interés económico. Su tercer incidente, valga aclarar, gira únicamente en torno a este último aspecto. Ahora, en el segundo, reclama la nulidad del fallo por una recusación pendiente, el planteamiento de una queja ante Corte Plena que, según admite, fue rechazada y el trámite de una denuncia penal no especificada.

III. Las gestiones incidentales son inadmisibles, por las siguientes razones.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Teléfonos: (506) 2295-3658 o 2295-3659, correo electrónico sala_primera@poder-judicial.go.cr

Según el artículo 152 inciso 3) del Código Procesal Contencioso Administrativo, las sentencias de esta Sala tan sólo admiten recurso de revisión, no así, gestiones incidentales, lo que torna inadmisible los incidentes planteados. A la misma respuesta se arriba, además, por el cauce de la normativa procesal civil común. Nótese que conforme al artículo 33.3 del Código Procesal Civil vigente, la nulidad, por vía incidental, luego de la emisión de la sentencia firme, sólo puede alegarse en procesos en los que no proceda la revisión. Según el artículo 72 ibídem, la revisión procede contra pronunciamientos que tengan efecto de cosa juzgada material. La sentencia del proceso ordinario -o de conocimiento- produce cosa juzgada material (numeral 64 ibídem), de modo que sólo admite recurso de revisión, no así, incidente de nulidad. Es decir, desde ambas normativas, la resolución impugnada sólo podría ser controvertida por la vía del recurso de revisión -a través de las causales de control dispuestas para ello- y no mediante incidentes de nulidad. Esto hace que los incidentes sean inadmisibles. Ahora, aún obviando lo anterior, y a mayor abundamiento de razones, conforme a la normativa procesal civil (aplicable en esta materia por su vocación supletoria ya señalada ante la falta de previsión en el ámbito procesal contencioso), la nulidad sólo puede decretarse cuando se cause indefensión (artículo 32.1). Ninguno de los alegatos contenidos en sus incidentes se orienta a evidenciar que el pronunciamiento de esta Sala, emitido con ocasión de su recurso de casación, le colocó en tal situación. Más bien sus reproches censuran -sin más fundamento que su dicho- el rechazo de su recurso, al tiempo que formula una serie de graves cargos relacionados con, según su dicho, conductas de estos integrantes alejadas del principio de imparcialidad de la persona juzgadora. Tales imputaciones, además de temerarias,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

infundadas y, por demás, obcecadas al punto de usar epítetos desmesurados e irrespetuosos, pierden de vista que su labor profesional debió encausar la defensa de los intereses de sus patrocinados, por las vías y remedios legales disponibles, demostrando que el Ordenamiento amparaba sus planteamientos , todo lo cual no logró oportunamente. Por ello, equivoca la vía -y el tono- al criticar a este órgano con falacias ad hominem, sin demostrar, ni por asomo, desapego a la juridicidad en la resolución de este órgano. Así las cosas, sus planteamientos en realidad esconden una revocatoria contra el fallo, gestión inexistente dentro del ordenamiento costarricense -no existe la revocatoria de sentencias- por lo que, a la postre, también por estas razones, debería denegarse. Cabe recordarle al incidentista que, como él bien refiere, la queja que planteó contra la mayoría de quienes suscriben, ante Corte Plena, con ocasión de lo dedicido por esta Sala en un proceso arbitral, fue oportunamente rechazada (Sesión no. 02-19 del 21 de enero de 2019, Artículo XVIII y Sesión no. 13-19 del 25 de marzo de 2019, Artículo XXIV). Lo propio aconteció con la recusación, planteada el 02 de abril de 2019 en este asunto y rechazada en la resolución 48-F-S1-2021 de las 10 horas del 13 de enero de 2021 de esta Sala. Vale recordarle al recurrente que esa última gestión la justificó en que, según dijo, estando pendiente el análisis del recurso de casación que había planteado, no correspondía a los entonces integrantes emitir criterio sobre el fondo, por la pendencia de la queja ante Corte Plena. No obstante, contrario a si dicho, en el que faltó a la verdad, para entonces ya la queja había sido resuelta incluso por la vía de la reposición. Finalmente, respecto al proceso penal que menciona, conviene hacer una precisión. Esta Sala, según se dijo, emitió sentencia de fondo, en este asunto, en su fallo 2017-F-S1-2020

This is a copy of Teléfonos: (506) 2295-3658 o 2295-3659, correo electrónico sala_primera@poder-judicial.go.cr b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

de las nueve horas del 25 de junio de 2020 . Para entonces, la mayoría de quienes

suscribimos no teníamos noticia alguna de la denuncia que había sido

formulada, ante la Fiscalía General de la República, por el señor Luis Carlos García

Rivera -apoderado especial judicial de Verizon Information Services LLC-. Este dato

obró en conocimiento de los denunciados hasta finales de agosto de ese año, con

ocasión de la notificación que se nos hizo de la desestimación dictada por la Sala

Tercera en su sentencia no. 2020-1007 de las 14 horas 12 minutos del siete de agosto

de 2020, en la que se acogió la solicitud en tal sentido de la Fiscala General. Esa

desestimación nos fue notificada -a los denunciados- a finales de ese mes de agosto

de 2020, según se dijo, por lo que la sentencia de esta Sala, ahora combatida por la

vía de varios incidentes de nulidad, se tomó sin tener noticia del proceso penal

incoado por el señor García Rivera. Por ello, tal denuncia no puede ser insinuada

como motivo de incompetencia subjetiva -por pérdida de imparcialidad- para emitir

sentencia de fondo en este litigio, pues sólo era de conocimiento del denunciante, no

así de los denunciados. Luego, pese a todas sus múltiples incidencias y gestiones

dilatorias, no se constata -ni se constató- motivo alguno que afecte la competencia

subjetiva de los integrantes de este órgano. Finalmente, es importante recordarle a la

parte que sus gestiones extrajudiciales, en contra de la mayoría de los integrantes de

este órgano, aparejadas a acusaciones de parcialidad, se han fundado únicamente en

su dicho pues respecto de la queja y la recusación, no han ido acompañadas de una

mínima demostración de desafuero subjetivo de alguna de las personas que integran

este órgano en el cumplimiento de sus deberes constitucionales o legales, quienes nos

hemos constreñido a resolver la controversia conforme a Derecho, a partir de los

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Teléfonos (506) 2295-3658 o 2295-3659, correo electrónico sala_primera@poder-judicial.go.cr

planteamientos de las partes. Si esos planteamientos de alguno de los litigantes es deficiente, técnicamente endeble o simplemente contrario a la legalidad, no corresponde a este órgano resolver para satisfacer los intereses -o presiones- de alguna de las partes, sino de aquél a quien el ordenamiento ampara, pues esa es la función de la justicia encomendada a este órgano. En suma, por todas estas razones, el incidente, al margen de lo señalado previamente, tampoco sería admisible por el fondo.

POR TANTO

Se declaran inadmisibles los tres incidentes de nulidad. Regresen los autos, sin más dilación, al Tribunal de origen.

