# Exhibit A

[handwritten text]:
[line 1] 91 original folios / 3 sets of copies
[line 2] 3 bundles of evidence that
[line 3] include 77 documents of evidence.
[line 4] fully reviewed [line 5] All are attached.

## ORDINARY CIVIL TAX ACTION

<u>Plaintiff</u>: "Trejos Hermanos Sucesores, Sociedad Anónima"

<u>Defendants</u>:     **Instituto Costarricense de Electricidad [Costa Rican Institute of Electricity]**
**Verizon Communications Incorporated**
**Verizon Information Services -Costa Rica- LLC**

**TAX COURT OF ADMINISTRATIVE LITIGATION AND CIVIL PROCEDURE. Second Judicial Circuit. Goicoechea, Building Annex A.-**

The undersigned, **ALVARO TREJOS FONSECA,** of legal age, married in second marriage, Master of Science, resident of San José, identity card number 1-0390-0895, acting in my capacity as President and broadly empowered attorney-in-fact without limit of amount, of the company of this domicile **"TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA"**, legal person identification card number 3-101-000940, with the attached certification, document marked as **No. 1**, hereby file an Ordinary Civil Tax Action against the **"INSTITUTO COSTARRICENSE DE ELECTRICIDAD" [Costa Rican Institute of Electricity]**, represented by its Executive President Pedro Pablo Quirós Cortés, of legal age, married, resident of Ciudadela Calderón Muñoz, Electrical Engineer, identity card number 2-195-129; and against the commercial firms **"VERIZON COMMUNICATIONS INCORPORATED",** a company registered in the State of



Delaware of the United States of America, but with offices at 140 West St., 29th floor, New York, NY 10007, telephone (212) 395-1000, registered with the **SEC** (U.S. Securities and Exchange Commission of the United States Government), with registration number 0000732712, represented by Ivan G. Seidenberg, Chairman and Chief Executive Officer, and alternatively by William P. Barr, Executive Vice President and General Counsel, both U.S. citizens, both with the same last name due to their nationalities and other unknown qualities, which we have verified by reproducing the web pages on the internet; and **"VERIZON INFORMATION SERVICES -COSTA RICA- LLC"** limited liability company, branch in Costa Rica registered in the Registry of Legal Entities of the National Registry of Costa Rica, with the legal identification number 3-012-026573, of the company of the same name incorporated and organized under the laws of the State of Delaware, United States of America, as recorded in volumes 147, 672 and 1517; folios 27, 65 and 214; entries 35, 76 and 220, respectively, represented by its Resident Agent in accordance with the provisions of Article 232 of the Code of Commerce, Mr. HERNÁN PACHECO ORFILA, attorney at law, resident of San José, with office open at the Pacheco Coto Law Firm at 11th Avenue, 5th and 7th Streets, identification card 1-585-980, as evidenced by the attached certification, documentary evidence marked as No. 2.-

[handwritten] *AEJ* →

The complaint is filed to declare that the actions and resolutions of the defendants, to terminate and leave without legal effects the administrative contract that had been formalized between them, for the "Publication of the Telephone Directory and Development and Implementation of Information Services", signed on March 10, 2000, have caused the plaintiff serious damages and losses that, as such, constitute a matter of financial liability.


**<u>Initial Clarification:</u>**


Solely for the purposes of the statement of the facts of the claim, we clarify that in this document we will use, conventionally and for procedural economy, the following abbreviations:

**THS** means the Costa Rican firm plaintiff in the proceedings Trejos Hermanos Sucesores, Sociedad Anónima.

**ICE** means the Instituto Costarricense de Electricidad [Costa Rican Institute of Electricity], an autonomous institution of Costa Rica, responsible for the administration, among others, of the country's telephone services.

**CGR** means the Office of the Comptroller General of the Republic, an auxiliary entity of the Legislative Assembly, in charge of auditing and controlling the Public Treasury.

**GTE** means the U.S. company GTE Corporation and indistinctly all its subsidiaries, the U.S. companies linked to the contracts entered into with ICE since 1975, such as GTE Information Services Incorporated (GTE-IS), GTE Directories Corporation (GTE-DC), General Telephone Directory Company C por A (GTDC) and the branch of the latter, of the same name, registered in the Mercantile Registry of Costa Rica in Volume 147, folio 27, entry 35.

**GTE GROUP** means the consortium comprising GTE Corporation, the Group Holding Company and all subsidiaries.

**VERIZON** means the U.S. company resulting from the merger between the American company Bell Atlantic and GTE and indistinctly all its subsidiaries, such as, for example, the U.S. companies linked to the contracts entered into with ICE, such as Verizon Information Services Inc., Verizon Directories Corp. and Verizon Information Services - Costa Rica, LLC.

**VERIZON GROUP** means the consortium comprising Verizon Communications Inc, the Holding Company and all subsidiaries.

**SEC** means the U.S. government office called the "U.S. Securities and Exchange Commission" of the United States Government, which oversees publicly listed companies in the United States.

**RACSA** means the public company Radiográfica Costarricense, Sociedad Anónima, which belongs to the **ICE** group.

**File or Administrative File** means the administrative file in ICE's files, to which we will refer, so as to identify the folios containing the proof of documents that we offer to prove the facts of the claim, duly certified by ICE's Procurement Department.

## Corporate background.-

In this explanation, which is inserted to serve as an exordium of the claim, we indicate, in summary, the corporate background of the U.S. companies that participated in the contract entered into with **ICE,** which is the conventional link from which the consequences and other facts on which this claim is based are derived.

As will be demonstrated later with the support of the pertinent evidence, three companies belonging to the holding company of the United States of America, called **GTE CORPORATION,** of which details will be given later, formed a consortium or association of companies to participate in a public bidding promoted by **ICE,** a group of companies that was awarded the contract. A fourth company joined the same group to unify the execution of the administrative contract, for which a branch of the same company was registered in Costa Rica.

Clause No. 25 of the contract signed and countersigned between **GTE** and **ICE** stipulates that the contract would remain unchanged and in force between the parties with the new legal names, in the event that the original firms or the holding company changed their names or merged into a different company, which actually ended up happening, since the **GTE** group subsequently merged with the U.S. firm Bell Atlantic and formed the **VERIZON** group, which expressly assumed all obligations and liabilities to **ICE** arising from the contract. For this reason and depending on the dates in which they occur, the corporate name **GTE** is substituted in the Facts of the Complaint by the new corporate name that we identify as **VERIZON,** without there being any solution of continuity in such events, with respect to the existence of the contract, as will be demonstrated later.

## A.- FACTS OF THE COMPLAINT.

**1).-** **THS** is a Costa Rican industrial company that, since 1912, has focused its commercial activities on text printing, and specifically on the publication and printing of telephone directories, also known commercially and in popular slang as phone books (Document No. 3).

**2).-** The experience of **THS** in the publication and printing of telephone directories began in Costa Rica and was extended, over time, to other countries in Central America and the Caribbean, which we demonstrate with photocopies of telephone directory covers produced by the company for the Dominican Republic, Jamaica, Honduras, Virgin Islands, Antigua and Barbados, Dominica, Turks and Caicos, Aruba, Montserrat, Grenada, Cayman Islands, the Caribbean and South Florida, St. Lucia, Louisiana, Belize, Puerto Rico, Jacksonville and Costa Rica (Document No. 4).

**3).-** The GTE Group, through its company **General Telephone Directory Company,** became interested in the publication of telephone directories in Costa Rica and began its activities in this country in 1974, participating in a bidding process promoted by **ICE** for such a purpose, which was awarded on a final basis and the respective administrative contract was formalized, as evidenced by the certificate issued by the General Manager of GTE Costa Rica on January 26, 1999 (Document Nos. 5 and 7).

**4).-** It has always been a contractual requirement imposed by **ICE,** included as an invariable condition in its public bidding documents, that the publication and printing of telephone directories had to be done in Costa Rican territory, a provision of the bidding document that is explained only by the following text, which is transcribed verbatim: ***"... thereby contributing to the growth of well-paid employment, vocational training, technology transfer for the benefit of Costa Rican citizens and the country's economy in***

***general, which ICE considers to be in the general interest..."*** (see Clause 27 of the ICE-GTE Consortium Contract signed on March 10, 2000, in Folio No. 2767 of the File, which is included in Document No. 6 and Document No. 24).

**5).-** Among other obligations and rights, in order to comply with the requirement of the previous fact and once it had acquired its condition as **ICE**'s awardee and consequently being its co-contractor, **GTE** entered into printing contracts with **THS** so that the latter would be in charge of updating the telephone subscriber database, printing and binding phone books as of 1975 and for thirty more years that the commercial relationship lasted (see copy of deeds 35-11, 36-11 and 45-15 executed before Notary Edgar Chamberlain); furthermore, through deed 53-15 executed before the same notary office, GTE contracted with THS the printing of the phone books of Panama for the year 1982 (Document No. 7).

**6).-** **THS**'s business relationship with **GTE** intensified over time, due to the excellence of its services, which contributed to **GTE** being awarded other tenders promoted by **ICE**, always in the same commercial activity, i.e., for the publication and printing of telephone directories. As a result of **GTE**'s sustained interest in **THS** as the printer of the telephone directories, new publishing and printing contracts were later formalized - in principle, one for each awarded bid -, the contents of which were negotiated between the two companies, based on the award of each administrative contract between **GTE** and **ICE**. In general terms, **THS** prepared the phone books for the **GTE Group** as long as the latter was awarded the contract and contractor of **ICE**, as mentioned above (Document Nos. 4, 5 and 8).

**7).-** **THS**'s relationship with **GTE** was not limited to the latter's subsidiaries in Costa Rica and Panama, but was extended, first, starting in 1988 and for twenty more years, to the printing and publishing of phone books in the Dominican Republic, initially through Compañía Dominicana de Teléfonos (CODETEL), a company equivalent in functions and competencies to **ICE** in Costa Rica and which was a subsidiary of the **GTE** group and then with GTE

Directories Corporation, another subsidiary of the **GTE** group (Document Nos. 8 and 9).-

**8).-** Within the framework of this business relationship, **GTE** entered into an "agency and mutual cooperation" agreement with **THS** on May 8, 1997. Within the clauses of this Agreement, in Annex B Point 5 it was established that GTE Information Services granted **THS** the status of ***"preferred vendor"*** or preferred supplier for Central America including Panama and the Caribbean, defined in Annex 2 as a series of thirty-two (32) countries including the Dominican Republic and Puerto Rico. While this status was in force and with the contracts of Costa Rica and the Dominican Republic also in force, by express and contractual decision of GTE of March 15, 1999, the plaintiff company received the requirements of GTE to acquire and implement its industrial process, a new plant and new equipment, which would eventually lead to the closing of operations, since it could not sustain it without the respective contracts signed with GTE, as demonstrated. At the same time, **THS** was asked on March 15, 1999, to [sic] (see the contract in Document No. 10 and the report of expert Bruce Wataru, as well as the requirements for handling the purchase of paper and quoting the directories for Puerto Rico for 2001).

**9).-** Subsequently, in 2000, **GTE** commissioned **THS** to print and publish telephone directories, including those of Costa Rica and Belize, and on January 21, a new contract was signed regarding the business relationship between the two companies. In the months leading up to this contract, various forms of association between **GTE** and **THS** were discussed, including the formalization of a joint venture between the two companies (see the contract in Documents Nos. 11 and 23).

**10).-** Regarding the relationship with **ICE,** this Costa Rican public institution issued Public Bidding No. 6378-T in 1999 and 2000, promoted for the "Development and Implementation of Information Services", in which Grupo GTE participated (Document No. 12).

**11).-** The commercial firms **"GTE Information Services Incorporated", "GTE Directories Corporation" and "General Telephone Directory Company C por A",** companies of the United States of America, domiciled in the State of Delaware and with main offices in the City of Dallas, State of Texas, submitted a joint bid, under the form of a consortium or association of companies, in Public Bidding No. 6378-T promoted by **ICE** and for all purposes related to this public bidding, identified themselves as the **GTE Consortium** (see folios 1 to 10 of the bid submitted by the Consortium in ICE's possession, copies of which are attached duly certified in Document No. 13).

**12).-** The offer of the GTE Consortium was signed by Terrence Mitchell Leve, acting as special attorney-in-fact of the consortium, as stated in the incorporation agreement of that legal entity (same evidence above and copy of the agreement in certified file folios 298 and 360 to 367 in Document No. 14).

**13).-** In the letter of presentation for the bid, in Point No. 10, the GTE Consortium stated the following:

"10. We give a brief explanation of the companies mentioned in the offer, including those that make up the GTE Consortium and the relationship between them, as follows:

- A) **GTE Corporation** is a corporation established in New York, United States of America, whose shares are listed and traded on the New York Stock Exchange.

- B) **GTE Information Services Incorporated** (GTE-IS) is a corporation established in the State of Delaware, United States of America, with its main offices in Dallas, Texas. All of its shares are owned by GTE Corporation.

- C)        **GTE Directories Corporation** (GTE-DC) is a Delaware corporation headquartered in Dallas, Texas. It is wholly owned by GTE Information Services Incorporated.

- D)        **General Telephone Directory Company C por A** (GTDC) is also a Delaware corporation, headquartered in Dallas, Texas. It is wholly owned by GTE Information Services Incorporated.

- E)        **General Telephone Directory Company C por A** (GTDC) established in Costa Rica, in 1975, a branch with the same name, which is registered in the Mercantile Registry of Costa Rica in Volume 147, folio 27, entry 35.

- F)        **GTE Information Services Incorporated, GTE Directories Corporation and General Telephone Directory C por A** have formed the **GTE Consortium** to complement their experience and background in order to bid in this bid. The GTE consortium shall be considered the principal bidder for all legal purposes" (see folios 4 and 5 of the file certified in Document No. 13)

**14).-**        On page 8 of its offer to **ICE,** the GTE Consortium wrote:

"**NAME AND MAILING ADDRESS**

The main domicile of the **GTE CONSORTIUM** is as follows:

GTE Place - West Airfield Drive DFW Airport, TX 7576-9810

United States of America

P.O. Box: P.O. BOX 619810

Telephone: 001-9724537589

Fax:        001-9724537655"

(Same evidence Document No. 13).

**15).-**         In folio 9 of its bid, the GTE Consortium stated textually:

"1.3.1.3 The GTE Consortium by the fact of submitting its bid declares that it knows, accepts and submits to ICE's procedures for the processing of bids, to everything stipulated in the documents of this bid and to the courts and laws of Costa Rica, as stated in the attached Consortium Agreement (Document III-I)" (same Exhibit Document No. 13).

**16).-**         The administrative contract was awarded to the GTE Consortium by the Board of Directors of **ICE,** in the ordinary session number five thousand one hundred fifty-two, held on February 1, 2000, an agreement published in Scope No. 10 of La Gaceta [National Gazette] No. 28 of February 9, 2000 (see folio 2779 of the file in ICE's possession, which is page one of the contract signed between ICE and the GTE Consortium "recital" letter "a" in the contract in Document No. 6).

**17).-**         The contract was countersigned by the **CGR** on December 13, 2000, as evidenced based on the approval visible on folio 2766 of the administrative file for the Tender in the possession of **ICE.** Attached, as documentary evidence, are pages 2751 to 2781 of the administrative file, which is a copy of the contract, duly certified by ICE's Procurement Department (see the contract in Document No. 6).

**18).-**         In Clause 25 of the contract, **ICE** and the GTE Consortium stipulated the following:

"In the event that due to a modification in the ICE law this entity changes its name or that, for its part, GTE changes its name as a result of a merger or association with another company, in both cases this agreement shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal

entities represented herein" (same evidence, folio 2768, Document No. 6).

**19).-** The firm VERIZON Information Services - Costa Rica, LLC, sent a note dated May 16, 2002, to the **ICE** Procurement Department, in which it states, among other things, that "General Telephone Directory Company C por A" changed its name to Verizon Information Services Costa Rica, LLC and requests that the change of the corporate name of the companies that make up the GTE Consortium be considered officially communicated, citing as a basis Clause 25 of the contract (see certified copy of official letter S I.-0247-05-02 that the Head of the Information Services Area sent to the Telecommunications Legal Department, visible on folio 3045 of the file). That is to say, in accordance with the legislation of its country, **GTE** merged with the American firm Bell Atlantic and as a result of the merger the **VERIZON GROUP** was created, so that in all ongoing contracts of **GTE** with **ICE** and **THS** the corporate name of the American contracting company **GTE** was replaced by companies of the **VERIZON GROUP** and all this means that the commercial relationship of **THS** to publish and print telephone directories, from that moment on, continued in execution with the firms of this group, so that the commercial relationship between **THS** and the **GTE and VERIZON Groups** lasted approximately thirty years, when adding the time of duration with **GTE** and **Verizon** without interruption (see documents of change of name of GTE to Verizon in folios 2956 to 3045 of the file in Document No. 15).-

**20).-** On June 8, 2002, by means of official letter DCA 966, the Administrative Contracting Division of **ICE**'s Institutional Legal Department advised the Information Services Area that the documentation received only evidenced the change of name of two of the companies of the consortium, "GTE Information Services Incorporated", which changed to "Verizon Information Services Inc." and "General Telephone Directory Company C por A", which changed to "Verizon Information Services - Costa Rica, LLC", and therefore the name of the Consortium could not be considered officially changed. This decision was communicated to Verizon Information Services by means of official letter S.I.-0284-06-02 dated June 18, 2002 (see folios 3043 and 3044 of the attached administrative file certified in Document No. 15).

**21).-** Michael Q. Neal, acting in his capacity as General Manager of "Verizon Information Services - Costa Rica, LLC", by means of a note dated August 28, 2002, clarified to the Information Services Area of **ICE** what happened with the name changes and attached the necessary documentation to prove the facts and stated literally:

"a) On August 5, 1999, the document creating the GTE Consortium was signed, which was formed by the companies GTE Directories Corp, GTE Information Services, Inc. and General Telephone Directory Company C por A., which was the awardee of public bidding 6378-T.

b) These 3 companies changed their names as a result of the merger between Bell Atlantic and GTE, which created VERIZON, to be called Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services-Costa Rica, LLC".

c) In the case of Verizon Directories Corporation on January 31, 2002, 2 things happened:

1) Verizon Directories Corp. **merged** with Verizon New Media Services Inc. and, legally, Verizon New Media Services, Inc. became the **surviving company** of the merger.

2) The second issue that happened that same day is that Verizon New Media Services Inc, the surviving company of the merger, decided to **CHANGE its name** from Verizon New Media Services, Inc (which had already absorbed Verizon Directories Corp), to VERIZON DIRECTORIES CORP.

As can be seen from the attached certification, at **11:30 a.m.** on January 31, 2002, the first change was filed and only 5 minutes later, at **11:35 a.m.**, the second change was filed, with the certificate of consolidation to **change the name.**

d)      The above sequence explains why, both in the certification that we have already attached together with the note of May 16, 2002, and in the certification that we now attach, it appears that the former name of Verizon Directories Corp. was Verizon New Media Services, Inc. and not Verizon Directories Corp., as occurred with the other two companies (see certified folios 3040, 3041 and 3042 of the administrative file attached in Document No. 15).

**22).-**      In the same note of August 28, 2002, to which the previous point refers, Verizon Information Services Costa Rica, LLC, expressed the following:

**"II.- MAINTENANCE OF ALL OBLIGATIONS AND RIGHTS.**

As required in the note of June 18, 2002, I also attach herewith a SWORN DECLARATION on the **Maintenance of Obligations and Rights,** signed by the legal representatives of Verizon Information Services, Inc, Verizon Directories Corp. and Verizon Information Services-Costa Rica, LLC, in which they accept the rights and obligations derived from the Bidding 6378-T and the contract derived therefrom" (folios 3035, 3036 and 3037 of the administrative file attached certified in Document No. 15).

**23).-**      The documents referred to by Verizon Information Services Costa Rica, LLC in the immediately preceding Fact, all of them authenticated and certified by the consulate, are found in folios 3019 to 3039 of the administrative file, which are summarized in the official translations of folios 3019 to 3027. Essentially, these documents are the statements of Maintenance of Undertakings made by the companies VERIZON Information Services, Inc. and VERIZON Directories Corp., these two companies represented by William G. Mundy, Vice President of each of them, with sufficient power and legal representation to commit the two principal companies and VERIZON Information Services - Costa Rica, LLC, represented by W. Scott Hanle, in his capacity as Vice President of the company, with sufficient power to bind the firm. The statement is made as follows:

"1.-    That our principals VERIZON Information Services Inc. formerly known as GTE Information Services, Incorporated, VERIZON Directories Corp. formerly known as GTE Directories Corporation and VERIZON Information Services-Costa Rica, LLC formerly known as General Telephone Directory Company C por A., signed a **"Consortium Agreement"** on August 5, 1999, to submit a bid to the COSTA RICAN INSTITUTE OF ELECTRICITY in Public Bidding 6378-T.

2.-    We declare that our principals, now under the new names indicated, fully and absolutely maintain the rights and obligations established in the consortium agreement of August 9, 1999; in the offer presented to ICE by GTE Consortium on August 26, 1999, and in the contract signed between ICE and GTE Consortium on March 10, 2000, which was authenticated (sic) by the Office of the Comptroller General of the Republic on December 13, 2000.

3.-    As stated in Clause "seven" of the Consortium Agreement, we repeat that for all obligations arising from Public Bidding 6378-T, "the company directly responsible, on behalf of the Consortium, before the COSTA RICAN INSTITUTE OF ELECTRICITY, is VERIZON Information Services-Costa Rica, LLC (formerly known as General Telephone Directory Company C por A).

4.-    That the compensation for the services required from each different company of the Consortium to comply with all the bidding conditions before the COSTA RICAN INSTITUTE OF ELECTRICITY will be affected in accordance with an internal agreement between the parties of the Consortium." *(evidently, this is a material error in the translation: what the statement says is "That the compensation for the services required by the different companies of the Consortium to fulfill, etc.")*

5.- The present statement was made at the request of ICE (Note dated June 18, 2002, S.I. 0284-06-02) to officially register the change of names of our principals in the contract signed between ICE and GTE Consortium (now VERIZON)..." (see folios 3019 to 3045 certified in Document No. 15-A).

**24).-** The Consortium Agreement signed on August 5, 1999, by GTE Information Services Inc., GTE Directories Corp. and General Telephone Directory Company C por A., consists of ten clauses and was signed by representatives with sufficient powers to do so, as evidenced by the documentation mentioned. In summary, the agreement states in its clauses:

**First:** that GTE Information Services Incorporated is a wholly owned subsidiary of GTE Directories Corporation and General Telephone Directory Company C por A.

**Second:** that the purpose - essential aim - of the consortium is to complete the background and experience of the three signatory companies in order to participate in the bidding process.

**Third:** ICE's bidding document requires the bidder to demonstrate experience in publishing telephone directories for administrations with at least 2 million telephone lines in total, experience in customer and quality orientation programs, experience in developing complementary services to the telephone directory, experience in developing substitute products to the telephone directory, experience in developing different technological platforms for information services; it requires certifying the budget allocated to research and development, indicating audio-text facilities and their operating mechanisms, granting an unconditional commitment to provide ICE with advice and access to technological development in information services for the Information Service [directory assistance] 113, by means of a letter of commitment, among other obligations.

**Fourth:** that the bidding companies are presented as a consortium so that the background and experience of each one of them may be jointly evaluated in the bidding process.

**Fifth:** They agree that the sole representative before ICE will be General Telephone Directory Company C por A., which will be the awardee and will be responsible for coordinating, with the other companies of the Consortium, the provision of all services and supplies. The parties to the Consortium shall be jointly and severally liable to ICE for all obligations arising from the bid, participation in the Consortium in the contracting procedures, the eventual award and its execution.

**Sixth:** appoint Bill J. Brewer and Terrence Mitchel Leve, U.S. citizens, and José María Quirós Alfaro, Costa Rican, as special attorneys-in-fact for the Consortium, so that they may sign and present the Consortium's bid; sign and present to ICE clarifications of the bid; extend the validity of the bid and of the participation guarantee; defend the award if it is favorable to the Consortium or appeal the award if it is not favorable to the Consortium; substitute the power of attorney in whole or in part, reserving for themselves at all times the power of attorney; sign the respective contract. The attorneys-in-fact may act jointly or separately and declare that the principal companies and the attorneys-in-fact submit to the laws and courts of Costa Rica for all effects and contracts entered into and to be executed in Costa Rica by reason of the aforementioned bidding.

**Seventh:** that the directly responsible party, on behalf of the consortium, before ICE for all obligations arising from the bidding, is General Telephone Directory Company C por A., without prejudice to the joint and several liability of the other members of the Consortium.

**Eighth:** That the responsibility of GTE Information Services Incorporated and GTE Directories Corporation shall consist of providing General Telephone Directory Company C por A with all types of technical and

financial support to enable it to comply with all obligations, such as providing ICE with advice and access to technological development in information systems for the Information Service 113 and any other type of financial or technological support required by the bidding document. This is without prejudice to the **joint and several liability of all the companies of the Consortium in the event of non-compliance by any of them**.

**Ninth:** that by virtue of the provisions of Clause 1, the compensation of the services required from the different companies of the consortium, in order to comply with all the obligations of the bidding document, shall be made by means of an internal agreement between the parties.

**Tenth:** The legal address of the Consortium is fixed in Costa Rica.

The three companies attach to the Consortium Agreement the certificates of incorporation issued by the Office of the Secretary of State of Delaware, together with their official translations, which show the legal existence of the companies and of the officers signing on their behalf (see folios 298 and 360 to 394 corresponding to the bid submitted by the Consortium to ICE, certified copies of which are attached in Document No. 14).

**25).-** Copies, with their official translations, of the contract signed by General Telephone Directory Company C por A with the firm Belize Telecommunications Limited, on February 10, 1994, can be found on folios 395 to 426 of the Consortium's bid (see those folios of the file certified in Document No. 16).

**26).-** Clause 2.4.1.B of ICE's Bidding Document 6378-T regulated the bid evaluation criteria under three headings: 40% for Experience; 30% for Financial Capacity and 30% for Quality of number 113 and in Point B of the clause, where the following was expressly stated:

"The bidding company must submit with its bid the audited financial statements in Spanish for the last 3 years containing at least the

Balance Sheet, Income Statement and Retained Earnings or Accumulated Deficit (according to the rules and regulations of its country of origin), which will allow ICE to verify its financial capacity. **In the event that the bidder is part of another company or group of companies (Holding Company), the presentation of the financial statements of the latter shall be allowed under the terms established herein, in which case the corporate group shall be jointly and severally liable with the bidder for all the obligations that the latter will acquire as awardee; this joint and several liability must be demonstrated by the bidder through an express and written statement of the representative of those companies."** (Document No. 17)

**27).-** On folios 427 to 432 of the Consortium's bid, there is a document in which, in order to comply with Clause 2.4.1.B, paragraph I, the company GTE CORPORATION HEREBY CERTIFIES:

"I.- This Corporation is aware that the Consortium formed by GTE Information Services Incorporated, GTE Directories Corporation and General Telephone Directory Company C por A, will participate in Public Bidding No. 6378-T, promoted by the COSTA RICAN INSTITUTE OF ELECTRICITY for "The Contracting of Services for eight years and the Development and Implementation of Information Services".

II.- That in accordance with the provisions of Clause 2.4.1-B (Financial Capacity of the Company) included in the Public Bidding Document No. 6378-T, mentioned above, the aforementioned Consortium will present the Financial Statements of GTE Corporation, which is the group's holding company.

III.- That in accordance with the requirements of the aforementioned Clause 2.4.1-B, GTE Corporation declares that it will be jointly responsible with the companies of the aforementioned Consortium for all the obligations that this Consortium acquires as bidder and awardee of the aforementioned Public Bidding No. 6378-T before the COSTA RICAN INSTITUTE OF ELECTRICITY.

IV-    This corporation issues this certification to be submitted to the Costa Rican Institute of Electricity in the aforementioned Public Bidding 6378-T.

Done in the city of Irving, State of Texas, United States of America, on June 22, 1999."

The document was signed by Daniel P. O'Brien in his capacity as EVP, Chief Financial Officer and is accompanied by a notarial footnote from Notary Public Cynthia Owens of Tarrant County, State of Texas, which is then certified by the consulate and notarized in accordance with the Law (see certified copies of the file in Document No. 18).

**28).-**    By virtue of all that has been proven with Facts 12, 13, 14, 15, 19, 20, 21, 22, 23, 24, 26 and 27 of this Complaint, the winning consortium of ICE's Public Bidding No. 6378 - T, was made up of the American companies GTE Directories Corp., GTE Information Services Inc. and General Telephone Directory Company, C. por A., all three belonging to the Group led by the Holding Company (of the Group) GTE Corporation, who freely granted its joint (and several) liability to the consortium companies for all obligations acquired by such consortium as bidder and awardees of the aforementioned Bidding. By changing the corporate name of the companies, both the Holding Company and the members of the Consortium continued to be jointly and severally liable, only now under the new corporate names. In this way, the companies of the consortium called "Verizon Information Services -Costa Rica, LLC", "Verizon Information Services Inc." and "Verizon Directories Corp.", as the awardees of the Bid and subsidiaries of Verizon Communications Incorporated, Holding Company of the Group, into which GTE Corporation was converted, retained their joint and several liability in relation to the contract derived from the aforementioned Public Bidding. All these entities integrate a single consortium, whose main entity is "Verizon Communications Incorporated" (same proof of all the Facts referred to at the beginning of this document).

**29).-**    The contract between **ICE** and the **GTE Consortium** was executed: In accordance with the rules of the bidding document, in Clauses

Three and Twenty-Seven of the contract, it was stipulated that the total production of the guide should be carried out in Costa Rica "thereby contributing to the growth of well-paid employment, professional training, technology transfer for the benefit of Costa Rican citizens and the country's economy in general, which ICE considers to be in the general interest" (see copy of the contract in folios 2751 to 2785 of the administrative file in Document No. 6).

**30).-** In compliance with the above and considering that the Costa Rican company **THS**, as already demonstrated in Facts 1 to 9 of this Complaint, had the best experience in the type of contract to be executed, VERIZON INFORMATION SERVICES - COSTA RICA, LLC, acting with respect to its obligations to **ICE** on behalf of the GTE Consortium awarded the Bid and VERIZON INFORMATION SERVICES - BELIZE, LLC (formerly General Telephone Directory Company, C por A) by virtue of the change of corporate name, all companies of the State of Delaware, United States of America, on February 28, 2002, signed with **THS** a Master Purchase Agreement for a maximum term of 168 months (Clause 2.b of the agreement), to produce, package and distribute the phone books, in accordance with the agreement signed between the GTE Consortium and ICE (see copy of the agreement attached in Document No. 19).

**31).-** Concomitant with the preparation of the participation of the **GTE Consortium** in bidding **6378-T**, a series of negotiations took place between **GTE** and **THS** to meet the new definitions of the publishing and printing needs imposed by **GTE**, and it was established, as a result, that the industrial plant (equipment and space) of **THS** should be expanded and renovated in order to be able to subscribe and meet the contract to be agreed upon in relation to this bid, based on the recommendations of the technicians sent by GTE to evaluate the machinery and facilities (see Fact 8 and Document No. 10).

**32).-** It was based on this extensive and profound relationship between them and due to the contractual and commercial requirements imposed by **GTE,** as a result of the contract originally signed in 2000 with **ICE,** that **THS**, in order to comply with the agreed obligations, decided to take on debt and carry out the

major industrial transformations in plant and equipment, as well as make the enormous investments that such a decision required. This investment (indebtedness) imposed as a contractual condition, meant another scale of industrial plant, such that it could only be sustained with the volume of work represented by the publications and printings of the Costa Rican phone books, as well as those of other countries that, like the Dominican Republic, were operations of the **GTE** entity (Document No. 20, which is the Investment Plan for the purchase of the Heidelberg rotary press and Document No. 27 that shows the annual negotiations of THS with the Transamerica Bank and Trust Co.).

**33).-** As a direct consequence of the Master Purchase Agreement signed by **THS** with **GTE** (later **Verizon**) and the recommendations of **GTE**'s technicians, it became necessary for my client to move all its industrial facilities, which for decades had been located in Curridabat, to the Canton of Cartago, occupying larger industrial buildings, where it could install not only its own equipment, offices and machines but also the new Heidelberg Mercury 24D rotary offset press and all its accessories, which according to said agreement, was indispensable in order to comply with the volume of work that **GTE** (later **Verizon**) had committed to purchase from **THS** (see agreement in Document No. 19 and Document No. 10).

**34).-** For this purpose, two industrial buildings were located and rented in the Zeta Free Zone, in Guadalupe de Cartago, property of INMOBILIARIA ZOROASTER S.A., legal identification number 3-101-326.723, where **THS** was established with all its equipment, offices and warehouse, according to the contract signed with the owner on July 1, two thousand four (Document No. 21).

**35).-** As indicated in the previous Fact and because for the same purposes, **THS** acquired a modern Heidelberg rotary press, a binding line and pre-press equipment called CTP or Direct to Plate, together with all the electrical and mechanical installations of the new plant, **THS** needed [to assume] a significant indebtedness with financial entities and was justified by the forecasts of industrial expansion that the company had due to its business relationship with **GTE.** In fact, the investment in the new plant was made as a result of a

contractual and commercial requirement (Document No. 19, master purchase agreement Clause 15 letter "j" and Document No. 20).

**36).-** These investments were made by the plaintiff company, heavily in debt, because the contract signed with **GTE** had a horizon of 168 months, which allowed it to recover the investment, especially with the promise and understanding that it would be granted the publication and printing of other directories in the region. Apart from the long horizon of the new contract, the twenty-five years of continuity and deepening of the business relationship were the basis for accepting the requirement to make major investments and, to this end, to borrow to the limit of the company's capacity. The project and **GTE**'s commitment were so viable that financial institutions did not hesitate to grant loans for the expansion, given the supposed seriousness of the **GTE** consortium (Document No. 20-A).

**37).-** It should be noted that two years and four months prior to the signing of the **Master Purchase Agreement** indicated in Fact 8 of this Complaint, that is, on October 15, 1999, Douglas C. LaVelle, then President of GTE Directories International (which was the parent company in phone books of GTE and as stated in the logo of the same note "A part of GTE Corporation"), sent an attached letter to **THS**, on behalf of its subsidiaries in Costa Rica and Dominican Republic, whose explicit intention is to define the terms and matters under which the printing and manufacturing services of the phone books would be provided by the GTE Group to such companies and defined in a subsequent contract. It was clear and established in Point 1 of the aforementioned note that if the terms of the letter were not accepted within seven days, the negotiations would be terminated, and this was made known by the local and regional executives of **GTE,** José María Quirós and David Andrade (Document No. 22).

**38).-** In Point e) of the same note, it is established that if **GTE** provides **THS** with the opportunity to print additional directories to those of Costa Rica and the Dominican Republic, **THS** was obligated to give additional price discounts to **GTE.** This condition clearly indicates **GTE**'s intention to grant an additional

volume of work from other countries to support the decision on the investment in plant and equipment to be made (Document No. 22).

**39).-** Point g) of that note is absolutely clear in that **THS** was to comply with each and every technical requirement demanded by **GTE** including, but not limited to, the so-called "white knock out" process and four colors in that process, which in effect implied the purchase of a new press according to a final deadline as this point states: "... from the first directories to be printed under any agreement" (Document No. 22).

**40).-** Point h) states that **THS** shall provide documentary evidence by November 15, 1999, i.e., 15 days after the date of this letter, that **THS** will procure, install and test equipment capable of printing white knock out and four colors in such process and that the quality of the tests will be acceptable at the sole discretion of **GTE** (Document No. 22).

**41).-** Point I) is conclusive in that any failure by **THS** to comply with any of these essential points will result in the right of **GTE** to immediately terminate any agreement it has with **THS** without any liability to **GTE** (Document No. 22**)**.

**42).-** In summary, this note, which is set forth in the Facts from No. 37 to the this document, replaces all previous conversations and offers the printing of the phone books of Costa Rica and the Dominican Republic, and eventually other directories, if the demands for equipment established therein are met, according to a final deadline and without the right to subsequent negotiation, so that the plaintiff company had to immediately start preparing the plan and documentation for the purchase of the equipment and the expansion of the plant necessary to make the directories in the established manner. In the strict legal sense, **GTE** and then **VERIZON** imposed on **THS** a true contract of adhesion, which it had to accept as presented by the other party (Document Nos. 22 and 23).

**43).-** In the note dated August 20, 1999, signed by Terence Mitchell Leve, Senior Attorney, who appears in **GTE**'s bidding documents before **ICE**,

addressed to Mr. Mario Quintana (deceased), who was attorney for the plaintiff at that time, in the second, fourth and ninth paragraphs, the possibility of setting up a joint venture between **GTE** and **THS** is discussed; the idea is not dismissed but it is considered that it would be very time-consuming and therefore the initial emphasis is for a printing contract. But these statements reflect a clear desire to move toward a joint venture (Document No. 23).

**44).-**          In the fourth paragraph of that note referred to in the previous Fact, it is clearly expressed that **GTE** recognizes that a greater volume of printing would greatly contribute to correcting some of the inefficiencies of **THS** existing at that time and also recognizes that the printing of the directories of the Dominican Republic could be beneficial to solve the problem (same Exhibit Document No. 23).

**45).-**          On November 15, 1999, a meeting was held between Mr. Alvaro and Mr. Alonso Trejos Fonseca and Mr. Guillermo Navarro, then President, Vice President and Production Manager of **THS,** respectively, with the Director of Printing of GTE Directories International for the purpose of: 1) evaluating the progress made on the plant improvement project; 2) assisting in developing a formal project to closely monitor the new plant project; 3) agreeing on a contingency plan in case **THS** did not meet the installation dates of the new equipment and plant, which consisted of contracting another plant in the United States, especially in case the equipment was not acquired on time; 4) evaluating the potential purchase of the equipment, with the specific assistance of **GTE**'s recommended consultant, Mr. Bill Snell (Document No. 24).

**46).-**          This means that **GTE** had a contingency plan to take - move - the printing of the phone books to the United States or any other country abroad, if the planned and required investments were not carried out by **THS. GTE** followed the project closely and continuously and assigned one of its consultants to recommend to **THS** the type of equipment to be purchased, which was recorded in detail in the final printing contract (Document No. 19).

**47).-** On August 31, 2000, José María Quirós, General Manager of **GTE** in Costa Rica, submitted to **ICE** (folio 3631 of the file) the subcontract for printing the telephone directories for its approval, indicating that **THS** is a commercial firm with recognized experience at the national and international level and that it has been in charge of printing **ICE**'s telephone directories for the last twenty-five years. This contract, which later became the basis for subsequent contracts with **Verizon**, was signed for a term of one hundred sixty-eight months (Document No. 25).

