# Exhibit B

CASE: 08-001505-1027 -CA
DECLARATORY PROCEEDINGS
PLAINTIFF:
TREJOS HERMANOS SUCESORES S.A.
DEFENDANTS:
INSTITUTO COSTARRICENSE DE ELECTRICIDAD VERIZON COMMUNICATIONS INCORPORATED
VERIZON INFORMATION SERVICES -COSTA RICA- LLC

66- 2017- V

**CONTENTIOUS-ADMINISTRATIVE AND CIVIL FINANCE COURT. FIFTH SECTION. SECOND JUDICIAL CIRCUIT OF SAN JOSÉ.** Goicoechea, Attached Building A, at 8:00 a.m. on the nineteenth day of July, two thousand and seventeen.

Declaratory proceedings initiated by **TREJOS HERMANOS SUCESORES S.A.,** represented by **ÁLVARO TREJOS FONSECA,** of legal age, married twice, holder of Master of Science degree, resident of San José, bearer of identity card number 1-0390-0895, acting in his capacity as President of the company with Full Power of Attorney and no restrictions as to the amounts involved; **EDUARDO SANCHO GONZÁLEZ,** of legal age, married, an attorney at law, resident of Montes de Oca, bearer of identity card number 1-380-073; **ANDRÉS MEZA VILLALOBOS,** of legal age, an attorney at law, married; **DIEGO BAUDRIT CARRILLO,** married, an attorney at law, resident of San José, bearer of identity card number 1 -323-212, Bar Association Card number 1155, **LUIS GERARDO VILLANUEVA MONGE,** of legal age, married once, an attorney at law, resident of Cartago, bearer of identity card number 3-221 -204, all in their capacity as Special Judicial Agents, against **INSTITUTO COSTARRICENSE DE ELECTRICIDAD,** represented at different procedural times by **ENRIQUE ROJAS FRANCO,** of legal age, married, Attorney at Law, resident of Santa Ana, bearer of identity card number one - three hundred and ninety - one thousand two hundred and fifty, Bar Association Card number 1184, **GERMAN CALDERÓN LOBO,** of legal age, married, an attorney at law, resident of Heredia, bearer of identity card number 4-149-125, Bar Association Card number 5995, **DANNY FABRICIO SABORÍO MUÑOZ,** of legal age, single, bearer of identify card number 1-903-770, Bar Association Card number 16289, **CARLOS CERDAS DELGADO,** of legal age, married, bearer of identity card number 1-896-201, Bar

Association Card number 15240, **ANA VICTORIA ZAPATA CALVO,** of legal age, divorced, an attorney at law, resident of Escazú, bearer of identity card number one - eight hundred and ninety-two - four hundred and ninety-one, **JUAN PABLO HERNÁNDEZ CORTES,** of legal age, an attorney at law, married, all in their capacity as Special Judicial Agents, **VERIZON COMMUNICATIONS INC.,** represented by **ANDREA HULBERT VOLIO,** of legal age, married, an attorney at law, resident of Santa Ana, bearer of identity card number 9-100-121, **ALEXANDER SALAZAR SOLORZANO,** of legal age, married, an attorney at law, bearer of identity card number one - eight hundred and thirty-five - three hundred and ninety-eight, resident of Guachipelin of Escazú, in his capacity as Special Judicial Agent (power of attorney, on page 1170); **JUAN CARLOS PIZARRO CORRALES,** of legal age, married, an attorney at law, resident of San José, bearer of identity card number one - eight hundred and twenty-five - three hundred and sixty-six, **RODRIGO ALBERTO PÉREZ GONZÁLEZ,** of legal age, an attorney at law, who appeared for the stage of conclusions of the hearing, and **MARVIN CÉSPEDES MÉNDEZ,** of legal age, married, an attorney at law, resident of San José, bearer of identity card number 1-531-965, who appeared on behalf of this company in the stage of arguments for indemnity, opening arguments and examination of witnesses at the hearing, in their capacity as Special Judicial Agents, and **VERIZON INFORMATION SERVICES COSTA RICA LLC,** represented by the latter and by **GINO CAPPELLA MOLINA,** of legal age, married, an attorney at law, resident of San José, bearer of identity card number one - five hundred and sixty-nine - two hundred and twenty-six, in their capacity as Special Judicial Agents,

FINDINGS OF FACT

I.    - On the fifteenth day of December 2008, the plaintiff initiated declaratory proceedings before this Court, and requested the following:

" 1.- That the so-named *"Master Purchase Agreement"* executed on February 28, 2002 by and between the plaintiff *Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES COSTA RICA, LLC) was the means for implementation of an agreement executed by and among the business companies "GTE Information Services*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware and with their main offices in the City of Dallas, State of Texas, identified as the "GTE Consortium," and INSTITUTO COSTARRICENSE DE ELECTRICIDAD, for the awarding to said Consortium of a contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, according to resolution of the Board of Directors of ICE, adopted at ordinary meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, approved by the Office of the Comptroller General of the Republic on December 13, 2000.

2).- Said "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A, was known by INSTITUTO COSTARRICENSE DE ELECTRICIDAD, which approved the involvement of TREJOS HERMANOS SUCESORES S.A. in the performance of the administrative contract awarded to the GTE Consortium as a result of Public Bidding Proceedings No. 6378-T conducted by ICE.

3).- The termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and GTE CONSORTIUM (which changed its name to VERIZON CONSORTIUM) caused the termination of the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A.

4).- TREJOS HERMANOS SUCESORES S.A. had no liability whatsoever for the events that led to the termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and GTE CONSORTIUM.

5).- TREJOS HERMANOS SUCESORES S.A. had no liability whatsoever for the events that led to the termination of the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A.

6.- The termination of the "Master Purchase Agreement" executed on February 28,2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

Directory Company, C por A. caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A.

**7.-** The defendant companies Verizon Communications Inc. and Verizon Information Services -Costa Rica- LLC compose an economic interest group, successor of the economic interest group named GTE Consortium, which was awarded a contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, performed through the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A.

8.- "**VERIZON COMMUNICATIONS INCORPORATED**" is the most senior entity of an economic interest group of which "VERIZON INFORMATION SERVICES -COSTA RICA- LLC" is a member. Therefore, the first of these companies is jointly and severally liable with the latter for all the obligations acquired by "**VERIZON INFORMATION SERVICES - COSTA RICA- LLC**" with **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA**.

**9).-** The defendant companies **Verizon Communications Inc.** and **Verizon Information Services -Costa Rica- LLC** are jointly and severally liable for the negative consequences suffered by the plaintiff company, which occurred due to the termination of the Master Purchase Agreement executed on February 28, 2002 with the plaintiff Trejos Hermanos Sucesores S.A.

**10).- INSTITUTO COSTARRICENSE DE ELECTRICIDAD** disregarded the lawful rights and interests of **TREJOS HERMANOS SUCESORES S.A.** that have arisen out of the implementation of said Public Bidding Proceedings No. 6378-T through the "Master Purchase Agreement" executed on February 28, 2002, reason for which it is jointly and severally liable with Verizon Communications Inc. and Verizon Information Services -Costa Rica- LLC for indemnification of the damages suffered by the plaintiff as a result of the termination of said Master Purchase Agreement executed on February 28, 2002.

11).- The clauses of the MASTER PURCHASE AGREEMENT executed by and between VERIZON and TREJOS HERMANOS SUCESORES regarding the release of VERIZON from civil liability for breach of contract are null and void, particularly Clauses 24 and 28 of that Agreement, although this statement is not limited to them, because it includes all clauses

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

*releasing VERIZON from civil liability.*

*12).- The defendants, **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** and the companies **Verizon Communications Inc.** and **Verizon Information Services - Costa Rica. LLC** must pay the plaintiff, jointly and severally, the damages incurred, which we define as follows:*

| | |
|---|---|
| *a) Investment in machinery* | *$2,582,156* |
| *b) Increase in inventories* | *$ 2,860,696* |
| *c) Operating Cash Flows not received 2004-2013 Directories in Costa Rica* | *$ 8,806,872* |
| *d) Operating Cash Flows not received 2004-2013 Directories in the Dominican Republic* | *$7,912,999* |
| *e) Losses incurred from 2004 to 2007* | *$ 7,237,068* |
| *f) Interest paid by THS* | *$ 983,825* |
| *g) Interruption of Operations* | *$28,885,195* |
| *h) Non-economic Damages* | *$ 5,000,000* |

*i) In accordance with the provisions of Article 123 of the Code of Contentious Administrative Procedure, the amounts of the judgment shall also be updated to compensate for the variation in purchasing power, and interest shall be recognized on all the above items, which shall be paid starting from August 30, 2008, until they are fully paid, and shall be calculated in accordance with the provisions of Article 1163 of the Code of Civil Procedure.*

*13).- The defendants shall jointly and severally pay to the plaintiff the personal and procedural costs of this case. "*

    **II. -** The complaint was served on the co-defendants by a decision issued at 8:00 a.m. on the twelfth day of January, two thousand and nine.

    **III. -** By means of an instrument filed on March 3, 2009, Instituto Costarricense de Electricidad answered the complaint and filed the defenses of lack of active and passive standing, lack of right and lack of jurisdiction.

    **IV. -** By means of an instrument filed on May 6, 2009, VERIZON COMMUNICATIONS INC. answered the complaint and filed the defenses of lack of right, lack of active and passive *ad causam* and *procesum* standing.

Digital signature of:
    RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
    MOLINA, DECIDING JUDGE
5

**V. -** By means of an instrument filed on May 7, 2009, VERIZON INFORMATION SERVICES COSTA RICA LLC answered the complaint and filed the defenses of lack of right, lack of jurisdiction and undue joinder of the lawsuit.

**VI. -** The defense of lack of jurisdiction was rejected by means of decision 1078-2009 by the Processing Judge. Upon the filing of an appeal expressing disagreement, the decision was upheld by vote **000874-C-S1-2009** issued **at** 11:15 a.m. on the twenty-fifth day of August, two thousand and nine, by the First Chamber of the Supreme Court of Justice.

**VII. -** The defense of undue joinder was initially rejected by means of decision 1080-2009, although it was decided subsequently to admit it by means of decision 3607-2010. The latter was upheld by decision 634-2010 issued at 10:30 a.m. on the 29th day of November 2010 by the Appeals Court. In view of the above, Verizon Information Services-Belize joined the lawsuit.

**VIII. -** The first preliminary hearing in these proceedings was conducted at 9:18 a.m. on the ninth day of June, two thousand and nine.

**IX. -** A second preliminary hearing in these proceedings was conducted at 1:45 p.m. on the twenty-third day of September, two thousand and ten. The petitions of the party were heard there, and Verizon Information Services- Belize was added to the proceedings.

**X. -** A third preliminary hearing in these proceedings was conducted at 8:40 a.m. on the fourteenth day of August, two thousand and twelve. The defense of undue joinder of claims was rejected by means of decision number 1314-2012-T. The facts in controversy were also established.

**XI. -** The discovery phase took place at 8:42 a.m. on the seventh day of September, two thousand and twelve, and accordingly, documental, testimonial and expert evidence was admitted.

**XII. -** Following the expert's assessment, this case was sent to Section IV of this Court, by means of a decision issued at 10:06 a.m. on the nineteenth day of March, two thousand and fourteen.

**XIII. -** By means of a decision issued at 9:00 a.m. on the fifth day of May, two

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

thousand and fourteen, Section IV of this Court returned the appropriate records to the Processing Judge.

**XIV. -** Verizon Information Services- Belize was excluded from the proceedings by means of a decision issued at 8:52 a.m. on the twenty-second day of April, two thousand and fifteen.

**XV. -** The Processing Judge ordered the case be sent to the trial stage by means of a decision issued at 2:37 p.m. on the fourth day of April, two thousand and sixteen.

**XV (sic). -** This Section of the Court scheduled an oral hearing in these proceedings, by means of a decision issued at 11:40 a.m. on the twenty-third day of June, two thousand and sixteen.

**XVI. -** An oral and public hearing in these proceedings was held on June 28 and 29 of this year. At the hearing, it was determined that Attorney Marvin Céspedes Méndez was the representative of both co-defendants, pursuant to the powers of attorney on record, the evidence offered by the plaintiff was admitted to ensure a better decision, opening arguments were heard, and the expert and testimonial evidence offered and produced was admitted. The deposition of a relevant party, Instituto Costarricense de Electricidad, was deemed to have been withdrawn by the co-defendants and was also declared inadmissible, given that at the time of the respective proceedings, their representative had not yet appeared at the hearing, and had arrived late. In the continuation of the hearing on June 29, Attorney Rodrigo Alberto Pérez González appeared on behalf of Verizon Communications Inc. Finally, the conclusions of the parties were heard.

**XVII. -** No nullities have been observed in the proceedings before this Court that need to be corrected and the judgment is issued within the term established for such purpose by paragraph 111.1 of the Code of Contentious Administrative Procedure, given that the 15-day term of that rule expires on July 20 of the current year. After deliberation and unanimously, the following decision was reached.

Written by Judge **Campos Hidalgo, with the affirmative vote of Judges Alvarez Molina and**

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

**Mena Garcia,**

**LEGAL CONSIDERATIONS**

**I.** - <u>**On the theory of the plaintiff's case and its main arguments**</u>: A review of the complaint and the respective arguments at the trial hearing indicates that the plaintiff based its claims on the following arguments:

**a) Arguments of a general nature:**

**1.** Whereas the printing of telephone directories is a public service, it was therefore the responsibility of ICE to ensure that it was properly provided (as *argued in the complaint and at the trial hearing by Attorney Sancho Gonzalez).*

**2.** The termination of the ICE - GTE (VERIZON) contract had the immediate effect of making the performance of the agreement between GTE (VERIZON) and the plaintiff impossible. Therefore, the negative consequences of this impossibility of performance (damages caused to the plaintiff company) rest on the termination of the former. *(arguments in the complaint).*

**3.** There are two contractual relationships: ICE - GTE (VERIZON) and GTE (VERIZON) - plaintiff, and there is also an extracontractual relationship, which is between ICE and the plaintiff *(arguments in the complaint).*

**b) Arguments related to Instituto Costarricense de Electricidad:**

**1.** There is a <u>complex contractual</u> relationship between and among, the codefendants and the plaintiff company in ICE, in which the different agreements are interconnected to achieve a financial result, and where the final outcome requires the participation of each party. Therefore, the actions of the contractual complex are oriented to the common business object, so that the party that does not participate in it must compensate for its illegal action or omission. The parties, although not directly contracting with each other, had mutual knowledge of their participation in the contracted material activity (the production of telephone directories) and ICE even maintained control and periodic visits to the plaintiff's plant to supervise the correct printing of the telephone directories. The approval of the Master Printing Agreement by ICE necessarily involved it in the legal

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

relationship that is the basis of this litigation *(argument expressed in the complaint and at the trial hearing by Attorney Baudrit Carrillo).*

**2.** The entity is being sued for developing bidding proceedings that required the contractor to print the guides elsewhere in the country. For this reason, the plaintiff company entered into an agreement with the co-defendants that was submitted to the knowledge of ICE, which had control over the subcontracted company. Upon the termination of its contract with the contractor, it was obliged to continue providing the respective public service and, despite knowing that there was a company that produced the telephone directories, it interacted only with the Verizon group, without involving the plaintiff company. In view of the foregoing, it considers that the <u>extra-contractual liability</u> of Article 190 of the General Law of Public Administration applies, because the plaintiff was not given the opportunity to exercise its rights before the aforementioned administrative decision. *(argument expressed in the complaint and at the trial hearing by Attorneys Villanueva Monge and Sancho González).*

**3.** The contractual mechanism used by ICE for the preparation and distribution of telephone directories was not the correct one, given that we are in the presence of a public service, according to the Attorney General's Office, *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**4.** Upon the termination of the contract between GTE Consortium and ICE, this Public Entity should have adopted the necessary preventive measures, in order that the public service of information to the public through Telephone Directories would not be seriously affected, nor would the classic principles of the concept be violated, such as equality, continuity and adaptability, be violated, *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**5.** The damages suffered by the plaintiff for the objective breach of its contract with GTE (VERIZON) were caused by the actions of ICE, which terminated its contract with GTE (VERIZON), without respecting the lawful interests that the plaintiff had in that contract, thus violating the principle of *Neminem iaedere* -not to harm others-. ICE incurred civil liability in accordance with the application of the principles of the General Law of Public

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

9

Administration (Articles 190 et seq.), whether its actions are considered lawful (Articles 194 and 195) or unlawful (Articles 191 and 192). Article 1045 of the Civil Code is also the basis for such liability, *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**c) Arguments related to the co-defendant companies:**

**1.** The GTE Group negotiated the future conditions for incorporating technological advances to improve the quality of work in editing and printing with the plaintiff. Consequently, it was also obliged to acquire the most modern equipment and the expansion of the physical plant. In accordance with the above, the plaintiff became seriously indebted to banks and commercial creditors in order to acquire the new equipment and expand its industrial plant *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**2.** The GTE Group merged with the firm Atlantic Bell and the VERIZON Group was formed, which maintained with ICE all the rights, duties, obligations and securities originally granted by the initial Group and jointly and severally guaranteed by the VERIZON companies *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**3.** Verizon Information Services - Costa Rica LLC breached its contract with ICE. However, when Verizon Information Services - Costa Rica LLC broke its contractual relationship with the plaintiff, it falsely indicated that the entity was responsible for the breach *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**4.** GTE CORPORATION, Holding of the GTE Group, by expressing that it provided its full guarantee backed by its financial statements, which could be used in the ICE Public Bidding Proceedings 6378-T to prove the financial capacity of the Consortium, which was then acting as the bidder and which also provided its guarantee, becoming jointly liable with the companies of the Consortium, for all the obligations that it acquires as a bidder and as the successful bidder, it irremediably acquired the condition of being jointly and severally liable not only for the Consortium, but also for the full performance of the contract and, therefore, became also jointly liable with the ICE for the results of the negotiation.

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

**5.** Verizon Information Services- Costa Rica- LLC went into malicious default, as it wanted to leave its business in the country. Consequently, the civil liability exemption clauses of the respective contract are ineffective when they refer to a willful breach, in accordance with the provisions of Article 701 of the Civil Code. And the breach is intentional, since the co-defendants could have complied without facing any material obstacles to do so, but failed to fulfill their obligations *(argument expressed in the complaint and at the trial hearing by Attorneys Baudrit Carrillo and Sancho González).*

**6.** The breach by Verizon is clearly demonstrated in the Court records. Because of it, the plaintiff could not pay the bank and commercial loans acquired, stopped paying its raw material suppliers and rents, stopped paying the salaries and labor rights of its employees and was forced to end its activities and permanently suspend its commercial operations *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**7.** The Agreement executed by the plaintiff with the GTE Group (later VERIZON Group), which was approved and authorized by ICE, is by its nature a contract governed by the principles of public service and is regulated by its principles, rules and values *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**8.** The commercial misfortune of the plaintiff has its origin in the breach of the contract executed with the GTE Group, recognized as the link derived from the bidding proceedings, and in the contract executed with the VERIZON Group, as a subcontract *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**9.** GTE CORPORATION, by virtue of a merger of companies in the United States of America, was transformed into VERIZON COMMUNICATIONS INC., Holding of the VERIZON Group; as a result, the relationships derived from the Administrative Contract of the International Public Bidding Proceedings 6378-T and its legal effects for the fulfillment of its duties and obligations, did not suffer any alteration. Consequently, the defendant companies Verizon Communications Inc: and Verizon Information Services - Costa Rica- LLC integrate an economic interest group, which we can conventionally call VERIZON GROUP *(argument*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

*expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**10.** The termination of the ICE-GTE (VERIZON) contract constitutes an objective breach of the GTE (VERIZON) - plaintiff contract, which is attributable to GTE (VERIZON), therefore, the latter entity must respond for the damages caused, according to the general principle of contractual liability established in Article 702 of the Civil Code *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**11.** The civil liability exonerating clauses that were included in the master purchase agreement by imposition of VERIZON are necessarily rendered ineffective under imperative principles of Public Law, since although the Verizon - THS contract was executed as a commercial agreement, by its object and effects it is administrative in nature, because it concerns the provision of a public service *(argument expressed in the complaint and at the trial hearing by Attorney Sancho González).*

**12.** The exonerating clauses are integrated to an adhesion contract, since the content of that agreement only allows acceptance or rejection by the plaintiff company, and the nullity of such clauses is a result of their abusive nature, in accordance with Article 1023, subsection m) of the Civil Code and Article 42 of Law 7,472 of January 19, 1995 (Law for the Promotion of Competition and Effective Defense of the Consumer).

**II.        - <u>On the theory of the case of INSTITUTO COSTARRICENSE DE ELECTRICIDAD and its main arguments</u>:** A review of the complaint and the respective reasoning at the trial hearing indicates that the ICE representatives base their claims on the following arguments:

**1.** The preparation of telephone directories is not a public service, and in any case when the events occurred, ICE opted not to charge for calls to 113 and also entered into an administrative contract with RACSA for their preparation. As a result, telecommunications was a public service at the beginning and now it is a service available to the public, but telephone directories are not understood to be within this concept.

**2.** The agreement between the plaintiff and the co-defendants is a private contract that is not governed by public service principles.

**3.** The were plaintiff should not be consulted about the termination of the contract

between ICE and the co-defendants.

**4.** The contractual relationship of the plaintiff company was with the codefendants, who opted to subcontract it, in accordance with the powers allowed by the Administrative Contracting Law. In this sense, the investments made by the plaintiff company were not only to satisfy the needs of ICE but also to provide services in other parts of the region. It indicates that the bidding terms required printing the guides in Costa Rica, but not at the plaintiff's facilities.

**5.** The contract with the co-defendant companies was terminated for reasons of public interest, since they unilaterally decided to restructure the 2005 guide, thus breaching the clauses of the contract.

**6.** The relationship between Verizon and the plaintiff company predates the public bidding proceedings 6378-T, so it was not ICE's place to endorse that private contract.

**7.** ICE's knowledge of the relationship between the co-defendants and the plaintiff was based on the fact that the latter was a simple subcontractor of the former.

**8.** In the case in question, we are not dealing with a complex contractual relationship, since we have an administrative contract, characterized by the existence of exorbitant clauses.

**9.** ICE was under no obligation to give any notice to the plaintiff since the plaintiff was not its provider.

**10.** ICE is not responsible for machinery acquired by the plaintiff to produce the telephone directories of the Dominican Republic.

**III.** **- <u>On the theory of the case of VERIZON COMMUNICATIONS INCORPORATED and VERIZON INFORMATION SERVICES -COSTA RICA- LLC and its main arguments</u>:** A review of the answer to the complaint and the respective arguments at the trial hearing indicates that the representatives of the codefendant companies base their claims on the following reasons:

**1.** If the plaintiff company made the decision to get into debt, it was due to its own business decision.

**2.** The plaintiff sold the acquired machinery, which it did not consider when claiming

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

losses.

**3.** The objected clause bases its logic on the fact that Verizon only has one business in Costa Rica and it was illogical for it to continue if ICE terminated its telephone directory contract.

**4.** The clause challenged by the plaintiff was negotiated with it and is not null and void under the provisions of Article 1023 of the Civil Code.

**5.** The relationship between Verizon and the plaintiff is exclusively private.

**6.** The damages are accessory to the issue of contractual nullity, since the parties did not know how to exercise the annulment claims, since they first had to request contractual termination and then payment of damages. Therefore, the Court faces a material impossibility to award damages, because contractual termination was not previously requested.

**7.** In the case under study, Article 701 of the Civil Code must be applied, which indicates that fraud is not presumed, and therefore must be proven, since a mere failure to comply does not per se mean fraudulent conduct.

**8.** It is not true that they formed an economic interest group, nor have they been part of any contractual relationship with the ICE or the plaintiff.

**9.** It is not true that Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. and Verizon Directories Corp are subsidiaries of Verizon Communications Incorporated and that the latter constitutes the holding company of the group.

**10.** With respect to the term of the contract, Clause 2 (b) of the agreement established a range between 48 months and 168 months, with the term of the agreement being conditional on the term of the agreement with ICE, given the nature of the agreement and the fact that Verizon had no other business in Costa Rica.

**11.** The problem that the plaintiff had with its plant and equipment was that they were obsolete and the production costs with those equipment units were higher; productivity was also lower during the printing time.

**12.** The claim made by the representative of the plaintiff that the contract with GTE was executed for a term of 168 months is false, because Clause 28 (b) established that the term

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

of Verizon's agreement with the plaintiff was subordinated to and dependent on the term of the agreement between Verizon and ICE, which was foreseeable and negotiated by the parties from the first contract executed by the plaintiff. Consequently, the termination of the agreement with the plaintiff was foreseen as valid grounds and agreed in advance by both parties in subsection (b) of Clause 28 of the Purchase Agreement.

**13.** In any event, termination did not imply any liability for any of the parties, since the early termination of the agreement arose as a direct consequence of the deed or action of a third party, which in this particular case was ICE.

**14.** It was assumed that the plaintiff did not depend on the existence of a single contract and that a company with the experience and national and international history of almost one hundred years maintained a variety of clients that guaranteed its solvency and the adequate management of finances and cash flows, to face its credit obligations in the face of any contingency.

**15.** Clauses 24 and 28, which establish exemptions from civil contractual liability and limitation of civil contractual liability, specifically subsections b) and e) of Clause 28, were negotiated and accepted by the representative of the plaintiff company as a logical and reasonable matter for both parties, because the effectiveness of the agreement with the plaintiff depended on the effectiveness of the agreement with ICE and it was known by the plaintiff that Verizon had no other business in Costa Rica.

**16.** The plaintiff did not in any way indicate that GTE Corporation had become Verizon Communications Inc.

**17.** The plaintiff acknowledges that the execution of the agreement was maintained under normal conditions for nearly four years, which tells us that the agreement was executed within the range of 48 months established in section b) of Clause 2 - The Term.

**18.** The plaintiff is seeking to mislead by stating that the agreement executed with Verizon is a subcontract of the contract executed between ICE and Verizon. This is not true and constitutes a legal aberration.

**19.** The problem of the closing of operations of the plaintiff company was the immediate consequence of the poor management of the business.

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

**20.** GTE Corporation's joint guarantee to ICE cannot be presumed nor can it be assumed to be transferred for the benefit of third parties.

**IV.- Purpose of the proceedings:** Based on the statements made by the parties, both in their claims and in their arguments, the purpose of these proceedings is to determine the liability of the co-defendants, based on the facts established in the complaint, as well as the existence of the alleged damage.

*V.-* Rationale of the Court.

**V.I.- In particular regarding proven facts:** Therefore, and relevant to the resolution of the case, the following facts have been proven to this Court during the proceedings:

**a) Proven facts regarding the legal relationships between ICE and the codefendant companies:**

1. The plaintiff is a company with extensive experience in the production of telephone directories *(exhibits 1-4 of the plaintiff's evidence file).*

2. GTE (General Telephone Directory Company) has entered into agreements with Instituto Costarricense de Electricidad since 1975 for preparation of telephone directories in Costa Rica *(exhibit number 5 produced by the plaintiff, deposition of José Maria Quiros Alfaro).*

3. During this period, GTE engaged the plaintiff company as a subcontractor to print the telephone directories *(exhibit number 5 produced by the plaintiff).*

4. Instituto Costarricense de Electricidad conducted Public Bidding Proceedings 6378-T for *"Publishing of the Telephone Guide and Development and Implementation of Information Services" (exhibit 17 of the plaintiff's evidence file).*

5. These bidding terms provided that if a bidder was part of a business group or holding company, it must submit their financial statements, in which case the business group would be jointly and severally liable with the bidder for all contractual obligations *(exhibit 17 of the plaintiff's evidence file).*

6. On August 10, 1999, the GTE Consortium submitted a bid to participate in the Public Bidding Proceedings 6378-T *(exhibit 13 of the plaintiff's evidence file).*

7. On the tenth day of March 2000, Instituto Costarricense de Electricidad and the GTE

Consortium executed the *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* (exhibit 6 of the plaintiff's evidence file).

8. The *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* provided the following with regard to the possibility of subcontracting by the contractor: *"In accordance with Clause 2.13.1. of the bidding terms, GTE accepts that it may subcontract with the prior written approval of ICE up to 50% of the development, production, and distribution of the Telephone Directories, without this approval obliging ICE to be jointly and severally liable in the event of default by the subcontractor. Subcontracting shall not release GTE from its responsibility for the full performance of the contract"* (exhibit 6 of the plaintiff's evidence file).

9. The *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* provided the following with regard to the production of the telephone directories: *"In accordance with the experience of recent years, GTE has produced the all of the telephone directories for the Costa Rican territory, thus contributing to the growth of well-paid employment, professional training, and technology transfer for the benefit of Costa Rican citizens and the country's economy in general, which ICE considers to be in the general interest. Consequently, ICE requests and GTE accepts that during the performance of this contract, all stages and processes of production of the ICE Telephone Directory will be carried out by GTE in Costa Rica"* (exhibit 6 of the plaintiff's evidence file).

10. The *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE"* provided the following with regard to the contractor's name change: *"In the event that, due to a change in the law governing ICE, this entity were to change its name or GTE were to change its name as a result of a merger or partnership with another company, in both cases this contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented here"* (exhibit 6 of the plaintiff's

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

*evidence file).*

11.  GTE Information Service changed its name to Verizon Information Services Inc, GTE Directories Corporation changed its name to Verizon Directories Corp and General Telephone Directory Company C por A changed its name to Verizon Information Service Costa Rica, LLC *(exhibit 6, corresponding to numbered pages from page 3045 to 3022 of the plaintiff's evidence file's evidence file).*

12.  The legal representatives of Verizon Information Services, Inc., Verizon Directories Corp, and Verizon Information Services-Costa Rica, LLC accepted the rights and obligations under Bidding Proceedings No. 6378-T and the contract derived therefrom (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

13.  VERIZON Information Services - Costa Rica, LLC sent a note dated May 16, 2002, to the ICE Procurement Directorate, stating that "General Telephone Directory Company C por A'' had changed its name to Verizon Information Services Costa Rica, LLC, and requesting that the change in the name of the companies that made up the GTE Consortium be considered officially communicated (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

14.  GTE merged with the American firm Bell Atlantic and as a result of the merger, VERIZON GROUP was created, replacing GTE's corporate name with VERIZON GROUP (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

15.  VERIZON Information Services, Inc. and VERIZON Directories Corp, issued Statements of Continued Commitment to ICE, with respect to the rights and obligations set forth in the consortium agreement of August 9, 1999; in the bid submitted to ICE by GTE Consortium on August 26, 1999 and in the contract executed by and between ICE and GTE Consortium on March 10, 2000, obliging the two principal companies and VERIZON Information Services- Costa Rica, LLC (pages 3035, 3036 and 3037 of the administrative records, exhibit No. 15 of the plaintiff's evidence file).

16. By means of official note DI-AA-875 dated December 13, 2000, the Unit of Authorizations and Approvals of the Division of Institutional Development of the Office of the Comptroller General of the Republic approved the *"Contract for Publishing of the*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

*Telephone Guide and Development and Implementation of Information Services between ICE and GTE" (exhibit 6 of the plaintiff's evidence file).*

17.  In 2004, Verizon Information Services CR. proposed several adjustments to the contract executed for the publishing of telephone directories to ICE. In addition, on May 13 of that year, it proposed a review of their preparation. As a result, the Assistant Manager of Telecommunications of the entity, by means of official note 6000-41046-2004 of July 15, 2004, indicated that the 2005 guides should have the same structure and number of copies as the 2004 edition (exhibits 32, 33 and 34 of the plaintiff's evidence file).

18.  Through a note dated September 8, 2004, received at the Procurement Department on December 16 of that year, the Vice President of Verizon Information Services CR told the Assistant Manager of Communications of ICE that since no response was obtained to the note dated May 13 of the current year, the concept of tacit consent would be considered applied to the request (exhibits 32, 33 and 34 of the plaintiff's evidence file).

19.  By means of official note 6000-52278-2004 dated September 14, 2004, the Assistant Manager of Communications of ICE rejected the application of tacit consent, taking into account that by means of official note 6000-41046-2004 dated July 15, 2004, it was stated that the publishing of the 2005 guides had to be done using the same structure and number of copies as 2004, in answer to the proposal of May 13 of that year to review their preparation. In his answer, by means of note dated November 8, 2004, the Vice President of Verizon said that Assistant Manager that tacit consent operated *ipso iure* because there had been no answer within 30 business days. By means of official note 600-64540-2004 of November 18, 2004, he received an answer stating that the application of tacit consent was not admissible in that case as it was interpreted by the contractor (exhibits 35, 36 and 40 of the plaintiff's evidence file).

20. Through official note SI-0726-11-04 dated November 15, 2004, the Head of the Information Services Process of ICE indicated to the General Manager of Verizon that it had not extended the validity of the performance bond requested since June 30, 2004, according to official note 6000-35344-2004, and that the structure of the Telephone Directory of the Metropolitan Area showed examples of non- compliance in disregard of

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

1

the indications in notes 6000-41046-2004 and 6000- 522678-2004 (exhibit 38 of the plaintiff's evidence file).

21.  On November 12, 2004, ICE ordered Notaries Public Leda Patricia Hernández Salazar and Attorney Ligia Picado Arguedas to draw up notarial records of the results of the visits they made to THS's industrial facilities, where it was noted that the telephone directories being prepared did not include the records of subscribers from the provinces and it was also noted that when printing the white residential pages of the Metropolitan Area Telephone Guide, only the San José records were used, excluding the subscribers from the Los Santos area and the provinces (exhibit 37 of the plaintiff's evidence file).

22.  By means of official note S.1.0730-11-04, Verizon was provided with the minutes of a meeting held with its officials, in which it was told that it was failing to comply with Clauses 3.1 and 3.4.1.3 of the Bidding Terms and Clause Two of the Contract (exhibit 39 of the plaintiff's evidence file).

23.  On November 18, 2004, by means of note 6000-64540-2004, the Assistant Manager of Telecommunications answered Verizon's note of the 8th of that month, stating again that it should maintain the format of the 2004 telephone directories (exhibit 40 of the plaintiff's evidence file).

24.  By means of a resolution adopted as set forth as Article 10 of the minutes of meeting 5649 held on November 23, 2004 of the Board of Directors of ICE, it was decided to tell the contractor that any intention to unilaterally amend the contractual conditions agreed upon was rejected (exhibits 41 and 42 of the plaintiff's evidence file).

25.  On December 2, 2004, during a visit made to the plaintiff's facilities, Notary Public Yaila Paola Sanchez drafted a notarial certificate stating that 103,000 copies of the residential white pages of the Metropolitan Area were printed and that the printing company had not received any type of order to modify the printing and binding process; rather, it was working with the purchase orders delivered by Verizon, which had not been modified by it (exhibit 44 of the plaintiff's evidence file).

26.  By means of official note SI-759-12-04 dated December 13, 2004, the company Verizon Information Services CR was asked to initiate a procedure for termination of the contract

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

because the company did not comply with the contract signed and the requirements of the entity (exhibit 45 of the plaintiff's evidence file).

27. By means of official note 5225-69163-2004 of AEG-0572-2004 dated December 14, 2004, the procedure for termination of the contract was initiated (exhibit 46 of the plaintiff's evidence file).

28. By means of official note 6000-27733-2005 of SGT-2326-2005 dated June 1,2005, the contract by and between ICE and Verizon Information Services Costa Rica LLC was terminated due to breach of contract by the latter. The above was confirmed by means of official note 0150-36359-2005 of GG-680-2005 dated July 8, 2005 of the General Management of the entity (exhibits 58 and 59 of the plaintiff's evidence file, testimony of José María Quirás Alfaro).

29. By means of an arbitral award issued at 3 p.m. on December 4, 2015 in an arbitration proceeding initiated by ICE against Verizon Information Services Costa Rica LLC, the latter was ordered to pay different amounts because it had been demonstrated that there had been breach of contract by it (evidence for a better resolution produced by the plaintiff at the trial hearing, testimony of José María Quirós Alfaro).

30. At all times, the contractual relationship and coordination for its implementation, as well as the respective payments, were made between ICE and Verizon Information Services Costa Rica LLC, exclusively (testimony of José María Quirós Alfaro).

31. It was Verizon's choice not to continue negotiating for the development of telephone directories in the country *(deposition of José María Quirós Alfaro, former Manager of said company).*

**b) Proven facts of relevance for the resolution of this case related to the relationship between the co-defendant companies and the plaintiff:**

1. GTE entered into an "agency and mutual cooperation'' agreement with the plaintiff on May 8, 1997. Among the clauses of this Agreement, in Annex B, Section 5, it was established that GTE Information Services granted the plaintiff the status of "preferred vendor'' for Central America, including Panama and the Caribbean, defined in Annex 2 as a series of thirty-two (32) countries, including the Dominican Republic and Puerto Rico

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

(exhibit number 10 of the plaintiff's evidence file).

2.  On January 21, 2000, GTE executed a new contract with the plaintiff company and also commissioned the latter to print and edit telephone directories, including those for Costa Rica and Belize (exhibit 11 of the plaintiff's evidence file).

3.  The plaintiff and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC executed a contract, number VIS-2001-21-IP, entitled Master Purchase Agreement, which provided the following in Clause 2.b with regard to the term: *"This Agreement shall become effective only when the following two requirements have been met: (i) execution of this Agreement by the parties; (ii) execution of a contract by and between instituto Costarricense de Electricid ad (ICE) and the Purchaser, entered info as a result of a Purchaser's bid in public bidding proceedings 6378-T. At the time the foregoing requirements have been met, the effective date (the "Effective Date") of this Agreement shall be from the time of execution of the agreement identified in subsection (ii) of this Section 2 (a)..."* (exhibit 19 of the plaintiff's evidence file).

4.  This agreement, number VIS-2001-21-IP, entitled Master Purchase Agreement, executed by and between Instituto Costarricense de Electricidad and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC, provided the following with regard to its termination: *"28. TERMINATION, (a) The Purchaser may terminate this Agreement by giving the Seller at least (90) days written notice of such termination if the parties cannot agree on any price revisions under this Agreement, any amendments to this Agreement pursuant to Section 28 (c) above, or the price for new options or specifications that the Purchaser may require, regardless of whether such new options or specifications are within the current capacity of the Seller. (b) The Purchaser may terminate this Agreement immediately at any time if during the Term of the Agreement, the Agreement between the Purchaser and ICE described in Section 2, Term is terminated for any reason..."* (exhibit 19 of the plaintiff's evidence file).

5.  This agreement, number VIS-2001-21-IP, entitled Master Purchase Agreement, executed by and between Instituto Costarricense de Electricidad and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC,

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

was governed by the Civil Code and by the Commercial Code of Costa Rica *(Clause 35, exhibit 19 of the plaintiff's evidence file).*

6. This agreement, number VIS-2001-21-IP, entitled Master Purchase Agreement, executed by and between Instituto Costarricense de Electricidad and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC, involved the preparation of telephone directories in Costa Rica and Belize *(Annex A, exhibit 19 of the plaintiff's evidence file).*

7. This Master Agreement was executed for a maximum term of 168 months (Clause 2.b of the Agreement), to produce, package and distribute the telephone directories, in accordance with the contract executed between the GTE Consortium and ICE *(exhibit 19 of the plaintiff's evidence file).*

8. On October 15, 1999, the President of GTE Directories International proposed terms to be agreed upon for the preparation of telephone directories for the Dominican Republic *(exhibit 22 of the plaintiff's evidence file).*

9. On October 14, 2004, the plaintiff and Verizon Information Services - Costa Rica- LLC signed the "Production Schedule, 2005 Provinces Guide," which establishes the conditions for the preparation of the books corresponding to that particular guide. This schedule establishes December 15, 2004 as the deadline for modifying the number of pages and the number of books (exhibit number 28 of the plaintiff's evidence file).

10. That by means of a note dated September 2, 2005, the General Manager of Verizon Information Services-Costa Rica LLC informed the plaintiff that it is terminating the contractual relationship originated in the respective Master Agreement (exhibit number 68 of the plaintiff's evidence file).

11. That in the aforementioned note, the General Manager of Verizon in Costa Rica told the plaintiff company that. *". iCE disrespected the contractual and legally established rights of my company and proceeded to initiate administrative proceedings for the termination of the contract, using public means to distort the reality of the facts"* (exhibit number 68 of the plaintiff's evidence file).

12. The company Verizon Information Services- Costa Rica LLC asked the plaintiff

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

company to modernize its equipment to deal with technological changes and contractors' requirements (testimonies of José María Quirós Alfaro and Guillermo Navarro Céspedes, exhibits 10 and 24 of the plaintiff's evidence file)

13. Ms. MARIANNE DROST, a U.S. citizen, granted powers of attorney and acted in her capacity as Corporate Secretary of the companies VERIZON COMMUNICATIONS INC. and VERIZON INFORMATION SERVICES-COSTA RICA, LLC (pages 1183 to 1188 of the Court records).

**c) Proven facts in connection with the existence of the damages claimed:**

1. On February 25 and 26, 1999, Mr. Bruce Wataru visited the facilities of the plaintiff and made a series of observations regarding the company's facilities and equipment (exhibit 10 of the plaintiff's evidence file)

2. On November 15, 1999, a meeting was held between Mr. Alvaro and Alonso Trejos Fonseca and Mr. Guillermo Navarro, then President, Vice President and Production Manager of **THS,** respectively, with the Printing Director of GTE Directories International for the purpose of 1) evaluating the progress made on the plant improvement project; 2) assisting in developing a formal project to closely monitor the new plant project; 3) agreeing on a contingency plan in the event that THS does not comply with the installation dates of the new equipment and plant, which consisted of engaging another plant in the United States, in particular, if the equipment was not acquired on time; 4) evaluation of the potential purchase of the equipment, with the specific assistance of the consultant recommended by GTE, Mr. Bill Snell (exhibit 24 of the evidence of the plaintiff).

3. That in February 2000, the company acquired a modern Heidelberg rotary machine, a binding line and a pre-press equipment called CTP or Direct to Plate together with all the electrical and mechanical installations of the new plant. This was done to meet the requirements of Mr. Wataru and the provision (j) of Clause 16 of the Master Purchase Agreement. The purchase of the Rotary Machine and all the accessory equipment of the Heidelberg brand were at a cost of C.955,116,741.00 (exhibits 10, 19 and 20 of the plaintiff's evidence file).

4. In response to the requirements of Mr. Wataru, the plaintiff rented two industrial

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

warehouses in the Zeta Free Zone, in Guadalupe de Cartago, owned by INMOBILIARIA ZOROASTER S.A., with all its equipment, offices and warehouse, according to the contract executed with the owner on the first of July, two thousand and four (testimony of Guillermo Navarro Céspedes, exhibit 21, plaintiff's evidence file).

5.  On July 15, 2004, using stationery of Compañia General de Directorios C. por. A, with offices in San José, Costa Rica, a subsidiary of GTE Corporation, as stated in the same document, the contractor consortium of the Verizon Group processed purchase order 4568 for the printing of the Telephone Directories for the Metropolitan Area for a total amount of $3,033,625.60, and on August 20, 2004, purchase order 4582 was issued for the amount of $2,134,503 for the printing of Telephone Directories for the Provinces, for a total amount of $5,168,128.00 for the 2005 Directories. The purchase orders indicated in the previous Fact were replaced by Verizon by order number 4612 of November 3, 2004, regarding the Telephone Directories for the Metropolitan Area for a total amount of $ 2,120,828 and by order number 4644 of December 17, 2004 for the Provincial Guides, in the amount of $ 1,254,023, for a total sum of $ 3,374,851; that is, an extemporaneous decrease of $ 1,793,277 (exhibit 30 of the plaintiff's evidence file).

6.  The last purchase orders meant a reduction in the number of pages of the telephone directories and the number of books, as well as a different conformation and composition of the directories than had been agreed upon by GTE in its contract with ICE (exhibit 30 of the plaintiff's evidence file)

7.  Due to the lack of payment of the obligations acquired for the machinery, the creditor-initiated pledge enforcement proceedings as case number 06-001956- 0640-CI, in the Civil Court of Major Pleas of Cartago. At 12:30 a.m. on June 6, 2007, the auction of the pledged equipment was carried out; and by resolution issued at 9:23 a.m. on August 19, 2007, the order was given to place HEIDELBERG PRINT FINANCE AMERICAS INC., the auctioneer, in possession of the equipment, which was executed at 24:00 p.m. on October 31, 2007 (exhibit 69 of the plaintiff's evidence file).

8.  The plaintiff was forced to incur in arrears with the payments of the rents for the lease of the industrial warehouses of Inmobiliaria Zoroaster S.A.; for this reason, a public

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

document was executed. It was number 144, starting on page 133 reverse of volume one of the Protocol of Notary LAURA MONICA ZAMORA ULLOA, issued at 12:00 noon of March 23, 2006, according to which the plaintiff undertook to pay up to the sum of TWO HUNDRED THOUSAND TWO HUNDRED AND TWENTY-THREE DOLLARS AND SEVENTY-FIVE CENTS (US$ 200,223.75), providing the following in Clause Two of said document: ." .. *TWO. Debt Substitution. This debt replaces the overdue monthly payments of rent owed by the Debtor - (TREJOS HERMANOS SUCESORES)- covering the months from July, two thousand and five, to and including March, two thousand and six, at a rate of nine months of monthly payments of rent, under the lease executed by and between Creditor and Debtor, dated the first day of July, two thousand and four. Such lease was for the property of the Creditor, with real estate registration number three - one nine zero eight seven three - zero zero zero and number three - one nine five eight nine eight - zero zero zero, which is expressly accepted by the Creditor."* …Likewise, interest was established, to be paid in monthly installments of twenty-two thousand two hundred and forty-seven dollars and eighty-three cents until the obligation is paid in full (exhibit 70 of the plaintiff's evidence file).

9. In view of the failure to comply with the agreement, Inmobiliaria Zoroaster S.A. initiated simple proceedings for collection before the Civil Court of Major Pleas of Cartago, as execution proceeding case number 06-001846-0640-CI. Such proceedings ended with a judgment that admitted the defense of partial payment and ordered the plaintiff to pay fifty-six thousand one hundred and eight dollars and ten cents (US$156,108.10) [Note of Translator: different amount in letters and numbers in the original document] (exhibit 71 of the evidence).

10. The plaintiff sold, under very unfavorable conditions, virtually all of its assets in equipment and improvements in the Lessor's buildings to the Colombian capital company CONDOR EDITORES DE COSTA RICA, S.A., which agreed with Inmobiliaria Zoroaster S.A. to lease the industrial facilities in the Zeta Free Zone of Cartago, and acquired the equipment auctioned by HEIDELBERG PRINT FINANCE AMERICAS INC., under favorable conditions and already installed in said industrial facilities, as well as the rest of the THS equipment pledged to Banco Nacional de Costa Rica and Banco Interfin (exhibit 73 of the plaintiff's evidence

file).

11.  The plaintiff reached an agreement with Inmobiliaria Zoroaster S.A., dated March 28, 2007, entitled "Lease Termination and Debt Recognition Agreement," according to which it delivered the industrial building where the rotary machine and the remaining printing equipment were located, since the other building where the offices and warehouse were located had already been handed over. Both parties released each other from liability, but also stated that Inmobiliaria Zoroaster S.A. acknowledged receipt of two payments up to that date (which had not been possible to demonstrate in the eviction proceedings), for a total amount of fifty-five thousand U.S. dollars, and also that it had the security deposit for an amount of thirty-nine thousand dollars, all of which was expressly authorized by the plaintiff to be applied by Inmobiliaria Zoroaster S.A. to the total debt. Independently of the fact that said Court proceedings could continue, the plaintiff undertook to pay the total due, to be determined in a timely manner, once these deductions have been made, together with the agreed interest and costs, until they are effectively paid, within a peremptory term. Both parties acknowledged that there is an express instruction in the "Trejos Hermanos-Fiduciaria Castro Garnier Trust," whereby what is due to Inmobiliaria Zoroaster S.A. must be paid, as soon as the plaintiff receives the payment of amounts owed to it for different pending business, such as, an outstanding debt of Radiográfica Costarricense, S.A. (exhibit 74 of the plaintiff's evidence file).

12. The plaintiff leased with a purchase option to DACONDOR Q.C.R. SOCIEDAD ANÓNIMA, which then, on May 29, 2007, assigned its rights to the aforesaid CONDOR EDITORES DE COSTA RICA, S.A. over the remaining industrial assets of the company, for a fraction of the liabilities, both with Transamerica Bank & Trust Co. (a subsidiary of Banco Interfin), with Banco Nacional de Costa Rica and with Banco Improsa S.A. In the specific case of Transamerica Bank & Trust Co. Ud., those liabilities correspond to a line of credit that was granted to it, based on the excellent perspectives that it had, and after conducting bank studies which analyzed the contracts signed with Verizon, for the preparation of the telephone directories of the Dominican Republic and Costa Rica (exhibit 75 of the plaintiff's evidence file).

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

13. That following termination of the Master Agreement with the co-defendants, the plaintiff enforced an agreement with RACSA (deposition of Guillermo Navarro Céspedes and exhibit 74 of the plaintiff's evidence file, mentioning an outstanding debt of RACSA)

14. The estimated damages to the plaintiff as the result of the malicious breach of the Master Agreement are as follows:

| | |
|---|---|
| *a) Investment in machinery* | *$2,582,156* |
| *b) Increase in inventories* | *$ 2,860,696* |
| *c) Operating Cash Flows not received 2004-20 J 3 Directories in Costa Rica* | *$ 8,806,872* |
| *d) Operating Cash Flows not received 2004-20 i 3 Directories in the Dominican Republic* | *$7,912,999* |
| *e) Losses incurred from 2004 to 2007* | *$ 7,237,068, less the contract with RACSA, S.A., which would have been performed during that period* |
| *f) Interest paid by THS* | *$ 983,825* |
| *g) Interruption of Operations* | *$28,885,195* |

(Exhibit 77 of the plaintiff's evidence file, an economic and financial report prepared by Mr. Tomás Evans Salazar and an expert report by Ramón Humberto Romero Rodríguez, Certified Public Accountant and Mathematical Actuary Expert, visible on pages 947 to 957 of the Court records).

**d) Other proven facts of relevance to this case:**

1. That the Board of Directors of ICE arranged for the preparation of telephone directories for 2006 with RACSA (exhibits 63, 65 and 66 of the plaintiff's evidence file).

2. That as a preventive measure in light of Verizon's failure to comply, ICE resolved to waive the 113-information service fee (exhibit 61 of the plaintiff's evidence file).

**V.II- Specifically in regard to non-proven facts:** Of this nature, and of importance for the resolution of the case, the following facts have not been demonstrated to this Court during the proceedings:

a) That ICE has participated at some point in the process of approving the plaintiff's contracting, carried out by the co-defendant companies (no evidence on record and

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

the deposition of witness Roger Echeverría Coto was limited to a generic statement that ICE approved subcontracting, but not stating specifically that the agreement by and between Trejos Hermanos Sucesores and the co-defendants) had been approved.

b) That the clauses exempting from civil liability contained in the master agreement executed by the plaintiff and other contractual contents have been imposed by the latter in an adhesion agreement and that the plaintiff was not in a position to modify in any way the contractual contents pre-established by Verizon Information Services - Costa Rica- LLC (no evidence of this was provided for the record).

c) That there have been significant arrears in the plaintiff's obligations towards the Costa Rican Social Security Fund and other public entities (no evidence of this was provided for the record).

d) That the plaintiff has conducted other business with the machinery and facilities acquired and leased for the production of telephone directories (no evidence of this was provided for the record).

e) That the damages claimed are attributable to the plaintiff, to the defendant entity (no evidence).

f) That the plaintiff has made investment errors due to poor business management (no evidence).

g) That the master agreement executed has contemplated the preparation of telephone directories in the Dominican Republic (no evidence).

h) That the plaintiff has suffered non-economic damages (no evidence).

**V.III. - On the lack of jurisdiction reiterated at the trial hearing:** As a significant part of its arguments, the representative of Verizon Information Services Costa Rica LLC reiterated allegations that in this case, the Trial Court is prevented from deciding on the merits given the lack of jurisdiction on its part. In this order of ideas, it claims the existence of errors and omissions on the part of the First Chamber of the Supreme Court of Justice at the time of defining jurisdiction and indicates that it limited itself to determining the existence of a public entity in the proceedings, without evaluating the substantive claims. In this regard, in an oral hearing the attorney was expressly told that the jurisdiction of this Court was

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

2

defined by vote 000874-C-S1-2009 issued at 11:15 a.m. on the twenty-fifth day of August, two thousand nine, by the First Chamber of the Supreme Court of Justice, and therefore any discussion on this matter is duly precluded. Given the above, it pointless and unnecessary to elaborate on this argument of the defendants' defense.

**V.IV.- Regarding the motion filed to dismiss based on the statute of limitations: a)** In its closing arguments, the representative of co-defendant Verizon Communications Inc. invoked the application of Article 984 of the Commercial Code, which provides: *"ARTICLE 984.- Except as expressly provided for in other chapters of this Code, all rights and their respective actions shall expire in four years, with the following exceptions, which shall expire in one year: a) The actions of nullity of the resolutions adopted by shareholders' meetings or boards of directors of business companies; those of claims for defects of things sold under a warranty of good operation; and those of responsibility of administrators, managers, directors and other members of the management of companies; b) Actions to collect interest, rent or leases; c) The actions of entrepreneurs to collect the value of the works they performed on a piecework basis; d) Actions to collect the use of any other rights in personal property; and e) Actions derived from wholesale and retail sales to other merchants or to the consumer directly,"* **b)** The representatives of the plaintiff made two arguments against this defense, as follows: 1. The possibility of raising this defense has expired. 2. We are not dealing with the requirements of Article 984 of the Commercial Code for one year, but for 4 years for the filing of the complaint, **c)** Court's criterion: According to a reading of the claims, it is noted that the plaintiff requests payment of the damages caused by the breach of contract by the co-defendant companies and entity, which it considered to be malicious. In view of the above, this Court considers that in this case, the statute of limitations is 4 years. Therefore, the Court affirms that by means of note dated September 2, 2005, the General Manager of Verizon Information Services- Costa Rica LLC informed the plaintiff that it was terminating the contractual relationship originated from the respective master agreement, and the complaint was filed on December 15, 2008. The complaint was served on the representative of Verizon Information Services Costa Rica LLC on January 28, 2009, and on March 18, 2009 on the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

representative of Verizon Communications Inc. Consequently, this Court considers that it is appropriate to reject the defense submitted, given that the complaint was served within the four-year term established in the statute of limitations. Additionally, the plaintiff is advised that in accordance with Article 67.1 of the Code of Contentious Administrative Procedure, the possibility of presenting this defense had not expired, given that the co-defendant filed it before the end of the trial hearing.

**V.V.-Determination of the existence of liability of Instituto Costarricense de Electricidad: a)** The representatives of the plaintiff base their arguments regarding ICE's liability on the following basic claims: **1)** A <u>complex contractual</u> relationship exists between and among ICE, the co-defendants, and the plaintiff company, in which the different agreements are interconnected to achieve a financial result, and where the final result requires the involvement of each party. **2)** ICE's approval of the Master Printing Agreement involved it with the parties to the agreement. **3)** When this entity terminated its contract with the contractor, it was still required to provide the respective public service, and even though it knew that there was a company that produced the telephone directories, it interacted only with the Verizon group, not involving the plaintiff. **4)** The contractual mechanism used by ICE for the preparation and distribution of telephone directories was not the correct one, given that we are in the presence of a public service. **5)** Upon the termination of the contract between the GTE Consortium and ICE, this Public Entity should have adopted the necessary preventive measures, in order that the public service of information to the public through Telephone Directories would not be seriously affected, nor would the classic principles of the concept, such as equality, continuity and adaptability, be violated. **6)** The damages suffered by the plaintiff for the objective breach of its contract with GTE (VERIZON) were caused by the actions of ICE, which terminated its contract with GTE (VERIZON), without respecting the lawful interests that THS had in that contract, thus violating the principle of *Neminem iaedere* - not to harm others-, **b.** The representatives of the defendant entity base their arguments supporting their answer to the plaintiff on the following basic claims: **1.** The preparation of telephone directories is not a public service. **2.** The agreement between the plaintiff and the co-defendants is a private contract that

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

is not governed by public service principles. Consequently, the plaintiff should not be consulted about termination of the contract between ICE and the co-defendants. **3.** The contractual relationship of the plaintiff company was with the co-defendants, who opted to subcontract with it, in accordance with the powers allowed by the Administrative Contracting Law. **4.** The investments made by the plaintiff company were not only to satisfy the needs of ICE but also to provide services in other parts of the region. **5.** The bidding terms required printing the guides in Costa Rica, but not at the plaintiff's facilities. **6.** The contract with the codefendant companies was terminated for reasons of public interest, since they unilaterally decided to restructure the 2005 guide, thus breaching the clauses of the contract. **7.** ICE's knowledge of the relationship between the co-defendants and the plaintiff was based on the fact that the latter was a simple subcontractor of the former. **8.** In the case under study we are not in the presence of a complex contractual relationship, since we have an administrative contract, characterized by the existence of exorbitant clauses. **9.** ICE is not responsible for machinery acquired by the plaintiff to produce the telephone directories of the Dominican Republic, **c) This Court will now proceed to the detailed analysis of each argument**: 1.- Regarding the first core argument expressed by the plaintiff: After analyzing the arguments made by the parties and the evidence collected in the proceedings, this Court considers that the plaintiff is not correct in alleging the existence of a complex contractual relationship between the plaintiff and Instituto Costarricense de Electricidad. This is because in the case under examination we are dealing with two different and defined legal relationships; the first one is characteristic of public law, namely, the link between the entity and Verizon Information Services Costa Rica LLC, and the second is a relationship characteristic of private law, between the latter company and Trejos Hermanos Sucesores S.A. As a result, this Court considers that the analysis to be carried out must be made in a differentiated manner, taking into account the nature of both legal relationships. The plaintiff is a company subcontracted by Verizon Information Services Costa Rica LLC. This does not result in any contractual obligation of ICE towards Trejos Hermanos Sucesores S.A. In the record, it has been demonstrated that Instituto Costarricense de Electricidad conducted Public Bidding Proceedings 6378-T for

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

*"Publishing of the Telephone Guide and Development and Implementation of Information Services,"* and on August 10, 1999, the GTE Consortium submitted a bid to participate in said Public Bidding Proceedings 6378-T. Since it became the successful bidder, on the tenth day of March, 2000, Instituto Costarricense de Electricidad and GTE Consortium executed the *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE."* This agreement provided the following regarding the possibility of subcontracting by the contractor company: *"In accordance with Clause 2.13.1. of the bidding terms, GTE accepts that it may subcontract with the prior written approval of ICE for up to 50% of the development, production, and distribution of the Telephone Directories, without this approval obliging ICE to be jointly and severally liable in the event of default by the subcontractor. Subcontracting shall not release GTE from its responsibility for the full performance of the contract."* This provision has to be analyzed in accordance with the provisions of another clause of the contract, which established the following: *"In accordance with the experience of recent years, GTE has produced the entire telephone directory for the Costa Rican territory, thus contributing to the growth of well-paid employment, professional training, and technology transfer for the benefit of Costa Rican citizens and the country's economy in general, which ICE considers to be in the general interest. Consequently, ICE requests and GTE accepts that during the performance of this contract, all stages and processes of production of the ICE Telephone Directory will be carried out by GTE in Costa Rica."* As noted on record, and given the existence of a long-term relationship, the plaintiff and the companies Verizon Information Services- Costa Rica LLC and Verizon Information Services - Belize LLC executed an agreement, number VIS-2001-21-IP, called Master Purchase Agreement, which provided the following with regard to its term: *"This Agreement shall become effective only when the following two requirements have been met: (i) execution of this Agreement by the parties; (ii) execution of a contract by and between instituto Costarricense de Electricidal (ICE) and the Purchaser, entered Into as a result of a Purchaser's bid in public bidding proceedings 6378-T. At the time the foregoing requirements have been met, the effective date (the "Effective Date") of this Agreement*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

*shall be from the time of execution of the agreement identified in subsection (ii) of this Section 2 (a)..."* On the other hand, this private agreement was governed by the Civil Code and the Commercial Code of Costa Rica (see Clause 35, exhibit 19 of the plaintiff's evidence file) and was executed, in principle, for the preparation of telephone directories in Costa Rica and Belize. Consequently, we are in the presence of a subcontracting carried out by these companies with the plaintiff, in order that they could fully perform the contract arising from said public bidding proceedings 6378-T. The fact remains that although the original contractual relationship of ICE was with GTE, it was subsequently modified, so that the role of contractor was occupied at the time of the events that are the subject matter of these proceedings by the economic interest group Verizon, as will be explained later. In accordance with the above, it should be noted that there is no direct link between ICE and the plaintiff, nor is it feasible to assume the existence of a complex contractual relationship, typical of private law. For such purposes, this Court must distinguish between the latter modality and subcontracting in administrative law. In the case of the so-called **complex legal relationship,** this Court considers that we are in the presence of different parties that concur to the fulfillment of a common business object, so that all the actions carried out by the contractual complex must be oriented to that end. As a result, even though the parties are not necessarily direct contracting parties, all directly linked to each other, they do have reciprocal knowledge of their participation in the contracted material activity, which is necessary within the complex relationship developed, and if one of them does not fulfill its obligations to the others, it is required to compensate, to indemnify, for the unlawful damages caused by its breach. There is then full awareness of the contractual link between one and the other and of the consequences of the participation and of the failure to comply with the obligations directed to this common purpose. As we can see, in these cases, the starting point is a first-degree relationship between the participants, where the contributions may be different and have a greater impact on the business object, but always maintaining a complementarity between and among them. In the case of this first assumption, characteristics such as: a) The union on a factual level of different contracts according to

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

the will of the interested parties and the unity of the end pursued; b) The existence of a social economic function and specific purposes that the different parties in the relationship seek to achieve; c) The existence of a social control by one or more parties is noted; d) The whole is considered as a legally organic unit and, therefore, interrelated, so it must start from the essential content of the contractual framework, at the time of the analysis of any eventuality that it faces. As we can see, we are in the presence of a contractual framework, in which contracts can have their own cause, but respond to a common purpose and there is a balance of benefits among them, which cannot be unreasonably broken by one of the parties without the duty to indemnify. This is because a systemic social relationship emerges between the parties from which reciprocal duties arise aimed at protecting the sphere of shared interests. From this relationship resulting duties arise of diligence, good faith, loyalty, compliance with main and accessory obligations, among others, and the framework of the will of the parties is oriented towards them, with full awareness of the functioning of the network and its operation. We are therefore in the presence of non-linear relationships, in the sense that this does not translate into a mere duty to provide services in exchange for the existence of a consideration, but rather to a relationship of a global nature that may include various legal ties and situations oriented towards the same business purpose. In the case under analysis, we note how the judgment of reproach made by the plaintiff is aimed at presuming the breach of an obligation derived from its theory regarding the existence of a contractual relationship, which is the duty to preserve the integrity and assets of the parties (interest of protection) and which translates into an obligation of warning and one of conservation. However, the situation of **subcontracting** is different, as it arises when one of the parties in a basically binary contractual relationship turns to third parties to obtain goods or services that are necessary to fulfill the primary contractual obligations. In this situation, there is a first level relationship in the initial contract, in which one of the parties, at its own risk and in an exclusive way according to its will, goes on to establish one or several second level contractual relationships with subcontractors, which have the means for the contractor to fulfill its obligation. Consequently, we are in the presence of a main contract and a secondary

contract signed by one of the parties, for the performance of some of the services that are, in turn, the object of the main contract or that contribute at least to its fulfillment. It is clear then that subcontracting arises because of the specialization of business organizations and the material impossibility for a contractor to have at its disposal all the goods and services necessary for the fulfillment of the main obligation. Therefore, subcontracting operates at different levels and while it is true that the proper performance of the main contract depends on the good operation of the subcontracting, it cannot be seen as a framework, given the *instrumental* nature of the latter for the contract executed by the contractor. Thus, the destination of the secondary contract or the one originated with the subcontracting must not have a direct legal or factual consequence in the performance of the main contract; that is, the breach of the subcontractor does not release the contractor from complying in time and form with the terms and conditions of the main contract. Conversely, the contractor's failure to comply does not obligate or bind its subcontractors, so the contractor, or in this case the Administration, may hold liable only the principal, given that this is the contractual relationship it acquired; the above is in accordance with the provisions of the *"Contract for Publishing of the Telephone Guide and Development and Implementation of Information Services between ICE and GTE,"* which provided the following concerning the possibility of a contractor to subcontract: *"in accordance with Clause 2.13.1. of the bidding terms, GTE accepts that it may subcontract with the prior written approval of ICE up to 50% of the development, production, and distribution of the Telephone Directories, without this approval obliging ICE to be jointly and severally liable in the event of default by the subcontractor. Subcontracting shall not release GTE from its responsibility for the full performance of the contract."* From the foregoing, it is evident that a contract arising from a subcontract or secondary contract is derived from or dependent on a previous primary contract, which is not exhausted by the former and exceeds the scope of the secondary contract, since it is a differentiated and distinguishable contractual relationship. Consequently, it is not possible to presume joint and several liability of the Administration as a contractor towards the subcontractor in events of default of the contractor, much less a legal relationship that is even more

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

complex beyond this second level linkage, where between the contracting party and the subcontractor, there is no direct linkage, but the contractor will always be involved, as responsible for the fulfillment of the contractual object. However, since in the contracting party and contractor relationship, the Administration may impose certain obligations on the latter referring to the public interest or to compliance with the law. This is because both applicable public order regulations and by the very existence of the exorbitant clauses and the very nature of the contractual object must be considered. In the case in question, Verizon Information Services Costa Rica LLC subcontracted with the plaintiff company. In addition to the fact that the guides had to be prepared in the national territory, it demonstrated a high degree of expertise in the subject, a long contractual relationship prior to the contract subject matter of this resolution, and the existence of a contractual recognition of the possibility that the contracting company could resort to this modality in order to comply with its contractual obligations. Consequently, the plaintiff is not correct in indicating a legal relationship other than subcontracting, nor has it demonstrated that in the case under analysis there was a relationship different from that established in the bidding terms, or that Trejos Hermanos Sucesores did not have a second-tier relationship, or that it was part of a contractual arrangement that allowed the presumption of the existence of a complex contractual relationship. On the contrary, the evidence provided by the plaintiff itself shows that its relationship is secondary to ICE and that there was full knowledge of such relationship. Even the testimonies of the witnesses Quirós Alfaro and Navarro Céspedes offered by the plaintiff confirm that there was no direct relationship between the entity and the plaintiff, so, it is not possible to assume a relationship beyond the one that has been demonstrated; that is, the one that the entity had with the Verizon Group. Additionally, we must not forget that we are in the presence of an administrative contracting of a public entity - state-owned company, so we consider it incorrect to allow a private law concept to prevail over a mechanism established to achieve public purposes, such as subcontracting. Although we are aware that the Administrative Contracting Law of that time established the subcontracting of contracts for the performance or construction of public works, the truth is that the possibility of using such

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

mechanism in other contractual modalities was opened up through administrative and jurisdictional jurisprudence, until we obtained the current wording of the regulations that expressly allows this mechanism for other types of administrative contracts. **Conclusion:** In accordance with the foregoing reasoning foregoing reasoning, it is appropriate to reject this first argument of the plaintiff. **2.-** The plaintiff claims that ICE's approval of the Master Printing Agreement involved it with the parties to the agreement. In this respect, this Court considers that first, there is no evidence that the entity has participated in the prior or post approval of such contract, given that the witness offered for such purpose said that he did not remember having issued any approval of the contract, nor is such a manifestation of will show by the agreement signed by the plaintiff. On the other hand, stating that the contract was approved is not the same thing as stating that the subcontractor modality was approved. This is because in accordance with the contractual text, ICE approved the possibility of subcontracting and the subcontractor in particular, but not the specific agreements of the contractor with the subcontractor. In this sense, we must not forget that we have a contract with a public company, a state entity, in which the obligation is permeated by the legal system itself and the public interest. Therefore, the imposition of the prior approval of the subcontractor mechanism is reasonable as indicated, since the Administration uses this mechanism to prevent the subcontractor from being subject to prohibitions or disqualified, among other aspects. Therefore, it is logical, as has been stated, that the activity of subcontracting is regulated by rules of a public nature that limit some aspects of the autonomy of the will of the parties, but this does not in any way imply that the legal nature of the relationship is blurred beyond its scope to the detriment of the contracting party and the public interest. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **3.-** In addition, the plaintiff indicates that this is a public service, so any contract executed in this area is covered by that legal nature. It invokes the application of a criterion of the Attorney General's Office. Therefore, this indicates that upon termination by the entity of its contract with the contractor, it was required to continue providing the respective public service. Even though it knew there was a company that prepared the telephone directories, it only

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

interacted with the Verizon group, without involving the plaintiff. In this regard, this Court considers that the plaintiff's arguments are not correct. In the first place, this Court considers that in the case under analysis, we are not dealing with a public service. In this regard, Article 3 of Law No. 7593 of August 9, 1996, defines public service as follows: *"a) Public Service: a service which, due to its importance for the sustainable development of the country, is defined as such by the Legislative Assembly, in order to subject it to the provisions of this law."* In this regard, we note that the rule leaves it up to the lawmaker to classify an economic activity in a given historical moment as a public service. This declaration or *"publicatio"* has been recognized by the Constitutional Court Division in the following manner: *"For example, Article 3 of the Public Services Regulatory Authority Law contains several definitions, including the definition of public service as every activity which, due to its importance for the sustainable development of the country, is defined as such by the Legislative Assembly, in order to subject if to the provisions of this law. As can be seen, the determination of whether a need is in the public interest is not a legal question, but one of fact and circumstance, which requires - as already stated - a judgment of opportunity and convenience. <u>There are no activities that by their 'nature' or imperatives of Constitutional Law are typical of public service: instead, that will depend on each company, its needs and the environment - private or public - in which these needs are best met</u>" (Vote No. 517-98 issued at 2:32 p.m. on August 26, 1998). Emphasis added.* In this vein, this Court notes that Article 2 of Decree Law 449 of April 8, 1949 did not determine that telephone directories could be considered a public service, and in this regard, it ruled *"Article 2 - The aims of this Institute, towards which all its efforts and work programs are directed, shall be as follows: ..h) To seek the establishment, improvement, extension and operation of telephone, telegraphic, radiotelegraphic and radiotelephonic communication services, for which it shall have the appropriate concession for an indefinite period."* Neither is it noted that the Public Services Regulatory Authority Law, Law No. 7593, of August 9, 1996, has considered the preparation of the guides as such, so any extensive interpretation is inappropriate if the will of the lawmaker is not expressly noted in this regard. In any case, based on the allegations of the plaintiff, this does not mean that

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

3

any subcontractors of a contractor company should be considered as being governed by an extensive public law relationship between the entity and them, given that their contractual relationship is not with the former, but with the company that would be the provider and that engages them. On the other hand, it should be noted, as additional reasoning that leads to the rejection of this argument, that the preparation per se of telephone directories does not meet the conditions to be considered a public service. In this sense, a public service is one that has certain characteristics, such as: a) it is an essential activity of general interest, b) the demand for it is captive and therefore implies profit, c) there is the "*publicatio*" by the lawmaker, d) a third party could not pretend to exploit the service without an enabling act of the Administration, taking into account that the Administration is the owner of the service, e) the concessionaire does not exercise fundamental powers, f) the Administration maintains control and accountability over the service. With regard to the above, Article 4 of the General Law of Public Administration applies, as follows: "*The activity of public entities must be subject, as a whole, to the fundamental principles of public service, in order to ensure its continuity, efficiency, adaptability to any change in the legal system or in the social need they satisfy, and equality in the treatment of recipients or beneficiaries.*" In the case in question, this Court considers that the preparation of telephone directories is one more means for the fulfillment of public service; it is an instrument, but not this latter concept itself. Consequently, in no way can making the guides be considered a public service and any extensive interpretation intended to give it such a character is erroneous and contrary to law. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **4)** The plaintiff claims that the contractual mechanism used by ICE for the preparation and distribution of telephone directories was not the correct one, given that we are in the presence of a public service. In this respect, the considerations made above should be applied, since in the opinion of this Court, in the case of the contractual object, we are not in the presence of a public service as such, and in any case, if there had been an erroneous administrative contracting procedure, what was appropriate was to apply the figure of irregular contracting - which, as has been

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

said, is not the situation under analysis - but without this implying any contractual or even noncontractual obligation, with the subcontractor. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **5)** The plaintiff also claims that when the contract between the GTE Consortium and ICE was terminated, this Public Entity should have adopted the necessary preventive measures so that the public service of information to the public by means of telephone directories was not seriously affected, and to ensure that the classic principles of the figure, such as equality, continuity, and adaptability, were not violated. In this regard, we see in the case record that the entity adopted measures against the breach of contract with Verizon Information Services Costa Rica LLC, although in any case, there was no contractual link or rule that forced the entity to engage the plaintiff in a contingent manner. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **6.** This Court considers that we are also not in the presence of extra contractual civil liability, insofar as there is no rule that has imposed on the entity the obligation to inform the subcontractors of the pathological situation reached in a contractual relationship with one of the successful bidders and contractors of public bidding proceedings. As indicated, we are in the presence of a single contractual relationship between ICE and Verizon Information Services Costa Rica LLC, so the obligations of the entity are limited to those established in it. Any legal relationship that Verizon Information Services Costa Rica LLC has entered into with third parties does not obligate or bind the entity in terms of contractual or extra- contractual obligations that have not been agreed upon. To admit the contrary would mean to accept the absurd position that the entity is required to notify all subcontractors, suppliers and employees of a contractor when the contractual relationship has been broken, which is obviously disproportionate, unfounded and would imply a burden on the entity that transcends the regulations and the respective contractual relationship. Nor has it been demonstrated that ICE has caused damage that is directly linked to its conduct and omissions. To the contrary, based on the arguments and evidence gathered in the case, it is clear that any harm would be caused by the act of a third party, but not the public entity itself. In the case of the defendant entity, in

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

principle, its obligations are limited to its relationship with the contracting company and it is this company that is responsible for responding to its subcontractors, as well as the latter responding to the company that contracted them. Far from administrative contracting being an obligatory relationship of a triangular nature, we are in a synallagmatic obligation, where the demonstrated breach of the contractor before ICE, should not serve as a justification to allege extra-contractual damages without a causal link to said entity. Consequently, the plaintiff has not demonstrated the requirements of Article 190 et seq. of the LGAP to trigger the extra-contractual liability of the Public Administration. Furthermore, it is evident that Article 1045 of the Civil Code, applicable to the relationship between subjects of private law, does not apply here. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **Final Reasoning:** This does not mean that it is not appropriate to claim the existence of an alleged joint and several liability of the entity with the co-defendant companies against the plaintiff, when, as in this case, a <u>direct</u> legal relationship between ICE and Trejos Hermanos Sucesores S.A. capable of generating legal effects has not been demonstrated and there is no rule that provides for such an assumption.

**V.VI. -** In accordance with the above considerations, the complaint should be rejected with respect to Instituto Costarricense de Electricidad, since the plaintiff is not correct in any of the arguments invoked, and since the existence of some type of contractual relationship between the plaintiff and the company that has generated a contractual or non-contractual damage linked to a causal link with any of its conducts or omissions has not been determined.

**V.VII.- Determination of the existence of liability of the co-defendant Verizon Information Services - Costa Rica- LLC: a)** The representatives of the plaintiff base their arguments regarding the liability of Verizon Information Services - Costa Rica - LLC on the following basic affirmations: **1)** The Agreement executed by the plaintiff with GTE Group (later VERIZON Group), which was approved and authorized by ICE, is by its nature a contract governed by the principles of public service and is regulated by its principles, norms and values. Consequently, the exonerating clauses of civil liability that by imposition of VERIZON

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

were included in the master purchase agreement, are necessarily ineffective based on the imperative principles of Public Law, since although the Verizon - THS agreement was executed with the formalities of a commercial agreement, by its object and by its effects, it has an administrative nature, since it is for the benefit of a public service. **2)** Verizon Information Services - Costa Rica LLC breached its contract with ICE. However, when terminating its contractual relationship with the plaintiff company, it falsely indicated to it that the party responsible for the contractual breach was said entity, and it committed a willful breach, since it wanted to leave its business in the country. Consequently, it considers that the clauses exonerating from civil liability in the respective contract are ineffective when they refer to a willful breach, in accordance with the provisions of Article 701 of the Civil Code. **3)** The termination of the ICE - GTE (VERIZON) contract constitutes an objective breach of the GTE (VERIZON) - plaintiff contract, which is attributable to GTE (VERIZON); therefore, the latter must respond for the damages caused, according to the general principle of contractual liability established in Article 702 of the Civil Code. **4)** The exonerating clauses are part of an adhesion contract, since the content of that agreement only allowed the plaintiff company to accept or reject it. The nullity of such clauses results from their abusive nature, in accordance with Article 1023, subsection m), of the Civil Code and Article 42 of Law 7472 of January 19, 1995 (Law for the Promotion of Competition and Effective Defense of the Consumer), **b) The representatives of Verizon Information Services - Costa Rica- LLC claims in its defense that: 1.** The disputed clause is logical in the sense that Verizon only has one business in Costa Rica and it would be illogical for it to remain if ICE terminated its telephone directory contract, since it was negotiated with the plaintiff and is not null and void under the provisions of Article 1023 of the Civil Code. With respect to the term of the agreement, clause 2(b) of the agreement established a range between 48 months and 168 months, with the term of the agreement being in any event subject to the term of the agreement with ICE, given the nature of the agreement and the fact that Verizon had no other business in Costa Rica. **2.** The relationship between Verizon and the plaintiff is exclusively private. The plaintiff intends to deceive the court by affirming that the agreement signed with Verizon is a subcontract of

Digital signature of:
    RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ
    MOLINA, DECIDING JUDGE

4

the contract executed by and between ICE and Verizon, which is not true and constitutes a legal aberration. **3.** Article 701 of the Civil Code must be applied. It indicates that willful misconduct is not presumed, but must instead be demonstrated; therefore, mere breach does not constitute willful misconduct. **4.** The termination of the agreement did not imply any liability for any of the parties, since the early termination of the agreement arises as a direct consequence of the fact or action of a third party, which in this particular case was ICE. **5.** Clauses 24 and 28, which establish an exemption from contractual civil liability and limitation of contractual civil liability, specifically subsections b) and e) of Clause 28, were negotiated and accepted by the representative of the plaintiff. **5. (sic)** The plaintiff acknowledges that the performance of the agreement was maintained under normal conditions for nearly four years, which tells us that the agreement was executed in the range of 48 months established in point b) of Clause 2 - Term, **c) <u>This Court will now proceed to the detailed analysis of each argument</u>**: **1.** Based on the reasoning indicated in the previous recital, it is clear to this Court that the relationship between the plaintiff company and Verizon Information Services - Costa Rica- LLC is not a matter of public law, nor does it imply the provision of a public service. As extensively indicated above, in this case there is a private law relationship, where Trejos Hermanos Sucesores is a subcontractor of Verizon Information Services - Costa Rica- LLC, the latter being the only one that executed a contract governed by public law regulations with ICE. Consequently, it is not true that the specific regulations by means of which the transfer of a public service is given are applicable to this contractual relationship. **<u>Conclusion:</u>** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **2.** On the other hand, the plaintiff has not demonstrated the existence of an adhesion agreement in the agreement it executed with Verizon Information Services - Costa Rica- LLC; to the contrary, it was based on free will at the time of the execution of the contract, according to the agreements adopted by the parties. In addition, the pre-existing relationship between the plaintiff and GTE rules out any possibility of impossibility of reviewing the agreed terms and conditions, or of a mere adhesion relationship. The plaintiff must remember that unlike contractual relationships based on negotiation, in an adhesion contract, one party drafts

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

the content exclusively, without letting the other party intervene, and the latter merely adheres to the formulation drafted by the professional. Consequently, it cannot be presumed that a contractual relationship is of such a nature if it does not have a massive nature, has a tendency towards generality, and there are no preliminary negotiations to the execution of the contract that demonstrate the formation of the will. The previous requirements made by GTE and later Verizon regarding the machinery used and the quality of the product cannot be considered the unilateral possibility to which the plaintiff had to adhere; instead, they were the necessary conditions to maintain and continue a contractual relationship, within a business framework and a market society in which the free forces of supply and demand operate and in which economic agents can require from their contractors the quality requirements they deem appropriate to obtain a final product in accordance with their commercial interests. It is not even possible to speak of a consumer relationship or of a demonstration of an obligatory contractual imbalance that could lead to the presumption of such an argument.

**Conclusion:** In accordance with the foregoing reasoning, it is appropriate to reject this argument of the plaintiff. **3.** The plaintiff alleges breach of contract by the co-defendant Verizon Information Services - Costa Rica- LLC in its relationship with ICE. In this regard, this Court considers this fact to be proven, since through official note 6000-27733-2005 of SGT-2326-2005 of June 1, 2005, the contract between ICE and Verizon Information Services Costa Rica LLC was terminated due to breach of contract by the latter. The above was confirmed by means of official note 0150-36359-2005 of GG-680-2005 dated July 8, 2005, from the General Management of the entity. This was confirmed by an arbitral award issued at 3:00 p.m. on the fourth day of December, 2015, issued in arbitration proceedings initiated by ICE against Verizon Information Services Costa Rica LLC, in which the latter was ordered to pay different amounts because breach of contract by it was shown (evidence for a better resolution produced by the plaintiff at the hearing). Thus, there is a final administrative act and an arbitral award that proves the breach alleged. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to admit this argument of the plaintiff. **3.** The plaintiff claims a malicious breach of contract attributable to Verizon

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

Information Services - Costa Rica- LLC, in its relationship with Trejos Hermanos Sucesores S.A. In this regard, this Court considers this fact to be proven, since the indicated co-defendant deliberately caused the termination of its contractual relationship with Instituto Costarricense de Electricidad, as will be analyzed below. It has been demonstrated in the record that in 2004, Verizon Information Services CR proposed to ICE several adjustments to the contract signed for the publishing of telephone directories. Furthermore, on May 13 of that year it proposed a review of their preparation. In official note 6000-41046-2004 dated July 15, 2004, the Assistant Manager of Telecommunications of the entity indicated that the 2005 edition of the guides should have the same structure and number of copies as the 2004 edition. Subsequently, by means of a note dated September 8, 2004, received at the Procurement Department on December 16 of that year, the Vice President of Verizon Information Services CR told the Assistant Manager of Communications of ICE that since no response was obtained to the note dated May 13 of the current year, tacit consent would be considered applied to the request. By means of official note 6000-52278-2004 dated September 14, 2004, the ICE Assistant Manager of Communications rejected the application of tacit consent, considering that official note 6000-41046-2004 dated July 15, 2004 stated that the edition of the 2005 guides had to be done using the same structure and number of copies of 2004, in response to the proposal of May 13 of that year to review their preparation. Subsequently, by means of note dated November 8, 2004, the Vice President of Verizon told said Assistant Manager that tacit consent operated *ipso iure* because there had been no answer within 30 business days. By means of official note 600-64540-2004 of November 18, 2004, he received an answer stating that the application of tacit consent was not admissible in this case, interpreted by the contractor. Moreover, by means of official note SI-0726-11-04 dated November 15, 2004, the Head of the Information Services Process of ICE indicated to the General Manager of Verizon that it had not extended the validity of the performance bond requested since June 30, 2004, according to official note 6000-35344-2004, and that the structure of the Telephone Directory of the Metropolitan Area showed non-complying items in disregard of the indications in notes 6000-41046-2004 and 6000-522678-2004. Furthermore, by means of resolution adopted as

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

set forth as Article 10 of the minutes of meeting 5649 held on November 23, 2004, of the Board of Directors of ICE, a decision was made to tell the contractor that any intention to unilaterally amend the contractual conditions agreed upon was rejected. In view of its failure to meet such requirement, by means of official note SI-759-12-04 dated December 13, 2004, a request was made to initiate proceedings for contractual termination against the company Verizon Information Services CR for not complying with the signed contract and the requirements of the entity. Consequently, by means of official note 5225-69163-2004 of AEG-0572-2004 dated December 14, 2004, the procedure for termination of the contract was initiated, and by means of official note 6000-27733-2005 of SGT-2326-2005 dated June 1, 2005, the contract by and between ICE and Verizon Information Services Costa Rica LLC was terminated due to breach of contract by the latter. This was confirmed by means of official note 0150-36359-2005 of GG-680-2005 dated July 8, 2005, issued by the General Management of the entity. This Court notes that in no way could the defendant have claimed the existence of tacit consent, for the following reasons: a) Prior to claiming it, ICE had already made an express negative statement, so any subsequent actions to the contrary invoking an alleged act are improper and irrelevant, b) The petition did not fall within the scope of Article 16 of the Administrative Contracting Law, since it was not a request to perform the contractual object, but rather to modify it to the detriment of what had been agreed, c) Tacit consent does not operate *ipso iure*, but must be complemented by the provisions of Article 7 of the Law for the Protection of Citizens from Excessive Requirements and Administrative Procedures, which was not done. Consequently, from the proven facts, the existence of awareness and willingness of Verizon Information Services Costa Rica LLC to breach the contractual relationship with ICE is noted, and it is known that such breach of contract would openly affect its relationship with the plaintiff. Therefore, it must be remembered that fraudulent breach of contract is configured when it is conscious and voluntary, without necessarily implying an intention to cause damage. This breach will result in the ineffectiveness of any agreed exemption or limitation of liability clauses. In this sense, to speak of willful misconduct in the obligations, not *dolo in contrahendo* (which is a defect of the will), the breach must meet

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

two requirements for it to be malicious: a) the subject's intent to not comply (negative element) and b) the specific possibility of the subject to comply (positive element). In other words, the contractor decides not to comply, even though it is in a position to do so. However, it chooses not to perform the service. Awareness of the unlawfulness and compliance with the elements indicated above occurred in this case, since it is evident from the evidence that the co-defendant was aware of the contrary nature of its behavior with respect to the law; despite this, it failed to comply. Consequently, the inexcusability of compliance determines the concurrence of willful misconduct, and the intentionality of not complying, since the co-defendant company never demonstrated an objectively relevant fact that justified its breach in either the administrative proceedings or in the arbitration. To the contrary, there is evidence of the foreseeability of non-compliance and its consequences. In support of this, the following communications from ICE on this subject are evidence in the record: a) By means of official note 6000- 41046-2004 of July 15, 2004, Verizon was told that the edition of the 2005 guides should have the same structure and number of copies as 2004. b) By means of official note 6000-52278-2004 dated September 14, 2004, the Assistant Manager of Communications of ICE rejected the application of tacit consent, taking into account that by means of official note 6000-41046-2004 dated July 15, 2004... (sic) c) By means of official note 600-64540-2004 of November 18, 2004, Verizon was told in the answer that the application of tacit consent was not admissible in this case, as had been interpreted by the contractor, d) By means of official note SI- 0726-11-04 dated November 15, 2004, the Head of the Information Services Process of ICE indicated to the General Manager of Verizon that it had not extended the validity of the performance bond requested since June 30, 2004, according to official note 6000-35344-2004, and that the structure of the Telephone Directory of the Metropolitan Area showed non-complying items in disregard of the indications in notes 6000-41046-2004 and 6000-522678-2004. e) On November 12, 2004, ICE ordered Notaries Public Leda Patricia Hernandez Salazar and Attorney Ligia Picado Arguedas to draw up notarial records of the results of the visits they made to THS's industrial facilities, where it was noted that the telephone directories being prepared did not include the records of subscribers from the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

provinces and it was also noted that when printing the white residential pages of the Metropolitan Area Telephone Guide, only the San José records were used, excluding the subscribers from the Los Santos area and the provinces, f) By means of official note S.1.0730-11-04, Verizon was provided with the minutes of a meeting held with its officials, in which it was told that it was failing to comply with Clauses 3.1 and 3.4.1.3 of the Bidding Terms and Clause Two of the Contract, g) On November 18, 2004, by means of note 6000-64540-2004, the Assistant Manager of Telecommunications answered Verizon's note of the 8th of that month, stating again that it should maintain the format of the 2004 telephone directories, h) By means of resolution adopted as set forth as Article 10 of the minute of meeting 5649 held on November 23, 2004 of the Board of Directors of ICE, it was decided to tell the contractor that any intention to unilaterally amend the contractual conditions agreed upon was rejected, i) On December 2, 2004, during a visit made to the facilities of the plaintiff, the Notary Public Yaila Paola Sanchez drafted a notarial certificate stating that 103,000 copies of the residential white pages of the Metropolitan Area were printed and that the printing company had not received any type of order to modify the printing and binding process; rather, it was working with the purchase orders delivered by Verizon, which were not modified by it. Therefore, the necessary requirements to determine the malicious breach of the co-defendant have been met, which means that despite the provisions of Clause 28 of the Master Agreement, it is liable for the damages caused to the plaintiff due to its breach in application of Articles 701 and 702 of the Civil Code. This is because its demonstrated breach with ICE also implies a lack of voluntary and therefore malicious compliance with the contractual relationship with the plaintiff. This can be seen through the proven fact that by means of a note dated September 2, 2005, the General Manager of Verizon Information Services-Costa Rica LLC informed the plaintiff that it was terminating the contractual relationship originated in the respective Master Agreement. It should be noted that the criterion for subjective attribution of willful misconduct implies the existence of a non-performing spirit, of the foreseeability rather than unlawful intention, of causing damage to the other contracting party, or of a behavior of a party that has no intention of honoring its contractual commitments. In this case, the above is demonstrated

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

4

based on the following considerations, duly demonstrated in the record: a) The fact that the rupture of the contractual relationship between the co-defendant and ICE was not due to rescission (either for reasons of public interest or agreement between the parties), but rather to contractual termination; that is, due to a deliberate breach of contract by the contractor, b) The evidence demonstrates the awareness and knowledge of the breach and its consequences. In each administrative act, it was warned in due time not to modify the telephone directories and in spite of this, the co-defendant continued with its non-compliant actions, c) There was a chance for the contractor to correct its behavior. The warnings about not modifying the guidelines were extended for several months and the co-defendant company could have corrected its behavior in a timely manner, but it failed to do so. d) The changes in the contractual object were unilateral, deliberate and without any evidence of the need for their implementation, e) The contractor could not claim to be unaware of the manner in which the entity operated or of the applicable legal system, given that its contractual relationship with ICE dated back several years, f) There is a final award that expressly recognizes the breach attributable to the contractor, g) Despite the fact that the Master Agreement also provided for the preparation of telephone directories for the Dominican Republic, it was decided to terminate the contractual relationship in its entirety, h) Sound judgment indicates that there was a possibility that the co-defendant company would have foreseen that its breach would generate bifrontal damage; that is, damage not only for its immediate party (that is, ICE and the public interest) but also for the contract that arose from the unfulfilled relationship; that is, with the plaintiff, i) There was no alternative for the contracting entity and the plaintiff company at the time the default was finalized. In its answer, the defendant invokes the existence of the provisions of Article 701 of the Civil Code, which states: *"ARTICLE 701.- Willful misconduct is not presumed, and whoever commits it is always obliged to compensate for the damages caused by it even if the opposite has been agreed."* With regard to Article 701 of the Civil Code, the vote 359-2014 issued at 11:30 a.m. on the thirty-first day of October, two thousand and fourteen, of the Second Section of the Second Civil Court, provided as follows: 'This *article determines the nullity of the clauses limiting liability*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

*derived from willful misconduct. This provision refers to the fact that if there is a* **MALICIOUS BREACH OF CONTRACT** *and a clause limiting liability has been agreed upon, such clause is null and void. By analogical interpretation, the doctrine teaches that the same thing happens in* cases of *culpable breach of contract; if there is a liability limitation agreement, the consequence is the same; in other words, such an agreement is null and void, since the debtor could, at his discretion, comply or not comply and be exempted from the compensatory liability arising from any breach, which would allow him to bind himself under a purely optional condition, which is tantamount to the fact that he can bind himself to nothing, and this is inadmissible; but furthermore, this is so because contractual liability can only be displaced by the creditor's act, an event of* force majeure, *or act of God, according to Article 702, never by agreement..."* The plaintiff affirms that Clause 28 of the Master Agreement relieves it of responsibility in that the agreement could be terminated, as indicated therein. It provided: "28. *TERMINATION, (a) The Purchaser may terminate this Agreement by giving the Seller at least (90) days written notice of such termination if the parties cannot agree to any price revisions under this Agreement, any amendments to this Agreement pursuant to Section 28 (c) above or the price for new options or specifications that the Purchaser may require, regardless of whether such new options or specifications are within the current capacity of the Seller. (b) The Purchaser may terminate this Agreement immediately at any time if during the Term of the Agreement, the Agreement between the Purchaser and ICE described in Section 2, Term, is terminated for any reason... e. Upon termination of this Agreement, the Purchaser shall not be liable to the Seller for compensation for damages of any kind or nature whatsoever, whether for loss by the Seller of present or future profits, expenses, investments or commitments made in connection with this Agreement, or in connection with the establishment, development or maintenance of the Seller's business or for any other cause or thing, provided that the termination shall not impair or affect the rights or responsibilities of either the Seller or the Purchaser with respect to the directories previously produced under this Agreement, or any indebtedness of either party to the other..."* In this regard, and in accordance with the above, and since the willful misconduct of Verizon Information Services Costa Rica LLC has

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

been duly proven, it is the opinion of this Court that the clause invoked by the latter does not justify the willful misconduct carried out and translated into the unilateral breach of the Master Agreement, given that it was based on other different assumptions, in which this contractor would not have been the one that caused the breach of contract with ICE. For this Court, it has been demonstrated that the conduct of Verizon Information Services Costa Rica LLC is clearly unlawful and has a double legal effect, one immediate and the other mediate. This occurred because the voluntary and conscious breach by the aforementioned company of the contract arising from the Bidding Proceedings 6378-T, translated into legal effects for ICE, but also for the plaintiff, while the same provisions of the contractual validity of the Master Agreement executed with Trejos Hermanos Sucesores S.A. depended on the existing relationship with the entity. This is seen from Clause 2.b invoked by the defendant, which provides: *"This Agreement shall become effective only when the following two requirements have been: (i) execution of this Agreement by the parties; (ii) execution of a contract by and between instituto Costarricense de Electricidad (ICE) and the Purchaser, entered into as a result of a Purchaser's bid in public bidding proceedings 6378-T. At the time the foregoing requirements have been the effective date (the "Effective Date") of this Agreement shall be from the time of execution of the agreement identified in subsection (ii) of this Section 2 (a)..."* In accordance with the foregoing, this Court believes that we are dealing with a specific case in which the provisions of Clause 28 of the above-mentioned Master Agreement, as well as any other clause that is deemed lawful for a breach of contract that has been brought without liability for the co-defendant company, become ineffective in view of the malicious breach incurred. Therefore, it must be understood that the willful misconduct that has been proven extends from the lack of compliance with ICE with respect to the contract that arose from Bidding Proceedings 6378-T towards the Master Agreement executed between the plaintiff and Verizon Information Service-Costa Rica LLC, given that, as has been demonstrated, the latter depended on the existence and validity of the former. As a result, logic indicates that a malicious breach of the contractual relationship with the entity would necessarily lead to a malicious breach

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

towards Trejos Hermanos Sucesores, as has been demonstrated to have occurred. Consequently, it is appropriate to apply the Civil Code, insofar as it provides the following in its Article 22: ."..Any *act or omission in a contract, which by the intention of its author, by its object or by the circumstances in which it is performed, manifestly exceeds the normal limits of the exercise of a right, with damage to a third party or to the other party, shall give rise to the appropriate compensation and to the adoption of the judicial or administrative measures that prevent the persistence of the abuse.*" For this Court it is clear that if a creditor alleges willful misconduct, it is not enough to prove default; instead, willful misconduct must be proven in order to produce the appropriate legal consequences (Articles 701 and 705 of the Civil Code). (Judgments of the First Chamber of the Supreme Court of Justice, number 320 issued at 2:20 p.m. on November 9, 1990. In the same sense, we note, among others, judgments 354 issued at 10:00 a.m. on December 14, 1990, 103 issued at 2:50 p.m. on June 28, 1991, 17 issued at 3:00 p.m. on January 27, 20 issued at 2:45 p.m. on January 31, both of 1992, 45 issued at 2:15 p.m. on June 11, 1997, 53 issued at 3:10 p.m. on May 27, 1998, 589 issued at 2:20 p.m. on October 1, 1999, 36 issued at 3:40 p.m. on January 10, and 509 issued at 2:25 p.m. on July 11, both of 2001). However, in the case under study, this Court considers that the intention to fail to comply with the contractual obligations on the part of the co-defendant company has been demonstrated, and that in order to be exempted from liability, the company must then demonstrate that the cause of the breach has been the creditor's act, an event of *force majeure* or act of God (Article 702 of said Code); however, in the case under analysis, this was not what occurred. It cannot be indicated that the damage was caused by the act of a third party, that is, Instituto Costarricense de Electricidad, given that the breakage did not occur by its unilateral decision as such; instead, that the cause of the entity's decision was the proven and malicious breach of contract by Verizon Information Services Costa Rica LLC. In response to this breach, the entity had to proceed to terminate its contractual relationship. If Verizon Information Services Costa Rica LLC had not breached its contract with ICE, the contractual relationship with the plaintiff company would have been normal, proof of the connection between the two and of the existence of willful misconduct in public

contracting that impacted private contracting. Note how the justification given by the co-defendant is precisely the contractual breach that it itself unilaterally and maliciously caused. This can be seen in the text of the respective letter: *"Given the situation described above, we call your attention to Clause 28, subsection b) of the agreement executed between VISCR and Trejos Hermanos Sucesores S.A. entitled "Master Purchase Agreement," which clearly states that VISCR may terminate the referred agreement immediately when the agreement between VISCR and ICE is terminated for any reason..."* It is clear to this Court from this quotation that the plaintiff caused a double breach of contract, one immediately and the other mediately, with full intention in both of them of not complying and with the possibility of compliance not being carried out, according to the objective facts that have been considered proven. Although the plaintiff negotiated and accepted the exemption from liability clauses, the truth is that they become ineffective in the event of a malicious breach of contract. 4. As an additional consideration, it should be noted that although the defendant company claims that the plaintiff recognizes that the contract was performed normally for nearly four years, which tells us that the contract was executed in the range of 48 months established in point b) of Clause 2 - Term, the truth is that the claim for the termination of the contractual relationship, as demonstrated, is the breach of contract with ICE and no other reason. Therefore, the true, real, effective and necessary cause for the breach of contract with Trejos Hermanos Sucesores is the deliberate and malicious breach and consequent contractual termination of Verizon Information Services Costa Rica LLC with ICE and no other reason, which reaffirms the preceding analysis. Proof of the existing willful misconduct with respect to the plaintiff company is the fact that in the note where the contractual relationship with it is terminated, the General Manager of Verizon in Costa Rica indicates that: ."*.. ICE disrespected the contractual rights of my principal and those established by law and proceeded to initiate administrative proceedings for the termination of the contract using public means to distort the reality of the facts."* As it has been determined, this statement is not correct and is therefore deliberately misleading, since it accuses the entity of being responsible for the breach of contract, when it has been duly demonstrated

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

that the break with ICE was due to the contractor's failure to comply with its contractual obligations. Furthermore, the former manager of Verizon in the country stated that it was Verizon's wish not to continue negotiating in the country for the production of telephone directories *(see deposition of José Maria Quiros Alfaro)*. Consequently, this Court considers that we are in the presence of a malicious breach to the detriment of the plaintiff company, which thus generates contractual liability and consequently any damage derived from it is indemnifiable. **Conclusion:** In accordance with the foregoing reasoning, it is appropriate to accept this argument of the plaintiff.

**V.VIII.- Argument related to the lack of joint and several liability of the co-defendant company with GTE Corporation's surety:** The defendant claims that the joint and several guarantees of GTE Corporation granted to ICE cannot be presumed, much less believed to be transferred for the benefit of third parties. In this regard, it is established in the record that in a letter dated August 28, 2002, Verizon Information Services Costa Rica, LLC expressed the following to ICE: *"11.- MAINTENANCE OF ALL OBLIGATIONS AND RIGHTS. As required in note dated June 18, 2002, I am enclosing hereto an AFFIDAVIT regarding the Maintenance of Obligations and Rights, signed by the legal representatives of Verizon Information Services, Inc., Verizon Directories Corp, and Verizon Information Services-Costa Rica, LLC, in which they accept the rights and obligations derived from Bidding Proceedings 6378-T and the agreement arising out of it."* In addition, Clause Twenty-Five of the contract between **ICE** and the GTE Consortium provided the following: *"In the event that, due to a change in the law governing ICE, this entity was to change its name, or that GTE were to change its name as a result of a merger or partnership with another company, in both cases this contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented here."* In accordance with the foregoing, in addition to the express provisions, there was an express statement by the co-defendant as to the maintenance of the obligations originally assumed by the GTE Group. Consequently, this argument must also be rejected.

**V.IX- Analysis of complementary argument:** As an additional argument, the codefendant argued at the trial hearing that the damages are accessory to the issue of contractual

nullity, therefore, the parties did not know how to exercise the annulment claims, since termination of the contract must first be requested and then the payment of damages. Therefore, it is materially impossible for the Court to award damages, because contractual termination was not requested before. In this respect, the defendant's attorney must consider that in a note dated September 2, 2005, the General Manager of Verizon Information Services-Costa Rica LLC informed the plaintiff that it was terminating the contractual relationship originated in the respective Master Agreement. Therefore, it was its own representative who unilaterally terminated the respective contractual relationship and therefore opened the possibility for the plaintiff to exercise its claims for compensation, based precisely on the breach of the contract executed between it and Verizon Information Services-Costa Rica LLC. Consequently, it is also appropriate to reject this argument.

**V.X.-** In accordance with the preceding reasoning, this Court considers that a malicious breach by the co-defendant Verizon Information Services-Costa Rica LLC can be determined, to the detriment of the plaintiff, and therefore it is appropriate to determine its duty to indemnify the damages caused by such breach.

**V.XI.- Arguments of the plaintiff with regard to the company Verizon Communications Inc.:**

**a)** The plaintiff's representatives base their reasoning regarding Verizon Communications Inc. on the following basic arguments: **1)** The GTE Group merged with the firm Atlantic Bell and the VERIZON Group was formed, which maintained with ICE all the rights, duties, obligations and securities originally granted by the initial Group and jointly guaranteed by the VERIZON companies, since GTE CORPORATION by virtue of a merger of companies in the United States of America, was transformed into VERIZON COMMUNICATIONS INC., Holding of the VERIZON Group. For this reason, the relationships derived from the Administrative Contract awarded in International Public Bidding Proceedings 6378-T and its legal effects for compliance with its rights and obligations did not suffer any alteration. Consequently, the defendants Verizon Communications Inc. and Verizon Information Services - Costa Rica- LLC compose an economic interest group which we may conventionally name the VERIZON GROUP, **b)** The co-defendant has answered using the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

following arguments: 1) The plaintiff did not in any way prove that GTE Corporation became Verizon Communications Inc., 2) It is not true that they formed an economic interest group nor have they been part of any contractual relationship with ICE or the plaintiff. 3) It is not true that Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. and Verizon Directories Corp, are subsidiaries of Verizon Communications Incorporated, **c) Criterion of the Court:** It has been demonstrated on record that the companies "GTE Information Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware with head offices in the city of Dallas, State of Texas, submitted a joint bid, as a consortium, in Public Bidding Proceedings No. 6378-T conducted by ICE, and for all purposes related to said public bidding proceedings, they identified themselves as the GTE Consortium. It is proven on record that the contract was awarded to said Consortium by the Board of Directors of ICE, at regular meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, and this resolution was published in Addendum No. 10 to the Official Journal "La Gaceta" No. 28 of February 9, 2000. In this order of ideas, Clause Twenty-Five of the contract between ICE and the Consortium provided the following: *"In the event that, due to a change in the law governing ICE, this entity should be to its name, or that GTE were to change its name as a result of a merger or partnership with another company, in both cases this contract shall remain unchanged and in force between the parties, under the new legal names that replace the names of the legal entities represented here."* Subsequently, on May 16, 2002, VERIZON Information Services - Costa Rica, LLC sent a note dated May 16, 2002, to the ICE Procurement Directorate, stating that "General Telephone Directory Company C por A" had changed its name to Verizon Information Services Costa Rica, LLC, and requesting that the change in the name of the companies that made up the GTE Consortium be considered officially communicated. Consequently, upon the merger of GTE with Bell Atlantic, it formed the so-called Verizon Group, composed of Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services-Costa Rica, LLC. An economic interest group is

considered to exist when a group of individuals or legal entities maintain common links and interests and coordinate their activities to achieve a certain common objective. In addition to the above, there is control, autonomy, and unity of behavior in the market. Therefore, a holding company make actually control others, or this control can be potential, when the possibility of carrying out the indicated control operates even if a centralized and hierarchical legal bond does not exist. Consequently, formal corporate autonomy transcends the interests of the group or economic entity. Therefore, although each subject of the group maintains a formal legal personality, in practice, transcending the forms, the factors of production of each one of them will be oriented to a determined common economic end and their wills are subordinated to that of the be leading or parent figure in some cases or to the integrated decision; but not specific to each individual company. This is how each member of the group comes to act in such a way that the whole behaves functionally as a single entity in the market, with a dominant subject and one or more secondary subjects. In the case under analysis, the legal representatives of the co-defendant companies are the same, in addition to the obvious similarity of their corporate names; this is because it has been proven in the record that MARIANNE DROST, a U.S. citizen, acted in her capacity as Corporate Secretary of the firm VERIZON COMMUNICATIONS INC. and VERIZON INFORMATION SERVICES-COSTA RICA, LLC., thereby, their common control and relationship is evident, in addition to the considerations made above regarding the origin of the Verizon Group, to the extent that its various companies were organized together (Verizon Information Services, Inc., Verizon Directories Corporation and Verizon Information Services-Costa Rica, LLC.), and maintain links since their founding (see note of Michael Quinn Neal, on pages 2964 and 2965 of the administrative records of ICE). Verizon Communications Inc. is no stranger to this economic group, for this reason, particularly considering that because of the phonetic similarity it would not be possible for a company not linked to the group to use the name "Verizon." This is why Article 1025 of the Civil Code should be understood as not being applicable to the case, given that the existence of the economic interest group binds the co-defendant in matters of liability. Consequently, Verizon Communications Inc. is jointly and severally

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

liable as a member of the economic interest group called "Verizon."

**Conclusion:** The argument of co-defendant Verizon Communications Inc. is rejected.

**V.XII.-** In accordance with the foregoing reasoning, this Court considers that the existence of an economic interest group among the companies of the Verizon group can be determined and that, consequently, Verizon Communications Inc. must be held jointly and severally liable for the malicious breach of the codefendant Verizon Information Services-Costa Rica LLC, to the detriment of the plaintiff and, consequently, it is necessary to determine its duty to compensate the damages caused by such breach.

**V.XIIII. - Regarding the declarative claims set forth in the complaint:** Based on the substantive arguments made in the preceding paragraphs, it is appropriate to resolve the declaratory claims filed, as follows: **Claim number 1**: This claim states: " *1*. The "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES COSTA RICA, LLC) *became a means for the performance of the contract executed by the business companies "GTE Information Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware with head offices in the city of Dallas, State of Texas, which identified themselves as the "GTE Consortium," and INSTITUTO COSTARRICENSE DE ELECTRICIDAD, as a result of the award to such Consortium of the contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, in accordance with a resolution of the Board of Directors of ICE, adopted at regular meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, and approved by the Office of the Comptroller General of the Republic on December 13, 2000.* In accordance with the analysis carried out and the evidence gathered, this Court considers that this claim should be accepted, in the understanding that said Master Agreement corresponds to a subcontract carried out by the subcontractor with the plaintiff company, as a contractually recognized means to achieve compliance with the respective contractual object.

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

5

**Claim 2:** This claim states the following: *"2).- That said "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A, was known by INSTITUTO COSTARRICENSE DE ELECTRICIDAD, which approved the involvement of TREJOS HERMANOS SUCESORES S.A. in the performance of the administrative contract awarded to the GTE Consortium as a result of Public Bidding Proceedings No. 6378-T conducted by ICE."* As indicated above, it was not demonstrated on the record that the Master Purchase Agreement was known to any ICE official, and therefore this claim should be rejected.

**Claim 3:** This claim states: *"3).- That the termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM (which changed its name to the VERIZON CONSORTIUM) caused the termination of the "Master Purchase Agreement" executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A."* As proven on record, the representative of Verizon claimed the termination of the contract executed by it with ICE as the reason to terminate the Master Purchase Agreement, executed by it with the plaintiff. Consequently, this claim should be accepted.

**Claim 4:** The plaintiff asks the Court to declare: *"4).- That TREJOS HERMANOS SUCESORES S.A. did not have any liability whatsoever for the events that caused the termination of the administrative contract entered into between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM."* In this regard, there is no evidence of any action or omission of the plaintiff that caused or contributed to the breach of contract between ICE and Verizon Information Services Costa Rica LLC, and on the contrary, a willful breach of such contractual relationship by the latter is determined. Therefore, this claim should be granted.

**Claim 5:** The plaintiff asks the Court to rule: *"5.- That TREJOS HERMANOS SUCESORES S.A. did not have any responsibility for the events that caused the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A."* In this regard, there is no evidence of any action or omission of the plaintiff that caused or contributed to the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

breach of contract between the plaintiff (sic) ICE and Verizon Information Services Costa Rica LLC; to the contrary, a willful breach of such contractual relationship by the latter has been determined. Therefore, this claim should be accepted.

**Claim 6:** The plaintiff asks the Court to rule: "**6.-** *That the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por* A. *caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A.*" This claim shall be determined in the next consideration, upon analysis of the evidence of the damages claimed.

**Claim 7:** The plaintiff asks the Court to declare: "**7.-** *That the defendant companies Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC are part of an economic interest group, successor of the economic interest group called GTE Consortium, which was awarded the contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, which was implemented through the Master Purchase Agreement executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A.*" In accordance with the analysis carried out above, this Court has been able to determine the existence of an economic interest group to which the aforementioned companies belong. Consequently, the claim should be accepted.

**Claim 8:** The plaintiff asks the Court to declare: .- *That* "**VERIZON COMMUNICATIONS INCORPORATED**" *is the most senior entity of an economic interest group of which* "**VERIZON INFORMATION SERVICES -COSTA RICA- LLC**" *is a member. Therefore, the first of these companies is jointly liable with the latter for all the obligations acquired by* "**VERIZON INFORMATION SERVICES -COSTA RICA- LLC**" *with TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA.*" In this respect, the plaintiff did not demonstrate the hierarchical condition invoked for Verizon Communications Inc., so it is appropriate to reject this aspect of the claim, but on the understanding that it accepts the aspect of the claim referring to its joint and several liability, as it is part of said economic interest group.

**Claim 9:** The plaintiff asks the Court to rule: "**9).-** *That the defendant companies Verizon Communications Inc. and Verizon Information Services - Costa Rica- LLC are jointly and*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

severally liable for the negative consequences suffered by the plaintiff company, which resulted from the termination of the Master Purchase Agreement executed on February 28, 2002 with the plaintiff Trejos Hermanos Sucesores S.A." In accordance with the considerations made above with respect to the participation of Verizon Information Services - Costa Rica - LLC in the facts that have been deemed proven and the existence of an economic interest group to which Verizon Communications Inc. belongs, this claim should be accepted.

**Claim 10:** The plaintiff asks the Court to declare: **"10).-** *That* **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** *disregarded the lawful rights and interests of* **TREJOS HERMANOS SUCESORES S.A.** *that have arisen out of the implementation of said Public Bidding Proceedings No. 6378-T through the "Master Purchase Agreement" executed on February 28,2002. For this reason, it is jointly and severally liable with Verizon Communications inc. and Verizon Information Services -Costa Rica- LLC for the indemnity of the damages suffered by the plaintiff as a result of the termination of said Master Purchase Agreement executed on February 28, 2002."* Since it has been determined that the plaintiff has no direct legal relationship with ICE, nor has the existence been demonstrated of any specific right or lawful interest derived from the implementation of public bidding proceedings 6378- T that has been harmed by reason of the conduct or omission of the entity, this claim should be rejected, according to the analysis made in previous recitals.

**Claim 11:** The plaintiff asks the Court to declare: "11) *That the clauses of the MASTER PURCHASE AGREEMENT executed by and between VERIZON and TREJOS HERMANOS SUCESORES regarding the release of VERIZON from civil liability for breach of contract are null and void. This nullity especially includes Clauses 24 and 28 of that Agreement, although this statement is not limited to them, because it includes all clauses releasing VERIZON from civil liability."* In accordance with the analysis made in this resolution and the evidence produced in the proceedings, it is deemed appropriate to rule that the aforementioned clauses are not in effect, in light of the willful breach demonstrated by the codefendant companies. The plaintiff did not demonstrate that the above- mentioned clauses were part of a contract of adhesion or that they met the conditions for their annulment, so in

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

this respect, the claim is rejected.

**Claims 12 and 13:** These are purely compensatory claims that will be analyzed in the following recital.

**V.XIV.- Regarding the material damages claimed: a)** In order to justify the alleged damages, the plaintiff claims the following: **1)** Due to the breach, the plaintiff could not pay the bank and commercial loans acquired, stopped paying its raw material suppliers and the rents, stopped paying the salaries and labor rights of its employees and was forced to end its activities and permanently suspend its commercial operations. 2) The GTE Group negotiated with the plaintiff for the future conditions to incorporate technological advances to improve the quality of the work in the editing and printing jobs. Consequently, it was also obliged to acquire the most modern equipment and to expand the physical plant. In accordance with the above, the plaintiff indicates, it borrowed heavily from banks and took out commercial loans in order to acquire the new equipment and expand its industrial plant, **b)** In their answer to the complaint, the plaintiffs (sic) argued that: **1)** If the plaintiff company made the decision to get into debt, it was due to a business decision of its own. **2)** The plaintiff sold the acquired machinery, which it did not consider when claiming losses. **3)** The problem that the plaintiff had with its plant and equipment was that they were obsolete and the production costs with those equipment units were higher; productivity was also lower during the printing time. **4)** It was assumed that the plaintiff did not depend on the existence of a single contract and that a company with the experience and national and international history of almost one hundred years maintained a variety of clients that guaranteed its solvency and the adequate management of finances and cash flows, to face its credit obligations in the face of any contingency. **5)** The problem of the closing of operations of the plaintiff company was the immediate consequence of the poor management of the business, **c) Criterion of the Court with respect to the items charged for material damage:** It has been proven on record that on February 25 and 26, 1999, Mr. Bruce Wataru visited the facilities of the plaintiff and made a series of observations regarding the facilities and equipment of the company. Subsequently, on November 15, 1999, a meeting was held between Mr. Alvaro and Alonso

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

Trejos Fonseca and Mr. Guillermo Navarro, then President, Vice President and Production Manager of **THS,** respectively, with the Printing Director of GTE Directories International for the purpose of: 1) evaluating the progress made on the plant improvement project; 2) assisting in developing a formal project to closely monitor the new plant project; 3) agreeing on a contingency plan in the event that THS does not comply with the installation dates of the new equipment and plant, which consisted of engaging another plant in the United States, in particular, if the equipment was not acquired on time; 4) evaluation of the potential purchase of the equipment, with the specific assistance of the consultant recommended by **GTE,** Mr. Bill Snell. As a consequence of the above, in February 2000, the company acquired a modern Heidelberg rotary machine, a binding line and a pre-press equipment called CTP or Direct to Plate together with all the electrical and mechanical installations of the new plant. This was done to meet the requirements of Mr. Wataru and the provision (j) of Clause 16 of the Master Purchase Agreement. The purchase of the Rotary Machine and all the accessory equipment of the Heidelberg brand were at a cost of C.955,116,741.00. Furthermore, in response to the requirements of Mr. Wataru, the plaintiff rented two industrial warehouses in the Zeta Free Zone, in Guadalupe de Cartago, owned by INMOBILIARIA ZOROASTER S.A., with all its equipment, offices and warehouse, according to the contract executed with the owner on the first of July, two thousand and four. On July 15, 2004, using stationery of Compañía General de Directorios C. por. A, with offices in San José, Costa Rica, a subsidiary of GTE Corporation, as stated in the same document, the contractor consortium of the Verizon Group processed the contractor consortium of the Verizon Group processed purchase order 4568 for the printing of the Telephone Directories for the Metropolitan Area for a total amount of $3,033,625.60 and on August 20, 2004, purchase order 4582 was issued for the amount of $2,134,503 for the printing of Telephone Directories for the Provinces, for a total amount of $5,168,128.00 for the 2005 Directories. The purchase orders indicated in the previous Fact were replaced by **Verizon** by order number 4612 of November 3, 2004, regarding the Telephone Directories for the Metropolitan Area for a total amount of $ 2,120,828 and by order number 4644 of December 17, 2004 for the Guides of Provinces, in the amount of $ 1,254,023, for a total

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

sum of $ 3,374,851, that is, an extemporaneous decrease of $ 1,793,277 (exhibit 30 of the plaintiff's evidence file). It has been demonstrated that the last purchase orders meant a reduction in the number of pages of the telephone directories and the number of books, as well as a different conformation and composition of the directories than had been agreed upon by **GTE** in its contract with **ICE.** Afterwards, the agreement between the plaintiff and the Verizon Group was terminated due to the willful breach by the latter, as has been demonstrated in the proceedings; in virtue of the this, the plaintiff ceased to honor its obligations with the seller of the machinery, and the creditor initiated pledge enforcement proceedings as case number 06-001956- 0640-CI, in the Civil Court of Major Pleas of Cartago, and at 12:30 a.m.s on June 6, 2007, the auction of the pledged equipment was carried out. Then, by order issued at 9:23 a.m. on August 19, 2007, the order was given to HEIDELBERG PRINT FINANCE AMERICAS INC., the auctioneer, to take possession of the equipment, which was executed at 2:00 p.m. on October 31, 2007. Furthermore, it has been demonstrated that the plaintiff was forced to incur in arrears with the payments of the rents for the lease of the industrial warehouses of Inmobiliaria Zoroaster S.A., for this reason, a public document was executed. It was number 144, starting on page 133 reverse of volume one of the Protocol of Notary LAURA MONICA ZAMORA ULLOA, issued at twelve noon on plaintiff undertook to pay up to the sum of TWO HUNDRED THOUSAND TWO HUNDRED AND TWENTY-THREE DOLLARS AND SEVENTY-FIVE CENTS (US$200,223.75), providing the following in Clause Two of said document: ."… TWO. *Debt Substitution. This debt replaces the overdue monthly payments of rent owed by the Debtor- (TREJOS HERMANOS SUCESORES)- covering the months from July, two thousand and five, to and including March, two thousand and six, at a rate of nine months of monthly payments of rent, under the lease executed by and between Creditor and Debtor, dated the first day of July, two thousand and four. Such lease was for the property of the Creditor, with real estate registration number three - one nine zero eight seven three - zero zero zero and number three - one nine five eight nine eight - zero zero zero, which is expressly accepted by the Creditor"* … Likewise, interest was established to be paid in monthly installments of twenty-two thousand two hundred and forty-seven dollars and eighty-three

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

cents until the obligation is paid in full (exhibit 70 of the plaintiff's evidence file). 9. In view of a failure to comply with the agreement, Inmobiliaria Zoroaster S.A. initiated simple execution proceeding for collection before the Civil Court of Major Pleas of Cartago, as case number 06-001846-0640-CI. Such proceedings ended with a judgment that admitted the defense of partial payment and ordered the plaintiff to pay fifty-six thousand one hundred and eight dollars and ten cents (US$ 156,108.10) [Note of Translator: different amount in letters and numbers in the original document]. In view of the above, the plaintiff sold, under very unfavorable conditions, virtually all of its assets in equipment and improvements in the Lessor's buildings to the Colombian capital company CONDOR EDITORES DE COSTA RICA, S.A., which agreed with Inmobiliaria Zoroaster S.A. to lease the industrial facilities in the Zeta Free Zone of Cartago, and acquired the equipment auctioned by HEIDELBERG PRINT FINANCE AMERICAS INC., under favorable conditions and already installed in said industrial facilities, as well as the rest of the THS equipment pledged to Banco Nacional de Costa Rica and Banco Interfin (exhibit 73 of the plaintiff's evidence file). Finally, the plaintiff reached an agreement with Inmobiliaria Zoroaster S.A., dated March 28, 2007, entitled *"Lease Termination and Debt Recognition Agreement,"* according to which it delivered the industrial building where the rotary machine and the remaining printing equipment were located, since the other building where the offices and warehouse were located had already been handed over. Both parties released each other from liability, but also stated that Inmobiliaria Zoroaster S.A. acknowledged receipt of two payments up to that date (which had not been possible to demonstrate in the eviction proceedings), for a total amount of fifty- five thousand U.S. dollars, and also that it had the security deposit for an amount of thirty-nine thousand dollars, all of which as expressly authorized by the plaintiff to be applied by Inmobiliaria Zoroaster S.A. to the total debt. Independently of the fact that said Court proceedings could continue, the plaintiff undertook to pay the total due, to be determined in a timely manner, once these deductions have been made, together with the agreed interest and costs, until they are effectively paid, within a peremptory term. Both parties acknowledged that there is an express instruction in the "Trejos Hermanos-Fiduciaria Castro Garnier Trust," whereby what

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

is due to Inmobiliaria Zoroaster S.A. must be paid, as soon as the plaintiff receives the payment of amounts owed to it for different pending business, such as, fan outstanding debt of Radiográfica Costarricense, S.A. On May 29, 2007, the plaintiff leased with a purchase option to DACONDOR Q.C.R. SOCIEDAD ANÓNIMA, which then assigned its rights to the aforesaid CONDOR EDITORES DE COSTA RICA, S.A. over the remaining industrial assets of the company, for a fraction of the liabilities, both with Transamerica Bank & Trust Co. Ud. (a subsidiary of Banco Interfin), with Banco Nacional de Costa Rica and with Banco Improsa S.A. In accordance with the foregoing, this Court considers that there is a causal link between the acquisition of the machinery and the lease of facilities with the contractual relationship entered into with GTE and subsequently with the Verizon Group, and it was the malicious breach by Verizon Information Services Costa Rica LLC that caused both the lack of payment of the equipment and leases and the remaining economic effects that have been proven and derived from them. For this Court it is clear that Bruce Wataru's initial indications must be complemented in its analysis with Clause 16 (j) of the Master Agreement which provided the following: *"Seller shall, beginning with the first Directories produced under this Agreement, comply with all technical requirements for printing and manufacturing the Directories for which Purchased (sic) has placed Orders, including, but not limited to; the technical ability to supply white trim and "four- color process" as those terms are understood in the printing industry."* As it can be seen, the contractual relationship of the plaintiff company with Verizon Information Services Costa Rica LLC, had as a background the need to change the work equipment of Trejos Hermanos Sucesores, since that this company had to assume obligations in order to meet the requirements of the contracting party. It is not true that the decision to modify the equipment or the location of facilities is due to a bad business decision, but rather it was a response to the evident need to maintain the contractual relationship between both parties. Therefore, the initial damage is composed of the value of the machinery acquired with the understanding that the cost of its sale must be deducted, as indicated below. In addition to the aforementioned damage, the plaintiff considers the following to also be damage: a) the differences in inventories between the periods from 1997 to 1999

Digital signature of:
  RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

and between 2000 and 2004, as a result of the necessary investment in working capital to meet the requirements of the agreement, b) the expected and unrealized flows from 2004 to 2013. c) the resulting losses for the periods from 2004 to 2007. d) interest paid to Banco Cuscatlán and the Heidelberg equipment supplier, according to their accounting record date, for which the amounts were carried at future value, e) lost profits on the occasion of the closing of operations. All of these items are recognized insofar as the closing of operations of the plaintiff company and the evidence of the sale of its machinery and assets, implied that the consequences of the breach had an ongoing impact over time, since it prevented the maintenance and even expansion of the business. Additionally, the defendants have not demonstrated the impropriety or unfounded nature of what was requested and therefore the application of Article 317 of the Code of Civil Procedure is appropriate, inasmuch as it was up to them to prove that the damages claimed did not exist or were not causally linked to their intentional breach of contract, which they did not do. This Court considers that the items indicated are justified for the following reasons: a) It is demonstrated that the plaintiff acquired a modern Heidelberg rotary machine, a binding line and a prepress equipment called CTP or Computer to Plate together with all the electrical and mechanical installations of the new plant. These investments were based on the expectation that their contractual relationship with GTE and then Verizon was decades old and that the Master Agreement had a 168-month horizon, which allowed them to recover their investment. This led to the recognition of the value of the machinery and the interest paid on it. b) The previous long-standing relationship and the proven fact that on October 14, 2004, in accordance with the terms of the agreement by and between THS and GTE, the parties involved signed the "Production Schedule, 2005 Provinces Guide, justify the differences in stock, the projected flows and the losses for which compensation is sought in the complaint, c) The reasonable expectation generated by the previous relationship, the planned contract and the compliance with the requirements of the contracting party justify the loss of profit, given that we are in the presence of a proven financial or other impairment that was not perceived, which was reasonable, and to be expected if the unlawful breach had not occurred. This impact

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

6

goes beyond the agreement and its term, given that the consequences of its breach were so serious that they led to the extinction of the plaintiff in the exercise of its economic activities by being forced to sell machinery and assets and pay the debts generated by the agreement signed with Verizon Information Services Costa Rica LLC. In this sense, the interruption of operations translates into damage or loss of profit, not only because the plaintiff was prevented from obtaining a profit from the contractual performance of the Master Agreement, but also from the profits that could have been obtained in the future if it had remained in operation. In this regard, we believe that the willful breach by Verizon Information Services Costa Rica LLC was a determining factor in the fact that the plaintiff could no longer operate and was affected in a definitive manner. Therefore, we consider that the abrupt termination of the primary contractual relationship of the company (as stated by the court expert) affected the impossibility of future operations. The situation would have been different if the breach had been attributable to the plaintiff company or if the agreement had normally expired, given that the consequences of not continuing the agreement would have had to be assumed by Trejos Hermanos Sucesores as part of the business risk of depending on a commercial relationship. For this Court, based on a comprehensive assessment of the evidence, it is evident that there is a probability that if the contractual relationship had not been abruptly, without cause, and intentionally broken by Verizon Information Services Costa Rica LLC, the plaintiff would have remained in business. The situation of the plaintiff goes beyond mere possibility, insofar as during the exercise of a normal performance of the agreement, there could have been the probability of recovering investments, paying debts, and having the opportunity to explore business alternatives. As evidenced on record, this was not possible, since the early termination caused by the co-defendant affected the economic projections of the plaintiff and the security provided by the signed agreement. Consequently, it was proven that an event occurred, with all its consequences expected according to the ordinary course of events, which, we repeat, would not have occurred if the contract had not been breached by the co-defendant. Therefore, it is indemnifiable, given the certainty that the company would have continued operating if the contractual object had been duly

performed by the contracting company. If, as has been demonstrated, Verizon Information Services Costa Rica LLC led the plaintiff to make substantial investments, and if it is evident from the contractual relationship and the type of activity that there was a marked dependence of the financial solvency of Trejos Hermanos Sucesores on its involvement with the contracts for the production of telephone directories, then it is logical to assume, in accordance with sound rational criticism, that the plaintiff was fully aware that its breach of contract would impact the very life of its contractor and its business operation. Thus, the so-called damages due to "interruption of operations" was not merely incidental but likely to occur and, as such, must be included among the damages to be compensated. Therefore, the existence of a willful default is determinant in considering that knowledge-avoidance position of Verizon Information Services Costa Rica LLC affects the determination of its contractual liability, not only for the damages and impairments suffered during the contractual period, but in any subsequent period, directly related from the causal point of view with the consequences of the unlawful act demonstrated to the contracting party. Consequently, claim 6 of the complaint should be accepted, which states: "**6.-** *That the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A.*" In accordance with the above, the co-defendant companies are ordered to pay the items indicated, jointly and severally.

**V.XV.- On the liquidated amounts:** a) In its complaint, the plaintiff files a claim for judgment as follows: "*12). - That the defendants* **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** *and the companies* **Verizon Communications Inc.** *and* **Verizon Information Services -Costa Rica. LLC** *must pay the plaintiff, jointly and severally, the damages caused, which are calculated as follows:*

| | |
|---|---|
| *a) Investment in machinery* | *$2.582.156* |
| *b) Increase in inventories* | *$2.860.696* |

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

| | |
|---|---|
| *c) Operating Cash Flows not received 2004-2013 Directories in Costa Rica* | *$ 8,806,872* |
| *d) Operating Cash Flows not received 2004-2013 Directories in the Dominican Republic* | *$ 7,912,999* |
| *e) Losses incurred from 2004 to 2007* | *$ 7,237,068* |
| *f) Interest paid by THS* | *$ 983,825* |
| *g) Interruption of Operations* | *$28,885,195* |

b) The objection of the defendants regarding these items is related to the causality of the alleged damages (since they allege poor business management and business decisions), the fact that in their opinion the subsequent sale of the machinery and the existence of a subsequent contract with Radiográfica Costarricense S.A. were not taken into account in the calculations, c) In this regard, this Court considers it appropriate to accept the amounts of the items listed, with the details that will be indicated for the following reasons: 1. Said calculations are based on the technical study prepared by Mr. Tomás Evans Salazar, provided as evidence by the plaintiff and ratified by the judicial expert Ramón Humberto Romero Rodríguez, Certified Public Accountant and Expert Actuary, who indicated the following in his expert opinion: *"ON THE STUDY PREPARED BY MR. TOMÁS EVANS SALAZAR. This professional conducted an exhaustive analysis entitled: "study prepared by Mr. Tomás Evans Salazar, member of the Association of Professionals in Economic Sciences," ID card 11968, which was attached as expert evidence. From his analysis, it was possible to conclude: I. The accounting information (accounting records and audited financial statements) on which the estimates for the periods from December 31, 1990 to March 31, 2004 were based was confirmed. 2. it was corroborated that the rates applicable to the calculations made correspond to calculated average rates, the source of which was the Central Bank of Costa Rica. 3. it was also determined that the focus of this study was conducted with a conservative criterion, using the tools of normal application in matters of prospective and retrospective information, using the necessary formulas to determine: - averages, - future values, - current values, - estimates based on*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

regressions and others. IV.- IN REGARD TO THE INVESTMENT IN MACHINERY. The formula for calculating the future value of the investments recorded for accounting purposes minus the sales price of the rotary machine and its accessories is the right formula. This was done with a cut-off date of August 31, 2008. The applied rate of 16.94% per year on average, seems to me to be reasonable. Amount of this item: US$ 2,582,156.00. It was therefore proven that the calculation of the amount claimed for investment in machinery of $2,582,156 is correct and based on an update to August 2008 of its acquisition cost, less the value at which it was auctioned. It was also concluded that said investment was made to meet the technical requirements of the ICE-GTE Consortium (later Verizon) contract and the agreement of these companies with the plaintiff. Therefore, its loss is a proven damage to the plaintiff's equity originated in the facts of this complaint. V.- REGARDING THE INCREASES IN INVENTORIES. The future value of the increase in the investment in inventories was calculated by comparing the average of the periods 1997 to 1999 with the inventory levels of the period from 2000 to 2004. This calculation is considered reasonable. The cut-off date considered was August 31, 2008. Likewise, the applicable average passive annual rate was considered reasonable. Amount of this item: US$2,860,696.00. The calculations for the amount claimed for the increase in inventories of $2,860,696.00 were verified as correct and adjusted to the technique. I agree with Mr. Evans that these variations were the result of the necessary investment in working capital to comply with the requirements of the agreement and, therefore, its loss is a proven damage to the equity of the plaintiff originated in the facts of the complaint, which is the subject matter of these proceedings. VI.- REGARDING THE PROFITS NOT EARNED FROM 2004 TO 2013, FOR COSTA RICA AND THE DOMINICAN REPUBLIC. The calculation of the future and present values of the cash flows that the company would have generated was reviewed in accordance with the terms of the agreement and according to the estimate of income based on the thousands of pages expected. This calculation was found to be correct. The cut-off date was August 31, 2008. An average rate of 2.79% per year was used and an average US inflation rate of 3.54% per year was employed. The company THS, as I was able to confirm based on the financial statements and the productive reality and full compliance of the contracts,

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

*expected a stable environment that was protected by the contractual practice, to continue for the term of 2004 to 2013 without any difficulty and in a normal way as had been happening in the last 25 years. Amount of this item: US$16,719,871.00. The calculations and determination of the expected and unrealized flows from the telephone directories of Costa Rica from 2004 to 2013 for a net amount of $8,806,872.00 until August 31, 2008 (date of the study) were verified as correct and adjusted to generally accepted accounting and financial principles. The contractual prices and terms and the spreadsheets for income and cost projections and the result of the quantified damage were verified as correct. It was found that conservatively, the plaintiff company could have counted on those net cash flows if the events that led to the termination of the agreement to produce the Costa Rican telephone directories had not occurred through no fault of its own. VII.- LIKEWISE, THE PREDICTED BUT NOT RECEIVED FLOWS FROM THE DOMINICAN REPUBLIC DIRECTORIES WERE CALCULATED AT AN AMOUNT OF US $7,912,999.00, UNTIL AUGUST 31, 2008. They were considered correct and adjusted to the technique. It should be noted that although the plaintiff company did not have an agreement for the entire calculated period, it was possible to verify based on the audited reports and purchase orders of different years that the company had been preparing such directories for more than twenty years and the Costa Rican agreement with the GTE group (later Verizon) provided for the contracting of such directories as preferred supplier and the facts of these proceedings coincided with the sale of the operations of the Verizon Corporation in the Dominican Republic, described above, to prevent the company from having those net flows, which under normal circumstances it could have received. Therefore, it is considered reasonable that such amounts constitute damages to the equity of the plaintiff. VIII.- REGARDING THE LOSSES INCURRED FROM 2004 TO 2007. The calculation by which the resulting losses were carried forward for the periods from 2004 to December 31, 2007 was reviewed and found to be correct. The cut-off date was August 31, 2008. The rate applied was also 2.79% per year on average. Amount of this item: US$7,237,068.00. The calculation of losses incurred from 2004 to 2007 with an updated value as of August 31, 2008 of $7,237,068 was verified as correct and adjusted to the technique. Based on the*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

accounting data, it was possible to verify that during 2004 and 2005 there was a reduction in income as a result of the above, with the loss of confidence of other clients and the company's fixed cost structure leading to losses. All this makes it possible to establish that the losses of the plaintiff company derive from the facts of the complaint that is the subject matter of these proceedings. IX.- REGARDING THE INTEREST PAID BY THE PLAINTIFF. The calculation of the interest paid to Banco Cuscatlán and the Heidelberg supplier was reviewed according to their accounting record date, and their amounts were taken to the future value, considering this calculation to be correct. The cutoff date used was August 31, 2008 and an average annual rate of 2.79% was used. Amount of this item: US$983,825.00. The calculation of the interest paid to the company that financed the rotary machinery Heidelberg Finance Corp, and to Banco Cuscatian which financed the purchase of other machinery and the updating of its value as of August 31, 2008 for a value of $983,825.00, was verified as correct. It was considered that such payments also originated from the technical requirements of contracts terminated for reasons beyond the control and responsibility of the plaintiff. X.- REGARDING THE INTERRUPTION OF OPERATIONS. The information from the audited financial statements for the years 1991 to 1999 was used to project the cash flows that the company would have generated without the participation of the agreement with Verizon in its operations. This calculation was considered reasonably correct. Here it is important to emphasize that since Verizon was the main client of THS, and the agreement of 168 months was the basis of the business, in its absence, the company did not have any possibility of continuing operations; for this reason, the use of the perpetuity formula is considered suitable, and that the loss of the agreement did not occur by deficiencies, and was not attributable to the plaintiff. Amount of this Item: US$28,885,195.00. In other words, the calculation of the amount claimed for interruption of operations for a value as of August 31,2008 of US $28,885,195.00 was proven to be correct, adjusted to the technique and the accounting and financial practices. In fact, the company was almost one hundred years old when, due to events beyond its control, it lost the contract for the preparation of Costa Rican telephone directories, which it had signed for a period of 168 months (14 years). It had been preparing these directories

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

*for almost one hundred years. It was possible to verify, based on the accounting records and audited reports, that because of the weight of this business in its operations and its cash flow, the company could not continue to operate without it. Likewise, and by virtue of the stability of the results of its operations, measured by both gross profit and earnings before interest, taxes, depreciation and amortization (EBITDA) for the fifteen years prior to the events, it is correct to calculate a perpetuity of the cash flows from the operations of the plaintiff company, as Mr. Evans did, and to consider the interruption of its centennial operations as a damage to the plaintiff. XI.- SUMMARY. The calculation of damages for breach of contract with Verizon Information Services Costa Rica, LLC, Verizon Information Services-Belize, LLC and GTE Directorios República Dominicana, C por A. prepared by Mr. Tomás Evans Salazar in the amount of $59,268,811.00 calculated as of August 31, 2008, is correct and accurate and was prepared in accordance with generally accepted accounting and financial principles and applying the correct techniques."* 2. The defendants have not demonstrated the opposite and therefore the application of Article 317 of the Code of Civil Procedure is appropriate, insofar as it was up their responsibility disprove, through technical evidence, that the amounts set and the concepts established did not conform to the truth or follow applicable techniques. 3. The calculations of indemnity for machinery investment made by Mr. Tomás Evans Salazar in a study provided as evidence by the plaintiff and ratified by the court expert Ramón Humberto Romero Rodríguez, Certified Public Accountant and Expert Actuary, do include the sale of the machinery. This is expressly indicated by pointing out that in this case the "Calculation of future value of investments recorded for accounting purposes minus the selling price of the rotary machine and its accessories" was considered. 4. The amounts determined in the documents mentioned, both by Evans Salazar and Romero Rodríguez, are based on the applicable techniques, are coincidental and include the items of machinery, increase in inventories, operating cash flows according to the agreement, losses incurred, interest paid and impairment due to interruption of operations. In this sense, this Court notes that in said documents with respect to the machinery, the cost of the equipment and machinery on the date on which the court auction became final, as well as the amounts

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

for depreciation thereof, were updated, and the loss was determined as the difference between the net value of the machinery as of June 30, 2007 (date of the auction) and the selling price thereof. Additionally, the variations in inventory were taken to future value, the projected but not actually realized flows were determined, projecting the consumption of thousands of pages obtained between the year 2000 and 2003, along with other calculation variables, in order to determine how the non-continuation of the contract affected this concept. On the other hand, the resulting losses for the periods between 2004 and 2007, the interest charges paid to Banco Cuscatlán and the Heidelberg company were taken to future value. Finally, the interruption of operations was calculated, using mathematical forecasts of economic income results for the period 2000-2014 based on the trends of the period from 1991 to 1999. The defendant did not object to or provide evidence that disproved the methodology or the estimated dates for future value of the losses incurred, the interest rates applied, projections, calculations, methodologies or conclusions obtained. Therefore, this Court does not have elements of conviction that allow it to question the scope of the documents under analysis. Consequently, it is appropriate to recognize the amounts indicated by the plaintiff and on the understanding that the additional amounts contemplated in the expert opinion of CPA Romero Rodríguez do not fall within the scope of the expert opinion requested and the claims put forward in the complaint, for which reason they should not be recognized. The amount indicated must be reduced by the amounts paid to the plaintiff by Radiográfica Costarricense S.A., for any contract of telephone directory preparation made after the breach of contract by Verizon information Services Costa Rica LLC. Likewise, this Court considers it appropriate to deduct the amounts corresponding to the following:

| | |
|---|---|
| d) Operating Cash Flows not received 2004-2013 Directories in the Dominican Republic | $ 7,912,999 |

This is because although the Master Agreement did not contemplate directories for that country, as can be seen from the text of the agreement, and the fact that the plaintiff's allegations are exclusively directed at the breach of said contractual object, there is no

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

proof of another duly signed contract that has been breached for the same *causa petendi* of these proceedings. Therefore, Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are jointly and severally ordered to pay the amounts specified.

**V.XI.- Regarding the noneconomic damages claimed:** As part of the damages awarded, the plaintiff claims the existence of a noneconomic damages as the result of the facts on which the complaint is based. With respect to the noneconomic damages, we note the following clarifications. The recognition of the responsibility of the State for purely noneconomic damages is implicit in the complementary reading of Articles 9 and 41 of the Political Constitution, given that in the former no distinction is made with respect to the responsibility of the State, and in the latter, there is an express reference to the possibility of protecting "noneconomic" interests, among which is the possibility of compensating for both subjective and objective noneconomic damages. The American Convention on Human Rights, on the other hand, affirmed in this regard: *"Article 11: 1. Everyone has the right to have his honor respected and his dignity recognized. 2. No one may be the object of arbitrary or abusive interference with his private life, his family, his home, or his correspondence, or of unlawful attacks on his honor or reputation. 3. Everyone has the right to the protection of the law against such interference or attacks."* Article 24: All persons are equal before the law. Consequently, they are entitled, without discrimination, to equal protection of the law."

*"Article 5.1:* Every person has the right to have his physical, mental, and moral integrity respected." Even before the 1949 Political Constitution came into force or the Convention was approved at the end of the 1960s, since the 19th century, Article 59 of the Civil Code provides: "The right to obtain compensation for noneconomic damages is established, in cases of injury to the rights of the personality." In matters of national administrative law itself, Article 197 of the General Law of Public Administration provides: *"There shall be liability for damage to purely noneconomic assets, as well as for noneconomic suffering and physical pain caused by death or injury, respectively."* Notwithstanding the foregoing, it is appropriate to make some clarifications on the matter, based on the doctrine and the

judicial decisions issued on the subject matter, given the existing particularities with respect to this type of damage, taking into account that in the case of subjective noneconomic damage, since the most intimate sphere of the individual is affected, the common rules with respect to the proof of damage cannot be applied, when the damage is caused to the subject's assets. In this sense, it has been said: *"In order to prove the noneconomic damage in its existence and entity, it is not necessary to provide direct evidence, but the judge must* assess *the circumstances of the act and the qualities of the victim in order to objectively and presumptively establish the noneconomic damage in the reserved sphere of the victim's privacy. We do not believe that noneconomic offense should be subject to direct proof, since this is absolutely impossible due to the nature of the offense, which resides in the most intimate part of the personality, although it is sometimes manifested by external signs that may not be an authentic expression ... no one can probe the spirit of another so deeply as to be able to affirm with certainty the existence and intensity of pain, the truth of a suffering, the reality of anguish or disappointment"* (Bustamante Alsina, *"Equitativa valuación del daño no mensurable"* ("Equitable assessment of non-measurable damage"), 1990. pages 655 and 656). The foregoing considerations have as their foundation the assessment that noneconomic damage must be seen as in *re ipsa or in itself*, given that in order to have spiritual damage configured, it is not necessary to prove, in a direct way, the suffering or depression externalized towards third parties, given that it implies rather the alteration of the existential balance of the persons, within their most intimate scope, and not necessarily made known or externalized in all its dimension towards third parties, while the latter is a function of the personality of each injured individual and based on the fact that the reactions of the human being have diverse forms and opportunities of manifestation. Therefore, in the event that the existence of a conduct is proven (death of a loved one, loss or damage to a noneconomic or material asset, impairment of fundamental rights, etc.) that could affect the person's privacy by causing pain, anguish, suffering, etc., it is interpreted that there could necessarily be noneconomic damages, and

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

therefore the intensity of such damages and the means for their compensation will be determined in accordance with the criteria that we will analyze in this same section. It is then, in function of the undermined subjective rights, that we can speak of the existence of a noneconomic damage, given that this will occur in the face of the violation of some of the inherent rights of the personality and that therefore they are considered nonmonetary. For this reason, it is said that noneconomic damages arise from the mere occurrence of formal or material actions by the Administration or from the omission of actions that violate such rights, but the particular circumstances of the case must be taken into consideration, as well as the existence of evidence that proves its compliance in a particular case. In this regard, reference should be made to the following: *"Since noneconomic offenses are necessary and unavoidable consequence of the violation of some of the rights of the personality of a subject, the demonstration of the existence of such transgression will require, at the same time, proof of the existence of the damage. The determination of the existence of noneconomic damage can be made in a way as objective as the verification of pecuniary damage. To this end, it is necessary only to compare a fact with the legal rule that grants a subject a right inherent to personality, to verify whether or not the former constitutes a violation of the provisions of the latter."* *Brebbia Roberto*. El Daño Moral *(Noneconomic Damage). Editorial Orbir.* In this regard, this Court considers that it is appropriate to make some clarifications regarding the noneconomic damages that will be fully applicable to the resolution of the performance submitted to its knowledge: In the first place, it should be noted that in matters of noneconomic damages we speak of a **compensatory role** and not of the equivalence sought in the case of material damages. In addition, it should not be forgotten that noneconomic damages are not exempt from the **certainty** required, which means that they must be the consequence of the action or omission of the Administration, and that the interest of the person who claims them

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

7

must be certain. In this regard, the following has been indicated: *"Noneconomic damage is not pain, sorrow, anguish, but the spiritual undermining derived from the injury to a non-pecuniary interest. Such detriment exists even when the victim does not understand the damage suffered; in the absence of tears; even when the victim is not in physical or "psychological" condition to "feel" grief, pain, or anguish (e.g., a braindead person). Subjective disvalue exists when the victim has "matured" such pain and, perhaps, stopped "feeling" it. Therefore, it is immediately apparent that noneconomic damage can wreak its effects into the future, with a sufficient degree of certainty..."* (Daniel Pizarro Ramón. Daño Moral (Noneconomic Damage). Ed. Hammurabi. Page 105). This certainty implies, then, that even though the noneconomic damage is of an *in re ipsa* (by itself) nature and there are injuries which, by their very nature, become such a damage, as has been indicated, in certain circumstances in which the claim is generic or has been delimited in a certain sense when it is specified in the complaint, it does not imply such an automaticity that it relieves the party that claims to be affected of its duty to provide evidence to help the judge verify its scope in the particular case. With respect to the need for indirect evidence in the determination of noneconomic damages, the following has been indicated: ."..

*This Chamber endorses the existence of noneconomic damages but reiterates that they correspond to an impairment of the non-monetary sphere. In this case, the damages awarded were of a subjective nature, i.e., pure or affective, which translates into an impairment of the individual's state of mind. Although it does not require direct proof, it does require at least indirect proof that would allow the judge to assess the damage..."* **(Vote No. 000290-FS1-2014 issued at 10:05 a.m., on the sixth day of March, two thousand and fourteen, by the First Chamber of the Supreme Court of Justice).** On the other hand, the noneconomic damage is of a **personal nature,** depending on the impact on the legitimate interest of the affected person. With regard to the scope of noneconomic damage in our country, the First Chamber, in its vote No. 112 issued at 2:15 p.m. on July 15, 1992, repeatedly quoted and applied by different jurisdictional bodies, stated: " *IV.-*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

Damage constitutes one of the assumptions of civil liability in tort, since the duty to compensate is only configured if there has been a harmful illegal act that injures a legally relevant interest, susceptible to be protected by the legal system. Damage, in the legal sense, constitutes any impairment, loss or detriment to the legal pecuniary or non-pecuniary sphere of the person (injured party], which causes the deprivation of a legal asset, with respect to which it was objectively expected that it would be preserved if the harmful event had not occurred. Under this premise, there is no civil liability if no damage is caused, just as there is no damage if there is no victim. On the other hand, it is only the damage that can be proven (reality or existence) that is indemnifiable, this being a matter of fact reserved for the prudent discretion of the judge. In summary, damage constitutes the detrimental gap for the victim resulting from the confrontation between the situation prior to the wrongful act and the situation subsequent to it. V.- On many occasions the expressions "damages" (daños, in Spanish) and "special damages" (perjuicios, in Spanish) are used indiscriminately, it is necessary to specify and distinguish both concepts. Damage constitutes the loss incurred by the victim (damnum emergens), while special damage ("perjuicio") is made up of the profit or utility that has been lost or frustrated (lucro cesans), which could reasonably and probably be expected if the wrongful act had not occurred. VI.- Not all damage gives rise to an obligation to compensate. For this purpose, basically the following characteristics must come together to be an "indemnifiable damage": A) it must be true, real, and effective, and not merely possible or hypothetical; it cannot be based on alleged or speculative realizations. Damage does not lose this characteristic if its quantification turns out to be uncertain, indeterminate or of difficult appreciation or proof; neither should certainty be confused with the current time, since it is admissible to repair damage that is certain but future; likewise, future damage should not be confused with loss of profit or special damage, since the former refers to that which arises as a necessary consequence of the causal or generating event of the damage, i.e., its repercussions are not projected when the proceedings are initiated. As to the magnitude or amount (seriousness) of the damage, this constitutes a point of subjective concern of the injured party; however, the law cannot deal with claims based on insignificant

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

damages, derived from excessive susceptibility. B) There must be an injury to a legally relevant interest that deserves protection. Thus, there can be a direct and an indirect victim: the former is the victim of the harmful act, and the latter will be the victim's successors. C) It must be caused by a third party, and subsist; that is, if it has been repaired by the responsible party or a third party (insurer), it would not subsist. D) There must be a causal relationship between the unlawful act and the damage. VII.- Within the classes of damages, we first find material and corporal damages; the former affects the things or material goods that make up the person's property, while the latter affects the corporal and physical integrity. For legal scholars, the generic denomination of material or pecuniary damage usually includes the specific bodily injury and material damage, in the strict sense. The latter seems to be the best expression, since personal injury usually affects the financial interests of the injured party (payment of medical treatment, hospitalization expenses, medicines, etc.), lost earnings if the injury has made him unable to carry out his usual occupations (special damages), etc. This distinction was born in the Roman Law, since a distinction was made between the damage inferred to the things directly (damnun) and damage that injured the physical personality of the individual (injuria,). In the case of damage to property, the loss generated Is economically quantifiable. VIII.- Noneconomic damages (also known in the literature as incorporeal, non-pecuniary, pain and suffering, or affective damages, etc.) occur when the individual's sphere of non-pecuniary interests are harmed, but since their violation can have financial consequences, a distinction must be made between "pure" subjective noneconomic damages or damages of affect, and objective or "objectified" noneconomic damages. Subjective noneconomic damage is produced when a non-monetary right has been injured, without property repercussions, normally supposing an unjust disturbance of the individual's psychic conditions (displeasure, discouragement, desperation, loss of satisfaction of living, etc., e.g., the offense against honor, dignity, intimacy, the so-called damage to life in a relationship, grief for the death of a relative or loved one, etc.). Objective noneconomic damages injure a non-monetary right with repercussions on property, i.e., they generate economically valuable consequences (e.g., the case of the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

*professional who loses his clientele in whole or in part because of the attributed fact). This distinction serves to distinguish the damage suffered by the individual in his social consideration (good name, honor, honesty, etc.) from the one suffered in the individual field (grief for the death of a relative), so one refers to the social part and the other to the emotional part of the person's life. Originally, this distinction arose to determine the scope of indemnifiable noneconomic damage, since in the beginning the doctrine was reluctant to compensate pure noneconomic damage because of its difficult quantification. For compensation, a distinction must be made between the different types of noneconomic damages. In the case of objective damages, the appropriate demonstration must be made, as in the case of pecuniary damages; but in the case of subjective noneconomic damages, since the amount cannot be precisely structured and demonstrated, it is left to the prudent discretion of the judge, who will take into account the circumstances of the case and the general principles of law and equity; the lack of evidence regarding the magnitude of the damages does not prevent a determination of the amount. The dogmatic difference between pecuniary and noneconomic damage does not exclude that, in practice, one and the other may occur concomitantly, which could be the case of injuries that generate physical pain or cause physical disfigurement or deformity (damage to health) and aesthetic damage (disruption of the physical harmony of the face or any other exposed part of the body), without the noneconomic damage being considered secondary or accessory, since it evidently has autonomy and peculiar characteristics. In sum, noneconomic damage consists of physical, psychological, affective or noneconomic pain or suffering inflicted by an unlawful act. Normally the fertile field of noneconomic damage is that of personality rights when they are violated."* Based on the foregoing, it is evident that in the case of subjective noneconomic damages, the existence of direct evidence is not required, but rather certain criteria are applicable to it that delimit the discretion of the judge and that are derived from its own legal nature and from the evidence provided by the party and that have been developed by national jurisprudence. Thus, the following can

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

be indicated: **1). - General principles of law and equity:** The decision mentioned above establishes the general principles of law and equity as the first delimiting criterion. **2).- Presumptions inferred in the particular case:** As a second criterion to be used to determine the existence and extent of subjective pain and suffering, it has been mentioned that the judge may use presumptions for its recognition. In this sense, the First Chamber has indicated: "*Since its quantification cannot be precisely demonstrated, it is left to the prudent judgment of the judges, without requiring specific proof of its existence, since its determination is made* in re ipsa *(in itself), which implies that it is "consubstantial or inherent to the injury itself, it goes with the thing, it is understood in principle as a derivation of the fact or the adopted conduct" (resolution No. 125-F-S12009 issued at 3:35 p.m. on February 5, 2009). However, for its recognition, it is necessary that from the weighting of all the existing evidence in the case, the subjective affliction claimed as a consequence of the accused conduct must be inferred, even in an indicative way or by means of presumptions... As stated above, it is not feasible to structure and demonstrate the quantification of subjective pain and suffering in a precise manner, hence the need to establish it based on the circumstances of the case, the general principles of law and equity. The issues listed do not correspond to specific evidence, since they are related to personal characteristics of the plaintiff and alleged consequences of what the plaintiff suffered, which leads the complainant to mention Article 417 of the Code of Civil Procedure concerning humane presumptions. However, it also cannot be established that such presumptions are involved, nor that they are admissible as evidence, since for such purposes they must be the direct, precise, and logical consequence of a proven fact, which is not the case, and the Cassation Court judge does not specify from which proven facts he extracts the aspects he mentions...*" **(Vote 000295-F-S1-2014 issued at 11:30 a.m. on the sixth day of March, two thousand and fourteen, of the First Chamber of the Supreme Court of Justice).** In this regard, it should be noted that in order to apply the presumptions to a specific case as an element of conviction of this Court, the provisions of Article 417 of the Code of Civil Procedure must be fulfilled, as it

provides the following: *"Article 417.- Human presumption. Human presumptions only constitute proof if they are a direct, precise, and logical consequence of a proven fact. The proof of presumptions must be serious and in agreement with other evidence given in the proceedings."* With respect to the concept of presumption, the First Chamber of the Supreme Court of Justice has said the following: *"For a presumption to exist as a means of proof it is first necessary that there be a positive or negative event, a true event from which the one to be known must be deduced. The existence or non-existence of this event, broadly called a base fact, or more technically an indication, must be duly demonstrated in the proceedings in order to ensure the viability of the presumption. This can be deduced from Article 417 of the Code of Civil Procedure: "Human presumptions only constitute proof if they are a direct, precise and logical consequence of a proven fact." The Court has indicated that this type of presumption. "..is the result of the exercise of the discretion granted to the judge to assess the evidence, deriving then the presumption of other facts that have been held to be true," (no. 848-F, issued at 2:45 p.m. on October 31, 2001). This connection between the basic fact or indication and the event that is intended to be derived (a consequential event) must be direct and precise, and it is verified in accordance with purely logical norms, with the rules of human judgment, a task carried out by the judge vested with discretionary power according to his conscience and discernment. It is he who exclusively infers a fact or act from such evidence, according to his inner conviction within a framework of reasonability and rationality, in a logical prius that does not violate sound criticism; hence, his judgment is maintained, unless it is proved to be contrary to the evidence that has been shown, either because of a factual or legal error in their evaluation with respect to the basic or indicative facts, or because the inference borders on the absurd because it contradicts common sense or natural phenomena"* (judgment No. 25-F-2007, issued at 10:45 a.m. on January 19, 2007) (emphasis added). (In this regard, see, among others, judgments of the same Chamber, No. 27 issued at 10:30 a.m. on May 5, 1993, No. 217 issued at 3:00 p.m. on May 5, 1999; and No. 848 issued at 2:45 p.m. on October 31, 2001). **3) Criteria of reasonability and proportionality:** With regard to the application of these criteria, the following has been

indicated: *"It should be remembered that when compensating for subjective noneconomic damages, although it is not a question of quantifying the suffering - which is negligible, an attempt is made to determine monetary compensation for the injury, as a mechanism to which the law can resort, in order to repair - at ¡east in part - the offense caused (in this sense, see, among many others the judgment of this Court No. 1143-FS1 - 2012 issued at 9:10 a.m. on September 13, 2012). The amount awarded must arise from a prudent assessment by the judge, through which he avoids falling into extremes of meager, symbolic or - to the contrary - excessive compensation; therefore, he must rule in line with equity and the principles of reasonability and proportionality. With respect to the latter, the following has been indicated: "Reasonability is opposed to arbitrariness and refers to a pattern of justice with which the principle of legality is completed. From another angle, that of proportionality, it refers to a correspondence between the factual circumstances, the means employed and the decision adopted, (First Chamber, judgment No. 1292-F-Sl-2012 issued at 9:55 a.m. on October 11, 2012). That is why, as regards the estimate of the subjective noneconomic damage, this Chamber has stated: "The judge's assessment within this inexorable framework allows for its quantification to be in accordance with the law and not to lead to disproportionate compensation that benefits or unjustifiably harms one of the parties. In other words, there must be a fair balance derived from the specific factual framework." (Decision No. 4-F-Sl-20l2 issued at 8:50 a.m. on January 12, 2012). By virtue of the above, it has been said that: "equity and the assessment of the seriousness of the offense committed must be used and the personal circumstances and subjective repercussions on the victim must also be taken into account (marital status, age, cultural level, degree of family cohesion and coexistence, among others)." (First Chamber, judgment No. 279-F-S1-2011 issued at 9:30 a.m. on March 17, 2011; and in similar sense, see decision No. 318-F-S1-2011 issued at 9:25 a.m. on March 31, 2011)* ...[11] **(Vote 001045-F-S1 -2013 issued at 9:05 a.m. on the fourteenth day of August, two thousand and thirteen, by the First Chamber of the Supreme Court of Justice). 4).- Causality:** Causality of the damage is another criterion of an unavoidable nature, while the actual cause of the damage may determine the scope and limits of the

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

compensatory estimate. This can be clearly inferred from the following: "The *subjective noneconomic damage is seen in the shock, anguish and the feeling of helplessness caused by being unable to ask for medical and safety assistance, having -those who were in better physical condition- to walk long distances in search of help, neglecting not only the other injured passengers but also the product they were carrying, all because of the absence of cell phone service. In other words, the lack of cellular coverage, as well as the failure to report telephone reception problems at the scene, led as a causal link to subjective noneconomic damage translated into anguish, shock and helplessness.*" **(Vote 000507-F-S1 -2014 issued at 2:00 p.m. on the twenty-seventh day of March, two thousand and fourteen, by the First Chamber of the Supreme Court of Justice).** Consequently, it should be noted that it has been accepted that within the framework of the theory of the responsibility of the Public Administration, in principle, it would be valid to admit the possibility that the defendant can prove the existence of one of the circumstances that exempt it from responsibility established in Article 190 of the General Law of Public Administration, namely, *force majeure*, the victim's guilt or an act of a third party; or even prove the nonexistence or lesser gravity of what is claimed. Thus, it has been indicated that "The *amount to be fixed must be a faithful reflection of the circumstances described in the record, so that it is an appropriate sum, given the problems suffered by the injured party, caused by the unlawful criminal or civil acts of the agent or agents producing the damage. Since these presumptions are iuris tantum, they admit proof to the contrary, of which the defendant or responsible for causing the damage must be extremely diligent, since he has the burden of proof to disprove the presumptions of pain, suffering, embarrassment or tort and for that purpose, he can resort to any type of ordinary evidence.*" (Montero Piña Fernando. El Daño Moral, Page 61. Impresión Gráfica del Este). It must be noted that some legal doctrine has held that there are no grounds for exoneration when the level of intensity is excessive, in the case of any damage resulting from lawful and normal conduct. **5) The prudent assessment of the Judge:** On the other hand, always within the order of proportionality, reference is made to the "judge's prudent assessment" of the damage and its compensation, as follows: "The *evidence of this type*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

*of injury is ''in re ipsa'' (in itself); the amount must be fixed in accordance with prudent judgment and based on the principles of reasonability and proportionality. In this regard, it is important to remember that the judge's assessment within this inexorable framework requires that its quantification be in accordance with the law and does not lead to disproportionate compensation that unjustifiably benefits one of the parties. In other words, they must maintain a fair balance derived from the specific factual situation. Therefore, this is not a question of quantifying the suffering, since it is negligible, but rather of establishing monetary compensation for the injury, the only mechanism to which the law can resort in order to repair, at least in part, the damage caused (in this regard, see judgment No. 537, issued at 10:40 a.m. on September 3, 2003, as quoted in resolutions No. 845-F-2007 issued at 10:05 a.m. on November 23, 2007, and No. 001-F-S 1-2009 issued at 9:05 a.m. on January 6, 2009). This Chamber has also stated: "The determination and quantification of the subjective noneconomic damage, then, is left to the fair and prudent assessment of the Judge, who will resort to human presumptions inferred from the proven facts. The human presumption is a logical judgment by the judge, by virtue of which a fact is considered probable, based on the general maxims of experience, which indicate the normal way in which things and facts happen..." (Decisions No. 878- F-2007 issued at 8:15 a.m. on December 14, 2007 and No. 001 -F-S 1 - 2009 issued at 9:05 a.m. on January 6, 2009, quoted in judgment No. 771-F-S 1-2011 issued at 1:30 p.m. on June 30, 2011).* **(Vote 000520- F-SI-2014 issued at 9:08 a.m. on the tenth day of April, two thousand and fourteen, of the First Chamber of the Supreme Court of Justice).** In accordance with the foregoing, the recognition of noneconomic damages must be made on the understanding that, although direct evidence is not required, Judges must be particularly prudent and proceed to evaluate it under their reasonable appreciation, under criteria of equity, applying the human presumptions inferred from the circumstantial elements of the case of analysis, in order to determine the origin and quantum of the judgment on this matter within the limits of reasonability and proportionality. The foregoing is due to the fact that noneconomic damages are not for this Court the product of an arbitrary determination by the Judges, but rather the very consequence of the assessment that the Court must

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

make of the totality of the elements described above in the context of the case under analysis, so that it may fulfill the compensatory function of its legal nature and not imply unjust enrichment for those who claim to be affected without being so, or when, despite delimiting the external manifestations of the same, they do not demonstrate so in court, at least with circumstantial evidence. The absence of an objective situation that per se implies a noneconomic impact, together with the lack of indications as to its scope, as defined by the parties, means that there is no certainty as to its existence in the particular situation under analysis. In view of the foregoing, the claim for compensation filed by the plaintiff should be decided on the merits, **b) Criterion of the Court regarding the claimed noneconomic damage:** The plaintiff asks in its claim for recognition of subjective and objective noneconomic damages on account of the facts proven in these proceedings. However, this Court considers that this is not appropriate since the plaintiff is a legal entity. As such, it does not suffer subjective noneconomic damage, given that those who could have suffered it would be the individuals who composed it, and they are not plaintiffs in the proceedings. Additionally, in any case, it is necessary to indicate that there is no proof in this case that demonstrates, as evidence, the existence of any type of subjective or objective noneconomic damage caused by the facts that give rise to these proceedings, and the party merely invokes them, without providing any elements of conviction with respect to their scope and consequences. It is striking that the expert dares to make a determination of subjective noneconomic damage without having the technical knowledge to fix it and also because, by its nature, it is beyond his competence and the possibility of being quantified materially a priori. Therefore, this compensatory item should be rejected.

**VI.- On the inflation adjustment and interest requested:** The plaintiff has made the following request: *"in accordance with the provisions of Article 123 of the Code of Contentious Administrative Procedure, the amounts of the judgment shall also be updated to compensate for the variation in purchasing power, and interest shall be recognized on all the above items, which shall be paid starting from August 30, 2008, until fully paid, and shall be calculated in accordance with the provisions of Article 1163 of the Code of Civil*

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

8

*Procedure.*" In this regard, in accordance with Article 123 of the Code of Contentious Administrative Procedure, the amounts subject to judgment are indexed in order to update the purchasing power of the amounts indicated, taking as a parameter the prime rate established for first-rate international banks. Similarly, the legal interest established in Article 1163 of the Civil Code must be applied to these items, with respect to the <u>net profit</u> component, items which must be recognized from August 30, 2008 until they are fully paid, as requested by the plaintiff; this is based on the line of jurisprudence of the First Chamber of the Supreme Court of Justice, which states: *. "...In principle it is feasible to jointly recognize interest (percentage of profit) and indexation (deflationary factor), since these aspects are distinct and autonomous, and therefore are not exclusive; this, of course, provided that the revenues awarded are net, since legal interest contains an added inflationary item. In addition, it is evident that these obligations can be awarded based on the judgment, in which the amount due was established and up to their effective payment..."* (judgment number 000293- F-SI-2016 issued at 9:45 a.m. on April 7, 2016, and in similar sense, judgments 000990-F-02 issued at 4:30 p.m. on December 18, 2002; 107 issued at 2:30 p.m., 108 issued at 3:00 p.m., both on July 10, 1992; 49 issued at 3:00 p.m. on May 19, 1995; 131 issued at 2:10 p.m. on December 18, 144 issued at 2:40 p.m. of December 23, both of 1998; and 14 issued on January 5, 2000, all of the First Chamber of the Supreme Court of Justice)

**VII.- Prior Defenses:** Notwithstanding the defenses already resolved during the course of the proceedings, and the defense of the statute of limitations rejected in previous considerations, the defendants filed the following defenses against the complaint:

A) VERIZON COMMUNICATIONS INC: filed a motion to dismiss based on lack of right, lack of active and passive ad *causam* and *procesum* standing.

1. With respect to the defenses of active and passive ad *causam* and *procesum* standing: The defenses of lack of standing should be rejected, considering that the plaintiff has demonstrated that the co-defendant is a part of the "Verizon" economic interest group and a party to a defaulted contractual relationship with ICE and to another contract with Trejos Hermanos Sucesores that was maliciously breached.

2. With regard to the defense of lack of ad *procesum* standing, it must be rejected,

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

9

because the plaintiff has demonstrated that it has sufficient authority to exercise the respective legal representation.

3. With regard to the defense of lack of right, for the reasons indicated above, it is appropriate to admit it on a partial basis, only concerning the items not recognized in this judgment.

B)  VERIZON INFORMATION SERVICES COSTA RICA LLC filed the defense of lack of right: For the reasons indicated above, it should be partially admitted, only concerning the items not recognized in this judgment.

C)  INSTITUTO COSTARRICENSE DE ELECTRICIDAD filed the defenses of lack of active and passive standing and lack of right.

1. With respect to the defense of lack of passive standing, it should be accepted, for the reasons mentioned above, since there is no contractual relationship between the entity and the plaintiff. Therefore, there is no material legal relationship of a procedural nature that would allow the plaintiff to sue the entity being sued and thus appear as a defendant in this case.

2. As it is unnecessary, the Court omits any ruling on the rest of the defenses filed by Instituto Costarricense de Electricidad.

**VIII.-Costs:** Article 193 of the Code of Contentious Administrative Procedure establishes that procedural and personal costs are assessed against the defendant by the mere fact of being a defendant, a ruling that must be made even ex *officio,* pursuant to Article 119.2 of said Code. Since the co-defendants Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are not covered by the exceptions, they are jointly and severally liable for the payment of procedural and personal costs. The plaintiff shall pay procedural and personal costs to Instituto Costarricense de Electricidad.

THEREFORE

The defenses of expiration of the statute of limitations, lack of active and passive standing and lack of ad procesum standing raised by the co-defendants Verizon Communications Inc and Verizon Information Services Costa Rica LLC are rejected and the defense of lack of right raised by the co-defendants is partially accepted. The defense of lack of passive

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

9

standing filed by Instituto Costarricense de Electricidad is admitted. Consequently, the complaint is partially accepted in all that is expressly indicated and is rejected in all that is not admitted in this operative part. Consequently, the following has been decided: **A)** The Court declares: **1.** That the "Master Purchase Agreement" executed on February 28, 2002 by and between the plaintiff Trejos Hermanos Sucesores S.A. and General Telephone Directory Company, C por A (which changed its name to VERIZON INFORMATION SERVICES COSTA RICA, LLC), was a subcontract employed by the contractor as means to perform the contract executed between the companies "GTE Information Services Incorporated," "GTE Directories Corporation" and "General Telephone Directory Company C por A," companies of the United States of America, domiciled in the State of Delaware with head offices in the city of Dallas, State of Texas, which identified themselves as the "GTE Consortium," and INSTITUTO COSTARRICENSE DE ELECTRICIDAD, as a result of the award of the contract to such Consortium in Public Bidding Proceedings No. 6378-T, conducted by ICE, in accordance with a resolution of the Board of Directors of ICE, adopted at regular meeting number five thousand one hundred and fifty-two, held on the first day of February, two thousand, and approved by the Office of the Comptroller General of the Republic on December 13, 2000. **2.-** That the termination of the administrative contract executed by and between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM (which changed its name to the VERIZON CONSORTIUM) caused the termination of the "Master Purchase Agreement" executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. **3.** That TREJOS HERMANOS SUCESORES S.A. did not have any liability for the events that caused the termination of the administrative contract entered into between INSTITUTO COSTARRICENSE DE ELECTRICIDAD and the GTE CONSORTIUM. **4.** That TREJOS HERMANOS SUCESORES S.A. did not have any responsibility for the events that caused the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. **5.** That the termination of the Master Purchase Agreement, executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

9

Telephone Directory Company, C por A. caused immediate and direct damages to TREJOS HERMANOS SUCESORES S.A..." **6.** That the defendant companies Verizon Communications Inc. and Verizon Information Services -Costa Rica- LLC are part of an economic interest group, successor of the economic interest group called GTE Consortium, which was awarded the contract in Public Bidding Proceedings No. 6378-T, conducted by ICE, which was implemented through the Master Purchase Agreement executed on February 28, 2002 by the plaintiff Trejos Hermanos Sucesores S.A. with General Telephone Directory Company, C por A. **7**. That "VERIZON COMMUNICATIONS INCORPORATED" is jointly and severally liable with the latter for all obligations incurred by "VERIZON INFORMATION SERVICES -COSTA RICA- LLC," with TREJOS HERMANOS SUCESORES SOCIEDAD ANÓNIMA." **8.**- That the defendant companies Verizon Communications Inc. and Verizon Information Services-Costa Rica- LLC are jointly and severally liable for the negative consequences suffered by the plaintiff company, which resulted from the termination of the Master Purchase Agreement executed on February 28, 2002 with the plaintiff Trejos Hermanos Sucesores S.A..." **9.-** That the clauses of the MASTER PURCHASE AGREEMENT executed between VERIZON and TREJOS HERMANOS SUCESORES regarding the release of VERIZON from civil liability for breach of contract are ineffective, including within that nullity, in particular, Clauses 24 and 28 of that agreement, without this ruling being limited to them, since it includes all the clauses exempting VERIZON from civil liability. B) Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are jointly and severally liable to pay the following amounts to the plaintiff: 1. For the investment in machinery: The amount of $2,582,156.00 (two million five hundred and eighty-two thousand one hundred and fifty-six dollars). 2. For increase in inventories: The amount of $2,860,696.00 (two million eight hundred and sixty thousand six hundred and ninety-six dollars). 3. For Operating Cash Flows not received during the 2004-2013 period for Directories in Costa Rica: The amount of $8,806,872 (eight million eight hundred and six thousand eight hundred and seventy-two dollars). 4. For Losses incurred from 2004 to 2007: The amount of $7,237,068 (seven million two hundred and thirty-seven thousand and sixty-eight dollars). 5. For interest paid: The amount of $ 983,825 (nine hundred and eighty-three

thousand eight hundred and twenty- five dollars). 6. For damages caused by interruption of operations: The amount of $28,885,195 (twenty-eight million eight hundred and eighty-five thousand one hundred and ninety-five dollars). C) The amounts covered by the judgment are indexed in order to update the purchasing power of the amounts stated, taking as a parameter the prime rate established for first-rate international banks. Similarly, the legal interest established in Article 1163 of the Civil Code must be applied to these items, with respect to the <u>net profit</u> component, items which must be recognized from August 30, 2008 until they are fully paid. D) Verizon Communications Inc. and Verizon Information Services Costa Rica LLC are jointly and severally liable for the payment of procedural and personal costs to the plaintiff. E) The plaintiff is ordered to pay procedural and personal costs to Instituto Costarricense de Electricidad.

**Rodrigo Alberto Campos Hidalgo**

**Marianella Álvarez Molina**                    **Sergio Mena García**

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE

9

TRANSLATION

- Verification Code -

PSKSOA47ICJ861

Digital signature of:
RODRIGO CAMPOS HIDALGO, DECIDING JUDGE SERGIO MENA GARCÍA, DECIDING JUDGE MARIANELA ÁLVAREZ MOLINA, DECIDING JUDGE



# <u>Certificate of Accuracy</u>

Tuesday, 26 October 2021

To whom it may concern,

We Trustpoint.One, hereby certify to the best of our knowledge and belief that the foregoing document described as "The Decision of the Contentious-Administrative and Civil Finance Court dated July 19, 2017" is a true and accurate translation of the original.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

If there is any additional information we can provide you, please do not hesitate to contact us.

Yours sincerely,

*Elizabeth Wozniak*
Elizabeth Wozniak
Project Manager
Trustpoint.One

3200 Cobb Galleria Parkway
Suite 200
Atlanta, GA 30339

Trustpoint.One/translate-one
p: 412.261.1101
f: 412.261.1159

page 1 of 1

EXPEDIENTE: 08-001505-1027 -CA
PROCESO DE CONOCIMIENTO
ACTOR:
TREJOS HERMANOS SUCESORES S.A.
DEMANDADOS:
INSTITUTO COSTARRICENSE DE ELECTRICIDAD
VERIZON COMMUNICATIONS INCORPORATED
VERIZON INFORMATION SERVICES -COSTA RICA- LLC

---

**66 - 2017- V**

**TRIBUNAL CONTENCIOSO ADMINISTRATIVO Y CIVIL DE HACIENDA. SECCIÓN QUINTA. SEGUNDO CIRCUITO JUDICIAL DE SAN JOSÉ.** Goicoechea, Edificio Anexo A, a las ocho horas del diecinueve de julio del año dos mil diecisiete.

Proceso de conocimiento interpuesto por **TREJOS HERMANOS SUCESORES S.A.** representado por **ÁLVARO TREJOS FONSECA**, mayor casado en segundas nupcias, Máster en Ciencias, vecino de San José, cédula de identidad número 1-0390-0895, actuando en su condición de Presidente con facultades de Apoderado Generalísimo sin límite de suma, **EDUARDO SANCHO GONZÁLEZ,** mayor, casado, abogado, vecino de Montes de Oca, cédula 1-380-073, **ANDRÉS MEZA VILLALOBOS**, mayor de edad, abogado, casado, **DIEGO BAUDRIT CARRILLO**, casado, abogado, vecino de San José, con cédula número 1-323-212, carné del Colegio de Abogados 1155, **LUIS GERARDO VILLANUEVA MONGE**, mayor, casado una vez, abogado, vecino de Cartago, cédula de identidad No. 3-221-204, todos en su condición de Apoderados Especiales Judiciales, contra el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD**, representado en diferentes momentos procesales por **ENRIQUE ROJAS FRANCO**, mayor, casado, Abogado, vecino de Santa Ana, portador de la cédula de identidad número: uno-trescientos noventa-mil doscientos ciocuenta, carnet de Abogado No. 1184, **GERMAN CALDERÓN LOBO**, mayor, casado, abogado, vecino, de Heredia, cédula número 4-149/125,



Firmado digital de:
ROXANA CHACÓN ARTAVIA, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

carné 5995, **DANNY FABRICIO SABORÍO MUÑOZ**, mayor, soltero, cédula de identidad 1-903-770, carnet de Abogado N 16289, **CARLOS CERDAS DELGADO**, mayor, casado, cédula de identidad 1-896-201, carnet de Abogado N 15240, **ANA VICTORIA ZAPATA CALVO**, mayor, divorciada, abogada, vecina de Escazú, cédula uno-ochocientos noventa y dos- cuatrocientos noventa y uno, **JUAN PABLO HERNANDEZ CORTES,** mayor de edad, abogado, casado, todos en sus condiciones de Apoderados Especiales Judiciales, **VERIZON COMMUNICATIONS INC.**, representado por **ANDREA HULBERT VOLIO,** mayor, casada, abogada, vecina de Santa Ana, portadora de la cédula de identidad número 9-100-121, **ALEXANDER SALAZAR SOLÓRZANO**, mayor. casado, abogado, uno-ochocientos treinta y cinco- trescientos noventa y ocho, vecino de Guachipelln de Escazú, en su condición de Apoderado Especial Judicial (poder folio 1170) **JUAN CARLOS PIZARRO CORRALES,** mayor, casado, abogado, vecino de San José, portador de la cédula de identidad número uno- ochocientos veinticinco- trescientos sesenta y seis, **RODRIGO ALBERTO PEREZ GONZALEZ,** mayor de edad, abogado, quien se constituye propiamente para la fase de conclusiones de la audiencia de juicio, y **MARVIN CÉSPEDES MÉNDEZ,** mayor, casado, abogado, vecino de San José, portador de la cédula de identidad número 1-531-965, quien representa a esta sociedad en la fase de alegados de saneamiento, alegatos de apertura e interrogatorio de testigos en audiencia de juicio, en su condición de apoderados especiales judiciales y **VERIZON INFORMATION SERVICES COSTA RICA LLC,** representado por este último y por **GINO CAPPELLA MOLINA,** mayor, casado, abogado, vecino de San José, portador de la cédula de identidad número uno-quinientos sesenta y nueve doscientos veintiséis, en su condición de Apoderados Especiales Judiciales,

### RESULTANDO

**I.-** Que el día quince de diciembre de 2008, la parte actora interpuso proceso de conocimiento ante este Tribunal y solicitó lo siguiente:

"*1. Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C. por A (que cambió su razón social a VERIZON*



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*INFORMATION SERVICES COSTA RICA, LLC) constituyó un medio de ejecución del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephohe Directory Company C por A", empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000.*

*2).- Que el citado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A, fue del conocimiento del INSTITUTO COSTARRICENSE DE ELECTRICIDAD, que aprobó la intervención de TREJOS HERMANOS SUCESORES S.A. en la ejecución del contrato administrativo adjudicado al Consorcio GTE resultante de la Licitación Pública No. 6378-T promovida por el ICE.*

*3).- Que la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*

*4).- Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE.*

***5).-*** *Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*

***6.-*** *Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a*


Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*TREJOS HERMANOS SUCESORES S.A.*

**7.-** *Que las empresas demandadas Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A.*

**8.-** *Que* **"VERIZON COMMUNICATIONS INCORPORATED"** *es el ente de mayor jerarquía de un grupo de interés económico del que forma parte* **"VERIZON INFORMATION SERVICES -COSTA RICA- LLC",** *por lo que la primera de esas sociedades responde solidariamente con la segunda por todas las obligaciones contraídas por* **"VERIZON INFORMATION SERVICES -COSTA RICA- LLC"** *, con* **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA.**

**9).-** *Que las empresas demandadas* **Verizon Communications Inc. y Verizon Information Services -Costa Rica- LLC** *son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A.*

**10).-** *Que el* **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** *desconoció los derechos e intereses legítimos de* **TREJOS HERMANOS SUCESORES S.A.** *derivados de la ejecución de la Licitación Pública No. 6378-T a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002, por lo que es responsable solidario con Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC de la indemnización de los daños y perjuicios sufridos por la actora por la extinción del citado Contrato Maestro de Compra suscrito el 28 de febrero del 2002.*

**11).-** *Que son nulas e ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON. .*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO UMAÑA PEREZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**12).-** *Que los demandados el **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** y las empresas **Verizon Communications Inc. y Verizon Information Services -Costa Rica. LLC** deben pagarle a la parte actora, solidariamente, los daños y perjuicios irrogados, que liquidamos de la siguiente manera:*

| a) Inversión en maquinaria | $2.582.156 |
|---|---|
| b) Incremento en inventarios | $2.860.696 |
| c) Flujos de Caja Operativos no recibidos 2004-2013 Directorios Costa Rica | $8.806.872 |
| d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana | $ 7.912.999 |
| e) Pérdidas realizadas 2004 a 2007 | $7.237.068 |
| f) Intereses pagados por THS | $ 983.825 |
| g) Interrupción de Operaciones | $28.885.195 |
| h) Daño Moral | $ 5.000.000 |

*i) De conformidad con lo que dispone el artículo 123 del Código Procesal Contencioso Administrativo se concederá, además, la actualización de las sumas de la condenatoria para compensar la variación en el poder adquisitivo y se reconocerán Intereses de todas las partidas anteriores que se pagarán a partir del 30 de agosto del 2008 y hasta que se cancelen totalmente, que se calcularán de conformidad con lo que dispone el artículo 1163 del Código Procesal Civil.*

**13).-** *Los demandados deberán pagar solidariamente a la parte actora las costas personales y procesales de este asunto".*

**II.-** Que mediante resolución de ocho horas del doce de enero del año dos mil nueve, se dio traslado de la demanda a las partes codemandadas.

**III.-** Que mediante escrito presentado el día 3 de marzo de 2009, el Instituto Costarricense de Electricidad contestó la demanda opuesta e interpuso las defensas de falta de legitimación activa y pasiva, falta de derecho y de falta de competencia

**IV.-** Que mediante escrito presentado el 6 de mayo de 2009, VERIZON COMMUNICATIONS INC., contestó la demanda e interpuso las defensas de falta de derecho, falta de legitimación ad causan y procesum activa y pasiva.



Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**V.-** Que mediante escrito presentado el 7 de mayo de 2009, VERIZON INFORMATION SERVICES COSTA RICA LLC, contestó la demanda e interpuso las defensas de falta de derecho, incompetencia e indebida integración de la litis.

**VI.-** Que la defensa de incompetencia fue rechazada mediante resolución 1078-2009 del Juez de Trámite. Ante recurso de inconformidad, lo resuelto fue confirmado por voto **000874-C-S1-2009 de** las once horas quince minutos del veinticinco de agosto de dos mil nueve de la Sala Primera de la Corte Suprema de Justicia.

**VII.-** Que la defensa de indebida integración fue inicialmente rechazada mediante resolución 1080-2009, siendo así que posteriormente en resolución 3607-2010, se dispuso acoger la integración. Lo anterior fue confirmado por resolución 634-2010 de las diez y treinta de 29 de noviembre de 2010 del Tribunal de Apelaciones. En razón de lo anterior, se integró a la litis Verizon information services- Belize.

**VIII.-** Que al ser las nueve horas y dieciocho minutos del nueve de junio del año dos mil nueve, se realizó la primera audiencia preliminar del presente proceso.

**IX.-** Que al ser las trece horas y cuarenta y cinco minutos del día veintitrés de setiembre del año dos mil diez, se realizó una segunda audiencia preliminar en el proceso. En la misma, se confirman pretensiones y se tiene por integrada a Verizon Information Services- Belize.

**X.-** Que al ser las ocho horas y cuarenta minutos del catorce de agosto del año dos mil doce, se realizó una tercera audiencia preliminar en el proceso. En la misma, mediante resolución número 1314-2012-T se rechaza la excepción de indebida acumulación de pretensiones opuesta en la misma. Asimismo, se determinan los hechos controvertidos.

**XI.-** Que al ser las ocho horas cuarenta y dos minutos del siete de septiembre del dos mil doce, se realizó la fase de admisión de prueba y como tal se admitió documental, testimonial y pericial.

**XII.-** Que una vez realizado el respectivo peritaje, mediante resolución de las diez horas y seis minutos del diecinueve de marzo del año dos mil catorce, se dio traslado del presente asunto a la Sección IV de este Tribunal.

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA CORDERO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**XIII.-** Que mediante resolución de las nueve horas del cinco de mayo del año dos mil catorce, la correspondiente integración de la Sección IV de este Tribunal, hizo la devolución del correspondiente expediente al Juez de Trámite.

**XIV.-** Que mediante resolución de las ocho horas y cincuenta y dos minutos del veintidós de abril del año dos mil quince, se procedió a excluir del proceso a Verizon Information Services- Belize.

**XV.-** Que mediante resolución de las catorce horas y treinta y siete minutos del cuatro de abril del año dos mil dieciséis, el Juez de Trámite ordenó enviar el asunto a etapa de juicio.

**XV.-** Que mediante resolución de las once horas y cuarenta del veintitrés de junio del año dos mil dieciséis, esta Sección de Juicio procedió a convocar a audiencia oral en el presente proceso.

**XVI.-** Que los días 28 y 29 de junio de los corrientes se realizó la audiencia oral y público en el presente proceso. En la misma se determinó que el Lic. Marvin Céspedes Méndez era el representante de ambas codemandadas, según poderes que constan en autos, se admitió prueba para mejor resolver ofrecida por la parte actora, se escucharon alegatos de apertura, se evacuó la prueba pericial y testimonial, ofrecida, admitida y que se hizo llegar a la misma. Se tuvo por desistida por las codemandadas y además se declaró inevacuable la declaración de parte respectiva, en lo que corresponde al Instituto Costarricense de Electricidad, dado que en el momento procesal respectivo, su representación aún no se había hecho presente a la audiencia, dado que llegó a la misma en forma tardía. En la continuación de la audiencia del día 29 de junio, se apersonó el abogado Rodrigo Alberto Pérez González, en representación de Verizon Communications Inc. Finalmente se escucharon las conclusiones de las partes.

**XVII.-** Que en el proceso ante este Tribunal no se han observado nulidades que deban ser subsanadas y la sentencia se dicta dentro del plazo establecido al efecto por el numeral 111.1 del Código Procesal Contencioso Administrativo, dado que el término de 15 días de la referida norma vence el 20 de julio de los corrientes. Previa deliberación y por unanimidad.-



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MSA OROZCO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Redacta el Juez **Campos Hidalgo, con el voto afirmativo de los jueces Álvarez**

**Molina y Mena García,**

CONSIDERANDO

**I.- <u>Sobre la teoría del caso de la parte actora y sus principales razonamientos</u>:** Que de una revisión de la demanda y de los respectivos razonamientos en audiencia de juicio, la parte actora funda sus pretensiones en los siguientes argumentos:

**a) Argumentos de carácter general:**

**1.** Que la impresión de guías telefónicas tiene como naturaleza ser un servicio público, por lo que correspondía al ICE velar por su debida prestación. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**2.** Que la extinción del contrato ICE - GTE (VERIZON) tuvo el efecto inmediato de hacer imposible la ejecución del contrato GTE (VERIZON) - sociedad actora, por lo que las consecuencias negativas que esa imposibilidad de ejecución (daños y perjuicios causados a la sociedad actora) descansa en la extinción del primero. *(argumentos de la demanda)*

**3.** Que hay dos relaciones contractuales: ICE - GTE (VERIZON) y GTE (VERIZON) - Sociedad actora y además existe una relación extracontractual que es ICE-sociedad actora. *(argumentos de la demanda)*

**b) Argumentos relacionados al Instituto Costarricense de Electricidad:**

**1.** Que en el ICE, las sociedades codemandadas y la empresa actora existe una relación <u>contractual compleja</u>, en donde los los diferentes acuerdos se interconectan entre sí para alcanzar un resultado patrimonial y donde el resultado final requiere el concurso de cada interviniente. Por lo anterior, las acciones del complejo contractual está orientada al objeto negocial común por lo que la parte que no concurra al mismo debe resarcir, por su actuación u omisión antijurídica. Señala que las partes, aunque no son contratantes directos entre sí, ambos tenían conocimiento recíproco de su participación en la actividad material contratada (la producción de directorios telefónicos) e incluso el ICE mantenía un control y visitas periódicas a la planta de la actora para supervisar la correcta impresión de los directorios telefónicos. Indica que la aprobación del



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Contrato Maestro de Impresión por parte del ICE, lo involucró necesariamente en la relación jurídica que es el fundamento de este litigio. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Baudrit Carrillo).*

2. Que el ente se encuentra demandado por desarrollar una licitación que exigía a la contratista que la impresión de las guías fuera en en el país. Es por este motivo que la sociedad actora rubrica un contrato con las codemandadas que fue presentado a conocimiento del ICE, el cual tenía control sobre dicha empresa sub contratada. Al terminar el ente su contrato con la contratista, se encontraba obligado a continuar prestando el respectivo servicio público y a pesar de que sabía que existía una empresa que elaboraba las guías telefonicas, se relacionó solo con el grupo Verizon, sin involucrar a la sociedad actora. En razón de lo anterior, estima que aplica la <u>responsabilidad extra contractual</u> del artículo 190 de la Ley General de la Administración Pública, por no haber dado oportunidad a la actora de ejercer sus derechos ante la indicada decisión administrativa. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Villanueva Monge y Sancho González).*

3. Que el mecanismo contractual empleado por el ICE para la elaboración y distribución de guías telefónicas no fue el correcto, habida cuenta que estamos en presencia de un servicio público, de conformidad con la Procuraduría General de la República. *(argumento expresado en la demanda y en audiencia de juicio por el apoderado Sancho González).*

4. Que al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación. *(argumento expresado en la demanda y en audiencia de juicio por el apoderado Sancho González).*

5. Que los daños y perjuicios sufridos por la actora por el incumplimiento objetivo de su contrato con GTE (VERIZON) fueron generados por la actuación del ICE, que dio por resuelto su contrato con GTE (VERIZON), sin respetar los intereses legítimos que la actora tenía en esa contratación, con lo que violentó el principio *Neminem laedere no dañar a otros*. Estima que el ICE incurrió en responsabilidad civil


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARITA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

conforme la aplicación de los principios de la Ley General de la Administración Pública (artículos 190 y siguientes), ya sea que se considere su actuación lícita (artículos 194 y 195) o ilícita (artículos 191 y 192). El artículo 1045 del Código Civil también es fundamento de esa responsabilidad. *(argumento expresado en la demanda y en audiencia de juicio por el apoderado Sancho González).*

**c) Argumentos relacionados con las empresas codemandadas:**

**1.** Que el Grupo GTE negoció con la parte actora las condiciones futuras para incorporar en los trabajos de edición e impresión, los avances tecnológicos para mejorar la calidad de los trabajos. Consecuentemente, se le impuso obligatoriamente, la adquisición de los equipos más modernos y la ampliación de la planta física. De conformidad con lo anterior, la actora indica, se endeudó con créditos bancarios y comerciales, seriamente para poder adquirir los nuevos equipos y ampliar su planta industrial. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**2.** Que el Grupo GTE se fusionó con la firma Atlantic Bell y se formó el Grupo VERIZON, que mantuvo con el ICE todos los derechos, deberes, obligaciones y garantías originalmente otorgadas por el Grupo inicial y con garantía solidaria entre las sociedades VERIZON. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**3.** Que la empresa Verizon Information Services - Costa Rica- LLC incumplió el contrato suscrito por ella con el ICE. No obstante, de manera falsa al romper su relación contractual con la sociedad actora, Verizon Information Services - Costa Rica- LLC, le indicó que el responsable del rompimiento contractual era el indicado ente. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**4.** Que la firma GTE CORPORATION, Holding del Grupo GTE, al expresar que otorgó su garantía plena respaldada por sus estados financieros, que podían usarse en la licitación pública 6378-T del ICE para acreditar la capacidad financiera del Consorcio, que actuaba entonces como oferente y que otorgaba, también, su garantía para ser conjuntamente responsable con las empresas del Consorcio, por todas las obligaciones que éste adquiera como oferente y como adjudicatario, adquirió, irremediablemente, la condición de responsable solidario


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DÍAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

no sólo del Consorcio, sino de la plena ejecución del contrato y por ello, también responsable conjuntamente con el ICE de los resultados de la negociación.

**5.** Que Verizon Information Services- Costa Rica- LLC incurrió en un incumplimiento doloso, en tanto que quería dejar sus negocios en el país. Consecuentemente considera que las cláusulas exonerativas de responsabilidad civil del respectivo contrato son ineficaces cuando están referidas a un incumplimiento doloso, de conformidad con lo dispuesto por el artículo 701 del Código Civil. Y el incumplimiento es doloso, dado que las codemandadas pudieron cumplir sin tener obstáculos materiales para ello, pero no ejecutaron sus obligaciones. *(argumento expresado en la demanda y en audiencia de juicio por los apoderados Baudrit Carrillo y Sancho González)*

**6.** Que el incumplimiento de Verizon está claramente demostrado en los autos. En razón del mismo, la parte actora no pudo cancelar los créditos bancarios y comerciales adquiridos, cesara en los pagos con relación a los proveedores de materia prima y los alquileres, cesó en el pago de los salarios y derechos laborales de sus empleados y se vio conducida al cierre de sus actividades y al paro permanente de su giro comercial. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**7.** Que el Contrato que firmó la actora con el Grupo GTE (luego Grupo VERIZON) y que aprobó y autorizó el ICE, es por su naturaleza un contrato que se rige por los principios del servicio público y queda regulado por sus principios, normas y valores. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**8.** Que el infortunio comercial de la actora se origina en el incumplimiento del contrato formalizado con el Grupo GTE, reconocido como el nexo derivado de la licitación y en el contrato firmado con Grupo VERIZON**,** como subcontrato. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**9.** Que GTE CORPORATION por virtud de una fusión de empresas en los Estados Unidos de América, se transformó en VERIZON COMMUNICATIONS INC., Holding del Grupo VERIZON, por lo que las relaciones derivadas del Contrato Administrativo de la Licitación Pública Internacional 6378-T y sus efectos jurídicos


Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DIAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

para el cumplimientos de sus deberes y obligaciones, no sufrieron alteración alguna. Consecuentemente, las empresas demandadas Verizon Communications Inc: y Verizon Information Services - Costa Rica- LLC integran un grupo de interés económico, que convencionalmente podemos llamar GRUPO VERIZON. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**10**. Que la extinción del contrato ICE- GTE (VERIZON) constituye un incumplimiento objetivo del contrato GTE (VERIZON) - sociedad actora, que es imputable a GTE (VERIZON), por lo que ésta entidad debe responder por los daños y perjuicios causados, según el principio general de la responsabilidad contractual establecido en el artículo 702 del Código Civil. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**11.** Que las cláusulas exonerativas de responsabilidad civil que por imposición de VERIZON se incluyeron en el contrato maestro de compra, necesariamente son ineficaces por principios imperativos de Derecho Público, dado que si bien el contrato Verizon - THS se suscribió con las formas de un acuerdo comercial, por su objeto y por sus efectos es de naturaleza administrativa, al ser para la prestación de un servicio público. *(argumento expresado en la demanda y en audiencia de juicio por el Apoderado Sancho González)*

**12.** Que las cláusulas exonerativas están integradas a un contrato de adhesión, ya que el contenido de ese acuerdo sólo permitía la aceptación o el rechazo por parte de la socieda actora, y la nulidad de tales cláusulas resulta de su naturaleza abusiva, de conformidad con artículo 1023, inciso m), del Código Civil y en el artículo 42 de la Ley 7 472 de 19 de enero de 1995 (Ley de Promoción de la Competencia y Defensa Efectiva del Consumidor). *(argumentos de la demanda)*

**II.- <u>Sobre la teoría del caso del INSTITUTO COSTARRICENSE DE ELECTRICIDAD y sus principales razonamientos</u>:** Que de una revisión de la contestación de la demanda y los respectivos argumentos en audiencia de juicio, la representación del ICE se funda en los siguientes argumentos:

**1.** La elaboración de guías telefónicas no es un servicio público, siendo así que en todo caso cuando sucedieron los hechos, el ICE optó por no cobrar las llamadas al 113 y además realizó una contratación administrativa con RACSA para su



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

elaboración. En este orden de ideas indica que las telecomunicaciones eran un servicio público al inicio y ahora es un servicio disponible al servicio público, mas las guías telefónicas no se comprenden dentro de este concepto.

**2.** Que el contrato entre la actora y las codemandadas es un contrato privado que no se rige por los principios de servicio público.

**3.** Que la resolución del contrato entre ICE y las codemandas no debía ser consultado a la sociedad actora.

**4.** Que la relación contractual de la sociedad actora era con las codemandadas, las cuales optaron sub contratar con ésta, de conformidad con las atribuciones que permitía la Ley de la Contratación Administrativa. En este orden de ideas las inversiones hechas por la sociedad actora, no era sólo para satisfacer las necesidades del ICE sino también para prestar servicios en otros lugares de la región. Indica que el cartel pedía imprimir las guías en Costa Rica, mas no en la sociedad actora.

**5.** Que el contrato con las sociedades codemandadas fue resuelto por razones de interés público, dado que éstas unilateralmente decidieron reestructurar la guía del año 2005, infringiendo las cláusulas del contrato

**6.** Que la relación entre Verizon y la sociedad actora es anterior a la licitación pública 6378-T, por lo que al ICE no le correspondía refrendar ese contrato privado.

**7.** Que el conocimiento que tuvo el ICE de la relación entre las codemandadas y la actora, se dio en razón de que ésta era una simple sub contratista de aquellas.

**8.** Que en el caso en examen no estamos en presencia de un relación contractual compleja, dado que estamos en una contratación administrativa, caracterizada por la existencia de cláusulas exhorbitantes.

**9.** Que el ICE no tenía ningún obligación de realizar comunicación alguna a la actora, dado que ésta no era su proveedora.

**10.** Que no corresponde al ICE responder por maquinaria adquirida por la actora para elaborar las guías telefónicas de República Dominicana.

**III.- <u>Sobre la teoría del caso de VERIZON COMMUNICATIONS INCORPORATED y VERIZON INFORMATION SERVICES -COSTA RICA- LLC y sus principales razonamientos:</u>** Que de una revisión de la contestación de la demanda y los



Firmado digitalmente por:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO GERARDO PORTUGUEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

respectivos argumentos en audiencia de juicio, la representación de las sociedades codemandadas se funda en los siguientes razonamientos:

**1.** Que si la empresa actora tomó la decisión de endeudarse, ello se debió a una decisión de negocios propia.

**2.** Que la actora vendió la maquinaria adquirida, lo cual no es tomado en consideración por ésta a hora de invocar pérdidas.

**3.** Que la cláusula objetada tiene su lógica en el sentido de que Verizon solo tiene un negocio en Costa Rica y era ilógico su vigencia si el ICE le terminaba el contrato de guías telefónicas.

**4.** Que la cláusula objetada por la parte actora fue negociada con ella y no es nula por las disposición del artículo 1023 del Código Civil.

**5.** Que la relación entre Verizon y la parte actora es exclusivamente privada.

**6.** Que los daños y perjuicios son accesorios al tema de la nulidad contractual, siendo así que las partes no supieron ejercer las pretensiones anulatorias, dado que primero debe pedir la resolución contractual y luego el pago de daños y perjuicios. Por lo anterior, el Tribunal tiene una imposibilidad material para condenar en daños y perjuicios, porque antes no se pidió resolución contractual.

**7.** Que en el caso de marras debe aplicarse el artículo 701 del Código Civil, que indica que el dolo no se presume, por lo que se debe demostrar, siendo así que el mero incumplimiento no significa per se una conducta dolosa.

**8.** Que no es cierto que formaran un grupo de interés económico ni han formado parte de relación contractual alguna con el ICE o la actora.

**9.** Que no es cierto que Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. y Verizon Directorias Corp. son empresas subsidiarias de Verizon Communications Incorporated y que esta última constituya el holding del grupo.

**10.** Que con relación al plazo del contrato, en la cláusula 2.(b) del mismo se estableció un rango entre 48 meses a 168 meses, quedando en todo caso la vigencia del contrato supeditada a la vigencia del contrato con el ICE, dada la naturaleza del contrato y que Verizon no tenía otros negocios en Costa Rica

**11.** Que el problema que tuvo la actora con su planta y los equipos fue que éstos eran obsoletos y los costos de producción con esos equipos eran más altos y la


Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO HIDALGO ABARCA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

productividad también era menor en el tiempo de impresión.

**12.** Que resulta falsa la afirmación hecha por el representante de la actora, de que el contrato con GTE se firmó por un plazo de 168 meses, ya que en la cláusula 28 (b) se estableció que la vigencia del contrato de Verizon con la actora, estaba supeditada y dependía de la vigencia del contrato de Verizon con el ICE, lo cual era previsible y negociado por las partes desde el primer contrato que firmó la actora. Consecuentemente, la terminación que se hizo del contrato con la actora estaba prevista como causal válida y convenida en forma anticipada por ambas partes en el apartado (b) de la cláusula. 28 del Contrato de Compra.

**13.** Que la terminación no implicaba en ningún caso responsabilidad para ninguna de las partes, debido a que la terminación anticipada del contrato surge como consecuencia directa del hecho o acción de un tercero, que en el caso en particular fue el ICE.

**14.** Que se suponía que la actora no dependía de la existencia de un solo contrato y que una empresa con la experiencia y trayectoria nacional e internacional de casi cien años mantenía una variedad de clientes que le garantizaban una solvencia y el manejo adecuado de las finanzas y los flujos de caja, para hacerle frente a sus obligaciones crediticias ante una eventual contingencia.

**15.** Que las cláusulas 24 y 28 de exoneración de responsabilidad civil contractual y de limitación de responsabilidad civil contractual, específicamente los incisos b) y e) de la cláusula 28, fueron negociadas y aceptadas por el representante de la sociedad actora como una cuestión lógica y razonable para ambas partes, porque la vigencia del contrato con esta dependía de la vigencia del contrato con el ICE y era conocido por la actora que Verizon no tenía otros negocios en Costa Rica.

**16.** Que la actora en ningún caso demostró que la compañía GTE Corporation se convirtió en Verizon Communications Inc.

**17.** Que la parte actora reconoce que la ejecución del contrato se mantuvo en condiciones normales cerca de cuatro años, lo cual nos dice que el contrato se ejecutó en el rango de 48 meses establecidos en el punto b) de la cláusula 2 del Plazo.


Firmado digitalmente de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ARENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**18.** Que la actora pretende engañar que el contrato firmado con Verizon es un subcontrato del contrato suscrito entre el ICE y Verizon, lo cual no es cierto y constituye una aberración jurídica.

**19.** Que el problema del cierre de operaciones de la sociedad actora resultó la consecuencia inmediata de la mala administración de los negocios.

**20.** Que la garantía solidaria de GTE Corporation otorgada al ICE no se puede presumir ni mucho menos pensar que se transfiere en beneficio de terceros.

**IV.**- **Del objeto del proceso:** De lo expresado por las partes, tanto en sus pretensiones como argumentos, el objeto del presente proceso estriba en determinar la responsabilidad de las partes codemandadas, con motivo de los hechos establecidos en la demanda, así como la existencia del daño invocado.

**V.- Razonamiento del Tribunal.**

**V.I.- En particular sobre los hechos probados:** De esta naturaleza, y de importancia para la resolución del asunto, durante el proceso para este Tribunal han quedado demostrados los siguientes hechos:

**a) Hechos probados con respecto a las relaciones jurídicas existentes entre el ICE las sociedades codemandadas:**

1. Que la sociedad actora es una empresa con amplia experiencia en la elaboración de guías telefónicas. (documentos 1 a 4 del expediente de prueba de la parte actora)

2. Que la empresa GTE (General Telephone Directory Company) ha contratado con el Instituto Costarricense de Electricidad, desde 1975 la elaboración de guías telefónicas en Costa Rica. *(prueba documento número 5 aportado por la parte actora, declaración de Jose María Quirós Alfaro)*

3. Que en ese período la impresión de las guías telefónicas fue contratada por GTE con la empresa actora, la cual fungía como subcontratista. *(prueba documento número 5 aportado por la parte actora)*

4. Que el Instituto Costarricense de Electricidad realizó la licitación pública 6378-T para *"Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información"* *(documento 17 del expediente de prueba de la parte actora)*

5. Que el indicado cartel señaló que si un oferente fuera parte de un grupo empresarial o Holding, deberá presentar los estados financieros de éstas, en cuyo


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DIAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

caso el grupo empresarial es solidariamente responsable con el oferente de la totalidad de obligaciones contractuales. *(documento 17 del expediente de prueba de la parte actora)*

6. Que con fecha 10 de agosto de 1999, el Consorcio GTE presentó oferta para participar en la contratación administrativa Licitación Pública 6378-T *(documento 13 del expediente de prueba del actor)*

7. Que con fecha diez de marzo del año 2000, el Instituto Costarricense de Electricidad y el Consorcio GTE suscribieron el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE" (documento 6 del expediente de prueba del actor)*

8. Que el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* dispuso en cuanto a la posibilidad de sub contratar por parte de la empresa contratista, lo siguiente: *"De acuerdo con lo establecido en la cláusula 2.13.1. del cartel GTE acepta que puede subcontratar con la aprobación previa y escrita del ICE hasta el 50% del desarrollo, producción y distribución de las Guías Telefónicas, sin que esta aprobación obligue al ICE a solidarizarse en caso de incumplimiento del subcontratista. La sub contratación no relevará a GTE de su responsabilidad por la ejecución total del contrato.." (documento 6 del expediente de prueba del actor)*

9. Que el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* dispuso en cuanto a la producción de las guías telefónicas, lo siguiente: *"De acuerdo con la experiencia de los últimos años GTE ha producido la totalidad de la Guía Telefónica en territorio costarricense, contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia tecnológica en beneficio de ciudadanos costarricenses y de la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general. Consecuentemente con lo anterior, el ICE solicita y GTE acepta que durante la ejecución del presente contrato, la totalidad de las etapas y procesos de producción de la Guía Telefónica del ICE sea realizada por GTE en Costa Rica". (documento 6 del expediente de prueba del actor)*

10. Que el *"Contrato para Edición de la Guía Telefónica y Desarrollo e*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*Implementación de Servicios de Información entre el ICE y GTE"* dispuso en cuanto al cambio de nombre del contratista, lo siguiente: *"En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas"* *(documento 6 del expediente de prueba del actor)*

*11.* Que la empresa GTE Information Service pasó a denominarse, Verizon Information Services Inc, la empresa GTE Directories Corporation pasó a llamarse Verizon Directories Corp y General Telephone Directory Company C por A cambió de nombre a Verizon Information Service Costa Rica, LLC. *(documento 6, correspondiente a un foliado que va del folio 3045 a 3022 del expediente de prueba del actor)*

*12.* Que los representantes legales de Verizon Information Services, Inc, Verizon Directorias Corp. y Verizon Information Services-Costa Rica, LLC, aceptaron los derechos y obligaciones con motivo de la licitación 6378-T y del contrato derivado de la misma" (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

13. Que VERIZON Information Services - Costa Rica, LLC, le envió a la Dirección de Proveeduría del ICE una nota con fecha 16 de mayo del 2002, en la que le manifiesta, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE. (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

14. Que GTE se fusionó con la firma americana Bell Atlantic y como resultado de la fusión se creó el GRUPO VERIZON, sustituyendose la razón social de GTE por el GRUPO VERIZON (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

15. Que VERIZON Information Services, Inc. y VERIZON Directories Corp. realizaron declaraciones de Mantenimiento de Compromisos ante el ICE, en lo que respecta


Firmado digitalmente
RODRIGO CAMROS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VALVERDE, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

a los derechos y obligaciones establecidos en el acuerdo de consorcio del 9 de agosto de 1999; en la oferta presentada al ICE por GTE Consortium el día 26 de agosto de 1999 y en el contrato firmado entre el ICE y GTE Consortium el día 10 de marzo de 2000 comprometiendo a las dos empresas comitentes y a VERIZON Information Services- Costa Rica, LLC. (folios 3035, 3036 y 3037 del expediente administrativo, documento No. 15 del expediente de prueba del actor).

*16.* Que mediante oficio DI-AA-875 de fecha 13 de diciembre de 2000, la Unidad de Autorizaciones y Aprobaciones de la División de Desarrollo Institucional de la Contraloría General de la República aprueba el denominado "*Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE*" *(documento 6 del expediente de prueba del actor)*

*17.* Que en el año 2004 Verizon Information Services CR. propuso al ICE varios ajustes al contrato rubricado para la edición de guías telefónicas, y además el 13 de mayo de ese año propuso revisar la elaboración de las mismas, siendo así que el Sub Gerente de Telecomunicaciones, del ente mediante oficio 6000-41046-2004 de 15 julio de 2004, le indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004. (documento 32, 33 y 34 del expediente de prueba del actor)

18. Que con nota de fecha 8 de setiembre de 2004, recibido en la Proveeduría el 16 de diciembre de ese año, el Vice Presidente de Verizon Information Services CR, le indica al Sub Gerente de Comunicaciones del ICE que en razón de que no se obtuvo respuesta a la nota del 13 de mayo de los corrientes, se tendrá por aplicado el silencio positivo a la petición. (documento 32, 33 y 34 del expediente de prueba del actor)

19. Que mediante oficio 6000-52278-2004 de 14 de setiembre de 2004 el Sub Gerente de Telecomunicaciones del ICE rechaza la aplicación del silencio positivo, habida cuenta que mediante oficio mediante oficio 6000-41046-2004 de 15 julio de 2004, se indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004,en respuesta a la propuesta de 13 de mayo de ese año para revisar la elaboración de las mismas. En respuesta, mediante nota de 8 de noviembre de 2004, el Vice Presidente de


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ... ... ... ...
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Verizon le indica al indicado Sub Gerente que el silencio positivo operó de pleno derecho, al no haberse contestado en 30 días hábiles. A lo anterior, mediante oficio 600-64540-2004 de 18 de noviembre de 2004, se le contesta que en el caso de marras no resulta procedente la aplicación del silencio positivo, tal y como lo interpreta la contratista. (documento 35, 36 y 40 del expediente de prueba del actor)

20. Que mediante oficio SI-0726-11-04 de 15 de noviembre de 2004, la Jefe del Proceso de Servicios de Información del ICE le indica al Gerente General de Verizon que no ha ampliado la vigencia de la garantía de cumplimiento pedida desde el 30 de junio de 2004, según oficio 6000-35344-2004 y que la estructura de la Guía Telefónica del Área Metropolitana presenta incumplimientos en desacato a lo indicado en las notas 6000-41046-2004 y 6000-522678-2004. (documento 38 del expediente de prueba del actor)

21. Que el 12 de noviembre 2004 el ICE ordenó a las Notarias públicas Leda. Patricia Hernández Salazar y Licda. Ligia Picado Arguedas, levantar actas notariales del resultado de las visitas que hacen en el local industrial de THS, en donde se hizo constar que en las guías telefónicas en elaboración, no se incluyeron los registros de los clientes de provincias y se constató que al imprimir las páginas blancas residenciales de la Guía Telefónica del Área Metropolitana, se hizo con los registros únicamente de San José, excluyendo los abonados de la zona de Los Santos y de las Provincias (documento 37 del expediente de prueba del actor).

22. Que mediante oficio S.I.0730-11-04 se comunicó a Verizon, minuta de una reunión efectuada con sus personeros, en donde se le indica que se incumplía las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación y segunda del contrato (documento 39 del expediente de prueba del actor).

23. Que el 18 de noviembre 2004, con nota 6000-64540-2004, la Subgerencia de Telecomunicaciones responde la nota del 8 de ese mes de Verizon, manifestándole nuevamente que debía mantener el formato de las guías telefónicas del año 2004 (documento 40 del expediente de prueba del actor).

24. Que mediante acuerdo de artículo 10 de sesión 5649 de 23 de noviembre de 2004 del Consejo Directivo del ICE se dispuso indicar a la empresa contratista que


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

se rechaza cualquier intención de modificar unilateralmente las condiciones contractuales pactadas. (documentos 41 y 42 del expediente de prueba del actor)

25. Que el 2 de diciembre de 2004 en visita que se realizó en las instalaciones de la actora, la Notaria pública Licda. Yaila Paola Sánchez, levantó una acta notarial en la que se constata que estaban impresos 103.000 ejemplares de las páginas blancas residenciales del Área Metropolitana y que la imprenta no había recibido ningún tipo de orden para modificar el proceso de impresión y encuadernación; sino que trabaja con las órdenes de compra entregadas por Verizon, las cuales no fueron modificadas por esta (documento 44 del expediente de prueba del actor).

26. Que mediante oficio SI-759-12-04 de 13 de diciembre de 2004 se solicitó iniciar procedimiento de resolución contractual a la empresa Verizon Information Services CR por no ajustarse al contrato rubricado y los requerimientos del ente. (documento 45 del expediente de prueba del actor)

27. Que mediante oficio 5225-69163-2004 de AEG-0572-2004 de 14 de diciembre de 2004 se dio inicio a procedimiento de resolución contractual. (documento 46 del expediente de prueba del actor)

28. Que mediante oficio 6000-27733-2005 de SGT-2326-2005 de 1 de junio de 2005 se resuelve el contrato entre el ICE y Verizon Information Services Costa Rica LLC por incumplimiento contractual de esta última. Lo anterior fue confirmado mediante oficio 0150-36359-2005 de GG-680-2005 de 8 de julio de 2005 de la Gerencia General del ente. (documento 58 y 59 del expediente de prueba del actor, declaración testimonial de Jose María Quirós Alfaro)

29. Que mediante resolución de las quince horas del cuatro de diciembre de 2015 en laudo arbitral en proceso de la misma naturaleza interpuesto por el ICE contra Verizon Information Services Costa Rica LLC, se condena a esta última al pago de diferentes sumas en virtud de haberse demostrado que incurrió en incumplimiento contractual. (prueba para mejor resolver ofrecida por la parte actora en audiencia de juicio, declaración testimonial de Jose María Quirós Alfaro)

30. Que en todo momento la relación contractual y la coordinación para su ejecución así como los pagos respectivos se realizaron entre el ICE y Verizon


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ARAYA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Information Services Costa Rica LLC, de manera exclusiva. (declaración testimonial de Jose María Quirós Alfaro)

31. Que fue voluntad de Verizon no continuar negociando en el país la elaboración de guías telefónicas. *(declaración de José María Quirós Alfaro, ex Gerente de la indicada empresa)*

**b) Hechos probados de relevancia para la resolución del presente asunto relacionados con la vinculación entre las sociedades codemandadas y la parte actora:**

1. Que GTE suscribió con la actora un contrato de "agencia y cooperación mutua" el 8 de mayo de 1997. Dentro de las cláusulas de este Convenio, en el Anexo B Punto 5 se estableció que GTE Information Services le otorgó a la actora el estatus de "*preferred vendar*" o suplidor preferido para Centroamérica incluyendo Panamá y el Caribe, definido en · el Anexo 2 como una serie de treinta y dos (32) países incluyendo República Dominicana y Puerto Rico. (documento número 10 del expediente de prueba de la parte actora)

2. Que el 21 de enero de 2000, GTE suscribió un nuevo contrato con la sociedad actora y además encargó a ésta la impresión y edición de guías telefónicas incluyendo las de Costa Rica y Belice. (documento 11 del expediente de prueba de la parte actora)

3. Que la sociedad actora y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, suscribieron el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, en donde respecto del plazo indicó la cláusula 2.b: "*Este Contrato será efectivo únicamente cuando se cumplan los dos siguientes requisitos: (i) al momento de la ejecución de este Contrato por las partes; (ii) al momento de la ejecución de un contrato entre el Instituto Costarricense de Electricidad (ICE) y el Comprador, celebrado como resultado de una licitación del Comprador a la Oferta Pública 6378-T. En el momento que los requisitos mencionados sean cumplidos, la fecha efectiva (la "Fecha Efectiva") de este contrato será a partir de la ejecución del contrato mencionado en la sub-sección (ii) de esta Sección 2(a)...*" (documento 19 del expediente de prueba de la actora)

4. Que el contrato número VIS-2001-21-IP denominado Contrato Maestro de


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Compra, suscrito entre el Instituto Costarricense de Electricidad y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, dispuso en cuanto a su terminación, lo siguiente: *" 28. TERMINACIÓN. (a) El Comprador puede terminar este Contrato al notificarle al Vendedor por escrito con al menos (90) días de anticipación de dicha terminación si las partes no pueden acordar cualquier revisión de precio de acuerdo a este Contrato, cualquier reforma a este Contrato de conformidad a la Sección 28 (c) anterior o el precio para nuevas opciones o especificaciones que el Comprador puede requerir, sin importar si dichas nuevas opciones o especificaciones están dentro de la capacidad actual del Vendedor. (b) El Comprador puede terminar este Contrato inmediatamente en cualquier momento si durante el Plazo del Contrato, el Contrato ente el Comprador y el ICE descrito en la Seccion 2, Plazo, es terminado por cualquier razón..." (documento 19 del expediente de prueba de la actora)*

5. Que el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, suscrito entre el Instituto Costarricense de Electricidad y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, se regulaba por el Código Civil y el Código de Comercio de Costa Rica *(cláusula 35, documento 19 del expediente de prueba de la actora)*

6. Que el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, suscrito entre el Instituto Costarricense de Electricidad y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, comprendía la elaboración de guías telefónicas en Costa Rica y Belice *(anexo A, documento 19 del expediente de prueba de la actora)*

7. Que el indicado contrato maestro era por un plazo máximo de 168 meses (cláusula 2.b del contrato), para producir, empacar y distribuir los directorios telefónicos, de conformidad con el contrato firmado entre el Consorcio GTE y el ICE *(documento 19 del expediente de prueba de la actora)*

8. Que con fecha 15 de octubre de 1999 el Presidente de GTE Directories International propone términos a convenir sobre la elaboración de directorios telefónicos para la República Dominicana *(documento 22 del expediente de prueba de la actora)*


Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

9. Que el 14 de octubre de 2004 la actora y Verizon Information Services - Costa Rica- LLC suscribieron el "*Cronograma de Producción, Guía Provincias 2005*", donde se establecen las condiciones para la confección de los libros correspondientes a esa guía en particular. En dicho cronograma se señala como fecha límite, para modificar el número de páginas y la cantidad de libros, el día 15 de diciembre de 2004 (documento número 28 del expediente de prueba del actor).

10. Que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information services- Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro. (documento número 68 del expediente de prueba del actor)

11. Que en la indicada nota el Gerente General de Verizon en Costa Rica, le indica a la sociedad actora que "*... el ICE irrespetó los derechos contractuales y aquellos establecidos por ley de mi representada y procedió a iniciar un procedimiento administrativo para la resolución del contrato, utilizando los medios públicos para distorsionar la realidad de los hechos*" (documento número 68 del expediente de prueba del actor)

12. Que la empresa Verizon information services- Costa Rica LLC le pidió a la sociedad actora modernizar sus equipos para enfrentar cambios tecnológicos y requerimientos de contratantes. (declaraciones testimoniales de José María Quirós Alfaro y Guillermo Navarro Céspedes, documentos 10 y 24 del expediente de prueba del actor)

13. Que la señora MARIANNE DROST, ciudadana norteamericana, otorgó poderes y actuó en su condición de Secretaria Corporativa de las firmas VERIZON COMMUNICATIONS INC., y de VERIZON INFORMATION SERVICES-COSTA RICA, LLC. (folios 1183 a 1188 del expediente judicial)

**c) Hechos probados con relación a la existencia de los daños invocados:**

1. Que con fecha 25 y 26 de febrero de 1999, el señor Bruce Wataru hizo visita a las instalaciones de la sociedad actora y realizó una serie de observaciones con respecto a las instalaciones y equipo de la misma. (documento 10 de prueba del expediente del actor)

2. Que el 15 de noviembre de 1999 se llevó a cabo una reunión de los señores


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Álvaro y Alonso Trejas Fonseca y don Guillermo Navarro, entonces Presidente, Vicepresidente y Gerente de Producción de **THS,** respectivamente, con el Director de "Printing" de GTE Directorias International con el propósito de: 1) evaluar el progreso realizado en el proyecto de las mejoras en la planta; 2) asistir en desarrollar un proyecto formal para dar un seguimiento cercano al proyecto de la nueva planta; 3) acordar un plan de contingencia en caso que **THS** no cumpliera con las fechas de instalación de los nuevos equipos y planta, el cual consistía en contratar otra planta en Estados Unidos, sobre todo, en caso de que no se adquirieran los equipos a tiempo; 4) evaluación de la compra potencial del equipo, con la específica asistencia del consultor recomendado por **GTE,** señor Bill Snell (documento 24 de prueba del actor).

3. Que en febrero del 2000, la actora adquirió una moderna máquina rotativa Heidelberg, una línea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta. Lo anterior, para cumplir los requerimientos del señor Wataru y la disposición (j) de la cláusula 16 del Contrato Maestro de Compra. La compra de la Máquina Rotativa y todo el equipo accesorio marca Heidelberg con un costo de adquisición de C. 955.116.741,00 (documentos 10, 19 y 20 del expediente de prueba del actor)

4. Que atendiendo a los requerimientos del señor Wataru, la sociedad actora alquiló dos naves industriales en la Zona Franca Zeta, en Guadalupe de Cartago, propiedad de INMOBILIARIA ZOROASTER S.A., con todos sus equipos, oficinas y bodega, según contrato que se suscribe con la propietaria de fecha primero de julio de dos mil cuatro (declaración testimonial de Guillermo Navarro Céspedes, documento 21, expediente de prueba del actor)

5. Que el el 15 de julio del 2004 el Consorcio contratista del Grupo Verizon tramitó, en papelería de la Compañía General de Directorios C.por.A, con oficinas en San José, Costa Rica, subsidiaria de GTE Corporation según consta en el mismo documento, la orden de compra 4568 para la impresión de las Guías Telefónicas para Área Metropolitana por la suma total de $ 3,033,625.60 y el día 20 de agosto del 2004, la orden de compra 4582, por la suma de $ 2,134,503 por las Guías Telefónicas de Provincias, para un total de $ 5,168,128.oo para las Guías


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

correspondientes al año 2005. Las órdenes de compra indicadas en el Hecho anterior fueron sustituídas por Verizon por la número 4612 del 3 de noviembre del 2004 para las Guías del Área Metropolitana por la suma de$ 2,120,828 y por la número 4644 del 17 de diciembre del 2004 para las Guías de Provincias, por la suma de $ 1,254,023, para un total de $ 3,374,851, o sea, con una disminución extemporánea, de$ 1,793.277 (documento 30 del expediente de prueba del actor).

6. Que las últimas órdenes de compra implicaron reducción del número de páginas de las guías telefónicas y el número de libros así como una conformación y composición de las guías distinta a la que había convenido GTE en su contrato con el ICE (documento 30 del expediente de prueba del actor)

7. Que en virtud de la falta de pago por las obligaciones adquiridas para la maquinaria la acreedora inicia un proceso ejecutivo prendario que con el expediente número 06-001956- 0640-CI, en el Juzgado Civil de Mayor Cuantía de Cartago, siendo así que a las :30 horas del 6 de junio de 2007, se realizó el remate del equipo pignorado y por auto de 9:23 horas del 19 de agosto de 2007, se ordenó la puesta en posesión del mismo a HEIDELBERG PRINT FINANCE AMERICAS INC, rematario, lo que se ejecuta a las 14:00 horas del 31 de octubre de 2007 (documento 69 del expediente de prueba del actor).

8. Que la sociedad actora se vio obligada a incurrir en mora con los pagos de las rentas por el alquiler de las naves industriales de Inmobiliaria Zoroaster S.A., por lo que se suscribió una escritura pública, que corresponde a la número 144, que se inicia al folio 133 vuelto del tomo primero del Protocolo de la Notaria LAURA MÓNICA ZAMORA ULLOA, a las doce horas del 23 de marzo de 2006, mediante la cual la actora se comprometió a pagar hasta por la suma de DOSCIENTOS MIL DOSCIENTOS VEINTITRÉS DÓLARES CON SETENTA Y CINCO CENTAVOS (US$ 200,223,75), indicándose en la cláusula segunda de dicho documento lo siguiente: "... *SEGUNDA Sustitución de deuda. Esta constitución de deuda, sustituye las mensualidades  atrasadas por concepto de alquiler adeudados por El Deudor -(TREJOS HERMANOS SUCESORES)- correspondientes a los meses de julio de dos mil cinco hasta marzo de dos mil seis inclusive, a razón de nueve meses de mensualidad, según contrato de arrendamiento suscrito entre Acreedor y Deudor,*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO OROZCO GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

de fecha primero de julio de dos mil cuatro, arrendamiento que se ejecuta en la propiedad del Acreedor, finca inscrita a Folios Reales tres- uno nueve cero ocho siete tres- cero cero cero y tres- uno nueve cinco ocho nueve ocho- cero cero cero, lo cual expresamente acepta El Acreedor" ... Asimismo, se establecieron intereses mediante cuotas mensuales de veintidós mil doscientos cuarenta y siete dólares con ochenta y tres céntimos hasta cancelar la totalidad de la obligación (documento 70 del expediente de prueba de la parte actora).

9. Que ante el incumplimiento de lo pactado, Inmobiliaria Zoroaster S.A., presenta ante el Juzgado Civil de Mayor Cuantía de Cartago, proceso ejecutivo simple que ocupa el expediente número 06-001846-0640-CI, que culmina con sentencia, acogiendo la excepción de pago parcial y condena a la actora a pagar cincuenta y seis mil ciento ocho dólares con diez céntimos de dólar (US$ 156,108.10) (documento 71 de prueba).

10. Que la actora concretó la venta en condiciones muy desfavorables, de prácticamente todos sus activos en equipos y mejoras en los inmuebles de la Arrendante, a la empresa de capital colombiano CONDOR EDITORES DE COSTA RICA, S.A., la cual convino con Inmobiliaria Zoroaster S.A. en el arrendamiento de las naves industriales de la Zona Franca Zeta en Cartago, adquieren el equipo rematado por HEIDELBERG PRINT FINANCE AMERICAS INC., en condiciones favorables y ya instalado en esas naves industriales, al igual que el resto del equipo de THS pignorado al Banco Nacional de Costa Rica y al Banco Interfin (documento 73 del expediente de prueba del actor).

11. Que la actora llegó a un acuerdo con Inmobiliaria Zoroaster S.A., con fecha 28 de marzo de 2007, titulado "Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda", en donde entrega la nave industrial donde se encuentra la máquina rotativa y el restante equipo de impresión, puesto que con anterioridad ya se había entregado la otra nave donde se encontraban las oficinas y bodega y otorgan ambas partes el finiquito en ese sentido, pero al mismo tiempo señala que Inmobiliaria Zoroaster S.A. reconoce haber recibido a la fecha dos pagos - (que en el proceso de desahucio no se habían podido acreditar)-, por una suma total de cincuenta y cinco mil dólares estadounidenses, así como tener a su haber un depósito de garantía por la suma de treinta y nueve


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

mil dólares, todo lo cual expresamente autoriza la actora lo aplique Inmobiliaria Zoroaster S.A. al total adeudado. Independientemente de que los procesos judiciales dichos puedan continuar, la actora se compromete a cancelar el total adeudado que oportunamente se determine, una vez hechas esas deducciones junto con los intereses pactados y costas, hasta su efectivo pago, en un plazo perentorio, reconociendo ambas partes que hay una instrucción expresa en el "Fideicomiso Trejos Hermanos- Fiduciaria Castro Garnier", por la cual se debe cancelar lo adeudado a Inmobiliaria Zoroaster S.A., en cuanto la actora, reciba el pago de sumas que se le deben por diferentes negocios pendientes de cancelación, como por ejemplo, una deuda pendiente de Radiográfica Costarricense, S.A. (documento 74 del expediente de prueba del actor).

12. Que la actora arrendó con opción de compraventa a DACONDOR Q.C.R. SOCIEDAD ANÓNIMA, que luego, con fecha 29 de mayo de 2007, cede sus derechos a la misma empresa dicha CONDOR EDITORES DE COSTA RICA, S.A. sobre los restantes activos industriales de la empresa, por una fracción de los pasivos, tanto en Transamérica Bank & Trust Co. Ud., (subsidiaria de Banco Interfin), en el Banco Nacional de Costa Rica y con Banco Improsa S.A. En el caso concreto de Transamérica Bank & Trust Co. Ud., esos pasivos corresponden a una línea de crédito que se le otorgó, con base en las magníficas perspectivas que se tenían y luego de los estudios bancarios donde se analizaron los contratos celebrados con Verizon, para la confección de los directorios telefónicos de República Dominicana y de Costa Rica (documento 75 del expediente de prueba del actor).

13. Que luego de finalizado el contrato maestro con las codemandadas, la actora ejecutó un contrato con RACSA (declaración de Guillermo Navarro Céspedes y documento 74 del expediente de prueba del actor, en donde se menciona una deuda pendiente de pago por parte de RACSA)

14. Que los daños estimados a la parte actora con motivo del rompimiento doloso del Contrato Maestro son los siguientes:

| a) Inversión en maquinaria | $2.582.156 |
| b) Incremento en inventarios | $2.860.696 |
| c) Flujos de Caja Operativos no recibidos | $8.806.872 |



Firmado digital de:
ROBERTO HERRERA ZUÑIGA JUEZ DECISOR
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

| 2004-2013 Directorios Costa Rica | |
|---|---|
| d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana | $ 7.912.999 |
| e) Pérdidas realizadas 2004 a 2007 | $7.237.068 menos la contratación que se hubiere realizado en ese período con RACSA. S.A. |
| f) Intereses pagados por THS | $ 983.825 |
| g) Interrupción de Operaciones | $28.885.195 |

(documento 77 del expediente de prueba del actor, informe económico financiero elaborado por el Lic. Tomás Evans Salazar e informe pericial de Ramón Humberto Romero Rodríguez, Contador Público Autorizado y Perito Actuario Matemático, visible a folios 947 a 957 del expediente judicial)

**d) Otros hechos probados de relevancia para el presente asunto:**

1. Que el Consejo Directivo del ICE dispuso la elaboración de guías telefónicas para el año 2006 con RACSA. (pruebas 63, 65 y 66 del expediente de prueba de la parte actora)

2. Que el ICE adoptó como medida cautelar ante el incumplimiento de Verizon, liberar el cobro del servicio de información del número 113 (documento 61 del expediente de prueba del actor)

**V.II.- En particular sobre los hechos no probados:** De esta naturaleza, y de importancia para la resolución del asunto, durante el proceso para este Tribunal no han quedado demostrados los siguientes hechos:

a) Que el ICE haya participado en algún momento en el proceso de aprobación de la contratación de la empresa actora, realizado por las sociedades codemandadas. (no hay prueba en autos y la declaración del testigo Róger Echeverría Coto se limitó a manifestar de manera genérica que el ICE aprobada sub contrataciones, mas sin especificar que haya aprobado de manera concreta el contrato ente Trejos Hermanos Sucesores y las empresas codemandadas)

b) Que las cláusulas eximentes de responsabilidad civil contenidas en el contrato maestro suscrito por la sociedad actora y los otros contenidos contractuales, hayan sido impuesto por esta última en un contrato de adhesión y que la actora no estuviera en condiciones de poder modificar en nada el contenido


Firmado digital de:
ROY GONZÁLEZ DELGADO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

contractual preestablecido por Verizon Information Services - Costa Rica- LLC. (no se aportó prueba a los autos en tal sentido)

c) Que se hayan presentado atrasos significativos en compromisos de la actora con la Caja Costarricense de Seguro Social y otras Instituciones Públicas. (no se aporto prueba a los autos en tal sentido)

d) Que la actora haya realizado otros negocios con la maquinaria e instalaciones adquirida y arrendada para la elaboración de guías telefónicas. (no se aportó prueba en tal sentido)

e) Que los daños invocados sean imputables a la actora, al ente demandado. (no hay prueba)

f) Que la actora haya incurrido en inversiones errores por una mala gestión de negocios (no hay prueba)

g) Que el contrato maestro suscrito haya contemplado la elaboración de guías telefónicas en República Dominicana.(no hay prueba)

h) Que la actora haya sufrido una lesión de orden moral. (no hay prueba)

**V.III.- Sobre la falta de competencia reiterada en audiencia de juicio:** Como una parte significativa de sus argumentos, el representante de Verizon Information Services Costa Rica LLC reiteró alegatos en el sentido de que en el presente caso, el Tribunal de Juicio se encuentra impedido de resolver por el fondo dada la existencia de una falta de competencia por su parte. En este orden de ideas, invoca la existencia de errores y omisiones por parte de la Sala Primera de la Corte Suprema de Justicia a la hora de definir la competencia e indica que la misma se limitó a determinar la existencia de un sujeto público en el proceso, sin valorar las pretensiones de fondo. Al respecto, de manera expresa en audiencia oral se le indicó al indicado abogado que mediante voto 000874-C-S1-2009 de las once horas quince minutos del veinticinco de agosto de dos mil nueve de la Sala Primera de la Corte Suprema de Justicia, la competencia de este Tribunal se encuentra  definida, por lo que cualquier discusión al respecto, se encuentra debidamente precluida. Dado lo anterior, resulta ocioso e innecesario profundizar respecto este argumento de la defensa de las partes de demandadas.

**V.IV.- Sobre la defensa de prescripción opuesta:  a)** En sus alegatos de cierre el representante  de  la  codemandada  Verizon  Communications  Inc  invocó  la


Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ACUÑA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

aplicación del artículo 984 del Código de Comercio en tanto dispone: "*ARTÍCULO 984.- Salvo lo expresamente dispuesto en otros capítulos de este Código, todo derecho y su correspondiente acción prescriben en cuatro años, con las siguientes salvedades que prescribirán en un año: a) Las acciones de nulidad de los acuerdos tomados por las asambleas de accionistas o consejos de administración de sociedades comerciales; las de reclamaciones por vicios de las cosas vendidas con garantía de buen funcionamiento; y las de responsabilidad de los administradores, gerentes, directores y demás miembros de la administración de sociedades; b) Las acciones para cobrar intereses, alquileres, arrendamientos o rentas; c) Las acciones de los empresarios, para cobrar el valor de las obras que ejecutaren por destajo; d) Las acciones para cobrar el uso de cualquier otro derecho sobre bienes muebles; y e) Las acciones derivadas de ventas al por mayor y al detalle a otros comerciantes o al consumidor directamente*". **b)** La representación de la parte actora realizó en contra de esta defensa dos razonamientos, a saber: 1. Precluyó la posibilidad de oponer esta defensa. 2. No estamos en presencia de los supuestos del artículo 984 del Código de Comercio de un año, sino de 4 años para la interposición de la demanda. **c)** Criterio del Tribunal: De conformidad con una lectura de las pretensiones se advierte que la parte actora solicita el pago de los daños y perjuicios causados con motivo del incumplimiento contractual que alega doloso de las sociedades y el ente codemandados. En razón de lo anterior, estima este Tribunal que en el caso de marras estamos ante un plazo de prescripción de 4 años. En este orden de ideas, se advierte que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information Services- Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro, siendo así que la demanda fue interpuesta el día 15 de diciembre de 2008. El 28 de enero de 2009 la demanda fue notificada al representante de Verizon Information Services Costa Rica LLC y el día 18 de marzo de 2009 a la representante de Verizon Communications Inc. Consecuentemente, estima este Tribunal que procede rechazar la defensa opuesta, habida cuenta que la demanda fue notificada sin que haya operado la prescripción cuatrienal. Adicionalmente, se le hace ver a la parte actora que de conformidad con el


Firma digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SELLADO ... VERIZON ...
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

artículo 67.1 del Código Procesal Contencioso Administrativo, la posibilidad de interponer esta defensa no se encontraba precluída, habida cuenta que la parte codemandada la alegó antes de la conclusión de la audiencia de juicio.

**V.V.-Determinación de la existencia de responsabilidad del Instituto Costarricense de Electricidad: a)** La representación de la parte actora funda sus razonamientos con respecto a la responsabilidad del ICE en los siguientes argumentos básicos: **1)** Entre el ICE, las sociedades codemandadas y la empresa actora existe una relación <u>contractual compleja</u>, en donde los los diferentes acuerdos se interconectan entre sí para alcanzar un resultado patrimonial y donde el resultado final requiere el concurso de cada interviniente. **2)** La aprobación del Contrato Maestro de Impresión por parte del ICE, lo involucró con las partes suscribientes del mismo. **3)** Al terminar el ente su contrato con la contratista, se encontraba obligado a continuar prestando el respectivo servicio público y a pesar de que sabía que existía una empresa que elaboraba las guías telefónicas, se relacionó solo con el grupo Verizon, sin involucrar a la sociedad actora. **4)** El mecanismo contractual empleado por el ICE para la elaboración y distribución de guías telefónicas no fue el correcto, habida cuenta que estamos en presencia de un servicio público, **5)** Al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación. **6)** Los daños y perjuicios sufridos por la actora por el incumplimiento objetivo de su contrato con GTE (VERIZON) fueron generados por la actuación del ICE, que dio por resuelto su contrato con GTE (VERIZON), sin respetar los intereses legítimos que THS tenía en esa contratación, con lo que violentó el principio *Neminem laedere* -no dañar a otros-. **b.** La representación del ente demandado funda sus razonamientos de contestación a la parte actora, en los siguientes argumentos básicos: **1.** La elaboración de guías telefónicas no es un servicio público. **2.** El contrato entre la actora y las codemandadas es un contrato privado que no se rige por los principios de servicio público. Consecuentemente, La resolución del contrato entre ICE y las codemandas no debía ser consultado a la sociedad actora. **3.** La


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA XXXXXXXXXXXXX
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

relación contractual de la sociedad actora era con las codemandadas, las cuales optaron sub contratar con ésta, de conformidad con las atribuciones que permitía la Ley de la Contratación Administrativa. **4.** Las inversiones hechas por la sociedad actora, no era sólo para satisfacer las necesidades del ICE sino también para prestar servicios en otros lugares de la región. **5.** El cartel pedía imprimir las guías en Costa Rica, mas no en la sociedad actora. **6.** El contrato con las sociedades codemandadas fue resuelto por razones de interés público, dado que éstas unilateralmente decidieron reestructurar la guía del año 2005, infringiendo las cláusulas del contrato. **7.** El conocimiento que tuvo el ICE de la relación entre las codemandadas y la actora, se dio en razón de que ésta era una simple sub contratista de aquellas. **8.** Que en el caso en examen no estamos en presencia de un relación contractual compleja, dado que estamos en una contratación administrativa, caracterizada por la existencia de cláusulas exhorbitantes. **9.** No corresponde al ICE responder por maquinaria adquirida por la actora para elaborar las guías telefónicas de República Dominicana. **c) A continuación este Tribunal procederá al análisis particularizado de cada argumento**: **1.-** Sobre el primer argumento medular expresado por la parte actora: Hecho un análisis de los argumentos esgrimidos por las partes y de la prueba recabada en autos, estima este Tribunal que no lleva razón la parte actora al invocar la existencia de una relación contractual compleja que vincule a esta y el Instituto Costarricense de Electricidad. Lo anterior, en tanto que en el caso de examen estamos en presencia de dos relaciones jurídicas diferentes y definidas, siendo la <u>primera</u> ella propia del derecho público, sea la vinculación entre el ente y Verizon Information Services Costa Rica LLC, y la <u>segunda</u>, una relación propia del derecho privado, entre esta última sociedad y Trejos Hermanos Sucesores S.A.. En este orden de ideas, estima este Tribunal que el análisis a realizar debe efectuarse de manera diferenciada, tomando en cuenta la naturaleza de ambas relaciones jurídicas, siendo la sociedad actora una empresa sub contratada por Verizon Information Services Costa Rica LLC, pero sin que se derive de esta última relación, una obligación contractual del ICE para con Trejos Hermanos Sucesores S.A.. En autos se ha tenido por demostrado que el Instituto Costarricense de Electricidad realizó la licitación pública 6378-T para *"Edición de la Guía Telefónica*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO SALAS CORTÉS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*y Desarrollo e Implementación de Servicios de Información"*, siendo así que con fecha 10 de agosto de 1999, el Consorcio GTE presentó oferta para participar en la contratación administrativa Licitación Pública 6378-T. En razón de que se le adjudicó la respectiva contratación, con fecha diez de marzo del año 2000, el Instituto Costarricense de Electricidad y el Consorcio GTE suscribieron el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* . En este orden de ideas, el referido acuerdo de voluntades dispuso en cuanto a la posibilidad de sub contratar por parte de la empresa contratista, lo siguiente: *"De acuerdo con lo establecido en la cláusula 2.13.1. del cartel GTE acepta que puede subcontratar con la aprobación previa y escrita del ICE hasta el 50% del desarrollo, producción y distribución de las Guías Telefónicas, sin que esta aprobación obligue al ICE a solidarizarse en caso de incumplimiento del subcontratista. La sub contratación no relevará a GTE de su responsabilidad por la ejecución total del contrato.."* . La indicada disposición debe analizarse de conformidad con lo dispuesto en otra cláusula del contrato, que dispuso lo siguiente: *"De acuerdo con la experiencia de los últimos años GTE ha producido la totalidad de la Guía Telefónica en territorio costarricense, contribuyendo con ello al crecimiento del empleo bien remunerado, a la formación profesional, a la transferencia tecnológica en beneficio de ciudadanos costarricenses y de la economía del país en general, lo cual el ICE considera propio a la satisfacción del interés general. Consecuentemente con lo anterior, el ICE solicita y GTE acepta que durante la ejecución del presente contrato, la totalidad de las etapas y procesos de producción de la Guía Telefónica del ICE sea realizada por GTE en Costa Rica"* Como se advierte de los autos, y dada la existencia de una relación de larga data, la sociedad actora y las Empresas Verizon Information Services- Costa Rica LLC y Verizon Information Services - Belize LLC, suscribieron el contrato número VIS-2001-21-IP denominado Contrato Maestro de Compra, en donde respecto del plazo del mismo, se indicó: *"Este Contrato será efectivo únicamente cuando se cumplan los dos siguientes requisitos: (i) al momento de la ejecución de este Contrato por las partes; (ii) al momento de la ejecución de un contrato entre el Instituto Costarricense de Electricidad (ICE) y el Comprador, celebrado como resultado de una licitación*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DIAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

del *Comprador a la Oferta Pública 6378-T. En el momento que los requisitos mencionados sean cumplidos, la fecha efectiva (la "Fecha Efectiva") de este contrato será a partir de la ejecución del contrato mencionado en la sub-sección (ii) de esta Sección 2(a)*..." Por otra parte este último acuerdo de voluntades privado, se regulaba por el Código Civil y el Código de Comercio de Costa Rica (ver cláusula 35, documento 19 del expediente de prueba de la actora) y fue rubricado para en principio, la elaboración de guías telefónicas en Costa Rica y Belice. Consecuentemente, estamos en presencia de una sub contratación realizada por las empresas dichas con la sociedad actora, a fin de que aquellas pudieran ejecutar a cabalidad el contrato originado con motivo de la licitación pública 6378-T. No es óbice indicar que si bien la relación contractual original del ICE se realizó con GTE, posteriormente operó una modificación, por lo que la figura de contratista la ocupó al momento de los hechos objeto del presente proceso, el grupo de interés económico Verizon, tal y como se indicará posteriormente. De conformidad con lo indicado anteriormente, se advierte que no existe una vinculación directa entre el ICE y la sociedad actora y tampoco es viable partir de la existencia de una relación contractual compleja, propia del derecho privado. Para tales efectos, este Tribunal debe distinguir entre esta última figura y la sub contratación en derecho administrativo. En el caso de la denominada **relación jurídica compleja**, estima este Tribunal que estamos en presencia de diferentes partes que concurren al cumplimiento de un objeto negocial común, por lo que todas las acciones realizadas por el complejo contractual deben estar orientadas hacia tal fin. En este orden de ideas, las partes, aunque no necesariamente sean contratantes directas entre sí, todos vinculados directamente con todos, tienen conocimiento recíproco de su participación en la actividad material contratada, la cual es necesaria dentro de la relación compleja desarrollada y si una de las mismas no concurre en el cumplimiento de sus obligaciones para con las demás, debe resarcir, para indemnizar los daños antijurídicos ocasionados por su incumplimiento. Existe entonces, plena conciencia de la vinculación contractual entre unas y otras y de las consecuencias de la participación y del no cumplimiento obligacional frente a ese objeto común. Como se advierte, en estos casos, se parte de una relación de


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO... 
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

primer grado entre unos y otros participantes, donde los aportes pueden ser diferentes y de mayor impacto en el objeto negocial, mas siempre manteniendo una complementariedad entre ellos. En el caso de este primer supuesto, se evidencian características tales como: a) La unión en el plano fáctico de diferentes contratos conforme a la voluntad de los interesados y a la unidad del fin perseguido b) Existe una función económico social y fines concretos que las diferentes partes de la relación pretenden obtener c) Se advierte la existencia de un control social de una o varias partes. d) El conjunto es considerado como una unidad jurídicamente orgánica y, por lo tanto, interrelacionada, por lo que debe partirse del contenido esencial del marco contractual, al momento del análisis de cualquier visicitud que afronte el mismo. Como se advierte, estamos en presencia de un entramado contractual, en el cual los contratos pueden tener su causa propia, mas responden a una finalidad común y entre ellos existía un equilibrio de prestaciones , que no se puede romper incausadamente por una de las partes, sin que surja el deber de indemnizar. Lo anterior, en tanto que entre las partes surge una relación social sistémica de la cual surgen recíprocos deberes dirigidos a proteger la esfera de intereses compartidos. De la misma surgen deberes consecuentes de diligencia, buena fe, lealtad, de cumplimiento de obligaciones principales y accesorias, entre otras, y el marco de la voluntad de las partes se orienta hacia las mismas, con plena conciencia del funcionamiento del entramado y su operación. Estamos en presencia entonces, de relaciones no lineales, en el sentido de que la misma no se traduce en el mero deber de prestación frente la existencia de una contraprestación, sino ante una relación de carácter global que puede albergar en su seno diversos vínculos y situaciones jurídicas orientadas hacia un mismo fin negocial. En el caso de análisis, se advierte cómo el juicio de reproche realizado por la actora se orienta a presumir el incumplimiento de una obligación derivada de su teoría respecto de la existencia de un relación contractual, sea el deber de preservar la integridad y patrimonio de las partes (interés de protección) y que traduce en una obligación de aviso y una de conservación. No obstante, diferente es la situación de la **sub contratación**, en tanto que la misma surge cuando uno de los obligados en una relación contractual básicamente binaria, acude a terceros para obtener bienes



Firma...
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO...
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

o servicios que resultan necesarios para cumplir las obligaciones contractuales primarias. En este orden de ideas, existe un relación de primer nivel en el contrato inicial, siendo así que una de las partes, por su cuenta y riesgo y de manera exclusiva según su voluntad, acude a entablar una o varias relaciones contractuales de segundo nivel con sub contratistas, en tanto que éstos poseen los medios para que el contratista cumpla su carga obligacional. Consecuentemente, estamos en presencia de un contrato principal y un contrato secundario suscrito por una de las partes, para la realización de alguna de las prestaciones que son, a su vez, objeto del contrato principal o que contribuyen al menos al cumplimiento. Es evidente entonces que la sub contratación nace con motivo de la especialización de las organizaciones empresariales y la imposibilidad material que un contratista tenga a su alcance todos los bienes y servicios necesarios para el cumplimiento de la obligación principal. Consecuentemente, la sub contratación opera en diferentes niveles y si bien, resulta indudable que de la buena operación de la sub contratación depende la debida ejecución de la contratación principal, no es dable verla como un entramado, dada la naturaleza *instrumental* de aquella para con el contrato rubricado por la contratista. Así el destino del contrato secundario o sea el originado con la sub contratación no debe tener una consecuencia jurídica o fáctica directa en la ejecución del contrato principal, es decir,  el incumplimiento del sub contratista no releva al contratista de cumplir en tiempo y forma los términos y condiciones del contrato principal. A la inversa, el incumplimiento del contratista no obliga ni vincula a sus sub contratistas, por lo que el contratante o en este caso la Administración, podrá pedir responsabilidad sólo al obligado principal, dado que ese el vínculo contractual que adquirió. Lo anterior, es acorde con lo dispuesto en el *"Contrato para Edición de la Guía Telefónica y Desarrollo e Implementación de Servicios de Información entre el ICE y GTE"* en cuanto  dispuso respecto a la posibilidad de sub contratar por parte de la empresa contratista, lo siguiente: *"De acuerdo con lo establecido en la cláusula 2.13.1. del cartel GTE acepta que puede subcontratar con la aprobación previa y escrita del ICE hasta el 50% del desarrollo, producción y distribución de las Guías Telefónicas, sin que esta aprobación obligue al ICE a solidarizarse en caso de*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA CECILIANO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*incumplimiento del subcontratista. La sub contratación no relevará a GTE de su responsabilidad por la ejecución total del contrato..".* De lo anterior, se evidencia que el contrato surgido con motivo de una sub contratación o secundario, es derivado o dependiente de otro previo primario, el cual no se ve agotado por aquel y excede los alcances del secundario, dado que es un vinculo contractual diferenciado y diferenciable. Consecuentemente, no es dable ni presumir solidaridad de la Administración como contratante frente al sub contratista por los incumplimientos del contratista, ni mucho menos una relación jurídica que trasciende en complejidad más allá de esta vinculación de segundo nivel, en donde entre la parte contratante y el sub contratista, no hay vinculación directa, sino que estará siempre de por medio la contratista, como obligada en el cumplimiento del objeto contractual. No obstante, es menester hacer una precisión, en tanto que en la relación contratante y contratista, la Administración, puede imponer a éste determinadas obligaciones referentes al interés público o al cumplimiento del ordenamiento, dado que la carga obligacional en tal caso, esta atravesada de manera transversal tanto por las regulaciones de orden público que aplican a la materia como a la existencia misma de las cláusulas exhorbitantes y la naturaleza misma del objeto contractual. En el caso en examen, Verizon Information Services Costa Rica LLC sub contrató a la empresa actora, en tanto que además de que se imponía la elaboración de las guías en territorio nacional, se demostró alto grado de expertia en el tema, una larga relación contractual previa al contrato objeto de la presente resolución y la existencia de un reconocimiento contractual a la posibilidad de que la empresa contratista pudiera acudir a esta modalidad para poder cumplir sus obligaciones contractuales. Consecuentemente, no lleva razón la parte actora al indicar una relación jurídica diferente a la sub contratación ni ha demostrado que en el caso de análisis haya operado una vinculación diferente a la prevista en la norma cartelaria o que Trejos Hermanos Sucesores no haya tenido una relación de segundo nivel o que formara parte de un entramado contractual que permitiera presumir la existencia de una relación contractual compleja. Por el contrario, la propia prueba aportada por la parte actora demuestra que su vinculación tiene un carácter secundario para con el ICE y que existía pleno conocimiento de tal


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

relación. Inclusive las declaraciones de los testigos Quirós Alfaro y Navarro Céspedes ofrecidos por la parte actora confirman que no había relación directa entre el ente y la sociedad actora, por lo que no es dable suponer una relación más allá de la que se ha tenido por demostrada, sea la que poseía el ente con el grupo Verizon. Adicionalmente, no podemos obviar que estamos en presencia de una contratación administrativa de un ente público- empresa estatal, por lo que estimamos incorrecto pretender la prevalencia de una figura propia del derecho privado por sobre un mecanismo previsto para el cumplimiento de los fines públicos, como es la sub contratación. Si bien somos conocedores que la Ley de la Contratación Administrativa de la época preveía la sub contratación para los contratos de ejecución o construcción de obra pública, lo cierto es que vía jurisprudencia administrativa y jurisdiccional se fue abriendo la posibilidad de emplear dicho mecanismo en otras figuras contractuales, hasta llegar a la redacción actual normativa que sí permite expresamente dicha figura para otros tipos de contratos administrativos. **Conclusión**: De conformidad con los anteriores razonamientos, procede rechazar este primer argumento de la parte actora. **2.-** La parte actora invoca que la aprobación del Contrato Maestro de Impresión por parte del ICE, lo involucró con las partes suscribientes del mismo. Al respecto, estima este Tribunal que en primer término no hay pruebas de que el ente haya tenido participación en la aprobación ex ante o ex post del referido contrato, habida cuenta que el testigo ofrecido para tal efecto, manifestó no recordar haber emitido acto alguno de aprobación del mismo, ni tampoco dicha manifestación de voluntad se evidencia del acuerdo de voluntades rubricado por la sociedad actora. Por otra parte no es lo mismo indicar que aprobó el contrato que aprobó la figura del sub contratista. Lo anterior, por cuanto, de conformidad con el texto contractual, el ICE aprobaba la posibilidad de sub contratar y el sub contratista en particular, mas no los acuerdos concretos del contratista con éste. En este orden de ideas, no debemos obviar que estamos en un contrato con una empresa pública, ente estatal, en donde la carga obligacional está permeada por el propio ordenamiento y el interés público. Por consiguiente, la imposición de aprobación previa de la figura del sub contratista tiene razonabilidad en orden a


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DELGADO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

lo indicado, habida cuenta que la administración mediante dicho mecanismo

cautela que el sub contratado no esté afecto a prohibiciones o inhabilitado, entre otros aspectos . Es lógico, pues, que, como se ha afirmado, la actividad de la subcontratación esté regulada por normas de carácter público que limitan en algunos aspectos la autonomía de la voluntad de las partes, mas lo anterior no implica de ninguna manera que se desdibuje la naturaleza jurídica de la relación más allá de sus alcances en perjuicio de la contratante y el interés público. **Conclusión**: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. **3.-** Adicionalmente, la parte actora indica que estamos ante un servicio público, por lo que cualquier contrato suscrito en esta materia, se ampara a dicha naturaleza jurídica. Invoca la aplicación de un criterio de la Procuraduría General de la República. Por lo anterior, indica que al terminar el ente su contrato con la contratista, se encontraba obligado a continuar prestando el respectivo servicio público y a pesar de que sabía que existía una empresa que elaboraba las guías telefónicas, se relacionó solo con el grupo Verizon, sin involucrar a la sociedad actora. Al respecto estima este Tribunal que no lleva razón la parte actora. En primer término considera este Colegio que en el caso de análisis, no estamos en presencia de un servicio público. En este orden de ideas, el artículo 3 de la Ley No. 7593, del 9 de agosto de 1996, define el servicio público de la siguiente manera: *"a) Servicio Público: el que por su importancia para el desarrollo sostenible del país sea calificado como tal por la Asamblea Legislativa, con el fin de sujetarlo a las regulaciones de esta ley"*. En el anterior orden de ideas, se advierte que la norma deja en manos del legislador la calificación de una actividad económica en un momento histórico determinado, como servicio público. Dicha declaratoria o *"publicatio"* ha sido reconocida por la Sala Constitucional, de la siguiente manera: *"Por ejemplo, el artículo 3 de la Ley de la Autoridad Reguladora de los Servicios Públicos contiene varias definiciones, entre ellas la de servicio público, como toda actividad que por su importancia para el desarrollo sostenible del país sea calificada como tal por la Asamblea Legislativa, con el fin de sujetarla a las regulaciones de esta ley. Como puede apreciarse, la determinación de si una necesidad es de interés público no es una cuestión jurídica, sino de hecho y circunstancial, que obliga —como ya se dijo- a un juicio de oportunidad y conveniencia. No existen actividades que por*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*'naturaleza' o imperativos del Derecho Constitucional sean propias del servicio público, sino que eso dependerá de cada sociedad, sus necesidades y en el ámbito –privado o público- en que estas se satisfagan de mejor manera." (voto n.° 517-98, de 14:32 horas del 26 de agosto de 1998). Lo subrayado no es del original.* En este orden de ideas, advierte este Tribunal que el artículo 2 del decreto Ley 449 de 8 de abril de 1949, no determinó que las guías telefónicas puedan ser consideradas como un servicio público, y en este orden de ideas, dispuso: *""Artículo 2.- Las finalidades del Instituto, hacia la consecución de las cuales se dirigirán todos sus esfuerzos y programas de trabajo, serán las siguientes: ..h) Procurar el establecimiento, mejoramiento, extensión y operación de los servicios de comunicaciones telefónicas, telegráficas, radiotelegráficas y radiotelefónicas, para lo cual tendrá de pleno derecho la concesión correspondiente por tiempo indefinido"* Tampoco se advierte que la Ley de la Autoridad Reguladora de los Servicios Públicos, Ley No. 7593, del 9 de agosto de 1996, haya considerado la elaboración de las guías como tales, por lo que cualquier interpretación extensiva resulta improcedente si no se advierte expresamente la voluntad del legislador en tal sentido. En todo caso, de partir del supuesto alegado por la parte actora, ello no quiere decir que los eventuales sub contratistas de una empresa contratista deban ser considerados como regidos por una relación extensiva de derecho público entre el ente y ellos, habida cuenta que su vinculación contractual no es con aquel, sino con la empresa que sería la prestadora y que los contrata. Por otra parte es de advertir, como un razonamiento adicional que lleva al rechazo de esta argumentación, que la elaboración per se de las guías telefónicas, no cumple las condiciones para ser considerado como servicio público. En este sentido, es servicio público  aquel que reúna ciertas características tales como: a) ser una actividad esencial de interés general b) la demanda del mismo resulta cautiva y por ende implica lucro. c) Existe la publicatio de por medio por parte del legislador. d) Un tercero, no podría pretender explotar el servicio sin un acto habilitante de la Administración, habida cuenta que ésta es la titular del mismo. e) El concesionario no ejerce potestades de imperio f) La Administración mantiene control y  responsabilidad sobre el servicio. En orden a lo anterior, se aplica el ordinal 4° de la Ley General de la Administración Pública en tanto, en dispone*"La*


Firmado digital y
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*actividad de los entes públicos deberá estar sujeta en su conjunto a los principios fundamentales del servicio público, para asegurar su continuidad, su eficiencia, su adaptación a todo cambio en el régimen legal o en la necesidad social que satisfacen y la igualdad en el trato de los destinatarios o beneficiarios"* En el caso en examen, estima este Tribunal que la elaboración de guías telefónicas es un medio más para el cumplimiento de servicio público, es un instrumento, mas no esta última figura en sí misma. Consecuentemente hacer las guías, de modo alguno puede llegar a ser considerado como servicio público y cualquier interpretación extensiva que pretenda darle tal carácter resulta errónea y contraria a derecho. **Conclusión**: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. **4)** Invoca la parte actora que el mecanismo contractual empleado por el ICE para la elaboración y distribución de guías telefónicas no fue el correcto, habida cuenta que estamos en presencia de un servicio público. Al respecto, procede la aplicación de las consideraciones realizadas anteriormente, en tanto que a criterio de este Tribunal en el caso del objeto contractual no estamos en presencia de un servicio público como tal, siendo así que en todo caso, de haber existido un procedimiento de contratación administrativa erróneo, lo que procedía era aplicar la figura de la contratación irregular – lo que como se ha dicho, no es la situación de análisis- mas sin que esto implique obligación contractual o inclusive extra contractual, tal y como se dirá, con la sub contratista. **Conclusión**: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. **5)** Alega también la parte actora que al disolverse el contrato entre el Consorcio GTE y el ICE, esta Institución Pública debió adoptar las medidas cautelares necesarias para que el servicio público de información al público por medio de Guías Telefónicas, no se viera gravemente afectado, ni violados los principios clásicos de la figura, como la igualdad, la continuidad y la adaptación. Al respecto, consta en autos que el ente adoptó medidas frente al rompimiento contractual con Verizon Information Services Costa Rica LLC, siendo así que en todo caso, no existía vinculo contractual o norma que obligara al ente a contratar de manera contingente a



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

la sociedad actora. **Conclusión**: De conformidad con los anteriores

razonamientos, procede rechazar este argumento de la parte actora. **6.** Estima este Tribunal que tampoco estamos en presencia de una responsabilidad civil extra contractual, en tanto que no se advierte la existencia de norma alguna que haya impuesto al ente la obligación de informar a los sub contratistas de la situación patológica a que se llega en una relación contractual con uno de los adjudicatarios y contratistas de una licitación pública. Como se ha indicado, estamos en presencia de una sola relación contractual entre el ICE y Verizon Information Services Costa Rica LLC, por lo que las obligaciones del ente se agotan en la misma. Cualquier relación jurídica que haya adoptado Verizon Information Services Costa Rica LLC, con terceros ni obliga, ni vincula al ente en cuanto a obligaciones contractuales y extra contractuales no pactadas. Admitir lo contrario, implicaría llegar al absurdo de que el ente se encuentra obligado a comunicar a todos los sub contratistas, proveedores y empleados de un contratista, cuando se haya roto la relación contractual, lo cual evidente es desproporcionado, infundado e implicaría una carga al ente que trasciende la normativa y la relación contractual respectiva. En este orden de ideas, tampoco se ha demostrado que el ICE haya causado un daño que se encuentre directamente vinculado con sus conductas y omisiones y por el contrario, de los propios argumentos y prueba recabada en autos, se evidencia que cualquier lesión causada sería provocada por el hecho de un tercero, mas no el ente público dicho. En el caso del ente demandado, en principio, sus obligaciones se agotan en su relación con la empresa contratista y es a esta a quien le corresponde responder frente a sus sub contratistas, así como a estos responder para con la sociedad que los contrató. Lejos de ser la contratación administrativa una relación obligacional de carácter triangular, estamos en una obligación sinalagmática, en donde el incumplimiento demostrado de la contratista frente al ICE, no debe servir de justificación para alegar daños extra contractuales sin nexo causal con el ente dicho. Consecuentemente, no ha demostrado la parte actora los supuestos del artículo 190 y siguientes de la LGAP para que opere la responsabilidad extra contractual de la administración pública y además, es evidente que no opera el artículo 1045 del Código Civil, aplicable a la relación entre sujetos de derecho privado. **Conclusión**: De conformidad con los anteriores


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ZUÑIGA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

razonamientos, procede rechazar este argumento de la parte actora.

**Razonamiento final:** No es óbice indicar que no es procedente pretender la existencia de una presunta solidaridad en materia de responsabilidad del ente con las sociedades codemandadas frente a la actora, cuando como en el caso no se ha demostrado una relación jurídica <u>directa</u> del ICE frente a Trejos Hermanos Sucesores S.A. capaz de generar efectos jurídicos y no hay norma que prevea tal supuesto.

**V.VI.-** De conformidad con las anteriores consideraciones, procede rechazar la demanda en lo que respecto al Instituto Costarricense de Electricidad, por estimarse que no lleva razón la parte actora en ninguno de los argumentos invocados y al no haberse determinado la existencia de algún tipo de vínculo contractual y la sociedad actora, que haya generado un daño contractual o extracontractual vinculado con un nexo causal con alguna de sus conductas u omisiones.

**V.VII.- Determinación de la existencia de responsabilidad de la codemandada Verizon Information Services - Costa Rica- LLC: a)** La representación de la parte actora funda sus razonamientos con respecto a la responsabilidad de Verizon Information Services - Costa Rica- LLC en los siguientes argumentos básicos: **1)** El Contrato que firmó la actora con el Grupo GTE (luego Grupo VERIZON) y que aprobó y autorizó el ICE, es por su naturaleza un contrato que se rige por los principios del servicio público y queda regulado por sus principios, normas y valores. Consecuentemente, las cláusulas exonerativas de responsabilidad civil que por imposición de VERIZON se incluyeron en el contrato maestro de compra, necesariamente son ineficaces por principios imperativos de Derecho Público, dado que  si bien el contrato Verizon - THS se suscribió con las formas de un acuerdo comercial, por su objeto y por sus efectos es de naturaleza administrativa, al ser para la prestación de un servicio público. **2)** La empresa Verizon Information Services - Costa Rica- LLC   incumplió el contrato  suscrito por ella con el ICE. No obstante, de manera falsa al romper su relación contractual con la sociedad actora, le indicó que el responsable del rompimiento contractual era el indicado ente incurrió en un incumplimiento doloso, en tanto que quería dejar sus negocios en el país. Consecuentemente considera que las cláusulas



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DURÁN, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

exonerativas de responsabilidad civil del respectivo contrato son ineficaces cuando están referidas a un incumplimiento doloso, de conformidad con lo dispuesto por el artículo 701 del Código Civil. **3)** La extinción del contrato ICE - GTE (VERIZON) constituye un incumplimiento objetivo del contrato GTE (VERIZON)- sociedad actora, que es imputable a GTE (VERIZON), por lo que ésta entidad debe responder por los daños y perjuicios causados, según el principio general de la responsabilidad contractual establecido en el artículo 702 del Código Civil. **4)** Las cláusulas exonerativas están integradas a un contrato de adhesión, ya que el contenido de ese acuerdo sólo permitía la aceptación o el rechazo por parte de la sociedad actora, y la nulidad de tales cláusulas resulta de su naturaleza abusiva, de conformidad con artículo 1023, inciso m), del Código Civil y en el artículo 42 de la Ley 7 472 de 19 de enero de 1995 (Ley de Promoción de la Competencia y Defensa Efectiva del Consumidor). **b) La representación de Verizon Information Services - Costa Rica- LLC alega en su descargo que : 1.** La cláusula objetada tiene su lógica en el sentido de que verizon solo tiene un negocio en Costa Rica y era ilógico su vigencia si el ICE le terminaba el contrato de guías telefónicas, siendo así que la misma fue negociada con la actora y no es nula por las disposición del artículo 1023 del Código Civil. Con relación al plazo del contrato, en la cláusula 2.(b) del mismo se estableció un rango entre 48 meses a 168 meses, quedando en todo caso la vigencia del mismo supeditada a la vigencia del contrato con el ICE, dada la naturaleza del contrato y que Verizon no tenía otros negocios en Costa Rica. **2.** La relación entre Verizon y la parte actora es exclusivamente privada**.** La actora pretende engañar que el contrato firmado con Verizon es un subcontrato del contrato suscrito entre el ICE y Verizon, lo cual no es cierto y constituye una aberración jurídica. **3.** En el caso de marras debe aplicarse el artículo 701 del Código Civil, que indica que el dolo no se presume, por lo que se debe demostrar, siendo así que el mero incumplimiento no significa per se una conducta dolosa. **4.** La terminación del contrato, no implicaba en ningún caso responsabilidad para ninguna de las partes, debido a que la terminación anticipada del contrato surge como consecuencia directa del hecho o acción de un tercero, que en el caso en particular fue el ICE. 5. Las cláusulas 24 y 28 de exoneración de responsabilidad civil contractual y de


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

limitación de responsabilidad civil contractual, específicamente los incisos b) y e) de la cláusula 28, fueron negociadas y aceptadas por el representante de la sociedad actora . **5.** La parte actora reconoce que la ejecución del contrato se mantuvo en condiciones normales cerca de cuatro años, lo cual nos dice que el contrato se ejecutó en el rango de 48 meses establecidos en el punto b) de la cláusula 2 del Plazo. **c) <u>A continuación este Tribunal procederá al análisis particularizado de cada argumento</u>: 1.** En orden al razonamiento indicado en el considerando anterior, para este Tribunal es claro que la relación entre la sociedad actora y la empresa Verizon Information Services - Costa Rica- LLC no es propia del derecho público, ni implica la prestación de un servicio público. Como se ha indicado de manera extensa anteriormente, en el caso indicado, hay una relación propia del derecho privado, en donde Trejos Hermanos Sucesores es sub contratista de Verizon Information Services - Costa Rica- LLC, siendo esta última la única que rubricó un contrato regido por las regulaciones de derecho público con el ICE. Consecuentemente, no es cierto que las regulaciones propias mediante el cual se da el traslado de un servicio público, le sean aplicables a la indicada relación contractual. **<u>Conclusión</u>**: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. **2.** Por otra parte no ha demostrado la actora la existencia de un contrato de adhesión entre el contrato que suscribió con Verizon Information Services - Costa Rica- LLC y por el contrario, debe partirse de la libre voluntad a la hora de rubricar el contrato, conforme a los acuerdos que hayan adoptado las partes. Adicionalmente, la relación preexistente entre la sociedad actora con GTE descarta cualquier posibilidad de imposibilidad de revisar los términos y condiciones pactadas o de una relación de mera adhesión. Debe recordar la parte actora que a diferencia de las relaciones contractuales fundadas en la negociación, una parte redacta en exclusiva ese contenido, sin dejar intervenir a la otra y ésta se limita a adherirse a la formulación redactada por el profesional. Consecuentemente, no es dable presumir que un vínculo contractual posee tal naturaleza si no posee carácter masivo, tiene una vocación de generalidad y no se advierten tratativas preliminares a la rúbrica del contrato, que evidencien la conformación de la voluntad. Los requerimientos previos hechos por GTE y luego a Verizon sobre la


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ANGULO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

maquinaria empleada y la calidad del producto no puede ser considerados como una posibilidad unilateral a la actora de su parte hacia la cual la misma debía adherirse, sino como condiciones necesarias para mantener y continuar una relación contractual, dentro de un marco negocial y una sociedad de mercado en donde opera el libre juego de la oferta y la demanda y en la cual los agentes económicos pueden establecer a sus contratistas los requerimientos de calidad que estimen convenientes para obtener un producto final conforme a sus intereses comerciales. Ni siquiera se puede hablar de una relación de consumo o de demostración de un desequilibrio contractual obligacional que pueda hacer presumir tal invocación. **Conclusión**: De conformidad con los anteriores razonamientos, procede rechazar este argumento de la parte actora. **3.** La parte actora invoca incumplimiento contractual imputable de la codemandada Verizon Information Services - Costa Rica- LLC en su relación con el ICE. Al respecto, este Tribunal da por probado este hecho, en razón de que mediante oficio 6000-27733-2005 de SGT-2326-2005 de 1 de junio de 2005 se resuelve el contrato entre el ICE y Verizon Information Services Costa Rica LLC por incumplimiento contractual de esta última. Lo anterior fue confirmado mediante oficio 0150-36359-2005 de GG-680-2005 de 8 de julio de 2005 de la Gerencia General del ente. Lo anterior fue confirmado mediante resolución de las quince horas del cuatro de diciembre de 2015 en laudo arbitral en proceso de la misma naturaleza interpuesto por el ICE contra Verizon Information Services Costa Rica LLC, en donde se condena a esta última al pago de diferentes sumas en virtud de haberse demostrado que incurrió en incumplimiento contractual. (prueba para mejor resolver ofrecida por la parte actora en audiencia de juicio). Así las cosas existe un acto administrativo firme y un laudo arbitral que demuestran el incumplimiento invocado. **Conclusión**: De conformidad con los anteriores razonamientos, procede acoger este argumento de la parte actora. **3.** La parte actora invoca incumplimiento contractual doloso imputable de Verizon Information Services - Costa Rica- LLC en su relación con Trejos Hermanos Sucesores S.A. Al respecto, este Tribunal da por probado este hecho, en razón de que la indicada codemandada, de manera deliberada provocó el rompimiento de su relación contractual con el Instituto Costarricense de Electricidad, tal y



Firma digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

como se analizará a continuación. En autos se ha tenido por demostrado que en el año 2004 Verizon Information Services CR. propuso al ICE varios ajustes al contrato rubricado para la edición de guías telefónicas, y además el 13 de mayo de ese año propuso revisar la elaboración de las mismas, siendo así que el Sub Gerente de Telecomunicaciones, del ente mediante oficio 6000-41046-2004 de 15 julio de 2004, le indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004.  Con posterioridad, mediante nota de fecha 8 de setiembre de 2004, recibido en la Proveeduría el 16 de diciembre de ese año, el Vice Presidente de Verizon Information Services CR, le indica al Sub Gerente de Comunicaciones del ICE que en razón de que no se obtuvo respuesta a la nota del 13 de mayo de los corrientes, se tendrá por aplicado el silencio positivo a la petición.  Mediante oficio 6000-52278-2004 de 14 de setiembre de 2004 el Sub Gerente de Telecomunicaciones del ICE rechaza la aplicación del silencio positivo, habida cuenta que mediante oficio mediante oficio 6000-41046-2004 de 15 julio de 2004, se indicó que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004, en respuesta a la propuesta de 13 de mayo de ese año para  revisar la elaboración de las mismas. Posteriormente, mediante nota de 8 de noviembre de 2004, el Vice Presidente de Verizon le indica al indicado Sub Gerente que el silencio positivo operó de pleno derecho, al no haberse contestado en 30 días hábiles. A lo anterior, mediante oficio 600-64540-2004 de 18 de noviembre de 2004, se le contesta que en el caso de marras no resulta procedente la aplicación del silencio positivo, tal y como lo interpreta la contratista. A mayor abundamiento, por oficio SI-0726-11-04 de 15 de noviembre de 2004, la Jefe del Proceso de Servicios de Información del ICE le indica al Gerente General de Verizon que no ha ampliado la vigencia de la garantía de cumplimiento pedida desde el 30 de junio de 2004, según oficio 6000-35344-2004 y que la estructura de la Guía Telefónica del Área Metropolitana presenta incumplimientos en desacato a lo indicado en las notas 6000-41046-2004 y 6000-522678-2004.  De manera adicional, por acuerdo de artículo 10 de sesión 5649 de 23 de noviembre de 2004 del Consejo Directivo del ICE se dispuso indicar a la empresa contratista que se rechaza cualquier intención de modificar unilateralmente las condiciones


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

contractuales pactadas. Dado el incumplimiento de lo requerido, mediante oficio SI-759-12-04 de 13 de diciembre de 2004 se solicitó iniciar procedimiento de resolución contractual a la empresa Verizon Information Services CR por no ajustarse al contrato rubricado y los requerimientos del ente. En consecuencia, por oficio 5225-69163-2004 de AEG-0572-2004 de 14 de diciembre de 2004 se dio inicio a procedimiento de resolución contractual, siendo así que por medio de oficio 6000-27733-2005 de SGT-2326-2005 de 1 de junio de 2005 se resuelve el contrato entre el ICE y Verizon Information Services Costa Rica LLC por incumplimiento contractual de esta última. Lo anterior fue confirmado mediante oficio 0150-36359-2005 de GG-680-2005 de 8 de julio de 2005 de la Gerencia General del ente. Para este Tribunal, no está de más indicar que de ninguna manera podría haber invocado la parte demandada la existencia de un silencio positivo, por los siguientes motivos: a) Previo a su invocación, el ICE ya había hecho una manifestación expresa denegatoria, por lo que cualquier gestión posterior en contrario invocando un acto presunto es improcedente e irrelevante. b) La petición no se enmarcaba dentro de los supuestos del artículo 16 de la Ley de la Contratación Administrativa, dado que no era una gestión para ejecutar el objeto contractual, sino para su modificación en detrimento de lo pactado. c) El silencio positivo no opera de pleno derecho, sino que debe complementarse con las disposiciones del artículo 7 de la Ley de Protección al ciudadano del exceso de requisitos y trámites administrativos, lo cual no fue cumplido. Consecuentemente de los hechos probados se advierte la existencia de conciencia y voluntad de Verizon Information Services Costa Rica LLC de incumplir la relación contractual con el ICE y se advierte conocimiento que el indicado rompimiento contractual incidiría abiertamente en su relación con la sociedad actora. En este orden debe tomarse en consideración que el incumplimiento doloso contractual se configura cuando el mismo es consciente y voluntario, sin que necesariamente implique una intencionalidad de causar daño. Este incumplimiento, tendrá como consecuencia la ineficacia de cláusulas de exoneración o limitación de responsabilidad pactadas. En este sentido, para hablar de dolo obligacional, no dolo in contrahendo (que es vicio de la voluntad), el incumplimiento debe reunir dos requisitos para que sea doloso: a) la previsión


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO IMEMEM POZZ IMANAM JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

del sujeto de no cumplir (elemento negativo) y b) la posibilidad concreta del sujeto de cumplir (elemento positivo). Es decir el contratista decide no cumplir, a pesar de estar en condiciones de hacerlo. No obstante, opta por no ejecutar la prestación. La consciencia de la ilicitud y el cumplimiento de los elementos indicados anteriormente, operan en el caso de análisis, dado que de la prueba se evidencia que la codemandada tenía conocimiento del carácter contrario de su comportamiento respecto del derecho y, pese a ello, incumplió. Consecuentemente, la inexcusabilidad del cumplimiento determina la concurrencia de dolo, y la intencionalidad de no cumplir, dado que la sociedad codemandada nunca demostró, ni en sede administrativa, ni en el arbitraje, ni en este proceso, hecho objetivamente relevante que justificara su incumplimiento. Por el contrario, hay prueba de la previsibilidad del incumplimiento y sus consecuencias. Así en autos se evidencia, las siguientes comunicaciones al respecto por parte del ICE: a) Mediante oficio 6000-41046-2004 de 15 julio de 2004, se le indicó a Verizon que la edición de las guías del año 2005 debía ser con la misma estructura y cantidad de ejemplares del año 2004. b) Con oficio 6000-52278-2004 de 14 de setiembre de 2004 el Sub Gerente de Telecomunicaciones del ICE rechaza la aplicación del silencio positivo, habida cuenta que mediante oficio mediante oficio 6000-41046-2004 de 15 julio de 2004. c) Mediante oficio 600-64540-2004 de 18 de noviembre de 2004, se le contesta a Verizon que en el caso de marras no resulta procedente la aplicación del silencio positivo, tal y como lo interpreta la contratista. d) Mediante oficio SI-0726-11-04 de 15 de noviembre de 2004, la Jefe del Proceso de Servicios de Información del ICE le indica al Gerente General de Verizon que no ha ampliado la vigencia de la garantía de cumplimiento pedida desde el 30 de junio de 2004, según oficio 6000-35344-2004 y que la estructura de la Guía Telefónica del Área Metropolitana presenta incumplimientos en desacato a lo indicado en las notas 6000-41046-2004 y 6000-522678-2004. e) El 12 de noviembre 2004 el ICE ordenó a las Notarias públicas Leda. Patricia Hernández Salazar y Licda. Ligia Picado Arguedas, levantar actas notariales del resultado de las visitas que hacen en el local industrial de THS, en donde se hizo constar que en las guías telefónicas en elaboración, no se incluyeron los registros de los clientes de provincias y se constató que al imprimir


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ... 
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

las páginas blancas residenciales de la Guía Telefónica del Área Metropolitana, se hizo con los registros únicamente de San José, excluyendo los abonados de la zona de Los Santos y de las Provincias. f) Mediante oficio S.I.0730-11-04 se comunicó a Verizon, minuta de una reunión efectuada con sus personeros, en donde se le indica que se incumplía las cláusulas 3.1 y 3.4.1.3 del Cartel de la Licitación y segunda del contrato. g) El 18 de noviembre 2004, con nota 6000-64540-2004, la Subgerencia de Telecomunicaciones responde la nota del 8 de ese mes de Verizon, manifestándole nuevamente que debía mantener el formato de las guías telefónicas del año 2004. h) Mediante acuerdo de artículo 10 de sesión 5649 de 23 de noviembre de 2004 del Consejo Directivo del ICE se dispuso indicar a la empresa contratista que se rechaza cualquier intención de modificar unilateralmente las condiciones contractuales pactadas. i) El 2 de diciembre de 2004 en visita que se realizó en las instalaciones de la actora, la Notaria pública Yaila Paola Sánchez, levantó una acta notarial en la que se constata que estaban impresos 103.000 ejemplares de las páginas blancas residenciales del Área Metropolitana y que la imprenta  no había recibido ningún tipo de orden para modificar el proceso de impresión y encuadernación; sino que trabaja con las órdenes de compra entregadas por Verizon, las cuales no fueron modificadas por esta. Por lo anterior, concurren los supuestos necesarios para determinar el incumplimiento doloso de la codemandada, que hacen que a pesar de lo dispuesto en la cláusula 28 del contrato maestro,  tenga el deber de responder por los daños causados a la actora con motivo de su incumplimiento en aplicación del artículo 701 y 702 del Código Civil. Lo anterior, dado que dicho incumplimiento demostrado con el ICE, como se ha dicho implica también una falta de cumplimiento voluntario y por ende doloso de la  relación contractual con la actora y que se traduce en el hecho demostrado que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information services-Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro. En este orden de ideas, debe notarse que el criterio de imputación subjetivo del dolo, implica la existencia de un ánimo incumpliente, de la previsibilidad no tanto intención, antijurídica de causar daño al otro contratante, o del comportamiento de quien


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GONZÁLEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

no tiene intención de hacer honor a los compromisos contractuales. En el caso de marras, lo anterior se demuestra con base en las siguientes consideraciones, debidamente demostradas en autos: a) El rompimiento de la resolución contractual de la sociedad codemandada con el ICE no fue por rescisión (sea por motivos de interés público o acuerdo entre partes), sino por resolución contractual, sea por incumplimiento deliberado de la contratista. b) De la prueba se desprende la conciencia y conocimiento del incumplimiento y de sus consecuencias. En sendos actos administrativos con la debida antelación, se le previno no modificar las guías telefónicas y a pesar de ello la codemandada continuó con su actuar incumpliente. c) Hubo posibilidad de la contratista de corregir su conducta. Las prevenciones de no modificación de las guías se extendieron por varios meses y bien podría haber la sociedad codemandada haber corregido su actuación oportunamente, mas no lo hizo. d) Los cambios en el objeto contractual fueron unilaterales, deliberados y sin que se evidencie prueba de la necesidad de su ejecución. e) La contratista no podía alegar ni desconocimiento de la forma de operación del ente ni del ordenamiento jurídico aplicable, dado que su relación contractual con el ICE, databa de varios años en el pasado. f) Existe laudo firme que reconoce expresamente el incumplimiento imputable a la contratista. g) A pesar de que el contrato maestro preveía además la elaboración de guías telefónicas para República Dominicana, se opta por finiquitar la relación contractual en su totalidad. h) La sana crítica hace ver que existía la posibilidad de que la sociedad codemandada tuviera previsibilidad de que su incumplimiento generaría un daño bifrontal, es decir, no sólo para contra su contra parte inmediata (sea el ICE y el interés público) sino también para el contrato surgido con motivo de la relación incumplida, sea con la sociedad actora. I) No existía alternativa alguna para el ente contratante y para la sociedad actora al momento en que se perfecciona el incumplimiento. En su contestación, la parte demandada invoca la existencia de las disposiciones del artículo 701 del Código Civil que establece: "*ARTÍCULO 701.- El dolo no se presume, y quien lo comete queda siempre obligado a indemnizar los daños y perjuicios que con él ocasione, aunque se hubiere pactado lo contrario*". Con relación al artículo 701 del Código Civil, el voto 359-2014 de las once horas treinta


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

minutos del treinta y uno de octubre de dos mil catorce, de la Sección segunda del Tribunal Segundo Civil, dispuso lo siguiente: *"Este artículo determina la nulidad de las cláusulas limitativas de responsabilidad derivada del dolo. Esta disposición hace referencia a que si existe un **INCUMPLIMIENTO CONTRACTUAL DOLOSO** y se ha convenido en una cláusula limitativa de responsabilidad, esa cláusula es nula. Por interpretación analógica, la doctrina enseña que igual sucede en los casos de incumplimiento contractual culposo, si hay pacto de limitación de responsabilidad, la consecuencia es la misma, es decir, ese convenio es nulo, pues el deudor podría a su antojo cumplir o no cumplir y quedar exento de la responsabilidad indemnizatoria que se deriva de todo incumplimiento, lo que le permitiría obligarse bajo condición puramente potestativa, que equivale a que pueda obligarse a nada, lo que resulta inadmisible; pero además, porque la responsabilidad contractual sólo se puede desplazar por el hecho del acreedor, la fuerza mayor o el caso fortuito, según el 702,nunca por pacto…"* La parte actora indica que la cláusula 28 del contrato maestro le releva de responsabilidad por cuanto el contrato podía ser cesado, según lo indicado en la misma, que disponía: *" 28. TERMINACIÓN. (a) El Comprador puede terminar este Contrato al notificarle al Vendedor por escrito con al menos (90) días de anticipación de dicha terminación si las partes no pueden acordar cualquier revisión de precio de acuerdo a este Contrato, cualquier reforma a este Contrato de conformidad a la Sección 28 (c) anterior o el precio para nuevas opciones o especificaciones que el Comprador puede requerir, sin importar si dichas nuevas opciones o especificaciones están dentro de la capacidad actual del Vendedor. (b) El Comprador puede terminar este Contrato inmediatamente en cualquier momento si durante el Plazo del Contrato, el Contrato ente el Comprador y el ICE descrito en la Seccion 2, Plazo, es terminado por cualquier razón... e. Al momento de la terminación de este contrato, el comprador no será responsable para con el vendedor de la compensación por daños de ningún tipo o naturalez, ya sea por la pérdida por parte del vendedor de ganancias, gastos, inversiones o compromisos presentes o futuros hechos en conexión con este Contrato, o en conexión con el establecimiento, desarrollo o mantenimiento de los negocios del Vendedor o por cualquier otra causa o cosa, siempre que la terminación no*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ALFARO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

perjudique o afecte los derechos o responsabilidades del vendedor o el comprador con respecto a los directorios previamente producidos bajo este Contrato, o cualquier deuda que tenga cualquier parte con la otra..." Al respecto y de conformidad con lo indicado y al haberse tenido por debidamente demostrado el dolo por parte de Verizon Information Services Costa Rica LLC, es criterio de este Tribunal que la cláusula invocada por ésta no justifica el incumplimiento doloso realizado y traducido en el rompimiento unilateral del referido contrato maestro, dado que parte de otros supuestos diferentes, en donde esta contratista no hubiera sido la que provocara el rompimiento contractual con el ICE. Para este Tribunal se ha demostrado una evidente antijuricidad de la conducta de Verizon Information Services Costa Rica LLC que tiene un doble efecto jurídico, uno inmediato y otro mediato. Lo anterior por cuanto el incumplimiento voluntario y conciente de la indicada sociedad del contrato surgido con motivo de la licitación 6378-T, se tradujo en efectos jurídicos para con el ICE, pero también para la sociedad actora, en tanto que las mismas disposiciones de la vigencia contractual del contrato maestro suscrito con Trejos Hermanos Sucesores S.A. dependían de la relación existente con el ente. Así se evidencia de la cláusula 2.b invocada por la demandada, cuando dispone: "*Este Contrato será efectivo únicamente cuando se cumplan los dos siguientes requisitos: (i) al momento de la ejecución de este Contrato por las partes; (ii) al momento de la ejecución de un contrato entre el Instituto Costarricense de Electricidad (ICE) y el Comprador, celebrado como resultado de una licitación del Comprador a la Oferta Pública 6378-T. En el momento que los requisitos mencionados sean cumplidos, la fecha efectiva (la "Fecha Efectiva") de este contrato será a partir de la ejecución del contrato mencionado en la sub-sección (ii) de esta Sección 2(a)...*" De conformidad con lo anterior, es criterio del Tribunal que estamos en un caso particular en donde las disposiciones propias de la cláusula 28 del indicado Contrato Maestro, así como cualquier otra cláusula que se estimare legitimate de un rompimiento contractual incausado sin responsabilidad para la sociedad codemandada, se torna ineficaz ante el incumplimiento doloso incurrido. En este sentido, debe entenderse que el dolo que se ha tenido por demostrado se extiende de la falta de cumplimiento con el


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SELENA MENA CAMARENO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

ICE con respecto al contrato surgido con motivo de la licitación 6378-T hacia el contrato maestro rubricado entre la parte actora y Verizon Information Service-Costa Rica LLC, habida cuenta que como se ha demostrado este último dependía de la existencia y vigencia de aquel, por lo que la lógica indica que el incumplimiento doloso de la relación contractual con el ente, necesariamente impactaría en un incumplimiento doloso para con Trejos Hermanos Sucesores, tal y como se ha demostrado, efectivamente llegó a suceder.  Consecuentemente, procede aplicar el Código Civil, en tanto dispone en su artículo 22, lo siguiente: "...*Todo acto u omisión en un contrato, que por la intención de su autor, por su objeto o por las circunstancias en que se realice, sobrepasa manifiestamente los límites normales del ejercicio de un derecho, con daño para tercero o para la contraparte, dará lugar a la correspondiente indemnización y a la adopción de las medidas judiciales o administrativas que impidan la persistencia en el abuso.*" Para este Tribunal es claro que si el acreedor alega el dolo, no basta con demostrar el incumplimiento, sino que el dolo debe ser probado para que genere las consecuencias jurídicas correspondientes (artículos 701 y 705 del Código Civil). (Sentencias de la Sala Primera de la Corte Suprema de Justicia, número 320 de las 14:20 hrs. del 9 de noviembre de 1990.  En igual sentido, pueden consultarse, entre otros, los fallos números 354 de las 10 hrs. del 14 de diciembre de 1990, 103 de las 14:50 hrs. del 28 de junio de 1991, 17 de las 15 hrs. del 27, 20 de las 14:45 hrs. del 31, ambas de enero de 1992, 45 de las 14:15 hrs. del 11 de junio de 1997, 53 de las 15:10 hrs. del 27 de mayo de 1998, 589 de las 14:20 hrs. del 1 de octubre de 1999, 36 de las 15:40 hrs. del 10 de enero y, 509 de las 14:25 hrs. del 11 de julio, ambas del 2001), no obstante en el caso de marras, estima este Colegio demostrada la intencionalidad de faltar al cumplimiento de las obligaciones contractuales por parte de la sociedad codemandada, siendo así que para eximirse de responsabilidad, ésta debió entonces demostrar que la causa del incumplimiento ha sido el hecho del acreedor, el caso fortuito o la fuerza mayor (artículo 702 ibídem); mas en el caso de análisis no fue así. En este sentido, no puede indicarse que el daño haya sido provocado por el hecho de un tercero, es decir el Instituto Costarricense de Electricidad, habida cuenta que el rompimiento no se dio por su decisión unilateral propiamente dicha, sino que la causa de la decisión del ente


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO OROSCO ??????????
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

fue el incumplimiento contractual demostrado y doloso de Verizon Verizon Information Services Costa Rica LLC, y ante el cual, el ente debió proceder a dar finalizada su relación contractual. Si Verizon Information Services Costa Rica LLC no hubiera incumplido su contrato con el ICE, la relación contractual con la sociedad actora hubiera discurrido normalmente, prueba de la vinculación de una con otra y de la existencia de un dolo en la contratación pública que impactó dolosamente en la contratación privada. Nótese como la justificación dada por la sociedad codemandada es precisamente el rompimiento contractual que ella misma provocó de manera unilateral y dolosa. Así lo indica el texto de la respectiva carta, en tanto indica: "*Ante la situación anteriormente descrita, llamamos a su atención la cláusula 28, inciso b) del contrato suscrito entre VISCR y Trejos Hermanos Sucesores S.A. titulado "Master Purchase Agreement", la cual establece claramente que VISCR puede dar por terminado el contrato referido de manera inmediata cuando el contrato entre VISCR y el ICE sea terminado por cualquier causa...*" Para este Tribunal es claro, de la anterior cita, que la parte actora provocó un doble rompimiento contractual, uno de manera inmediata y otra mediata, con plena convicción en ambos de no cumplir y con la posibilidad de cumplimiento no realizada, según los hechos objetivos que se han tenido por demostrados. Si bien la parte actora negoció y aceptó las cláusulas de exoneración de responsabilidad, lo cierto es que las mismas se tornan entonces ineficaces ante la existencia de un incumplimiento doloso. 4. Como consideración adicional, debe tomarse en consideración que si bien la sociedad demandada alega que la actora reconoce que la ejecución del contrato se mantuvo en condiciones normales cerca de cuatro años, lo cual nos dice que el contrato se ejecutó en el rango de 48 meses establecidos en el punto b) de la cláusula 2 del Plazo, lo cierto es que la invocación para el cese de la relación contractual, como se ha demostrado, es el rompimiento contractual con el ICE y no otro motivo, por lo que la causa cierta, real, efectiva y necesariamente para el rompimiento contractual con Trejos Hermanos Sucesores es el incumplimiento deliberado y doloso y la resolución contractual consecuente de Verizon Information Services Costa Rica LLC con el ICE y no otro motivo, por lo que se reafirma el análisis realizado anteriormente. Prueba del dolo existente con


Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

respecto a la sociedad actora, es que en la nota en donde de manera escueta se da por rota la relación contractual con ella, el Gerente General de Verizon en Costa Rica, indica que  "... *el ICE irrespetó los derechos contractuales y aquellos establecidos por ley de mi representada y procedió a iniciar un procedimiento administrativo para la resolución del contrato, utilizando los medios públicos para distorsionar la realidad del los hechos*". Como se ha determinado, esta afirmación no es correcta y por tanto de manera deliberada induce a error, por cuanto imputa al ente la responsabilidad por el incumplimiento contractual, siendo así que está debidamente demostrado que el rompimiento con el ICE, operó por la falta de cumplimiento de las obligaciones contractuales de la empresa contratista. A mayor abundamiento el ex Gerente de Verizon en el país afirmó que fue voluntad de Verizon no continuar negociando en el país la elaboración de guías telefónicas.  *(ver declaración de José María Quirós Alfaro)*. Por consiguiente, estima este Tribunal que estamos en presencia de un incumplimiento doloso en perjuicio de la sociedad actora y por ende genera responsabilidad contractual y consecuentemente es indemnizable todo daño derivado del mismo. **Conclusión**: De conformidad con los anteriores razonamientos, procede acoger este argumento de la parte actora.

**V.VIII.- Argumento relacionado con la falta de solidaridad de la empresa codemandada con la garantía solidaria de GTE Corporation:** La parte demandada alega que la garantía solidaria de GTE Corporation otorgada al ICE no se puede presumir ni mucho menos pensar que se transfiere en beneficio de terceros. Al respecto, consta en autos que mediante escrito de fecha 28 de agosto de 2002,  Verizon Information Services Costa Rica, LLC, expresó lo siguiente al ICE: **"11.- MANTENIMIENTO DE TODAS LAS OBLIGACIONES Y DERECHOS.** *De acuerdo con lo requerido en la nota del 18 de junio del 2002, también me permito adjuntar al presente documento una DECLARACION JURADA sobre el Mantenimiento de Obligaciones y Derechos, firmada por los representantes legales de Verizon Information Services, Inc, Verizon Directorias Corp. y Verizon Information Services-Costa Rica, LLC, en la cual aceptan los derechos y obligaciones derivados de la licitación 6378-T y del contrato derivado de la misma". Adicionalmente, la* cláusula Vigésima Quinta del contrato entre el **ICE** y el


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Consorcio GTE estipuló lo siguiente: "*En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas*" De conformidad con lo anterior además de lo dispuesto expresamente, hubo manifestación expresa de la codemandada en cuanto al mantenimiento de las obligaciones contraídas originalmente por el grupo GTE. Consecuentemente, también procede el rechazo de este argumento.

**V.IX- Análisis de argumento complementario:** Como argumento adiciona, la codemandada alegó en audiencia de juicio que los daños y perjuicios son accesorios al tema de la nulidad contractual, siendo así que las partes no supieron ejercer las pretensiones anulatorias, dado que primero debe pedir la resolución contractual y luego el pago de daños y perjuicios. Por lo anterior, el Tribunal tiene una imposibilidad material para condenar en daños y perjuicios, porque antes no se pidió resolución contractual. Al respecto, debe tomar en cuenta el abogado de la parte demandada que mediante nota de fecha 2 de setiembre de 2005, el Gerente General de Verizon information services- Costa Rica LLC le informa a la parte actora que está dando por terminada la relación contractual originada en el respectivo contrato maestro. Por lo anterior, fue su propia representada la que dio por terminada unilateralmente la relación contractual respectiva y por ende abrió la posibilidad de que la parte actora ejerciera sus pretensiones indemnizatorias, con base precisamente, en el rompimiento del contrato suscrito entre ella y Verizon information services- Costa Rica LLC. Consecuentemente, también procede el rechazo de este argumento.

**V.X.-** De conformidad con los anteriores razonamientos, estima este Tribunal que se puede determinar un incumplimiento dolososo de la codemandada Verizon information services- Costa Rica LLC, en perjuicio de la sociedad actora y por consiguiente corresponde determinar su deber de indemnizar los daños y perjuicios que haya causado con motivo del mismo.-

**V.XI.- Argumentos de la parte actora con respecto de la empresa Verizon Communications, Inc.: a)** La representación de la parte actora funda sus



Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

razonamientos con respecto a la responsabilidad de Verizon Verizon Communications Inc. en los siguientes argumentos básicos: **1)** El Grupo GTE se fusionó con la firma Atlantic Bell y se formó el Grupo VERIZON, que mantuvo con el ICE todos los derechos, deberes, obligaciones y garantías originalmente otorgadas por el Grupo inicial y con garantía solidaria entre las sociedades VERIZON, siendo así que GTE CORPORATION por virtud de una fusión de empresas en los Estados Unidos de América, se transformó en VERIZON COMMUNICATIONS INC., Holding del Grupo VERIZON, por lo que las relaciones derivadas del Contrato Administrativo de la Licitación Pública Internacional 6378-T y sus efectos jurídicos para el cumplimientos de sus deberes y obligaciones, no sufrieron alteración alguna. Consecuentemente, las empresas demandadas Verizon Communications Inc: y Verizon Information Services - Costa Rica- LLC integran un grupo de interés económico, que convencionalmente podemos llamar GRUPO VERIZON. **b)** La codemandada contesta bajo los siguientes argumentos: 1) La actora en ningún caso demostró que la compañía GTE Corporation se convirtió en Verizon Communications Inc., 2) No es cierto que formaran un grupo de interés económico ni han formado parte de relación contractual alguna con el ICE o la actora. 3) No es cierto que Verizon Information Services-Costa Rica, LLC; Verizon Information Services Inc. y Verizon Directorias Corp. son empresas subsidiarias de Verizon Communications Incorporated. **c) Criterio del Tribunal:** En autos se ha tenido por demostrado que las firmas comerciales "GTE Information Services Incorporated", "GTE Directorias Corporation" y "General Telephone Directory Company C por A", empresas de los Estados Unidos de América, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, sometieron oferta conjunta, bajo la formalidad de consorcio en la Licitación Pública No. 6378-T promovida por el ICE y para todos los efectos relacionados con ese concurso público, se identificaron como el Consorcio GTE. Consta en autos que la contratación fue adjudicada al indicado Consorcio por el Consejo Directivo del ICE, en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, acuerdo publicado en el Alcance No. 10 a La Gaceta No. 28 del 9 de febrero del 2000. En este orden de ideas, en la cláusula Vigésima Quinta del contrato, el ICE y el Consorcio, se


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

estipuló lo siguiente: "*En el caso de que por modificación en la ley del ICE esta entidad cambiase de nombre o que, por su parte, GTE cambiase de nombre como resultado de fusionarse o asociarse con otra empresa, en ambos casos el presente contrato permanecerá invariable y vigente entre las partes, bajo las nuevas denominaciones legales que sustituyan los nombres de las entidades jurídicas aquí representadas*" Con posterioridad, el 16 de mayo de 2002, VERIZON Information Services - Costa Rica, LLC, le envió a la Dirección de Proveeduría del ICE la nota de fecha 16 de mayo del 2002, en la que le manifiesta, entre otras cosas, que "General Telephone Directory Company C por A" cambió de nombre a Verizon Information Services Costa Rica, LLC y pide que se tenga por oficialmente comunicado el cambio de la razón social de las empresas que integran el Consorcio GTE. Consecuentemente al funcionarse GTE con Bell Atlantic pasó a formar el denominado Grupo Verizon, integrado por Verizon Information Services, Inc., Verizon Directories Corporation y Verizon Information Services-Costa Rica, LLC. Para poder determinar la presencia de un grupo de interés económico, debe tomarse en cuenta que el mismo opera cuando un grupo de personas físicas o jurídicas mantienen vínculos e intereses comunes y coordinan sus actividades para lograr un determinado objetivo común. Adicional lo anterior, se presenta control, la autonomía y la unidad de comportamiento en el mercado. En este orden de ideas, puede darse un control de una empresa de controladora hacia otras o puede ser potencial, cuando opera la posibilidad de efectuar el indicado control aunque no exista un vínculo jurídico centralizado y jerarquizado. Consecuentemente la autonomía formal societaria trasciende hacia los intereses del grupo o de la entidad económica. Por lo anterior, si bien cada sujeto del grupo mantiene una personalidad jurídica formal, en la práctica, trascendiendo de las formas, los factores de producción de cada una de ellas irá orientada a un fin económico determinado común y la voluntad estará supeditada a la figura líder o madre en algunos casos o a la decisión integrada, mas no particular de cada uno. Es así como cada integrante llega a actuar de manera tal que el conjunto se comporta funcionalmente como una sola persona en el mercado, con un sujeto dominante y uno o varios secundarios. En el caso de análisis, consta en autos, que la representación legal de las empresas codemandadas es la


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

misma, además de su evidente similitud de la denominación social. Lo anterior por cuanto, consta en el expediente judicial que MARIANNE DROST, ciudadana norteamericana, actúa en su condición de Secretaria Corporativa de la firma VERIZON COMMUNICATIONS INC., y de VERIZON INFORMATION SERVICES-COSTA RICA, LLC., por lo cual queda en evidencia el control común y la relación que ambas guardan, además de las consideraciones hechas ut supra sobre la genésis del grupo Verizon. Lo anterior, en tanto que las diferentes sociedades del mismo se constituyen de manera conjunta (Verizon Information Services, Inc., Verizon Directories Corporation y Verizon Information Services-Costa Rica, LLC.), mantienen vinculos desde su constitución (ver nota de Michael Quinn Neal visible a folios 2964 y 2965 del expediente administrativo del ICE) y Verizon Communications Inc no es extraña a este grupo económico, por el motivo dicho, máxime tomando en consideración que por la similitud fonética no sería posible que una sociedad no vinculada al grupo pueda usar la denominación "Verizon". Es por este motivo que debe entenderse que el artículo 1025 del Código Civil no resulta aplicable al caso, habida cuenta que la existencia del grupo de interés económico vincula en materia de responsabilidad a la codemandada. Consecuentemente, Verizon Communications Inc. concurre solidariamente en la responsabilidad correspondiente al integrar el grupo de interés económico denominado "Verizon".

**Conclusión:** Se rechaza el argumento de la codemandada Verizon Communications Inc.**.**

**V.XII.-** De conformidad con los anteriores razonamientos, estima este Tribunal que se puede determinar la existencia de un grupo de interés económico entre las empresas del grupo Verizon y donde consecuentemente la sociedad Verizon Communications Inc. debe responder solidariamente por el incumplimiento doloso de la codemandada Verizon information Services- Costa Rica LLC, en perjuicio de la sociedad actora y por consiguiente corresponde determinar su deber de indemnizar los daños y perjuicios que haya causado con motivo del mismo.-

**V.XIIII.- Sobre las pretensiones declarativas establecidas en la demanda:** Con base en los razonamientos de fondo hechos en los considerandos anteriores,


Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GUERRERO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

procede resolver las pretensiones declarativas interpuestas, de la siguiente manera: **Pretensión número 1**: La indicada pretensión establece: "*1. Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A (que cambió su razón social a VERIZON INFORMATION SERVICES COSTA RICA, LLC) constituyó un medio de ejecución del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephohe Directory Company C por A", empresas de los Estados Unidos de américa, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000.* De conformidad con el análisis realizado y la prueba recabada, estima este Tribunal procede acoger esta pretensión, en el entendido de que el indicado Contrato Maestro corresponde a una sub contratación realizada por la parte sub contratista con la empresa actora, como un medio reconocido contractualmente para lograr el cumplimiento del respectivo objeto contractual.

**Pretensión 2**: La pretensión indica lo siguiente: "*2).- Que el citado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A, fue del conocimiento del INSTITUTO COSTARRICENSE DE ELECTRICIDAD, que aprobó la intervención de TREJOS HERMANOS SUCESORES S.A. en la ejecución del contrato administrativo adjudicado al Consorcio GTE resultante de la Licitación Pública No. 6378-T promovida por el ICE".* Como se ha indicado anteriormente, no se demostró en autos que el indicado Contrato Maestro de Compra haya sido del conocimiento de funcionario alguno del ICE, por lo que procede el rechazo de esta pretensión.

**Pretensión 3:** Esta pretensión indica: "*3).- Que la extinción del contrato*

Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A."* Tal y como consta en autos, el representante de Verizon invocó el rompimiento del contrato suscrito por ella con el ICE, para dar por concluído el contrato maestro de compra suscrito por ella con la parte actora. Por consiguiente procede acoger esta pretensión.

**Pretensión 4:** La parte actora pide se declare: *"4).- Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE".* Al respecto, no consta prueba alguna de hecho u omisión de la actora que provocara o contribuyera al rompimiento contractual entre el ICE y Verizon Information Services Costa Rica LLC y por el contrario se determina un incumplimiento doloso de dicha relación contractual por parte de esta. Por consiguiente procede acoger esta pretensión.

**Pretensión 5:** La parte actora pide se resuelva que: *"**5.-** Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A."* Al respecto, no consta prueba alguna de hecho u omisión de la actora que provocara o contribuyera al rompimiento contractual entre la actora ICE y Verizon Information Services Costa Rica LLC y por el contrario se determina un incumplimiento doloso de dicha relación contractual por parte de esta. Por consiguiente procede acoger esta pretensión.

**Pretensión 6:** La parte actora pide se resuelva que: *"**6.-** Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A".* Esta pretensión se terminará en el considerando siguiente, una vez realizado el análisis de la prueba de los daños invocados.

**Pretensión 7:** La parte actora solicita se declare: *"**7.-** Que las empresas*


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

demandadas Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A." De conformidad con el análisis realizado anteriormente, este Tribunal ha podido determinar la existencia de un grupo de interés económico en donde las indicadas sociedades forman parte. Consecuentemente, procede acoger lo pedido.

**Pretensión 8:** *La parte actora pide se declare: ".- Que* **"VERIZON COMMUNICATIONS INCORPORATED"** *es el ente de mayor jerarquía de un grupo de interés económico del que forma parte* **"VERIZON INFORMATION SERVICES -COSTA RICA- LLC",** *por lo que la primera de esas sociedades responde solidariamente con la segunda por todas las obligaciones contraídas por* **"VERIZON INFORMATION SERVICES -COSTA RICA- LLC"** *, con* **TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA"** Al respecto, no demostró la parte actora la condición jerárquica invocada para Verizon Commmunications Inc, por lo que procede rechazar este extremo de la pretensión, mas en en el entendido de que se acoge el extremo de la pretensión referente a su responsabilidad solidaria, al formar parte del grupo de interés económico dicho.

**Pretensión 9:** La parte actora pide se resuelva que: **"9).-** *Que las empresas demandadas* **Verizon Communications Inc. y Verizon Information Services -Costa Rica- LLC** *son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A"* De conformidad con las consideraciones hechas anteriormente respecto de la participación de Verizon Information Services -Costa Rica- LLC en los hechos que se han tenido por demostrados y la existencia de un grupo de interés económico en donde forma parte Verizon Communications Inc., procede acoger esta pretensión.



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**Pretensión 10:** La parte actora solicita que se declare que: **"10).-** *Que el* **INSTITUTO**

**COSTARRICENSE DE ELECTRICIDAD** desconoció los derechos e intereses legítimos de **TREJOS HERMANOS SUCESORES S.A.** derivados de la ejecución de la Licitación Pública No. 6378-T a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002, por lo que es responsable solidario con Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC de la indemnización de los daños y perjuicios sufridos por la actora por la extinción del citado Contrato Maestro de Compra suscrito el 28 de febrero del 2002" En razón de que se ha determinado que la actora no posee ninguna relación jurídica directa con el ICE ni se ha demostrado la existencia de algún derecho subjetivo o interés legítimo derivado de la ejecución de la licitación pública 6378- T que haya sido lesionado con motivo de conducta u omisión del ente, procede el rechazo de esta pretensión, según el análisis realizado en considerandos anteriores.

**Pretensión 11:** La parte actora pide se declare: "*11).- Que son nulas e ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON.*" De conformidad con el análisis hecho en la presente resolución y la prueba aportada a los autos, estima procedente determinar la ineficacia de las referidas cláusulas ante el incumplimiento doloso demostrado por parte de las sociedades codemadadas. No demostró la parte actora que las indicadas cláusulas hayan formado parte de un contrato de adhesión o que reúnan las condiciones para su anulación, por lo que en este extremo, se rechaza lo pedido.

**Pretensión 12 y 13:** Corresponden a pretensiones puramente indemnizatorias que se analizará en el considerando siguiente.

**V.XIV.- Sobre los daños materiales invocados: a)** Para justificar los daños invocados, la parte actora alega lo siguiente: **1)** En razón del incumplimiento, no pudo cancelar créditos bancarios y comerciales adquiridos, tuvo que cesar en los pagos con relación a los proveedores de materia prima y los alquileres, cesó en el pago de los salarios y derechos laborales de sus empleados y se vio


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA LIZANO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

conducida al cierre de sus actividades y al paro permanente de su giro comercial. 2) El Grupo GTE negoció con la parte actora las condiciones futuras para incorporar en los trabajos de edición e impresión, los avances tecnológicos para mejorar la calidad de los trabajos. Consecuentemente, se le impuso obligatoriamente, la adquisición de los equipos más modernos y la ampliación de la planta física. De conformidad con lo anterior, la actora indica, se endeudó con créditos bancarios y comerciales, seriamente para poder adquirir los nuevos equipos y ampliar su planta industrial. **b)** En su contestación de la demanda, las sociedades actoras alegaron que: **1)** Si la empresa actora tomó la decisión de endeudarse, ello se debió a ue una decisión de negocios propia. **2)** La actora vendió la maquinaria adquirida, lo cual no es tomado en consideración por ésta a hora de invocar pérdidas. **3)** El problema que tuvo la actora con su planta y los equipos fue que éstos eran obsoletos y los costos de producción con esos equipos eran más altos y la productividad también era menor en el tiempo de impresión. **4)** Se suponía que la actora no dependía de la existencia de un solo contrato y que una empresa con la experiencia y trayectoria nacional e internacional de casi cien años mantenía una variedad de clientes que le garantizaban una solvencia y el manejo adecuado de las finanzas y los flujos de caja, para hacerle frente a sus obligaciones crediticias ante una eventual contingencia. **5)** El problema del cierre de operaciones de la sociedad actora resultó la consecuencia inmediata de la mala administración de los negocios. **c)** Criterio del Tribunal con respecto a los extremos cobrados por concepto de daño material: En autos se ha tenido por demostrado que con fecha 25 y 26 de febrero de 1999, el señor Bruce Wataru hizo visita a las instalaciones de la sociedad actora y realizó una serie de observaciones con respecto a las instalaciones y equipo de la misma. Posteriormente, el 15 de noviembre de 1999 se llevó a cabo una reunión de los señores Álvaro y Alonso Trejas Fonseca y don Guillermo Navarro, entonces Presidente, Vicepresidente y Gerente de Producción de **THS,** respectivamente, con el Director de "Printing" de GTE Directories International con el propósito de: 1) evaluar el progreso realizado en el proyecto de las mejoras en la planta; 2) asistir en desarrollar un proyecto formal para dar un seguimiento cercano al proyecto de la nueva planta; 3) acordar un plan de contingencia en caso que **THS** no


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DURÁN, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

cumpliera con las fechas de instalación de los nuevos equipos y planta, el cual consistía en contratar otra planta en Estados Unidos, sobre todo, en caso de que no se adquirieran los equipos a tiempo; 4) evaluación de la compra potencial del equipo, con la específica asistencia del consultor recomendado por **GTE,** señor Bill Snell. Consecuencia de lo anterior, en febrero del 2000, la actora adquirió una moderna máquina rotativa Heidelberg, una línea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta. Lo anterior, para cumplir los requerimientos del señor Wataru y la disposición (j) de la cláusula 16 del Contrato Maestro de Compra. La compra de la Máquina Rotativa y todo el equipo accesorio marca Heidelberg con un costo de adquisición de C. 955.116.741,00. Adicionalmente, atendiendo a los requerimientos del señor Wataru, la sociedad actora alquiló dos naves industriales en la Zona Franca Zeta, en Guadalupe de Cartago, propiedad de INMOBILIARIA ZOROASTER S.A., con todos sus equipos, oficinas y bodega, según contrato que se suscribe con la propietaria de fecha primero de julio de dos mil cuatro. El 15 de julio del 2004 el Consorcio contratista del Grupo Verizon tramitó, en papelería de la Compañía General de Directorios C.por.A, con oficinas en San José, Costa Rica, subsidiaria de GTE Corporation según consta en el mismo documento, la orden de compra 4568 para la impresión de las Guías Telefónicas para Área Metropolitana por la suma total de $ 3,033,625.60 y el día 20 de agosto del 2004, la orden de compra 4582, por la suma de $ 2,134,503 por las Guías Telefónicas de Provincias, para un total de $ 5,168,128.oo para las Guías correspondientes al año 2005. Las órdenes de compra indicadas en el Hecho anterior fueron sustituídas por **Verizon** por la número 4612 del 3 de noviembre del 2004 para las Guías del Área Metropolitana por la suma de$ 2,120,828 y por la número 4644 del 17 de diciembre del 2004 para las Guías de Provincias, por la suma de $ 1,254,023, para un total de $ 3,374,851, o sea, con una disminución extemporánea, de$ 1,793.277 (documento 30 del expediente de prueba del actor). Se ha demostrado que las últimas órdenes de compra implicaron reducción del número de páginas de las guías telefónicas y el número de libros así como una conformación y composición de las guías distinta a la que había convenido **GTE** en su contrato con el **ICE.** Con posterioridad el


Firmado digitalus
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MATA JIMENEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

contrato entre la actora y el Grupo Verizon fue resuelto con motivo del incumplimiento doloso de éste, lo que se ha demostrado en el proceso, siendo así que en virtud de lo anterior, la sociedad actora deja de honrar sus obligaciones con la vendedora de la maquinaria, siendo así que esta inicia un proceso ejecutivo prendario que con el expediente número 06-001956- 0640-CI, en el Juzgado Civil de Mayor Cuantía de Cartago, y a las :30 horas del 6 de junio de 2007, se realizó el remate del equipo pignorado y por auto de 9:23 horas del 19 de agosto de 2007, se ordenó la puesta en posesión del mismo a HEIDELBERG PRINT FINANCE AMERICAS INC, rematario, lo que se ejecuta a las 14:00 horas del 31 de octubre de 2007. De manera adicional se ha demostrado que la sociedad actora se vio obligada a incurrir en mora con los pagos de las rentas por el alquiler de las naves industriales de Inmobiliaria Zoroaster S.A., por lo que se suscribió una escritura pública, que corresponde a la número 144, que se inicia al folio 133 vuelto del tomo primero del Protocolo de la Notaria LAURA MÓNICA ZAMORA ULLOA, a las doce horas del 23 de marzo de 2006, mediante la cual la actora se comprometió a pagar hasta por la suma de DOSCIENTOS MIL DOSCIENTOS VEINTITRÉS DÓLARES CON SETENTA Y CINCO CENTAVOS (US$ 200,223,75), indicándose en la cláusula segunda de dicho documento lo siguiente: "... *SEGUNDA Sustitución de deuda. Esta constitución de deuda, sustituye las mensualidades atrasadas por concepto de alquiler adeudados por El Deudor - (TREJOS HERMANOS SUCESORES)- correspondientes a los meses de julio de dos mil cinco hasta marzo de dos mil seis inclusive, a razón de nueve meses de mensualidad, según contrato de arrendamiento suscrito entre Acreedor y Deudor, de fecha primero de julio de dos mil cuatro, arrendamiento que se ejecuta en la propiedad del Acreedor, finca inscrita a Folios Reales tres- uno nueve cero ocho siete tres- cero cero cero y tres- uno nueve cinco ocho nueve ocho- cero cero cero, lo cual expresamente acepta El Acreedor*" ... Asimismo, se establecieron intereses mediante cuotas mensuales de veintidós mil doscientos cuarenta y siete dólares con ochenta y tres céntimos hasta cancelar la totalidad de la obligación (documento 70 del expediente de prueba de la parte actora). 9. Que ante el incumplimiento de lo pactado, Inmobiliaria Zoroaster S.A.,  presenta ante el Juzgado Civil de Mayor Cuantía de Cartago, proceso ejecutivo simple que ocupa


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ... PEREZ ... JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

el expediente número 06-001846-0640-CI, que culmina con sentencia, acogiendo la excepción de pago parcial y condena a la actora a pagar cincuenta y seis mil ciento ocho dólares con diez céntimos de dólar (US$ 156,108.10). Dado lo anterior la actora concretó la venta de prácticamente todos sus activos en equipos y mejoras en los inmuebles de la Arrendante, a la empresa de capital colombiano CONDOR EDITORES DE COSTA RICA, S.A., la cual convino con Inmobiliaria Zoroaster S.A. en el arrendamiento de las naves industriales de la Zona Franca Zeta en Cartago, adquieren el equipo rematado por HEIDELBERG PRINT FINANCE AMERICAS INC., en condiciones favorables y ya instalado en esas naves industriales, al igual que el resto del equipo de THS pignorado al Banco Nacional de Costa Rica y al Banco Interfin (documento 73 del expediente de prueba del actor). Finalmente, la actora llegó a un acuerdo con Inmobiliaria Zoroaster S.A., con fecha 28 de marzo de 2007, titulado "*Contrato de Finiquito de Arrendamiento y Reconocimiento de Deuda*", en donde manifiesta entregar la nave industrial donde se encuentra la máquina rotativa y el restante equipo de impresión, puesto que con anterioridad ya se había entregado la otra nave donde se encontraban las oficinas y bodega y otorgan ambas partes el finiquito en ese sentido, pero al mismo tiempo señala que Inmobiliaria Zoroaster S.A. reconoce haber recibido a la fecha dos pagos -(que en el proceso de desahucio no se habían podido acreditar)-, por una suma total de cincuenta y cinco mil dólares estadounidenses, así como tener a su haber un depósito de garantía por la suma de treinta y nueve mil dólares, todo lo cual expresamente autoriza la actora lo aplique Inmobiliaria Zoroaster S.A. al total adeudado. Independientemente de que los procesos judiciales dichos puedan continuar, Trejos Hermanos Sucesores se compromete a cancelar el total adeudado que oportunamente se determine, una vez hechas esas deducciones junto con los intereses pactados y costas, hasta su efectivo pago, en un plazo perentorio, reconociendo ambas partes que hay una instrucción expresa en el "Fideicomiso Trejos Hermanos- Fiduciaria Castro Garnier", por la cual se debe cancelar lo adeudado a Inmobiliaria Zoroaster S.A., en cuanto reciba el pago de sumas que se le deben por diferentes negocios pendientes de cancelación, como por ejemplo, una deuda pendiente de Radiográfica Costarricense, S.A. Con fecha 29 de mayo de 2007, la actora arrendó con opción



Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

de compraventa a DACONDOR Q.C.R. SOCIEDAD ANONIMA, que luego, cede sus derechos a la misma empresa dicha CONDOR EDITORES DE COSTA RICA, S.A. sobre los restantes activos industriales de la empresa, por una fracción de los pasivos, tanto en Transamérica Bank & Trust Co. Ud., (subsidiaria de Banco Interfin), en el Banco Nacional de Costa Rica y con Banco Improsa S.A. De conformidad con lo anterior, estima este Tribunal que existe una vinculación causal entre la adquisición de la maquinaria y el arrendamiento de instalaciones con la relación contractual entablada con GTE y posteriormente con el Grupo Verizon, siendo el incumplimiento doloso de Verizon Information Services Costa Rica LLC, el que provocara tanto la falta de pago del equipo y arrendamientos como las restantes afectaciones económicas que se han tenido como demostradas y derivadas de los mismos. Para este Tribunal es evidente que las indicaciones iniciales de Bruce Wataru deben ser complementadas en cuando a su análisis con la cláusula 16. (j) del Contrato Maestro que estableció lo siguiente: *"El Vendedor deberá comenzando con los primeros Directorios producidos bajo este Contrato, cumplir con todos los requisitos técnicos para imprimir y fabricar los Directorios para los cuales el Comprados (sic) ha colocado Órdenes, incluyuendo, pero sin limitarse a; la capacidad técnica de suministrar reborde blanco y "proceso de cuatro colores" según se comprendan aquellos términos en la industria de impresión."* Como se advierte, la relación contractual de la sociedad actora con Verizon Information Services Costa Rica LLC, tenía como antecedente la necesidad de cambiar el equipo de trabajo de Trejos Hermanos Sucesores, siendo así que esta sociedad debió incurrir en compromisos para poder ajustarse a los requerimientos de la contratante. No es cierto que la decisión de modificación del equipo o de ubicación de instalaciones obedezca a una mala decisión empresarial, sino que responde a la evidente necesidad de mantenimiento de la relación contractual entre ambas partes. Por lo anterior, el daño inicial se traduce en el valor de la maquinaria adquirida en el entendido a que al mismo, se le debe deducirse el costo de su venta, según se indicará a continuación. Adicional al indicado daño, la parte actora considera como daño, lo siguiente: a) las diferencias de la existencias, entre los períodos que van de 1997 a 1999 y entre el 2000 y el 2004, como producto de la inversión necesaria en capital de trabajo para dar


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO JIMENEZ VARELA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

cumplimiento a los requerimientos de la contratación. b) los flujos previstos y no realizados desde el período 2004 al 2013. c) las pérdidas resultantes para los períodos comprendidos entre el año 2004 y el 2007 d) intereses pagados a Banco Cuscatlán y a la empresa proveedora del equipo Heildelberg, según su fecha de registro contable, y sus importes fueron llevados a valor futuro. e) lucro cesante con motivo del cierre de operaciones. Todos estos extremos se reconocen en tanto que el cierre de operaciones de la sociedad actora y que se evidencia de la venta de su maquinaria y activos, implicó que las consecuencias del incumplimiento impactaran en el tiempo con un efecto continuado, dado que impidió el mantenimiento y hasta expansión del negocio. Adicionalmente, no ha demostrado las partes demandadas la improcedencia o el carácter infundado de lo pedido y por consiguiente procede la aplicación del artículo 317 del Código Procesal Civil, en tanto que les correspondía a ellas probar que los daños invocados o no existían o no estaban ligados causalmente con su incumplimiento contractual doloso, lo cual no se dio. Considera este Colegio que  los rubros indicados se justifican por los siguientes motivos: a) Está demostrado que la actora adquirió una una moderna máquina rotativa Heidelberg, una línea de encuadernación y un equipo de pre-prensa denominado CTP o Directo a Plancha en conjunto con todas las instalaciones eléctricas y mecánicas de la nueva planta, estas inversiones, fundado en la expectativa de que su relación contractual con GTE y luego con Verizon databa de décadas atrás y que el Contrato Maestro tenía un horizonte de 168 meses, que le permitía recuperar la inversión. Esto motiva el reconocimiento de valor de maquinaria e intereses pagados por la misma. b) La larga relación ex ante y el hecho probado de que el 14 de octubre de 2004  de conformidad con los términos del contrato entre THS y GTE,  las partes involucradas suscribieron el "Cronograma de Producción, Guía Provincias 2005, justifican  las diferencias en existencias, los flujos previstos y las perdidas puestas al cobro en la demanda. c) La expectativa razonable generada con motivo de la relación previa, el contrato previsto y el cumplimiento de los requerimientos de la parte contratante justifican el lucro cesante, habida cuenta que estamos en presencia de un comprobado detrimento patrimonial o de otra naturaleza dejado de percibir, el cual resultaba razonable, y esperable de no


Firma digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DURÁN, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

haber acaecido el incumplimiento ilegítimo. Esa afectación trasciende el contrato y su período de vigencia, habida cuenta que las consecuencias de su incumplimiento fueron tan graves que llevaron a la extinción de la actora en el ejercicio de sus actividades económicas al verse obligada a vender maquinaria y activos y pagar las deudas generadas con motivo del contrato rubricado con Verizon Information Services Costa Rica LLC. En este orden de ideas, la interrupción de operaciones se traduce en perjuicio o lucro cesante, no sólo porque se le impidió a la actora obtener una utilidad con motivo de la ejecución contractual del Contrato Maestro, sino también de las ganancias que a futuro podría haber obtenido de haberse mantenido en operación. En este sentido, estimamos que el incumplimiento doloso de Verizon Information Services Costa Rica LLC fue determinante para que la actora no pudiera seguir operando y fuere afectada de manera definitiva. Por lo anterior, estimamos procedente tomar en consideración como parte de la afectación sufrida que el rompimiento abrupto de la relación contractual primaria de la empresa (tal y como lo sostiene el perito judicial) incidió en su imposibilidad de operación a futuro. Diferente si hubiera sido la situación si el incumplimiento le hubiera sido imputable a la sociedad actora o si hubiere fenecido normalmente el contrato, habida cuenta que las consecuencias de no continuación del mismo, tendrían que haber sido asumidas por Trejos Hermanos Sucesores como parte del riesgo empresarial de depender de una relación comercial. Para este Tribunal, de una valoración integral de la prueba, se evidencia la existencia de una <u>probabilidad</u> de que de no haberse roto la relación contractual abrupta, incausada y dolosamente por parte de Verizon Information Services Costa Rica LLC, la parte actora se hubiera mantenido en el ejercicio de sus actividades económicas. La situación de la actora, trasciende de la mera posibilidad en tanto que durante el ejercicio de una ejecución normal del contrato, habría podido existir la probabilidad de recuperar inversiones, pagar deudas, y dar oportunidad de explorar alternativas de negocios. Como se evidencia de los autos, esto no pudo operar, dado que el rompimiento anticipado provocado por la codemandada, afectó las proyecciones económicas de la actora y seguridad que le brindaba el contrato rubricado. Consecuentemente se ha probado el acaecimiento de un hecho que


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA CARRANZA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

fue desarrollando todas sus consecuencias, esperables de acuerdo al curso ordinario de los acontecimientos, y que reiteramos no habría ocurrido si hacemos exclusión hipotética del incumplimiento de la codemandada. Por lo anterior, resulta indemnizable dada la certidumbre de que la empresa hubiera seguido operando si se hubiera dado debida ejecución del objeto contractual por parte de la sociedad contratante. Si como se ha demostrado, Verizon Information Services Costa Rica LLC hizo incurrir a la actora en inversiones cuantiosas y si resulta evidente de la relación contractual y el tipo de actividad que existía una marcada dependencia de la solvencia financiera de Trejos Hermanos Sucesores de su vinculación con los contratos para elaboración de guías telefónicas, es lógico suponer, de conformidad con la sana crítica racional, que la contratante tenía plena conciencia que su rompimiento contractual impactaría en la vida misma de su contratista y en su operación comercial. Así las cosas, el denominado daño por "interrupción de operaciones", no era algo meramente contingente sino de probable acaecimiento y que como tal, debe ser comprendido dentro de los daños a ser indemnizados. Consecuentemente, la existencia de un incumplimiento doloso es determinante para considerar que la dupla conocimiento- evitabilidad por parte de Verizon Information Services Costa Rica LLC inciden en determinar su responsabilidad contractual, no solamente por los daños y afectaciones sufridas durante el período de vigencia contractual, sino en cualquiera posterior, directamente relacionado desde el punto de vista causal con las consecuencias del hecho antijurídico demostrado a la contratante. Consecuentemente, procede acoger la pretensión 6 de la demanda, en tanto dispone: "**6.-** *Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A".* De conformidad con lo anterior, se condena a las sociedades codemandadas a pagar los rubros indicados, de manera solidaria.

**V.XV.- Sobre los Montos liquidados:** a) En su demanda, la parte actora ejerce una pretensión de condena de la siguiente manera: "*12).- Que los demandados el* **INSTITUTO COSTARRICENSE DE ELECTRICIDAD** *y las empresas* **Verizon**



Firma(s) digital(es)
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

***Communications Inc. y Verizon Information Services -Costa Rica. LLC*** *deben pagarle a la parte actora, solidariamente, los daños y perjuicios irrogados, que liquidamos de la siguiente manera:*

| | |
|---|---|
| *a) Inversión en maquinaria* | *$2.582.156* |
| *b) Incremento en inventarios* | *$2.860.696* |
| *c) Flujos de Caja Operativos no recibidos 2004-2013 Directorios Costa Rica* | *$8.806.872* |
| *d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana* | *$ 7.912.999* |
| *e) Pérdidas realizadas 2004 a 2007* | *$7.237.068* |
| *f) Intereses pagados por THS* | *$ 983.825* |
| *g) Interrupción de Operaciones* | *$28.885.195* |

b) La objeción de las partes demandadas respecto de estos extremos se relacionan con la causalidad de los daños invocados (dado que alegan mala gestión de negocios y decisiones empresariales), el hecho de que a su criterio en los cálculos no se tomó en cuenta la venta posterior de la maquinaria y la existencia de un contrato posterior con Radiográfica Costarricense S.A. c) Al respecto, este Tribunal estima procedente acoger el quantum de los rubros indicados, con las precisiones que se indicarán por los siguientes motivos: 1. Los cálculos dichos se fundan en el estudio técnico elaborado por el Lic. Tomás Evans Salazar aportado como prueba por la parte actora y ratificado por el perito judicial Ramón Humberto Romero Rodríguez, Contador Público Autorizado y Perito Actuario, quien indicó en lo que interesa en su peritaje, lo siguiente: *"SOBRE EL ESTUDIO REALIZADO POR EL LIC. TOMÁS EVANS SALAZAR. Este profesional procedió a efectuar un exhaustivo análisis denominado: estudio elaborado por el Licenciado Tomás Evans Salazar, miembro del Colegio de Profesionales en Ciencias Económicas, carné 11968, que se adjuntó como prueba pericial. De su análisis se pudo concluir: l. Se confirmó la información contable (registros contables y estados financieros auditados) con que se fundamentaron las estimaciones de los periodos del 31 de diciembre de 1990 al 31 de marzo del 2004. 2. Se corroboró que las tasas aplicables a los cálculos efectuados corresponden a tasas promedio calculadas y cuya fuente fue el Banco Central de Costa Rica. 3.*


Firmado digital de
ROSS NURIE DAVIS JAMES (FIRMA)
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

También se determinó que el enfoque de dicho estudio se hizo con criterio conservador, usando las herramientas de aplicación normal en materia de información prospectiva y retrospectiva, utilizando las fórmulas necesarias para determinar: - promedios, - valores futuros, - valores actuales, - estimaciones basadas en regresiones y otros. IV.- EN RELACION CON LA INVERSIÓN EN MAQUINARIA. La fórmula de cálculo del valor futuro de las inversiones registradas contablemente menos el precio de venta de la máquina rotativa y sus complementos, es la fórmula adecuada. Se hizo con fecha de corte del 31 de agosto del 2008. La tasa aplicada del 16,94% anual promedio, me parece que es razonable. Importe de este rubro US $ 2.582.156.00. Se comprobó pues, que el cálculo del monto reclamado por inversión en maquinaria por $2.582.156 es conecto y basado en una actualización a agosto del 2008 de su costo de adquisición menos el valor con que fue rematada la misma. También se concluyó que la referida inversión se realizó para atender los requerimientos técnicos de los contratos ICE- Consorcio GTE (luego Velizon) y de estas empresas con la actora. Por lo que su pérdida es un daño comprobado en el patrimonio de la actora originado en los hechos de esta demanda. V.- EN RELACIÓN CON LOS INCREMENTOS EN INVENTARIOS. Se calculó el valor futuro del incremento de la inversión realizada en inventarios comparando el promedio de los periodos 1997 al1999 con los niveles de inventario del periodo 2000 al 2004. Este cálculo se considera razonable. La fecha de corte que se consideró fue la del 31 de agosto del 2008. Asimismo la tasa anual promedio pasiva aplicable se consideró razonable. Importe de este rubro US $ 2.860.696.00. Se comprobaron como conectos y ajustados a la técnica, los cálculos para el monto reclamado por concepto de aumento de inventarios por $2.860.696.00. Coincido con el Lic. Evans que estas variaciones fueron producto de la inversión necesaria en capital de trabajo, para dar cumplimiento a los requerimientos de la contratación y por lo tanto su pérdida es un daño comprobado en el patrimonio de la actora originado en los hechos de la demanda objetó de este proceso. VI.- EN RELACIÓN CON LAS GANANCIAS NO REALIZADAS PARA EL PERÍODO 2004-2013, PARA COSTA RICA Y REPUBLICA DOMINICANA. Se revisó el cálculo de los valores futuros y presentes de los flujos de efectivo que la empresa hubiese generado con apego a los términos


Firmado digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

de la contratación y según la estimación de ingresos basada en los millares de páginas previstos, este cálculo se encontró conecto. La fecha de corte con que se hizo fue la del 31 de agosto del 2008. Se utilizó una tasa promedio del 2, 79 % anual y se usó una tasa de inflación promedio USA del 3,54% anual. La empresa THS, según pude constatar con vista a los estados financieros y a la realidad productiva y de cabal cumplimiento de los contratos que esta esperaba un horizonte estable y amparado a la práctica contractual, para continuar por el plazo del 2004 al2013 sin ninguna dificultad y en forma normal como se había venido sucediendo en los últimos 25 años. Importe de este rubro US $ 16.719.871.00. Se comprobaron como  correctos y ajustados a los principios contables y financieros generalmente aceptados, los cálculos y la determinación de los flujos previstos y no realizados de los directorios telefónicos de Costa Rica desde el periodo 2004 al 2013 por un monto neto de $8.806.872.00 hasta el 31 de agosto del 2008 (fecha del estudio). Se comprobaron como conectos los precios y plazos contractuales y las hojas de cálculo de las proyecciones de ingresos y costos y el resultado del daño y perjuicio cuantificado. Efectivamente se comprobó que conservadoramente, la empresa actora pudo haber contado con esos flujos netos de efectivo de no haber ocumdo los hechos que provocaron la terminación del contrato de elaboración de las guías telefónicas de Costa Rica por causas ajenas a ella. VII.- DE IGUAL FORMA SE COMPROBARON LOS FLUJOS PREVISTOS Y NO REALIZADOS DE LOS DIRECTORIOS DE REPÚBLICA DOMINICANA POR UN MONTO DE US $7.912.999,00, HASTA EL 31 DE AGOSTO DEL 2008. Y se consideraron correctos y ajustados a la técnica. Cabe señalar que si bien la empresa actora no contaba con un contrato por todo el plazo calculado, se pudo comprobar con base en los informes auditados y órdenes de compra de diferentes años que la empresa venía elaborando dichos directorios durante más de veinte años y el contrato de Costa Rica con el grupo GTE (luego Verizon) preveía la contratación de dichos directorios como proveedor preferente y coincidieron los hechos de este proceso con la venta de las operaciones de la corporación Verizon en República Dominicana, descritos anteriormente, para impedir que la empresa contara con esos flujos netos, que en circunstancias normales pudo haber recibido. Por lo tanto se considera razonable que dichos


Firma digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MEJIA A... GOMEZ...
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

montos constituyan daños y perjuicios en el patrimonio de la actora. VID.- EN RELACION CON LAS PÉRDIDAS REALIZADAS PARA EL PERÍODO 2004-2007. Se revisó el cálculo por el cual se llevaron a valor futuro las pérdidas resultantes para los periodos comprendidos entre el año 2004 y el 31 tle diciembre del 2007, este cálculo se consideró correcto. La fecha de corte con que se hizo fue la del 31 de agosto del 2008. Y la tasa aplicada fue igualmente del 2. 79 % anual promedio. Importe de este rubro US $ 7.237.068.00. Se comprobó entonces, como correcto y ajustado a la técnica el cálculo de la pérdidas realizadas del 2004 al2007 con un valor actualizado al31 de agosto del2008 de $7.237.068. Se pudo comprobar con base en los datos contables que dmante el 2004 y 2005 hay una reducción de los ingresos producto de lo arriba indicado, con la pérdida de confianza de otros clientes y la estructura de costos fijos de la empresa que llevan a las pérdidas incurridas. Todo lo cual permite establecer que esas pérdidas de la empresa actora se derivan de los hechos de la demanda objeto de este proceso. IX.- EN RELACION CON LOS INTERESES PAGADOS POR LA ACTORA Se revisó el cálculo de los intereses pagados al Banco Cuscatlán y a la empresa proveedora de Heildelberg según su fecha de registro contable, y sus importes fueron llevados al valor futuro, considerándose este cálculo correcto. La fecha de corte usada fue la del 31 de agosto del 2008 y se utilizó una tasa del 2.79 % anual promedio. Importe de este rubro US $983.825.00. Se verificó como correcto el cálculo de los intereses pagados a la empresa que fmanció la maquinaria rotativa Heidelberg Finance Corp. y al Banco Cuscatlán quien financió la compra de otra maquinaria y la actualización de su valor al31 de agosto del2008 por un valor de $983.825.00. Se consideró que dichos pagos fueron originados también en los requisitos técnicos de los contratos rescindidos por razones ajenas a la voluntad y responsabilidad de la empresa actora. X.- EN RELACIÓN CON LA INTERRUPCION DE OPERACIONES. Se usó la información de los estados financieros auditados para los años de 1991 a 1999, se proyectaron los flujos de efectivo que la empresa hubiese generado sin que mediara en sus operaciones la participación del contrato con Verizon. Este cálculo se consideró razonablemente conecto. Aquí cabe recalcar que siendo Verizon la cliente principal de THS y el contrato de 168 meses la base del negocio, en ausencia de este la empresa no tiene posibilidades


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

de continuar operaciones, por lo que se considera adecuada la utilización de la fórmula de la perpetuidad y que la pérdida del contrato no se dio por deficiencias o imputable a la autora. Importe de este rubro US $28.885.195.00. En otras palabras, se comprobó como correcto, ajustado a la técnica y · prácticas contables y financieras, el cálculo del monto reclamado por concepto de interrupción de operaciones por un valor al 31 de agosto de~ 2008 de US $28.885.195.00. Efectivamente la empresa tenía casi cien años de existencia cuando por hechos ajenos a su voluntad pierde el contrato de elaboración de los directorios telefónicos de Costa Rica que tenía contratados hasta por un periodo de 168 meses (14 años), los cuales venía elaborando durante esos mismos casi cien años. Se pudo verificar, con base en los registros contables e informes auditados, que por el peso de este negocio en sus operaciones y en su flujo de caja, la empresa no podía continuar operando sin el mismo. Asimismo y en virtud de lo estable de los resultados sus operaciones, medido tanto por la utilidad bruta como por la utilidad antes de intereses, impuestos, depreciación y amortización ( UAllDA) de los quince años previos a los hechos, es correcto calcular una perpetuidad de los flujos de efectivo de las operaciones de la empresa actora, como lo hizo el Lic. Evans y considerar como un daño en perjuicio de la actora la interrupción de sus operaciones centenarias. XI.- RESUMEN. El cálculo de daños y perjuicios por incumplimiento de contratos con Verizon Information Services Costa Rica, LLC, Verizon Information Services- Belice, LLC y GTE Directorios República Dominicana, C por A. elaborado por el Lic. Tomás Evans Salazar por un monto de $59.268.811.00 calculados al 31 de agosto del 2008 es correcto y exacto y fue elaborado de acuerdo a los principios contables y financieros generalmente aceptados y aplicando la técnica correcta". 2. No ha demostrado las partes demandadas lo contrario y por consiguiente procede la aplicación del artículo 317 del Código Procesal Civil, en tanto que les correspondía a ellas desvirtuar media prueba técnica que los montos fijados y los conceptos determinados no se ajustaran a la verdad o a la técnica aplicable. 3. Los cálculos de indemnización por inversión de maquinaria realizados por  el Lic. Tomás Evans Salazar en estudio aportado como prueba por la parte actora y ratificado por el perito judicial Ramón Humberto Romero Rodríguez, Contador Público Autorizado y Perito


Firma(s) digitales
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ULLOA MATTEY, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Actuario, sí contemplan la venta de la maquinaria. Así lo indica expresamente al señalar que en este caso se tomó en cuenta el "*Cálculo de valor futuro de inversiones registradas contablemente menos el precio de venta de la máquina rotativa y sus complementos*". 4. Las sumas determinadas en los documentos en mención, tanto de Evans Salazar como Romero Rodríguez se fundan en la técnica aplicable, son coincidentes y comprenden los rubros de maquinaria, incremento en inventarios, flujos de caja operativos según el contrato, pérdidas realizadas, intereses pagados y afectación por interrupción de operaciones. En este sentido, advierte este Tribunal que en los indicados documentos con respecto a la maquinaria se procedió a actualizar el costo del equipo y maquinaria a la fecha de la firmeza de la subasta judicial, así como los importes por depreciación de la misma, determinándose la pérdida, como diferencia entre el valor neto de la maquinaria al 30 de junio de 2007 (fecha del remate) y el precio de venta de la misma. Adicionalmente, se llevó a valor futuro las variaciones de inventario, se determinó los flujos previstos y no realizados efectivamente, proyectando el consumo de millares de páginas obtenidos entre el año 2000 y 2003, junto con otras variables de cálculo, con el fin de determinar cómo la no continuación del contrato afectó dicho concepto. Por otra parte, se llevó a valor futuro las pérdidas resultantes para los períodos entre 2004 y 2007, los cargos por concepto de intereses pagados a Banco Cuscatlán y la empresa Heidelberg y cuyos importes fueron llevados a valor futuro. Finalmente, se calculó la interrupción de operaciones, tomando en consideración, pronósticos matemáticos de los resultados de ingresos económicos para el período 2000-2014 con base en las tendencias del período 1991 a 1999. La parte demandada no objetó ni aportó prueba que desvirtuara, la metodología ni las fechas estimadas para valor futuro de las pérdidas realizadas, la tasas de interés aplicadas, proyecciones, cálculos, metodologías o las conclusiones obtenidas. Por lo anterior, este Tribunal no cuenta con elementos de convicción que permitan cuestionar los alcances de los documentos objeto de análisis. Consecuentemente procede reconocer los montos indicados por la parte actora y en el entendido que las sumas adicionales contempladas en el peritaje del Lic. Romero Rodríguez escapan del objeto del peritaje solicitado y de las pretensiones esgrimidas en la demanda, por lo que no


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MAYA CASTRO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

procede su reconocimiento. Al monto indicado, se le deberá deducir las sumas que se le hayan pagado a la actora por parte de Radiográfica Costarricense S.A., por concepto de cualquier contrato de elaboración de guías telefónicas que se haya realizado con posterioridad al rompimiento contractual por parte de Verizon Information Services Costa Rica LLC. Asimismo, estima este Tribunal oportuno deducir los montos correspondientes a lo siguiente:

| d) Flujos de Caja Operativos no recibidos 2004-2013 Directorios República Dominicana | $ 7.912.999 |
|---|---|

Lo anterior, en tanto que el contrato maestro no contemplaba directorios para ese país, como se advierte del texto del mismo y las alegaciones de la parte actora se dirigen al incumplimiento de dicho objeto contractual exclusivamente no hay prueba de otro contrato debidamente rubricado que haya sido incumplido por la misma causa petendi del presente proceso. Por consiguiente, se condena de manera solidaria a Verizon Communications Inc y Verizon Information Services Costa Rica LLC al pago de las indicadas sumas.

**V.XI.- Sobre los daños morales invocados:** Como parte de los daños puestos al cobro, la parte actora invoca la existencia de un daño moral fundado en los hechos que dan base a la demanda. Con relación al daño moral, conviene hacer las siguientes precisiones. El reconocimiento de la responsabilidad del Estado por daños puramente morales se encuentra implícito en la lectura complementaria de los artículos 9 y 41 de la Constitución Política, habida cuenta que en el primero no se realiza en ningún tipo de distinción con respecto a la responsabilidad del Estado y en el segundo, se hace expresamente referencia a la posibilidad de tutelar intereses "*morales*", entre los cuales, se encuentra la posibilidad de resarcir tanto el daño moral subjetivo, como el objetivo. Por otra parte, la Convención Americana de Derechos Humanos, dispuso sobre este tema: "*Artículo 11: 1. Toda persona tiene derecho al respeto de su honra y al reconocimiento de su dignidad. 2. Nadie puede ser objeto de injerencias arbitrarias o abusivas en su vida privada, en la de su familia, en su domicilio o en su correspondencia, ni de ataques ilegales a su honra o reputación. 3. Toda persona tiene derecho a la protección de la ley contra esas injerencias o esos*


Firmado digital de:
ROBERTO GARITA NAVARRO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

ataques." *Artículo 24: Todas las personas son iguales ante la ley. En consecuencia, tienen derecho, sin discriminación, a igual protección de la ley." "Artículo 5.1: Toda persona tiene derecho a que se respete su integridad física, psíquica y moral.*" Inclusive de manera previa a que entrara a regir la Constitución Política de 1949 o se aprobara dicha Convención a finales de la década de los 60, desde el siglo XIX, el numeral 59 del Código Civil preceptúa: "*Se establece el derecho a obtener indemnización por daño moral, en los casos de lesión a los derechos de la personalidad*" En materia del derecho administrativo nacional propiamente, el artículo 197 de la Ley General de la Administración Pública, dispuso: "*Cabrá responsabilidad por el daño de bienes puramente morales, lo mismo que por el padecimiento moral y el dolor físico causados por la muerte o por la lesión inferida, respectivamente*". No obstante lo anterior, procede realizar algunas precisiones sobre la materia, con base en la doctrina y sendas resoluciones judiciales emitidas en la materia, dadas las particularidades existentes con respecto a este tipo de daño, habida cuenta que en el caso del daño moral subjetivo, al afectarse la esfera más íntima del individuo, no pueden aplicarse las reglas comunes con respecto a la prueba del daño, cuando la afectación se realiza en el patrimonio del sujeto. En este orden de ideas, se ha dicho, "*Para probar el daño moral en su existencia y entidad no es necesario aportar prueba directa, sino que el juez deberá apreciar las circunstancias del hecho y las cualidades de la víctima para establecer objetiva y presuntivamente el agravio moral en la órbita reservada de la intimidad del sujeto pasivo. No creemos que el agravio moral deba ser objeto de prueba directa, pues ello resulta absolutamente imposible por la índole del mismo que reside en lo más íntimo de la personalidad, aunque se manifiesta a veces por signos exteriores que pueden no ser una auténtica expresión ... nadie puede indagar el espíritu de otro tan profundamente como para poder afirmar con certeza la existencia y la intensidad del dolor, la verdad de un padecimiento, la realidad de la angustia o de la decepción*" (Bustamante Alsina, "Equitativa valuación del daño no mensurable", 1990. p 655 y 656). Las anteriores consideraciones tienen como fundamento la apreciación de que el daño moral debe ser visto como *in re ipsa* o *en sí mismo*, dado que para tener configurado un perjuicio espiritual, no resulta necesario probar de manera


Firma digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DÍAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

directa, el sufrimiento o depresión exteriorizados hacia terceros, dado que implica más bien la alteración del equilibrio existencial de las personas, dentro de su ámbito más íntimo y no necesariamente dado a conocer o exteriorizado en toda su dimensión hacia terceros, en tanto que esto último está en función de la personalidad de cada individuo lesionado y partiendo de que las reacciones del humano tienen diversas formas y oportunidades de manifestación. Por lo anterior, en el caso de que se demostrara la existencia de una conducta (muerte de un ser querido, pérdida o lesión de un bien moral o patrimonial, afectación a derechos fundamentales, etc) que pudiere afectar el ámbito de intimidad de la persona -por provocar dolor, angustia, sufrimiento, etc-, se interpreta que necesariamente podría existir un daño moral, siendo así que la intensidad de éste y por ende el medio para su resarcimiento, se determinarán de conformidad con los criterios que a continuación analizaremos en este mismo considerando. Es entonces, en función de los derechos subjetivos menoscabados, que podemos hablar de la existencia de un daño moral, dado que éste se producirá ante la violación de alguno de los derechos inherentes de la personalidad y que por ende son considerados extrapatrimoniales. Es por ello, que se habla que el daño moral surge con el mero acaecimiento demostrado de la actuación formal o material de la Administración u omisión de actuación que vulnera dichos derechos, mas debiendo tomarse en consideración las particulares circunstancias del caso y la existencia de indicios que así evidencien su cumplimiento en un caso en particular. En este orden de ideas, conviene hacer referencia a lo siguiente:"*Siendo el agravio moral la consecuencia necesaria e ineludible de la violación de algunos de los derechos de la personalidad de un sujeto, la demostración de la existencia de dicha transgresión importará, al mismo tiempo, la prueba de la existencia del daño. La determinación de la existencia de un daño moral puede efectuarse de una manera tan objetiva como la comprobación de un agravio patrimonial. Se hace necesario a tal fin sólo confrontar un hecho con la norma jurídica que otorga a favor de un sujeto un derecho inherente a la personalidad, para comprobar si el primero constituye o no violación de lo preceptuado en la segunda..*" Brebbia Roberto. El Daño Moral. *Editorial Orbir.* En este orden de ideas, considera este Tribunal que conviene hacer


Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ...... ......, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

algunas precisiones con respecto al daño moral que serán plenamente aplicables para la resolución de la ejecución sometida a su conocimiento: En primer término, debe destacarse que en materia de daño moral hablamos de una **función compensadora** y no de la equivalencia buscada en el caso del daño material. Adicionalmente, no debe obviarse que el daño moral no escapa de la **certeza** con relación a que éste debe ser consecuencia de la actuación u omisión de la administración, así como debe ser cierto el interés lesionado de la persona que lo invoca. En este orden de ideas, se ha indicado lo siguiente:" *El daño moral no es el dolor, la pena, la angustia sino la minoración espiritual derivada de la lesión a un interés no patrimonial. Dicho detrimento existe aunque falte comprensión por parte del damnificado del perjuicio sufrido; en ausencia de lágrimas; inclusive cuando la víctima no se encuentre en condiciones físicas o "síquicas" para "sentir" pena, dolor o angustia (v.gr. una persona descerebrada). El disvalor subjetivo existe cuando la víctima haya "madurado" ese dolor y quizás, dejado de "sentirlo". Así concebida la cuestión, se advierte de inmediato que el daño moral puede derivar sus efectos hacia el futuro, con suficiente grado de certeza...*" (Daniel Pizarro Ramón Daño Moral. Ed. Hammurabi. Página 105). Esta certeza implica entonces que si bien el daño moral posee una naturaleza in re ipsa y hay afectaciones que por su propia naturaleza devienen en una lesión de tal naturaleza, tal y como se ha indicado, en determinadas circunstancias en que su alegación se genérica o haya sido delimitada en determinado sentido a la hora de ser precisado en la demanda, no implica una automaticidad tal que releve a la parte que se dice afectada, de su deber de aportar indicios que contribuyan a que el Juez pueda comprobar sus alcances en el caso en particular. Con respecto a la necesidad de la prueba indirecta en la determinación del daño moral, se ha indicado lo siguiente: "...*Esta Sala avala la existencia del daño moral, pero reitera que éste corresponde a un menoscabo a la esfera extrapatrimonial, en este caso el concedido fue el de tipo subjetivo, es decir, el puro o de afección, el cual se traduce en afecciones en las condiciones anímicas del individuo, si bien no requiere de prueba directa si necesita de prueba al menos indirecta que permita al juzgador su fijación....* **(voto 000290-F-S1-2014 de las diez horas cinco minutos del seis de marzo de dos mil catorce de la**


Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SEGUNDO MEDIO FIRMA, PEREZ FERNANDEZ ...
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**Sala Primera de la Corte Suprema de Justicia).** Por otra parte, el daño moral es de **orden personal**, en función de la afectación de un interés legítimo del afectado. Con relación a los alcances del daño moral en nuestro país, la Sala Primera en su voto N 112 de las 14 horas 15 minutos del 15 de julio de 1992, reiteradamente citado y aplicado por diferentes instancias jurisdiccionales, indicó: " *IV.- El daño constituye uno de los presupuestos de la responsabilidad civil extracontractual, por cuanto el deber de resarcir solamente se configura si ha mediado un hecho ilícito dañoso que lesione un interés jurídicamente relevante, susceptible de ser tutelado por el ordenamiento jurídico. El daño, en sentido jurídico, constituye todo menoscabo, pérdida o detrimento de la esfera jurídica patrimonial o extrapatrimonial de la persona (damnificado), el cual provoca la privación de un bien jurídico, respecto del cual era objetivamente esperable su conservación de no haber acaecido el hecho dañoso. Bajo esta tesitura, no hay responsabilidad civil si no media daño, así como no existe daño si no hay damnificado. Por otra parte, sólo es daño indemnizable el que se llega a probar (realidad o existencia), siendo ello una cuestión de hecho reservada al prudente arbitrio del juzgador. En suma, el daño constituye la brecha perjudicial para la víctima, resultante de confrontar la situación anterior al hecho ilícito con la posterior al mismo. V.- En muchas ocasiones se utilizan indiscriminadamente las expresiones "daños" y "perjuicios". Es menester precisar y distinguir ambos conceptos. El daño constituye la pérdida irrogada al damnificado (damnum emergens), en tanto el perjuicio está conformado por la ganancia o utilidad frustrada o dejada de percibir (lucro cesans), la cual era razonable y probablemente esperable si no se hubiese producido el hecho ilícito. VI.- No cualquier daño da pie a la obligación de resarcir. Para tal efecto, han de confluir, básicamente las siguientes características para ser un "daño resarcible": A) Debe ser cierto; real y efectivo, y no meramente eventual o hipotético, no puede estar fundado en realizaciones supuestas o conjeturables. El daño no pierde esta característica si su cuantificación resulta incierta, indeterminada o de difícil apreciación o prueba; tampoco debe confundirse la certeza con la actualidad, pues es admisible la reparación del daño cierto pero futuro; asimismo, no cabe confundir el daño futuro con el lucro cesante o perjuicio, pues el primero está referido a aquél que surge como una*



Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO RODRIGO ROJAS VARGAS, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

consecuencia necesaria derivada del hecho causal o generador del daño, es decir, sus repercusiones no se proyectan al incoarse el proceso. En lo relativo a la magnitud o monto (seriedad) del daño, ello constituye un extremo de incumbencia subjetiva única del damnificado, empero el derecho no puede ocuparse de pretensiones fundadas en daños insignificantes, derivadas de una excesiva susceptibilidad. B) Debe mediar lesión a un interés jurídicamente relevante y merecedor de amparo. Así puede haber un damnificado directo y otro indirecto: el primero es la víctima del hecho dañoso, y el segundo serán los sucesores de la víctima. C) Deberá ser causado por un tercero, y subsistente, esto es, sí ha sido reparado por el responsable o un tercero (asegurador) resulta insubsistente. D) Debe mediar una relación de causalidad entre el hecho ilícito y el daño. VII.- Dentro de las clases de daños, se encuentra en primer término el daño material y el corporal, siendo el primero el que incide sobre las cosas o bienes materiales que conforman el patrimonio de la persona, en tanto el segundo repercute sobre la integridad corporal y física. En doctrina, bajo la denominación genérica de daño material o patrimonial, suelen comprenderse las específicas de daño corporal y de daño material, en sentido estricto. La segunda parece ser la expresión más feliz, pues el daño corporal suele afectar intereses patrimoniales del damnificado (pago de tratamiento médico, gastos de hospitalización, medicamentos, etc.), ganancias frustradas si el daño lo ha incapacitado para realizar sus ocupaciones habituales (perjuicios), etc.. Esta distinción nació en el Derecho Romano, pues se distinguía entre el daño inferido a las cosas directamente (damnun) y el que lesionaba la personalidad física del individuo (injuria). En el daño patrimonial el menoscabo generado resulta ser valorable económicamente. VIII.- El daño moral (llamado en doctrina también incorporal, extrapatrimonial, de afección, etc.) se verifica cuando se lesiona la esfera de interés extrapatrimonial del individuo, empero como su vulneración puede generar consecuencias patrimoniales, cabe distinguir entre daño moral subjetivo "puro", o de afección, y daño moral objetivo u "objetivado". El daño moral subjetivo se produce cuando se ha lesionado un derecho extrapatrimonial, sin repercutir en el patrimonio, suponiendo normalmente una perturbación injusta de las condiciones anímicas del individuo (disgusto, desánimo, desesperación,


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

*pérdida de satisfacción de vivir, etc., vg. el agravio contra el honor, la dignidad, la intimidad, el llamado daño a la vida en relación, aflicción por la muerte de un familiar o ser querido, etc.). El daño moral objetivo lesiona un derecho extrapatrimonial con repercusión en el patrimonio, es decir, genera consecuencias económicamente valuables (vg. el caso del profesional que por el hecho atribuido pierde su clientela en todo o en parte). Esta distinción sirve para deslindar el daño sufrido por el individuo en su consideración social (buen nombre, honor, honestidad, etc.) del padecido en el campo individual (aflicción por la muerte de un pariente), así uno refiere a la parte social y el otro a la afectiva del patrimonio. Esta distinción nació, originalmente, para determinar el ámbito del daño moral resarcible, pues en un principio la doctrina se mostró reacia a resarcir el daño moral puro, por su difícil cuantificación. Para la indemnización debe distinguirse entre los distintos tipos de daño moral. En el caso del objetivo, se debe hacer la demostración correspondiente como acontece con el daño patrimonial; pero en el supuesto del daño moral subjetivo al no poder estructurarse y demostrarse su cuantía de modo preciso, su fijación queda al prudente arbitrio del juez, teniendo en consideración las circunstancias del caso, los principios generales del derecho y la equidad, no constituyendo la falta de prueba acerca de la magnitud del daño óbice para fijar su importe. La diferencia dogmática entre daño patrimonial y moral no excluye que, en la práctica, se presenten concomitantemente uno y otro, podría ser el caso de las lesiones que generan un dolor físico o causan una desfiguración o deformidad física (daño a la salud) y el daño estético (rompimiento de la armonía física del rostro o de cualquier otra parte expuesta del cuerpo), sin que por ello el daño moral se repute como secundario o accesorio, pues evidentemente tiene autonomía y características peculiares. En suma el daño moral consiste en dolor o sufrimiento físico, psíquico, de afección o moral infligido con un hecho ilícito. Normalmente el campo fértil del daño moral es el de los derechos de la personalidad cuando resultan conculcados."* Con base en lo anterior, se evidencia que en el caso del daño moral subjetivo, no se requiere de la existencia de una prueba directa, sino que le es aplicable determinados criterios que delimitan la discrecionalidad del juzgador, y que se desprenden de su propia naturaleza jurídica y  de los indicios


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO VARGAS VÁSQUEZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

aportados por la parte y que han sido desarrollados por la jurisprudencia nacional. Así, se pueden indicar los siguientes: **1).- Principios generales del derecho y la equidad:** En la resolución mencionada ut supra se establece como primer criterio delimitador, los principios generales del derecho y la equidad. **2).- Presunciones inferidas en el caso particular**: Como segundo criterio a emplear para la determinación de la existencia y alcances de un daño moral subjetivo, se ha hecho referencia a que el Juzgador puede hacer uso de las presunciones para su reconocimiento. En este sentido, la Sala Primera ha indicado: "*Al no poderse demostrar de modo preciso su cuantificación, esta queda al prudente arbitrio de por los juzgadores, sin que se requiera prueba concreta sobre su existencia, ya que su determinación se hace in re ipsa, lo que implica que es "consustancial o inherente a la lesión misma, va con la cosa, se entiende en principio como derivación del hecho o la conducta adoptada." (fallo 125-F-S1-2009 de las 15 horas 35 minutos del 5 de febrero de 2009). Sin embargo, para su reconocimiento es necesario que de la ponderación de todas las probanzas existentes en autos se logre colegir, aún de forma indiciaria o mediante presunciones, la aflicción subjetiva reclamada como consecuencia de la conducta acusada... Como se dijo supra la cuantificación del daño moral subjetivo no es factible estructurarla y demostrarla de manera precisa, de ahí la necesidad de establecerla a partir de las circunstancias propias del caso, los principios generales del derecho y la equidad. Los puntos enlistados no corresponden a pruebas concretas, pues se relacionan con características personales del actor y supuestas consecuencias de lo padecido por el accionante, ello hace que el recurrente mencione el precepto 417 del CPC atinente a las presunciones humanas. Sin embargo, tampoco puede establecerse que se trate de ese tipo de presunciones, ni que sean admisibles como prueba, pues para esos efectos deben resultar consecuencia directa, precisa y lógicamente deducida de un hecho comprobado, situación que no se observa y el casacionista no específica de cuáles hechos acreditados extrae los aspectos que menciona...*" **(voto 000295-F-S1-2014 de las once horas treinta minutos del seis de marzo de dos mil catorce de la Sala Primera de la Corte Suprema de Justicia).** En este orden de ideas, conviene acotar que para poder aplicar las


Firma digital de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO ULLOA QUESADA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

presunciones a un caso concreto como elemento de convicción de este Tribunal, se deben cumplir las disposiciones del artículo 417 del Código Procesal Civil, en tanto dispone lo siguiente: *"Artículo 417.- Presunción humana. Las presunciones humanas solo constituyen prueba si son consecuencia directa, precisa y lógicamente deducida de un hecho comprobado. La prueba de presunciones deberá ser grave y concordar con las demás rendidas en el proceso"*. Con respecto a la figura de la presunción, ha dicho, la Sala Primera de la Corte Suprema de Justicia lo siguiente: *"Para que exista una presunción como medio de prueba es necesario, en primer término, que se de un acontecimiento positivo o negativo, cierto del que ha de deducirse el que se quiere conocer. La existencia o inexistencia de este acaecimiento denominado en sentido amplio hecho base, o más técnicamente indicio, tiene que estar debidamente acreditado en el proceso para que asegure la viabilidad de la presunción. Así se deduce del artículo 417 del Código Procesal Civil: "Las presunciones humanas sólo constituyen prueba si son consecuencia directa, precisa y lógicamente deducida de un hecho comprobado". La Sala ha indicado que este tipo de presunción "...es el resultado del ejercicio de la discrecionalidad otorgada al juzgador para apreciar la prueba, derivando entonces la presunción de otros hechos que se han tenido por ciertos" (no. 848-F, de las 14 horas 45 minutos del 31 de octubre del 2001). Esta conexión, que debe ser directa y precisa, entre el hecho base o indicio y el acaecimiento que se pretende derivar (hecho consecuencia), se verifica con arreglo a normas puramente lógicas, a las reglas del criterio humano, tarea que lleva a cabo el Juez investido de poder discrecional según su conciencia y discernimiento. Es éste quien de modo exclusivo infiere de tal prueba un hecho o acto, según su convicción interna le inspire dentro de un marco de razonabilidad y racionalidad, en un prius lógico que no atente con la sana crítica, de ahí que, su juicio se mantiene, salvo se demuestre ser contrario a la evidencia que las pruebas ostentan, ya sea por mediar error de hecho o de derecho en su estimación respecto de los hechos base o indiciarios, o bien, que la inferencia raye en lo absurdo por contrariar el sentido común o los fenómenos naturales"* (sentencia no. 25-F-2007, de las 10 horas 45 minutos del 19 de enero de 2007) (la


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

negrita no es del original).(Sobre el particular, pueden consultarse entre otras, las

sentencias de la misma Sala no. 27 de las 10 horas 30 minutos del 5 de mayo de 1993, no. 217 de las 15 horas del 5 de mayo de 1999 y no. 848 de las 14 horas 45 minutos del 31 de octubre del 2001). **3) Criterios de racionalidad y proporcionalidad:** Con relación a la aplicación de estos criterios, se ha indicado lo siguiente: *"Conviene recordar que, cuando se indemniza el daño moral subjetivo, si bien no se trata de cuantificar el sufrimiento –que es inapreciable–, se procura fijar una compensación monetaria a su lesión, como mecanismo al cual puede acudir el derecho, para así reparar –al menos en parte– la ofensa causada (en ese sentido puede verse, entre muchas otras, la sentencia de esta Sala no. 1143-F-S1-2012 de las 9 horas 10 minutos del 13 de setiembre de 2012). El monto conferido debe surgir de una prudente valoración del juez, mediante la cual se evite caer en extremos de indemnizaciones exiguas, simbólicas o –por el contrario– excesivas; lo que impone resolver, entonces, conforme a la equidad y los principios de razonabilidad y proporcionalidad. Respecto de estos últimos se ha indicado: "lo razonable se opone a lo arbitrario y remite a una pauta de justicia con la cual se completa el principio de legalidad. Desde otro ángulo, el de proporcionalidad, se refiere a una correspondencia entre las circunstancias de hecho, los medios empleados y la decisión adoptada, […]." (Sala Primera, sentencia no. 1292-F-S1-2012 de las 9 horas 55 minutos del 11 de octubre de 2012). Es por ello que, en cuanto a la estimación del daño moral subjetivo, esta Cámara ha señalado: "La valoración del juez dentro de ese marco inexorable, permite que su cuantificación sea acorde a derecho y no lleve a indemnizaciones desproporcionadas que beneficien o perjudiquen injustificadamente a una de las partes. Es decir, deben guardar un justo equilibrio derivado del cuadro fáctico específico." (Resolución no. 4-F-S1-2012 de las 8 horas 50 minutos del 12 de enero de 2012). En virtud de lo anterior se ha dicho que: "ha de acudirse a la equidad y a la valoración de la gravedad de la falta cometida y deben tenerse en cuenta, también las circunstancias personales y repercusión subjetiva en la víctima (estado civil, edad, nivel cultural, grado de cohesión y convivencia familiar, entre otros)." (Sala Primera, sentencia no. 279-F-S1-2011 de las 9 horas 30 minutos del 17 de marzo de 2011; en similar sentido véase también la resolución no. 318-F-S1-2011 de las 9 horas 25 minutos del 31 de marzo de 2011)...*" **(voto 001045-F-S1-2013 de**


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO PIEDRA PATIÑO, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**las nueve horas cinco minutos del catorce de agosto de dos mil trece de la Sala Primera de la Corte Suprema de Justicia). 4).- La causalidad**: La causalidad del daño es otro criterio de naturaleza insoslayable, en tanto que la causa real de éste puede determinar los alcances y límites de la estimación reparadora. Esto se puede inferir claramente al indicarse lo siguiente: *"El daño moral subjetivo se otorga por la conmoción, angustia y la sensación de impotencia ocasionada, al verse imposibilitados de pedir ayuda médica y de seguridad, teniendo -quien se encontraba en mejor condición física- que caminar largas distancias en búsqueda de ayuda, descuidando no solo a los otros pasajeros heridos sino también el producto que transportaba, todo por la ausencia del servicio celular. Es decir, la falta de cobertura celular, así como la omisión de informar los problemas de recepción telefónica en el lugar de los hechos condujo como nexo causal al daño moral subjetivo traducido en angustia, conmoción e impotencia.."*
**(voto 000507-F-S1-2014 de las catorce del veintisiete de marzo de dos mil catorce de la Sala Primera de la Corte Suprema de Justicia).** Por consiguiente, debe advertirse que se ha aceptado que dentro del marco de la teoría de la responsabilidad de la Administración Pública, en tesis de principio, sería válido admitir la posibilidad de que el demandado puede probar la existencia de una de las circunstancias eximentes de responsabilidad establecidas en el artículo 190 de la Ley General de la Administración Pública, a saber, la fuerza mayor, la culpa de la víctima o de un hecho de un tercero; o inclusive probar su inexistencia o menor gravedad de lo invocada. Es así como se ha indicado que *"La cantidad que se fije, debe ser fiel reflejo de las circunstancias descritas en el expediente, para que resulte una suma apropiada, dado los problemas sufridos por el perjudicado, causados por los actos ilícitos penales o civiles del agente o de los agentes productores del daño. En razón de que esas presunciones son iuris tantum, admiten prueba en contrario, de lo cual debe ser sumamente diligente el demandado o sujeto activo del daño, ya que le corresponde la carga de la prueba para desvirtuar las presunciones de dolor, sufrimiento, mortificación o agravio y para ello puede acudir a cualquier tipo de prueba ordinaria."* (Montero Piña Fernando. El Daño Moral, Página 61. Impresión Gráfica del este). No sin advertir que alguna doctrina ha sostenido que cualquier daño producto de una


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

conducta lícita y normal, cuando el nivel de intensidad es excesivo, no procede ningún tipo de eximente. **5) La prudente apreciación del Juzgador**: Por otra parte, siempre dentro del orden de la proporcionalidad, se habla de la "*prudente apreciación del Juez*" del daño y su resarcimiento, de la siguiente manera: "*La prueba de este tipo de lesión es "in re ipsa", el monto debe fijarse de acuerdo con el prudente arbitrio y con base en los principios de razonabilidad y proporcionalidad. Al respecto, es importante recordar que la valoración del juez dentro de ese marco inexorable, obliga que su cuantificación sea acorde a derecho y no lleve a indemnizaciones desproporcionadas que beneficien injustificadamente a una de las partes. Es decir, deben guardar un justo equilibrio derivado del cuadro fáctico específico. No se trata, entonces, de cuantificar el sufrimiento, pues es inapreciable, sino de fijar una compensación monetaria a su lesión, único mecanismo al cual puede acudir el derecho, para así reparar, al menos en parte la afectación (al respecto puede consultarse el fallo no. 537 de las 10 horas 40 minutos del 3 de septiembre del 2003, según se cita en las resoluciones no. 845-F-2007 de las 10 horas 5 minutos del 23 de noviembre de 2007 y no. 001-F-S1-2009 de las 9 horas 5 minutos del 6 de enero de 2009). También, ha estimado esta Sala: "La determinación y cuantificación del daño moral subjetivo entonces, queda a la equitativa y prudente valoración del Juzgador, quien acude para ello a presunciones del ser humano inferidas de los hechos comprobados. La presunción humana es un juicio lógico del juez, en virtud del cual se considera probable un hecho, con fundamento en las máximas generales de la experiencia, que indican cuál es el modo normal como suceden las cosas y los hechos …" (resoluciones no. 878-F-2007 de las 8 horas 15 minutos del 14 de diciembre de 2007 y no. 001-F-S1-2009 de las 9 horas 5 minutos del 6 de enero de 2009 citadas en la sentencia no. 771-F-S1-2011 de las 13 horas 30 minutos del 30 de junio de 2011).* **(voto 000520-F-S1-2014 de las nueve horas ocho minutos del diez de abril de dos mil catorce de la Sala Primera de la Corte Suprema de Justicia).** De conformidad con lo anterior, el reconocimiento del daño moral debe realizarse en el entendido de que si bien no requiere prueba directa, los Juzgadores deben tener especial prudencia y proceder a su valoración bajo su razonable apreciación, bajo criterios de equidad, aplicando las presunciones del



Firmado digitalmente por
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

hombre inferidas de los elementos circunstanciales del caso de análisis, a efecto de determinar la procedencia y el quantum de la sentencia condenatoria por este extremo dentro de los límites de la razonabilidad y la proporcionalidad. Lo anterior, debido a que el daño moral no es para este Tribunal, producto de una fijación arbitraria de los Juzgadores, sino consecuencia misma del ejercicio valorativo que deberá realizar el Tribunal de la integralidad de los elementos descritos anteriormente en el contexto propio del caso de análisis, a fin de que cumpla la función compensatoria de su naturaleza jurídica y no implique un enriquecimiento sin causa para el que se dice afectado sin serlo o cuando, a pesar de que delimite las manifestaciones externas del mismo, no lo demuestre así en juicio, al menos con prueba indiciaria. La ausencia de una situación objetiva que *per se* implique una afectación moral, aunado a la carencia de indicios sobre los alcances de ésta, según lo delimitado por las partes, hacen que exista una ausencia de certeza sobre su existencia en la situación particular de análisis. Hechas las anteriores consideraciones, procede resolver por el fondo, la pretensión indemnizatoria mantenida por la parte actora. **b) Criterio del Tribunal respecto del daño moral pretendido:** La parte actora pide en su demanda, se le reconozca un daño moral subjetivo y objetivo con motivo de los hechos probados en el presente proceso, no obstante estima este Colegio que no resulta procedente, en tanto que la parte actora es una persona jurídica que como tal no sufre un daño moral subjetivo, habida cuenta que los que lo podrían haber sufrido, serían las personas que la conformaron y éstas no son actoras en el proceso. Adicionalmente, en todo caso, es menester indicar que no consta en autos prueba alguna que demuestre a manera de indicio, la existencia de algún tipo de daño moral subjetivo u objetivo ocasionado con motivo de los hechos que originan el presente proceso y la parte se limita a su invocación, mas sin aportar elementos de convicción respecto de su alcance y consecuencias. Llama la atención de que el señor Perito se atreva a realizar una determinación de daño moral subjetivo, sin contar con los conocimientos técnicos para su fijación y siendo así que además por la naturaleza del mismo, escapa en todo a su competencia y a la posibilidad de ser cuantificado materialmente apriori. Así las cosas, procede el rechazo de este extremo indemnizatorio.


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA DÍAZ, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

**VI.- Sobre la indexación e intereses solicitados:** La parte actora solicita lo siguiente: "*De conformidad con lo que dispone el artículo 123 del Código Procesal Contencioso Administrativo se concederá, además, la actualización de las sumas de la condenatoria para compensar la variación en el poder adquisitivo y se reconocerán Intereses de todas las partidas anteriores que se pagarán a partir del 30 de agosto del 2008 y hasta que se cancelen totalmente, que se calcularán de conformidad con lo que dispone el artículo 1163 del Código Procesal Civil*". Al respecto, de conformidad con el canon 123 del Código Procesal Contencioso Administrativo, sobre la sumas objeto de condena procede la indexación prevista consistente en la actualización del poder adquisitivo de los montos indicados, tomando como parámetro la tasa prime rate establecida para los bancos internacionales de primer orden. De igual manera, sobre estas partidas, debe aplicarse el interés legal previsto en el artículo 1163 del Código Civil, en lo que corresponde al componente de <u>utilidad neta</u>, rubros que deberán ser reconocidos desde el 30 de agosto del 2008 y hasta que se cancelen totalmente, según lo solicitado por la parte actora. Lo anterior, fundado en la línea jurisprudencial de la Sala Primera de la Corte Suprema de Justicia que indica, "*…en principio resulta factible reconocer de forma conjunta intereses (porcentaje de utilidad) e indexación (factor deflacionario), dado que tales aspectos son distintos y autónomos, por lo que no son excluyentes. Lo anterior, claro está, siempre que los réditos concedidos sean los netos, dado que el interés legal contiene agregado un rubro inflacionario. Además, es evidente, dichos extremos tratándose de obligaciones de valor, es posible concederlos a partir de la sentencia donde se estableció el monto debido y hasta su efectivo pago...*" (sentencia número 000293-F-S1-2016 dictada a las 09:45 horas del 07 de abril de 2016 y en sentido similar, sentencias 000990-F-02 de las 16:30 del 18 de diciembre del 2002; 107 de las 14:30 horas, 108 de las 15 horas, ambas del 10 de julio de 1992; 49 de las 15 horas del 19 de mayo de 1995; 131 de las 14:10 horas del 18 de diciembre, 144 de las 14:40 horas del 23 de diciembre, ambas de 1998 y 14 del 5 de enero de 2000, todas de la Sala Primera de la Corte Suprema de Justicia)

**VII.- Defensas previas:** Sin perjuicio de las defensas ya resueltas durante el curso del proceso y la de prescripción rechazada en considerandos anteriores, en su


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO SILVA CHACÓN, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

demanda las partes demandadas oponen las siguientes defensas:

A) VERIZON COMMUNICATIONS INC: Interpone la excepción de falta de derecho, falta de legitimación ad causan y procesum activa y pasiva.

1. Con respecto a las defensas de falta de legitimación ad causan y procesum activa y pasiva: Al respecto, procede rechazar las defensas de falta de legitimación, habida cuenta que la parte actora demuestra que la codemandada forma parte del grupo de interés económico "Verizon" suscribiente de una relación contractual incumplida con el ICE y de otro contrato incumplido dolosamente con Trejos Hermanos Sucesores.

2. Con respecto a la defensa de falta de legitimación ad procesum; debe rechazarse, dado que la parte actora demuestra tener poder suficiente para ejercer la representación legal respectiva.

3. Con respecto a la defensa de falta de derecho, por los motivos indicados anteriormente, procede acogerla parcialmente, únicamente en cuanto a los extremos no reconocidos en la presente sentencia.

B) VERIZON INFORMATION SERVICES COSTA RICA LLC interpone la defensa de falta de derecho: Por los motivos indicados anteriormente, procede acogerla parcialmente, únicamente en cuanto a los extremos no reconocidos en la presente sentencia.

C) El INSTITUTO COSTARRICENSE DE ELECTRICIDAD, opone las defensas de falta de legitimación activa y pasiva, falta de derecho.

1. Con respecto a la defensa de falta de legitimación pasiva, procede acoger la misma, por los motivos dichos anteriormente, al no mediar ninguna relación contractual entre el ente y la sociedad actora. Por ende, no existe una relación jurídico material, de naturaleza procesal que permita al actor demandar al ente accionado y de ese modo figurar como demandado dentro de esta causa.

2. Por innecesario se omite pronunciamiento sobre el resto de defensas opuestas por el Instituto Costarricense de Electricidad.

**VIII.-Costas**: El artículo 193 del Código Procesal Contencioso Administrativo establece que las costas procesales y personales se imponen al vencido por el solo hecho de serlo, pronunciamiento que debe hacerse incluso de oficio, al tenor del numeral 119.2 ibídem. En razón de no estarse las codemandadas Verizon


Firma digitale
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCIA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Communications Inc y Verizon Information Services Costa Rica LLC en los supuestos de excepción, procede la condena solidaria al pago de costas procesales y personales. Corresponde a la parte actora el pago de costas procesales y personales al Instituto Costarricense de Electricidad.

**POR TANTO**

Se rechazan las defensas de prescripción, falta de legitimación activa y pasiva y falta de legitimación ad procesum opuestas por las codemandadas Verizon Communications Inc y Verizon Information Services Costa Rica LLC y se acoge parcialmente la de falta de derecho opuestas por las mismas. Se acoge la defensa de falta de legitimación pasiva opuesta por el Instituto Costarricense de Electricidad. En consecuencia, se acoge parcialmente la demanda en todo aquello que se indica expresamente y se deniega en todo lo que no se acoja en la presente parte dispositiva. Por consiguiente, se resuelve lo siguiente: **A)** Se declara: **1.** Que el denominado "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A (que cambió su razón social a VERIZON INFORMATION SERVICES COSTA RICA, LLC) constituyó una sub contratación que empleó la contratista como medio de ejecución del contrato celebrado entre las firmas comerciales "GTE Information Services Incorporated", "GTE Directories Corporation" y "General Telephohe Directory Company C por A", empresas de los Estados Unidos de américa, con domicilio en el Estado de Delaware y con oficinas principales en la Ciudad de Dallas, Estado de Texas, que se identificaron como el "Consorcio GTE", y el INSTITUTO COSTARRICENSE DE ELECTRICIDAD, por la adjudicación a dicho Consorcio de la Licitación Pública No. 6378-T, promovida por el ICE, según acuerdo del Consejo Directivo del ICE, tomado en la sesión ordinaria número cinco mil ciento cincuenta y dos, celebrada el primero de febrero del dos mil, y refrendado por la Contraloría General de la República el 13 de diciembre del 2000. **2.-** Que la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE (cuyo nombre cambió a CONSORCIO VERIZON) provocó la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos


Firmado por de
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Hermanos Sucesores S.A. con General Telephone Directory Company, C por A." **3.** Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del contrato administrativo celebrado entre el INSTITUTO COSTARRICENSE DE ELECTRICIDAD y el CONSORCIO GTE. **4.** Que TREJOS HERMANOS SUCESORES S.A. no tuvo responsabilidad alguna en los hechos que provocaron la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. **5.** Que la extinción del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A. causó daños y perjuicios inmediatos y directos a TREJOS HERMANOS SUCESORES S.A". **6.** Que las empresas demandadas Verizon Communications Inc., Verizon Information Services -Costa Rica- LLC integran un grupo de interés económico, sucesor del grupo de interés económico denominado Consorcio GTE, a quien se adjudicó la Licitación Pública No. 6378-T, promovida por el ICE, que se ejecutó a través del "Contrato Maestro de Compra" suscrito el 28 de febrero del 2002 por la actora Trejos Hermanos Sucesores S.A. con General Telephone Directory Company, C por A." **7.** Que "VERIZON COMMUNICATIONS INCORPORATED" responde solidariamente con la segunda por todas las obligaciones contraídas por "VERIZON INFORMATION SERVICES -COSTA RICA- LLC" , con TREJOS HERMANOS SUCESORES SOCIEDAD ANONIMA" **8.-** Que las empresas demandadas Verizon Communications Inc. y Verizon Information Services -Costa Rica- LLC son solidariamente responsables de las consecuencias negativas sufridas por la sociedad actora, que se produjeron por la extinción del Contrato Maestro de Compra suscrito el 28 de febrero del 2002 con la actora Trejos Hermanos Sucesores S.A" **9.-** Que son ineficaces las cláusulas del CONTRATO MAESTRO DE COMPRA celebrado entre VERIZON y TREJOS HERMANOS SUCESORES relativas a la exoneración de responsabilidad civil de VERIZON por incumplimiento contractual, comprendiéndose dentro de esa nulidad, sobre todo, las cláusulas 24 y 28 de ese contrato, sin que este pronunciamiento se limite a ellas, pues comprende a todas las cláusulas exonerativas de responsabilidad civil que favorecieren a VERIZON. B) Se condena de manera solidaria a Verizon Communications Inc y Verizon Information Services


Firmado digitalmente
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA ÁVILA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

Costa Rica LLC a pagar a la sociedad actora, las siguientes sumas: 1. Por concepto de inversión en maquinaria: La suma de $2.582.156,00 (dos millones quinientos ochenta y dos mil ciento cincuenta y seis dólares). 2. Por concepto de incremento en inventarios: La suma de $2.860.696,00 (dos millones ochocientos sesenta mil seiscientos noventa y seis dólares. 3. Por concepto de Flujos de Caja Operativos no recibidos en el período 2004-2013 por concepto de Directorios Costa Rica, la suma de $8.806.872 (ocho millones ochocientos seis mil ochocientos setenta y dos dólares. 4. Por concepto de Pérdidas realizadas en el período 2004 a 2007, la suma de $7.237.068 (siete millones doscientos treinta y siete mil sesenta y ocho dólares). 5. Por concepto de intereses pagados, la suma de $ 983.825 (novecientos ochenta y tres mil ochocientos veinticinco dólares. 6. Por concepto de daños por interrupción de operaciones, la suma suma de $28.885.195 (veintiocho millones ochocientos ochenta y cinco mil ciento noventa y cinco dólares). C) Sobre la sumas objeto de condena procede la indexación prevista consistente en la actualización del poder adquisitivo de los montos indicados, tomando como parámetro la tasa prime rate establecida para los bancos internacionales de primer orden. De igual manera, sobre estas partidas, debe aplicarse el interés legal previsto en el artículo 1163 del Código Civil, en lo que corresponde al componente de utilidad neta, rubros que deberán ser reconocidos desde el 30 de agosto del 2008 y hasta que se cancelen totalmente. D) Corresponde a Verizon Communications Inc y Verizon Information Services Costa Rica LLC de manera solidaria, el pago de costas procesales y personales a la sociedad actora. E) Corresponde a la parte actora el pago de costas procesales y personales al Instituto Costarricense de Electricidad.

**Rodrigo Alberto Campos Hidalgo**

**Marianella Álvarez Molina**                    **Sergio Mena García**



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A

- Código Verificador -

PSKSOA47ICJ861



Firmado digital de:
RODRIGO CAMPOS HIDALGO, JUEZ/A DECISOR/A
SERGIO MENA GARCÍA, JUEZ/A DECISOR/A
MARIANELA ALVAREZ MOLINA, JUEZ/A DECISOR/A