Luis Guillermo Rivas Loáiciga

Román Solís Zelaya                              Rocío Rojas Morales

William Molinari Vílchez                         Damaris Vargas Vásquez

Rosalena

This is a copy of Teléfonos: (506) 2295-3658 o 2295-3659, correo electrónico sala_primera@poder-judicial.go.cr b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# Exhibit E

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

06/21/1999 4:48 p.m.          [GTE] LEGAL DIR          972 453 [6569] P. 04/06

**042[3]**

[stamp:] ICE [Instituto Costarricense de Electricidad]
COSTA RICAN INSTITUTE OF ELECTRICITY
PROCUREMENT DEPARTMENT
[stamp:] [illegible] PROCUREMENT DEPARTMENT
Public Tender

## GUARANTY OF JOINT LIABILITY BETWEEN

## GTE CORPORATION AND THE CONSORTIUM MADE UP OF GTE INFORMATION

## SERVICES INCORPORATED, GTE DIRECTORIES CORPORATION AND GENERAL

## TELEPHONE DIRECTORIES COMPANY C POR A

## FOR THE USE OF THE ANNUAL BALANCE SHEET

(Clause 2.4.1-B, paragraph 1)

### GTE CORPORATION CERTIFIES

I.      That this Corporation is aware that the Consortium made up of GTE Information Services, Incorporated, GTE Directories Corporation and General Telephone Directory Company C. por A. are going to participate in Public Tender No. 6378-T, sponsored by the COSTA RICAN INSTITUTE OF ELECTRICITY for "The Procurement of Services for eight years and the Development and Implementation of Information Services."

II.     That according to the provisions in Clause 2.4.1-B (Financial Capacity of the Company) included in the Portfolio for Public Tender No. 6378-T, mentioned above, the aforementioned Consortium will submit the Financial Statements of GTE Corporation, which is the holding (*tenedora*, in Spanish) company for the group.

III.    According to the requirements in the same Clause 2.4.1-B, mentioned above, GTE Corporation declares that it will be jointly liable with the companies in the aforementioned Consortium for all obligations that this Consortium may acquire as bidder and awardee of the aforementioned Public Tender No. 6378-T with the COSTA RICAN INSTITUTE OF ELECTRICITY.

[handwritten:] *No. 194*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

TRANSLATION

2

**042**

[stamp:] ICE [Instituto Costarricense de Electricidad]
COSTA RICAN INSTITUTE OF ELECTRICITY
PROCUREMENT DEPARTMENT

IV.   This corporation issues this certificate to be submitted to the Costa Rican Institute of Electricity for Public Tender No. 6378-T, mentioned above.

Given in the city of Irving, Texas, United States of America, on June ~~10~~ [handwritten:] *22* [initials], 1999.

**GTE CORPORATION**

By:     (Signature)        [signature]

Name:  [handwritten:] *Daniel P. O'Brien*

Title:   [handwritten:] *EVP; Chief Financial Officer*

[handwritten:] *No. 195*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 461 of 490

RECEIVED NYSCEF: 10/26/2021

**TRANSPERFECT**

## Certificate of Accuracy

Tuesday, 26 October 2021

To whom it may concern,

We TransPerfect Transperfect Translations, Inc., hereby certify to the best of our knowledge and belief that the foregoing document described as "GTE Guaranty" is a true and accurate translation of the original.

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

Signature

Jacqueline Yorke

Sworn to before me this
October 26, 2021

Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01PO6356754
MY COMMISSION EXPIRES 04-03-2025

Stamp, Notary Public

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



0423

**GARANTIA DE RESPONSABILIDAD CONJUNTA ENTRE**

**GTE CORPORATION Y EL CONSORCIO INTEGRADO POR GTE INFORMATION**

**SERVICES INCORPORATED, GTE DIRECTORIES CORPORATION Y GENERAL**

**TELEPHONE DIRECTORIES COMPANY C POR A**

**PARA USO DEL BALANCE ANNUAL**

(Cláusula 2.4.1-B, párrafo 1)

**GTE CORPORATION**

**CERTIFICA**

I.  Que esta Corporación tiene conocimiento de que el Consorcio consituido por GTE
    Information    Services Incorporated, GTE Directories Corporation y General
    Telephone Directory Company C. por A. van a participar en la Licitación Pública
    No. 6378- T, promovida por el INSTITUTO COSTARRICENSE DE
    ELECTRICIDAD para "La Contratación de Servicios por ocho años y el
    Desarrollo e Implementación de Servicios de Información".

II. Que de acuerdo con las disposiciones de la Cláusula 2.4.1-B (La Capacidad
    Financiera de la Compañía) incluida en el Cartel de la Licitación Pública No.
    6378- T, antes mencionada, el Consorcio mencionado presentará los Estados
    Financieros de GTE Corporation, que es la compañía "holding" (tenedora) del
    grupo.

III. Que de acuerdo a los requisitos de la misma Cláusula 2.4.1-B, antes mencionada,
     GTE Corporation declara que será conjuntamente responsable con las empresas
     del Consorcio mencionado por todas las obligaciones que este Consorcio adquiera
     como oferente y como adjudicatario de la mencionada Licitación Pública No.
     6378-T ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

IV.    Esta corporación emite esta certificación para ser presentada al Instituto Costarricense de Electricidad en la Licitación Pública No. 6378-T, antes mencionada.

Dado en la ciudad de Irving, Estado de Texas, Estados Unidos de América, el 10 de junio de 1999.


**GTE CORPORATION**

Por:        (Firma)

Nombre:    Daniel P. O'Brien

Titulo:     EVP, Chief Financial Officer

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit F

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 10          Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 465 of 490   RECEIVED NYSCEF: 10/26/2021

```
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>e8-k.txt
<DESCRIPTION>FORM 8-K
<TEXT>

<PAGE>   1
```
================================================================


UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549


FORM 8-K

CURRENT REPORT


Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934


Date of Report: June 30, 2000
(Date of earliest event reported)



BELL ATLANTIC CORPORATION
(D/B/A VERIZON COMMUNICATIONS)
(Exact name of registrant as specified in its charter)


```
<TABLE>
<S>                              <C>                      <C>
        Delaware                 1-8606                   23-2259884
(State or other jurisdiction of  (Commission File Number) (I.R.S. Employer Identification No.)
    incorporation)


1095 Avenue of the Americas,
New York, New York                                        10036
(Address of principal executive offices)                 (Zip Code)
</TABLE>
```


Registrant's telephone number, including area code: (212) 395-2121



Not applicable
(Former name or former address, if changed since last report)


================================================================

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

<PAGE>   2

Item 2.   Acquisition or Disposition of Assets

On June 30, 2000, Bell Atlantic Corporation ("Bell Atlantic"), a
Delaware corporation, and GTE Corporation ("GTE"), a New York
corporation, consummated a merger (the "Merger") whereby Beta Gamma
Corporation ("Merger Subsidiary"), a New York corporation and a
wholly-owned subsidiary of Bell Atlantic, was merged with and into GTE
pursuant to an Agreement and Plan of Merger ("the Merger Agreement"),
dated as of July 27, 1998, by and among Bell Atlantic, Merger
Subsidiary and GTE. As a result of the Merger, GTE has become a
wholly-owned subsidiary of Bell Atlantic. The combined company will be
doing business as Verizon Communications.

Prior to the Merger, the assets of GTE, through GTE's subsidiaries were
used to provide a broad range of telecommunications and
telecommunications-related services. Verizon Communications intends to
continue such uses for the assets of GTE.