**48).-** Two e-mails highlight the material nature of the business relationship between **THS** and **GTE:** one is from February 2001 in which **GTE** requests a quote for Puerto Rico directories, which demonstrates the breadth of the relationship; the other, from September 2001, states that as preferred printer for Costa Rica and the Dominican Republic, **THS** is expected to seek quotes from paper suppliers, etc. This reaffirms the status of preferred printer even in 2001 (Document No. 26).

**49).-** **THS**, as is evidenced in this Complaint, complied with all the duties and obligations imposed, first by the GTE Group and then by the Verizon Group, at the cost of heavy indebtedness that was supported, in order to justify the company's ability to pay, by the income from its commercial activity and that generated by the contract for the publication, printing, binding and delivery of the telephone directories, which was valid for 168 months. That is to say, with respect to the financial institutions (banks, finance companies and suppliers), the projected income, mainly in accordance with the current contract, was sufficient guarantee to meet the obligations assumed with the indebtedness, as well as sufficient to produce the profits projected with this business (Document No. 27).

**50).-** On October 14, 2004, and in accordance with the terms of the contract between **THS** and **GTE,** already at that date the **Verizon** Group, the parties involved entered into the **"Production Schedule, 2005 Provincial Guide"**, which establishes the conditions for the preparation of the books corresponding to that particular guide. This schedule sets December 15, 2004,

as the deadline for modifying the number of pages and the number of books (Document No. 28).

**51).-** In accordance with what is stated in the previous Facts, on July 15, 2004, the Consortium contractor of the Verizon Group processed, on the stationery of Compañía General de Directorios C. por A., with offices in San José, Costa Rica, subsidiary of GTE Corporation as stated in the same document, purchase order 4568 for the printing of the Telephone Directories for Metro (Acronyms for Metropolitan Area), for the total amount of $3,033,625.60 and on August 20, 2004, purchase order 4582, for the amount of $2,134,503 for the Provincial Telephone Directories, for a total of $5,168,128.00 for the Directories corresponding to the year 2005 (Document No. 29).

**52).-** The purchase orders indicated in the previous Fact were substituted by **Verizon** by number 4612 dated November 3, 2004, for the Metropolitan Area Guides in the amount of $2,120,828 and by number 4644 dated December 17, 2004, for the Provincial Guides, in the amount of $1,254,023, for a total of $3,374,851, that is, with a unilateral and also untimely decrease of $1,793,277 (Document No. 30).

**53).-** In accordance with the above and with the terms of the contract between the parties, any modification in relation to these two aspects must be communicated at least seven days in advance. Notwithstanding the foregoing, it is on December 20, 2004, when **THS** receives "Purchase Order" number 0004644, dated December 17, 2004, and signed by the General Manager of **Verizon**, Melvin Andujar Queipo, that is, five days after the deadline (see Master Agreement, Clause 11 b in Document No. 19), in which they not only drastically reduce the number of pages of the telephone directories and the number of books, but also unilaterally establish a different conformation and composition of the directories than the one that **GTE** had agreed to in its contract with **ICE** (same Document No. 30).

**54).-** Based on what is stated above, the following essential aspects are analyzed in the previous Facts of the Complaint: a) the commercial background of **THS** and its links with **GTE** first and then with **Verizon** in the publication, printing, binding and distribution of the telephone directories in Costa Rica; b) the promotion of Public Bidding No. 6378-T by **ICE**, in which, participating and becoming the awardee was the **GTE Consortium,** which later changed its name to **Verizon**; c) the commercial obligations imposed by **GTE (Verizon)** on **THS**, to increase in equipment and facilities, based on the economy of scale entailed by the editing, printing and publication of telephone directories for a term of ONE HUNDRED SIXTY EIGHT (168) months, which led the Costa Rican company to incur heavy indebtedness to acquire modern equipment and rent larger facilities; d) the cessation of payments (income) that occurred against **THS**, which meant that the company lacked sufficient resources to meet the payment of its obligations incurred due to the imposition of **GTE,** so that all accumulated debts became due and were judicially executed, leading the company to totally cease operations and to exit the commercial line of business that it had exercised for almost one hundred years. From now on, in the following Facts, we point out what happened with the contract formalized between **ICE and the GTE Consortium** (later **Verizon)**, as a consequence of the awarding of **ICE**'s Public Bidding No. 6378-T (see all evidence from Fact 1 to 54).

**55).-** According to Clause Two of the **ICE - GTE (later Verizon)** contract, each year **ICE** and **GTE** were to review the structure of the Telephone Directories according to market needs. In application of this provision, on May 13, 2004, **Verizon** submitted to **ICE** a proposal to restructure the Telephone Directories for the 2005 edition, in order to eliminate the entries of Metropolitan Area customers in the Provincial Telephone Directories and vice versa (Document No. 31).

**56).-** In official letter 6000-29898-2004 dated May 25, 2004, the Telecommunications Deputy Manager's Office replied and informed **Verizon** that the request would not be attended to until it complied with the contractual terms regarding the amount and term of the Performance Bond, as stipulated in Clause 2.3.1 of the Bidding Document and Clause 29 of the contract (Document No. 32).

**57).-** On July 15, 2004, ICE's Telecommunications Department, through official letter 6000-41046-2004, informed **Verizon** that the 2005 edition of the Telephone Directories, since there was no agreement between the parties on a possible restructuring, would be published in the same manner as in 2004 (Document No. 33).

**58).-** On September 8, 2004, **Verizon** informed the Deputy Manager of Telecommunications that on May 13 of that same year, it had made several requests to review the structure of the telephone directories and that since more than thirty days had elapsed as established in Article 16 of the Administrative Contracting Law without obtaining a response, it asserted its right to positive silence and declared that the points referring to the structure of the Directory and Contents; the publication and distribution of the Directory; and the so-called processes and responsibilities had been accepted (Document No. 34).

**59).-** On September 14, 2004, by note 6000-52278-2004, the Telecommunications Department responded to Verizon that its claim to assert positive silence was clearly inadmissible and was therefore expressly rejected (Document No. 35).

**60).-** On November 8, 2004, **Verizon** indicated to the Deputy Manager of Telecommunications that it reiterated its position on the positive silence in relation to the note of May 13, 2004 (Document No. 36).

**61).-** On November 12, 2004, **ICE** ordered the Notaries Public Ms. Patricia Hernández Salazar and Ms. Ligia Picado Arguedas, to draw up notarial records of the results of the visits made to **THS**'s industrial premises, certifying that the telephone directories being prepared did not include the records of customers in the provinces and verifying that **Verizon** ordered **THS** to print the residential white pages of the Metropolitan Area Telephone Directory with the records only of San José, excluding the subscribers of the Los Santos area and the Provinces (Document No. 37).

**62).-** On November 15, 2004, with note S.I.-0726-11-04, **ICE** informed **Verizon** that the telephone directories of the Metropolitan Area did not comply with the contractual terms, which contravenes notes 6000-41046-2004 and 6000-52278-2004 of July 15 and September 14, both of 2004, issued by the Telecommunications Department of that institution (Document No. 38).

**63).-** ICE ordered the Notary Mr. Francisco Solis to prepare a notarial act to certify that **Verizon** was printing the Telephone Directories according to the proposal presented thereby, according to the note of May 13, 2004, and not as indicated by ICE, in accordance with the terms of the contract and on November 17, 2004, a meeting was held between ICE and Verizon and through official communication S.I.0730-11-04 the minutes of the meeting were communicated, with ICE indicating that Verizon did not comply with Clauses 3.1 and 3.4.1.3 of the Bidding Document and Clause 2 of the contract (Document No. 39).

**64).-** On November 18, 2004, with note 6000-64540-2004, the Telecommunications Department responded to **Verizon**'s note of November 8, 2004, again stating that it should maintain the format of the 2004 telephone directories (Document No. 40).

**65).-** On November 23, 2004, in its Session 5649, **ICE**'s Board of Directors firmly agreed to "instruct the Deputy Manager of Telecommunications to notify Verizon Information Services, contractor of Public Bidding 6378-T, processed for the development, marketing, production, distribution and implementation of the Telephone Directories, as well as complementary and substitute products and services for the period 2001-2008, that this Board of Directors rejected any intention to unilaterally vary the contractual conditions agreed upon, and urges it to comply in all aspects of the current contract. Final agreement" (Document No. 41).

**66).-** On November 29, 2004, with note 6000-66202-2004, SGT-2625-2004, the Deputy Manager of Telecommunications notified **Verizon** of

agreement 10 of the Minutes of the 5649 meeting of the Board of Directors of November 23, 2004, which rejected any intention to unilaterally vary the agreed contractual conditions and urged Verizon to comply with the current contract in all its aspects (Document No. 42).

**67).-** On November 30, 2004, by note 9100-UENSC/888, **ICE**'s Information Processes Unit of the Customer Service Strategic Business Unit (UEN) ratified the Board of Directors' agreement for **Verizon**; it also indicated that **ICE** would not allow or authorize the distribution of telephone directories printed in violation of the contract and that if this stance continued, **ICE** could opt to execute the performance bond and initiate the contract termination process (Document No. 43).

**68).-** On December 2, 2004, during a visit to **THS**'s facilities, the Notary Public Ms. Yaila Paola Sanchez notarized a document certifying that 103,000 copies of the residential white pages of the Metropolitan Area were printed and that the printing company **(THS)** had not received any type of order to modify the printing and binding process; that the printing company works with the purchase orders delivered by **Verizon** (Document No. 44).

**69).-** On December 13, 2004, Agnes Paniagua Cubero, Head of **ICE**'s Information Services Process, requested the Administrative Department of Procurement to open the corresponding procedure for the termination of the contract and execution of the performance bond against **Verizon** (Document No. 45).

**70).-** On December 14, 2004, **ICE** issued the opening the administrative procedure for the termination of the contract and the execution of the performance bond against **Verizon**, according to official letter 5225-69163-2004, AEG-0572-2004 of December 14, 2004 (Document No. 46).

**71).-** On December 17, 2004, Mr. MELVIN A. ANDUJAR QUEIPO, in his capacity as General Manager of **Verizon**, filed a written objection to the prior pronouncement of the arbitration clause, which was sent on January 3, 2005, by

note AEG-0003-2005 to ICE's Institutional Legal Department, in order to obtain a legal pronouncement on the matter. The Office of Procurement, Warranties, Records and Sanctions Area, through Official Letter 5225-2022-2005, AEG-0037-2005 dated January 13, 2005, examined the matter and found that Verizon's opposition was inadmissible (Document No. 47).

**72).-** On January 7, 2005, **ICE**'s Information Processes unit of the Customer Service Strategic Business Unit (UEN) requested the Procurement Department to implement some precautionary measures within the administrative procedure, among others, not to execute the contractual services due to **Verizon**'s non-compliance; that **ICE** continue with the billing procedure of the advertisers of the 2004 and 2005 Telephone Directory, as well as the inclusion of the necessary information for billing; that **Verizon** refrain from using the **ICE** brand logo in possible telephone directories, complementary products and in any other media or activity not authorized by **ICE.** All this in internal note S.I. 0013-01-05 of January 7, 2005 (Document No. 48).

**73).-** On January 7, 2005, by resolution No. 5225-00939-2005 AEG-0020.2005, **ICE**'s Procurement Department notified **Verizon** of the precautionary measures (Document No. 49).

**74).-** On January 10, 2005, **Verizon** filed a motion for revocation with appeal and concomitant nullity against the resolution ordering the precautionary measures, arguing that they seriously violate its subjective rights. Furthermore, that the administrative act that was born to legal life is a tacit act of approval of its request, with all the characteristics and guarantees that the legal system grants to this kind of acts, in light of the doctrine of numeral 16 of the Administrative Contracting Law (Document No. 50).

**75).-** On January 12, 2005, **ICE**'s Institutional Legal Department received a legal opinion signed by Patricia Hernández Salazar, Francisco Rojas Giralt, and Hissell Mayorga Quirós, indicating and recommending that the appeal for revocation with appeal in subsidy and concomitant nullity filed against the

precautionary measures be declared inadmissible, according to note 0092.01644.2005 DCA-020-05 of January 12, 2004 (Document No. 51).

**76).-** On January 12, 2005, Ms. Agnes Paniagua of the Information Services Process of the Costa Rican Institute of Electricity, requests that the Motion for Revocation with Supplementary Appeal and Accompanying Nullity, be declared inadmissible, according to note S.I.-0025-01-2004 of January 12, 2004 (Document No. 52).

**77).-** On January 12, 2005, **Verizon** filed, within the term granted in resolution 5225-69163-2004 (AEG - 0572-2004) dated December 14, 2004, its pleadings with respect to the opening of the Proceeding to declare the Contractual Termination (Document No. 53).

**78).-** On January 21, 2005, **ICE** notified **Verizon** of resolution 5225-03122-2005 of January 21, 2005, rejecting the appeal for revocation against the application of the precautionary measures and filed an appeal with concomitant nullity against the application of the precautionary measures issued in official letter 5225-00939-2005 AEG-0020.2005 of January 7, 2005 before the Deputy Manager of Telecommunications (Document No. 54).

**79).-** Received on January 31 but dated January 25, 2005, **Verizon** filed within the term granted in resolution 5225-03122-2005, (AEG - 0060-2005) dated January 21, 2005, an extension of the pleadings of the appeal against the precautionary measures, before the Hierarchical Superior [court] (Document No. 55).

**80).-** On January 13, 2005, **ICE** notified **Verizon** of the writ of transfer of the request for a "prior exception to arbitration agreement" to the Telecommunications Department, so that the latter, in turn, could submit it to the Board of Directors for its knowledge and resolution (Document No. 56).

**81).-** On February 2, 2005, by means of note number 0012-5372-2005 CD-070-2005 sent to the Deputy Manager of Telecommunications, the Board of Directors communicated that in article 12 of the minutes of Session 5657, held on February 1, 2005, it agreed to reject in its entirety the request to resort to arbitration proceedings as contained in the prior exception to the arbitration agreement filed by **Verizon** (Document No. 56).

**82).-** On February 7, 2005, the Deputy Manager of Telecommunications rejected the appeal and concomitant nullity appeal filed, according to official letter number 6000-06301-2005 SGT-510-2005 (Document No. 57).

**83).-** The Deputy Manager of Telecommunications, Claudio Bermúdez Aquart, MBA, issued the final act of the procedure, based on the recommendation of the final act that was sent to him by the Board of Directors in Official Letter AEG-0128-2005 of February 11, 2005, indicating textually the following:

> *"This Deputy Manager's Office, based on the legal citations, applicable jurisprudence and documentary evidence contained in the administrative file, agrees to accept the recommendation of the Institutional Legal Department, of the Technical Unit Information Services Process and of the Procurement Department in its note AEG -0128-2005, therefore, in accordance with articles 10, 11, 13, 14, 20, 21 and 34 of the Administrative Contracting Law, articles 12.1, 13.2, 15.1, 15.2, 15.3, 15.4, 16.2, 22.1, 23.1, 35.1, 35.1 [sic], 49.2 of the General Regulations for Administrative Contracting, article 3, 75, 76, 77, 78, 79 of the Internal Regulations for Administrative Contracting, orders:*

> *I) The termination of the contract and execution of the performance bond, given the non-compliance of the contractor VERIZON INFORMATION SERVICE (Costa Rica) LLC.*

*II) Proceed to collect the damages caused, all in accordance with Clause 3.10.3 which textually states: If the quality of the materials used in a particular edition and the preparation of the telephone directories delivered does not guarantee ICE's compliance with the contract and the specifications in this bidding document, and if the amount fixed as a guarantee is not sufficient or is exhausted, ICE may take legal action against the contractor for the collection of damages....*

*III) VERIZON INFORMATION SERVICES (Costa Rica) LLC is hereby notified that this resolution may be appealed within three working days following its notification, in accordance with articles 342 and 346 of the General Law of Public Administration.*

*IV)* **This resolution shall be notified to the legal domicile of Verizon Information Services (Costa Rica) LLC"** (Document No. 58).

**84).-** **Verizon**'s representative filed the appeals mentioned in the previous resolution. On July 8, 2005, by means of Official Letter 0150-36359-2005-GG-680-2005, Engineer Carlos Obregón Quesada rejected the appeal with concomitant nullity (folios 4593 to 4617 of the administrative file) and considered the administrative process exhausted, thus confirming the administrative act of contract termination, contained in note 6000-27733 of June 1, 2005, and ordered the lifting of the precautionary measures issued to that effect. By virtue of this resolution, the contract between **ICE** and **Verizon Group**, which provided the legal basis for the contract between **THS** and **Verizon**, was terminated (Document No. 59).

**85).-** The administrative act that declared the termination of the contract became final on July 20, 2005, date on which the company was notified of the rejection of the appeal filed (Document No. 59).

**86).-** On February 15, 2005 **THS** sent a note to Mr. Pablo Cob, then Executive President of **ICE**, indicating that **THS** had been acting as the main subcontractor with **ICE**'s approval in all the contracts for publishing and printing the phone books and that for reasons beyond its control, the main contract was being questioned by the parties **(ICE - Verizon)** without **THS** knowing the reasons because it was not involved in the discussion between the parties. It was pointed out that according to Clause Three of the **GTE (later Verizon) - ICE** contract, the former was obliged to carry out the entire process for printing Telephone Directories in Costa Rica. According to Clause 2.13.1 idem, subcontracts had to have prior written approval from **ICE.** In this note, a direct **ICE - THS** contract was proposed in the event that the contract between **ICE** and **Verizon** was definitively terminated. All this, because the information contained in the telephone directories is a public service and is based on what is expressly stated in Article 79 paragraph 1) in relation to paragraph 6) of the Administrative Contracting Regulations. Among the considerations were the unique experience in Costa Rica, the capacity and the fact that the work and experience of **THS** as a company had guaranteed the continuity and regularity of the public service (Document No. 60)

**87).-** On July 1, 2005, **THS** sent a note to **ICE** requesting reconsideration of the agreements that, among other things, released ICE from charging for the information service of number 113, instead of contracting directly all the stages of the publication, marketing and printing of the guides and reiterated the request for **ICE** to contract these processes directly with **THS** (Document No. 61).

**88).-** On July 11, 2005, the Secretary of the Board of Directors of **ICE,** Mr. José Abraham Madrigal informs that in session 5679 it was agreed to transfer the letter referred to in the previous Fact to the Telecommunications Sub-Management and Legal Department (Document No. 62).

**89).-** On August 4, 2005, the Deputy Manager of Telecommunications sent note SGT-3228-2005 in which he informed that at the 5679 meeting of **ICE**'s Board of Directors held on July 5 of that year, it was agreed that **ICE** would enter

into an agreement with **RACSA** so that this public company of ICE Group would prepare the 2006 guides (Document No. 63).

**90).-** On that same date, August 4, 2005, **ICE**'s Legal Director, Mr. Geovanni Bonilla, by means of note 0090.38888.2005, informed **THS** of article 01 of the 5680 session of July 12, 2005, of the Board of Directors, in which the interim General Manager was instructed to coordinate what was necessary to do with **RACSA**, so that the 2006 Telephone Directory could be prepared through **RACSA** and thus "decided how to proceed in relation to the telephone directory" (Document No. 64).

**91).-** **ICE,** with this act, failed to comply with its duty to guarantee the principles of regularity and continuity of the public service, which was imposed by the contract originally formalized with the **GTE Group,** now **Verizon Group**, and in which **THS** was in charge of supplying it to users through the publication and printing of telephone directories (same Document No. 64).

**92).-** Pronouncement No. C-152-2000 of the Office of the Attorney General of the Republic, binding for the entire Public Administration, states that the provision of telephone directories by ICE to be supplied to all users is an unavoidable obligation, because it is a public service (Document No. 65).

**93).-** In the session held on August 30, 2005, the Board of Directors of **ICE** agreed:

"To authorize ICE's General Management to evaluate, within a period of thirty working days, the technical, legal, financial, and marketing feasibility of executing the following tasks, starting in 2007 through the execution of a specific agreement with RACSA:

(...)

e) The development, marketing, production and distribution of the Telephone Directories, starting in 2007.

To repeal resolutions of sessions 5679 of July 5, 2005, and 5680 of July 12, 2005" (Document No. 66).

**94).-**　　　Given the events described in Fact 49 of this Complaint and in order to avoid litigation with **Verizon, THS** filed with the Conciliation and Arbitration Center of the Costa Rican Chamber of Commerce, a request for Conciliation in file CCA28-C011-09-05. The conciliation hearing was held at 10:00 a.m. on October 18, 2005, but the representative of **Verizon**, Mr. Melvin Andujar Queipo, indicated that by instructions of the parent company, he was unable to make any type of proposal or reach any conciliation (Document No. 67).

**95).-**　　　On **September 2, 2005,** the General Manager of **Verizon** in Costa Rica, by means of an Official Letter, a copy of which is attached, informed **THS**, among other things, that "... **ICE** disrespected the contractual rights and those established by law of my client and proceeded to initiate an administrative procedure for the termination of the contract, using public means to distort the reality of the facts", and that as expressly authorized by Clause 28 paragraph b) of the Master Purchase Agreement, **Verizon** terminates this contract due to the termination of the existing contract between **Verizon** and **ICE** for any reason. Thus, **Verizon** unilaterally terminated the Master Purchase Agreement, without assuming and acknowledging its responsibilities to **THS** (Document No. 68).

**96).-**　　　The contract with **ICE** was seriously altered and ceased to produce income, which is why **THS** is in arrears in the payments of its pledge obligation contracted with HEIDELBERG PRINT FINANCE AMERICAS INC. for the acquisition of the Heidelberg Mercury 24D Offset press and all its accessories. On October 19, 2006, the creditor initiated an executive foreclosure proceeding which, under file number 06-001956-0640-CI, was filed in the Civil Court of Cartago, ordering a preventive seizure of up to US $2,831,409.07, which was executed on November 29, 2006 (Document No. 69).

**97).-** In spite of various delaying actions of **THS** in the exercise of its right of defense in the judicial process, at 1:30 p.m. on June 6, 2007, the pledged equipment was auctioned and by order of 9:23 a.m. on August 19, 2007, HEIDELBERG PRINT FINANCE AMERICAS INC. was ordered to take possession of it, which was executed at 2:00 p.m. on October 31, 2007 (Document No. 69).

**98).-** As a result of the actions of the defendants, as indicated and proven in the preceding Facts, **THS** is forced to be in arrears with the rental payments for the industrial buildings of Inmobiliaria Zoroaster S.A., accumulating several monthly payments, so as a delaying measure, while a hope remains of a satisfactory solution between **Verizon** and **ICE, THS** agrees with the said lessor, the company "Inmobiliaria Zoroaster, S.A.", to execute a public deed, corresponding to number 144, beginning on page 133 reverse of the first volume of the Protocol of the Notary Public LAURA MÓNICA ZAMORA ULLOA, at twelve o'clock on March 23, 2006, whereby **THS** commits up to the sum of TWO HUNDRED THOUSAND TWO HUNDRED TWENTY-THREE DOLLARS AND SEVENTY-FIVE CENTS (US $200,223.75), Clause 2 of said document indicating the following: "...SECOND. Debt substitution. This constitution of debt substitutes the monthly rent arrears owed by the Debtor - (TREJOS HERMANOS SUCESORES) - corresponding to the months of July two thousand five up to and including March two thousand six, at the rate of nine months of monthly payments, according to the lease contract signed between Creditor and Debtor, dated July first, two thousand four, lease that is executed on the property of the Creditor, property registered in Property Identification ("Folios Reales") three-one nine zero eight seven three- zero zero zero and three- one nine five eight nine eight- zero zero zero, which is expressly accepted by the Creditor..." (Document No. 70).

**99).-** In said public deed, which in accordance with the provisions of the Code of Commerce is enforceable, interest and form of payment are established by means of monthly installments of twenty-two thousand two hundred forty-seven dollars and eighty-three cents until the obligation is paid in full (same Document No. 70).

**100).-** **THS** made some payments to its obligations, but due to **Verizon**'s actions and the cessation of contractual payments ordered by **ICE**, it was unable to comply with the form of payment agreed with Inmobiliaria Zoroaster S.A., for which reason the latter filed before the Civil Court of Cartago, a simple enforcement proceeding under file number 06-001846-0640-CI, which culminated with a judgment, accepting the exception of partial payment and ordering **THS** to pay the sum of one hundred fifty-six thousand one hundred eight dollars and ten cents (US $156,108.10) (see Document No. 71).

**101).-** By separate Eviction process filed by INMOBILIARIA ZOROASTER S.A. against **THS**, by resolution of the Small Claims Civil Court of Cartago, issued at 11:35 a.m. on November 8, 2006, within the file number 06-002424-0346-CI, the same is considered established and the eviction is foreseen in the following fifteen days. In said proceedings, several incidents and dilatory actions were filed to extend the term until the judgment of Second Instance issued at 7:40 a.m. on October 4, 2007, but by that time, a settlement had already been reached with the Lessor, which is discussed below (see Document No. 72).

**102).-** In view of the imminent eviction by Inmobiliaria Zoroaster S.A., the auction of the entire press printing equipment by HEIDELBERG PRINT FINANCE AMERICAS INC, **THS** is forced to make a sale under very unfavorable conditions, of practically all its assets in equipment and improvements in the real estate of the Lessor, to the Colombian company CONDOR EDITORES DE COSTA RICA, S.A., legal identification number three- one hundred one- three hundred ninety-five thousand five hundred six, who agree with Inmobiliaria Zoroaster S.A., in the lease of the industrial buildings of the Zeta Free Zone in Cartago, to acquire the equipment auctioned by HEIDELBERG PRINT FINANCE AMERICAS INC. under favorable conditions and already installed in those industrial buildings, as well as the rest of the **THS** equipment pledged to the Banco Nacional de Costa Rica and Banco Interfin (Document No. 73).

**103).-** In order to deliver the industrial buildings so that the Lessor could agree on the new contract with CONDOR EDITORES, as mentioned above, **THS** reached an agreement with Inmobiliaria Zoroaster S.A., which is specified in a

document dated March 28, 2007, entitled *"Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda" [Lease Settlement and Debt Acknowledgment Agreement]*. In this contract, **THS** basically delivers the industrial building where the rotary press and the remaining printing equipment are located, since previously the other building where the offices and warehouse were located had already been delivered, and both parties grant the settlement in that sense, but at the same time it is stated that "...Inmobiliaria Zoroaster S.A. acknowledges having received to date two payments - (which in the eviction process had not been accredited) - for a total amount of fifty five thousand US dollars, as well as having to its credit a security deposit for the amount of thirty-nine thousand dollars, all of which **THS** expressly authorizes Inmobiliaria Zoroaster S.A. to apply toward the total amount owed. Regardless of the fact that the aforementioned legal proceedings may continue, **THS** undertakes to pay the total amount owed as determined in due course, once such deductions are made, together with the agreed interest and costs, until its effective payment, by a final deadline, both parties recognizing that there is an express instruction in the "Trejos Hermanos Trust - Fiduciary Castro Garnier", by which the amount owed to Inmobiliaria Zoroaster S.A. must be paid, as soon as **THS** receives payment of the amounts owed for different transactions pending cancellation, such as for example, an outstanding debt from Radiográfica Costarricense, S.A. (Document No. 74).

**104).-** Together with the auction of the HEIDELBERG rotary printing equipment, the delivery of the industrial buildings, with all the necessary and specific facilities and infrastructure for such equipment, on that same date, March 28, 2007, **THS** is forced to lease with an option to purchase to DACONDOR D.C.R. SOCIEDAD ANONIMA, which then, on May 29, 2007, assigns its rights to the same company CONDOR EDITORES DE COSTA RICA, S.A. over the remaining industrial assets of the company, for a fraction of the liabilities, both in Transamérica Bank & Trust Co. Ltd. (a subsidiary of Banco Interfin), Banco Nacional de Costa Rica and Banco Improsa S.A. In the specific case of Transamérica Bank & Trust Co. Ltd., these liabilities correspond to a line of credit that was granted to **THS**, based on the magnificent prospects that it had and after the banking studies where the contracts entered into with Verizon for the

preparation of the phone books of the Dominican Republic and Costa Rica were analyzed (Document No. 75).

**105).-** As can be seen in the attached evidence, the loss of the contract and its immediate consequence of the loss of the income associated with it, implied that the plaintiff company became delinquent with a series of Financial Institutions, accumulating arrears of hundreds of days with several of them and placing some operations in judicial collection. The Company also accumulated significant arrears in its commitments with the Costa Rican Social Security Fund and other public institutions. All of this led the company and its partners that financially guaranteed it to cease to be creditworthy, since with the accumulated levels of delinquency and according to SUGEF regulations, no institution could grant credit to debtors with this type of score, due to the reserves that the financial institution would be obliged to make. By not being able to obtain credit and remaining in a default position in the National Financial System and among the Public Institutions, moral damage of incalculable proportions and impossible to repair has been caused, since not only were the claimed sums not received, but it was also impossible to conduct new business (Document No. 76).

**106).-** In the MASTER PURCHASE AGREEMENT entered into between the **Verizon Group and THS** on February 28, 2002, and March 1, 2002, clauses exempting contractual civil liability and limiting contractual civil liability were inserted, such as those numbered 24 and 28. Specifically, Clause 28 (b) states that the master agreement terminates if the contract with **ICE** terminates for "any reason", and Clause 28 (e) states that "the buyer", i.e. **VERIZON,** is not obligated to compensate TREJOS HERMANOS SUCESORES for damages for non-performance of the contract (Document No. 19, which is a copy of the Master Purchase Agreement).

**107).-** The disclaimers referred to in Fact **105**, above, were imposed by **VERIZON** on **THS**, as well as the other contractual contents, in such a way that **THS** could not modify in any way the contractual content pre-established by **VERIZON** (this Fact is proven by **VERIZON**'s statement, which is requested in the evidence).

## B) .- PURPOSE OF THE TRIAL.-

The purpose of the complaint filed by **THS** is for the judgment to state, as will be specified in the petitioning part of this Complaint, that the actions and decisions of the defendants to set aside the administrative contract between the **ICE** and the **GTE Group,** subsequently called the **Verizon Group,** for the "Edition of the Telephone Guide and Development and Implementation of Information Services" signed in San José on March 10, 2000 have caused the plaintiff serious damages and losses that, as such, constitute a matter of pecuniary liability.

In order to arrive at a better understanding of the object of the trial, we outline the main lines and points of interest of the complaint, providing a rational and comprehensive summary of the interests of the plaintiff.

a).- **THS** is a commercial company that specializes in the edition, printing, binding and distribution of telephone directories or phone books. It has worked in this line of business for nearly 90 years.

b).- The **GTE Group** entered the national market in 1974 after being awarded a tender issued by the **ICE** to edit and print telephone directories and to sell advertising and feature space in those telephone directories. As part of the set specifications of the call for bids, the ICE required that the part of the contract related to the edition, printing, binding and distribution of the directories be performed in Costa Rica in order to take advantage of the nation's economy and technology.

c).- After exploring the Costa Rican market, the **GTE Group** hired **THS** for this purpose based on its history and business reports. The **GTE Group** gradually expanded the coverage of the edition and printing of telephone directories to the Central American and Caribbean market (32 countries). It engaged in negotiations with **THS,** which became its regional partner specializing in such tasks, and was granted the status of "preferred vendor" by the **GTE Group.**

d).- In 1999 and 2000, the **ICE** published Public Tender Number 6378 - T, and the **GTE Group** participated in that process and was awarded the administrative contract through a consortium comprised of three of its companies, which participated with the unconditional and full support of the Group's holding company, GTE CORPORATION.

e).- Alongside the bidding process, the **GTE Group** negotiated the future conditions for regulating and incorporating technological advances that would improve the quality of the editing and printing processes with **THS**. **THS** was required to acquire the most modern equipment and to expand its physical plant so that it could install the necessary equipment.

f).- Once the main contract was signed by the **ICE** and the **GTE Group,** it was endorsed by the Comptroller General of the Republic. The **GTE Group** hired **THS** for a period of one hundred sixty-eight (168) months to edit and print telephone directories for Costa Rica, Belize and the Dominican Republic.

g).- Based on the security that such a contract represents, **THS** went into serious debt to be able to acquire the new equipment and expand its industrial plant. **THS** was able to finance the bank and commercial credits that it engaged with the sole purpose of making its production sustainable. If the contract signed by GTE with the **ICE** were added, it would allow **THS** to produce enough income to meet all of its obligations and secure a reasonable and decent profit.

h).- The contract between **GTE** and the **ICE** entered into force as scheduled. The **GTE Group** merged with the firm Atlantic Bell and formed the **VERIZON Group,** issuing a written statement to the **ICE** indicating that it would maintain all of the rights, duties, obligations and guarantees originally granted by the **GTE Group.** This was confirmation of the fact that, based on the duties set out the contract with the **ICE,** absolutely

nothing was to change when the company's name changed as stipulated in Clause Twenty-Five of the contract.

i).-    The contract remained in place under normal conditions for about four years. In 2004, when production of the 2005 telephone directories began, the contract execution policies issued by **Verizon** came into conflict with the bidding and contractual provisions set by the **ICE.** As such, the contract was suspended by both parties, at which point the **ICE** called the performance bonds, declared default and terminated the contract, ordering its management to demand that **Verizon** pay compensation for damages and losses.

j).-    **Verizon** unilaterally terminated its valid and current contracts with **THS** and abandoned all of its commercial activities in the country;

k).-    **THS** is unaware of the legal implications of what occurred between the **ICE and Verizon,** but **THS** was unable to pay off its bank and commercial loans due to the actions of these two parties. It also stopped making payments to raw materials suppliers and on its leases, stopped paying wages and benefits to its employees and was forced to suspend its activities and permanently close its business. In a technical sense, **THS** was placed in a situation that is equivalent to commercial bankruptcy.

l).-    Given that the commercial misfortune of **THS** stems from the breach of the contract signed with the **GTE Group,** subsequently named **VERIZON Group,** and based on the fact that the nexus is the tender and the contract signed between **THS and VERIZON Group** as a subcontract and, therefore, an accessory to it, it is legally essential that it sue both parties so that **THS** can be compensated for the damages and losses caused by each of them proportionally.

In short, the purpose of the trial is to demand that the defendants pay for the damages and losses caused to **THS** as a result of the conflict that both parties -

the **ICE and the GTE Group** (later **VERIZON Group)-** created between them, with the terrible effects of the suspension of all of the industrial activity of **THS** and its permanent exit from the business line that it had exercised for more than 90 years.

## C).- MAIN CONTRACT, ITS NATURE AND LEGAL FRAMEWORK.-

The contract that the GTE Consortium initially signed with the ICE was based on the administrative hiring procedures (public tender) that the Costa Rican Electricity Institute established in the performance of its duties. These strictly follow the provisions of Article 182 of the Constitution. The GTE Consortium was awarded the tender through this process as outlined in the Facts of this complaint.

National doctrine, case law established by the constitutional and contentious-administrative courts, and the case law of the Office of the Comptroller General of the Republic unanimously hold that an administrative contract is much more that the "document contract" signed by the parties when the awarding act is final.

In our system, the administrative contract includes the bid specifications (tender); the awarded offer with its annexes and clarifications; the technical, financial and legal studies that serve as the basis for awarding the tender; the awarding document itself; and the document that is signed, which is endorsed by the Comptroller General of the Republic.

This was expressly recognized by the **GTE Consortium** and the **ICE** when they signed the First Clause of their contract, which was endorsed by the **CGR** on December 13, 2000.

These principles and regulations played an important role in the contract between the GTE Consortium and the ICE, which we summarize as follows:

1).-        In Fact 15) of the complaint, we show that on page 9 of its bid, the GTE Consortium stated, unconditionally accepting Clause 1.3.1.3 of the tender, that it is aware of, accepts and submits to ICE procedures for bidding, to everything stipulated in the documents of this tender, and to the courts and laws of Costa Rica, as stated in the Consortium Agreement, in which the companies that formed it literally expressed: *"... In addition, in compliance with the provisions of articles two hundred twenty-six and two hundred thirty-two of the Commercial Code of the Republic of Costa Rica, we hereby declare, for the purposes of this document and the Consortium Agreement in general, that both the three companies that comprise this Consortium and the legal representatives named herein submit to the Laws and Courts of Costa Rica for all purposes and contracts that are signed or are to be executed in Costa Rica as part of the aforementioned tender...".* (Document No. 13 and Clause Six of the consortium agreement in Fact 24 of this Complaint).

2).-        In Fact 18) of the Complaint, we show that in Clause 25 of the document, the two parties involved with the contract, the **ICE** and **GTE Consortium,** stipulated that, *"In the event that this entity changes its name due to a change in the law or GTE changes its name as a result of merging or partnering with another company, this contract will remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented herein"* (Document No. 6).

3).-        In Fact 21 of the Complaint, we also demonstrate that in a note dated August 28, 2002, the General Manager of Verizon Information Services - Costa Rica, LLC explained the changes to the names of the three companies that signed the Consortium agreement to the **ICE** Information Services Area and attached the necessary documentation to prove those facts. This was done in order to indicate that the companies GTE Directories Corp, GTE Information Services, Inc and General Telephone Directory Company C por A. changed their names as a result of the merger between Bell Atlantic and GTE, which created VERIZON. They came to be called Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services- Costa Rica, LLC. All

this is demonstrated in folios numbers 3040, 3041 and 3042 of the administrative file attached in Document No. 15, which were certified by the ICE.

4).-    Fact 22 of the Complaint shows that in the August 28, 2002 note referenced in the immediately preceding point, the following is stated: *"II.- MAINTENANCE OF ALL OBLIGATIONS AND RIGHTS. In accordance with the requirements set out in the note dated June 18, 2002, I attach to this document an AFFIDAVIT on the Maintenance of Obligations and Rights signed by the legal representatives of Verizon Information Services, Inc, Verizon Directories Corp and Verizon Information Services-Costa Rica, LLC in which they accept the rights and obligations derived from Tender 6378-T and the contract derived from the same"* (folios 3035, 3036 and 3037 of the administrative file attached and certified in Document No.15).

5).-    Fact 27 of the Complaint shows that pages 427 to 432 of the administrative file contain the Consortium's offer. In compliance with Clause 2.4.1.B, paragraph I of the tender, the American firm **GTE CORPORATION** CERTIFIES:

*"I.- That this Corporation is aware that the Consortium constituted by GTE Information Services Incorporated, GTE Directories Corporation and General Telephone Directory Company C por A will participate in Public Tender No. 6378-T, promoted by COSTA RICAN ELECTRICITY INSTITUTE for "The Contracting of Services for eight years and the Development and Implementation of Information Services."*

*II.- That in accordance with the provisions of Clause 2.4.1- B (The Financial Capacity of the Company) included in Public Tender No. 6378-T, the aforementioned Consortium will submit the Financial Statements of GTE Corporation, the group's holding company.*

*III. - That according to the requirements of the same Clause 2.4.1- B mentioned above, **GTE Corporation** declares that it will be jointly responsible with the companies of the aforementioned Consortium for all of the obligations that this Consortium acquires as a bidder and as the winner of the aforementioned Public Tender No. 6378-T before the COSTA RICAN ELECTRICITY INSTITUTE.*

*IV. - This corporation issues this certification to be presented to the Costa Rican Electricity Institute in Public Tender 6378-T mentioned above.*

*Issued in the city of Irving, State of Texas, United States of America, on June 22, 1999."*

The document was signed by Daniel P. O'Brien in his capacity as EVP, Chief Financial Officer, and is accompanied by a notarized footnote from Notary Public Cynthia Owens of Tarrant County, State of Texas, which is then certified by the Consulate and certified in accordance with the Law (see certified copies of the file in Document No. 18).