Pursuant to the terms of the Merger Agreement, each issued and
outstanding share of common stock, par value $.05 per share, of GTE
("GTE Common Stock") was converted into the right to receive 1.22
shares of common stock, par value $0.10 per share, of Bell Atlantic
("Bell Atlantic Common Stock"). Bell Atlantic will issue approximately
1,175 million shares of Bell Atlantic Common Stock in exchange for the
shares of GTE Common Stock. In addition, each option to purchase GTE
Common Stock outstanding under GTE's stock option plans was converted
into an option to purchase the number of shares of Bell Atlantic Common
Stock equal to the number of shares of GTE Common Stock subject to such
option multiplied by the exchange ratio for the Merger, and the
associated exercise price was adjusted accordingly. Bell Atlantic's
Common Stock will be listed on the New York Stock Exchange under the
symbol VZ.

Effective upon the close of the Merger, the Board of Directors of Bell
Atlantic (the "Board") contains 16 members, one-half of whom have been
designated by Bell Atlantic and one-half of whom have been designated
by GTE. Joining Richard L. Carrion, Helene L. Kaplan, Joseph Neubauer,
Thomas H. O'Brien, Hugh B. Price, Ivan G. Seidenberg, Walter V. Shipley
and John R. Stafford, all of whom were elected to the Board, effective
May 24, 2000, by the shareholders of Bell Atlantic, are James R.
Barker, Edward H. Budd, Robert F. Daniell, Charles R. Lee, Sandra O.
Moose, Russell E. Palmer, John W. Snow and Robert D. Storey, all of
whom were directors of GTE prior to the Merger and have been elected to
the Board pursuant to the Merger Agreement.

At the time of the Merger, employment agreements with each of Charles
R. Lee and Ivan G. Seidenberg were in effect as provided in the Merger
Agreement. Mr. Lee, who was Chairman and Chief Executive Officer of GTE
prior to the Merger, is now Chairman and Co-Chief Executive Officer of
Verizon Communications, and Mr. Seidenberg, who was Chairman and Chief
Executive Officer of Bell Atlantic prior to the Merger, is now
President and Co-Chief Executive Officer of Verizon Communications.

Item 5.   Other Events

All information concerning GTE which has been filed with the Securities
and Exchange Commission (the "SEC") as part of GTE's Annual Report on
Form 10-K, filed March 30, 2000 (File No. 1-2755) for the year ended
December 31, 1999, and all other reports filed by GTE pursuant to the
Securities Exchange Act of 1934 since the end of the fiscal year
covered by such report, are incorporated herein by reference.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

<PAGE>   3

Item 7.  Financial Statements, Pro Forma Financial Information and Exhibits

     (a)      Financial Statements of Businesses Acquired.

              The (i) consolidated audited balance sheets of GTE as of
              December 31, 1998 and 1999 and (ii) consolidated statements of
              income and cash flows of GTE for the fiscal years ended
              December 31, 1997, 1998 and 1999 have been filed with the SEC
              as part of GTE's Annual Report on Form 10-K, filed March 30,
              2000 (File No. 1-2755), and are incorporated by reference.

              The (iii) unaudited consolidated balance sheet of GTE as of
              March 31, 2000 and (iv) unaudited consolidated statements of
              income and cash flows of GTE for the three months ended March
              31, 1999 and 2000 have been filed with the SEC as part of
              GTE's Quarterly Report on Form 10-Q, filed May 12, 2000 (File
              No. 1-2755), and are incorporated herein by reference.

     (b)      Pro Forma Financial Information.

              The (i) pro forma combined condensed statements of income of
              Bell Atlantic and GTE for the three months ended March 31,
              1999 and 2000, and the years ended December 31, 1997, 1998 and
              1999; and (ii) pro forma combined condensed balance sheets of
              Bell Atlantic and GTE as of December 31, 1998 and 1999 and
              March 31, 2000 (to be filed in an amendment to this Form 8-K
              as soon as practicable, but not later than 75 days after the
              date of consummation of the Merger).

     (c)      Exhibits.

              3.1      Certificate of Amendment to Restated Certificate of
                       Incorporation of Bell Atlantic.

              3.2      Bylaws, as Amended, of Bell Atlantic.

              23       Consent of Arthur Andersen LLP.

              99.1     Press Release, dated June 30, 2000, issued by Verizon
                       Communications.

              99.2     Press Release, dated June 30, 2000, issued by Verizon
                       Communications.

              99.3     Consolidated audited balance sheets of GTE as of
                       December 31, 1998 and 1999 and consolidated
                       statements of income and cash flows of GTE for the
                       fiscal years ended December 31, 1997, 1998 and 1999
                       (incorporated by reference to GTE's Annual Report on
                       Form 10-K, filed March 30, 2000, File No. 1-2755).

              99.4     Unaudited consolidated balance sheet of GTE as of
                       March 31, 2000 and unaudited consolidated statements
                       of income and cash flows of GTE for the three months
                       ended March 31, 1999 and 2000 (incorporated by
                       reference to GTE's Quarterly Report on Form 10-Q,
                       filed May 12, 2000, File No. 1-2755).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

<PAGE>   4

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 468 of 490

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized.

                              Bell Atlantic Corporation
                              ------------------------------------
                                      (Registrant)


Date: June 30, 2000                   /s/ MARIANNE DROST
      --------------            ------------------------------------
                                    Marianne Drost
                              Senior Vice President, Deputy
                                 General Counsel and
                                 Corporate Secretary



<PAGE>   5

                         EXHIBIT INDEX

<TABLE>
<CAPTION>
EXHIBIT
NUMBER          DESCRIPTION
-------         -----------
<S>             <C>                                                 <C>
3.1             Certificate of Amendment to Restated Certificate of
                Incorporation of Bell Atlantic.

3.2             Bylaws, as Amended, of Bell Atlantic.

23              Consent of Arthur Andersen LLP.

99.1            Press Release, dated June 30, 2000, issued by Verizon
                Communications.

99.2            Press Release, dated June 30, 2000, issued by Verizon
                Communications.

99.3            Consolidated audited balance sheets of GTE as of December 31,    Incorporated
herein by reference
                1998 and 1999 and consolidated statements of income and cash     to GTE's Annual
Report on
                flows of GTE for the fiscal years ended December 31, 1997,        Form 10-K,
filed March 30,
                1998 and 1999.                                                    2000, File No.
1-2755.

99.4            Unaudited consolidated balance sheet of GTE as of March 31,       Incorporated
herein by reference
                2000 and unaudited consolidated statements of income and cash     to GTE's
Quarterly Report on
                flows of GTE for the three months ended March 31, 1999 and         Form 10-Q,
filed May 12, 2000,
                2000.                                                             File No. 1-
2755.
</TABLE>

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 10    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 469 of 490    RECEIVED NYSCEF: 10/26/2021

```
</TEXT>
</DOCUMENT>
```

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 11 Case 1:21-cv-08928 Document 1-1 Filed 11/01/21 Page 470 of 490 RECEIVED NYSCEF: 10/26/2021

# Exhibit G

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

 (https://www.verizon.com/?lid=//global//residential)



## GTE is now Verizon Communications Inc.

Verizon is a global technology company delivering the promise of the digital world to millions of customers every day. The company operates America's most reliable wireless network (https://www.verizon.com/about/our-company/wireless-network) and the nation's premier all-fiber network (https://www.verizon.com/home/fios/). It provides products and services to consumers, businesses (https://www.verizon.com/business/) and governmental agencies (https://www.verizon.com/business/solutions/state-local-government/).