6).-       The firm **GTE CORPORATION,** Holding company of the GTE Group, by stating that it granted its full guarantee backed by its financial statements, which could be used in the ICE's Public Tender 6378-T to prove the financial capacity of the Consortium, which was then acting as bidder, and also granting its guarantee to be jointly responsible with the companies of the Consortium for all of the obligations that it undertook as a bidder and as a successful bidder, acquired, irremediably, the condition of joint and several responsible party for both the Consortium and for the full execution of the contract and therefore also the condition of a party that is jointly responsible with the ICE for the results of the negotiation.

Note that according to the text of Clause 2.4.1.B of ICE Tender 6378 T, this was not a mandatory provision, but was available to all potential bidders, who could

decide to use or not use this resource when formulating the proposal that they submitted to the administration.

In other words, in cases in which the participants (bidders) in the bidding process needed or wanted to strengthen their financial endorsements, relevant experience, and knowledge of the technological development of information systems such as is required by the ICE, they could accompany the audited financial statements of the Holding to which they belonged in order to earn the full score for the elements considered in the evaluation of the offers.

But in this case, the Holding Company (**GTE Corporation**) assumed joint and several liability together with the bidder or bidders for all of the obligations arising from the contract to be awarded. As such, they had to prove indubitably and manifestly in the proposal their will freely expressed in that sense. In other words, in this specific case, solidarity was not a condition imposed by the ICE, but an obligation freely assumed and undertaken by the Holding Company **GTE CORPORATION,** which expressed in writing, in certified documents, its intention to act in that manner at the time.

Through a merger of companies in the United States of America, **GTE Corporation** became **VERIZON COMMUNICATIONS INC.,** the Holding Company of the VERIZON Group. It is therefore clear that the relationships derived from the Administrative Contract of International Public Tender 6378-T and its legal effects for the fulfillment of its duties and obligations did not undergo any changes, remaining unaltered, final and in force because the entity liable to the ICE is the same company (the winning Consortium) with a different name or company name.

7).- That said, it is more than evident that the defendant companies Verizon Communications Inc. and Verizon Information Services - Costa Rica-LLC are part of an economic interest group, which we conventionally call the VERIZON GROUP, which is the same economic interest group as the entity that

was called GRUPO GTE, comprised of the GTE Consortium and GTE CORPORATION. This entity was awarded Public Tender No. 6378-T promoted by the ICE, entering into an administrative contract that was executed through this economic interest group through the "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

8).-        When it addressed the specifications set out in the terms of Public Tender 6378-T, the GTE Consortium indicated in its response to Clause 1.1 regarding the purpose of the contract that it is to Develop and Implement Information Services, which includes the development, marketing, production and distribution of telephone directories and complementary and substitute products and services.

Based on the criteria of the Office of the Attorney General of the Republic set out in pronouncement No. C-152-2000, which is binding for the entire Public Administration, in which it declared that the provision of telephone directories by the ICE to all of its users is an unavoidable obligation because it is **a public service,** it is clear that in the administrative contract awarded in Public Tender 6378-T has a main objective and secondary objectives.

The main objective of the administrative contract from the perspective of this area of public service is the duty to edit, publish and distribute telephone directories to all telephone service users, and everything else is accessory and dispensable. If one analyzes the terms, it is clear that it is possible to publish the telephone directories without advertisements, and that it is not possible to publish a commercial advertising book without including the names and telephone numbers of all telephone service users.

This was recognized by the parties - GTE Consortium and the ICE - when describing the work covered by the contract in the Second Clause "Description of the Work": the Phone Book is the main element, and the rest is secondary.

As such, by dissolving the contract between the GTE Consortium and the ICE, this Public Institution should have taken the precautionary measures necessary to ensure that the public service of providing information through Phone Books was not seriously affected and that classic principles such as equality, continuity and adaptation were not violated.

Although the administrative contract was signed between the GTE Consortium and the ICE, as shown in Facts that 4) through 9) and 29) of this Complaint, the terms required that the main part of the contract be formalized with a company based in Costa Rica, which was historically done with **THS.** That contract had to be reported to and approved by the **ICE** in advance in order to be valid.

As such, the Contract that THS signed with the GTE Group (later the VERIZON Group) and that the ICE approved and authorized, is by its very nature a contract governed by the principles of public service and is regulated by its principles, standards and values.

## D) .- DAMAGES AND LOSSES CLAIMED.-

As demonstrated by the list of Facts set forth in this Complaint, which are proven by the evidence that supports them, the plaintiff company demands that the defendants compensate it by paying for the damages and losses incurred as a result of their actions, which led the two parties - the **ICE** and **Verizon Group-** to terminate the administrative contract signed by the two as part of International Public Tender No. 6378-T held by the **ICE.**

This administrative contract provided legal and commercial support to the negotiation that was held and the contract between the plaintiff and the **GTE Group**, which would later change its name to **Verizon Group.**

The seriousness of the actions and omissions of the defendants and the effects of their conduct forced **THS** to irrevocably cease all commercial activity; to be absolutely unable to pay the obligations that it had undertaken with financial and commercial institutions in order to comply with the obligations imposed by its contract with **Verizon Group**, which the **ICE** approved; and to liquidate all of the business activities that it had conducted for nearly one hundred years.

The attached economic-financial report prepared by renowned expert Tomás Evans Salazar, Bachelor of Business Administration, attests to the consequences of the contractual breaches of the **Verizon** Group in Costa Rica, Belize and the Dominican Republic.

This study supports the estimate of damages and losses caused by the irregular execution of contracts after 2000 which forced **THS** to make special investments in order to increase its capacity (in physical plant, machinery and equipment) and increase the production of telephone directories to reasonable levels based on the production volumes required by the defendants.

As such, and in accordance with the attached financial analyses, the plaintiffs demand compensation for the following from the defendants, all of them settled as of August 31, 2008:

Based on the study prepared by Mr. Tomás Evans Salazar, member of the College of Professionals in Economic Sciences, card 11968 and which is attached as expert evidence that must be ratified by the experts to be appointed by the Court, this claim identifies as the elements that comprise the damages and losses incurred by the defendants against the plaintiff to be the amount that should have been reserved for investment in machinery, the increase in average inventories that should have been maintained from the years 2000 to 2004, the expected and unrealized flows from the period 2004 to 2007, the interest paid inherent to the operations subscribed for the purchase of machinery and infrastructure financing, the interruption of operations, the related pain and

suffering, the interest that these elements produce until the full payment of the amounts established in the judgment and, finally, the costs of these proceedings.

The estimates made are based on the accounting information for the periods from December 31, 1990 to March 31, 2004, which is duly recorded in the company's accounting records. In addition, for the financial statements for 2000 to 2004, the necessary adjustments were incorporated into the calculations aside from the exceptions filed by the auditors in each of these periods relative to the development of new projects.

The rates applicable to the calculations correspond to average rates calculated based on Central Bank of Costa Rica publications.

The tools that are normally used for prospective and retrospective information have been used conservatively, which involves the use of formulas to determine averages, future values, current values, estimates based on regressions, and others.

The periods 2003 and 2004 are presented together given that there was a change during the 2003 accounting period in accordance with the provisions of paragraph 2 of Article 4 of the Income Tax Law, which meant that the financial information audited would last from October 1, 2003 to March 31, 2004.

## BASES FOR THE ESTIMATION OF DAMAGES AND LOSSES

| Basis for Compensation | Assumptions |
|---|---|
| **For Investment in Machinery** | • Calculation of the future value of investments recorded in accounting minus the sale price of the rotating machine and its accessories.<br>• Cut-off date August 31, 2008.<br>• Average annual rate of 16.94% applied. |

| | |
|---|---|
| **For Increased Inventory** | • The future value of the increase in the investment made in inventories was calculated by comparing the average for the periods 1997 to 1999 with the inventory levels for 2000 to 2004.<br><br>• Cut-off date August 31, 2008.<br><br>• Average basic passive annual rate applicable to the corresponding period. |
| **For Unrealized Profits**<br>**P 2004-2013**<br><br>    **Costa Rica and Dominican Republic** | • We proceeded to calculate the future and present values of the cash flows that the company would have generated in accordance with the terms of the contract and according to the estimated income based on the thousands of pages provided.<br><br>• Cut-off date August 31, 2008.<br><br>• Average annual rate of 2.79% applied.<br><br>• Average US inflation rate 3.54% per year. |
| **For Losses 2004-2007** | • The resulting losses for the period between 2004 and December 31, 2007 were carried to future value.<br><br>• Cut-off date August 31, 2008.<br><br>• Average annual rate of 2.79% applied. |

| Basis for Compensation | Assumptions |
|---|---|
| **Interest** | • All of the interest paid to Banco Cuscatlán and Heidelberg's supplier company was considered based on the accounting record dates, and their amounts were carried to future value.<br><br>• Cut-off date August 31, 2008.<br><br>• Average annual rate of 2.79% applied. |
| **Due to interruption of operations** | • Based on the information contained in the audited financial statements for 1991 to 1999, the cash flows that the company would have generated without the impact of the Verizon contract on its operations were projected. |

# Calculation Detail

## 1).-  Investment in Machinery

In order to comply with the terms of the contracts signed with Verizon Information Services - Costa Rica, LLC, Verizon Information Services - Belize, LLC, and GTE Directorios República Dominicana, C por A., the company had to purchase a Rotating Machine and all of the related Heidelberg brand equipment with an acquisition cost of ¢ 955,116,741.00 including the capital expenditures necessary to make it operational.

The rotating machine stopped operating because the original terms of the contract were not met. This specialized equipment was eventually sold by the seller company in June 2007. The following procedure was followed to ascertain the loss caused by the judicial sale of the machine:

The original cost of the equipment and the rotary machine was updated to express it in *colones* for June 2007, the month the judicial auction was finalized. The same procedure was applied with the amount of the revaluation carried out in December 2004. Monetary adjustment factors calculated based on the Consumer Price Index published by the Central Bank of Costa Rica were used.

The accumulated depreciation amounts of the historical cost of the equipment and the rotating machine and of the revaluation that was carried out on it were indexed in order to re-express the amounts in *colones* for June 2007. Next, the loss was determined as the difference between the net value of the machinery as of June 30, 2007 and its sale price on the same date.

The resulting amount was restated in *colones* for August 2008 using the aforementioned consumer price index. This figure was converted to its equivalent in US dollars by dividing it by the exchange rate for August 31, 2008 published by the Central Bank of Costa Rica.

Given that the aforementioned investment in machinery would not have been necessary for the company had it not signed the contracts in question (to meet the technical, volume and quality requirements provided for therein), compensation for that investment and capitalizable expenses incurred inherent to it must be provided.

**Amount to be compensated for this item**      **$ 2,582,156.00**

**2).-      Increase in Inventory**

There were significant differences in the investment in inventory between 1997 and 1999 and between 2000 and 2004. These variations were the result of the investment in working capital necessary to comply with the contracting requirements.

Therefore, to calculate the damage, the variations in inventory expressed in US dollars for 2000 to 2004 were taken to future value using the cut-off date of August 31, 2008. The average net passive interest rate of the Financial System for deposits in US dollars for the pertinent periods was used.

**Amount to be compensated for this item**      **$2,860,696.00**

**3).-      Projected and unrealized flows for 2004-2013**

To calculate the damage and loss derived from this situation due to contracting in Costa Rica, the consumption of thousands of pages between 2000 and 2003 was used. The information was projected from 2004 to 2013. The contractual rate of $1.20 per thousand was applied for 2004 through 2005 and that of $1.15 was used for 2006 to 2013 to establish the amount of projected income. The percentage of the historical average of the cost of sales for 2000 to 2004 was

determined. The projected cost of sales was estimated based on that percentage. The edition and administration expenses corresponding to the 2004 period were determined. The percentage that the thousands of pages produced represent of the total income for this item was calculated. Based on said distribution percentage, the portion of administrative and publishing expenses inherent to the Costa Rican directories was estimated. Average US inflation was determined for 2004 to June 2008. This inflation was applied to the administrative and publishing costs (in US$) through 2013. The elapsed and remaining days were calculated between December 31, 2004 and 2013 compared to August 31, 2008. Future and current values were calculated as of August 31, 2008. The total amount of the quantified damages is $8,806,872.00.

We used the same calculation to ascertain the damage and loss generated in the Dominican Republic as a result of the same premature termination of the contract and its partial execution under parameters other than those agreed to. The total amount of the quantified damages is $7,912,999.00.

**Amount to be compensated for this item**

| | |
|---|---|
| **Costa Rica** | **$ 8,806.872.00** |
| **Dominican Republic** | **$ 7,912.999.00** |

**4).-    Losses incurred between 2004 and 2007**

The resulting losses for 2004 through 2007 were carried to future value on the cut-off date of August 31, 2008 using the average net borrowing rate of the financial system for deposits in US$ according to information from the Central Bank of Costa Rica.

**Amount to be compensated for this item          $ 7,237,068.00**

### 5).-        Interest

To calculate the damage and loss derived from the interest incurred, each of the interest charges paid to Banco Cuscatlán and to the Heidelberg equipment supplier company were considered based on their accounting record date. The amounts were taken to future value, with August 31, 2008 established as the cut-off date. To calculate the future value of each of these disbursements, the average net Passive Interest Rate of the Financial System for deposits in US$ was used based on information from the Central Bank of Costa Rica.

**Amount to be compensated for this item            $ 983,825.00**

### 6).-       Interruption of operations

The company Trejos Hermanos Sucesores, S.A. (THS) has maintained continuous operations in the printing industry for decades, specifically since 1912. This speaks to the historical consolidation of a business with normal operations. The economic performance of the firm during the period 1991-1999 has been evaluated on this basis, and an external audit opinion has been provided for those financial statements. The firm's representatives believe that, as of the year 2000, the effects of the contractual relationship with its counterpart considerably and cumulatively damaged the firm's management to the point of preventing it from maintaining its normal operation and, finally, causing it to be impossible for it to continue. Given this background, a technical procedure was carried out to estimate lost profits in US$. This procedure includes the following points:

1.    Analysis of the real economic trajectory of the firm (audited figures) during the period 1991-1999.

2.    Forecast of the results of economic income for the period 2000-2014 based on the trends for the period 1991-1999.

3.  Estimate of sales costs and operating expenses for the period 2000-2014 in accordance with the real proportion that these items represented in the economic structure of the firm during the period 1991-1999.

4.  Depreciation is added to operating profit as it constitutes a non-effective expense, thus determining Earnings before Interest, Taxes, Depreciation and Amortization (EBITDA).

5.  The reinvestment rate in fixed assets that would have been reasonably necessary to maintain future operational continuity is subtracted from the EBITDA. The annual cash flows for the period 2000-2013 are estimated based on this.

6.  The net cash flow is completed by calculating the present value of the perpetuity of the business assuming, given its previous history, the operational continuity of an indefinite term. A perpetuity is a financial technical procedure that allows one to express the value of the future flows of a business beyond the horizon or basic planning term. The cash flow corresponding to the last projected year is divided by the rate of return of the business (discount rate).

7.  Perpetuity includes a real growth rate of 3.28%, which conservatively corresponds to two-thirds of the Gross Domestic Product for the period corresponding to the years 2000 to 2007. Perpetuity is based on the technical financial principle that states that permanently generating a cash flow is equivalent to having its present value (in this case, the value as of 2007).

8.  The discount rate of the flows (update rate) was determined considering the Average Deposit Rate for 2002 to 2008 in US$ from the State Bank in Costa Rica, the average US inflation for 2002-2006, the business risk and return represented by its historical percentage EBITDA.

9.  The net cash flows were discounted in order to establish the present value of normal operations projected for the 2007 and subsequent periods and the values corresponding to the flows for the 2000-2006 period were updated, all in order to express the flows in *colones* of December 2007.

**<u>Amount to be compensated for this item</u>**        **$28,885,195.00**

## Summary of Claimed Items

TREJOS BROTHERS SUCCESSORS SOCIEDAD ANONIMA
SUMMARY OF ESTIMATE OF INDEMNIFIABLE AMOUNTS
In US$

| | |
|---|---|
| Cut-off date | 31 Aug 08 |
| Average Basic Passive Rate 2000 - 2008 | 16.94% |
| Average interest rate on deposits of the Financial System for deposits in the US - 2000-2008 | 2.79% |
| Estimated exchange rate as of August 31, 2008 | 547.93 |

| Element | Concept | Amount in USD As of 06/30/200? |
|---|---|---|
| 1 | Investment in Machinery | 2,582,156 |
| 2 | Increase in Inventories | 2,860,696 |
| 3A | Operating Cash Flows not received P 2004-2013 Directories Costa Rica | 8,806,872 |
| 3B | Operating Cash Flows not received P 2004-2013 Dominican Republic | 7,912,999 |
| 4 | Losses (2004 to 2007) | 7,237,068 |
| 5 | Interest | 983,825 |
| 6 | Interruption of operations | 28,885,195 |
| | **TOTAL COMPENSATION SOUGHT** | **59,268,811** |

## 7).-    <u>Pain and Suffering Caused.-</u>

In addition to the items listed above, **THS** has suffered severe pain and suffering as a direct result of the conflict created by the defendants through the termination of the contract signed on February 28, 2002.

The lack of production volume necessary to produce the income required to cover fixed costs caused the company to stop making payments and lose other customers, among other negative effects.

The company and the partners that endorsed it fell into the ignominious category of being classified as unfit for credit, mainly due to delays in meeting financial obligations and, later, due to the real impossibility of being able to meet those obligations.

The company saw its machinery and equipment seized, was evicted from industrial facilities, had bank loans closed and was unable to compensate its staff. All of this together prevented the company and its partners from seeking out other business opportunities and affected partners' other companies, which had no connection to **THS.**

See the certified documentation submitted by Caribbean Publishing Co., its notes, its emails about the board from the Republic of Honduras and the credit history issued by the General Superintendency of Financial Entities (SUGEF) and credit protectors, which comprise Document No. 72 and form part of the documentary evidence.

  **<u>Amount to be compensated for this item</u>**       **$ 5,000,000.00**

**<u>8).- Interest.-</u>**

Finally, the plaintiffs demand that the defendants pay interest on these sums that accrued between the cut-off date for the calculation, August 30, 2008, and the effective payment of their obligations. This interest will be calculated in accordance with Article 1163 of the Civil Code, that is, at the rate paid by the National Bank of Costa Rica for six-month certificates of deposit for the currency in question.

## <u>E).- LAW.</u>

The legal situation set out in the complaint speaks to the presence of a complex contractual relationship.

It is based on a contract between GTE (now VERIZON) and the ICE for the production of telephone directories that they entered into in 2000. This contract required that the printing of the telephone directories be carried out entirely in Costa Rica. To that end, GTE (now VERIZON) agreed to a "Master Purchase Agreement" in February 2002 under which TREJOS HERMANOS SUCESORES, S.A. would produce, pack and distribute telephone directories.

When it signed the Master Purchase Agreement, GTE (now VERIZON) considered the highly positive information provided regarding THS's efficiency in its continued business relationship as well as the material preparation that GTE (now VERIZON) required from THS, such as the transformation and expansion of its industrial plant.

The GTE - THS Master Purchase Agreement was the tool that GTE used to meet its obligations to the ICE under the 2000 contract. The existence of the Master Purchase Agreement cannot be understood without its foundation, the ICE - GTE contract. Even said Master Contract had to be approved by the ICE.

Once the ICE administratively ordered the termination of the 2000 contract with GTE (now VERIZON) attributing to it a serious breach, the GTE - THS Master Purchase Agreement was left without the foundation necessary for its execution.

As such, the legal relationships cited are ICE - GTE (VERIZON) - THS, constituting a complex contractual network in which the end parties (ICE and THS) are not completely separate. Although they are not direct contractors, both had mutual knowledge of each other's participation in the contracted material activity (the production of telephone directories), and the ICE oversaw and conducted periodic visits to the THS plant to supervise the correct printing of the telephone directories. It is important to highlight the approval of the Master

Printing Agreement by the ICE, which necessarily involved it in the legal relationship that is the basis of this litigation.

The termination of the ICE - GTE (VERIZON) contract had the immediate effect of making the execution of the GTE (VERIZON) - THS contract impossible. Thus, all of the resulting negative consequences (damages and losses caused to THS) rest on the termination of the ICE - GTE (VERIZON) contract.

There are two contractual relationships: ICE - GTE (VERIZON) and GTE (VERIZON) - THS. There is also an extra-contractual relationship: ICE - THS.

The termination of the ICE - GTE (VERIZON) contract constitutes an **objective breach** of the GTE (VERIZON) - THS contract. This objective breach is attributable to GTE (VERIZON). As such, this entity must be liable for the damages and losses caused under the general principle of contractual liability established in Article 702 of the Civil Code.

And the losses and damages suffered by THS, due to the objective breach of its contract with GTE (VERIZON) were generated by the ICE, which terminated its contract with GTE (VERIZON) without considering the legitimate interests that THS had in that agreement, thereby violating the *Neminem laedere* principle of not harming others. The ICE incurred civil liability in accordance with the application of the principles of the General Law of Public Administration (Articles 190 and following), whether its action is considered lawful (Articles 194 and 195) or illegal (Articles 191 and 192). Article 1045 of the Civil Code also establishes such responsibility.

The damages and losses for which compensation is sought from the defendants by THS are an immediate and direct consequence of the unlawful actions attributed to the defendants. The provisions of Article 704 of the Civil Code are thus met, as the charges made against the defendants are the sole cause of such damages. The damages and losses claimed are foreseeable in nature because

the defendants could rationally anticipate that they would be caused to THS by the alleged actions.

The direct damages or capital decrease itself consists of the assets and rights that THS lost as a result of the termination of the complex contractual relationship referred to in this complaint.

Damages for loss of profits refer to the assets and rights that were to be received by THS (as is a clear case of anticipated and foreseeable profits) and the fact that the entity could not receive them due to the termination of the aforementioned complex contractual relationship.

This termination of the contractual relationship caused pain and suffering to THS because the defendants' actions robbed it of the prestige developed since its founding in 1912. Compensation for this must be provided under Article 59 of the Civil Code, which establishes the general principle of the right of compensation for damage to the right of publicity.

This complaint presents facts that speak to the existence of an *economic interest group* comprised of the companies of the VERIZON GROUP. It notes that the civil liability claimed in the complaint covers the *higher-ranking entity* VERIZON COMMUNICATIONS INCORPORATED.

It should be noted that the First Chamber of the Supreme Court has used the concept of economic interest group to assign civil liability for the actions of the entities that comprise it. Supreme Court judgment number 000973-F-2005 issued at 4:00 p.m. on December 15, 2005 (declaring a cassation appeal inadmissible) supports the criterion of the Second Civil Court of San José regarding the responsibility of the ***"highest ranking entity"*** within the group.

Economic interest groups have also been called "economically efficient contractual networks." This term reflects a move to put into play the principle of contractual relativity, in the sense that only those who appear formally as parties

to the contract can be subject to the rights and obligations derived from it. But if the "economically efficient contractual network" or the "economic interest group" are found to be tools for abusing legal status, it should be understood that such abuse of rights is expressly condemned by Article 22 of the Civil Code. Article 432 of the Commercial Code (cited in another judgment regarding economic interest groups) states that the obligation of co-debtors is joint and several. It is that solidarity between co-debtors that is claimed in this process.

The civil liability disclaimers included in the master purchase agreement at VERIZON's insistence are necessarily ineffective due to imperative principles of Public Law. It should be noted that although the Verizon - THS contract was signed in the form of a commercial agreement, it is administrative in nature due to its purpose and effects. The Office of the Attorney General of the Republic has expressed, in a binding opinion and as stated in this complaint, that the edition, printing and distribution of telephone directories constitutes a public service. As such, it adds, the agreements that have as their object the editing, printing and distribution of telephone directories are also administrative in nature. Based on this legal situation, the anticipated exemption of responsibility by the Administration through the agreement is inadmissible. The same is true for the renunciation of the Administration's privileges given that the Public Treasury manages such matters, which are protected by principles of constitutional rank. Under the administrative principle, these privileges cover both the contract that "appears" as the main one and the subcontracts established to comply with all the expected effects of the public service.

On the other hand, from a Private Law perspective, note that the disclaimers of contractual civil liability contained in the MASTER PURCHASE AGREEMENT entered into by VERIZON and TREJOS HERMANOS SUCESORES are also null and void.

These clauses are integrated into an ***adhesion contract*** because the content of that agreement only allowed TREJOS HERMANOS to accept or reject it and the **abusive** nature of the clauses results in their nullity. This nullity is recognized in Article 1023, paragraph m) of the Civil Code and Article 42 of Law 7472 of

January 19, 1995 (Law for the Promotion of Competition and Effective Defense of the Consumer).

In the end, these civil liability disclaimers are ineffective in the case of an intentional breach in accordance with Article 701 of the Civil Code. Verizon's breach of the MASTER PURCHASE AGREEMENT is intention: this company did not meet its obligations even though it had no material obstacles to doing so. This is clear based on the fact that VERIZON unilaterally tried to modify its contract with the ICE so that it would not have to comply with its original obligations, which was attributed to VERIZON's compliance with the Master Purchase Agreement with the plaintiff. This is intent in the execution of a contract in accordance with the doctrine of the First Chamber of the Supreme Court of Justice, established in Judgment Number 320, which was issued at 2:20 p.m. on November 9, 1990. As a result of this willful breach, all of the contractual clauses that were intended to exonerate VERIZON from civil liability are rendered ineffective.

## F).- CLAIM.

Based on what was explained in Chapter D) above on the Damages claimed, in accordance with the Facts of the Complaint, the evidence provided and the economic studies that are attached, we are filing suit against the **Costa Rican Electricity Institute** and companies **Verizon Communications Incorporated** and **Verizon Information Services - Costa Rica- LLC,** so that the judgment finds in favor of the plaintiff on all counts and said parties are ordered to pay for the damages and losses claimed jointly and severally.

We thus ask that the sentence state:

**1).-** That the "Master Purchase Agreement" signed on February 28, 2002 by plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES - COSTA RICA, LLC) constituted a **means of execution** of the contract between the commercial firms "GTE Information

Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A", companies of the United States of America domiciled in the State of Delaware with their main offices in the City of Dallas, State of Texas, who identified themselves as the <u>GTE Consortium</u>" and the COSTA RICAN ELECTRICITY INSTITUTE, for the award to said Consortium of Public Tender No. 6378-T promoted by the ICE according to the agreement of the ICE Board of Directors reached during ordinary session number five thousand one hundred fifty-two held on February 1, 2000 and endorsed by the Office of the Comptroller General of the Republic on December 13, 2000.

**2).-** That the aforementioned "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A, was known to the COSTA RICAN ELECTRICITY INSTITUTE, **which approved the intervention of TREJOS HERMANOS SUCESORES S.A. in the execution of the administrative contract awarded to the GTE Consortium** resulting from Public Tender No. 6378-T promoted by the ICE.

**3).-** That the termination of the administrative contract entered into by the COSTA RICAN ELECTRICITY INSTITUTE and the GTE CONSORTIUM (whose name changed to the VERIZON CONSORTIUM) led to the termination of the "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

**4).-** That TREJOS HERMANOS SUCESORES S.A. was not responsible for the events that led to the termination of the administrative contract entered into between the COSTA RICAN ELECTRICITY INSTITUTE and the GTE CONSORTIUM.

**5).-** That TREJOS HERMANOS SUCESORES S.A. had no responsibility whatsoever for the events that led to the termination of the "Master

Purchase Agreement" signed on February 28, 2002 by plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

**6) .-** That the termination of the "Master Purchase Agreement" signed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. caused immediate and direct damages and losses to TREJOS HERMANOS SUCESORES S.A.

**7.-** That the defendant companies Verizon Communications Inc. and Verizon Information Services –Costa Rica- LLC are part of an economic interest group that is in turn a successor to the economic interest group called the GTE Consortium, which was awarded Public Tender No. 6378-T, promoted by the ICE, and executed through the "Master Purchase Agreement" signed on February 28, 2002 by plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.

**8) .-** That **"VERIZON COMMUNICATIONS INCORPORATED"** is the highest-ranking entity of an economic interest group which is part **"VERIZON INFORMATION SERVICES –COSTA RICA- LLC."** Therefore, the first of these companies is jointly and severally liable with the second for all the obligations contracted by **"VERIZON INFORMATION SERVICES - COSTA RICA- LLC"** with **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA.**

**9) .-** That the defendant companies **Verizon Communications Inc. and Verizon Information Services –Costa Rica- LLC** are jointly and severally liable for the negative consequences suffered by the plaintiff company, which occurred due to the termination of the Master Purchase Agreement signed on February 28, 2002 with plaintiff Trejos Hermanos Sucesores S.A.

**10) .-** That the **COSTA RICAN ELECTRICITY INSTITUTE** ignored the legitimate rights and interests of **TREJOS HERMANOS SUCESORES S.A.** derived from the execution of Public Tender No. 6378-T through the "Master Purchase Agreement" signed on February 28, 2002, for which it is jointly liable

with Verizon Communications Inc. and Verizon Information Services –Costa Rica- LLC for compensation for the damages suffered by the plaintiff due to the termination of the aforementioned Master Purchase Agreement signed on February 28, 2002.

**11).-** That the clauses of the MASTER PURCHASE CONTRACT entered into between VERIZON and TREJOS HERMANOS SUCESORES regarding the exemption of civil liability of VERIZON for breach of contract are null and void, including within this nullity, above all, Clauses 24 and 28 of that contract. This statement is not limited to them, since it includes all the civil liability exonerative clauses that favor VERIZON.

**12) .-** That the defendants the **COSTA RICAN ELECTRICITY INSTITUTE** and companies **Verizon Communications Inc.** and **Verizon Information Services –Costa Rica. LLC** must pay the plaintiff, jointly and severally, the damages and losses incurred, which we break down as follows:

| | |
|---|---|
| a) Investment in machinery | $ 2,582,156 |
| b) Increase in inventories | $ 2,860,696 |
| c) Operating cash flows not received 2004-2013 Costa Rica Directories | $ 8,806,872 |
| d) Operating Cash Flows not received 2004-2013 Dominican Republic Directories | $ 7,912,999 |
| e) Realized losses from 2004 to 2007 | $ 7,237,068 |
| f) Interest paid by THS | $ 983,825 |
| g) Interruption of operations | $28,885,195 |
| h) Pain and suffering | $ 5,000,000 |

i) In accordance with the provisions of Article 123 of the Contentious-Administrative Procedure Code, an update of the sums of the conviction will also be granted to compensate for the variation in purchasing power, and interest will be recognized from all the previous items that will be paid as of August 30, 2008 and

until they are fully settled, which will be calculated in accordance with the provisions of Article 1163 of the Civil Procedure Code.

**13) .-**          The defendants must jointly pay the plaintiff the personal and procedural costs of this matter.

**Complaint Estimate:** We estimate the total amount of the claim to be US $64,268,811 (sixty-four million two hundred sixty-eight thousand eight hundred eleven United States dollars).

## G.- TEST.-

### I.- Documentation:

We attach the following documentary evidence, which refers to that elements necessary to verify the Facts of the Complaint.

**Document No. 1.-**          Notarial certification of the legal status of Mr. Alvaro Trejos Fonseca, President with unlimited powers of attorney of the plaintiff company.

**Document No. 2.-**          Notarial certification of the registration of the firm Verizon Information Services –Costa Rica- LLC, in which it is stated that its Resident Agent is Mr. Hernán Pacheco Orfila, attorney, resident of San José, with an office at Bufete Pacheco Coto, Avenida Once, Calles Cinco and Siete, identity card number 1-585-980. Additionally, the publication of the internet pages containing the bylaws, the certificate of incorporation, the list of directors and the corporate history of Verizon Communications Inc. is attached. These indicate that Ivan G. Seidenberg is the President of the Board of Directors, and that Chief Executive Officer and William P. Barr is Executive Vice President and General Counsel.                              [handwritten:] *Yes*

**Document No. 3.-** Notarial certification in which the original registration of the Trejos Hermanos Collective Society, later Trejos Hermanos Sucesores, S.A., whose corporate term began on January 1, 1912 and expires on September 30, 2025. The same attached document includes a copy of the List of Subscribers (telephone directory) of Costa Rica from 1918, the first published in the country.

[handwritten:] *Yes    Yes*

**Document No. 4.-** Photocopies of the covers of the Telephone Guides printed by THS for various Central American and Caribbean countries and cities in the United States.                    [handwritten:] *No     irrelev.*

**Document No. 5.-** Copy of the certificate issued by Mr. José María Quirós Alfaro, General Manager of GTE Costa Rica dated January 26, 1999.

[handwritten:] *irrelev.*

**Document No. 6.-** Folios 12-87 of Volume II of the documentary evidence, which contains the initial contract signed by GTE and the ICE with its addenda and additional information. This evidence refers to the Complaint Facts 4, 16, 17, 18, 29 and 35.                    [handwritten:] *It isn't here.*

**Document No. 7.-** Copy of the public deeds certified by notary public in which contracts were formalized between GTE and THS to draft, assemble, print and bind the telephone directories in Costa Rica for contract years 1978 and 1981.                    [handwritten:] *Yes*

**Document No. 8.-** Copy of the letter sent by the Manager of GTE Costa Rica on December 18, 1995 to the Board of Directors of Antel in El Salvador, stating that GTE Directories gives THS its broadest possible support, which covers all the aspects necessary for the directory production to be a complete success. It also states that GTE will make available to THS all of the resources and technology necessary to meet and exceed the sales projections and other aspects contemplated in the tender.       [handwritten:] *Yes    irrelev.*

**Document No. 9.-** Certified copies of purchase orders issued by Verizon Servicios de Información Dominicana S.A. in the Dominican Republic to THS so that it would edit and print directories for that country in 1995, 1997, 1999, 2000, 2001 and 2002. A copy of the Financial Statements of THS as of September 30, 1989, September 30, 1991 and 1992, and September 30, 1992 and 1993 are included. They reflect the commitments (current contracts) in place with the Dominican Republic, Costa Rica, Honduras and Jamaica.

[handwritten:] *Yes translation*

*Without translation   irrelev.*

**Document No. 10.-** Certified copy and official translation of the Agency and Cooperation contract between GTE and THS; translated and certified copy of the letter dated November 4, 1996 that GTE attorney Sandra Parker sent to executives Scout Hanle and Doug LaVelle; and a copy of the certificate issued by Notary Mario Quintana Musmanni regarding the execution of the contract. Document No. 10 also includes official translations of the evaluation conducted by GTE through its agent Bruce Wataru dated March 15, 1999, of the existing equipment in the THS facilities and of the recommendations for modernizing the printing plant and the details and translation of correspondence with Art Nixon regarding a request to provide paper and issue a quote for providing directories for Puerto Rico for 2001. [handwritten:] *Yes, irrelev.*

**Document No. 11.-** Copy of the contract signed by General Telephone Directory Company, C. por Ac and Trejos Hermanos Sucesores, S.A. on January 21, 2000 as shown in the Annex (Exhibit E), which would later be modified by the parties, together with the purchase orders to print the phone books for the year 2000. [handwritten:] *It is not translated.*

**Document No. 12.-** Pages 294 through 317 of Volume II of the documentary evidence, which contains the latest version of the contract signed by GTE and the ICE for Tender 6378-T. The background section includes information regarding this tender. [handwritten:] *Volume II*

**Document No. 13.-**       Folios 1 through 11 of Volume II of the documentary evidence, which contains copies of part of the offer submitted by the GTE Consortium with the information listed in Fact 11 of the Complaint.

**Document No. 14.-**       Folios 125 through 160 of Volume II of the documentary evidence, which contains documents related to and that prove Facts 12 and 24 of the Complaint.

**Document No. 15.-**       Pages 88 through 124 of Volume II of the documentary evidence, which contains documents related to Facts 19, 20, 21, 22 and 23 of the Complaint.

**Document No. 15-A.-**    Folios 199 through 293 of Volume II of the documentary evidence, which contains documents related to Fact 23 of the Complaint.

**Document No. 16.-**       Pages 161 through 192 of Volume II of the documentary evidence, which contains documents related to Fact 25 of the Complaint.

**Document No. 17.-**       A certified copy of Clause 2.4.1.B of ICE Public Tender 6378-T.

**Document No. 18.-**       Folios 193 through 198 of Volume II of the documentary evidence, which contains documents related to Fact 27 of the Complaint.

**Document No. 19.-**       Certified copy of the Master Purchase Agreement signed by Verizon and THS on February 28, 2002 with its Annexes, in the official translation version. The document proves Facts 30 and 33.

**Document No. 20.-**       Copy of the Investment Plan presented by THS for the purchase of the Heidelberg Rotating Machine for the sum of CIF US $2,700,000.

**Document No. 20-A.-**    Official Translation of the Heidelberg Rotary Machine purchase documents.

**Document No. 21.-**    Certified copy of the lease contract signed by THS with Inmobiliaria Zoroaster, S.A. for the rental of the physical plant in Cartago.

**Document No. 22.-**    Official translation and notarial certification of the Letter sent by Douglas C. LaVelle, President of GTE Directories International to THS on October 15, 1999 proposing the terms to be agreed upon regarding the telephone directories of the Dominican Republic and Costa Rica and the conditions imposed. The Document proves Facts 37 through 42 inclusive.

**Document No. 23.-**    Official translation of the messages sent by Terrence Mirtchell Leve, Senior Attorney at GTE, dated August 20, 1999, in which he proposes that the goal of the discussions is to obtain a long-term contract with THS and eventually to sign a joint venture; the need to increase the production of telephone directories in other countries such as the Dominican Republic in order to achieve prices that are adequate for GTE; the need for THS to change equipment so that it could be more cost efficient; and the possibility that GTE might provide technical services through experts that would visit THS plants. The documents prove Fact No. 43.

**Document No. 24.-**    Official translation of the document that Art Nixon sent on November 15, 1999 to prove the contents of Fact 45 of the Complaint.

**Document No. 25.-**    Certified copy of the note sent by José María Quirós, General Manager of GTE, to the ICE on August 31, 2000. He submitted the subcontract for printing the telephone directories from 2001 to 2008 for verification in accordance with Clauses 2.13.1 and 3.13.5 signed by GTE with THS. In the note, the GTE Manager says that the chosen company is THS, which has recognized national and international experience and handled the printing the telephone directories that the ICE entrusted to GTE for 25 years. The document proves Fact 47.

**Document No. 26.-** Official translation of the two messages sent by Art Nixon of Verizon on February 1 and September 16, 2001, which prove Fact 48 of the Complaint.-

**Document No. 27.-** Certified copies of the documents of part of the financing assumed by THS with Banco Interfin S.A. and the credit line with Transamérica Bank and Trust.