Visit Verizon's website (https://www.verizon.com/about/) to review corporate and financial information, get the latest news and explore Verizon's history.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
10/26/21 1:11 AM
NYSCEF DOC. NO. 11

Case 1:21-cv-08928    Document 1-1    Filed 11/01/21    Page 472 of 490

RECEIVED NYSCEF: 10/26/2021

**Verizon
(https://www.verizon.com/?
lid=//global//residential)**

# About GTE

GTE Corp. merged with Bell Atlantic Corp. to become Verizon
Communications Inc. (https://www.verizon.com/about/) on June
30, 2000.

Prior to the merger, GTE had been the largest independent
telephone company in the U.S. It provided local and wireless
service in 29 states, as well as nationwide long distance and
internet services for residential and business customers.
Headquartered in Stamford, CT, the company was the first
among its peers to offer one-stop shopping for local, long
distance and Internet access services. Outside the United
States, the company served customers on five continents.

The Bell Atlantic-GTE transaction – valued at more than $52
billion at the time of the announcement in July 1998 – combined
Bell Atlantic's sophisticated network with GTE's national
footprint to create new a leader in the communications industry.
After receiving regulatory approval for the merger, Verizon began
operations in mid-2000.

# Learn more about GTE and Verizon:

Read archived GTE news
(https://www.verizon.com/about/news-tag/gte)
Information for GTE investors
(https://www.verizon.com/about/investors)

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Information for GTE retirees
(https://www.verizon.com/about/our-company/retiree-
information)

GTE and Verizon history (https://www.verizon.com/about/our-
company/history-and-timeline)

✓ (https://www.verizon.com/?lid=//global//residential)

## About Verizon

About Us (https://www.verizon.com/about/)

Our Company (https://www.verizon.com/about/our-company)

Corporate Responsibility (https://www.verizon.com/about/responsibility)

Careers (https://www.verizon.com/about/careers)

News (https://www.verizon.com/about/news)

Investor Relations (https://www.verizon.com/about/investors)

## Business Units

Verizon (https://www.verizon.com/?lid=//global//residential)

Verizon Fios (https://www.verizon.com/home/fios/)

Verizon Wireless (https://www.verizonwireless.com/)

Verizon Business (https://www.verizon.com/business/)

Verizon Connect (https://www.verizonconnect.com/)

Enterprise Solutions (https://enterprise.verizon.com/)

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

https://www.verizon.com/about/sites/default/files/gte/index.html

10/26/21, 1:11 AM

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 474 of 490

**Follow**

(https://www.facebook.com/Fios/)   (https://twitter.com/verizonfios)

(https://www.youtube.com/user/verizon/Verizon)   (https://www.instagram.com/verizon/?hl=en)

(https://www.linkedin.com/company/verizon)

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



Calculation of Indexation, Net Interest, and Legal Fees and Costs
on the Judgment Awarded to Trejos Hermanos Sucesores, S.A.

October 26, 2021



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



## Scope of Work

This report calculates the standard amounts of (i) indexation, (ii) interest, and (iii) legal fees and costs to which Trejos Hermanos Sucesores, S.A. ("**the Company**") is entitled under the judgment issued by the Contention Administrative Civil Court against Verizon Communications, Inc. and Verizon Information Services Costa Rica, LLC in Ruling No. 66-2017-V on July 19, 2017 ("**the Judgment**").

This report does not reflect any personal opinion or judgment. We have merely performed the routine calculations required by the Judgment and Costa Rican law.

## Executive Summary

The Judgment awarded the Company a principal sum of $51,355,812, along with three adjustments. First, the Judgment ordered **indexation**, which adjusts the value of money over time according to its purchasing power. Second, the Judgment ordered the imposition of **net interest**, which accounts for the time-value of money between the date of the Judgment and the date on which the damages calculation was first performed. Third, the Judgment imposed legal fees and costs, which are set by government decree and pegged to the quantum of the award. Together with these adjustments, the total value of the judgment, if paid on October 15, 2021, would be **$93,970,866**.

| Principal Amount | Indexed Amount (a) | Net Interest (b) | Legal Fees and Costs (c) | Grand Total (d=a+b+c) |
|---|---|---|---|---|
| $51,355,812 | $76,432,427 | $7,089,284 | $10,449,155 | **$93,970,866** |

## Data Sources

To prepare this report, we collected certain figures for the relevant dates and adjustments.

First, we requested the documentation related to the lawsuit to determine the principal amount of the damages award and the types of adjustments required. According to the Judgment, the defendants must pay the following amounts to the Company:

1.  For investment in machinery, the sum of $2,582,156.

2.  For increased inventory, the sum of $2,860,696.

3.  For paid interest, the sum of $983,825.

4.  For lost operating cash flows between 2004 and 2013, the sum of $8,806,872.

5.  For certain losses between 2004 and 2007, the sum of $7,237,068.

6.  For damages due to halted operations, the sum of $28,885,195.

7.  The total sum of the aforementioned items amounts to $51,355,812.

Second, we retrieved the relevant economic figures necessary to perform the calculations for indexing and net interest.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



1. Indexing must be calculated using prime rate indicator. As such, we obtained historical data on the Prime Rate published by the Central Bank of Costa Rica (BCCR) up through its most recent date of publication on October 6, 2021. We converted these annual prime rates into daily rates using a 360-day annual period, using "Term-Adjusted Interest Rates."

2. Net interest must be calculated using the rates specified in Article 1163 of the Costa Rican Civil Code. Consequently, we obtained the historical interest rates in dollars from the National Bank of Costa Rica up through its most recent date of publication on October 6, 2021. One must also account for changes in purchasing power during the period of interest calculation. We therefore obtained the historical values of the Consumer Price Index (CPI) published by the BCCR up through its most recent publication in August 2021, using "Term-Adjusted CPI" for daily rates. For the calculation of net interest, the provisions established by the First Chamber of Costa Rica in its ruling number 000902-F-S1-2012 were taken as a reference.

3. Indexation and net interest must be calculated from August 30, 2008 until the date of effective payment.

Third, we retrieved the relevant thresholds and fees for the legal fees and costs.

1. We converted the sum of (a) the indexed principal sum and (b) net interest to colones. For this conversion, we used the sale exchange rate issued by the Central Bank of Costa Rica on October 6, 2021.

2. We then calculated the legal fees. Article 18 of the Costa Rican Executive Decree No. 32493, which governs the "Fee for Professional Legal and Notary Services," provides that fees are calculated in tiers corresponding to the total damages:

   - For awards up to ₡15,000,000, the fee is twenty percent.
   - On the excess of ₡15,000,000 and up to ₡75,000,000, the fee is fifteen percent.
   - On the excess of ₡75,000,000, the fee is ten percent.

   Additionally, the net legal fees from the previous tees must be increased by twenty-five percent for appeals to the Court of Cassation.

## Calculations

Based on the procedures described above and assuming a payment date of October 15, 2021, the arithmetic for each adjustment is set forth in Appendix A (indexation), Appendix B (net interest), and Appendix C (legal fees and costs).