**Document No. 28.-** Certified copies of the 2005 Telephone Directory Production Schedule and evidence in Fact No. 50 of the Complaint.

**Document No. 29.-** Certified copies of the purchase orders issued by Verizon for the production of the telephone directories for the year 2005 indicated in Fact No. 51 of the Complaint.

**Document No. 30.-** Certified copies of the substitute purchase orders for the 2005 guides issued by Verizon, which are discussed in Facts 52, 53 and 54 of the Complaint.

**Document No. 31.-** Certified copy of the document that Verizon presented to the ICE Telecommunications Department on May 13, 2004, proposing changes to the telephone directory publication system for 2005 in accordance with the terms of the contract. This refers to Fact 55 the Complaint.

**Document No. 32.-** Certified copy of the acknowledgment of receipt of the note dated May 13, 2004 sent by the Assistant Manager of Telecommunications demanding that the terms of the compliance guarantee be adjusted in advance. The note refers to Fact 56 of the Complaint.

**Document No. 33.-** Certified copy of official letter 6000-41046-2004 dated July 15, 2004 sent by the Telecommunications Assistant Manager to Verizon stating that if there is no consensus between the parties, the 2005 phone book

must be produced with the same structure and quantity as that of 2004. It refers to Fact 57 of the Complaint.

**Document No. 34.-** Certified copy of the note sent by Verizon on September 8, 2004 to the Telecommunications Department asserting positive silence due to a lack of response from the ICE. It refers to Fact 58 of the Complaint.

**Document No. 35.-** Certified copy of official letter 6000-52278-2004 dated September 14, 2004, which the ICE Telecommunications Department sent to Verizon, rejecting the claim of positive silence and maintaining the contractual conditions, which is analyzed in Fact 59 of the Complaint.

**Document No. 36.-** Certified copy of the note sent by Verizon to the ICE's Telecommunications Department on November 8, 2004 reiterating the claim for positive silence, which proves Fact 60 of the Complaint.

**Document No. 37.-** Certified copies of the public deeds signed by notaries on the telephone directory production process for 2005, which proves Facts 61 and 63 of the Complaint.

**Document No. 38.-** Certified copy of the official letter S.I.-0726-11-04 dated November 15, 2004 sent by Attorney Agnes Paniagua Cubero from the ICE to Verizon requesting information on the performance bond and the structure of the telephone directory for the Metropolitan Area, which proves Fact 62 of the Complaint.

**Document No. 39.-** Certified copy of the official letter S.I.-0730-11-04 of November 17, 2004, in which Attorney Agnes Paniagua informs the different ICE offices about the meeting with Verizon that same day. It is related to Fact 63 of the Complaint.

**Document No. 40.-** Certified copies of official letter 6000-64540-2004 dated November 18, 2004 in which the ICE Telecommunications Department contacts the Verizon Information Services Vice President for Latin America and Asia regarding the decision to maintain the conditions originally agreed to in the contract for the production of telephone directories for the year 2005. The Document proves Fact 64 of the Complaint.

**Document No. 41.-** Certified copy of official letter 0012-65785-2004 dated November 25, 2004 with which the ICE notified Verizon of the agreement of the Board of Directors to reject any intention to unilaterally change the contractual conditions for the production of telephone directories and urged Verizon to comply with every aspect of the current contract. The Document proves Fact 65 of the Complaint.

**Document No. 42.-** Copy of official letter 6000-66202-2004 (SGT-2625-2004) dated November 29, 2004 that ICE's Telecommunications Department sent to Verizon notifying it of the agreement with Article 10 of the Minutes of session 5649 held November 23, 2004, which proves Fact 66 of the Complaint.

**Document No. 43.-** Copy of Official Letter 9100-UENSC-888 dated November 30, 2004 in which the ICE Customer Service UEN informs Verizon that in accordance with the decision of the Board of Directors, it will not allow the telephone directory printing process to fail to comply with the terms agreed in the current contract. The Document proves Fact 67 of the Complaint.

**Document No. 44.-** Certified copy of deed number 131 issued before Public Notary Yaila Paola Sánchez Canessa at eleven o'clock a.m. on December 2, 2004 on the process of printing the telephone directories for the year 2005. The Document proves Fact 68 of the Complaint.

**Document No. 45.-** Copies of Official Letter SI-0759-12-04 dated December 13, 2004 sent by the ICE Information Services Process to the

Procurement Office accusing Verizon of engaging in a contractual breach and asking it to initiate the process of termination of the contract and execution of the performance guarantee. The Document proves Fact 69 of the Complaint.

**Document No. 46.-**       Copies of Official Letter 5225-69163-2004 (AEG-0572-2004) sent by the ICE Procurement Office to Verizon notifying the company that the contract resolution procedure is being opened and granting it a hearing to present witnesses and evidence. The Document proves Fact 70 of the Complaint.

**Document No. 47.-**       Copies of the brief presented by Verizon on December 17, 2004 in response to the hearing granted and opposing the previous exception to the arbitration agreement. The Document proves Fact 71 of the Complaint.

**Document No. 48.-**       Copies of Official Letter SI-0013-01-05 that UENSC Information Services sent to Procurement on January 7, 2005 requesting that Verizon not be allowed to fulfill the benefits of the contract under its charge given the breach which it has incurred and asking that certain precautionary measures be issued to protect the public interests involved. The Document proves Fact 72 of the Complaint.

**Document No. 49.-**       Copies of Official Letter 5225-00939-2005 (AEG-0020-2005) dated January 7, 2005 in which the Procurement Office notifies Verizon of the precautionary measures issued. The Document proves Fact 73 of the Complaint.

**Document No. 50.-**       Copies of the brief presented by Verizon on January 10, 2005, challenging the precautionary measures. The Document proves Fact 74 of the Complaint.

**Document No. 51.-**       Copy of Official Letter 0092-01644-2005 (DCA-020-05) of January 12, 2005 by which the ICE Institutional Legal Directorate recommends

denying the appeals filed by Verizon against the precautionary measures issued. The Document proves Fact 75 of the Complaint.

**Document No. 52.-**     Copy of Official Letter Sl-0025-01-2004 of January 12, 2005 of Attorney Agnes Paniagua also recommending that the administrative appeals against the precautionary measures be denied. The Document proves Fact 76 of the Complaint.

**Document No. 53.-**     Copy of the brief filed on January 12, 2005 by Verizon exercising its right of defense within the administrative procedure for terminating the contract and proving Fact 77 of the Claim.

**Document No. 54.-**     Copy of official letter 5225-03122-2005 (AEG-0060-2005) dated January 21, 2005, through which the revocation filed by Verizon against the decision set out in official letter 5225-00939-2005 AEG-0020-2005 is declared invalid and the appeal to the Telecommunications Department was admitted. The Document proves Fact 78 of the Complaint.

**Document No. 55.-**     Copy of the brief filed by Verizon on January 31, 2005 reiterating its arguments in support of the appeal. The Document proves Fact 79 of the Complaint.

**Document No. 56.-**     Certified copies of official letter 5225-01843-2005 (AEG-0033-2005) dated January 13, 2005 in which the ICE informs Verizon that the Board of Directors is reviewing its request to go to arbitration and a copy of the official letter 0012-5372-2005 (CD-070-2005) of February 2, 2005 in which the Telecommunications Department is notified of the agreement of the Board of Directors that rejects the request to go to arbitration. The Documents prove Facts 80 and 81 of the Complaint.

**Document No. 57.-**     Copy of official letter 6000-06301-2005 (SGT-510-2005) dated February 7, 2005 by means of which the ICE informs Verizon of its rejection of the appeal and the attendant nullity filed confirming note 5225-00939

-2005 and the execution of the precautionary measures. The Document proves Fact 82 of the Complaint.

**Document No. 58.-** Certified copies of the resolution contained in official letter 6000-27733-2005 (SGT-2326-2005) dated June 1, 2005 in which the Telecommunications Department declares the contract terminated and orders the company to proceed to collect the damages and losses incurred. Attached to the Document is the recommendation of the Governing Body of the Administrative Procedure on which it is based. The documents prove Fact 83 of the Complaint.

**Document No. 59.-** Certified copy of the brief presented by Verizon on June 7, 2005 filing the appeals for revocation with subsidiary appeal and attendant nullity against the termination of the contract, which was rejected by a resolution issued by the General Manager of ICE through official communication 0150-36359-2005 (GG-680-2005) dated July 8, 2005, the last act being final. The Document proves Facts 84 and 85 of the Complaint.

**Document No. 60.-** Certified copy of the note that THS sent to the Executive President of the ICE on February 15, 2005 stating that the provision of telephone directories to telephone service users is a public service and that THS, as a subcontractor of such service, could legally continue with that service. The Document proves Fact 86 of the Complaint.

**Document No. 61.-** Certified copy of the note sent by THS to the ICE Board of Directors proposing a direct contract to continue to produce the telephone directories. The Document proves Fact 87 of the Complaint.

**Document No. 62.-** Certified copy of official letter 0012-34690-2005 (CD-581-2005) that the Secretary of the ICE Council sent to THS indicating that its request had been sent to the Telecommunications Department. The Document proves Fact 88 of the Complaint.

**Document No. 63.-**     Certified copy of official letter SGT-3228-2005 dated August 4, 2005 sent by the ICE Telecommunications Department to THS indicating that the Board of Directors decided to sign a contract with RACSA to prepare the telephone directories. The Document proves Fact 89 of the Complaint.

**Document No. 64.-**     Copy of official letter 0090-38888-2005 (DJI/220) dated August 4, 2005, in which the Institutional Legal Directorate of ICE informs THS that RACSA has been contracted to produce the telephone directories. The Document proves Facts 90 and 91 of the Complaint.

**Document No. 65.-**     Copy of Opinion number C-152-2000 of the Office of the Attorney General of the Republic dated July 7, 2000 addressed to the Commission to Promote Competition and binding for the Public Administration.

**Document No. 66.-**     Copy of the agreement of the ICE Board of Directors in which it is decided that RACSA will be in responsible for preparing the telephone directories. The Document proves Fact 93 of the Complaint.

**Document No. 67.-**     Certified copy of the note dated September 13, 2005, which THS sent to the Conciliation and Arbitration Center of the Costa Rican Chamber of Commerce requesting their intervention to discuss the conciliation of the conflict with the Verizon Group. The Document proves Fact 94 of the Complaint.

**Document No. 68.-**     Certified copy of the note that Verizon sent to THS on September 2, 2005, unilaterally terminating the current contract without Verizon's liability. The Document proves Fact 95 of the Complaint.

**Document No. 69.-**     Certified copies of the resolutions of the Civil Court of Cartago in the Pledge Executive Process of Heidelberg Print Finance Americas Inc. against Trejos Hermanos Sucesores, S.A., which was processed in file No. 06-001956-0640-CI, in which the assets acquired by THS were auctioned off by

order of the courts and pawned for up to US $2,831,409.07. The Documents prove Facts 96 and 97 of the Complaint.

**Document No. 70.-** Certified copy of public deed No. 144 granted before the Notary Public Laura Mónica Zamora Ulloa in San José at 12:00 p.m. on March 23, 2006, in which the debt is established for the rental of the industrial buildings where THS was located in Cartago, for the sum of US $200,223.75 with annual interest of 9.5% and a variable rate based on the fluctuations in the current rate of Banco Interfin. The Document proves Facts 98 and 99 of the Complaint.

**Document No. 71.-** Certified copies of the judgments issued by the Civil Large Claims Court of Cartago and the Civil and Labor Court of Cartago, in File 06-001846-0640-CI, in the Simple Executive process of Inmobiliaria Zoroaster, S.A. against Trejos Hermanos Sucesores, S.A. The Document proves Fact 100 of the Complaint.

**Document No. 72.-** Certified copies of the Sentences of First and Second Instance issued by the Civil Court of Cartago in the Eviction Process in file No. 06-002404-346-CI of Inmobiliaria Zoroaster, S.A. against Trejos Hermanos Sucesores, S.A. This is the documentary evidence for Fact 101 of the Complaint.

**Document No. 73.-** Certified copy of the sale contract formalized between THS and Condor Editores de Costa Rica, S.A. for the sale of THS industrial movable property, which proves Fact 102 of the Complaint.

**Document No. 74.-** Certified copy of the lease settlement contract signed by THS with Inmobiliaria Zoroaster, S.A., which proves Fact 103 of the Complaint.

**Document No. 75.-** Certified copy of the contract for the lease of movable property with purchase option, signed by THS and Dacondor DCR, S.A., which proves Fact 104 of the Complaint.

**Document No. 76.-**      Notarial certification of the THS "Credit Report" issued by the Credit Information Center of the General Superintendency of Financial Entities (SUGEF), together with the Regulation for Debtor Qualification published in Official Gazette 238 on December 9, 2005.

**Document No. 77.-**      Financial report prepared in October 2008 by Mr. Tomás Evans Salazar, member No. 11968 of the Board of Professionals in Economic Sciences, which contains the calculations of the damages and losses incurred by the defendants to the plaintiff firm .

## II.- Party's Declaration.-

We offer as evidence the statement made by the representative of the defendant <u>Verizon Information Services –Costa Rica- LLC</u> regarding the Facts of the Complaint in general, and especially numbers 31, 32, 33, 34, 35, 37, 38, 39 and 42.

## III.- Expert Evidence.-

We request that the Court appoint an expert, who must be a certified public accountant or a firm of authorized public accountants, to study the analysis of Mr. Tomás Evans Salazar that accompanies the complaint. The expert must establish whether Mr. Evans' analysis is based on recognized accounting practices and if his results are true and correct. If discrepancies are found between the expert's conclusions and Mr. Evans' analysis, the expert will correct any aspects of the latter that they deem pertinent. The plaintiff shall make all its accounting records and files available to that expert, and the expert will outline the records and methods used in their report.

## IV.- Administrative File.-

The Costa Rican Electricity Institute is ordered to submit a certified copy of the Administrative File corresponding to Public Tender No. 6378-T "Development and Implementation of Information Services," including the complete tender terms, the bid submitted by the GTE Consortium, and the contracts signed by the ICE and the GTE Consortium. It must include all of the procedures, actions and resolutions issued within the administrative contract execution process, including those that were processed before Courts of Justice or Arbitration, all of in accordance with the provisions of Article 51 of the Contentious-Administrative Procedure Code.

**Precautionary Measure:** In the ordinary proceedings against **VERIZON INFORMATION SERVICES - COSTA RICA, LLC** processed in the Contentious Administrative and Civil Court of Finance under the file 05-000881-0163-CA, the Costa Rican Electricity Institute secured a seizure of the assets of that defendant. As the assets seized there constitute an important basis for the plaintiff in these proceedings, TREJOS HERMANOS SUCESORES S.A., to be compensated for the damages and losses incurred by the ICE and by VERIZON, we request that, in accordance with Articles 19 and following of the Code Administrative Litigation; 241 and following of the Civil Procedure Code, and specifically 242 idem, that ICE be ordered not to dispose of the proceeds of this embargo until the claim derived in the process initiated with this brief is resolved.

**Notifications:** The plaintiff states that notifications can be sent to the fax number 22 83 11 46. It is hereby ordered that notice be given to the Costa Rican Electricity Institute at its headquarters in Sabana Norte; to the defendant firm "VERIZON INFORMATION SERVICES –COSTA RICA- LLC" at the offices of its Licensed Resident Agent Hernán Pacheco Orfila, at the Pacheco Coto Law Firm located on the fourth floor of Building A of the FORUM 2 Executive Center in Santa Ana; and to the company "VERIZON COMMUNICATIONS INCORPORATED." It is further ordered that its President and Chief Executive Officer be notified at their offices on 140 West St. 29th Floor, New York, NY 10007 and at its registered address located at 1209 Orange Street in the City of Wilmington, New Castle County, in the State of Delaware. As these are

notifications issued abroad, the case will proceed in accordance with Article 180 of the Civil Procedure Code.

**Goicoechea, December 15, 2008.**


[signature]

**Alvaro Trejos Fonseca.**


[raised seal:]                                    [12 stamps:]
EDUARDO SANCHO GONZALEZ            250 COLONES
ATTORNEY AND NOTARY C 1147          STAMP
COSTA RICA                                        BAR ASSOCIATION
        [signature]

[illegible]

[handwritten:] *Document #1 Notarized certification of legal status / Document 2 Notarized certification/ Document #3 Notarized certification original registration of the company / Internet page / Document #4 Copy of telephone directory entries*

RECEIVED BY: *Eduardo M.*

TIME: *10:36 a.m.*                                                    *12/16/18*

| | |
|---|---|
| *Document #5* | *Copy of certification issued by José Maria Quirós* |
| *Document #7* | *Copy of public deeds notarial certificate* |
| *Document #8* | *Copy of letter sent by the manager of GTE* |
| *Document #9* | *Certified copies of purchase order by Verizon Servicios de Información Dominicana S.A.* |
| *Document #10* | *Certified copy and official translation of the agency and cooperation contract between GTE and THS.* |
| *Document #11* | *Copy of the contract signed by General Telephone Directory company C. por AC and Trejos Hermanos Sucesores* |
| *Document #17* | *Certified copy of Clause 2.4.1.B of Public Tender 6378-T of the ICE* |
| *Document #19* | *Certified copy of the Master Purchase Agreement* |
| *Document #20* | *Copy of investment plan by THS* |
| *Document 20-A* | *Official translation of the purchase documents* |
| *Document 21* | *Certified copy of the lease contract* |
| *Document 22* | *Official translation and notarial certification of the letter sent by Douglas C. LaValle* |
| *Document 23* | *Official translation of the messages sent by Terrence Mirtchell Leve* |
| *Document 24* | *Official translation of the document sent by Art Nixon on 11/15/99.* |
| *Document 25* | *Certified copy* |
| *Document 26* | *Official translation of messages sent by Art Nixon* |
| *Document 27* | *Certified copies* |

*The administrative file was provided, which includes 318 folios.*

| | |
|---|---|
| *Document 28* | *Certified copy of the production timetable of the telephone books 2005 and proof #50* |
| *Document 29* | *Certified copy of purchase orders* |
| *Document 30* | *Copy of substitute purchase orders* |
| *Document 31* | *Certified copy of the document presented by Verizon* |
| *Document 32* | *Certified copy of the proof of receipt of the note of 5/13/04* |

*Document 33*   *Certified copy of official letter 6000-41046-2004*

*Document 34*   *Certified copy of the note sent by Verizon 9/8/04*

*Document 35*   *Certified copy of official letter 6000-52278-2004 9/14/04*

*Document 36*   *Certified copy*

*Document 37*   *Certified copy of the public deeds*

*Document 38*   *Certified copy of official letter SI-0726-11-04,15*

*Document 39*   *Certified copy of official letter SI-0730-11-04*

*Document 40*   *Certified copy of official letter 6000-64510-2004*

*Document 41*   *Certified copy of official letter 0012-65785-2004*

*Document 42*   *Copy of official letter 6000-66202-2004*

*Document 43*   *Copy of official letter 9100-UENSC-888*

*Document 44*   *Certified copy of Deed #131*

*Document 45*   *Copy of official letter SO-0759-12-04*

*Document 46*   *Copy of official letter 5225-69163-2004*

*Document 47*   *Copy of the document of 12/17/04*

*Document 48*   *Copy of official letter SI-0013-01-05*

*Document 49*   *Copy of official letter 5225-00939-2005*

*Document 50*   *Copy of the document of 01/10/05*

*Document 51*   *Copy of official letter 0092-01644-2005*

*Document 52*   *Copy of official letter SI-0025-01-2004*


*Document 53*   *Copy of document of January 12, 2005*

*Document 54*   *Copy of official letter 5225-03122-2005*

*Document 55*   *Copy of document 1/31/05*

*Document 56*   *Certified copy of     5225-01843-2005*
                                *0012-5372-2005*

*Document 57*   *Copy of official letter 6000-06301-2005 / 5225-00939-2005*

*Document 58*   *Certified copy of the [illegible] official letter 6000-27733-2005*

*Document 59*   *Certified copy of document of June 7, 2005*

*Document 60*   *Certified copy of the note of 02/15/05*

*Document 61*   *Certified copy of the note from THS*

*Document 62*   *Certified copy of official letter 0012-34690-2005*

*Document 63*   *Certified copy of official letter 56T-3228-2005*

*Document 64*   *Copy of official letter 0090-38888-2005*

*Document 65*   *Report ISZ-2000*

*Document 66*   *Copy of the agreement of the Board of Directors of the ICE*

*Document 67*   *Certified copy of the note of 09/13/05*

*Document 68*   *Certified copy of the note of 9/2/05*

*Document 69*   *Certified copy of the resolutions of the Civil Court of Cartago*

*Document 70*   *Certified copy of public deed*

*Document 71*   *Certified copy of sentences and the Civil Large Claims Court of Carthage*

*Document 72*   *Certified copy of 1st and 2nd instance sentences*

*Document 73*   *Certified copy of the purchase contract*

*Document 74*   *Certified copy of the lease settlement contract*

*Document 75*   *Certified copy of the lease contract of goods and furnishings*

*Document 76*   *Notarial certificate credit report*

*Document 77*   *Report financial [illegible]*

[handwritten:] *08-001505 – 1027-CA* [signature] *2-638-788*

**PLAINTIFF: TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA.**
**PROCEEDINGS: ORDINARY CIVIL TREASURY.**
**DEFENDANTS: COSTA RICAN ELECTRICITY INSTITUTE, VERIZON**
**COMMUNICATIONS INCORPORATED, VERIZON**
**INFORMATION SERVICES - COSTA RICA- LLC.**

|  |  |
|---|---|
| *1 power* *1 [ill.] of copy of the document of the Complaint 4 of the Exhibit Doc. (34 [ill.])* | [seal] JUDICIAL AUTHORITY N JUDICIAL CIRCUIT OF SAN JOSE DEC. 18, 2008 14.50 Contentious Administrative Procedural Court RECEIVED |

**CIVIL AND CONTENTIOUS-ADMINISTRATIVE PROCEDURAL COURT OF THE TREASURY.**
**SECOND JUDICIAL CIRCUIT. GOICOECHEA, BUILDING ANNEX A.**

**The undersigned, ÁLVARO TREJOS FONSECA, an adult married for the second time, Master in Sciences, resident of San José, identity card number 1-0390-0895, acting in my capacity as President with unlimited powers of attorney, of the company domiciled at this address "TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA," legal entity identification number 3-101-000940, grants SPECIAL JUDICIAL POWER to Attorney EDUARDO SANCHO GONZÁLEZ, an adult married lawyer and resident of Montes de Oca, identity card number 1- 380- 073, in accordance with the provisions of Articles 1256, 1289 and 1290 of the Civil Code, with all of the attributions indicated in those legal regulations understood to be expressly conferred. The representative signs this document to signal acceptance of the power of attorney.**

**San José, December 16, 2008.**
　　　　　[signature]
**Álvaro Trejos Fonseca.**

*AUTHENTICATED BY*
*Jose Leonardo Céspedes R.*
*LAWYER AND NOTARY PUBLIC*
*C. 1582*

|  |  |  |  |
|---|---|---|---|
| [stamp] 250 COLONES STAMP BAR ASSOCIATION | [stamp] REPUBLIC OF COSTA RICA STAMP 100 COLONES | [stamp] REPUBLIC OF COSTA RICA STAMP 50 COLONES | [raised seal:] JOSE LEONARDO CESPEDES RUIZ ATTORNEY AND NOTARY C 1182 COSTA RICA |

[illegible]
1 power, 1 set of copies of the document of the complaint, 3 [ill.] of documentary proof
(3 ampos) only.
RECEIVED BY: [initials]
TIME: 10:00 a.m.                    12/19/08

[illegible]
Document added [ill.]        12/19/08
Added [ill.]                 Maria Luisa
                             [initials]
                             [illegible]

[illegible]



# <u>Certificate of Accuracy</u>

Tuesday, 26 October 2021

To whom it may concern,

We Trustpoint.One, hereby certify to the best of our knowledge and belief that the foregoing document described as "The Ordinary Civil Tax Action filed by Trejos Hermanos Sucesores" is a true and accurate translation of the original.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

If there is any additional information we can provide you, please do not hesitate to contact us.

Yours sincerely,

*Elizabeth Wozniak*

Elizabeth Wozniak
Project Manager
Trustpoint.One

3200 Cobb Galleria Parkway
Suite 200
Atlanta, GA 30339

Trustpoint.One/translate-one
p: 412.261.1101
f: 412.261.1159

page 1 of 1



1505

II CIRCUITO JUDICIAL DE SAN JOSE

15 DIC. 2008
CZP 12:55.
Tribunal Procesal Contencioso Administrativo

RECIBIDO

91 folios originales / 3 juegos de copias
3 legajos de pruebas que
constan de 71 documentos de pruebas.
(revisados en su totalidad).
Todos se adjuntan.

**PROCESO ORDINARIO CIVIL DE HACIENDA**

**Actora:** "Trejos Hermanos Sucesores, Sociedad Anónima"

**Demandados:**      Instituto Costarricense de Electricidad

Verizon Communications Incorporated

Verizon Information Services –Costa Rica- LLC

**TRIBUNAL PROCESAL CONTENCIOSO ADMINISTRATIVO Y CIVIL DE HACIENDA.**
**Segundo Circuito Judicial. Goicoechea, Edificio Anexo A.-**

El suscrito, **ALVARO TREJOS FONSECA**, mayor, casado en segundas nupcias, Máster en Ciencias, vecino de San José, cédula de identidad número 1-0390-0895, actuando en mi condición de Presidente con facultades de apoderado generalísimo sin límite de suma, de la compañía de este domicilio **"TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA"**, cédula de persona jurídica número 3-101-000940, personería que compruebo con certificación adjunta, documento que marcamos con el N° 1, interpongo Proceso Ordinario Civil de Hacienda contra el **"INSTITUTO COSTARRICENSE DE ELECTRICIDAD"**, representado por su Presidente Ejecutivo Pedro Pablo Quirós Cortés, mayor, casado, vecino de Ciudadela Calderón Muñoz, Ingeniero Eléctrico, cédula de identidad número 2-195-129; y contra las firmas comerciales **"VERIZON COMMUNICATIONS INCORPORATED"**, empresa inscrita en el Estado de Delaware de los Estados Unidos de América, pero con oficinas en la calle 140 Oeste, piso veintinueve (140 West St. 29th. Floor) de la Ciudad de New York, No. 10007, teléfono (212) 395-1000, registrada en la **SEC** (U.S. Securities and Exchange Commision del Gobierno de los Estados

Unidos), con el número de inscripción 0000732712, representada por Ivan G.
Seidenberg, Presidente y Principal Oficial Ejecutivo (Chairman and Chief
Executive Officer) y alternativamente por William P. Barr, Vicepresidente
Ejecutivo y Abogado General (Executive Vice President and General Counsel),
los dos ciudadanos estadounidenses, de único apellido por razón de sus
nacionalidades y demás calidades ignoradas, lo que comprobamos con la
reproducción de las páginas WEB de internet; **y "VERIZON INFORMATION
SERVICES –COSTA RICA- LLC",** sociedad de responsabilidad limitada,
sucursal en Costa Rica inscrita en el Registro de Personas Jurídicas del
Registro Nacional de Costa Rica, con la cédula jurídica número 3-012-026573,
de la empresa de igual nombre constituida y organizada conforme con las
leyes del Estado de Delaware, Estados Unidos de América, según consta a los
tomos 147, 672 y 1517; folios 27, 65 y 214; asientos 35, 76 y 220,
respectivamente, representada por su Agente Residente de conformidad con lo
que dispone el artículo 232 del Código de Comercio, Licenciado HERNÁN
PACHECO ORFILA, abogado, vecino de San José, con oficina abierta en el
Bufete Pacheco Coto en avenida 11, calles 5 y 7, cédula 1-585-980, como se
comprueba con la certificación adjunta, prueba documental marcada con el No.
2.-      $A \mathcal{E} \mathcal{J} . \longrightarrow$

La demanda se interpone para que se declare que en las actuaciones y
resoluciones de las demandadas, para resolver y dejar sin efectos jurídicos el
contrato administrativo que habían formalizado entre ellas, para la "Edición de
la Guía Telefónica y Desarrollo e Implementación de Servicios de Información",
firmado el día diez de marzo del año dos mil, le han producido a la actora
graves daños y perjuicios que, como tales, conforman una cuestión de
responsabilidad patrimonial.

### Aclaración Inicial:

Únicamente para los efectos de la exposición de los hechos de la demanda,
aclaramos que en este documento usaremos, convencionalmente y por
economía procesal, las siguientes abreviaturas:

**THS** por la firma costarricense actora en el proceso Trejos Hermanos Sucesores, Sociedad Anónima.

**ICE** por el Instituto Costarricense de Electricidad, institución autónoma de Costa Rica, encargada de la administración, entre otros, de los servicios telefónicos del país.

**CGR** por la Contraloría General de la República, ente auxiliar de la Asamblea Legislativa, encargado de la fiscalización y el control de la Hacienda Pública.

**GTE** por la empresa estadounidense GTE Corporation e indistintamente todas sus subsidiarias, las empresas estadounidenses vinculadas con los contratos formalizados con el ICE desde 1975, como por ejemplo GTE Information Services Incorporated (GTE-IS), GTE Directories Corporation (GTE-DC), General Telephone Directory Company C por A (GTDC) y la sucursal de esta última, de igual nombre inscrita en el Registro Mercantil de Costa Rica al Tomo 147, folio 27, asiento 35.

**GRUPO GTE** por el grupo de interés económico integrado por GTE Corporation, el Holding del grupo y todas las empresas subsidiarias.

**VERIZON** por la empresa estadounidense resultante de la fusión entre la empresa americana Bell Atlantic y GTE e indistintamente todas sus subsidiarias, como por ejemplo, las empresas estadounidenses vinculadas con los contratos formalizados con el ICE, como Verizon Information Services Inc., Verizon Directories Corp., y Verizon Information Services – Costa Rica, LLC).

**GRUPO VERIZON** por el grupo de interés económico integrado por Verizon Communications Inc, el Holding y todas las empresas subsidiarias.

**SEC** por la oficina gubernamental denominada "U.S. Securities and Exchange Commision" del Gobierno de los Estados Unidos, que supervisa las empresas de suscripción pública en ese país.

**RACSA** por la empresa pública Radiográfica Costarricense, Sociedad Anónima, que pertenece al grupo **ICE.**

**Expediente o Expediente Administrativo** por el expediente administrativo que consta en los archivos del ICE, al que haremos referencia para identificar los folios en los que se encuentra la prueba de documentos que ofrecemos para demostrar los hechos de la demanda, debidamente certificados por la Dirección de Proveeduría del ICE.

## Antecedentes corporativos.-

En esta explicación que se inserta para que sirva de exordio de la demanda, indicamos, en síntesis, cuáles son los antecedentes corporativos de las empresas estadounidenses que participaron en el contrato formalizado con el **ICE,** que es el nexo convencional del que se derivan las consecuencias y los demás hechos en los que se fundamenta esta demanda.

Como luego se demostrará con el respaldo de la prueba pertinente, tres empresas pertenecientes a la compañía "holding" de los Estados Unidos de América, denominada **GTE CORPORATION,** de las que luego se dará detalle, constituyeron un consorcio o asociación de empresas para participar en una licitación pública promovida por el **ICE,** grupo de empresas que resultó adjudicatario. En ese mismo grupo ingresó una cuarta empresa para unificar la ejecución del contrato administrativo, para lo cual se inscribió una sucursal de la misma en Costa Rica.

La cláusula No. 25 del contrato firmado y refrendado entre **GTE** y el **ICE,** estipula que el contrato permanecería invariable y vigente entre las partes con las nuevas denominaciones legales, en el caso que las firmas originales o el holding cambiaran de nombre o se fusionaran en una empresa distinta, lo que efectivamente llegó a suceder puesto que, posteriormente, el grupo **GTE** se fusionó con la firma estadounidense Bell Atlantic y se formó el grupo **VERIZON**

que expresamente, asumió frente al **ICE** todas las obligaciones y responsabilidades originadas en el contrato. Por este motivo y dependiendo de las fechas en que ocurren, la razón social **GTE** se sustituye en los Hechos de la Demanda por la nueva razón social que identificamos como **VERIZON**, sin que mediara en tales eventos solución de continuidad, en lo que se refiere a la existencia del contrato, como luego se demostrará.

## A.- HECHOS DE LA DEMANDA.

**1).-** **THS** es una empresa industrial costarricense que desde el año 1912, ha orientado sus actividades comerciales a la impresión de textos, y específicamente a la edición e impresión de guías telefónicas llamadas también comercialmente y en el argot popular, directorios telefónicos (Documento No. 3).

**2).-** La experiencia de **THS** en la edición e impresión de guías telefónicas se inició en Costa Rica ampliándose, con el tiempo, a otros países de Centroamérica y del Caribe, lo que demostramos con fotocopias de portadas de guías telefónicas producidas por la empresa para República Dominicana, Jamaica, Honduras, Islas Vírgenes, Antigua y Barbados, Dominica, Islas Turku y Caicos, Araba, Montserrat, Grenada, Islas Cayman, el Caribe y el Sur de Florida, Santa Lucia, Estado de Louisiana, Belice, Puerto Rico, Jacksonville y Costa Rica (Documento No. 4).

**3).-** El grupo GTE, por medio de su empresa **General Telephone Directory Company,** se interesó en la edición de guías telefónicas en Costa Rica e inició sus actividades en este país en el año 1974, participando en una licitación promovida por el **ICE** para tal propósito, concurso que se le adjudicó en firme formalizándose el respectivo contrato administrativo, lo que demostramos con la constancia expedida por el Gerente General de GTE Costa Rica el 26 de enero de 1999 (Documentos Nos. 5 y 7).

**4).-** Desde siempre fue exigencia contractual impuesta por el **ICE,** incluida como una condición invariable de sus carteles de licitación pública, que la edición y la impresión de guías telefónicas tenía que hacerse obligatoriamente en territorio de Costa Rica, disposición del cartel que se explica sola con el siguiente texto que se transcribe literalmente : *"... contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia de tecnología en beneficio de los ciudadanos costarricenses y a la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general..."* (véase cláusula 27 del Contrato ICE-Consorcio GTE firmado el 10 de marzo del 2000 en el Folio No. 2767 del Expediente, que se encuentra incluido en el Documento No. 6 y Documento No. 24).

**5).-** Entre otras obligaciones y derechos, para cumplir con la exigencia del hecho anterior y una vez adquirida su condición de adjudicataria del **ICE** y en consecuencia siendo su co-contratante, **GTE** suscribió contratos de impresión con **THS**, para que ésta se encargara de la actualización de la base de datos de los abonados telefónicos, la impresión y encuadernación de directorios telefónicos a partir del año 1975 y por treinta años más que duró la relación comercial (ver copia de las escrituras 35-11, 36-11 y 45-15 otorgadas ante el Notario Licenciado Edgar Chamberlain); además, mediante escritura 53-15 otorgada en esa misma notaría, GTE contrató con THS la impresión de los directorios telefónicos de Panamá para el año de 1982 (Documento No. 7).

**6).-** La relación empresarial de **THS** con **GTE** se intensificó con el tiempo, por la excelencia de sus servicios que contribuyeron a que **GTE** fuera adjudicataria de otras licitaciones promovidas por el **ICE,** siempre en la misma actividad comercial, es decir, para la edición e impresión de guías telefónicas. De esta manera, el interés sostenido de **GTE** para que **THS** fuera el impresor de las guías telefónicas, tuvo como resultado que más adelante se formalizaran nuevos contratos de edición e impresión —en principio, uno para cada licitación adjudicada-, cuyos contenidos fueron negociados entre las dos empresas, teniendo como base de ellos la adjudicación de cada contrato administrativo entre **GTE** y el **ICE**. En términos generales, **THS** elaboró los

directorios telefónicos para el **Grupo GTE** mientras éste fuera adjudicatario y contratista del **ICE,** como ha quedado dicho (Documentos Nos. 4, 5 y 8).

**7).-** La relación de **THS** con **GTE** no se limitó a las subsidiarias de ésta en Costa Rica y Panamá, sino que se amplió, primero, a partir de 1988 y por veinte años más, a la impresión y edición de los directorios telefónicos de República Dominicana, inicialmente a través de la Compañía Dominicana de Teléfonos (CODETEL), empresa equivalente en funciones y competencias al **ICE** de Costa Rica y que era subsidiaria del grupo **GTE** y luego con GTE Directories Corporation, otra subsidiaria del grupo **GTE** (Documentos Nos. 8 y 9).-

**8).-** En el marco de esa relación empresarial, **GTE** suscribió con **THS** un contrato de "agencia y cooperación mutua" el 8 de mayo de 1997. Dentro de las cláusulas de este Convenio, en el Anexo B Punto 5 se estableció que GTE Information Services le otorgó a **THS** el estatus de *"preferred vendor"* o suplidor preferido para Centroamérica incluyendo Panamá y el Caribe, definido en el Anexo 2 como una serie de treinta y dos (32) países incluyendo República Dominicana y Puerto Rico. Estando vigente ese estatus y con los contratos de Costa Rica y República Dominicana también vigentes, por decisión expresa y contractual de GTE del 15 de marzo de 1999, la empresa actora recibe los requerimientos de GTE para adquirir y a poner en ejecución de su proceso industrial, una nueva planta y un nuevo equipo, que a la postre la llevará al cierre de operaciones, al no poder sostenerla sin los contratos respectivos firmados con GTE, como se demuestra. A la vez, se le solicitó a THS el 15 de marzo de 1999 que (ver el contrato en Documento No. 10 y el informe del experto Bruce Wataru, como también los requerimientos para manejar la compra de papel y cotizar los directorios para Puerto Rico para el 2001).

**9).-** Posteriormente, en el año 2000, **GTE** encargó a **THS** la impresión y edición de guías telefónicas incluyendo las de Costa Rica y Belice, firmando el día 21 de enero, un nuevo contrato relativo a la relación empresarial sostenida entre ambas firmas. En los meses previos a este

contrato, se discutieron varias formas de asociación entre **GTE** y **THS** y entre ellas, formalizar un joint venture ente ambas empresas (ver el contrato en Documentos Nos. 11 y 23).

**10).-** En lo que se refiere a la relación con el **ICE,** esta institución pública costarricense sacó a concurso la Licitación Pública No. 6378-T en los años 1999 y 2000, promovida para el "Desarrollo e Implementación de Servicios de Información", en la que participó el Grupo GTE (Documento No. 12).

**11).-** Las firmas comerciales **"GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephone Directory Company C por A",** empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, sometieron oferta conjunta, bajo la formalidad de consorcio o de asociación de empresas, en esa Licitación Pública No. 6378-T promovida por el **ICE** y para todos los efectos relacionados con ese concurso público, se identificaron como el **Consorcio GTE** (ver folios del 1 al 10 de la oferta presentada por el Consorcio en poder del ICE, cuyas copias se adjuntan debidamente certificadas en el Documento No. 13).