Sincerely,

German Morales Martínez, CPA
Partner

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



## APPENDIX A

### Indexation

The principal amount owed to the Company is $51,355,812. Indexation of the principal amount through October 15, 2021 is $25,076,615. In total, the indexed principal amount owing on the Judgment is $76,432,427.

<span style="color:teal">Summary of the Calculation:</span>

Column A provides the starting date.

Column B sets the projected date on which the payment will be made.

Column C calculates the number of days elapsed from the initial date to the estimated date of payment.

Column D calculates the cumulative sum of the daily Prime Rates over the period.

Column E reflects the principal amount of the Judgment

Column F calculates the principal amount of indexation.

Column G encompasses the adjustment obtained by applying the fully indexed interest rate, which seeks to appraise the value of money over time by adjusting its purchasing power.

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Starting Date (a) | Final Date (b) | Elapsed Days (c=b-a+1) | Daily Accumulated Prime Rate (d) | Principal Amount (e) | Indexed Amount (f=e*(1+d)) | Indexation Adjustment (g=f-e) |
| 30-8-2008 | 15-10-2021 | 4,795 | 48.83% | $51,355,812 | $76,432,427 | $25,076,615 |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



**APPENDIX B**

**Net Interest**

The amount of net interest owing under the Judgment is $7,089,284. Net interest is calculated in three steps. First, we calculated the term-adjusted legal interest rate for the relevant period. Second, we calculated the term-adjusted consumer price index for the same period. Third, we calculate term-adjusted net interest, which eliminates the effect of changes in consumer price index from interest (e.g., in cases where inflation is higher than nominal interest, the net interest rate would be 0%). For the calculation of net interest, the provisions established by the First Chamber of Costa Rica in its ruling number 000902-F-S1-2012 were taken as a reference.

**Summary of the Term-Adjusted Legal Interest Rate Calculation:**

Column A contains the starting date of the interest rate calculation. The information is presented in intervals according to the National Bank of Costa Rica's historical database of annual interest rates in dollars.

Column B has the final date of each interval in which the annual interest rate in dollars, was valid.

Column C represents the annual interest rate that was in effect in each date timespan.

Column D details the daily interest rate in dollars obtained by calculating a 360-day annual period.

Column E represents the number of elapsed days between each legal interest dates interval.

Column F contains the calculation of the interest rate according to each term. It is obtained by multiplying the daily interest rate by the number of days of each date interval.

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Initial Date** | **Final Date** | **Annual %** | **Daily %** | **Elapsed Days** | **Term-Adjusted Rate** |
| 30-Aug-2008 | 17-Sep-2008 | 3.75 | 0.010 | 19 | 0.20% |
| 18-Sep-2008 | 18-Dec-2008 | 3.80 | 0.011 | 92 | 0.97% |
| 19-Dec-2008 | 08-Feb-2009 | 2.80 | 0.008 | 52 | 0.40% |
| 09-Feb-2009 | 08-Mar-2009 | 4.65 | 0.013 | 28 | 0.36% |
| 09-Mar-2009 | 22-Mar-2009 | 4.25 | 0.012 | 14 | 0.17% |
| 23-Mar-2009 | 20-Apr-2009 | 3.75 | 0.010 | 29 | 0.30% |
| 21-Apr-2009 | 10-May-2009 | 3.25 | 0.009 | 20 | 0.18% |
| 11-May-2009 | 21-May-2009 | 2.75 | 0.008 | 11 | 0.08% |
| 22-May-2009 | 02-Jun-2009 | 2.25 | 0.006 | 12 | 0.08% |
| 03-Jun-2009 | 30-Jun-2009 | 2.00 | 0.006 | 28 | 0.16% |
| 01-Jul-2009 | 19-Jul-2009 | 1.90 | 0.005 | 19 | 0.10% |
| 20-Jul-2009 | 26-Aug-2009 | 1.80 | 0.005 | 38 | 0.19% |
| 27-Aug-2009 | 29-Sep-2009 | 1.23 | 0.003 | 34 | 0.12% |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Initial Date | Final Date | Annual % | Daily % | Elapsed Days | Term-Adjusted Rate |
| 30-Sep-2009 | 03-Feb-2010 | 1.10 | 0.003 | 127 | 0.39% |
| 04-Feb-2010 | 05-May-2010 | 0.95 | 0.003 | 91 | 0.24% |
| 06-May-2010 | 06-Sep-2010 | 0.90 | 0.003 | 124 | 0.31% |
| 07-Sep-2010 | 01-Mar-2011 | 0.55 | 0.002 | 176 | 0.27% |
| 02-Mar-2011 | 17-Aug-2011 | 0.45 | 0.001 | 169 | 0.21% |
| 18-Aug-2011 | 05-Sep-2011 | 0.40 | 0.001 | 19 | 0.02% |
| 06-Sep-2011 | 02-Oct-2011 | 0.45 | 0.001 | 27 | 0.03% |
| 03-Oct-2011 | 08-Dec-2011 | 0.60 | 0.002 | 67 | 0.11% |
| 09-Dec-2011 | 28-Feb-2012 | 1.20 | 0.003 | 82 | 0.27% |
| 29-Feb-2012 | 15-Jul-2012 | 2.05 | 0.006 | 138 | 0.79% |
| 16-Jul-2012 | 07-Mar-2013 | 2.30 | 0.006 | 235 | 1.50% |
| 08-Mar-2013 | 14-Apr-2013 | 3.00 | 0.008 | 38 | 0.32% |
| 15-Apr-2013 | 28-Apr-2013 | 2.50 | 0.007 | 14 | 0.10% |
| 29-Apr-2013 | 20-May-2013 | 2.25 | 0.006 | 22 | 0.14% |
| 21-May-2013 | 27-May-2013 | 1.95 | 0.005 | 7 | 0.04% |
| 28-May-2013 | 04-Nov-2013 | 1.90 | 0.005 | 161 | 0.85% |
| 05-Nov-2013 | 09-Feb-2014 | 1.65 | 0.005 | 97 | 0.44% |
| 10-Feb-2014 | 18-May-2014 | 1.80 | 0.005 | 98 | 0.49% |
| 19-May-2014 | 15-Jul-2014 | 2.25 | 0.006 | 58 | 0.36% |
| 16-Jul-2014 | 04-Feb-2015 | 2.00 | 0.006 | 204 | 1.13% |
| 05-Feb-2015 | 11-Mar-2015 | 1.90 | 0.005 | 35 | 0.18% |
| 12-Mar-2015 | 03-May-2015 | 1.50 | 0.004 | 53 | 0.22% |
| 04-May-2015 | 25-May-2015 | 1.35 | 0.004 | 22 | 0.08% |
| 26-May-2015 | 20-Jul-2015 | 1.25 | 0.003 | 56 | 0.19% |
| 21-Jul-2015 | 29-Sep-2015 | 1.45 | 0.004 | 71 | 0.29% |
| 30-Sep-2015 | 25-Oct-2015 | 1.75 | 0.005 | 26 | 0.13% |
| 26-Oct-2015 | 10-Jan-2016 | 2.00 | 0.006 | 77 | 0.43% |
| 11-Jan-2016 | 18-Dec-2016 | 2.50 | 0.007 | 343 | 2.38% |
| 19-Dec-2016 | 14-May-2017 | 2.75 | 0.008 | 147 | 1.12% |
| 15-May-2017 | 22-Mar-2020 | 2.60 | 0.007 | 1043 | 7.53% |
| 23-Mar-2020 | 20-Jul-2020 | 1.85 | 0.005 | 120 | 0.62% |
| 21-Jul-2020 | 28-Feb-2021 | 1.65 | 0.005 | 223 | 1.02% |
| 01-Mar-2021 | 15-Oct-2021 | 1.40 | 0.004 | 229 | 0.89% |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



<p style="text-align:center; color:teal;">Summary of the Term-Adjusted Consumer Price Index Calculation:</p>

Column A notes the starting date of each month in which the calculation of legal interest began, corresponding to the ranges of annual interest in dollars of the National Bank of Costa Rica.