**12).-** La oferta del Consorcio GTE fue firmada por Terrence Mitchell Leve, actuando como apoderado especial del consorcio, como consta en el acuerdo de constitución de esa figura jurídica (misma prueba anterior y la copia del acuerdo en folios del expediente certificados 298 y del 360 al 367 en el Documento No. 14).

**13).-** En la carta de presentación de la oferta, en el punto No. 10, el Consorcio GTE expresó lo siguiente:

"10. Damos una breve explicación de las compañías que se mencionan en la oferta, incluyendo las que integran el Consorcio GTE y de la relación que existe entre ellas, de la siguiente manera:

- A)      **GTE Corporation** es una corporación establecida en Nueva York, Estados Unidos de América, cuyas acciones figuran y son negociables en la Bolsa de Valores de Nueva York (New York Stock Exchange).

- B)      **GTE Information Services Incorporated** (GTE-IS) es una corporación establecida en el Estado de Delaware, Estados Unidos de América, con sus oficinas principales en Dallas, Texas. La totalidad de sus acciones pertenecen a GTE Corporation.

- C)      **GTE Directories Corporation** (GTE-DC) es una corporación establecida en Delaware, Estados Unidos de América, con sus oficinas principales en Dallas, Texas. La totalidad de sus acciones pertenecen a la GTE Information Services Incorporated.

- D)      **General Telephone Directory Company C por A** (GTDC) es también una compañía establecida en Delaware, Estados Unidos de América, con sus oficinas principales en Dallas, Texas. La totalidad de sus acciones pertenecen a la GTE Information Services Incorporated.

- E)      **General Telephone Directory Company C por A** (GTDC) estableció en Costa Rica, en el año 1975, una sucursal que lleva su mismo nombre, la cual se encuentra inscrita en el Registro Mercantil de Costa Rica al Tomo 147, folio 27, asiento 35.

- F)      **GTE Information Services Incorporated, GTE Directories Corporation y General Telephone Directory C por A** han constituido el **Consorcio GTE** para complementar su experiencia y antecedentes, con

el fin de ofertar en esta licitación. El consorcio GTE se tendrá como el oferente principal para todos los efectos legales" (ver folios 4 y 5 del expediente certificados en el Documento No. 13).-

**14).-**     Al folio 8 de su oferta al **ICE**, el Consorcio GTE escribió:

**"NOMBRE Y DIRECCION POSTAL**

El domicilio principal del **CONSORCIO GTE** es el siguiente:

GTE Place – West Airfield Drive DFW Airport, TX 7576-9810

Estados Unidos de América

Apartado postal : P.O. BOX 619810

Teléfono: 001-9724537589

Fax:     001-9724537655"

(Misma prueba Documento No. 13).

**15).-**     En el folio 9 de su oferta el Consorcio GTE expresó textualmente:

"1.3.1.3 El Consorcio GTE por el hecho de presentar su oferta declara que conoce, que acepta y que se somete a los procedimientos del ICE para el trámite de licitaciones, a todo lo estipulado en los documentos de esta licitación y a los tribunales y leyes de Costa Rica, según consta en el Convenio de Consorcio que se adjunta (Documento III-I)" (misma prueba Documento No. 13).

**16).-**     El contrato administrativo fue adjudicado al Consorcio GTE por el Consejo Directivo del **ICE**, en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, acuerdo publicado en el Alcance No. 10 a La Gaceta No. 28 del 9 de febrero del 2000 (véase folio 2779 del expediente que obra en poder del ICE y que es página primera del contrato firmado entre el ICE y el Consorcio GTE "antecedente" letra "a" en el contrato en Documento No. 6).

**17).-** El contrato fue refrendado por la **CGR** el 13 de diciembre del 2000, según consta en la razón de aprobación visible al folio 2766 del expediente administrativo de la Licitación en poder del **ICE**. Se adjuntan, como prueba documental, los folios del 2751 al 2781 del expediente administrativo, que es copia del contrato, debidamente certificados por la Proveeduría del ICE (ver el contrato en Documento No. 6).

**18).-** En la cláusula Vigésima Quinta del contrato, el **ICE** y el Consorcio GTE estipularon lo siguiente:

"En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas" (misma prueba, folio 2768, Documento No. 6).

**19).-** La firma VERIZON Information Services - Costa Rica, LLC, le envió a la Dirección de Proveeduría del **ICE** la nota de fecha 16 de mayo del 2002, en la que le manifiesta, entre otras cosas, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE y cita como fundamento la cláusula Vigésima Quinta del contrato (véase la copia certificada del oficio S.I.-0247-05-02 que la Jefe del Área de Servicios de Información le envió a la Asesoría Legal de Telecomunicaciones, visible al folio 3045 del expediente). Es decir, de conformidad con la legislación de su país, **GTE** se fusionó con la firma americana Bell Atlantic y como resultado de la fusión se creó el **GRUPO VERIZON,** de manera que en todos los contratos en curso de **GTE** con el **ICE** y con **THS** se sustituyó la razón social de la empresa contratante estadounidense **GTE** por empresas del **GRUPO VERIZON** y todo ello significa que la relación comercial de **THS** para editar e imprimir guías

telefónicas, a partir de ese momento siguiera en ejecución con las firmas de este grupo, de manera que la relación comercial entre **THS** y los **Grupos GTE y VERIZON** durara aproximadamente treinta años, al sumar los tiempo de duración con **GTE** y con **Verizon** sin solución de continuidad (ver documentos de cambio de razón social de GTE a Verizon en los folios del 2956 al 3045 del expediente en Documento No. 15).-

**20).-** El 8 de junio del 2002, mediante oficio DCA 966, la División de Contratación Administrativa, de la Dirección Jurídica Institucional del **ICE**, advirtió al Área de Servicios de Información, que en la documentación recibida sólo se acreditó el cambio de nombre de dos de las empresas del consorcio "GTE Information Services Incorporated" que cambió a "Verizon Information Services Inc." y "General Telephone Directory Company C por A", que cambió a "Verizon Information Services – Costa Rica, LLC", por lo que no se podía tener por oficialmente cambiado el nombre del Consorcio. Tal decisión se comunicó a Verizon Information Services mediante oficio S.I.-0284-06-02 del 18 de junio del 2002 (véanse folios 3043 y 3044 del expediente administrativo que se adjuntan certificados en el Documento No. 15).

**21).-** Michael Q. Neal, actuando en su condición de Gerente General de Verizon Information Services – Costa Rica, LLC", mediante nota del 28 de agosto del 2002, le aclara al Área de Servicios de Información del **ICE**, lo ocurrido con los cambios de nombres y adjunta la documentación necesaria para acreditar los hechos y manifestó literalmente:

"a) El 5 de agosto de 1999 se firmó el documento de creación del Consorcio GTE, el cual estaba integrado por las empresas GTE Directories Corp, GTE Information Services, Inc y General Telephone Directory Company C por A., el cual resultó adjudicatario de la licitación pública 6378-T.

b) Estas 3 empresas cambiaron sus nombres, como consecuencia de la fusión entre Bell Atlantic y GTE, que creó VERIZON, para denominarse Verizon Information Services, Inc., Verizon

Directories Corporation y Verizon Information Services-Costa Rica, LLC".

c) En el caso de Verizon Directories Corporation el 31 de enero del 2002 sucedieron 2 cosas:

1) Verizon Directories Corp. **se fusionó** con Verizon New Media Services Inc. y, jurídicamente, Verizon New Media Services, Inc, se convirtió en la **compañía sobreviviente** de la fusión.

2) La segunda cuestión que sucedió ese misma día es que Verizon New Media Services Inc, la compañía sobreviviente de la fusión, decidió **CAMBIAR su nombre** de Verizon New Media Services, Inc (Que ya había absorvido a Verizon Directories Corp), para denominarse **VERIZON DIRECTORIES CORP.**

Como se puede observar de la certificación adjunta, a las **11:30 hrs** del 31 de enero del 2002 se presentó el primer cambio y tan solo 5 minutos después, a las **11:35 hrs.,** se presentó el segundo cambio, con el certificado de consolidación para **cambiar el nombre.**

d) La anterior secuencia explica por qué, tanto en la certificación que ya adjuntamos junto con la nota del 16 de mayo del 2002, como en la certificación que adjuntamos ahora, aparece que el nombre anterior de Verizon Directories Corp. era Verizon New Media Services, Inc y no Verizon Directories Corp, como ocurrió con las otras dos empresas" (véanse folios certificados 3040, 3041 y 3042 del expediente administrativo que se adjuntan en el Documento No. 15).

**22).-** En la misma nota del 28 de agosto del 2002, a que alude el punto inmediato anterior, Verizon Information Services Costa Rica, LLC, expresó lo siguiente:

"II.- **MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS.**

De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el **Mantenimiento de Obligaciones y Derechos,** firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directories Corp. y Verizon Information Services-Costa Rica, LLC, en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma" (folios 3035, 3036 y 3037 del expediente administrativo que se adjuntan certificados en el Documento No. 15).

**23).-** En los folios del 3019 al 3039 del expediente administrativo, se encuentran los documentos a que se refiere Verizon Information Services Costa Rica, LLC en el Hecho inmediato anterior, todos ellos autenticados y consularizados, que se resumen en las traducciones oficiales de los folios del 3019 al 3027. En lo esencial, esos documentos son las declaraciones de Mantenimiento de Compromisos que hacen las compañías VERIZON Information Services, Inc. y VERIZON Directories Corp., estas dos empresas representadas por William G. Mundy, Vicepresidente de cada una de ellas, con suficiente poder y representación legal para comprometer a las dos empresas comitentes y VERIZON Information Services – Costa Rica, LLC., representada por W. Scott Hanle, en su condición de Vicepresidente de la empresa, con poder suficiente para comprometer a la firma. La declaración la hacen de la siguiente manera:

"1.- Que nuestros comitentes VERIZON Information Services Inc., anteriormente conocida como GTE Information Services,

Incorporated, VERIZON Directories Corp., anteriormente conocida como GTE Directories Corporation y VERIZON Information Services-Costa Rica, LLC, anteriormente conocida como General Telephone Directory Company C por A., firmaron un **"Acuerdo de Consorcio"** el día 5 de agosto de 1999, para presentar una oferta al INSTITUTO COSTARRICENSE DE ELECTRICIDAD en la Licitación Pública 6378-T.

2.- Declaramos que nuestros comitentes, ahora bajo los nuevos nombres que se indican, mantienen de manera total y absoluta los derechos y obligaciones establecidos en el acuerdo de consorcio del 9 de agosto de 1999; en la oferta presentada al ICE por GTE Consortium el día 26 de agosto de 1999 y en el contrato firmado entre el ICE y GTE Consortium el día 10 de marzo de 2000, el cual fue autenticado (sic) por la Oficina del Contralor General de la República el día 13 de diciembre de 2000.

3.- Según se establece en la cláusula "siete" del Acuerdo de Consorcio, repetimos que para todas las obligaciones que se originen en la licitación pública 6378-T, "la compañía directamente responsable, en nombre del Consorcio, ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, es VERIZON Information Services-Costa Rica, LLC (anteriormente conocida como General Telephone Directory Company C por A).

4.- Que la compensación por los servicios requeridos de cada compañía diferente del Consorcio para cumplir con todas las condiciones de la licitación ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, se verán afectadas de conformidad con un acuerdo interno entre las partes del Consorcio." *(evidentemente, se trata de un error material en la traducción: lo que la declaración dice es "Que la compensación por los servicios requeridos por las diferentes compañías del Consorcio para cumplir, etc.")*

5.- Se hizo la presente declaración a solicitud del ICE (Nota del 18 de junio de 2002, S.I. 0284-06-02) para registrar de manera oficial el cambio de nombres de nuestros comitentes en el contrato firmado entre el ICE y GTE Consortium (ahora VERIZON)..."(ver folios del expediente del 3019 al 3045 certificados en el Documento No. 15-A).

**24).-** El acuerdo de Consorcio firmado el 5 de agosto de 1999 por las empresas GTE Information Services Inc., GTE Directories Corp. y General Telephone Directory Company C por A., consta de diez cláusulas y fue firmado por representantes con facultades suficientes para hacerlo, según consta en la documentación que se dirá. En síntesis, el convenio señala en sus cláusulas:

**Primera:** que GTE Information Services Incorporated es dueña en su totalidad de GTE Directories Corporation y de General Telephone Directory Company C por A.

**Segunda:** que el objeto –finalidad esencial- del consorcio es completar los antecedentes y la experiencia de las tres empresas firmantes para participar en el concurso.

**Tercera:** que el cartel de la licitación del ICE exige del oferente que demuestre experiencia en la edición de guías telefónicas para administraciones con al menos 2 millones de líneas telefónicas en total, experiencia en programas de orientación al cliente y a la calidad, experiencia en desarrollo de servicios complementarios a la guía telefónica, experiencia en desarrollo de productos sustitutos a la guía telefónica, experiencia en el desarrollo de diferentes plataformas tecnológicas para servicios de información; requiere certificar el presupuesto destinado a investigación y desarrollo, indicar facilidades de audiotexto y sus mecanismos de operación, otorgar un compromiso incondicional para brindar al ICE asesoría y acceso al desarrollo tecnológico en servicios de información para el Servicio de Información 113, por medio de una carta de compromiso, entre otras obligaciones.

**Cuarta:** que las empresas oferentes se presentan en consorcio con el fin de que los antecedentes y experiencia de cada una de ellas, sean evaluados conjuntamente en la licitación.

**Quinta:** convienen en que el único representante ante el ICE lo sea General Telephone Directory Company C por A., la que se tendrá como adjudicataria y que será la responsable de coordinar con las demás empresas del Consorcio, la prestación de todos los servicios y suministros. Las partes del Consorcio responderán, solidariamente, ante el ICE por todas las obligaciones derivadas de la oferta, de la participación en Consorcio en los procedimientos de contratación, de la eventual adjudicación y su ejecución.

**Sexta:** nombran como apoderados especiales del Consorcio a Bill J. Brewer y Terrence Mitchel Leve, ciudadanos estadounidenses y a José María Quirós Alfaro, costarricense, para que puedan firmar y presentar la oferta del Consorcio; firmar y presentar ante el ICE aclaraciones de la oferta; ampliar la validez de la oferta y de la garantía de participación; defender la adjudicación si es favorable al Consorcio o apelar la misma si no se favorece al Consorcio; sustituir el poder en todo o en parte, reservándose para sí en todo momento el poder de representación; firmar el contrato respectivo. Los mandatarios pueden actuar conjunta o separadamente y declaran que las empresas poderdantes y los mandatarios se someten a las leyes y tribunales de Costa Rica para todos los efectos y contratos que se celebren y deban ejecutarse en Costa Rica en razón de la licitación antes mencionada.

**Sétima:** que el responsable directo, a nombre del consorcio, ante el ICE para todas las obligaciones que deriven de la licitación es General Telephone Directory Company C por A., sin perjuicio de la responsabilidad solidaria de los demás integrantes del Consorcio.

**Octava:** que la responsabilidad de GTE Information Services Incorporated y de GTE Directories Corporation, consistirá en brindar a General Telephone Directory Company C por A, todo tipo de apoyo técnico y financiero para que pueda cumplir todas las obligaciones, como brindar al ICE asesoría y acceso al desarrollo tecnológico en sistemas de información para el Servicio de Información 113 y cualquier otro tipo de apoyo financiero o tecnológico requerido por el cartel. Todo ello sin perjuicio de la **responsabilidad solidaria que cabe a todas las empresas del Consorcio, en caso de incumplimiento de alguna de ellas**.

**Novena:** que en virtud de lo establecido en la cláusula primera, la compensación de los servicios requeridos de las diferentes empresas del consorcio, para cumplir todas las obligaciones del cartel, se hará mediante un acuerdo interno entre las partes.

**Décima:** se fija la dirección legal del Consorcio en Costa Rica.

Al acuerdo de Consorcio, las tres empresas adjuntan los certificados de incorporación expedidas por la Oficina del Secretario del Estado de Delaware, junto con sus traducciones oficiales, en los que constan las existencias jurídicas de las empresas y de los dignatarios que firman a nombre de ellas (véanse folios 298 y del 360 al 394 que corresponde a la oferta presentada por el Consorcio ante el ICE, copias que se adjuntan certificadas en el Documento No. 14).

**25).-** En los folios del 395 al 426 de la oferta del Consorcio se encuentran unas copias, con sus traducciones oficiales, del contrato firmado por General Telephone Directory Company C por A con la firma Belize Telecommunications Limited, el 10 de febrero de 1994 (ver esos folios del expediente certificados en Documento No. 16).

**26).-** La cláusula 2.4.1.B del Cartel de la Licitación 6378-T del ICE, regulaba los criterios de evaluación de las ofertas en tres rubros: 40 % por la

Experiencia; 30 % por la Capacidad Financiera y 30 % por la Calidad del número 113 y en el punto B de la cláusula, se indicó expresamente:

> "La empresa oferente deberá presentar con su oferta los estados financieros auditados en español de los últimos 3 años que contengan como mínimo el Balance General (Estado de Situación), Estado de Resultados y su Utilidad Retenida o Déficit Acumulado (de acuerdo a las reglas y normas de su país de origen), los que le permitan al ICE comprobar su capacidad financiera. **En caso de que la oferente sea parte de otra compañía o grupo de empresas (Holding), se permitirá la presentación de los estados financieros de éstas últimas en los términos aquí establecidos, en cuyo caso el grupo empresarial será solidariamente responsable con la oferente de la totalidad de las obligaciones que ésta última adquirirá como adjudicataria; esta solidaridad deberá ser demostrada por la oferente mediante manifestación expresa y por escrito del representante de aquellas empresas."**
> (Documento No. 17)

**27).-** En los folios del 427 al 432 de la oferta del Consorcio, se encuentra un documento en el que, para cumplir con la cláusula 2.4.1.B, párrafo I, la empresa GTE CORPORATION CERTIFICA:

> "I.- Que esta Corporación tiene conocimiento de que el Consorcio constituido por GTE Information Services Incorporated, GTE Directories Corporation y General Telephone Directory Company C por A, van a participar en la Licitación Pública No. 6378-T, promovida por el INSTITUTO COSTARRICENSE DE ELECTRICIDAD para "La Contratación de Servicios por ocho años y el Desarrollo e Implementación de Servicios de Información".
>
> II.- Que de acuerdo con las disposiciones de la Cláusula 2.4.1-B (La Capacidad Financiera de la Compañía) incluida en el Cartel de la Licitación Pública No. 6378-T, antes mencionada, el Consorcio mencionado presentará los Estados Financieros de GTE Corporation, que es la compañía "holding" (tenedora) del grupo.

III.- Que de acuerdo a los requisitos de la misma cláusula 2.4.1-B, antes mencionada, GTE Corporation declara que será conjuntamente responsable con las empresas del Consorcio mencionado por todas las obligaciones que este Consorcio adquiera como oferente y como adjudicatario de la mencionada Licitación Pública No. 6378-T ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD.

IV.- Esta corporación emite esta certificación para ser presentada al Instituto Costarricense de Electricidad en la Licitación Pública 6378-T, antes mencionada.

Dado en la ciudad de Irving, Estado de Texas, Estados Unidos de América, el 22 de junio de 1999."

El documento fue firmado por Daniel P. O´Brien en su condición de EVP, Chief Financial Officer y se acompaña una razón notarial de la Notario Público Cynthia Owens del Condado de Tarrant, Estado de Texas, que es luego consularizada y legitimada conforme con la Ley (ver copias certificadas del expediente en Documento No. 18).

**28).-** En virtud de todo lo que se ha probado con los hechos 12, 13, 14, 15, 19, 20, 21, 22, 23, 24, 26 y 27 de esta Demanda, el consorcio adjudicatario de la Licitación Pública No. 6378 – T del ICE, estaba integrado por las empresas americanas GTE Directories Corp., GTE Information Services Inc. y General Telephone Directory Company, C. por A., pertenecientes las tres al Grupo liderado por el Holding (empresa tenedora del Grupo) GTE Corporation, quien otorgó libremente su responsabilidad solidaria (conjunta) a las empresas del consorcio por todas las obligaciones que ese consorcio adquiriera como oferente y adjudicatarios de la mencionada Licitación. Por cambiar de razón social las empresas, tanto el Holding como las integrantes del Consorcio, continuaron siendo solidariamente responsables, solamente que ahora con las nuevas razones sociales. De esta forma, las empresas del consorcio denominadas "Verizon Information Services –Costa Rica. LLC", "Verizon

Information Services Inc." y "Verizon Directories Corp.", por ser las adjudicatarias de la Licitación y subsidiarias de Verizon Communications Incorporated, Holding del Grupo, en que se convirtió la empresa GTE Corporation conservaron su responsabilidad solidaria con relación al contrato derivado de la Licitación Pública indicada. Todas esas entidades integran un único grupo de interés económico, cuya entidad principal es "Verizon Communications Incorporated" (misma prueba de todos los Hechos referidos en el inicio de éste).

**29).-** El contrato entre el **ICE** y el **Consorcio GTE** fue puesto en ejecución: De conformidad con lo que establecen las normas del cartel de la licitación, en las Cláusulas Tercera y Vigésima Sétima del contrato, se estipuló que la producción total de la guía debía ser realizada en Costa Rica "contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia tecnológica en beneficio de los ciudadanos costarricenses y a la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general" (ver copia del contrato a los folios 2751 a 2785 del expediente administrativo en Documento No. 6).

**30).-** En cumplimiento de lo señalado en el punto anterior y atendiendo a que la empresa costarricense **THS**, como ya se demostró en los Hechos del 1 al 9 de esta Demanda, tenía la mejor experiencia en el tipo de contrato que se debía ejecutar, VERIZON INFORMATION SERVICES – COSTA RICA, LLC, actuando con respecto a sus obligaciones para con el **ICE** en representación del Consorcio GTE adjudicatario de la Licitación y de VERIZON INFORMATION SERVICES – BELIZE, LLC (antes General Telephone Directory Company, C por A) en virtud del cambio de razón social, todas empresas del Estado de Delaware, Estados Unidos de América, firmaron el 28 de febrero del 2002 con **THS** un contrato Maestro de Compra por un plazo máximo de 168 meses (cláusula 2.b del contrato), para producir, empacar y distribuir los directorios telefónicos, de conformidad con el contrato firmado entre el Consorcio GTE y el ICE (ver copia del contrato que se adjunta en Documento No. 19).

**31).-** Concomitantemente a la preparación de la participación del **Consorcio GTE** en la licitación 6378-T, se produjeron una serie de negociaciones entre **GTE** y **THS** para atender las nuevas definiciones de las necesidades de edición e impresión impuestas por **GTE**, y se estableció, como resultado, que debía ampliarse y renovarse la planta industrial (equipo y espacio) de **THS** para poder-suscribir y atender el contrato que se acordaría en relación con esa licitación, con base en las recomendaciones de los técnicos enviados por GTE a evaluar la maquinaria y las instalaciones (véase Hecho 8 y Documento No. 10).

**32).-** Fue con base en esa extensa y profunda relación entre ellas y debido a las exigencias contractuales y comerciales impuestas por **GTE**, como derivación del contrato firmado originalmente en el año 2000 con el **ICE**, que **THS**, para cumplir con las obligaciones pactadas, toma la decisión de endeudarse y llevar a cabo las grandes transformaciones industriales en planta y equipo, así como realizar las enormes inversiones que tal decisión exigía. Esta inversión (endeudamiento) impuesta como condición contractual, significaba otra escala de planta industrial, tal que sólo podía sostenerse con el volumen de trabajo que representaban las ediciones e impresiones de los directorios telefónicos de Costa Rica, así como los de otros países que, como República Dominicana, eran operaciones de la entidad **GTE** (Documento No. 20, que es el Plan de Inversión para la compra de la máquina rotativa Heidelberg y Documento No. 27 que recoge las negociaciones anuales de THS con el Transamerica Bank and Trust Co.)

**33).-** Como consecuencia directa del contrato Maestro (Master Purchase Agreement), suscrito por **THS** con **GTE** (luego **Verizon**) y de las recomendaciones de los técnicos de **GTE**, se hace necesario para mi representada trasladar todas sus instalaciones industriales, que por décadas habían estado ubicadas en Curridabat, al Cantón de Cartago, ocupando unas naves industriales más amplias, donde se pudieran instalar no sólo sus propios equipos, oficinas y máquinas sino también la nueva máquina rotativa tipo "Offset" marca Heidelberg, modelo Mercury 24D y todos sus accesorios, que conforme con dicho contrato, era indispensable para poder cumplir con el

volumen de trabajo que **GTE** (luego **Verizon)** se había comprometido a comprarle a **THS** (ver contrato en el Documento No. 19 y Documento No. 10).

**34).-**     Con ese objeto se localizan y alquilan dos naves industriales en la Zona Franca Zeta, en Guadalupe de Cartago, propiedad de INMOBILIARIA ZOROASTER S.A., cédula jurídica 3-101-326.723, donde se llega a instalar **THS** con todos sus equipos, oficinas y bodega, según contrato que se suscribe con la propietaria de fecha primero de julio de dos mil cuatro (Documento No. 21).

**35).-**     Lo indicado en el Hecho anterior y en razón de que para los mismos propósitos, **THS** adquirió una moderna máquina rotativa Heidelberg, una línea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta, precisó de un importante endeudamiento por parte de **THS** con entidades financieras, y se justificó con las previsiones de expansión industrial que tenía la empresa por su relación empresarial con **GTE**. De hecho la inversión en la nueva planta se realizó por una exigencia tanto contractual como comercial (Documento No. 19, contrato maestro de compra cláusula 15 letra "j" y el Documento No. 20).

**36).-**     Estas inversiones las realizó la empresa actora endeudándose fuertemente, porque el contrato suscrito con **GTE** tenía un horizonte de 168 meses, que la permitía recuperar la inversión, sobre todo con la promesa y el entendimiento que se le iban a otorgar la edición e impresión de otros directorios en la región. Aparte del largo horizonte del nuevo contrato, los veinticinco años de continuidad y profundización de la relación comercial, constituyeron la base para aceptar el requisito de realizar las grandes inversiones y para ello, endeudarse al límite de las capacidades de la empresa. Tan viable era el proyecto y el compromiso de **GTE**, que las instituciones financieras no dudaron en otorgar los créditos para esa expansión, dada la supuesta seriedad del consorcio **GTE** (Documento No. 20-A).

**37).-** Debe advertirse que dos años y cuatro meses antes de la firma del **Contrato Maestro de Compra** que se indica en el Hecho 8 de esta Demanda, sea el día 15 de octubre de 1999, Douglas C. LaVelle Presidente entonces de GTE Directories Internationational (que era la casa matriz en directorios telefónicos de GTE y como consta en el logo de la misma nota "Una parte de GTE Corporation"), remite una carta adjunta a **THS,** en nombre de sus subsidiarias de Costa Rica y República Dominicana, cuya intención explícita es definir los términos y asuntos bajo los cuales los servicios de impresión y manufactura de los directorios telefónicos, serían provistos por el Grupo GTE a dichas empresas y definidos en un contrato subsecuente. Fue claro y se estableció en el punto uno de la nota referida, que si en siete días no se aceptaban los términos de dicha carta, las negociaciones se terminaban y así lo hicieron saber los ejecutivos locales y regionales de **GTE**, José María Quirós y David Andrade (Documento No. 22).

**38).-** En el punto e) de esa misma nota, se establece que si **GTE** provee a **THS** la oportunidad de imprimir directorios adicionales a los de Costa Rica y República Dominicana, **THS** quedaba obligada a dar descuentos adicionales de precios a **GTE**. Tal condición indica, claramente, la intención de **GTE** de otorgar un volumen adicional de trabajo de otros países, para apoyar la decisión de la inversión en planta y equipo a realizar (Documento No. 22).

**39).-** El punto g) de esa nota es totalmente claro en que **THS** debía cumplir todos y cada uno de los requerimientos técnicos exigidos por **GTE** incluyendo, pero no limitado a, el proceso denominado "white knock out" y cuatro colores en dicho proceso, lo que en efecto implicaba la compra de una nueva rotativa en un plazo perentorio ya que dice este punto: "...a partir de los primeros directorios que se imprimirán bajo cualquier acuerdo" (Documento No. 22).

**40).-** El punto h) dice que **THS** deberá proveer evidencia documental el 15 de noviembre de 1999, o sea 15 días después de la fecha de esta carta, que **THS** procurará, instalará y probará equipo con capacidad para imprimir white knock out y cuatro colores en dicho proceso y que la calidad de las

pruebas será aceptable a criterio, exclusivamente, de **GTE** (Documento No. 22).

**41).-** El punto I) es terminante en el sentido de que cualquier falta de **THS** en el cumplimiento de cualquiera de estos puntos esenciales, dará como resultado el derecho de **GTE** de terminar inmediatamente cualquier acuerdo que tenga con **THS** sin ninguna responsabilidad para **GTE** (Documento No. 22).

**42).-** En resumen, esta nota que se expone en los Hechos del No. 37 al presente, sustituye todas las conversaciones anteriores y ofrece la impresión de los directorios telefónicos de Costa Rica y República Dominicana, y eventualmente otros directorios, si se cumplen las demandas de equipo ahí establecidas, en un plazo perentorio y sin derecho a negociación posterior, por lo que la empresa actora tuvo que avocarse, de inmediato, a la elaboración del plan y la documentación de compra del equipo y la ampliación de la planta necesaria para hacer los directorios en la forma establecida. En estricto sentido jurídico **GTE** y luego **VERIZON** imponían a **THS** un verdadero contrato de adhesión, que debía aceptar tal y como lo presentaba la contraparte (Documentos Nos. 22 y 23).

**43).-** En la nota de Agosto 20, 1999 suscrita por Terence Mitchell Leve, Senior Attorney, quien figura en los documentos de la licitación de **GTE** ante el **ICE**, dirigida al Lic Mario Quintana (q.d.D.g.), quien era abogado de la actora en esa época, en el segundo, cuarto y noveno párrafo se discute la posibilidad de integrar un "joint venture" entre **GTE** y **THS;** la idea no se desecha sino que se considera que consumiría mucho tiempo realizarla y que por lo tanto, el énfasis inicial es por un contrato de impresión. Pero estas afirmaciones reflejan el deseo manifiesto de ir hacia un "joint venture" (Documento No. 23).

**44).-** En el cuarto párrafo de esa nota referida en el Hecho anterior, se expresa claramente que **GTE** reconoce que un mayor volumen de impresión, sería un gran contribuyente para subsanar algunas de las ineficiencias de **THS** existentes en aquel momento y asimismo, reconoce que la impresión de los

directorios de República Dominicana podría ser beneficiosa para resolver el problema (misma prueba Documento No. 23).

**45).-** El 15 de noviembre de 1999 se llevó a cabo una reunión de los señores Álvaro y Alonso Trejos Fonseca y don Guillermo Navarro, entonces Presidente, Vicepresidente y Gerente de Producción de **THS,** respectivamente, con el Director de "Printing" de GTE Directories International con el propósito de: 1) evaluar el progreso realizado en el proyecto de las mejoras en la planta; 2) asistir en desarrollar un proyecto formal para dar un seguimiento cercano al proyecto de la nueva planta; 3) acordar un plan de contingencia en caso que **THS** no cumpliera con las fechas de instalación de los nuevos equipos y planta, el cual consistía en contratar otra planta en Estados Unidos, sobre todo, en caso de que no se adquirieran los equipos a tiempo; 4) evaluación de la compra potencial del equipo, con la específica asistencia del consultor recomendado por **GTE**, señor Bill Snell (Documento No. 24).

**46).-** Significa lo anterior que **GTE** tenía un plan de contingencia para llevarse -trasladar- la impresión de los directorios telefónicos a Estados Unidos o a cualquier otro país en el extranjero, si las inversiones programadas y exigidas no las llevaba a cabo **THS**. **GTE** le dio un seguimiento continuo y cercano al proyecto y asignó a uno de sus consultores para recomendarle a **THS** el tipo de equipo que se debía adquirir, lo que quedó consignado, con detalle, en el contrato de impresión definitivo (Documento No. 19).

**47).-** El 31 de agosto del 2000 José María Quirós, Gerente General de **GTE** en Costa Rica, remite al **ICE** (folio 3631 del expediente) el subcontrato de impresión de las guías telefónicas para que fuera aprobado, indicando que la empresa **THS** es una firma comercial de reconocida experiencia a nivel nacional e internacional y que ha sido la encargada, durante los últimos veinticinco años, de llevar a cabo la impresión de las Guías Telefónicas del **ICE.** Este contrato, que luego dio base a los subsiguientes con **Verizon,** se firmó por un plazo de ciento sesenta y ocho meses (Documento No. 25).

**48).-** En dos correos electrónicos se pone de manifiesto la naturaleza material de la relación empresarial entre **THS** y **GTE**: uno es de Febrero del 2001 en el que **GTE** solicita cotización para los directorios de Puerto Rico, que demuestra la amplitud de la relación; el otro, de Setiembre de 2001 donde se afirma que como impresor preferido para Costa Rica y República Dominicana, se espera que **THS** busque cotizaciones de suplidores de papel, etc.– En esa forma se reafirma el estatus de impresor preferido aún en el año 2001 (Documento No. 26).

**49).-** **THS**, como queda acreditado en esta Demanda, cumplió con todos los deberes y obligaciones impuestas, primero por el Grupo GTE y luego por el Grupo Verizon, a costa de fuertes endeudamientos que quedaron respaldados, para justificar la capacidad de pago de la empresa, por los ingresos que provenían de su giro comercial y los que generaba el contrato para las ediciones, impresiones, encuadernación y entrega de las guías telefónicas, con una validez de 168 meses. Es decir, frente a los institutos financieros (bancos, financieras y proveedores), los ingresos proyectados principalmente de conformidad con el contrato vigente, eran garantía suficiente para enfrentar las obligaciones asumidas con los endeudamientos, como también eran suficientes para producir las ganancias que se proyectaron con este negocio (Documento No. 27)

**50).-** El 14 de octubre de 2004 y de conformidad con los términos del contrato entre **THS** y **GTE**, ya a esa fecha el Grupo **Verizon**, las partes involucradas suscribieron el **"Cronograma de Producción, Guía Provincias 2005"**, donde se establecen las condiciones para la confección de los libros correspondientes a esa guía en particular. En dicho cronograma se señala como fecha límite, para modificar el número de páginas y la cantidad de libros, el día 15 de diciembre de 2004 (Documento No.28).

**51).-** De conformidad con lo que viene dicho en los Hechos anteriores, el 15 de julio del 2004 el Consorcio contratista del Grupo Verizon tramitó, en papelería de la Compañía General de Directorios C.por.A, con oficinas en San José, Costa Rica, subsidiaria de GTE Corporation según consta en el mismo

documento, la orden de compra 4568 para la impresión de las Guías Telefónicas para Metro (Siglas para Área Metropolitana), por la suma total de $ 3,033,625.60 y el día 20 de agosto del 2004, la orden de compra 4582, por la suma de $ 2,134,503 por las Guías Telefónicas de Provincias, para un total de $ 5,168,128.oo para las Guías correspondientes al año 2005 (Documento No. 29).

**52).-** Las órdenes de compra indicadas en el Hecho anterior fueron sustituidas por **Verizon** por la número 4612 del 3 de noviembre del 2004 para las Guías del Área Metropolitana por la suma de $ 2,120,828 y por la número 4644 del 17 de diciembre del 2004 para las Guías de Provincias, por la suma de $ 1,254,023, para un total de $ 3,374,851, o sea, con una disminución unilateral y además, extemporánea, de $ 1,793.277 (Documento No. 30).

**53).-** De acuerdo con lo anterior y a lo señalado en el Contrato entre las partes, cualquier modificación en relación a estos dos aspectos, debía comunicarse con una antelación de por lo menos siete días. No obstante lo anteriormente dicho, es el 20 de diciembre del 2004 la fecha en que **THS** recibe la "Orden de Compra" número 0004644, de fecha 17 de diciembre de 2004 y suscrita por el Gerente General de **Verizon**, Melvin Andujar Queipo, es decir, cinco días después de la fecha límite (ver Contrato Maestro, Cláusula 11 b en Documento No. 19), en la que no sólo reducen drásticamente el número de páginas de las guías telefónicas y el número de libros, sino que establecen en forma unilateral, una conformación y composición de las guías distinta a la que había convenido **GTE** en su contrato con el **ICE** (mismo Documento No.° 30).

**54).-** En lo dicho hasta aquí, en los anteriores Hechos de la Demanda se analizan los siguientes aspectos esenciales: a) los antecedentes comerciales de **THS** y sus vínculos con **GTE** primero y luego con **Verizon** en la edición, impresión, encuadernación y distribución de las guías telefónicas en Costa Rica; b) la promoción de la Licitación Pública No. 6378-T por el **ICE,** en la que participó y resultó adjudicatario el **Consorcio GTE**, que luego cambia de nombre para identificarse como **Verizon**; c) las obligaciones comerciales

impuestas por **GTE (Verizon)** a **THS**, para crecer en equipo e instalaciones, con fundamento en la economía de escala que significaba la edición, impresión y publicación de las guías telefónicas por un término de CIENTO SESENTA Y OCHO (168) meses, lo que llevó a la empresa costarricense a contraer fuertes endeudamientos para adquirir modernos equipos y alquilar instalaciones más grandes; d) la cesación de pagos (ingresos) que se dio en contra de **THS**, lo que significó que la empresa careciera de recursos suficientes para hacer cumplido pago de sus obligaciones contraídas en razón de la imposición de **GTE**, de manera que todas las deudas acumuladas se vencieran y se ejecutaran judicialmente, llevando a la empresa al cese total de operaciones y a salir del giro comercial que había ejercido por casi cien años. A partir de ahora, en los siguientes Hechos, señalamos lo que sucedió con el contrato formalizado entre el **ICE y el Consorcio GTE** (luego **Verizon)**, como consecuencia de la adjudicación de la Licitación Pública No. 6378-T del **ICE** (véase toda la prueba del Hecho 1 al 54).

**55).-** Según la Cláusula Segunda del contrato **ICE – GTE (luego Verizon)** cada año el **ICE** y **GTE** debían revisar la estructura de las Guías Telefónicas atendiendo a las necesidades del mercado. En aplicación de tal disposición, el día 13 de mayo de 2004 **Verizon** presentó al **ICE** una propuesta de reestructuración de las Guías Telefónicas para la edición del 2005, para eliminar los registros de los clientes del Área Metropolitana en las Guías Telefónicas de Provincias y viceversa (Documento No 31).

**56).-** En oficio 6000-29898-2004 de fecha 25 de mayo 2004, la Subgerencia de Telecomunicaciones le contestó y comunicó a **Verizon** que la solicitud no se atendería hasta tanto no se pusiera a derecho en cuanto a los términos contractuales de monto y plazo de la Garantía de Cumplimiento, según lo estipulado en la Cláusula 2.3.1 del cartel de la Licitación y la cláusula 29 del contrato (Documento No. 32).