Column B notes the end date of each monthly interval.

Column C shows the number of days elapsed between each date interval.

Column D shows the CPI value that was valid on the starting date of the range.

Column E details the CPI value that was valid on the end date of the interval.

Column F corresponds to the percentage variance in the initial CPI and the final CPI for each date range. (Formula = Final CPI divided by Initial CPI minus 1).

Column G represents the variance in the adjusted CPI.

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Initial CPI Date | Final CPI Date | Days | Initial Monthly CPI | Final Monthly CPI | CPI Variance | Term-Adjusted CPI |
| 01-Aug-2008 | 30-Sep-2008 | 61 | 69.07 | 69.73 | 0.95% | 0.30% |
| 01-Sep-2008 | 31-Dec-2008 | 122 | 69.73 | 71.02 | 1.86% | 1.40% |
| 01-Dec-2008 | 28-Feb-2009 | 90 | 71.02 | 71.60 | 0.82% | 0.47% |
| 01-Feb-2009 | 31-Mar-2009 | 59 | 71.60 | 71.61 | 0.01% | 0.01% |
| 01-Mar-2009 | 31-Mar-2009 | 31 | 71.61 | 71.61 | 0.00% | 0.00% |
| 01-Mar-2009 | 30-Apr-2009 | 61 | 71.61 | 71.85 | 0.33% | 0.16% |
| 01-Apr-2009 | 31-May-2009 | 61 | 71.85 | 71.76 | -0.12% | -0.04% |
| 01-May-2009 | 31-May-2009 | 31 | 71.76 | 71.76 | 0.00% | 0.00% |
| 01-May-2009 | 30-Jun-2009 | 61 | 71.76 | 71.88 | 0.17% | 0.03% |
| 01-Jun-2009 | 30-Jun-2009 | 30 | 71.88 | 71.88 | 0.00% | 0.00% |
| 01-Jul-2009 | 31-Jul-2009 | 31 | 72.54 | 72.54 | 0.00% | 0.00% |
| 01-Jul-2009 | 31-Aug-2009 | 62 | 72.54 | 73.02 | 0.65% | 0.40% |
| 01-Aug-2009 | 30-Sep-2009 | 61 | 73.02 | 73.10 | 0.11% | 0.06% |
| 01-Sep-2009 | 28-Feb-2010 | 181 | 73.10 | 75.61 | 3.44% | 2.41% |
| 01-Feb-2010 | 31-May-2010 | 120 | 75.61 | 76.23 | 0.82% | 0.62% |
| 01-May-2010 | 30-Sep-2010 | 153 | 76.23 | 76.75 | 0.68% | 0.55% |
| 01-Sep-2010 | 31-Mar-2011 | 212 | 76.75 | 79.27 | 3.28% | 2.72% |
| 01-Mar-2011 | 31-Aug-2011 | 184 | 79.27 | 80.85 | 1.99% | 1.83% |
| 01-Aug-2011 | 30-Sep-2011 | 61 | 80.85 | 80.73 | -0.16% | -0.05% |
| 01-Sep-2011 | 31-Oct-2011 | 61 | 80.73 | 80.92 | 0.24% | 0.10% |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Initial CPI Date | Final CPI Date | Days | Initial Monthly CPI | Final Monthly CPI | CPI Variance | Term-Adjusted CPI |
| 01-Oct-2011 | 31-Dec-2011 | 92 | 80.92 | 81.90 | 1.22% | 0.89% |
| 01-Dec-2011 | 29-Feb-2012 | 91 | 81.90 | 82.28 | 0.46% | 0.41% |
| 01-Feb-2012 | 31-Jul-2012 | 182 | 82.28 | 83.83 | 1.89% | 1.43% |
| 01-Jul-2012 | 31-Mar-2013 | 274 | 83.83 | 87.73 | 4.66% | 3.99% |
| 01-Mar-2013 | 30-Apr-2013 | 61 | 87.73 | 88.37 | 0.73% | 0.45% |
| 01-Apr-2013 | 30-Apr-2013 | 30 | 88.37 | 88.37 | 0.00% | 0.00% |
| 01-Apr-2013 | 31-May-2013 | 61 | 88.37 | 88.39 | 0.02% | 0.01% |
| 01-May-2013 | 31-May-2013 | 31 | 88.39 | 88.39 | 0.00% | 0.00% |
| 01-May-2013 | 30-Nov-2013 | 214 | 88.39 | 88.33 | -0.06% | -0.05% |
| 01-Nov-2013 | 28-Feb-2014 | 120 | 88.33 | 90.04 | 1.93% | 1.56% |
| 01-Feb-2014 | 31-May-2014 | 120 | 90.04 | 92.11 | 2.30% | 1.88% |
| 01-May-2014 | 31-Jul-2014 | 92 | 92.11 | 93.30 | 1.30% | 0.82% |
| 01-Jul-2014 | 28-Feb-2015 | 243 | 93.30 | 93.22 | -0.10% | -0.08% |
| 01-Feb-2015 | 31-Mar-2015 | 59 | 93.22 | 93.35 | 0.15% | 0.09% |
| 01-Mar-2015 | 31-May-2015 | 92 | 93.35 | 93.01 | -0.37% | -0.21% |
| 01-May-2015 | 31-May-2015 | 31 | 93.01 | 93.01 | 0.00% | 0.00% |
| 01-May-2015 | 31-Jul-2015 | 92 | 93.01 | 93.00 | 0.00% | 0.00% |
| 01-Jul-2015 | 30-Sep-2015 | 92 | 93.00 | 92.68 | -0.35% | -0.27% |
| 01-Sep-2015 | 31-Oct-2015 | 61 | 92.68 | 92.42 | -0.28% | -0.12% |
| 01-Oct-2015 | 31-Jan-2016 | 123 | 92.42 | 93.21 | 0.86% | 0.54% |
| 01-Jan-2016 | 31-Dec-2016 | 366 | 93.21 | 93.29 | 0.09% | 0.08% |
| 01-Dec-2016 | 31-May-2017 | 182 | 93.29 | 94.15 | 0.92% | 0.75% |
| 01-May-2017 | 31-Mar-2020 | 1066 | 94.15 | 99.48 | 5.66% | 5.54% |
| 01-Mar-2020 | 31-Jul-2020 | 153 | 99.48 | 99.13 | -0.35% | -0.28% |
| 01-Jul-2020 | 28-Feb-2021 | 243 | 99.13 | 99.92 | 0.80% | 0.73% |
| 01-Mar-2021 | 31-Oct-2021 | 245 | 99.95 | 100.83 | 0.88% | 0.83% |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



### Summary of the Term-Adjusted Net Interest Calculation:

Column A set the starting date of the interest rate calculation.