**57).-** El 15 de julio del 2004 la Subgerencia de Telecomunicaciones del ICE, mediante el oficio 6000-41046-2004, le comunicó a **Verizon** que para la edición de las Guías Telefónicas del año 2005, como no había un acuerdo

entre las partes sobre una posible reestructuración, se editarían de la misma manera como se hizo para el año 2004 (Documento No. 33).

**58).-** El 8 de setiembre del 2004 **Verizon** le comunicó a la Subgerencia de Telecomunicaciones, que el 13 de mayo de ese mismo año, hizo varias solicitudes para revisar la estructura de las guías telefónicas y que como habían transcurrido más de los treinta días que establece el artículo 16 de la Ley de Contratación Administrativa sin obtener respuesta, hacía valer su derecho al silencio positivo y declara que han sido aceptados los puntos referidos a la estructura del Directorio y Contenido; a la publicación y distribución del Directorio; y, a los llamados procesos y responsabilidades (Documento No. 34).

**59).-** El 14 de septiembre 2004 con nota 6000-52278-2004, la Subgerencia de Telecomunicaciones respondió a Verizon que resultaba abiertamente improcedente su pretensión de hacer valer el silencio positivo, por lo que se la rechazaba expresamente (Documento No. 35).

**60).-** El 8 de noviembre del 2004 **Verizon** le indicó a la Subgerencia de Telecomunicaciones, que reiteraba su posición sobre el silencio positivo con relación a la nota del 13 de mayo del 2004 (Documento No. 36).

**61).-** El 12 de noviembre 2004 el **ICE** ordenó a las Notarias públicas Lcda. Patricia Hernández Salazar y Licda. Ligia Picado Arguedas, levantar actas notariales del resultado de las visitas que hacen en el local industrial de **THS,** certificando que en las guías telefónicas en elaboración, no se incluyeron los registros de los clientes de provincias y comprobando que **Verizon** ordenó a **THS** imprimir las páginas blancas residenciales de la Guía Telefónica del Área Metropolitana con los registros únicamente de San José, excluyendo los abonados de la zona de Los Santos y de las Provincias (Documento Nº 37).

**62).-** El 15 de noviembre 2004 con nota S.I.-0726-11-04, el **ICE** le comunicó a **Verizon** que las guías telefónicas del Área Metropolitana no cumplían los términos contractuales, lo que significa desacato a las notas

6000-41046-2004 y 6000-52278-2004 del 15 de julio y 14 de setiembre, ambas del 2004, emitidas por la Subgerencia de Telecomunicaciones de esa Institución (Documento No. 38).

**63).-**    El ICE ordenó al Notario Lic. Francisco Solís levantar una acta notarial para certificar que **Verizon,** estaba imprimiendo las Guías Telefónicas de acuerdo a la propuesta presentada por ella misma, según la nota del 13 de mayo del 2004 y no como se lo había indicado el ICE, de conformidad con los términos del contrato y el día 17 de noviembre del 2004 se celebró una reunión entre el ICE y Verizon y mediante oficio S.I.0730-11-04 se comunicó la minuta de la reunión señalando el ICE que Verizon incumplía las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación y segunda del contrato (Documento No. 39).

**64).-**    El 18 de noviembre 2004, con nota 6000-64540-2004, la Subgerencia de Telecomunicaciones responde la nota del 8 de ese mes de **Verizon,** manifestándole nuevamente que debía mantener el formato de las guías telefónicas del año 2004 (Documento No. 40).

**65).-**    El 23 de noviembre 2004, en su Sesión 5649 el Consejo Directivo del **ICE** acordó, en firme, "instruir a la Subgerencia de Telecomunicaciones para que notifique a la empresa Verizon Information Services contratista de la Licitación Pública 6378-T, tramitada para el desarrollo, mercadeo, producción, distribución e implementación de las Guías Telefónicas, así como los productos y servicios complementarios y sustitutos a las mismas, para el período 2001-2008, que este Consejo Directivo rechazó cualquier intención de variar unilateralmente las condiciones contractuales pactadas, y se le insta a cumplir en todos sus extremos el contrato vigente. Acuerdo firme" (Documento No. 41).

**66).-**    El 29 de noviembre 2004, con nota 6000-66202-2004, SGT-2625-2004, la Subgerencia de Telecomunicaciones le notificó a **Verizon** el acuerdo 10 del Acta de la sesión 5649 del 23 de noviembre de 2004 del Consejo Directivo que rechazó cualquier intención de variar unilateralmente las

condiciones contractuales pactadas y le insta a cumplir en todos sus extremos el contrato vigente (Documento No. 42).

**67).-** El 30 de noviembre 2004 con nota 9100-UENSC/888, la dependencia del **ICE** denominada Procesos de Información de la UEN Servicio al Cliente, le ratifica a **Verizon** el acuerdo del Consejo Directivo; además, le indica que el **ICE** no permitirá ni autorizará la distribución de las guías telefónicas que se impriman contra lo dispuesto en el contrato y que de mantenerse esa actitud el **ICE** podría optar por ejecutar la garantía de cumplimiento e iniciar el proceso de resolución del contrato (Documento No. 43).

**68).-** El 2 de diciembre de 2004 en visita que se realizó en las instalaciones de **THS**, la Notaria pública Licda. Yaila Paola Sánchez, levantó una acta notarial en la que se certifica que estaban impresos 103.000 ejemplares de las páginas blancas residenciales del Área Metropolitana y que la imprenta **(THS)** no había recibido ningún tipo de orden para modificar el proceso de impresión y encuadernación; que la imprenta trabaja con las órdenes de compra entregadas por **Verizon** (Documento No. 44).

**69).-** El día 13 de diciembre del 2004 la Licenciada Agnes Paniagua Cubero, Jefe de Proceso Servicios de Información del **ICE,** solicitó a la Dirección Administrativa de Proveeduría, la apertura del procedimiento correspondiente de Resolución del contrato y ejecución de garantía de cumplimiento contra **Verizon** (Documento No. 45).

**70).-** El 14 de diciembre de 2004 el **ICE** dictó el acto de apertura del procedimiento administrativo para la resolución del contrato y la ejecución de la garantía de cumplimiento contra **Verizon**, según oficio 5225-69163-2004, AEG-0572-2004 de 14 de diciembre del 2004 (Documento No. 46).

**71).-** El 17 de diciembre del 2004, el señor MELVIN A. ANDUJAR QUEIPO, en su calidad de Gerente General de **Verizon,** presentó por escrito la excepción de previo pronunciamiento de cláusula arbitral, que fue remitida el

día 3 de enero de 2005 mediante nota AEG-0003-2005 a la Dirección Jurídica Institucional del ICE, con el fin de obtener pronunciamiento jurídico al respecto. La Dirección de Proveeduría, Area Garantías, Registros y Sanciones, mediante Oficio 5225-2022-2005, AEG-0037-2005 del 13 de enero de 2005, examinó el asunto y opinó que la oposición de Verizon era improcedente (Documento No. 47).

**72).-** El 7 de enero de 2005 la dependencia del **ICE** denominada Procesos de Información de la UEN Servicio al Cliente, solicitó a la Dirección de Proveeduría la implementación de algunas medidas cautelares dentro del procedimiento administrativo entre otras, no ejecutar las prestaciones contractuales por incumplimiento de **Verizon;** que el **ICE** continuara con el procedimiento de facturación de los anunciantes de la Guía Telefónica 2004 y 2005, así como la inclusión de la información necesaria para la facturación; que **Verizon** se abstuviera de utilizar el logotipo de la marca **ICE** en posibles guías telefónicas, productos complementarios y en cualquier otro medio o actividad no autorizado por el **ICE.** Todo ello en nota interna S.I. 0013-01-05 del 7 de enero, 2005 (Documento No. 48).

**73).-** El 7 de enero de 2005, mediante resolución No. 5225-00939-2005 AEG-0020.2005, la Dirección de Proveeduría del **ICE** le notificó a **Verizon** las medidas cautelares dictadas (Documento No. 49).

**74).-** El 10 de enero de 2005 **Verizon** interpuso recurso de revocatoria con apelación en subsidio y nulidad concomitante contra la resolución que ordena las medidas cautelares, aduciendo que lesionan gravemente sus derechos subjetivos. Además, que el acto administrativo que nació a la vida jurídica es un acto tácito de aprobación de su solicitud, con todas las características y garantías que el ordenamiento jurídico le concede a esta clase de actos, a la luz de la doctrina del numeral 16 de la Ley de Contratación Administrativa (Documento No. 50).

**75).-** El 12 de enero de 2005 en la Dirección Jurídica Institucional del **ICE**, se recibe dictamen jurídico suscrito por los licenciados Patricia Hernández

34

Salazar, Francisco Rojas Giralt, y Hissell Mayorga Quirós, indicando y recomendando que el recurso de revocatoria con apelación en subsidio y nulidad concomitante interpuesto contra las medidas cautelares sea declarado improcedente, según nota 0092.01644.2005 DCA-020-05 del 12 de enero del 2004 (Documento No. 51).

**76).-** El 12 de enero del 2005 la Licda. Agnes Paniagua del Proceso Servicios de Información del Instituto Costarricense de Electricidad, solicita que el Recurso de Revocatoria con Apelación en Subsidio y Nulidad concomitante, sea declarado improcedente, según nota S.I.-0025-01-2004 del 12 de enero del 2004 (Documento No. 52).

**77).-** El 12 de enero de 2005 **Verizon** presentó, dentro del plazo concedido en resolución 5225-69163-2004 (AEG – 0572-2004) de fecha 14 de diciembre de 2004, sus alegatos con respecto a la apertura del Procedimiento para declarar la Resolución Contractual (Documento No. 53).

**78).-** El 21 de enero de 2005 el **ICE** le notificó a **Verizon** la resolución 5225-03122-2005 del 21 de enero del 2005, rechazando el recurso de revocatoria contra la aplicación de las medidas cautelares y elevó ante la Subgerencia de Telecomunicaciones el recurso de apelación con nulidad concomitante contra la aplicación de las medidas cautelares dictadas en el oficio 5225-00939-2005 AEG-0020.2005 del 7 de enero de 2005 (Documento No. 54).

**79).-** Recibida el día 31 pero de fecha 25 de enero de 2005 **Verizon** presentó dentro del plazo concedido en resolución 5225-03122-2005, (AEG – 0060-2005) de fecha 21 de enero del 2005, ampliación de alegatos del recurso de apelación en contra de las medidas cautelares, ante el Superior Jerárquico (Documento No. 55).

**80).-** El 13 de enero de 2005 el **ICE** le notificó a **Verizon** el auto de traslado de la solicitud "excepción previa de acuerdo arbitral", a la Subgerencia

de Telecomunicaciones, para que ésta a su vez, la elevara a conocimiento y resolución del Consejo Directivo (Documento No. 56).

**81).-** El 2 de febrero de 2005 mediante nota número 0012-5372-2005 CD-070-2005 remitida a la Subgerencia de Telecomunicaciones, el Consejo Directivo comunica que en el artículo 12 del acta de la Sesión 5657, celebrada el primero de febrero de 2005, acordó rechazar en todos sus extremos la solicitud para acudir a procedimiento arbitral según lo contenido en la excepción previa de acuerdo arbitral presentada por la empresa **Verizon** (Documento No. 56).

**82).-** El 7 de febrero de 2005 la Subgerencia de Telecomunicaciones rechaza en todos sus extremos el recurso de apelación y nulidad concomitante interpuesto, según oficio número 6000-06301-2005 SGT-510-2005 (Documento No. 57).

**83).-** El Subgerente de Telecomunicaciones, MBA. Claudio Bermúdez Aquart, dictó el acto final del procedimiento, con fundamento en la recomendación de acto final que en Oficio AEG-0128-2005 del 11 de febrero del 2005, le remitió el Organo Director Administrativo, indicando textualmente lo siguiente:

> *"Esta Subgerencia con fundamento en las citas legales, jurisprudencia aplicable y prueba documental que consta en expediente administrativo, se acuerda acoger la recomendación de la Dirección Jurídica Institucional, de la Dependencia Técnica Proceso Servicios de Información y de la Dirección de Proveeduría en su nota AEG -0128-2005, por lo que al tenor de los artículos 10, 11, 13, 14, 20, 21,, 34, de la Ley de Contratación Administrativa, artículos 12.1, 13.2, 15.1, 15.2, 15.3, 15.4, 16.2, 22.1, 23.1, 35.1, 35.1, 49.2 del Reglamento General de Contratación Administrativa, artículo 3, 75, 76, 77, 78, 79 del Reglamento Interno de la Contratación Administrativa, acuerda :*

*I)* La resolución del contrato y ejecución de la garantía de cumplimiento, dado el incumplimiento del contratista VERIZON INFORMATION SERVICE (Costa Rica) LLC.

*II)* Proceder al cobro de los daños y perjuicios ocasionados, todo de acuerdo a la cláusula 3.10.3 que textualmente dice: Si la calidad de los materiales empleados en una edición particular y la confección de las guías telefónicas entregadas, no garantiza al ICE el cumplimiento de lo ofrecido en el contrato y lo especificado en este cartel y si además el monto fijado como garantía no fuese suficiente o se encontrare agotado, el ICE podrá accionar judicialmente contra el contratista para el cobro de daños y perjuicios…

*III)* Se le Comunique a la empresa VERIZON INFORMATION SERVICES(Costa Rica) LLC que contra la presente resolución se pueden interponer los recursos de revocatoria y el de apelación, que han de plantearse, dentro de los tres días hábiles siguientes a su notificación, de conformidad con el artículo 342 y 346 de la Ley General de la Administración Pública.

*IV)* **Se notifique la presente resolución en el domicilio legal de la empresa Verizon Information Services (Costa Rica) LLC"** (Documento No. 58).

**84).-** El representante de **Verizon** interpuso los recursos mencionados en la resolución anterior. El 8 de julio de 2005, mediante Oficio 0150-36359-2005-GG-680-2005 el Ingeniero Carlos Obregón Quesada rechazó el recurso de apelación con nulidad concomitante (folios 4593 a 4617 del expediente administrativo) y dio por agotada la vía administrativa confirmando, de esta forma, el acto administrativo de resolución contractual, contenido en la nota 6000-27733 del 1 de junio del 2005 y ordenó levantar las medidas cautelares dictadas al efecto. Por virtud de esta resolución se dio por terminado el contrato

entre el **ICE** y el **Grupo Verizon**, que daba el sustento jurídico al contrato formalizado por **THS** y **Verizon** (Documento No. 59).

**85).-** El acto administrativo que declaró la resolución del contrato quedó firme el 20 de julio de 2005, fecha en la cual se le notificó a la empresa el rechazo del recurso de apelación interpuesto (Documento No. 59).

**86).-** El día 15 de febrero de 2005 **THS** remitió una nota al Ing, Pablo Cob, entonces Presidente Ejecutivo del **ICE**, en la que se indicaba que **THS** se había venido desempeñando como subcontratista principal con la aprobación del **ICE**, en todos los contratos de edición e impresión de los directorios telefónicos y que por razones ajenas a su voluntad, el contrato principal estaba siendo cuestionado por las partes **(ICE – Verizon)** sin conocer **THS** las razones por haber sido ajena a la discusión entre las partes. Se le señaló que de acuerdo con la Cláusula Tercera del contrato **GTE (luego Verizon) - ICE**, la primera se obligaba a efectuar todo el proceso de impresión de las Guías Telefónicas en Costa Rica. De acuerdo con la cláusula 2.13.1 ídem, las subcontrataciones debían contar con la aprobación previa y escrita del **ICE**. En dicha nota se propuso una contratación directa **ICE – THS,** en el evento que el contrato entre el **ICE** y **Verizon** fuese resuelto en forma definitiva. Todo esto, por constituir la información contenida en las guías telefónicas un servicio público y con base en lo expresamente señalado en el artículo 79 inciso 1) en relación con el inciso 6) del Reglamento de Contratación Administrativa. Dentro de las consideraciones se estableció la experiencia única en Costa Rica, la capacidad y el hecho que la labor y experiencia de **THS** que era la empresa que había garantizado la continuidad y regularidad del servicio público (Documento No. 60).-

**87).-** El día 1 de Julio de 2005 **THS** envía al **ICE** una nota en la que se solicita reconsiderar los acuerdos que, entre otras cosas, liberaba de cobro del servicio de información del número 113, en vez de contratar directamente todas las etapas de la edición, comercialización e impresión de las guías y se

reitera la solicitud para que el **ICE** contrate directamente esos procesos con **THS** (Documento No. 61).

**88).-** El 11 de Julio de 2005 el Secretario del Consejo Directivo del **ICE**, Lic. José Abraham Madrigal informa que en la sesión 5679 acordó trasladarle la misiva a que se refiere el Hecho anterior a la Subgerencia de Telecomunicaciones y a la Dirección Jurídica (Documento No. 62).

**89).-** El 4 de agosto de 2005, el Subgerente de Telecomunicaciones remite la nota SGT-3228-2005 en la que informa que en la sesión 5679 del Consejo Directivo del **ICE** del 5 de Julio de ese año, acordó que el **ICE** celebrara un convenio con **RACSA** a efecto de que esa empresa pública del Grupo ICE elabore las guías del año 2006 (Documento No. 63).

**90).-** El mismo día 4 de agosto de 2005 el Director Jurídico del **ICE**, Licenciado Geovanni Bonilla, mediante nota 0090.38888.2005, le informa a **THS** del artículo 01 de la sesión 5680 del 12 de Julio del 2005 del Consejo Directivo, en el que se instruye al Gerente General a.i. para que coordine lo necesario con **RACSA,** para que se posibilite que la Guía Telefónica del año 2006 sea elaborada a través de **RACSA** y con eso "decidió como procederá con relación al tema de la guía telefónica" (Documento No. 64).

**91).-** El **ICE** con ese acto, faltó al deber de tutela que debía garantizar los principios de regularidad y continuidad del servicio público, que le imponía el contrato formalizado originalmente con el **Grupo GTE,** ahora **Grupo Verizon,** y en el que **THS** era el encargado de suplirlo a los usuarios a través de la edición e impresión de las guías telefónicas (mismo Documento No. 64).

**92).-** El pronunciamiento No. C-152-2000 de la Procuraduría General de la República, vinculante para toda la Administración Pública, declara que el suministro de las guías telefónicas por el ICE para ser suministradas a todos los usuarios, es una obligación ineludible, porque se trata de un servicio público (Documento Nº 65).

**93).-** En la sesión del 30 de agosto del 2005 el Consejo Directivo del **ICE** acuerda:

"Autorizar a la Gerencia General del ICE para que en conjunto con RACSA valore, en un plazo de treinta días hábiles, la viabilidad técnica, jurídica, financiera y de mercadeo, de ejecutar a través de la suscripción de un convenio específico, las siguientes labores a partir del 2007:

(...)

e)    El desarrollo, mercadeo, producción y distribución de las Guías Telefónicas a partir del año 2007.

Derogar los acuerdos de las sesiones 5679 del 5 de Julio del 2005 y 5680 del 12 de Julio del 2005" (Documento No. 66).

**94).-**        Dados los eventos señalados en el Hecho 49 de esta Demanda y con el propósito de evitar un litigio con **Verizon**, **THS** presenta ante el Centro de Conciliación y Arbitraje de la Cámara de Comercio de Costa Rica, una solicitud de Conciliación que ocupa el expediente CCA28-CO11-09-05. La audiencia de conciliación se realiza a las 10:00 horas del 18 de octubre de 2005, pero el representante de **Verizon,** señor Melvin Andujar Queipo señala que por instrucciones de la casa matriz, se inhibe de hacer cualquier tipo de propuesta o llegar a alguna conciliación (Documento No. 67).

**95).-** El **2 de setiembre del 2005** el Gerente General de **Verizon** en Costa Rica, mediante Oficio cuya copia se adjunta, le comunicó a **THS,** entre otras cosas, que "... el **ICE** irrespetó los derechos contractuales y aquellos establecidos por ley de mi representada y procedió a iniciar un procedimiento administrativo para la resolución del contrato, utilizando los medios públicos para distorsionar la realidad de los hechos", y que como la cláusula 28 inciso b) del "Master Purchase Agreement" la autoriza expresamente, **Verizon** da por terminado este contrato por haber terminado el existente entre **Verizon** y el **ICE** por cualquier causa. De esta manera, **Verizon** concluyó unilateralmente el Master Purchase Agreement, sin asumir y reconocer las responsabilidades que le correspondían para con **THS** (Documento No. 68).

**96).-** El contrato con el **ICE** se vio seriamente alterado y cesó de producir ingresos, razón por la que **THS** incurre en atrasos en los pagos de su obligación prendaria contraída con HEIDELBERG PRINT FINANCE AMERICAS INC., para la adquisición de la prensa rotativa tipo "Offset" marca Heidelberg, modelo Mercury 24D y todos sus accesorios. La acreedora inicia un proceso ejecutivo prendario que con el expediente número 06-001956-0640-CI, se presenta el 19 de octubre de 2006 en el Juzgado Civil de Mayor Cuantía de Cartago, ordenándose un embargo preventivo hasta por la suma de US$ 2,831.409,07, embargo que se practica el 29 de noviembre de 2006 (Documento No. 69).

**97).-** A pesar de distintas acciones dilatorias de **THS** en ejercicio de su derecho de defensa en la vía jurisdiccional, a las 13:30 horas del 6 de junio de 2007, se realiza el remate del equipo pignorado y por auto de 9:23 horas del 19 de agosto de 2007, se ordena la puesta en posesión del mismo a HEIDELBERG PRINT FINANCE AMERICAS INC., rematario, lo que se ejecuta a las 14:00 horas del 31 de octubre de 2007 (Documento No. 69).

**98).-** A raíz de las actuaciones de las demandadas, como se indica y se prueba en los Hechos anteriores, **THS** se ve obligada a incurrir en mora con los pagos de las rentas por el alquiler de las naves industriales de Inmobiliaria Zoroaster S.A., llegando a acumularse varias mensualidades, por lo que como

medida dilatoria, mientras se mantiene la esperanza de una solución satisfactoria entre **Verizon** y el **ICE**, **THS** conviene con la arrendante dicha, la empresa "Inmobiliaria Zoroaster, S.A.", en suscribir una escritura pública, que corresponde a la número 144, que se inicia al folio 133 vuelto del tomo primero del Protocolo de la Notaria LAURA MÓNICA ZAMORA ULLOA, a las doce horas del 23 de marzo de 2006, mediante la cual **THS** se compromete hasta por la suma de DOSCIENTOS MIL DOSCIENTOS VEINTITRÉS DOLARES CON SETENTA Y CINCO CENTAVOS (US$ 200,223,75), indicándose en la cláusula segunda de dicho documento lo siguiente: "...SEGUNDA. Sustitución de deuda. Esta constitución de deuda, sustituye las mensualidades atrasadas por concepto de alquiler adeudados por El Deudor -(TREJOS HERMANOS SUCESORES)- correspondientes a los meses de julio de dos mil cinco hasta marzo de dos mil seis inclusive, a razón de nueve meses de mensualidad, según contrato de arrendamiento suscrito entre Acreedor y Deudor, de fecha primero de julio de dos mil cuatro, arrendamiento que se ejecuta en la propiedad del Acreedor, finca inscrita a Folios Reales tres- uno nueve cero ocho siete tres- cero cero cero y tres- uno nueve cinco ocho nueve ocho- cero cero cero, lo cual expresamente acepta El Acreedor..." (Documento No. 70).

**99).-** En dicha escritura pública, que conforme a lo dispuesto en el Código de Comercio tiene carácter de título ejecutivo, se establecen intereses y forma de pago, mediante cuotas mensuales de veintidós mil doscientos cuarenta y siete dólares con ochenta y tres céntimos hasta cancelar la totalidad de la obligación (mismo Documento No. 70).

**100).-** **THS** hizo algunos pagos a sus obligaciones, pero a causa de las actuaciones de **Verizon** y de la cesación de pagos contractuales ordenada por el **ICE,** se vio imposibilitada de cumplir con la forma de pago pactada con Inmobiliaria Zoroaster S.A., por lo que ésta presenta ante el Juzgado Civil de Mayor Cuantía de Cartago, proceso ejecutivo simple que ocupa el expediente número 06-001846-0640-CI, que culmina con sentencia, acogiendo la excepción de pago parcial y condenando a **THS** a pagar la suma de ciento cincuenta y seis mil ciento ocho dólares con diez céntimos de dólar (US$ 156,108.10) (ver Documento No. 71).

**101).-** Por aparte y mediante proceso de Desahucio que presenta INMOBILIARIA ZOROASTER S.A. contra **THS,** por resolución del Juzgado Civil de Menor Cuantía de Cartago, dictada a las 11:35 hrs. del 8 de noviembre de 2006, dentro del expediente número 06-002424-0346-CI, se tiene por establecido el mismo y se previene el desalojo en los quince días siguientes. En dicho proceso se presentaron varias incidencias y acciones dilatorias, para extender ese plazo hasta la sentencia de Segunda Instancia que se dicta a las 7:40 horas del 4 de octubre de 2007, pero ya para entonces, se había llegado a un finiquito con la Arrendante, que se comenta seguidamente (ver Documento No. 72).

**102).-** Ante la inminencia del desalojo por parte de Inmobiliaria Zoroaster S.A., el remate del equipo completo de impresión en rotativa por parte de HEIDELBERG PRINT FINANCE AMERICAS INC., **THS** se ve en la necesidad de concretar una venta en condiciones muy desfavorables, de prácticamente todos sus activos en equipos y mejoras en los inmuebles de la Arrendante, a la empresa de capital colombiano CONDOR EDITORES DE COSTA RICA, S.A., cédula jurídica tres- ciento uno- trescientos noventa y cinco mil quinientos seis, quienes convienen con Inmobiliaria Zoroaster S.A., en el arrendamiento de las naves industriales de la Zona Franca Zeta en Cartago, adquieren el equipo rematado por HEIDELBERG PRINT FINANCE AMERICAS INC., en condiciones favorables y ya instalado en esas naves industriales, al igual que el resto del equipo de **THS** pignorado al Banco Nacional de Costa Rica y al Banco Interfin (Documento No. 73).

**103).-** A fin de entregar las naves industriales para que la Arrendante pudiera convenir en el nuevo contrato con CONDOR EDITORES, según se dijo, **THS** llega a un acuerdo con Inmobiliaria Zoroaster S.A., que se concreta en un documento de fecha 28 de marzo de 2007, titulado *"Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda".* En ese contrato, básicamente **THS** entrega la nave industrial donde se encuentra la máquina rotativa y el restante equipo de impresión, puesto que con anterioridad ya se había entregado la otra nave donde se encontraban las oficinas y bodega y otorgan

ambas partes el finiquito en ese sentido, pero al mismo tiempo se señala que "...Inmobiliaria Zoroaster S.A. reconoce haber recibido a la fecha dos pagos - (que en el proceso de desahucio no se habían podido acreditar)-, por una suma total de cincuenta y cinco mil dólares estadounidenses, así como tener a su haber un depósito de garantía por la suma de treinta y nueve mil dólares, todo lo cual expresamente autoriza **THS** lo aplique Inmobiliaria Zoroaster S.A. al total adeudado. Independientemente de que los procesos judiciales dichos puedan continuar, **THS** se compromete a cancelar el total adeudado que oportunamente se determine, una vez hechas esas deducciones junto con los intereses pactados y costas, hasta su efectivo pago, en un plazo perentorio, reconociendo ambas partes que hay una instrucción expresa en el "Fideicomiso Trejos Hermanos – Fiduciaria Castro Garnier", por la cual se debe cancelar lo adeudado a Inmobiliaria Zoroaster S.A., en cuanto **THS,** reciba el pago de sumas que se le deben por diferentes negocios pendientes de cancelación, como por ejemplo, una deuda pendiente de Radiográfica Costarricense, S.A. (Documento No. 74).

**104).-** Junto con el remate del equipo rotativo de impresión HEIDELBERG, la entrega de las naves industriales, con toda las instalaciones e infraestructura necesaria y específica para esos equipos, en esa misma fecha, 28 de marzo de 2007, **THS** se ve en la necesidad de arrendar con opción de compraventa a DACONDOR D.C.R. SOCIEDAD ANONIMA, que luego, con fecha 29 de mayo de 2007, cede sus derechos a la misma empresa dicha CONDOR EDITORES DE COSTA RICA, S.A. sobre los restantes activos industriales de la empresa, por una fracción de los pasivos, tanto en Transamérica Bank & Trust Co. Ltd., (subsidiaria de Banco Interfin), en el Banco Nacional de Costa Rica y con Banco Improsa S.A. En el caso concreto de Transamérica Bank & Trust Co. Ltd., esos pasivos corresponden a una línea de crédito que se le otorgó a **THS**, con base en las magníficas perspectivas que se tenían y luego de los estudios bancarios donde se analizaron los contratos celebrados con Verizon, para la confección de los directorios telefónicos de República Dominicana y de Costa Rica (Documento No. 75).

**105).-** Como se puede observar en la prueba que se adjunta, la pérdida del contrato y su consecuencia inmediata de la pérdida de los ingresos asociados al mismo, implicó que la empresa actora quedara morosa con una serie de Instituciones Financieras, acumulando atrasos de cientos de días con varias de ellas y colocando algunas operaciones en cobro judicial. De igual manera se acumularon atrasos significativos en sus compromisos con la Caja Costarricense de Seguro Social y otras Instituciones Públicas. Todo esto llevó a la empresa y a sus socios que la avalaron financieramente a dejar de ser sujetos de crédito, puesto que con los niveles de morosidad acumulados y de acuerdo a la normativa de la SUGEF que se certifica, ninguna institución podría conceder crédito a deudores con este tipo de puntaje, debido a las reservas que estaría obligada esa institución financiera a realizar. Al no poder obtener crédito y quedar en una posición morosa en el Sistema Financiero Nacional y entre las Instituciones Públicas, se ha producido un daño moral de incalculable proporciones y de imposible de reparación, ya que no solo se dejaron de percibir las sumas reclamadas sino que imposibilitaron conducir nuevos negocios (Documento No. 76).

**106).-** En el CONTRATO MAESTRO DE COMPRA suscrito entre el **Grupo Verizon y THS,** en fechas 28 de febrero de 2002 y 1 de marzo de 2002, se insertaron cláusulas de exoneración de responsabilidad civil contractual y de limitación de responsabilidad civil contractual, como son las que llevan los números 24 y 28. Específicamente, en el inciso b) de la cláusula 28 se indica que el contrato maestro termina si el contrato con el ICE concluye por "cualquier razón", y en el inciso e) de esa cláusula se señala que "el comprador", o sea **VERIZON,** no está obligado a indemnizar a TREJOS HERMANOS SUCESORES los daños y perjuicios por inejecución del contrato (Documento No. 19 que es copia del Contrato Maestro de Compra).

**107).-** Las cláusulas eximentes de responsabilidad civil referidas en el Hecho 105 anterior, fueron impuestas por **VERIZON** a **THS,** así como los otros contenidos contractuales, en forma tal que **THS** no podía modificar en nada el contenido contractual preestablecido por **VERIZON** (este Hecho se prueba con la declaración de parte de **VERIZON,** que se solicita en la prueba).

## B).- OBJETO DEL JUICIO.-

La demanda que interpone **THS** es para que en sentencia se declare, como se especificará en la parte petitoria de esta Demanda, que con las actuaciones y las resoluciones de las demandadas, acordadas por ellas para dejar sin efectos jurídicos el contrato administrativo que habían formalizado el **ICE** y el **Grupo GTE,** luego denominado como el **Grupo Verizon**, para la "Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información" y que fue firmado en San José el día 10 de marzo del año 2000, le han producido a la actora graves daños y perjuicios que, como tales, conforman una cuestión de responsabilidad patrimonial.

A los efectos de lograr una mejor comprensión del objeto del juicio presentamos, en forma esquemática, los grandes lineamientos y puntos de interés de la demanda, lo que hacemos a manera de una síntesis racional y comprensiva de los intereses de la parte actora.

a).- **THS,** como empresa mercantil especializada en la edición, impresión, encuadernación y distribución de guías telefónicas o directorios telefónicos, trabajó en este giro comercial desde hace cerca de noventa años;

b).- a partir del año 1974 se insertó en el mercado nacional el **Grupo GTE**, obteniendo la adjudicación de una licitación promovida por el **ICE**, para editar e imprimir los directorios telefónicos y comercializar la publicidad y los destacados de esas guías telefónicas. Dentro de las especificaciones invariables del cartel de la licitación, el ICE exigió que la parte específica del contrato, vinculada con la edición, impresión, encuadernación y distribución de los libros, debía realizarse en Costa Rica, para que aprovechara a la economía y a la tecnología nacional;

c).-   examinado el mercado de oferta costarricense, el **Grupo GTE** contrató para tales fines a **THS,** justamente por sus antecedentes y atestados comerciales. Posterior y paulatinamente, el **Grupo GTE** fue ampliando la cobertura de la edición e impresión de guías telefónicas al mercado de Centroamérica y el Caribe (32 países), siempre negociando con **THS**, que se convirtió en su asociada regional especializada en tales labores, al recibir del **Grupo   GTE** la calificación de "preferred vendor";

d).-   en los años 1999 – 2000 el **ICE** publicó la Licitación Pública número 6378 – T y el **Grupo GTE** participó y resultó adjudicatario de ese contrato administrativo, lo que hizo por medio de un consorcio formado por tres de sus empresas, que participaron con la garantía incondicional y total de la empresa Holding del Grupo, la firma GTE CORPORATION;

e).-   paralelamente a los trámites de la licitación, el **Grupo GTE** negociaba con **THS** las condiciones futuras para regular e incorporar en los trabajos de edición e impresión, los avances tecnológicos para mejorar la calidad de los trabajos. Se le impuso a **THS** de manera obligatoria, la adquisición de los equipos más modernos y la ampliación de la planta física para poder instalar esos equipos;

f).-   firmado el contrato principal por el **ICE** y el **Grupo GTE,** el mismo fue refrendado por la Contraloría General de la República. El **Grupo GTE** contrató con **THS,** por un plazo de ciento sesenta y ocho (168) meses, la edición y la impresión de las guías telefónicas de Costa Rica, más los directorios telefónicos de Belice y de República Dominicana;

g).-   con la garantía que significaba la ejecución de tal contrato, **THS** se endeudó seriamente para poder adquirir los nuevos equipos y ampliar su planta industrial. Los créditos bancarios y comerciales que formalizó eran financiables para la economía de **THS,** con  sólo hacer sostenible la producción de los contratos que estaban en proceso de

ejecución y si a ello se le agregaba, además, el contrato formalizado por GTE con el **ICE**, todo esto en su conjunto, le permitía a **THS** producir suficientes ingresos para el pago de todas sus obligaciones y obtener, adicionalmente, una utilidad razonable y decorosa;

h).- el contrato de **GTE** con el **ICE** entró en vigencia en su momento; el **Grupo GTE** se fusionó con la firma Atlantic Bell y se formó el **Grupo VERIZON**, que manifestó por escrito al **ICE** mantener todos los derechos, deberes, obligaciones y garantías originalmente otorgadas por el **Grupo GTE.** Fue este un acto de confirmación del hecho real que frente a los deberes del contrato formalizado con el **ICE**, no se alteraba absolutamente nada por virtud del cambio de la razón social, como lo estipula la Cláusula Vigésimo Quinta del contrato.

i).- el contrato se mantuvo en condiciones normales de ejecución por cerca de cuatro años y en el 2004, cuando se inició la producción de las guías telefónicas que correspondían para el año 2005, las políticas de ejecución del contrato por parte de **Verizon** entraron en conflicto con las disposiciones licitatorias y contractuales del **ICE**; el contrato lo paralizaron del todo ambas partes y luego el **ICE** ejecutó las garantías de cumplimiento, declaró el incumplimiento y resolvió el contrato, ordenándole a su administración exigirle a **Verizon** el resarcimiento de los daños y perjuicios causados;

j).- **Verizon**, unilateralmente, dejó sin efectos jurídicos los contratos que mantenía válidos y vigentes con **THS** y abandonó toda actividad comercial en el país;

k).- **THS** desconoce las implicaciones jurídicas de lo sucedido entre el **ICE y Verizon**, pero el resultado de lo que produjeron estas dos partes implicó que **THS** no pudiera cancelar los créditos bancarios y comerciales, cesara en los pagos con relación a los proveedores de materia prima y los alquileres, cesó en el pago de los salarios y derechos laborales de sus empleados y se vio conducida al cierre de

sus actividades y al paro permanente de su giro comercial. En sentido técnico, la situación en que se colocó a **THS** resultó equivalente a la de una quiebra comercial;

l).- como el infortunio comercial de **THS** se origina en el incumplimiento del contrato formalizado con el **Grupo GTE**, luego denominado **Grupo VERIZON,** reconocido como el nexo derivado de la licitación y en el contrato firmado entre **THS y Grupo VERIZON**, como subcontrato y por tanto, accesorio de aquél, resulta jurídicamente imprescindible demandar a ambas partes, para que se le indemnice a **THS** de los daños y perjuicios irrogados por cada una de ellas, en la parte proporcional que corresponda.

En síntesis: el objeto del juicio es exigirle a las demandadas el pago de los daños y perjuicios irrogados a **THS,** con el conflicto que ambas partes  - **ICE y Grupo GTE** (luego **Grupo VERIZON**) crearon entre ellas, con los efectos terribles de la paralización de toda actividad industrial de **THS** y de su salida definitiva del giro comercial que había ejercido por más de noventa años.

## C).- CONTRATO PRINCIPAL, SU NATURALEZA Y SU RÉGIMEN JURÍDICO.-

El contrato que inicialmente formalizó el Consorcio GTE con el ICE, se originó en los procedimientos de contratación administrativa (licitación pública) que impulsó en el ejercicio de su competencia, el Instituto Costarricense de Electricidad, sujetándose estrictamente a lo que dispone el artículo 182 de la Constitución Política, procedimiento en el que resultó adjudicatario el Consorcio GTE como ya se ha explicado en los Hechos de esta demanda.

De conformidad con la doctrina nacional, la jurisprudencia de los Tribunales de Justicia, tanto la constitucional como la contencioso administrativa y la que emana de la Contraloría General de la República, se manifiestan de forma unánime, en el sentido de que contrato administrativo es mucho más que el

llamado "contrato documento" que es el que firman las partes, cuando el acto de adjudicación queda firme.

En nuestro sistema, forman parte del contrato administrativo el pliego de condiciones (cartel de la licitación), la oferta adjudicada con sus anexos y aclaraciones, los estudios técnicos, económicos y jurídicos que sirven de base para adjudicar la licitación, el acto mismo de adjudicación y el documento que se firma, en el que se obtiene el refrendo de la Contraloría General de la República.

Así lo reconocieron el **Consorcio GTE** y el **ICE** expresamente, al suscribir la Cláusula Primera de su contrato, que fue refrendado por la **CGR** el 13 de diciembre del 2000.