Column B sets the end date of each interval in which the annual interest rate in dollars was valid.

Column C represents the principal amount that the company will receive. Meaning that this amount is the previously calculated indexed main amount, as seen in the preceding timespan.

Column D shows the indexed main amount at the end date of each date interval.

Column E details the calculation of the real or net interest rate. This rate represents the legal interest rate of each range modified according to the variation in the purchasing power per term. (Formula = (1 + Legal Rate According to Term) / (1 + Term Adjusted CPI) minus 1).

Column F details the sum of real interest calculated using the real or net interest rate. In cases where the real interest rate is negative, there is no calculation of interest. (Formula = Main amount multiplied by the real interest rate).

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Initial Date | Final Date | Main Amount | Indexed Main Amount | Real Interest Rate | Real Interest |
| 30-Aug-2008 | 17-Sep-2008 | $51,355,812 | $51,491,334 | -0.10% | $ 0 |
| 18-Sep-2008 | 18-Dec-2008 | $51,491,334 | $52,058,388 | -0.42% | $ 0 |
| 19-Dec-2008 | 08-Feb-2009 | $52,058,388 | $52,299,475 | -0.07% | $ 0 |
| 09-Feb-2009 | 08-Mar-2009 | $52,299,475 | $52,429,291 | 0.35% | $185,636 |
| 09-Mar-2009 | 22-Mar-2009 | $52,429,291 | $52,494,199 | 0.17% | $ 86,654 |
| 23-Mar-2009 | 20-Apr-2009 | $52,494,199 | $52,628,652 | 0.14% | $ 75,965 |
| 21-Apr-2009 | 10-May-2009 | $52,628,652 | $52,721,377 | 0.22% | $116,622 |
| 11-May-2009 | 21-May-2009 | $52,721,377 | $52,772,376 | 0.08% | $ 44,301 |
| 22-May-2009 | 02-Jun-2009 | $52,772,376 | $52,828,012 | 0.04% | $ 22,066 |
| 03-Jun-2009 | 30-Jun-2009 | $52,828,012 | $52,957,828 | 0.16% | $ 82,177 |
| 01-Jul-2009 | 19-Jul-2009 | $52,957,828 | $53,045,918 | 0.10% | $ 53,105 |
| 20-Jul-2009 | 26-Aug-2009 | $53,045,918 | $53,222,096 | -0.21% | $ 0 |
| 27-Aug-2009 | 29-Sep-2009 | $53,222,096 | $53,379,730 | 0.05% | $ 28,444 |
| 30-Sep-2009 | 03-Feb-2010 | $53,379,730 | $53,968,539 | -1.98% | $ 0 |
| 04-Feb-2010 | 05-May-2010 | $53,968,539 | $54,390,441 | -0.38% | $ 0 |
| 06-May-2010 | 06-Sep-2010 | $54,390,441 | $54,965,341 | -0.24% | $ 0 |
| 07-Sep-2010 | 01-Mar-2011 | $54,965,341 | $55,781,328 | -2.39% | $ 0 |
| 02-Mar-2011 | 17-Aug-2011 | $55,781,328 | $56,564,861 | -1.59% | $ 0 |
| 18-Aug-2011 | 05-Sep-2011 | $56,564,861 | $56,652,950 | 0.07% | $ 39,496 |
| 06-Sep-2011 | 02-Oct-2011 | $56,652,950 | $56,778,130 | -0.07% | $ 0 |
| 03-Oct-2011 | 08-Dec-2011 | $56,778,130 | $57,088,761 | -0.77% | $ 0 |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 12    Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 484 of 490   RECEIVED NYSCEF: 10/26/2021



| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Initial Date** | **Final Date** | **Main Amount** | **Indexed Main Amount** | **Real Interest Rate** | **Real Interest** |
| 09-Dec-2011 | 28-Feb-2012 | $57,088,761 | $57,468,937 | -0.14% | $ 0 |
| 29-Feb-2012 | 15-Jul-2012 | $57,468,937 | $58,108,745 | -0.64% | $ 0 |
| 16-Jul-2012 | 07-Mar-2013 | $58,108,745 | $59,198,272 | -2.40% | $ 0 |
| 08-Mar-2013 | 14-Apr-2013 | $59,198,272 | $59,374,451 | -0.14% | $ 0 |
| 15-Apr-2013 | 28-Apr-2013 | $59,374,451 | $59,439,359 | 0.10% | $ 57,725 |
| 29-Apr-2013 | 20-May-2013 | $59,439,359 | $59,541,358 | 0.13% | $ 78,380 |
| 21-May-2013 | 27-May-2013 | $59,541,358 | $59,573,812 | 0.04% | $ 22,576 |
| 28-May-2013 | 04-Nov-2013 | $59,573,812 | $60,320,254 | 0.90% | $534,094 |
| 05-Nov-2013 | 09-Feb-2014 | $60,320,254 | $60,769,974 | -1.10% | $ 0 |
| 10-Feb-2014 | 18-May-2014 | $60,769,974 | $61,224,331 | -1.36% | $ 0 |
| 19-May-2014 | 15-Jul-2014 | $61,224,331 | $61,493,235 | -0.45% | $ 0 |
| 16-Jul-2014 | 04-Feb-2015 | $61,493,235 | $62,439,038 | 1.21% | $746,675 |
| 05-Feb-2015 | 11-Mar-2015 | $62,439,038 | $62,601,308 | 0.10% | $ 60,546 |
| 12-Mar-2015 | 03-May-2015 | $62,601,308 | $62,847,032 | 0.44% | $273,046 |
| 04-May-2015 | 25-May-2015 | $62,847,032 | $62,949,030 | 0.08% | $ 51,849 |
| 26-May-2015 | 20-Jul-2015 | $62,949,030 | $63,208,662 | 0.20% | $ 123,082 |
| 21-Jul-2015 | 29-Sep-2015 | $63,208,662 | $63,537,839 | 0.56% | $ 353,072 |
| 30-Sep-2015 | 25-Oct-2015 | $63,537,839 | $63,658,382 | 0.25% | $ 156,810 |
| 26-Oct-2015 | 10-Jan-2016 | $63,658,382 | $64,024,292 | -0.11% | $ 0 |
| 11-Jan-2016 | 18-Dec-2016 | $64,024,292 | $65,738,292 | 2.30% | $1,472,407 |
| 19-Dec-2016 | 14-May-2017 | $65,738,292 | $66,546,077 | 0.37% | $ 245,310 |
| 15-May-2017 | 22-Mar-2020 | $66,546,077 | $73,780,470 | 1.89% | $1,258,310 |
| 23-Mar-2020 | 20-Jul-2020 | $73,780,470 | $74,336,825 | 0.90% | $ 661,116 |
| 21-Jul-2020 | 28-Feb-2021 | $74,336,825 | $75,370,717 | 0.29% | $ 212,112 |
| 01-Mar-2021 | 15-Oct-2021 | $75,370,717 | $76,432,427 | 0.06% | $ 47,707 |
| | | | | | **$7,089,284** |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)



# APPENDIX C

## Legal Fees and Costs

Legal fees and costs are set by government decree at specific rates and tiers, based on the total amount awarded by the court. The legal fees and costs together total $10,449,155.