Estos principios y estas normas jugaron un papel importante en el contrato entre el Consorcio GTE y el ICE, que resumimos así:

1).-        En el Hecho 15) de la demanda, demostramos que en el folio 9 de su oferta el Consorcio GTE expresó, aceptando incondicionalmente la cláusula 1.3.1.3 del cartel, que conoce, acepta y se somete a los procedimientos del ICE para el trámite de licitaciones, a todo lo estipulado en los documentos de esta licitación y a los tribunales y leyes de Costa Rica, según consta en el Convenio de Consorcio, en el que expresaron literalmente las empresas que lo conformaron: *"...Además, en cumplimiento de lo estipulado en los artículos doscientos veintiséis y doscientos treinta y dos del Código de Comercio de la República de Costa Rica, por el presente declaramos, para efectos de este poder como para efectos del Acuerdo Consorcial en general, que tanto las tres empresas que forman este Consorcio como los apoderados aquí nombrados se someten a las Leyes y Tribunales de Costa Rica para todos los efectos y contratos que se celebren o que deban ejecutarse en Costa Rica en razón de la licitación antes mencionada..."*. (Documento N° 13 y cláusula sexta del acuerdo de consorcio en el Hecho 24 de esta Demanda).

2).- En el Hecho 18) de la Demanda demostramos que en la cláusula Vigésima Quinta del documento contrato las dos partes involucradas, **ICE** y **Consorcio GTE**, estipularon que *"En el caso de que por modificación en la ley del ICE, esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas"* (Documento N° 6).

3).- En el Hecho 21 de la Demanda demostramos, también, que el Gerente General de Verizon Information Services – Costa Rica, LLC, mediante nota del 28 de agosto del 2002, dejó aclarado ante el Área de Servicios de Información del **ICE**, lo ocurrido con los cambios de nombres de las tres empresas que suscribieron el Consorcio y adjuntó la documentación necesaria para acreditar esos hechos, para señalar que las empresas GTE Directories Corp, GTE Information Services, Inc y General Telephone Directory Company C por A., cambiaron sus nombres, como consecuencia de la fusión entre Bell Atlantic y GTE, que creó VERIZON, para denominarse Verizon Information Services, Inc., Verizon Directories Corporation y Verizon Information Services-Costa Rica, LLC. Todo ello está demostrado con los folios certificados por el ICE números 3040, 3041 y 3042 del expediente administrativo que se adjuntan en el Documento N° 15).

4).- En el Hecho 22 de la Demanda se demuestra que en la misma nota del 28 de agosto del 2002, a que alude el punto inmediato anterior, se expresó lo siguiente: *"II.- MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS. De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el Mantenimiento de Obligaciones y Derechos, firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directories Corp y Verizon Information Services-Costa Rica, LLC, en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma"* (folios 3035, 3036 y 3037 del expediente administrativo que se adjuntan certificados en el Documento N° 15).

5).- En el Hecho 27 de la Demanda se demuestra que en los folios 427 al 432 del expediente administrativo, aparece la oferta del Consorcio y en ella se encuentra un documento en el que, para cumplir con la cláusula 2.4.1.B, párrafo I del cartel de la licitación, la firma estadounidense **GTE CORPORATION** CERTIFICA:

*"I.- Que esta Corporación tiene conocimiento de que el Consorcio constituido por GTE Information Services Incorporated, GTE Directories Corporation y General Telephone Directory Company C por A, van a participar en la Licitación Pública No. 6378-T, promovida por el INSTITUTO COSTARRICENSE DE ELECTRICIDAD para "La Contratación de Servicios por ocho años y el Desarrollo e Implementación de Servicios de Información".*

*II.- Que de acuerdo con las disposiciones de la Cláusula 2.4.1-B (La Capacidad Financiera de la Compañía) incluida en el Cartel de la Licitación Pública No. 6378-T, antes mencionada, el Consorcio mencionado presentará los Estados Financieros de GTE Corporation, que es la compañía "holding" (tenedora) del grupo.*

*III.- Que de acuerdo a los requisitos de la misma cláusula 2.4.1-B, antes mencionada, **GTE Corporation** declara que será conjuntamente responsable con las empresas del Consorcio mencionado por todas las obligaciones que este Consorcio adquiera como oferente y como adjudicatario de la mencionada Licitación Pública No. 6378-T ante el INSTITUTO COSTARRICENSE DE ELECTRICIDAD.*

*IV.- Esta corporación emite esta certificación para ser presentada al Instituto Costarricense de Electricidad en la Licitación Pública 6378-T, antes mencionada.*

*Dado en la ciudad de Irving, Estado de Texas, Estados Unidos de*
*América, el 22 de junio de 1999."*

El documento fue firmado por Daniel P. O´Brien en su condición de EVP, Chief
Financial Officer y se acompaña una razón notarial de la Notario Público
Cynthia Owens del Condado de Tarrant, Estado de Texas, que es luego
consularizada y legitimada conforme con la Ley (ver copias certificadas del
expediente en Documento Nº 18).

6).-        La firma **GTE CORPORATION**, Holding del Grupo GTE, al
expresar que otorgó su garantía plena respaldada por sus estados financieros,
que podían usarse en la licitación pública 6378-T del ICE para acreditar la
capacidad financiera del Consorcio, que actuaba entonces como oferente y
que otorgaba, también, su garantía para ser conjuntamente responsable con
las empresas del Consorcio, por todas las obligaciones que éste adquiera
como oferente y como adjudicatario adquirió, irremediablemente, la condición
de responsable solidario no sólo del Consorcio, sino de la plena ejecución del
contrato y por ello, también responsable conjuntamente con el ICE de los
resultados de la negociación.

Adviértase que según el texto de la cláusula 2.4.1.B del Cartel de la Licitación
6378 T del ICE, era ésta una disposición no obligatoria pero que estaba
disponible para todos los potenciales oferentes, quienes podían o no usar ese
recurso al formular la propuesta que sometían a la administración.

Es decir, que en los casos en que los participantes (oferentes) en el proceso
de licitación, necesitaran o quisieran fortalecer sus respaldos financieros, la
experiencia en el giro comercial de la licitación y el conocimiento en el
desarrollo tecnológico de sistemas de información como los requeridos por el
ICE, podían acompañar los estados financieros auditados del Holding al que
pertenecían, para poder aspirar a obtener todo el puntaje de los extremos de
la evaluación de las ofertas.

Pero en este supuesto, el Holding (en el caso concreto **GTE Corporation**), asumía la responsabilidad solidaria junto con el oferente o los oferentes por todas las obligaciones derivadas del contrato que se adjudicara, motivo por el cual, debía acreditar en la propuesta, de manera indubitable y por manifestación expresa, su voluntad libremente expresada en ese sentido. Es decir, que en el caso concreto, la solidaridad no era una condición impuesta por el ICE, sino una obligación libremente asumida y adquirida por la empresa Holding **GTE CORPORATION,** que expresó en su momento por escrito en documentos legalizados, su propósito comercial de actuar de esa manera.

**GTE CORPORATION** por virtud de una fusión de empresas en los Estados Unidos de América, se transformó en **VERIZON COMMUNICATIONS INC.**, Holding del Grupo VERIZON, de manera que resulta evidente, que las relaciones derivadas del Contrato Administrativo de la Licitación Pública Internacional 6378-T y sus efectos jurídicos para el cumplimientos de sus deberes y obligaciones, no sufrieron alteración alguna, permaneciendo inalteradas, firmes y vigentes, puesto que la obligada frente al ICE es la misma empresa (el Consorcio adjudicatario) pero con distinto nombre o razón social.

7.- Dicho lo anterior, resulta más que evidente que las empresas demandadas Verizon Communications Inc. y Verizon Information Services – Costa Rica- LLC integran un grupo de interés económico, que convencionalmente podemos llamar GRUPO VERIZON, que es el mismo grupo de interés económico que en su momento se denominó GRUPO GTE, integrado por el Consorcio GTE y por GTE CORPORATION, a quien se adjudicó la Licitación Pública No. 6378-T promovida por el ICE conformando un contrato administrativo que por medio de este grupo de interés económico se ejecutó, a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

8).- Al contestar las especificaciones invariables del cartel en la Licitación Pública 6378-T, el Consorcio GTE indicó en la respuesta a la

Cláusula 1.1 y refiriéndose al objeto del contrato, que es para el Desarrollo e Implementación de Servicios de Información, que incluye el desarrollo, mercadeo, producción y distribución de las Guías Telefónicas, así como productos y servicios complementarios y sustitutos de las Guías Telefónicas.

Si se toma en cuenta que de conformidad con el criterio de la Procuraduría General de la República, en su pronunciamiento No. C-152-2000, que es vinculante para toda la Administración Pública, en el que declaró que el suministro de las Guías Telefónicas por el ICE para todos sus usuarios es una obligación ineludible, porque se trata de **un servicio público**, es evidente que en el contrato administrativo adjudicado en la Licitación Pública 6378-T, hay un objetivo principal y otros que son secundarios.

Desde esta dimensión del servicio público, el objetivo principal del contrato administrativo es el deber de editar, publicar y distribuir las Guías Telefónicas a todos los usuarios del servicio telefónico, y todo lo demás, es accesorio y prescindible, lo que se entiende si se analiza que es posible publicar las Guías Telefónicas sin ninguna publicidad comercial en el directorio; pero en cambio, no es posible publicar un libro de publicidad comercial, pero sin incluir los nombres y los números telefónicos de todos los usuarios del servicio telefónico.

Así lo reconocieron las partes – Consorcio GTE y el ICE- al describir los trabajos que corresponden al contrato en la Cláusula Segunda "Descripción del Trabajo": las Guías Telefónicas es lo principal y lo demás lo accesorio.

Consecuentemente, al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación.

Si bien el contrato administrativo se formalizó entre el Consorcio GTE y el ICE, en el Cartel de la Licitación se exigió, como se demuestra en los Hechos que

van del 4) al 9) y el 29) de esta Demanda, que la parte principal del contrato se debía formalizar con una empresa radicada en Costa Rica, lo que se hizo históricamente con **THS**, contratación que debía ser conocida y aprobada previamente por el **ICE** para que fuera válida.

Consecuentemente, el Contrato que firmó THS con el Grupo GTE (luego Grupo VERIZON) y que aprobó y autorizó el ICE, es por su naturaleza un contrato que se rige por los principios del servicio público y queda regulado por sus principios, normas y valores.

### D).- DAÑOS Y PERJUICIOS RECLAMADOS.-

Como queda demostrado de la relación de Hechos expuesta en esta Demanda, comprobados con los elementos probatorios que la soportan, la empresa  actora le exige a las demandadas indemnizarla con el pago de los daños y perjuicios irrogados con sus actuaciones,  que condujeron a las dos partes - **ICE** y **Grupo Verizon**- a dar por terminado el contrato administrativo formalizado entre ambas en el trámite de la Licitación Pública Internacional No. 6378-T promovida por el **ICE.**

Ese contrato administrativo es el que le dio sustento jurídico y comercial a la negociación que se formalizó, a su vez,  en un contrato entre la actora con el **Grupo GTE** que luego cambiaría su razón social por **Grupo Verizon.**

La gravedad de las actuaciones y omisiones de las demandadas y los efectos que sus conductas condujeron a **THS**, irremediablemente, a cesar en toda actividad comercial; a colocarse en estado de incapacidad absoluta de pago de las obligaciones contraídas con instituciones financieras y comerciales, para poder cumplir con los deberes impuestos en la formalización del contrato con **Grupo Verizon** que el **ICE** aprobó; y, por último, a la liquidación de toda sus

actividades empresariales que había venido ejerciendo por casi cien años consecutivos.

En el informe económico financiero que se adjunta, elaborado por el conocido experto Tomás Evans Salazar, Licenciado en Administración de Negocios, se le da sustento técnico a las consecuencias de los incumplimientos de los contratos por el Grupo **Verizon** en Costa Rica, Belice y República Dominicana.

En este estudio se sustenta la estimación de los daños y perjuicios originados en la irregular ejecución de los contratos formalizados a partir del año 2000, que impusieron a **THS** la obligación de hacer inversiones especiales para aumentar la capacidad de trabajo (en planta física, maquinaria y equipo), para elevar a niveles razonables la producción de guías telefónicas según los volúmenes de producción exigidos por las demandadas.

Por consiguiente, y de conformidad con esos estudios económicos adjuntos, en la demanda se reclama de las demandadas el resarcimiento de los siguientes extremos o partidas, todas ellas liquidadas al 31 de agosto del 2008:

Con fundamento en el estudio elaborado por el Licenciado Tomás Evans Salazar, miembro del Colegio de Profesionales en Ciencias Económicas, carné 11968 y que se adjunta como prueba pericial que deberá ser ratificada por los peritos que nombrará el Tribunal, esta demanda identifica como extremos que integran los daños y perjuicios irrogados por las demandadas contra la parte actora, el importe que debió inmovilizarse por inversión en maquinaria, el incremento en los inventarios promedio que debió mantener de los años 2000 al 2004, los flujos previstos y no realizados desde el período 2004 hasta el 2007, los intereses pagados inherentes a las operaciones suscritas por compra de maquinaria y financiamiento de infraestructura, la interrupción de operaciones, el daño moral asociado, los intereses que producen esos extremos hasta la total cancelación de los montos que se fijen en sentencia y finalmente, las costas de este proceso.

Las estimaciones realizadas se fundamentan en la información contable de los períodos que van del 31 de diciembre de 1990 al 31 de marzo del 2004 y que se encuentra debidamente asentada en los libros contables de la empresa. Además para los estados financieros del 2000 al 2004, en los cálculos se incorporaron los ajustes necesarios para salvar las excepciones interpuestas por los auditores en cada uno de esos períodos, relativas al desarrollo de nuevos proyectos.

Las tasas aplicables a los cálculos corresponden a tasas promedio calculadas con base en publicaciones del Banco Central de Costa Rica.

Se han utilizado con criterio conservador las herramientas de aplicación normal en materia de información prospectiva y retrospectiva, que implican la utilización de fórmulas para determinar promedios, valores futuros, valores actuales, estimaciones basadas en regresiones y otros.

Los períodos 2003 y 2004 se presentan agrupados en atención a que se produjo un cambio en el período contable del año 2003, conforme a lo dispuesto en el párrafo segundo del artículo 4 de la Ley del Impuesto sobre la Renta, que implicó que la información financiera auditada abarcara del primero de octubre del 2003 al 31 de marzo del 2004.

## SUPUESTOS DE ESTIMACIÓN DE LOS DAÑOS Y PERJUICIOS

| Concepto a Indemnizar | Supuestos |
|---|---|
| Por Inversión en Maquinaria | • Cálculo de valor futuro de inversiones registradas contablemente menos el precio de venta de la máquina rotativa y sus |

| | |
|---|---|
| | complementos. |
| | • Fecha de corte 31 de agosto del 2008. |
| | • Tasa aplicada 16.94% anual promedio. |
| **Por Incremento en Inventarios** | • Se calculó el valor futuro del incremento de la inversión realizada en inventarios comparando el promedio de los períodos 1997 al 1999 con los niveles de inventario del período 2000 al 2004. |
| | • Fecha de corte 31 de agosto del 2008. |
| | • Tasa básica anual promedio pasiva aplicable para el período correspondiente. |
| **Por Ganancias no realizadas P 2004-2013** <br><br> **Costa Rica y República Dominicana** | • Se procedió a calcular los valores futuros y presentes de los flujos de efectivo que la empresa hubiese generado con apego a los términos de la contratación y según la estimación de ingresos basada en los millares de páginas previstos. |
| | • Fecha de corte 31 de agosto del 2008. |
| | • Tasa aplicada 2.79% anual promedio. |
| | • Tasa de inflación promedio U.S.A 3.54% anual. |
| **Por Pérdidas realizadas 2004 al 2007** | • Se llevaron a valor futuro las pérdidas resultantes para los períodos comprendidos entre el año 2004 y el 31 de diciembre del 2007. |
| | • Fecha de corte 31 de agosto del 2008. |
| | Tasa aplicada 2.79% anual promedio. |

| Concepto a Indemnizar | Supuestos |
|---|---|
| **Intereses** | • Fueron considerados cada uno de los intereses pagados a Banco Cuscatlán y a la empresa proveedora de Heildelberg según su fecha de registro contable, y sus importes fueron llevados al valor futuro. |
| | • Fecha de corte 31 de agosto del 2008. |
| | • Tasa aplicada 2.79% anual promedio. |
| **Por interrupción de operaciones** | • Con base en la información de los estados financieros auditados que abarcaron los años de 1991 a 1999, se proyectaron los flujos de efectivo que la empresa hubiese generado sin que mediara en sus operaciones la participación del contrato con Verizon. |

## Detalle de Cálculo

### 1).- Inversión en Maquinaria

Para el cumplimiento de los contratos suscritos con Verizon Information Services – Costa Rica, LLC, Verizon Information Services – Belice, LLC, y GTE Directorios República Dominicana, C por A., fue necesaria la compra de una Máquina Rotativa y todo el equipo accesorio marca Heidelberg con un costo de adquisición de ¢ 955.116.741,oo incluyendo las erogaciones capitalizables necesarias para su puesta en operación.

Debido a la no continuidad del contrato en los términos originalmente pactados, la máquina rotativa dejó de operar. Este equipo especializado fue finalmente rematado por la compañía vendedora en junio del 2007. El procedimiento para determinar la pérdida originada en la venta judicial de la máquina es el siguiente:

Se procedió a actualizar el costo original del equipo y la máquina rotativa para expresarlo en colones de junio del 2007, mes en que quedó firme esa subasta judicial. Igual procedimiento se aplicó con el importe de la revaluación realizada en diciembre del 2004. Para tales efectos se utilizaron factores de ajuste monetario calculados con base en el Índice de Precios al Consumidor publicado por el Banco Central de Costa Rica.

Del mismo modo se indexaron los importes de depreciación acumulada del costo histórico del equipo y la máquina rotativa y de la revaluación que se practicó a la misma, a fin de reexpresarla en colones de junio del 2007. Seguidamente, se determinó la pérdida, producto de la diferencia entre el valor neto de la maquinaria al 30 de junio del 2007 y el precio de venta de la misma a esa fecha.

El importe resultante fue reexpresado en colones de agosto del 2008 utilizando el referido Índice de precios al consumidor. Esta cifra fue convertida a su equivalente en U. S. Dólares dividiéndola entre el tipo de cambio al 31 de agosto del 2008, publicado por el Banco Central de Costa Rica.

Dado que la referida inversión en maquinaria, no habría sido necesaria para la empresa de no haber suscrito los contratos de marras (para cubrir requerimientos técnicos, de volumen y calidad previstos en los mismos), se requiere la indemnización por esa inversión y los gastos capitalizables incurridos inherentes a ella.

**Monto a indemnizar por este concepto**       **$ 2,582.156.oo**

### 2).-   Incremento en Inventarios.

Se produjeron diferencias significativas de la inversión en existencias, entre los períodos que van de 1997 a 1999 y entre el 2000 y el 2004. Estas variaciones fueron producto de la inversión necesaria en capital de trabajo para dar cumplimiento a los requerimientos de la contratación.

Por tanto, para calcular el perjuicio, se llevaron a valor futuro las variaciones en inventario expresadas en U. S. Dólares de los años 2000 al 2004, utilizando como fecha de corte el 31 de agosto del 2008. Para tales efectos se utilizó la tasa de interés pasiva neta promedio del Sistema Financiero para depósitos en dólares de los Estados Unidos de América para los períodos pertinentes.

**Monto a indemnizar por este concepto          $ 2,860.696.oo**

### 3).-   Flujos previstos y no realizados desde el período 2004 al 2013

Para calcular el daño y perjuicio derivado de esta situación por la contratación en Costa Rica, se utilizó el consumo de millares de páginas entre los años 2000 y 2003. Se proyectó la información del 2004 al 2013. Se aplicó la tarifa contractual de $ 1.20 por millar para los períodos 2004 y 2005 y la de $ 1.15 del 2006 al 2013 para establecer la cuantía de los ingresos proyectados. Se determinó el porcentaje de costo de ventas promedio histórico de los años 2000 al 2004. Se estimó el costo de ventas proyectado con base en ese porcentaje. Se determinaron los gastos de edición y administración correspondientes al período 2004. Se calculó el porcentaje de contribución de los millares de páginas producidos al total de ingresos por ese concepto. Se estimó, con base en el porcentaje de distribución dicho, la porción de gastos administrativos y de edición inherentes a los directorios de Costa Rica. Se determinó la inflación promedio de los Estados Unidos de América del período

2004 a junio del 2008. Se aplicó esa inflación a los costos (en US $) administrativos y de edición hasta el año 2013. Se calcularon los días transcurridos y por transcurrir entre el 31 de diciembre del 2004 y el 2013, respecto del 31 de agosto del 2008. Se calcularon valores futuros y valores actuales al 31 de agosto de 2008. El resultado del daño y perjuicio cuantificado asciende a la suma de $ 8,806.872.oo.

Con relación al daño y perjuicio generado en República Dominicana, producto de la misma resolución anticipada de contrato y de su ejecución parcial bajo parámetros distintos de los convenidos, se aplicó el mismo procedimiento de cálculo descrito en el párrafo anterior. El resultado del daño y perjuicio cuantificado asciende a la suma de $ 7,912.999.oo.

**Montos a indemnizar por estos conceptos**

| | |
|---|---|
| **Costa Rica** | **$ 8,806.872.oo** |
| **República Dominicana** | **$ 7,912.999.oo** |

**4).- Pérdidas realizadas 2004 a 2007**

Considerando las pérdidas resultantes para los períodos comprendidos entre el año 2004 y el 2007, se llevaron a valor futuro con fecha de corte 31 de agosto del 2008, cada uno de los importes de las mismas, utilizando la Tasa de interés pasiva neta promedio del Sistema Financiero para depósitos en US $, según información del Banco Central de Costa Rica.

**Monto a indemnizar por este concepto**       **$ 7,237.068.oo**

### 5)-    Intereses

Para calcular el importe requerido por el daño y perjuicio derivado de los intereses incurridos, fueron considerados cada uno de los cargos por intereses pagados a Banco Cuscatlán y a la empresa proveedora del equipo Heildelberg, según su fecha de registro contable, y sus importes fueron llevados a valor futuro, estableciendo como fecha de corte el día 31 de agosto de 2008. Para calcular el valor futuro de cada uno de esos desembolsos, se utilizó la Tasa de Interés Pasiva neta promedio del Sistema Financiero para depósitos en US$ según información del Banco Central de Costa Rica.

### Monto a indemnizar por este concepto       $    983.825.oo

### 6).-    Interrupción de operaciones

La compañía Trejos Hermanos Sucesores, S. A. (THS), ha mantenido operaciones en la industria de impresión durante décadas, para ser más preciso, desde 1912. Este antecedente supone la consolidación histórica de un negocio con operaciones normales. Sobre esta base se ha evaluado la trayectoria económica de la firma durante el período 1991-1999, cuyos estados financieros cuentan con dictamen de auditoría externa. Los personeros de la firma consideran que a partir del año 2000 las incidencias de la relación contractual con su contraparte, perjudican de manera considerable y acumulativa la gestión de la firma, hasta el punto de impedir su normal operación y, finalmente, hacer imposible la continuidad de la misma. Considerando este antecedente, se practicó un procedimiento técnico para la estimación del lucro cesante en US$. Este procedimiento incluye los siguientes puntos:

1. Análisis de la trayectoria económica real de la firma (cifras auditadas) durante el período 1991-1999.

2. Pronóstico de los resultados de los ingresos económicos para el período 2000-2014, sobre la base de las tendencias del período 1991-1999.

3. Estimación de los costos de venta y gastos de operación para el período 2000-2014, de conformidad con la proporción real que representaron dichos rubros en la estructura económica de la firma durante el período 1991-1999.

4. A la utilidad operativa se le suma la depreciación por constituir un gasto no efectivo, determinando así la Utilidad antes de Intereses, Impuestos, Depreciación y Amortización (UAIIDA).

5. A la UAIIDA se le resta la tasa de reinversión en activos fijos que razonablemente hubiese sido necesaria para mantener la continuidad operativa futura, con lo cual se estiman los flujos de efectivo anuales del período 2000-2013.

6. Se completa el flujo neto de efectivo calculando el valor presente de la perpetuidad del negocio, asumiendo, dado su antecedente histórico, la continuidad operativa de plazo indefinido. Una perpetuidad es un procedimiento técnico financiero que permite expresar el valor de los flujos futuros de un negocio, más allá del horizonte o plazo básico de planeación. Se toma el flujo de efectivo correspondiente al último año proyectado y se divide entre la tasa de rendimiento del negocio (tasa de actualización).

7. La perpetuidad incluye una tasa de crecimiento real del 3,28%, que corresponde conservadoramente a dos tercios del Producto Interno Bruto del período correspondiente a los años 2000 a 2007. La perpetuidad se basa en el principio técnico financiero que señala que generar permanentemente un flujo de efectivo, equivale a contar con el valor presente del mismo (en este caso, el valor al año 2007).

8. Se determinó la tasa de descuento de los flujos (tasa de actualización) considerando la Tasa Pasiva Promedio del período 2002 a 2008 en USA $ de la Banca Estatal en Costa Rica, la inflación promedio de los Estados

Unidos de América para el período 2002-2006, el riesgo del negocio y rendimiento que representa su UAIIDA histórica porcentual.

9. Se descontaron los flujos netos de efectivo a fin establecer el valor presente de las operaciones normales proyectadas para el período 2007 y siguientes y se actualizaron los valores correspondientes a los flujos del período 2000-2006, todo ello a fin de expresar los flujos en colones de diciembre del 2007.

**Monto a indemnizar por este concepto**          **$ 28,885.195.oo**

## Resumen de Partidas Reclamadas

TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA
RESUMEN DE ESTIMACION DE MONTOS INDEMNIZABLES
En USA $ Dólares

| Fecha de Corte | 31-ago-08 |
|---|---|
| Tasa Básica Pasiva Promedio 2000 - 2008 | 16.94% |
| Tasa de interés pasiva neta promedio del Sistema Financiero para depósitos en EUA$ - 2000-2008 | 2.79% |
| Tipo de cambio estimado al 31 de agosto 2008 | 547.93 |

| Elemento | Concepto | Monto en USA$ Al 30/06/2007 |
|---|---|---|
| 1 | Inversión en Maquinaria | 2.582.156 |
| 2 | Incremento en Inventarios | 2.860.696 |
| 3 A | Flujos de Caja Operativos no recibidos P 2004-2013 Directonos Costa Rica | 8.806.872 |
| 3 B | Flujos de Caja Operativos no recibidos P 2004-2013 República Dominicana | 7.912.999 |
| 4 | Pérdidas realizadas 2004 a 2007 | 7.237.068 |
| 5 | Intereses | 983.825 |
| 6 | Interrupción de operaciones | 28.885.195 |
| | TOTAL RUBROS A INDEMNIZAR | 59,268,811 |

**7).- Daño Moral causado.-**

Además de las partidas antes reclamadas, **THS** ha sufrido un severo daño moral, con las consecuencias directas del conflicto creado por las demandadas con la resolución del contrato suscrito el 28 de febrero del 2002.

La falta de volumen de producción necesario para producir los ingresos imprescindibles para poder cubrir los costos fijos, provocó, entre otros efectos negativos, que la empresa cesara en sus pagos y perdiera otros clientes.

La empresa y los socios que la avalaron, cayeron en la categoría ignominiosa de ser calificados como sujetos no aptos para el crédito, sobre todo, por causa de los atrasos en cumplir las obligaciones financieras y luego, por la imposibilidad real de poder enfrentar esas obligaciones.

Embargada la maquinaria y el equipo, ordenado el desalojo de las instalaciones industriales, cerrados los créditos bancarios y habiendo cesado en los pagos de los extremos laborales del personal de la empresa, todo ello en conjunto, impidió a la empresa y a sus socios buscar otras actividades productivas, a la vez que contagió, por ósmosis, las otras empresas de los socios que no tenían relación alguna con **THS.**

Véase la documentación legalizada de Caribbean Publishing Co., sus notas, sus correos sobre el directorio de la República de Honduras y el historial crediticio emitido por la Superintendencia General de Entidades Financieras (SUGEF) y de las protectoras de crédito, que integran todos el Documento N° 72 de la prueba documental.

**Monto a indemnizar por este concepto**          **$ 5,000.000.oo**

**8).- Intereses.-**

Por último, se reclama también el pago de los intereses sobre esas sumas a partir de la fecha de corte del cálculo, sea el 30 de agosto de 2008 y hasta la efectiva cancelación de las obligaciones, intereses que se calcularán de conformidad con lo que establece el artículo 1163 del Código Civil o sea, a la tasa que paga el Banco Nacional de Costa Rica por los certificados de depósito a seis meses plazo para la moneda de que se trate.

## E).- DERECHO.

La situación jurídica que se expone en la demanda revela la presencia de una relación contractual compleja.

La base de la cuestión es un contrato entre GTE (ahora VERIZON) y el ICE para la producción de directorios telefónicos celebrado en el año 2000. En ese contrato se exigía que la impresión de las guías telefónicas se realizara enteramente en Costa Rica, para lo cual GTE (ahora VERIZON) acordó en febrero de 2002 un "Contrato Maestro de Compra" con TREJOS HERMANOS SUCESORES, S.A. para producir, empacar y distribuir los directorios telefónicos.

Para la suscripción del Contrato Maestro de Compra GTE (ahora VERIZON), tomó en consideración los antecedentes altamente positivos de la eficiencia de THS en su continuada relación empresarial, así como la preparación material que GTE (ahora VERIZON) exigió a THS, como fue la transformación y ampliación de su planta industrial.

El Contrato Maestro de Compra GTE – THS constituyó la herramienta para que GTE cumpliera sus obligaciones con el ICE derivadas del contrato del año 2000. No puede comprenderse la existencia del Contrato Maestro de Compra

sin su soporte elemental que fue el contrato ICE – GTE. Incluso dicho Contrato Maestro, requirió ser aprobado por el ICE.

Como el ICE dispuso administrativamente la resolución del contrato con GTE (ahora VERIZON) del año 2000, por atribuirle a ésta un incumplimiento grave, el Contrato Maestro de Compra GTE – THS quedó sin el sustrato necesario para su ejecución.

Entonces las relaciones jurídicas citadas son ICE – GTE (VERIZON) – THS, constituyendo un complejo contractual en el cual las partes extremas (ICE y THS) no son totalmente extrañas, ya que aunque no son contratantes directos entre sí, ambos tenían conocimiento recíproco de su participación en la actividad material contratada (la producción de directorios telefónicos) e incluso el ICE mantenía un control y visitas periódicas a la planta de THS para supervisar la correcta impresión de los directorios telefónicos. Es de importancia destacar la aprobación del Contrato Maestro de Impresión por parte del ICE, lo que lo involucró necesariamente en la relación jurídica que es el fundamento de este litigio.

La extinción del contrato ICE – GTE (VERIZON) tuvo el efecto inmediato de hacer imposible la ejecución del contrato GTE (VERIZON) – THS. De manera que todas las consecuencias negativas de esa imposibilidad de ejecución (daños y perjuicios causados a THS) descansa en la extinción del contrato ICE – GTE (VERIZON).

Hay dos relaciones contractuales: ICE – GTE (VERIZON) y GTE (VERIZON) – THS. Y existe una relación extracontractual que es ICE – THS.

La extinción del contrato ICE – GTE (VERIZON) constituye un **incumplimiento objetivo** del contrato GTE (VERIZON) – THS. Ese incumplimiento objetivo es imputable a GTE (VERIZON), por lo que ésta entidad debe responder por los daños y perjuicios causados, según el principio general de la responsabilidad contractual establecido en el artículo 702 del Código Civil.

Y los daños y perjuicios sufridos por THS por el incumplimiento objetivo de su contrato con GTE (VERIZON) fueron generados por la actuación del ICE, que dio por resuelto su contrato con GTE (VERIZON), sin respetar los intereses legítimos que THS tenía en esa contratación, con lo que violentó el principio *Neminem laedere* –no dañar a otros-. El ICE incurrió en responsabilidad civil conforme la aplicación de los principios de la Ley General de la Administración Pública (artículos 190 y siguientes), ya sea que se considere su actuación lícita (artículos 194 y 195) o ilícita (artículos 191 y 192). El artículo 1045 del Código Civil también es fundamento de esa responsabilidad.

Los daños y perjuicios cuya indemnización se reclama por parte de THS a los demandados, son consecuencia inmediata y directa de las actuaciones antijurídicas que se imputan a los demandados. Se cumple así con lo previsto en el artículo 704 del Código Civil, al constatarse que lo imputado a los demandados, es la causa única de tales daños y perjuicios. Los daños y perjuicios reclamados son de naturaleza previsible, porque los demandados podían, racionalmente, estimar que se iban a causar a THS por las actuaciones alegadas.

El daño emergente o disminución patrimonial propiamente dicha, consiste en los bienes y derechos que THS vio desaparecer de su patrimonio, por la extinción de la relación contractual compleja referida en esta demanda.

Los perjuicios, lucro cesante, están representados por los bienes y derechos que necesariamente debían entrar al patrimonio de THS (como es el caso claro de las utilidades previstas y previsibles) y que no fue posible que se produjeran, por la extinción de la citada relación contractual compleja.

Esa extinción de la relación contractual causó daño moral a THS, al desaparecer por causa de las actuaciones de los demandados, el prestigio empresarial que se forjó desde la fundación de la empresa en el año 1912, lo que debe ser indemnizado según lo ordena el artículo 59 del Código Civil, que

fija el principio general de derecho de la indemnización por lesión a los derechos de la personalidad.

En esta demanda se presentan hechos que revelan la existencia de un *grupo de interés económico*, integrado por las empresas del GRUPO VERIZON, para destacar que la responsabilidad civil que se reclama en la pretensión abarca al *ente de mayor jerarquía* que es VERIZON COMMUNICATIONS INCORPORATED.

Debe subrayarse que la Sala Primera de la Corte Suprema de Justicia ha utilizado el concepto de *grupo de interés económico* para asignar responsabilidad civil por actuaciones de las entidades que lo integran. Es en la sentencia número 000973-F-2005 de las 16 horas del 15 de diciembre de 2005 que ese alto Tribunal (declarando sin lugar un recurso de casación) respalda el criterio del Tribunal Segundo Civil de San José relativa a la responsabilidad que compete al *"ente de mayor jerarquía"* dentro del grupo.

Los grupos de interés económico han sido también denominados "redes contractuales económicamente eficientes", con lo que se intenta poner en juego el principio de la relatividad contractual, en el sentido de que solamente quienes aparecen formalmente como partes en el contrato pueden ser sujetos de los derechos y las obligaciones que de él se derivan. Pero si se considera que la "red contractual económicamente eficiente" o el "grupo de interés económico" son instrumentos para abusar de la personalidad jurídica, debe entenderse que tal abuso de derecho está condenado expresamente por el artículo 22 del Código Civil. El artículo 432 del Código de Comercio (citado en otra sentencia referente a grupos de interés económico) dispone que entre codeudores la obligación es solidaria. Es esa solidaridad entre codeudores la que se reclama en este proceso.

Las cláusulas exonerativas de responsabilidad civil que por imposición de VERIZON se incluyeron en el contrato maestro de compra, necesariamente son ineficaces por principios imperativos de Derecho Público. Debe destacarse que si bien el contrato Verizon – THS se suscribió con las formas de un

acuerdo comercial, por su objeto y por sus efectos es de naturaleza administrativa. La Procuraduría General de la República ha expresado, en opinión vinculante y como queda dicho en esta demanda, que la edición, impresión y distribución de las guías telefónicas constituye un servicio público, por lo que, se añade, los convenios que tengan como objeto la edición, impresión y distribución de guías telefónicas también tienen naturaleza administrativa, y frente a esta realidad jurídica, no procede la exoneración anticipada de responsabilidad frente a la Administración por la vía del convenio, como no procede la renuncia a ninguno de los privilegios de la Administración, puesto que en el manejo de sus asuntos tienen que ver con la Hacienda Pública, protegidas por principios de rango constitucional. Tales privilegios, por principio administrativo cobijan, no sólo el contrato que "aparezca" como principal, sino que se comunica, también, a las subcontrataciones que se formalicen para hacer cumplir con todos los efectos que se esperan del servicio público.

Por otro lado, desde una perspectiva de Derecho Privado, nótese que las cláusulas exonerativas de responsabilidad civil contractual contenidas en el CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES también son nulas e ineficaces.

Esas cláusulas están integradas a un **contrato de adhesión**, ya que el contenido de ese acuerdo sólo permitía la aceptación o el rechazo por parte de TREJOS HERMANOS, y la nulidad de tales cláusulas resulta de su naturaleza **abusiva**. Esa nulidad está reconocida en el artículo 1023, inciso m), del Código Civil y en el artículo 42 de la Ley 7472 de 19 de enero de 1995 (Ley de Promoción de la Competencia y Defensa Efectiva del Consumidor).

En última hipótesis, esas cláusulas exonerativas de responsabilidad civil son ineficaces cuando están referidas a un incumplimiento doloso, de conformidad con lo dispuesto por el artículo 701 del Código Civil. Y el incumplimiento del CONTRATO MAESTRO DE COMPRA por parte de VERIZON es doloso: esta empresa pudo cumplir sin tener obstáculos materiales para ello, pero no ejecutó sus obligaciones. Tal circunstancia se revela en que VERIZON intentó

modificar unilateralmente su contrato con el ICE, para no cumplir sus obligaciones originales, lo que se comunicó al cumplimiento por parte de VERIZON del Contrato Maestro de Compra con la parte actora. Eso es dolo en la ejecución de un contrato, de acuerdo con la doctrina de la Sala Primera de la Corte Suprema de Justicia establecida en la sentencia número 320 de las 14.20 horas del 9 de noviembre de 1990. Como consecuencia de ese incumplimiento doloso, son ineficaces todas las cláusulas contractuales que pretendieran exonerar de responsabilidad civil a VERIZON.

## F).- PRETENSIÓN.

Con fundamento en lo explicado en el Capítulo D) anterior, sobre los Daños y Perjuicios reclamados, de conformidad con los Hechos de la Demanda, la prueba aportada y los estudios económicos que se adjuntan, demandamos en esta vía al **Instituto Costarricense de Electricidad** y a las empresas **Verizon Communications Incorporated** y **Verizon Information Services – Costa Rica- LLC,** para que en sentencia se declare con lugar la demanda en todos sus extremos y se las condene, solidariamente, al pago de los daños y perjuicios irrogados.

Consecuentemente, pedimos que en sentencia se declare:

**1).-** Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A (que cambió su razón social a VERIZON INFORMATION SERVICES – COSTA RICA, LLC) constituyó un **medio de ejecución** del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephone Directory Company C por A", empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la

adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000.