### Summary of the Legal Fees and Costs Calculation:

1. With indexation and net interest, the amount awarded under the Judgment is $83,521,711. We converted this amount Costa Rican colones using an exchange rate of ₡629.12, which yielded a result of ₡52,545,178,847.

2. We then applied the tiered rates of 20%,15%, and 10% in accordance with Article 18 of Decree No. 32493 to determine the legal fees:

|  | Lower | Upper | Rate | Tranche Amount | Legal Fees in CRC | Legal Fees in USD |
|---|---|---|---|---|---|---|
| Tier 1 | ₡ 0 | ₡ 15,000,000 | 20% | ₡ 15,000,000 | ₡ 3,000,000 | $ 4,769 |
| Tier 2 | ₡15,000,000 | ₡ 75,000,000 | 15% | ₡ 60,000,000 | ₡ 9,000,000 | $ 14,306 |
| Tier 3 | ₡75,000,000 | ₡52,545,178,847 | 10% | ₡52,470,178,847 | ₡5,247,017,885 | $ 8,340,250 |
|  |  |  |  |  | ₡5.259.017.885 | $ 8,359,324 |

3. Finally, when a party appeals to the Court of Cassation and loses, it owes an additional 25% on top of the legal fees for the first-instance court. As applied here, that increases the legal fees to **$10,449,155.**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(10(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 13                                                                RECEIVED NYSCEF: 10/26/2021

Case 1:21-cv-08928   Document 1-1   Filed 11/01/21   Page 486 of 490

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

## New York Supreme COURT, COUNTY OF New York

Index No: _____   Date Index Issued: _____

| | For Court Use Only: |
|---|---|

**CAPTION**   Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Trejos Hermanos Sucesores S.A.

**IAS Entry Date**

-against-                                                    Plaintiff(s)/Petitioner(s)

Verizon Communications, Inc.

**Judge Assigned**

**RJI Filed Date**

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING:**   Check only one box and specify where indicated.

**COMMERCIAL**
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☒ Contract
- ☐ Insurance (where insurance party is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (specify): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

**REAL PROPERTY:**   Specify how many properties the application includes: _____
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):   ☐ Residential   ☐ Commercial
  Property Address: _____

  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.*

- ☐ Tax Certiorari - Section:        Block:        Lot:
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

**OTHER MATTERS**
- ☐ Certificate of Incorporation/Dissolution   [see **NOTE** in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

**MATRIMONIAL**
- ☐ Contested
  *NOTE: If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.*

  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI **(UD-13)**.*

**TORTS**
- ☐ Asbestos
- ☐ Child Victims Act
- ☐ Environmental (specify): _____
- ☐ Medical, Dental, or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ☐ CPLR Article 75 (Arbitration)   [see **NOTE** in **COMMERCIAL** section]
- ☐ CPLR Article 78 (Body or Officer)
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 (Kendra's Law)
- ☐ MHL Article 10 (Sex Offender Confinement-Initial)
- ☐ MHL Article 10 (Sex Offender Confinement-Review)
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☐ Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING:**   Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION:**   Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental, or Podiatric Malpractice   Date Issue Joined: _____
- ☒ Notice of Motion   Relief Requested: Judgment - Summary in Lieu of Complaint   Return Date: 12/06/2021
- ☐ Notice of Petition   Relief Requested: _____   Return Date: _____
- ☐ Order to Show Cause   Relief Requested: _____   Return Date: _____
- ☐ Other Ex Parte Application   Relief Requested: _____   Return Date: _____
- ☐ Poor Person Application
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Writ of Habeas Corpus
- ☐ Other (specify): _____

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**RELATED CASES:** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**PARTIES:** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Un-Rep | Parties (List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant; 3rd party plaintiff, etc.) | Attorneys and/or Unrepresented Litigants (For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email.) | Issue Joined (For each defendant, indicate if issue has been joined.) | Insurance (For each defendant, indicate insurance carrier, if applicable.) |
|---|---|---|---|---|
| ☐ | Name: Trejos Hermanos Sucesores S.A.  Role(s): Plaintiff/Petitioner | BENJAMIN GRAHAM, Williams & Connolly LLP, 650 Fifth Avenue Suite 1500, New York, NY  10019, 2024345000, bgraham@wc.com | ☒ YES ☐ NO |  |
| ☒ | Name: Verizon Communications, Inc.  Role(s): Defendant/Respondent | 1095 Avenue of the Americas, New York, NY  10036 | ☐ YES ☒ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:  Role(s): |  | ☐ YES ☐ NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:  10/26/2021

BENJAMIN WALKER GRAHAM
Signature

5412440
Attorney Registration Number

BENJAMIN WALKER GRAHAM
Print Name

*This form was generated by NYSCEF*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

UCS-840C
3/2011

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF  New York**

—————————————————————————— x

Trejos Hermanos Sucesores S.A.

**Plaintiff(s)/Petitioner(s)**

-against-

Verizon Communications, Inc.

**Defendant(s)/Respondent(s)**
—————————————————————————— x

**Index No:**

**RJI No. (if any):**

## COMMERCIAL DIVISION

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

93000000.00

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) and (c).**

**Dated:**    10/26/2021

BENJAMIN WALKER GRAHAM

**SIGNATURE**

BENJAMIN WALKER GRAHAM

**PRINT OR TYPE NAME**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Index not Assigned - New York County Supreme Court

Short Caption: **Trejos Hermanos Sucesores S.A. v. Verizon Communications, Inc.**
Case Type: **Commercial - Contract - Commercial Division**
Case Status: **RJI Pending**
eFiling Status: **Waiting for Index Number**

**Full Caption**
Trejos Hermanos Sucesores S.A. v. Verizon Communications, Inc.

**Plaintiffs/Petitioners**

| Name | Represented By |
|------|----------------|
| Trejos Hermanos Sucesores S.A. | GRAHAM, BENJAMIN WALKER on 10/26/2021 Williams & Connolly LLP |

**Defendants/Respondents**

| Name | Represented By |
|------|----------------|
| Verizon Communications, Inc. | *none recorded* |

**Sort By:** Doc #

| # | Document | Filed By | Status |
|---|----------|----------|--------|
| 1 | SUMMONS | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 2 | NOTICE OF MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 3 | MEMORANDUM OF LAW | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 4 | AFFIDAVIT<br>*Affidavit of Rolando Lacl Ziga* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 5 | EXHIBIT(S)  - A<br>*Complaint* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 6 | EXHIBIT(S)  - B<br>*Judgment* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 7 | EXHIBIT(S)  - C<br>*Decision on Appeal* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 8 | EXHIBIT(S)  - D<br>*Second Decision on Appeal* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 9 | EXHIBIT(S)  - E<br>*GTE Corp. Guaranty* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 10 | EXHIBIT(S)  - F<br>*SEC Filing - Verizon Communications, Form 8-K (June 30, 2000)* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 11 | EXHIBIT(S)  - G<br>*Verizon Website* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 12 | AFFIDAVIT<br>*Expert Report of Grant Thornton LLP* | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 13 | RJI -RE: NOTICE OF MOTION | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |
| 14 | ADDENDUM - COMMERCIAL DIVISION (840C) | Graham, B.<br>Filed: 10/26/2021<br>*Received: 10/26/2021* | *** *Pending* ***<br>Confirmation Notice |