**2).-** Que el citado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A, fue del conocimiento del INSTITUTO COSTARRICENSE DE ELECTRICIDAD, **que aprobó la intervención de TREJOS HERMANOS SUCESORES S.A. en la ejecución del contrato administrativo adjudicado al Consorcio GTE** resultante de la Licitación Pública No. 6378-T promovida por el ICE.

**3).-** Que la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

**4).-** Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE.

**5).-** Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

**6.-** Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con

General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A.

**7.-** Que las empresas demandadas Verizon Communications Inc., Verizon Information Services –Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.

**8).-** Que **"VERIZON COMMUNICATIONS INCORPORATED"** es el ente de mayor jerarquía de un grupo de interés económico del que forma parte **"VERIZON INFORMATION SERVICES –COSTA RICA- LLC",** por lo que la primera de esas sociedades responde solidariamente con la segunda por todas las obligaciones contraídas por "VERIZON INFORMATION SERVICES – COSTA RICA- LLC", con **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA.**

**9).-** Que las empresas demandadas **Verizon Communications Inc. y Verizon Information Services –Costa Rica- LLC** son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A.

**10).-** Que el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** desconoció los derechos e intereses legítimos de **TREJOS HERMANOS SUCESORES S.A.** derivados de la ejecución de la Licitación Pública No. 6378-T a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002, por lo que es responsable solidario con Verizon Communications Inc., Verizon Information Services –Costa Rica- LLC de la indemnización de los daños y perjuicios sufridos por la actora por la extinción del citado Contrato Maestro de Compra suscrito el 28 de febrero del 2002.

**11).-** Que son nulas e ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON.



**12).-** Que los demandados el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** y las empresas **Verizon Communications Inc.** y **Verizon Information Services –Costa Rica. LLC** deben pagarle a la parte actora, solidariamente, los daños y perjuicios irrogados, que liquidamos de la siguiente manera:



| | |
|---|---|
| a) Inversión en maquinaria | $ 2.582.156 |
| b) Incremento en inventarios | $ 2.860.696 |
| c) Flujos de Caja Operativos no recibidos 2004-2013 Directorios Costa Rica | $ 8.806.872 |
| d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana | $ 7.912.999 |
| e) Pérdidas realizadas 2004 a 2007 | $ 7.237.068 |
| f) Intereses pagados por THS | $ 983.825 |
| g) Interrupción de Operaciones | $28.885.195 |
| h) Daño Moral | $ 5.000.000 |

i) De conformidad con lo que dispone el artículo 123 del Código Procesal Contencioso Administrativo se concederá, además, la actualización de las sumas de la condenatoria para compensar la variación en el poder adquisitivo y se reconocerán Intereses de todas las partidas anteriores que se pagarán a partir del 30 de agosto del 2008 y hasta que se cancelen totalmente, que se calcularán de conformidad con lo que dispone el artículo 1163 del Código Procesal Civil.

**13).-** Los demandados deberán pagar solidariamente a la parte actora  las costas personales y procesales de este asunto.

**Estimación de la Demanda:** La estimamos en la suma de los extremos reclamados US $ 64,268,811 (sesenta y cuatro millones doscientos sesenta y ocho mil ochocientos once dólares de los Estados Unidos de América).

### G.- PRUEBA.-

#### I.- Documental:

Acompañamos la siguiente prueba documental, que se refiere a la necesaria para comprobar los Hechos de la Demanda.

**Documento No. 1.-** Certificación notarial de la personería de don Alvaro Trejos Fonseca, Presidente con facultades de apoderado generalísimo sin límite de suma, de la empresa actora.

**Documento No. 2.-** Certificación notarial de la inscripción registral de la firma Verizon Information Services –Costa Rica- LLC, en la que consta que su Agente Residente es el Licenciado Hernán Pacheco Orfila, abogado, vecino de San José, con oficina en el Bufete Pacheco Coto, avenida once, calles cinco y siete, cédula de identidad 1-585-980. Adicionalmente, se adjunta la publicación de las páginas de internet en las que constan los estatutos, el certificado de incorporación, la lista de directores y la historia corporativa de Verizon Communications Inc. Consta en ellos, que Ivan G. Seidenberg es el Presidente de la Junta Directiva y Principal Oficial Ejecutivo y William P. Barr es el Vicepresidente Ejecutivo y Abogado General.

**Documento No. 3.-** Certificación notarial en la que consta la inscripción original de la Sociedad Colectiva Trejos Hermanos, luego transformada en Trejos Hermanos Sucesores, S.A., cuyo plazo social se inició el día primero de

enero de 1912 y vence el 30 de setiembre del año 2025. Se adjunta, también *Sí*
con el mismo documento, un ejemplar de la Lista de Abonados (guía
telefónica) de Costa Rica de 1918, históricamente es la primera editada en el
país.

**Documento No. 4.-** Fotocopias de las portadas de las Guías Telefónicas *NO*
impresas por THS para los diferentes países de Centro América, el Caribe y
ciudades de Estados Unidos. *irrelev*

**Documento No. 5.-** Copia de la certificación expedida por don José María *irrelev*
Quirós Alfaro, Gerente General de GTE Costa Rica de fecha 26 de enero de
1999.

**Documento No. 6.-** Folios del 12 al 87 del Tomo II de la prueba documental, *no está*
en los que consta el contrato inicial firmado por GTE y el ICE, con sus
addendas e información adicional, prueba que se refiere a los Hechos de la
Demanda 4, 16, 17, 18, 29 y 35.

**Documento No. 7.-** Copia de las escrituras públicas certificadas *Sí*
notarialmente, en la que se formalizaron contratos entre GTE y THS para
levantar, componer, imprimir y encuadernar las guías telefónicas en Costa Rica
para los contratos de los años 1978 y 1981.

**Documento No. 8.-** Copia de la carta enviada por el Gerente de GTE Costa *Sí*
Rica el 18 de diciembre de 1995 a la Junta Directiva de Antel, en El Salvador, *irrelev*
en la que hace consta que el respaldo de GTE Directories a THS es el más
amplio posible y abarca todos los aspectos necesarios para que la operación
de los directorios sea todo un éxito; GTE pondrá a disposición de THS todos
los recursos y la tecnología necesarios para cumplir y superar las proyecciones
de ventas y demás aspectos contemplados en la licitación. *→ Sí TRADUO*

**Documento No. 9.-** Copias certificadas de órdenes de compra expedidas por *SIN TRADUC*
Verizon Servicios de Información Dominicana S.A. en República Dominicana, a *irrelev.*
favor de THS para editar e imprimir directorios para ese país, que

corresponden a los años 1995, 1997, 1999, 2000, 2001 y 2002. Se incluye copia de los Estados Financieros de THS al 30 de setiembre de 1989, al 30 de setiembre de 1992 y 1991, al 30 de setiembre de 1993 y 1992 en donde constan los compromisos (contratos vigentes) con República Dominicana, Costa Rica, Honduras y Jamaica.

**Documento No. 10.-** Copia certificada y traducción oficial del contrato de Agencia y Cooperación entre GTE y THS; copia traducida y certificada de la carta del 4 de noviembre de 1996 que envió la abogada de GTE Sandra Parker a los ejecutivos Scout Hanle y Doug LaVelle y una copia de la certificación expedida por el Notario Mario Quintana Musmanni, sobre la ejecución del contrato. Integran también el Documento No. 10 traducciones oficiales de la evaluación que hizo GTE por medio de su agente Bruce Wataru del 15 de marzo de 1999, del equipo existente en las instalaciones de THS y de las recomendaciones para modernizar la planta de impresión y los detalles y también la traducción de la correspondencia con Art Nixon, para suministrar papel y para cotizar directorios para Puerto Rico para el 2001.

*Sí
— ireleu.*

**Documento No. 11.-** Copia del contrato firmado por General Telephone Directory Company, C. por Ac y Trejos Hermanos Sucesores, S.A. el 21 de enero del 2000 como consta en el Anexo (Exhibit E) y que luego sería modificado por las partes, junto con las órdenes de compra para imprimir las guías telefónicas para el año 2000.

*NO ESTÁ TRADUCIDO*

**Documento No. 12.-** Formado por los folios del 294 al 317 del Tomo II de la prueba documental, en los que consta la última versión del contrato firmado por GTE y el ICE para la Licitación 6378-T y en sus antecedentes se lee la información que concierne a esa licitación.

*Tomo II*

**Documento No. 13.-** Formado por los folios del 1 al 11 del Tomo II de la prueba documental y se integra con copias de parte de la oferta presentada por el Consorcio GTE con la información que se indica en el Hecho 11 de la Demanda.

**Documento No. 14.-** Formado por los folios del 125 al 160 del Tomo II de la prueba documental y son documentos que tienen que ver y prueban los Hechos 12 y 24 de la Demanda.

**Documento No. 15.-** Formado por los folios del 88 al 124 del Tomo II de la prueba documental y son documentos que tienen que ver con los Hechos 19, 20, 21, 22 y 23 de la Demanda.

**Documento No. 15-A.-** Formado por los folios del 199 al 293 del Tomo II de la prueba documental y son documentos que tienen que ver con el Hecho 23 de la Demanda.

**Documento No. 16.-** Formado por los folios del 161 al 192 del Tomo II de la prueba documental y son documentos que tienen que ver con el Hecho 25 de la Demanda.

**Documento No. 17.-** Es copia certificada de la Cláusula 2.4.1.B del Cartel de la Licitación Pública 6378-T del ICE.

**Documento No. 18.-** Formado por los folios del 193 al 198 del Tomo II de la prueba documental y son documentos que tienen que ver con el Hecho 27 de la Demanda.

**Documento No. 19.-** Copia certificada del Contrato Maestro de Compra firmado por Verizon y THS el 28 de febrero del 2002 con sus Anexos, en versión de traducción oficial, documento que prueba en los Hechos 30 y 33.

**Documento No. 20.-** Copia del Plan de Inversión presentado por THS para la compra de la Máquina Rotativa Heidelberg por la suma de CIF US $ 2.700.000.

**Documento No. 20-A.-** Traducción Oficial de los documentos de compra de la Máquina Rotativa Heidelberg.

**Documento No. 21.-** Copia certificada del contrato de arrendamiento firmado por THS con la firma Inmobiliaria Zoroaster, S.A., para el alquiler de la planta física en Cartago.

**Documento No. 22.-** Traducción Oficial y certificación notarial de la Carta enviada por Douglas C. LaVelle, Presidente de GTE Directories Internacional a THS el 15 de octubre de 1999, proponiendo los términos para convenir sobre los directorios telefónicos de República Dominicana y Costa Rica, con las condiciones impuestas. El Documento prueba en los Hechos del 37 al 42 inclusive.

**Documento No. 23.-** Traducción Oficial de los mensajes enviados por Terrence Mirtchell Leve, Sr. Abogado Superior de GTE, del 20 de agosto de 1999, en los que propone que es objeto de las conversaciones obtener un contrato de largo plazo con THS y eventualmente, suscribir un joint venture; la necesidad de aumentar la producción de directorios telefónicos en otros países, como República Dominicana, para lograr precios que sean adecuados para GTE; la necesidad de que THS cambie el equipo para ser más eficiente con el costo y la posibilidad que GTE suministre servicios técnicos por medio de expertos que visiten las plantas de THS. Los documentos prueban en el Hecho No. 43.

**Documento No. 24.-** Traducción Oficial del documento que envió el 15 de noviembre de 1999 Art Nixon, para probar el contenido del Hecho 45 de la Demanda.

**Documento No. 25.-** Copia certificada de la nota enviada por José María Quirós, Gerente General de GTE al ICE el 31 de agosto del 2000, remitiendo para homologación el subcontrato de impresión de las guías telefónicas del año 2001 al 2008, de conformidad con las cláusulas 2.13.1 y 3.13.5, suscrito por GTE con THS. En la nota el Gerente de GTE dice que la empresa escogida es THS de reconocida experiencia a nivel nacional e internacional, firma que ha sido la encargada, en los últimos 25 años, de la impresión de la guía

telefónica que el ICE le ha confiado a GTE. El Documento prueba en el Hecho 47.

**Documento No. 26.-** Traducción Oficial de los dos mensajes enviados por Art Nixon de Verizon, los días 1 de febrero y 16 de setiembre del 2001, que hacen prueba en el Hecho 48 de la Demanda.-

**Documento No. 27.-** Copias certificadas de los documentos de parte de los financiamientos asumidos por THS con el Banco Interfin S.A. y la línea de crédito con el Transamérica Bank and Trust.

**Documento No. 28.-** Copias certificadas del Cronograma de Producción de las Guías Telefónicas del año 2005 y prueba en el Hecho No. 50 de la Demanda.

**Documento No. 29.-** Copias certificadas de las órdenes de compra emitidas por Verizon para la producción de las guías telefónicas del año 2005 señaladas en el Hecho No. 51 de la Demanda.

**Documento No. 30.-** Copias certificadas de las órdenes de compra sustitutas para las guías del año 2005 emitidas por Verizon, que se analizan en los Hechos 52, 53 y 54 de la Demanda.

**Documento No. 31.-** Copia certificada del documento que presentó Verizon en la Subgerencia de Telecomunicaciones del ICE el 13 de mayo del 2004, proponiendo modificar el sistema de publicación de los directorios telefónicos para el año 2005, de conformidad con los términos del contrato y que se refiere al Hecho 55 de la Demanda.

**Documento No. 32.-** Copia certificada del acuse de recibo de la nota del 13 de mayo del 2004, enviada por el Subgerente de Telecomunicaciones exigiendo, de previo, que se ajusten los términos de la garantía de cumplimiento. La nota hace al Hecho 56 de la Demanda.

**Documento No. 33.-** Copia certificada del oficio 6000-41046-2004 del 15 de julio del 2004 enviada por el Subgerente de Telecomunicaciones a Verizon, señalando que si no hay consenso entre las partes, la guía del 2005 se debe producir en estructura y cantidad igual a la del 2004 y se refiere al Hecho 57 de la Demanda.

**Documento No. 34.-** Copia certificada de la nota enviada por Verizon el 8 de setiembre del 2004 a la Subgerencia de Telecomunicaciones, haciendo valer el silencio positivo por falta de respuesta del ICE y que se refiere al Hecho 58 de la Demanda.

**Documento No. 35.-** Copia certificada del oficio 6000-52278-2004 del 14 de setiembre del 2004, que la Subgerencia de Telecomunicaciones del ICE le envía a Verizon, rechazando el reclamo del silencio positivo y mantener las condiciones contractuales vigentes, que se analiza en el Hecho 59 de la Demanda.

**Documento No. 36.-** Copia certificada de la nota enviada por Verizon a la Subgerencia de Telecomunicaciones del ICE el 8 de noviembre del 2004 reiterando el reclamo del silencio positivo y que prueba en el Hecho 60 de la Demanda.

**Documento No. 37.-** Copias certificadas de las escrituras públicas levantadas por notarios, sobre el proceso de producción de los directorios telefónicos para el año 2005, que prueban en los Hechos 61 y 63 de la Demanda.

**Documento No. 38.-** Copia certificada del oficio S.I.-0726-11-04 del 15 de noviembre del 2004, enviado por la Licda. Agnes Paniagua Cubero del ICE a Verizon, requiriendo información sobre la garantía de cumplimiento y sobre la estructura de la guía telefónica del Area Metropolitana, lo que prueba el Hecho 62 de la Demanda.

**Documento No. 39.-** Copia certificada del oficio S.I.-0730-11-04 del 17 de noviembre del 2004, en el que la Licda. Agnes Paniagua informa a los diferentes despachos del ICE sobre la reunión con Verizon de ese mismo día. Atañe al Hecho 63 de la Demanda.

**Documento No. 40.-** Copias certificadas del oficio 6000-64540-2004 del 18 de noviembre del 2004, en el que la Subgerencia de Telecomunicaciones del ICE le señala al Vicepresidente para Latino América y Asia de Verizon Information Services, en el sentido de mantener las condiciones originalmente pactadas en el contrato para la producción de las guías telefónicas para el año 2005. El Documento prueba el contenido del Hecho 64 de la Demanda.

**Documento No. 41.-** Copia certificada del oficio 0012-65785-2004 del 25 de noviembre del 2004 con el cual el ICE notificó a Verizon del acuerdo del Consejo Directivo que rechazó cualquier intención de variar unilateralmente las condiciones contractuales para la producción de guías telefónicas e insta a Verizon a cumplir en todos sus extremos el contrato vigente. El Documento prueba el Hecho 65 de la Demanda.

**Documento No. 42.-** Copia del oficio 6000-66202-2004 (SGT-2625-2004) del 29 de noviembre del 2004 que la Subgerencia de Telecomunicaciones del ICE le envía a Verizon notificándole el acuerdo con el artículo 10 del Acta de la sesión 5649 del 23 de noviembre del 2004, que prueba el Hecho 66 de la Demanda.

**Documento No. 43.-** Copia del Oficio 9100-UENSC-888 del 30 de noviembre del 2004 mediante el cual el UEN Servicio al Cliente del ICE, le comunica a Verizon que de acuerdo con lo resuelto por el Consejo Directivo, no se admitirá que el proceso de impresión de las guías telefónicas incumpla los términos convenidos en el contrato vigente. El Documento prueba el Hecho 67 de la Demanda.

**Documento No. 44.-** Copia certificada de la escritura número 131 otorgada ante la Notaria Pública Yaila Paola Sánchez Canessa a las once

horas del 2 de diciembre del 2004 sobre el proceso de impresión de las guías telefónicas del año 2005. El Documento prueba el Hecho 68 de la Demanda.

**Documento No. 45.-** Copias del Oficio S.I.-0759-12-04 del 13 de diciembre del 2004 enviado por el Proceso Servicios de Información del ICE a la Dirección de Proveeduría, acusando el incumplimiento contractual de Verizon y pidiendo iniciar el proceso de resolución del contrato y de ejecución de la garantía de cumplimiento. El Documento prueba el Hecho 69 de la Demanda.

**Documento No. 46.-** Copias del Oficio 5225-69163-2004 (AEG-0572-2004) enviado por la Dirección de Proveeduría del ICE a Verizon, notificando que se procede a la apertura del procedimiento de resolución del contrato y le concede audiencia para la presentación de los descargos y pruebas. El Documento prueba el Hecho 70 de la Demanda.

**Documento No. 47.-** Copias del escrito presentado por Verizon el 17 de diciembre del 2004, respondiendo la audiencia conferida y oponiendo la excepción previa de acuerdo arbitral. El Documento prueba el Hecho 71 de la Demanda.

**Documento No. 48.-** Copias del Oficio S.I.-0013-01-05 que Servicios de Información UENSC le envía el 7 de enero del 2005 a la Proveeduría solicitándole que no se le permita a Verizon cumplir las prestaciones del contrato a su cargo, dado el incumplimiento en que ha incurrido y que se dicten ciertas medidas cautelares para proteger los intereses públicos involucrados. El Documento prueba el Hecho 72 de la Demanda.

**Documento No. 49.-** Copias del Oficio 5225-00939-2005 (AEG-0020-2005) del 7 de enero del 2005 en el que la Dirección de Proveeduría le notifica a Verizon de las medidas cautelares dictadas. El Documento prueba el Hecho 73 de la Demanda.

**Documento No. 50.-** Copias del escrito presentado por Verizon el 10 de enero del 2005, impugnando las medidas cautelares. El Documento prueba el Hecho 74 de la Demanda.

**Documento No. 51.-** Copia del Oficio 0092-01644-2005 (DCA-020-05) del 12 de enero del 2005 mediante el cual la Dirección Jurídica Institucional del ICE recomienda denegar los recursos interpuestos por Verizon contra las medidas cautelares dictadas. El Documento prueba el Hecho 75 de la Demanda.

**Documento No. 52.-** Copia del Oficio S.I.-0025-01-2004 del 12 de enero del 2005 de la Licda. Agnes Paniagua recomendando, también, denegar los recursos administrativos contra las medidas cautelares. El Documento prueba el Hecho 76 de la Demanda.

**Documento No. 53.-** Copia del escrito presentado el 12 de enero del 2005 por Verizon ejerciendo su derecho de defensa dentro del procedimiento administrativo de resolución del contrato y que prueba el Hecho 77 de la Demanda.

**Documento No. 54.-** Copia del oficio 5225-03122-2005 (AEG-0060-2005) del 21 de enero del 2005 mediante el cual se declara sin lugar la revocatoria interpuesta por Verizon contra lo resuelto en oficio 5225-00939-2005 AEG-0020-2005 y se admite la apelación para ante la Subgerencia de Telecomunicaciones. El Documento prueba el Hecho 78 de la Demanda.

**Documento No. 55.-** Copia del escrito presentado por Verizon el 31 de enero del 2005 reiterando sus argumentos para respaldar la apelación presentada. El Documento prueba el Hecho 79 de la Demanda.

**Documento No. 56.-** Copias certificadas del oficio 5225-01843-2005 (AEG-0033-2005) del 13 de enero del 2005 en el que el ICE le comunica a Verizon que el Consejo Directivo está conociendo su solicitud para ir a la vía del arbitraje y copia del oficio 0012-5372-2005 (CD-070-2005) del 2 de febrero

del 2005 en el que se le comunica a la Subgerencia de Telecomunicaciones el acuerdo del Consejo Directivo que rechaza la solicitud para ir a la vía arbitral. Los Documentos prueban los Hechos 80 y 81 de la Demanda.

**Documento No. 57.-** Copia del oficio 6000-06301-2005 (SGT-510-2005) del 7 de febrero del 2005 por medio del cual el ICE le comunica a Verizon el rechazo de la apelación y la nulidad concomitante interpuestas confirmando el acto de la nota 5225-00939-2005 y se confirma la ejecución de las medidas cautelares. El Documento prueba el Hecho 82 de la Demanda.

**Documento No. 58.-** Copias certificadas de la resolución contenida en el oficio 6000-27733-2005 (SGT-2326-2005) del 1 de junio del 2005 en el que la Subgerencia de Telecomunicaciones declara resuelto el contrato y ordena proceder al cobro de los daños y perjuicios causados. Se adjunta, al Documento, la recomendación del Organo Director del Procedimiento Administrativo en la que se fundamenta. Los documentos prueban el Hecho 83 de la Demanda.

**Documento No. 59.-** Copia certificada del escrito presentado por Verizon el 7 de junio del 2005 interponiendo los recursos de revocatoria con apelación subsidiaria y nulidad concomitante contra el acto de resolución del contrato, que fue rechazado por resolución dictada por el Gerente General del ICE, mediante oficio 0150-36359-2005 (GG-680-2005 del 8 de julio del 2005, quedando firme el acto final. El Documento prueba los Hechos 84 y 85 de la Demanda.

**Documento No. 60.-** Copia certificada de la nota que el 15 de febrero del 2005, THS le envió al Presidente Ejecutivo del ICE, señalando que el suministro de guías telefónicas a los usuarios de los servicios de telefonía es un servicio público y que THS, siendo subcontratante de tal servicio, jurídicamente podía continuar con ese servicio. El Documento prueba el Hecho 86 de la Demanda.

**Documento No. 61.-** Copia certificada de la nota que envió THS al Consejo Directivo del ICE, proponiendo celebrar una contratación directa para continuar produciendo las guías telefónicas. El Documento prueba el Hecho 87 de la Demanda.

**Documento No. 62.-** Copia certificada del oficio 0012-34690-2005 (CD-581-2005) que el Secretario del Consejo del ICE le envía a THS, indicando que su solicitud ha sido enviada a la Subgerencia de Telecomunicaciones. El Documento prueba el Hecho 88 de la Demanda.

**Documento No. 63.-** Copia certificada del oficio SGT-3228-2005 del 4 de agosto del 2005 que le envía la Subgerencia de Telecomunicaciones del ICE a THS, indicándole que el Consejo Directivo decidió contratar con RACSA la elaboración de las guías telefónicas. El Documento prueba el Hecho 89 de la Demanda.

**Documento No. 64.-** Copia del oficio 0090-38888-2005 (DJI/220) del 4 de agosto del 2005, en el que la Dirección Jurídica Institucional del ICE le comunica a THS, que se ha contratado con RACSA la producción de las guías telefónicas. El Documento prueba los Hechos 90 y 91 de la Demanda.

**Documento No. 65.-** Copia del Dictamen número C-152-2000 de la Procuraduría General de la República del 7 de julio del 2000, dirigido a la Comisión para Promover la Competencia, vinculante para la Administración Pública.

**Documento No. 66.-** Copia del acuerdo del Consejo Directivo del ICE en que se decide que sea RACSA quien se encargue de la elaboración de las guías telefónicas. El Documento prueba el Hecho 93 de la Demanda.

**Documento No. 67.-** Copia certificada de la nota de fecha 13 de setiembre del 2005, que THS envió al Centro de Conciliación y Arbitraje de la Cámara Costarricense de Comercio, pidiendo su intervención para discutir con

el Grupo Verizon la conciliación del conflicto creado. El Documento prueba el Hecho 94 de la Demanda.

**Documento No. 68.-** Copia certificada de la nota que con fecha 2 de setiembre del 2005, envió Verizon a THS dando por terminado unilateralmente el contrato vigente sin responsabilidad de Verizon. El Documento prueba el Hecho 95 de la Demanda.

**Documento No. 69.-** Copias certificadas de las resoluciones del Juzgado Civil de Cartago en el Proceso Ejecutivo Prendario de Heidelberg Print Finance Americas Inc. Contra Trejos Hermanos Sucesores, S.A., que se tramitó en el expediente No. 06-001956-0640-CI, en el que se remataron judicialmente los bienes adquiridos por THS y pignorados hasta por la suma de US $ 2.831.409,07. Los Documentos prueban los Hechos 96 y 97 de la Demanda.

**Documento No. 70.-** Copia certificada de la escritura pública No. 144 otorgada ante la Notaria Laura Mónica Zamora Ulloa en San José a las 12:00 horas del 23 de marzo del 2006, en la que se constituyó la deuda por alquileres de las naves industriales en donde se ubicó THS en Cartago, por la suma de US $ 200.223,75, con intereses del 9.5 % anual, con tasa variable según las oscilaciones que sufra la tasa corriente del Banco Interfin. El Documento prueba los Hechos 98 y 99 de la Demanda.

**Documento No. 71.-** Copias certificadas de las sentencias dictadas por el Juzgado Civil de Mayor Cuantía de Cartago y el Tribunal Civil y de Trabajo de Cartago, en el Expediente 06-001846-0640-CI, en el proceso Ejecutivo Simple de Inmobiliaria Zoroaster, S.A. contra Trejos Hermanos Sucesores, S.A.- El Documento prueba el Hecho 100 de la Demanda.

**Documento No. 72.-** Copias certificadas de las Sentencias de Primera y Segunda Instancia dictadas por el Juzgado Civil de Cartago, en el Proceso de Desahucio en el expediente No. 06-002404-346-CI de Inmobiliaria Zoroaster, S.A. contra Trejos Hermanos Sucesores, S.A.- El Documento prueba el Hecho 101 de la Demanda.

**Documento No. 73.-** Copia certificada del contrato de compraventa formalizado entre THS y Condor Editores de Costa Rica, S.A. para la venta de bienes muebles industriales de THS, que prueba el Hecho 102 de la Demanda.

**Documento No. 74.-** Copia certificada del contrato de finiquito de arrendamiento suscrito por THS con Inmobiliaria Zoroaster, S.A., que prueba el Hecho 103 de la Demanda.

**Documento No. 75.-** Copia certificada del contrato de arrendamiento de bienes muebles con opción de compra, suscrito por THS y Dacondor D.C.R., S.A., que prueba el Hecho 104 de la Demanda.

**Documento No. 76.-** Certificación notarial del "Reporte Crediticio" de THS emitido por el Centro de Información Crediticia de la Superintendencia General de Entidades Financieras (SUGEF), junto con el Reglamento para la Calificación de Deudores publicado en La Gaceta 238 del 9 de diciembre del 2005.

**Documento No. 77.-**Informe económico financiero elaborado en el mes de octubre del 2008 por el Licenciado Tomás Evans Salazar, miembro del Colegio de Profesionales en Ciencias Económicas, con el carné número 11968, que contiene los cálculos de los daños y perjuicios irrogados por las demandadas a la firma actora.

## II.- Declaración de parte.-

Ofrecemos como prueba la declaración de parte del representante de la demandada Verizon Information Services –Costa Rica- LLC, para que se refiera a los Hechos de la Demanda en general, y en especial los números 31, 32, 33, 34, 35, 37, 38, 39 y 42.

### III.- Prueba Pericial.-

Solicitamos que el Despacho designe a un perito, que debe ser un contador público autorizado, o una firma de contadores públicos autorizados, para que estudie el análisis del Licenciado Tomás Evans Salazar que se acompaña a la demanda. El perito deberá establecer si el análisis del Licenciado Evans es correcto, si está fundamentado en bases reconocidas por la práctica contable y si sus resultados son ciertos y correctos. El perito, en caso de discrepancia con el análisis del Licenciado Evans, corregirá los aspectos de éste en lo que estime pertinente. La parte actora pondrá a disposición de ese perito todos sus registros contables y sus archivos, y el perito indicará en su informe cuáles de esos registro utilizó y cómo lo hizo.

### IV.- Expediente Administrativo.-

Ordénese al Instituto Costarricense de Electricidad la remisión de una copia certificada del Expediente Administrativo que corresponde al proceso de Licitación Pública No. 6378-T "Desarrollo e Implementación de Servicios de Información", incluyendo el cartel de la licitación completo, la oferta presentada por el Consorcio GTE, los contratos firmados por el ICE con el Consorcio GTE y deberá incluir todas las gestiones, actuaciones y resoluciones dictadas dentro del proceso de ejecución del contrato administrativo, incluyendo las que se hubieran tramitado ante tribunales de Justicia o de Arbitraje, todo ello de conformidad con lo que dispone el artículo 51 del Código Procesal Contencioso Administrativo.

**Medida Cautelar:** El Instituto Costarricense de Electricidad, en el proceso ordinario contra **VERIZON INFORMATION SERVICES - COSTA RICA, LLC**, tramitado en el Juzgado Contencioso Administrativo y Civil de Hacienda bajo el expediente 05-000881-0163-CA, obtuvo embargo en bienes de esa demandada. Como los bienes embargados allí constituyen una base importante para que la actora en este proceso, TREJOS HERMANOS

SUCESORES S.A., pueda resarcirse de los daños y perjuicios irrogados por el ICE y por VERIZON, solicitamos que, de conformidad con los artículos 19 y siguientes del Código Procesal Contencioso Administrativo; 241 y siguientes del Código Procesal Civil, y específicamente con el 242 idem, que se ordene al ICE que no disponga del producto de ese embargo hasta tanto no se resuelva en firme la pretensión deducida en el proceso que se inicia con este memorial.

**Notificaciones:**     La parte actora señala para oir notificaciones el Número de Fax 22 83 11 46. Notifíquese al Instituto Costarricense de Electricidad en sus oficinas centrales en Sabana Norte; a la firma demandada "VERIZON INFORMATION SERVICES –COSTA RICA- LLC" en las oficinas de su Agente Residente Licenciado Hernán Pacheco Orfila, en el Bufete Pacheco Coto ubicado en el Cuarto Piso del Edificio A del Centro Ejecutivo FORUM 2 en Santa Ana; y a la empresa "VERIZON COMMUNICATIONS INCORPORATED", notifíquese en los Estados Unidos de América, en la persona de su Presidente y Principal Oficial Ejecutivo, en sus oficinas en la Calle 140 Oeste, piso 29 (140 West St. 29th.Floor) en la Ciudad de New York, No. 10007 y, además, en su domicilio registral ubicado en el Número 1209 Orange Street, en la Ciudad de Wilmington, Condado de New Castle, en el Estado de Delaware. Por tratarse de notificaciones en el extranjero, se procederá de conformidad con lo que dispone el artículo 180 del Código Procesal Civil.

**Goicoechea, diciembre 15 del 2008.**

**Alvaro Trejos Fonseca.**



JUNTO CON (91) FOLIOS (31) LLHAS

JUNTA Documento #1 Certificacion notarial de personeria / Documento 2
certificacion notarial / Documento #3 Certif. Notarial inscripcion original
de la sociedad / Pág de internet / Documento #4 Cop. portadas guías telefónicas

RECIBIDO POR Edwardo M.                    16/12/8

HORA: 10:36 hrs

Documento #5 Cop. certificacion expedida x don José María Olivos

Documento #7 Cop. escrituras publicas cotif. notarial mente

Documento #8 cop. carta enviada x el gerente de GTE

Documento #9 Cop. certificadas de ordenes de compra x verizon servicios
de informacion Dominicana S.A.

Documento #10 Cop. certificada y traduccion oficial del contrato de
agencia x cooperacion entre GTE y THS.

Documento #11 Copia del contrato Firmado x general telephone Directory campany
C. por AC y trejos Hermanos sucesores

Documento #17 Cop. certificada de la cláusula 24.1.B del cartel de la
licitacion Publica G378-T del ICE

Documento #19 Copia certificada del contrato Maestro de campra

Documento #20 Cop. plan de inversion x THS

Documento 20-A traduccion oficial de los documentos de campra

Documento 21 Cop. certificada del contrato de arrendamiento

Documento 22 traduccion oficial y certificacion notarial de la carta
enviada por douglas C. La valle

Documento 23 traduccion oficial de los mensajes enviados por terrence
Mintchell Leve

Documento 24 traduccion oficial del documento que envió el 15/11/99
Art Nixan.

Documento 25 cop. certificada

Documento 26 traduccion oficial de mensajes enviados x art Nixan

Documento 27 cop. certificadas

se aparta exp. Administrativo el cual consta de
318 folios

Documento 28 cop. certificada del cronograma de producción debis/guías telefónicas 2005 y prueba #50

Documento 29 Cop. certificada, de ordenes de compra

Documento 30 Cop. de ordenes de compra sustitutas.

Documento 31 Cop. certificada del documento que presento Verizan

Documento 32 Cop. certificada del acuse de recibo de la nota del 13/5/4

Documento 33 Cop. certificada del oficio 6000-41046-2004

Documento 34 Cop. certificada de la Nota enviada x Verizan -8/4/4

Documento 35 cop. certificada del ofic. 6000-52278-2004 14/9/4

Documento 36 Cop. certificada

Documento 37 cop. certificada de las escrituras públicas

Documento 38 cop. certificada del ofic. SI.-0726-11-04, 15

Documento 39 cop. certif. of. SI-0730-11-04

Documento 40 Cop. certf. of. 6000-64510-2004

Documento 41. Cop. certf. of. 0012-65785-2004

Documento 42 cop. ofic. 6000-66702-2004

Documento 43 Cop. ofic. 9100-UENJc-888

Documento 44 Cop. certificada escritura # 131

Documento 45 Cop. oficio. SL-0759-12-04

Documento 46 cop. of. 5775-69163-2004

Docum. 47 cop. del escrito del 17/12/04

Docum. 48 cop. ofi. S.I.-0013-01-05

Docum. 49. Cop. ofi. 5725-00939-2005

Docum. 50. cop. del escrito del 10/1/5

Docum. 51 Cop. of. 0092-01644-2005

Docum. 52 cop. ofic. S.I.-0025-01-2004

Docum. 53. Cop. escrito   12 enero 2005
Docum. 54 Cop. ofic.   5225-03122-2005
Docmto. 55 cop. escrito 31/1/5
Docmto 56. cop certificada   5225-01843-2005
                              0012-5372-2005
Docmto 57. Cop. ofic. 6000-06301-2005 / 5225-00939-2005
Docmto 58. Cop. certif. resolucion oficio. 6000-27733-2005
Docmto 59. Cop. certif. de escrito del 7/junio 2005
Docmto 60. cop. certif. de la nota del 15/2/05
Doc. 61 Cop. certif. nota de THS
Doc. 62 cop. certif. ofici. 0012-34690-2005
Doc. 63. cop. certif. ofr. 5GT-3826-2005
Doc. 64. cop. ofic. 0090-38888-2005
Doc 65 Dictamen 152-2000
Doc. 66. Copia. del acuerdo del consejo directivo del ICE
Doc. 67 Cop. certificada de la nota del 13/9/5
Doc. 68 cop. certif. nota del 2/9/5
Doc. 69 cop. certif. de las resoluciones del juzgado civil de cartago
Doc. 70 cop. certif escritura publica
Doc 71 cop. certif. sentencias x el juzgado civil de mayor cuentia
de cartago
Doc. 72. Cop. certif. sentencias de 1era y segunda instancia
Doc. 73. Cop. certif. del contrato de compraventa
Doc. 74. cop. certif. del contrato de finiquito de arrendamiento
Doc. 75. cop. certif. de contrato de arrendamiento de bienes y muebles
Doc. 76 certif. Notarial reporte crediticia
Doc. 77. Informe Economico Financiero.

93

Expediente: OS-001505 - 1527-CA

**ACTOR: TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA.**
**PROCESO: ORDINARIO CIVIL DE HACIENDA.**
**DEMANDADOS: INSTITUTO COSTARRICENSE DE ELECTRICIDAD,**
**VERIZON COMMUNICATIONS INCORPORATED, VERIZON**
**INFORMATIONS SERVICES – COSTA RICA- LLC.**

PODER JUDICIAL
II CIRCUITO JUDICIAL DE SAN JOSE

18 DIC. 2008
14.50
Tribunal Procesal Contencioso Administrativo
RECIBIDO

**TRIBUNAL PROCESAL CONTENCIOSO ADMINISTRATIVO Y CIVIL DE HACIENDA.**
**SEGUNDO CIRCUITO JUDICIAL. GOICOECHEA, EDIFICIO ANEXO A.**

El suscrito ÁLVARO TREJOS FONSECA, mayor casado en segundas nupcias, Máster en Ciencias, vecino de San José, cédula de identidad número 1-0390-0895, actuando en mi condición de Presidente con facultades de apoderado Generalísimo sin límite de suma, de la compañía de este domicilio "TREJOS HERMANOS SUCESORES, SOCIEDAD ANÓNIMA", cédula de persona jurídica número 3-101-000940, otorgo PODER ESPECIAL JUDICIAL al Licenciado EDUARDO SANCHO GONZÁLEZ, mayor, casado, abogado, vecino de Montes de Oca, cédula 1-380-073, de conformidad con lo que disponen los artículos 1256, 1289 y 1290 del Código Civil, entendiéndose conferidas, expresamente, todas las atribuciones que se señalan en esas normas jurídicas. El apoderado firma este acto en señal de aceptación del poder.

San José, 16 de diciembre de 2008.

Álvaro Trejos Fonseca.

AUTENTICA

José Leonardo Céspedes R.
ABOGADO Y NOTARIO PÚBLICO
C. 1582





Tribun: [...]
](...

ESC[...] OCu± 1[...] = [...]
AU[...] 1 poder, 1 juego de cop. del escrito
de la demanda, 3 ampos. de prueba
documental (3 ampos), únicamente.–

RECIL[...]
HORA: 10:00          19|12|08

Tribunal P[...]          [...] nistrativo
II C[...]                [...] osé

Escrito agregad[...]      19|12|08
                         M9 Luisa
Agregad[...] por